UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA, )
                              )
          Petitioner,         )
                              )    Civil Action
v.                            )    No. 07-12060-GAO
                              )
JOHN CHARLES VOLUNGUS,        )
                              )
          Respondent.         )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


## **MOTION HEARING**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 28, 2007
2:45 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Mark J. Grady and Mark T. Quinlivan,
 3              Assistant United States Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts 02210
 5         On Behalf of the Petitioner

 6         FEDERAL DEFENDER'S OFFICE
           By: William W. Fick, Esq.
 7         408 Atlantic Avenue
           Suite 328
 8         Boston, Massachusetts 02210
           - and -
 9         SWOMLEY & ASSOCIATES
           By: Eric Tennen, Esq.
10         227 Lewis Wharf
           Boston, Massachusetts 02110
11         On Behalf of the Respondent

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        **P R O C E E D I N G S**

2           THE CLERK:  All rise.  The United States District

3     Court for the District of Massachusetts.  Court is now in

4     session.

5           Please be seated.

6           For a motion hearing, the case of the United States of

7     America versus John Charles Volungus, which is Docket 07-12060.

8     Will counsel please identify yourselves for the record.

9           MR. QUINLIVAN:  Good afternoon, your Honor.  Mark

10    Quinlivan on behalf of the United States.  With me at counsel

11    table is Mark Grady.

12          MR. FICK:  Good afternoon, your Honor.  William Fick

13    with the Federal Defender's on behalf of Mr. Volungus.  With me

14    is Eric Tennen of Swomley & Associates, CJA co-counsel in this

15    case.

16          THE COURT:  All right.  Mr. Fick, we have your motion

17    to dismiss.

18          MR. FICK:  Thank you, your Honor.  As the Court is

19    aware, this case is one of -- really a first of a handful in

20    the country under the new civil commitment provisions of the

21    Adam Walsh Act, which is the federal government's first foray

22    into the sort of brave new world of seeking to lock up,

23    potentially for life, people who are deemed sexually dangerous,

24    quote/unquote.  And there's been a tremendous amount of ink

25    spilled by both parties in district courts who have grappled

1    with these issues already on some of the constitutional issues

2    raised by this statute.  And unless the Court has particular

3    areas which it wishes to point the parties to, as an initial

4    matter I think I'll start with what are some of the chief

5    points of controversy in the district court decisions that have

6    come down so far.

7          THE COURT:  Okay.  Let me tell you one issue I want

8    you to skip.

9          MR. FICK:  Okay.

10          THE COURT:  And that's the equal protection one.

11          MR. FICK:  Okay.

12          THE COURT:  I've read the briefs on that.  I don't

13    think it's necessary to hear further argument on that.

14          MR. FICK:  I appreciate that.  Thank you, your Honor.

15          The first issue I want to address is that of the

16    standard of proof.  Essentially, the statute provides for all

17    matters under the commitment provisions that the standard of

18    proof is clear and convincing evidence.  And it's the

19    defendant's argument that that standard is inadequate given the

20    nature of what is at stake here; that, in fact, proof ought to

21    be beyond a reasonable doubt as a matter of due process.

22          And Judges Saris, in the *Shields* case, and Britt in

23    the *Comstock* case, have essentially reached a consensus among

24    them that the statute has a problem.  And they've split the

25    baby, in a way of speaking.  And that is that they have found

1    that the proof that the defendant committed a prior predicate

2    act, that is, a prior act of sexual violence or child

3    molestation, that that predicate for a dangerousness finding

4    must be proved beyond a reasonable doubt, but that in contrast

5    the proof of future dangerousness is okay if only by clear and

6    convincing dangerousness.  That's the finding of, I think, the

7    two most extensive decisions that have come down so far, Judge

8    Saris and Judge Britt.

9          And the basis for that split is derived from two

10   Supreme Court cases, the first being *Winship.*  That was the

11   case where the Supreme Court said a juvenile delinquency

12   proceeding, although civil, must be proven beyond a reasonable

13   doubt because it's very much like a criminal case.  And they

14   contrasted that to the *Addington* case where the Court found

15   that a civil commitment proceeding for someone who's a danger

16   to himself or others only has to be proven by a clear and

17   convincing standard.

18         And this distinction, I would admit, has a certain

19   amount of surface appeal; however, I would suggest that while

20   Judges Saris and Britt were correct to say that at a minimum

21   the predicate acts have to be found by beyond a reasonable

22   doubt, I don't think they went far enough in accepting clear

23   and convincing evidence on the future dangerousness question.

24   And that's because I think the reliance on *Addington* is

25   essentially misplaced.  The Walsh Act is very different in the

1    kind of civil commitment that it authorizes in contrast to the

2    state commitment statute that was at issue in *Addington*.

3         The first real distinction is one of stigma.  And the

4    *Addington* -- the discussion in the *Addington* case -- the

5    Supreme Court's discussion in *Addington* over *Winship* is very

6    instructive.  And what the Supreme Court said in -- in

7    *Addington* about *Winship* is that the key to *Winship* is that the

8    court saw no controlling difference in the loss of liberty and

9    stigma between a conviction for an adult and a delinquency

10   adjudication for a juvenile.

11        So in *Addington* they say we have a state mental health

12   commitment, don't have any kind of the criminal stigma attached

13   there; therefore, a lower standard of proof can apply.  And

14   that's very different from the kind of commitment that is at

15   issue in the Adam Walsh matter because we're not just talking

16   about generalized psychological mental illness that poses a

17   danger to self or others, but the actual designation of

18   somebody as sexually dangerous.  And I would suggest certainly

19   in terms of stigma that is at least as stigmatizing, perhaps

20   much more stigmatizing, than a criminal conviction.  And so

21   that's at least one reason why the *Addington* analogy really

22   does not or should not control here.

23        The second thing to point out is the nature of the

24   commitment itself is different.  *Addington* involved treatment

25   for an acute mental illness where the commitment proceeding was

1    initiated by the respondent's mother in part for his own

2    benefit, to prevent him from harming himself.  And that's very

3    different from the kind of commitment the Adam Walsh Act

4    envisions where you have essentially a Bureau of Prisons

5    committee person -- a Bureau of Prisons designee, no relation

6    to the defendant -- making a determination if the defendant

7    poses a danger not to himself but simply a danger to others.

8    And really treatment, to the extent there is any -- and we're

9    actually not aware of any the BOP has provided as yet.  It's

10   just an afterthought there.

11          So you're not talking about commitment brought by a

12   family member for an acute mental illness that poses some

13   immediate risk; instead, you're talking about really a

14   bureaucratic governmental commitment of a person, potentially

15   for life, for a risk that may play out over a period of ten or

16   15 or 20 years.  This is not somebody who is sort of incapable

17   of acting in a sane matter in the same way as a person who may

18   be committed under an ordinary mental health commitment

19   statute.

20          And the third thing I point out to really distinguish

21   *Addington* is that of the states who have instituted to date

22   commitment for so-called sexually dangerous persons, I think

23   over half of them, at least, have a beyond-a-reasonable-doubt

24   standard for all of the -- all of the determinations

25   thereunder.  The question has actually never before come before

1   the Supreme Court directly in regard to that kind of statute,

2   but it's worth noting that the *Hendricks* case, which is derived

3   from a Kansas statute, the only case that has been before the

4   Supreme Court, that statute did have a

5   beyond-a-reasonable-doubt requirement.  So while the Supreme

6   Court didn't pass on it at least implicitly, the only such

7   statute the Supreme Court has ever approved did have that

8   standard of proof as a base.

9        And so while I think Judges Saris and Britt were

10  correct to say the statute is defective, at least insofar as

11  there is no beyond-a-reasonable-doubt requirement on the

12  predicates, I think they should have gone farther to find that,

13  in fact, there ought to be a beyond-a-reasonable-doubt burden

14  of proof on the future dangerousness determination as well.

15       THE COURT:  Both *Winship* and *Addington* point to the

16  two impacts -- two kinds of impacts on the individual as a way

17  of recognizing what the interests of the individual is in the

18  process.  And in both cases they say it's the loss of liberty

19  and stigmatization.  They use the same terms and they come out

20  differently, which leads you to think that there's some other

21  difference between those cases than the fact that the person

22  being committed either as a delinquent or as a mental patient

23  is losing liberty and is being stigmatized in some way.  And I

24  guess I'll ask both sides this question:  What's the

25  difference?

1      MR. FICK:  I think -- as an initial matter I would be

2  inclined to take the Court at its word that it does have to do

3  with stigma and loss of liberty, and I think qualitatively

4  there really are important differences.  A juvenile delinquency

5  proceeding is like a criminal conviction; that has more stigma

6  than simply being deemed mentally ill.

7      Similarly, the loss of liberty from a juvenile

8  delinquency proceeding I think tends to be much longer and more

9  akin to what happens in a criminal case rather than in a

10  typical kind of mental health commitment where usually more

11  often, I think, it winds up being a very short stay in a

12  hospital until someone sort of gets back on their feet and goes

13  out again.

14      THE COURT:  Well, to the extent that in a non-sexually

15  dangerous case a mentally ill person might be committed for

16  precisely the same generic reason, that is, dangerousness to

17  himself or others, which could be a hint at violation of the

18  criminal law just as the sexual dangerousness is in this

19  statute.  Could it be, I guess, then, that the difference is

20  simply that one is categorized as a criminal proceeding and the

21  other is civil?

22      MR. FICK:  Well, except that the juvenile delinquency

23  proceeding in *Winship* was characterized as civil.  And the

24  court, I don't believe, made a finding that it was actually

25  criminal.  So they really were both civil proceedings just

1    like -- the government's position here is that this also is a

2    civil proceeding.  The real difference I think is being

3    sexually dangerous, or deemed sexually dangerous, certainly in

4    the conditions of today is far more stigmatizing than simply

5    mental illness, or even most kinds of criminal convictions, I

6    would suggest.  And empirically, most of the folks who have

7    been committed under civil sexually dangerous commitments

8    statutes in states -- very few, if any of them, have ever been

9    released.  So this really does, as a practical matter, portend

10   a potential lifetime commitment as opposed to a more

11   shorter-term commitment for an acute mental illness that might

12   have been what was at stake in *Addington*.

13          THE COURT:  Okay.

14          MR. FICK:  So moving on, the next real area of -- I

15   guess the next area I want to focus on, coming out of Judge

16   Saris' decision in particular, was the lack of a probable cause

17   hearing in the statute.

18          Essentially there's very little I can say to improve

19   on the findings in Judge Saris' opinion, but the bottom line is

20   that those committed under the statute -- or those certified

21   for commitment under the statute -- certainly those in the

22   first wave, as Mr. Volungus is, have now been held for a long

23   time beyond what their release date would have been.  And in

24   Mr. Volungus' case it is something along the order of ten

25   months.  And there is no requirement in the statute that the

1  government make any kind of initial showing that can be

2  challenged that there's any kind of probable cause to do that.

3         The government really doesn't, in its papers,

4  seriously argue that there is not a due process lay *[sic]*

5  implicating when someone like this is -- when someone is

6  detained in this fashion.  It seems to me the argument really

7  boils down to the government saying, "Well, the statute doesn't

8  prohibit a probable cause hearing."  The government could

9  provide some kind of a probable cause protection, but even if

10 the government did that -- and there's no indication that

11 that's intended or that's part of the regulations the BOP is in

12 the process of promulgating -- that's a far cry from a

13 court-instituted mechanism as part of the statute that is --

14 that would involve a neutral decision-maker looking at this at

15 an early stage.

16        THE COURT:  Would a certificate such as the one that

17 was filed in this case, if signed off on by a judicial officer,

18 suffice as a probable cause determination?

19        MR. FICK:  The certificate really says -- the

20 certificate, as filed in this case, really just says Mr.

21 Volungus is in BOP custody, and we've looked at the statute,

22 and we've decided he's sexually dangerous; therefore, we so

23 certify.

24        THE COURT:  Well, there's a little more than that.

25        MR. FICK:  There's a little bit more than that, but

1   those are the essential concepts.

2        And what I would suggest would be required for a

3   probable cause finding would be for there to be some kind of a

4   person with direct knowledge, for example, the examining BOP

5   psychologist to file something a little more substantive with

6   the Court that then could be challenged on cross-examination in

7   a probable-cause-type hearing, sort of analogous to what

8   happens in a criminal case.  If an agent comes in, submits an

9   affidavit, that can be a basis for probable cause, but the

10  agent typically is also then required to testify and submit to

11  cross-examination by counsel for the accused.

12        THE COURT:  We issue arrest warrants all the time on

13  affidavits.

14        MR. FICK:  An arrest warrant is issued; the person is

15  brought into custody.  But then before the case can continue,

16  before the defendant can continue, the person is entitled to

17  probable cause.  Certainly -- the courts have come down in

18  different numbers in terms of how many days is reasonable, but

19  certainly even under -- even in the best case under the statute

20  here, the statute itself envisions there could be up to 75 days

21  for a court-ordered evaluation to take place, which says

22  nothing about when the court actually must order a hearing, et

23  cetera.

24        THE COURT:  Well, I think time periods may be a

25  separate issue -- I guess that's what I'm trying to isolate

1    here -- from a showing of probable cause.  And what I'm

2    directly interested in is whether your concern is with the

3    level of information objective -- strike "objective" because

4    there will be a fight about that, I guess -- but the level of

5    information presented specifically with respect to a given

6    person to be detained and whether that is sufficient

7    information to establish probable cause as distinguished from

8    who makes the probable cause determination.

9         In other words, if you're -- is your argument that the

10   kinds of things that are said in this certificate are

11   insufficient substantively to constitute probable cause or

12   because they weren't approved by a judicial officer and only by

13   an executive officer?

14        MR. FICK:  I think certainly the -- several of the

15   basis -- several predicate elements of the statute are

16   certainly covered in a conclusory summary way in a

17   certification statement that the government has filed here.  I

18   would suggest that it ought to be a little bit more detailed in

19   the same way usually the courts require a bit more detail from

20   the affidavit.  Certainly rather than just a BOP bureaucrat

21   signing off on this, I think it would make sense, to the extent

22   there is a psychological diagnosis involved, the diagnosing

23   psychologist, presumably, ought to state from personal

24   knowledge the basis of the diagnosis, the basis of -- a little

25   more detail about the basis of the factual predicate and why

1    that leads to a conclusion of future dangerousness.

2         Certainly if there were an opportunity for

3    cross-examination before a neutral judicial officer, this

4    certification that has been filed might be a starting point.

5    And certainly those details may be able to be brought out on

6    cross-examination, although as a general matter I would suggest

7    that standing alone, even, that certification signed by a

8    person without personal knowledge of the different things that

9    are being certified to would not be sufficient.

10         So I guess the Court is quite right to break it down

11    that way.  There's a question of the content.  And I do have

12    issue with the content as it is.  There's a question about who

13    is the decision-maker.  And I think certainly at some point

14    there ought to be a neutral decision-maker and the opportunity

15    for cross-examination.

16         And the third question then does become one of timing.

17    And --

18         THE COURT:  When you say "a neutral decision-maker,"

19    does it have to be a neutral judicial decision-maker or could

20    it be a neutral executive decision-maker?

21         MR. FICK:  I would suggest it should be a judicial

22    decision-maker, and I think that the Supreme Court cases about

23    situations in which probable cause is required, it seems to me,

24    at least implicitly require that, and I think that would

25    certainly be the most efficacious way to handle it given the

1    existence of the positions and procedures we're all accustomed

2    to in criminal proceedings, which these are very -- you know,

3    whether they get there or not is another piece of this

4    argument, but they're simply similar in many respects.

5         In any event, I think Judge Saris really handled that

6    issue, at least in terms of the lack of that provision in the

7    statute, quite correctly and thoughtfully as a legal matter.

8         Then the question about this and the standard of proof

9    then becomes, "Well, if the statute is deficient, what is the

10   remedy?"  And for Judge Saris the remedy was to engraft,

11   essentially, modifications to the statute as a judicial matter

12   to save the statute.  And what I would suggest is that that, in

13   fact, is not the appropriate remedy here.

14        And the government, and to some extent Judge Saris,

15   relied upon principally the Supreme Court *Zadvydas* case which

16   is a case about whether the immigration laws warrant or justify

17   indefinite detention.  And what the Supreme Court found there,

18   no, there is no clear congressional intent to authorize

19   indefinite detention; therefore, we're going to read the

20   statute as not containing an authorization.

21        That's really a very different situation from what we

22   have here because we're not talking about a narrow

23   interpretation of congressional intent or not meting one part

24   of the statute out and meeting the rest.  What Judge Saris

25   essentially had to do to save the statute was to engraft things

1   on the statute that were not there and were contrary to

2   congressional intent.  Congress clearly said "clear and

3   convincing."  It didn't say "beyond a reasonable doubt."  You

4   can't just strike out "clear and convincing" and go forward.

5   What you would have to do is rewrite the statute and say

6   "beyond a reasonable doubt."  I mean, my suggestion to the

7   Court is that's not an appropriate thing for the Court to do;

8   that, in fact, if the statute is deficient, it ought to be

9   struck down, and if Congress wants to repass the statute in a

10   constitutional manner, they're free to do that.  But it's not

11   the place of the Court to edit the statute as it were rather

12   than simply striking pieces of it out.

13         And essentially the same is true as to the probable

14   cause hearing.  The statute doesn't provide for a probable

15   cause hearing.  For the Court to say we're going to do one and

16   that solves the problem, I think in terms of the practical

17   preservation of the right of the individual defendant, it may

18   go a little way toward at least reducing the prejudice to that

19   individual person, but it doesn't save the statute.  The statue

20   doesn't contain a probable cause determination; it provides for

21   essentially indefinite detention.  And it's not just a matter

22   of interpretation to say, "Well, we can do one," because it's

23   not there.

24         And so my bottom line to this suggestion to the Court

25   on that issue is that the real appropriate remedy, rather than

1   trying to amend the statute from the bench, is to say on these

2   grounds it's unconstitutional; it cannot stand.

3       I guess the stickiest issue that has come out of the

4   district court decision so far is the issue of the

5   congressional authority to pass the statute in the first place,

6   and that's the area where there's the clearest split of

7   authority so far between the *Comstock* case and the *Shields*

8   case.  It's also likely to be one that is rather esoteric and

9   is likely to vex the appeals courts in both places for a long

10  time and potentially can only be resolved in the Supreme Court.

11      But I would suggest there, not surprisingly, is I

12  think Judge Britt in North Carolina got it right.  The sort of

13  baseline here is that Congress can only enact statutes that are

14  a necessary and proper means to accomplish or to effectuate an

15  enumerated power.  Congress does have the enumerated power to

16  prosecute federal offenses, to promulgate federal offenses and

17  to arrange for the prosecution of those offenses.  And the

18  cases that the government and the courts in -- and the courts

19  have examined in litmus, the *Greenwood* case, the *Perry* case and

20  the *Salerno* case, none of them justify the kind of exercise the

21  federal power embodied in the ability to prosecute federal

22  crimes that the Adam Walsh Act seeks to do.

23      *Perry* and *Salerno* both concern the operation of the

24  Bail Reform Act which the courts found was authorized under the

25  enumerated power of prosecuting crimes for the purpose of

1    preventing the commission of specific federal crimes and to

2    prevent the violation of specific federal statutes; it does not

3    confer on the federal government a generalized general public

4    safety power to protect public safety by incapacitating anyone

5    who happens to come within its clutches.  There's, in fact,

6    even a line in *Perry* that says, "Congress may concern itself

7    with the safety of the community only to the extent that other

8    grants of specific power so permit."

9         And here there's essentially no nexus between the Adam

10   Walsh civil commitment provisions and the prosecution of

11   federal crimes.  There's no requirement that any predicate

12   offense be a federal crime.  There's no necessary finding that

13   any dangerousness in the future is a particularized dangerous

14   to commit a federal crime.  In other words, "sexually

15   dangerous" is defined in terms of difficulty in restraining

16   from engaging in sexually violent conduct or child molestation.

17        Most crimes of sexually violent conduct or child

18   molestation are classic state crimes, classic crimes within the

19   police power of the state to prosecute and not within the power

20   of the federal government.  The federal government's work in

21   the area of sex crimes, so to speak, is much more constrained,

22   specifically in terms of those crossing state lines to commit

23   certain offenses and downloading things, for example, from the

24   Internet, like child pornography.

25        And there's no requirement here that any finding of

1    future dangerousness be tied particularly to the likelihood

2    that a defendant will commit a particular federal crime is a

3    generalized dangerousness finding.  And so the suggestion that

4    it's not -- it's well beyond -- it's well beyond what is

5    necessary and proper for Congress to exercise its powers in

6    that area.

7          The final area I guess to address in terms of the

8    constitutional challenges is the question of whether this is

9    really a criminal statute or a civil statute, because obviously

10   if it's a criminal statute many of the criminal justice

11   protections -- constitutional protections that attach are not

12   provided for here.  And the touchstone is really the lack of

13   any provisions for treatment and the essentially punitive

14   nature of the statute.  That really is, I would suggest to the

15   Court, the touchstone in terms of trying to determine whether a

16   statute is de facto criminal or, in fact, civil.

17         And the Supreme Court in *Allen versus Illinois*

18   essentially defined a criminal law as one resulting in both a

19   regimen which is essentially identical to that imposed upon

20   felons with no need for psychiatric care.  And here we really

21   have nothing in the record to suggest the government or the BOP

22   has anything in place to treat the people who were -- any

23   people who are eventually committed under the statute.

24         The respondents like Mr. Volungus so far are being

25   held at Fort Devens with other federal prisoners in essentially

1    the same conditions that federal prisoners are held; perhaps,

2    in certain ways, conditions that are more restrictive.  No

3    treatment is being provided to him presently.  And so

4    essentially the statute is operating in a way that is punitive.

5    And whether it might operate in a way that is not punitive in

6    the future, certainly there's nothing in the record to suggest

7    that it will.  And I would suggest, then, based on what we know

8    about the statute and its operation right now, it is de

9    facto --

10           THE COURT:  All right.  You now have to get off of

11   that little detour for a moment because you seem to be shifting

12   from a facial attack to an as-played-out-in-the-real-world

13   attack, whatever that is.  The statute on its face says that

14   the attorney general shall place the person for treatment in a

15   suitable facility, all right?  So whether treatment is

16   effectively provided is, perhaps, a different question that is

17   affected by real-world events as the statute plays out.  But on

18   the face of it, the statute calls for treatment, doesn't it?

19           MR. FICK:  On the face of the statute, the provision

20   for treatment, I would suggest, is really just a throw-away

21   provision.  I mean, the word "treatment" is in there, but the

22   overall -- you can call it the gestalt or whatever of the

23   statute is we are going to incapacitate people who have done

24   bad things and we think are dangerous.  They are being

25   incapacitated by being held in a federal prison.  And I would

1    suggest that that is punitive in nature and therefore renders

2    the statute de facto criminal in nature and not civil, and

3    that, therefore, all the accompanying criminal due process

4    rights ought to attach.

5         I guess the final thing I would then address is -- and

6    it's unclear to me.  The Court may wish to address this in the

7    form of a separate *Daubert* hearing rather than as a part of

8    this challenge, but as part of the papers submitted to date,

9    the respondent had made a suggestion that -- with an affidavit

10   from a psychologist who has been in this field for many years,

11   that essentially the efficacy of even the best so-called

12   scientific actuarial instruments to produce some kind of

13   prediction about future dangerousness -- that even the best of

14   those instruments is sort of wildly -- is nowhere near accurate

15   enough to make any kind of finding by clear and convincing

16   evidence, and certainly not by a finding beyond a reasonable

17   doubt of future dangerousness.

18        The essential upshot of the affidavit of Dr. Kriegman

19   is that when you run these actuarial tables on people, when you

20   find someone is dangerous, you're likely to be wrong two-thirds

21   of the time.  When you find that somebody is not dangerous,

22   you're likely to be wrong one-third of the time.  And margins

23   of error that big are simply insufficient to commit somebody

24   potentially to prison for the rest of their life, one; and,

25   two, cannot survive the federal Rules of Evidence under *Daubert*

1 | *versus Merrill Dow Pharmaceuticals.*

2 |        THE COURT:  If that's true, isn't there sufficient

3 | protection in the standard of proof; that is, if the science is

4 | so weak, then wouldn't there be some difficulty in establishing

5 | that weak science by clear and convincing evidence?

6 |        MR. FICK:  Yes.  But I think that doesn't absolve the

7 | Court of its responsibility to conduct the *Daubert* threshold

8 | determination also.  And if, indeed, the science is so weak --

9 | the way it's framed in the motion to dismiss is that because

10 | the science is so weak a finding to the standard that even

11 | Congress is asking for is simply -- cannot be made, and

12 | therefore the statute ought to be struck down because it's

13 | requiring a finding to which a standard of proof that simply

14 | cannot be achieved and any attempt to achieve it would

15 | essentially undermine the defendant's rights by essentially

16 | causing a finding to have been made by a lower standard of

17 | proof.

18 |        So with that, I think I will rest on the papers and

19 | see what the government has to say, unless the Court has

20 | further questions.

21 |        THE COURT:  All right.  Thank you.

22 |        MR. FICK:  Thank you.

23 |        THE COURT:  All right, Mr. Quinlivan?

24 |        MR. QUINLIVAN:  Thank you, your Honor.  May it please

25 | the Court, if I might, I might address the issues that my

1    brother raised in reverse order.

2          I think the last thing can be disposed of fairly

3    quickly.  On the *Daubert* issue, it's clear that *Daubert* did not

4    establish any form of constitutional rule.  And that's clear,

5    as we noted in our brief, by the fact that states aren't

6    compelled to adopt the *Daubert* standard.  So what I would

7    suggest the respondent is trying to do is to have this Court

8    make a preliminary *Daubert* finding to justify a constitutional

9    rule, and that's -- it's premature and it's inappropriate.  And

10   as we've pointed out, in addition, every state that has

11   considered the state of the medical and scientific evidence has

12   concluded that it satisfies whether it be the *Daubert* standard

13   or the *Frye* standard, which several states also follow.

14         I would also point out that Dr. Kriegman effectively

15   impeaches himself.  We note that he has testified on numerous

16   occasions in Massachusetts state court using the very sorts of

17   analytical tools, the actuarial instrument, which he now says

18   he can't use.  It's not part of the record.  I would note that

19   in testimony before Judge Saris yesterday, he admitted in open

20   court that he had overstated that, his conclusion in his

21   affidavit, and that in some cases you can make a determination

22   about somebody's sexual dangerousness based on these methods.

23   So however you sort of parse out that argument, it's premature

24   and it utterly lacks merit.

25         I would suggest the question whether or not the

1  statute is civil versus criminal can also be readily

2  dispatched.  What the Supreme Court said in *Kansas v.*

3  *Hendricks* is that if the legislature, or Congress in this

4  instance, has made a determination as to whether it is civil or

5  criminal in nature, then the courts ordinarily will defer to

6  the legislature's intent, absent the most overwhelming evidence

7  that it was the opposite.

8       Now, here Congress has said that this is a civil

9  commitment proceeding.  It's put Section 4248 amongst other

10  civil-like statutes, 4245, 4246, involving, for example,

11  involuntary medication of an inmate in the control of the

12  Bureau of Prisons.

13       And if you compare the factors that the Court looked

14  at in *Kansas v. Hendricks* with this statute, it's clear that

15  this is a civil statute, there is no stand to requirement, it's

16  not punitive in nature, and as your Honor noted, this is a

17  facial challenge.

18       My brother points out that there has been no treatment

19  to date, but, in fact, neither Mr. Volungus nor anyone else has

20  actually been civilly committed pursuant to this statute to

21  date.  And so the suggestion that there's been no treatment

22  pursuant to the statute, when that ultimate conclusion hasn't

23  been made, I would suggest is misplaced.

24       THE COURT:  You say he hasn't been civilly committed.

25  You mean -- your position is that his release has been stayed?

1          MR. QUINLIVAN:  His release has been stayed.  He's

2     been certified but not committed.  And what the statute talks

3     about is treatment upon commitment.

4          So in any event, I would point out again that I think

5     it does sort of bleed into the kind of as-applied challenge,

6     which this case most certainly is not.  The respondent in this

7     case, and the others, chose to make this a facial attack on the

8     statute; and therefore, in our view the *Salerno*

9     no-set-of-circumstances test applies with respect to all of the

10    different constitutional plaintiffs.

11         THE COURT:  Let me just ask you about that because I'm

12    not sure -- I think that the -- to my reading, anyway, there's

13    some looseness of the use of the terms "facial challenge" and

14    "as-applied challenge" in the cases throughout numbers of areas

15    of controversy.  So I have one particular question about that

16    in this case.

17         Under the statute there are three categories of

18    persons in custody of the Bureau of Prisons who are liable to

19    the commitment.  This respondent falls in only one of those.

20         MR. QUINLIVAN:  That's right.

21         THE COURT:  And is it sufficient for a facial

22    challenge to focus on the one that he falls in in his

23    particular case?

24         MR. QUINLIVAN:  Well, I actually think that it is not.

25    I think that whether you look at it -- whether it's the

1    federal --

2          THE COURT:  So that if under the *Salerno* rule there is

3    no application of the statute to persons in his category that

4    could be constitutional, because there might be an application

5    to people unlike him in other categories, that that would

6    prevent a facial challenge --

7          MR. QUINLIVAN:  I think the only area where that

8    potentially makes a difference, based on my understanding of

9    the statute, is potentially on the federalism challenge.  I'm

10   not sure where, on any of the other challenges, that might make

11   a difference.

12         THE COURT:  Well, there might not be any difference

13   among the others.

14         MR. QUINLIVAN:  I would say even if your Honor were to

15   choose to adopt that the -- to look at the facial aspect with

16   respect to solely the category of people that the respondent

17   is, I think that there still is no difference.

18         And let me -- if I may, if I move to --

19         THE COURT:  Go ahead.

20         MR. QUINLIVAN:  For example, the probable cause

21   determination.  I think that Judge Tauro had that exactly

22   right.  On a facial challenge -- put aside the fact that the

23   respondent in this and other cases has self-consciously chosen

24   to delay any hearing, or not request a hearing or probable

25   cause hearing, pending the briefing of these challenges.  Now,

1    he has every right to change his mind and request a probable

2    cause hearing at any point.  I would point out to your Honor

3    that --

4           THE COURT:  To whom would he make the request?

5           MR. QUINLIVAN:  Well, I would -- one of the

6    respondents before Judge Saris made a request, and it was

7    referred to Magistrate Judge Bowler.  And a probable cause

8    hearing is scheduled for December 18th.  We also -- in the case

9    that we had a *Daubert* hearing in front of Judge Saris we

10   provided her with the -- under seal with the psychological

11   evaluation that formed, in part, the basis of the

12   certification, and she determined that probable cause was

13   found.

14       In this case, I would point out the respondent is not

15   unaware of that basis.  When these certifications were made, we

16   provided them immediately with the underlying documentation

17   upon which the certification was based including the

18   psychological evaluation that was sent to the review panel.

19   And if the respondent chose to request a probable cause

20   hearing, we provide that same information to the Court.

21         THE COURT:  So is it your view that, although the

22   statute makes no provision for a finding of probable cause

23   before the commitment -- using the "commitment" term broadly --

24   the fact that it might happen in a particular case because of

25   the ingenuity of the people involved is significant?

1      MR. QUINLIVAN:  It's not just that, your Honor.  I

2  think that on a facial challenge, as Judge Tauro noted -- I

3  think we start with the fact that these are amongst the first

4  cases that have been brought as -- after this statute was

5  passed last summer -- or two summers ago -- and necessarily

6  we're going to be dealing with a lot of difficult -- you know,

7  it was anticipated that several constitutional challenges would

8  be raised.

9      But there's nothing that would prohibit going forward;

10  that probable cause hearings, if a Court thought it was

11  necessary, could occur on a very fast track; or that the

12  hearings themselves might take place.  That upon certification

13  a court might order that an independent evaluation be conducted

14  and that a hearing could take place within a specified period

15  of time.

16      On a facial challenge you can't say that because --

17  you can't sort of look at the fact that it hasn't happened in

18  one individual case and therefore say --

19      THE COURT:  No, but the challenge -- there's no

20  provision for it.  It's not required to happen, is the

21  challenge --

22      MR. QUINLIVAN:  That's right.  That's right.

23      THE COURT:  And your answer to that is, "Well, it

24  might."

25      MR. QUINLIVAN:  And on a facial challenge, absolutely.

1    I think that there's -- it certainly could in certain cases,

2    and even again -- even if, as Judge Saris found, it was

3    necessary to have such a finding, the courts themselves could

4    engraft that requirement to save the statute.

5         I would suggest my brother's absolutely wrong when he

6    says that a court doesn't have that power, because whether on

7    the probable cause issue or the burden of proof, what the

8    Supreme Court said in -- I believe it's the *Alaska Airlines*

9    case, is that you can excise a portion of the statute upon

10   determining whether or not Congress would have preferred that

11   the statute go forward without that specific provision.

12        And it's abundantly clear here that Congress would

13   want this statute to survive even if there were a probable

14   cause requirement or even if the predicate determination about

15   whether somebody had committed a sexually violent act, or an

16   act of child molestation, whether that predicate act was

17   subject to a beyond-a-reasonable-doubt standard.  So that --

18   what Judge Saris did is in accord with widely accepted and

19   well-established Supreme Court authority.

20        If I might turn briefly to that standard, because I

21   think that what my brother's arguing is that not only should

22   the predicate finding be beyond a reasonable doubt, as both

23   Judge Saris and Judge Britt found, but that the ultimate

24   conclusion has to be beyond a reasonable doubt.  And that's

25   where the courts are in accord, because all of the courts that

1   have looked at this issue -- Judge Britt, Judge Tauro, Judge

2   Saris, and most recently Judge Degiusti's decision that was

3   just rendered Monday and that we filed with the Court

4   yesterday, have all found that under *Addington* the ultimate

5   conclusion here, clear-and-convincing-evidence standard

6   satisfies constitutional due process.

7          And importantly, *Addington* is the appropriate case to

8   analogize this to, because in contrast to *Winship*, when you're

9   just making a determination about whether or not somebody had

10  engaged in a criminal act, the determination about mental

11  illness or whether somebody's sexually dangerous to others

12  involves the application of some sort of psychiatric or

13  psychological judgment to facts.

14         And what the Supreme Court said in *Addington* was that

15  if you had -- given the importance of the government interest,

16  if you had a beyond-a-reasonable-doubt standard it may not be

17  the case that that's -- the government's interest could never

18  be established.  But they also pointed out that in contrast to

19  a criminal proceeding, these kinds of civil commitment

20  proceedings allow for the opportunity for the person to be

21  released should the underlying medical judgment change.

22         And that's exactly what the statute provides for here.

23  Subsection 4248(e) provides that the person shall be released

24  upon a determination that they're no longer sexually dangerous

25  to others, and Subsection 4247(h) allows for the respondent to

1    petition the Court to have a hearing in that regard.  And

2    that's something that all of the courts have pointed to in

3    concluding that the clear and convincing evidence standard with

4    respect to the ultimate conclusion, or judicial determination,

5    satisfies constitutional due process.

6            THE COURT:  Let me ask you the question I asked Mr.

7    Fick, and that is, how do you reconcile very similar

8    expressions in *Winship* and *Addington* and different results?

9            MR. QUINLIVAN:  I think that the best way to look at

10   it is the distinction which I hope I attempted to draw which is

11   that when you're looking at a juvenile delinquency

12   determination, it was not -- it was simply about whether a

13   particular act had taken place.  And the court in *Addington*

14   contrasted that to a situation where there has to be some sort

15   of predicate act to take place, but then a further

16   determination based on professional judgment as to whether in

17   the case the person was suffering from a mental illness, or in

18   this case whether somebody was sexually dangerous to others.

19           THE COURT:  That explanation would support Judge

20   Saris' conclusion that there are two standards of proof, one

21   related to the historical act and one related to the prognosis.

22           MR. QUINLIVAN:  It would.  And I --

23           THE COURT:  So *Winship* might govern part of the case

24   and *Addington* might govern another part?

25           MR. QUINLIVAN:  I think that's what both Judge Saris

1    and Judge Britt have concluded.  You know, I think our view is

2    that *Addington* should control across the board, but I think the

3    most important question is whether the ultimate question is

4    subject to the clear-and-convincing-evidence standard.

5           And even if your Honor were to conclude that those

6    courts were correct, that the predicate determination had to be

7    beyond a reasonable doubt, again, the question is what would

8    Congress have wanted in these circumstances.  Would they have

9    wanted the statute to have risen or fell on whether or not the

10   predicate act was subject to something more than clear and

11   convincing evidence or would they have wanted the statute to

12   survive and allow for a higher burden of proof?

13          And Judge Saris so concluded -- actually, Judge Britt

14   never engaged in that analysis.  He just rendered the

15   conclusion that you had to have that standard; and, therefore,

16   it's unconstitutional.

17          THE COURT:  Well, he also ended the case.

18          MR. QUINLIVAN:  That's right.  That's right.

19          THE COURT:  He didn't have to go any further.

20          MR. QUINLIVAN:  He didn't.  And obviously he had

21   another finding too which would have ended the case as well.

22          THE COURT:  Right.

23          MR. QUINLIVAN:  So turning briefly, if I could get to

24   the federalism challenge.  I think this is quite similar to the

25   Supreme Court's decision in *Salerno* and the Third Circuit's

1   decision in *Perry* regarding the Bail Reform Act.  And I think

2   what's most instructive -- my brother focuses on the fact that

3   the -- the statute doesn't necessarily protect against future

4   federal crimes.  But importantly, the Bail Reform Act does not

5   either.  And I think what's particularly noteworthy is Justice

6   Marshall's dissent in *Salerno*.  Because in Footnote 4 of his

7   dissent, he makes the very point that the respondent makes

8   here.

9        I quote that Justice Marshall argued, "Preventing

10  danger to the community through the enactment and enforcement

11  of criminal laws is indeed a legitimate goal, but in our system

12  the achievement of that goal is left primarily to the states.

13  The Constitution does not contain an explicit delegation to the

14  federal government of the power to define and administer the

15  general criminal law.  The Bail Reform Act has not limited its

16  definition of dangerousness to the likelihood that the

17  defendant poses a danger to others through the commission of

18  federal crimes."  And he emphasized "federal" in that finding.

19       Now, admittedly, the Supreme Court's decision in

20  *Salerno* was a substantive due process decision.  It wasn't a

21  federalism challenge.  But notwithstanding Justice Marshall's

22  dissent, that statute was upheld.  And when the federalism

23  challenge was presented to the Bail Reform Act, which was the

24  *Perry* case, the Third Circuit unanimously concluded that it

25  survived under the necessary and proper clause because Congress

1  has the power to criminalize the underlying conduct and through

2  the necessary and proper clause has the power to ensure against

3  future commission of federal crimes.

4      I'm not sure --

5      THE COURT:  Both of those cases dealt with people who

6  were charged with federal offenses.

7      MR. QUINLIVAN:  That's right.  And I would say that

8  that is a difference here but it's not a difference that in our

9  view is significant because in this case you have -- everyone

10 who's subject to the act is in federal custody.  It's not as if

11 the federal government --

12     THE COURT:  But with respect to Mr. Volungus that begs

13 the question, because he would not be in federal custody but

14 for the act.

15     MR. QUINLIVAN:  Well, that certainly is true.  But

16 nobody can be certain --

17     THE COURT:  Well, if somebody else were in the other

18 two categories they would be.  They might well be.

19     MR. QUINLIVAN:  They might well be.  That's right.

20     THE COURT:  If they want, if we can call it that --

21     MR. QUINLIVAN:  But anyone who -- the only people who

22 can be certified under the act are those who are in federal

23 custody.  Now -- at the time --

24     THE COURT:  My point is with respect to Category 1,

25 that begs the question, because they're only in federal custody

1   by virtue of the operation of the act, and the act's operation

2   can't form its own justification.

3            MR. QUINLIVAN:  No.  And I would respectfully

4   disagree, your Honor, because you can't be certified under the

5   act unless you're in federal custody.  Ultimately there are

6   going to be some people, like the respondent, who their

7   sentence was about to expire, they were certified, and then

8   they remain in federal custody pending the hearing on whether

9   or not they're sexually dangerous to others.

10           But the important point is that you can't -- you

11   can't -- the act is not triggered unless somebody is in federal

12   custody.  It may not be that they're in federal custody because

13   of a sexually violent crime or a child molestation crime, but

14   they're in federal custody.  And so I would suggest that that

15   aspect of the statute parallels what you have in the Bail

16   Reform Act in *Salerno* and in *Perry*.

17           Your Honor, we -- I just --

18           THE COURT:  Well, so let me just -- I'm not sure I've

19   completely understood your argument on the enumerated powers.

20   What is the enumerated power that the act is a proper and

21   necessary effectuation on?

22           MR. QUINLIVAN:  It would be the commerce clause power

23   to criminalize the different either child molestation crimes or

24   sex crimes.  It would be any of the several federal crimes

25   dealing with -- you know, obviously having an interstate

1    element --

2           THE COURT:  How about lewd and lascivious behavior

3    within a school zone?  If there were a federal crime --

4           MR. QUINLIVAN:  If there were a federal crime.

5           THE COURT:  -- the power would extend to that?

6           MR. QUINLIVAN:  Well, that --

7           THE COURT:  It would?

8           MR. QUINLIVAN:  Well, it would beg the *Morrison*

9    question, obviously.

10          THE COURT:  Well, it would beg *Morrison* and *Lopez*.

11          MR. QUINLIVAN:  That's right.  That's right.  But,

12   again, we're dealing with -- I mean, there certainly may be --

13   the statute might -- an individual who might be determined to

14   be sexually dangerous to others might in the future engage in a

15   sex crime within state borders, and so it's not subject to

16   federal regulation, but --

17          THE COURT:  There's no requirement that the historical

18   finding of the two-part findings here has to be a federal

19   offense.

20          MR. QUINLIVAN:  No; that's right.

21          THE COURT:  So your federal custody argument is on the

22   unrelated -- at least not necessarily related prior crime that

23   puts him in Bureau of Prisons' custody in the first place, not

24   any sexually dangerous crime necessarily.

25          MR. QUINLIVAN:  Well --

1        THE COURT:  He could be in the Bureau of Prisons'

2   custody on bank robbery and the statute would apply.

3        MR. QUINLIVAN:  The statute would apply if -- that's

4   right, if he has a prior -- if he either -- that's right.  If

5   there's a prior act of sexually dangerousness or child

6   molestation.  That's right.

7        THE COURT:  Is it your federalism argument, then, that

8   the enumerated power depends on the predicate -- the prior

9   offense that put him in federal custody in the first place

10  rather than the sexual crimes?

11       MR. QUINLIVAN:  I think when I'm focusing on the fact

12  that once in federal custody, I'm trying to point out that this

13  isn't sort of a general federal police power to -- you know,

14  that anyone in the community who's determined to be sexually

15  dangerous to others might come within the auspices of the

16  statute.

17       Yes.  In the Bail Reform Act you had to have committed

18  certain specified federal crimes.  In this statute you have to

19  be in Bureau of Prisons' custody and have to have committed a

20  prior at least sexually dangerous act, or an act of sexual

21  molestation.  There is a difference, but I would suggest it's

22  not a distinction that makes a difference for purposes of

23  whether or not the Congress' intention of protecting the

24  community from somebody who might commit a future federal

25  crime; that that is not a distinction but renders it obsolete

1    under the necessary and proper clause.

2         And again, you know, that's the conclusion that not

3    only did Judge Tauro and Judge Saris find, but importantly, in

4    reaching a contrary conclusion, Judge Britt focused, in large

5    part, on the application of the Tenth Amendment which really

6    cannot come into play here in the sense that a respondent has

7    no standing to make a Tenth Amendment challenge.  And the

8    differences between this statute and the 4246 with respect to

9    what the attorney general does in terms of the interplay with

10   the states I would suggest don't render the statute in any way

11   suspect for purposes of the Tenth Amendment.

12        THE COURT:  But as I understand you, it is the fact of

13   federal custody that permits this statute which authorizes an

14   extension of custody.

15        MR. QUINLIVAN:  That's right.

16        THE COURT:  And it doesn't matter what the reason for

17   the original federal custody is.

18        MR. QUINLIVAN:  That's -- in the sense, yes, that

19   somebody could be in federal custody for something that is not

20   either sexually violent conduct or child molestation.

21        THE COURT:  So the statute in your -- my question:  In

22   your view does the statute, because it's anchored to that

23   perhaps unrelated federal interest -- the statute doesn't need

24   justification under the enumerated powers of the necessary and

25   proper clause, it's simply -- it's a piggyback to some other

1   existing authority?

2           MR. QUINLIVAN:  Yes.  Well, yes.

3           THE COURT:  I mean, that sounds like what your

4   argument boils down to.  I don't want to --

5           MR. QUINLIVAN:  Well, Congress clearly has the

6   authority to prosecute certain sex crimes.  Whether -- it may

7   not be that the individual -- and prevent certain sex crimes

8   and crimes involving sex with children.  It may not be that a

9   particular individual is in federal custody because they

10  committed such an act but they are in federal custody by virtue

11  of some act.  And Congress does have the power, yes, to prevent

12  the commission of those acts under the necessary-and-proper

13  clause.

14          THE COURT:  A person who is then -- who finishes his

15  term and is released, then if Congress were to enact a statute

16  that says that he could be taken into custody and federally

17  committed because he might commit, in the future, some federal

18  sex crime, would that be constitutional under the enumerated

19  powers?

20          MR. QUINLIVAN:  I haven't thought that one through,

21  your Honor.  I think that that would be --

22          THE COURT:  Well, what I'm trying to do is break the

23  link between existing custody because I want to see how strong

24  that link is, I guess.  In other words, that -- well, that it

25  is not necessary, or it's -- it came out the wrong way -- to

1    analyze the statute without the federal custody link, and

2    therefore, it is the federal custody link that supports the

3    statute.  But I don't -- I'm not trying to distort your

4    argument; I just want to make sure I understand it.

5          MR. QUINLIVAN:  Yeah.  Your Honor, I have to say, I

6    haven't thought through that, nor do I think the department has

7    taken a position on that.  I think it would be a more difficult

8    question than that presented here.

9          If I could sort of break it down, I think the fact

10   that somebody is in federal custody, I think, mitigates any of

11   the federalism Tenth Amendment, as Judge Britt would have

12   concerns that he expressed, that, you know, the federal

13   government would -- pursuant to the statute potentially could

14   commit anyone.  And I don't -- the statute is narrowed in that

15   respect and, as I think Judge Saris found, can be viewed almost

16   as a catch-all.  There are people who are -- most states, not

17   all -- several states have civil commitment statutes.  There

18   may be people in federal custody who should -- if found to be

19   by clear and convincing evidence to be sexually dangerous,

20   should be held as well.  And Congress wanted to have that extra

21   layer of protection.  The states still have --

22         THE COURT:  That's the question, though:  Can Congress

23   just do what the states do?

24         MR. QUINLIVAN:  No.  No.

25         THE COURT:  They can't.

1          MR. QUINLIVAN:  No.  But I guess I'm going back to the

2     distinction between *Salerno* and *Perry* with respect to the Bail

3     Reform Act.  Does the analysis change simply by virtue of the

4     fact that somebody in those cases had committed a specified

5     federal crime?  In this case everyone who's subject to the act

6     has committed some federal crime to be in federal --

7          THE COURT:  Or has been charged with.

8          MR. QUINLIVAN:  Or been charged with.  That's right.

9          And that is -- and so the argument is, yes, Congress

10    does have -- Congress has authority to charge or to prosecute

11    or to prevent the commission of certain sex acts.  And the

12    question is:  Under the necessary-and-proper clause can they do

13    so even if the person in federal custody hasn't necessarily --

14    the reason they're there isn't necessarily because of the

15    sexually violent or child molestation?  Nonetheless, Congress

16    has provided that you have to have -- somebody has to have

17    engaged in such an act for the act to be triggered itself.

18         I recognize there's a distinction, your Honor.  I

19    would suggest that Judge Saris and Judge Tauro had it right,

20    that it's not enough of a distinction to render this

21    unconstitutional under the necessary-and-proper clause.

22         THE COURT:  Let me ask you one final question which

23    Mr. Fick did not address, I don't think -- it's in his brief --

24    and that is the vagueness of the terms.

25         MR. QUINLIVAN:  Your Honor, I think that we are

1   arguing with a -- I mean, obviously one of the questions your

2   Honor has to decide is whether or not this is a civil or

3   criminal statute.  But if your Honor concludes with the -- I

4   think everyone who has looked at it to date, that it is a civil

5   statute, you go to the *Village of Hoffmann Estates* test for

6   vagueness, and I think it easily satisfies that.  And I think

7   we pointed out in our brief the states, in construing similar

8   terms, have unanimously concluded that like terms satisfy any

9   sort of form of constitutional vagueness or due process.

10          THE COURT:  Okay.

11          MR. QUINLIVAN:  Thank you, your Honor.

12          THE COURT:  Mr. Fick, any brief rebuttal?

13          MR. FICK:  Very briefly, your Honor.

14          I think it's really quite extraordinary the notion

15   that the necessary-and-proper function can be piggybacked

16   strictly on the fact of federal custody.  And as I was sitting

17   here, a different kind of thought experiment came to mind, and

18   that is, suppose someone is in federal custody for bank robbery

19   or something, he's an alcoholic and recidivist OUI.  You know,

20   does that -- it's the government's position that under the

21   necessary-and-proper clause, Congress would have the authority

22   to say, "Well, you know, this guy's going to go out and

23   recidivate driving under the influence.  We think that's

24   dangerous.  Keep him in federal custody because, hey, maybe he

25   might drive in the Charlestown Navy yard and not just on state

1   highways."  And this is really, I think, an analogous kind of

2   piggyback they're trying to do here.  And I think it's really

3   extraordinary and it's certainly beyond what the Constitution

4   ought to allow.

5        The final thing I want to do is briefly address the

6   *Salerno* facial challenge question that you asked at the

7   beginning that I didn't address.  I think the first thing I

8   would point out is that I think the viability of *Salerno* is

9   clearly in question after *Chicago v. Morales.*  Even the Supreme

10  Court seems to say, "Well, you know, we're not necessarily

11  going to apply this test all the time."  But, in fact, in

12  *Lopez, Morrison* and the *RAV versus St. Paul* cases, statutes

13  were invalidated based on facial challenges without even really

14  invoking the kind of *Salerno* test.

15       The other thing I would suggest -- or say is -- to

16  distinguish *Salerno, is* that the real question in *Salerno* is

17  whether the Bail Reform Act could operate constitutionally;

18  whether it had the right to due process protections attached.

19  And there you had this no-circumstances-possibility kind of

20  test whereas the question here is really different.  It's not

21  "Can the statute operate constitutionally"; it's "Did Congress

22  have the authority to pass it in the first place?"  And that's

23  the kind of question -- the constitutional question that really

24  sort of precedes ever getting to a *Salerno* kind of analysis.

25       And I think the final thing to say on that is that the

1   Court is quite right to focus on Mr. Volungus as being in one

2   category of offenders, those in BOP custody pursuant to a

3   sentence.  Even if there might be some constitutional

4   application as to the other classes, the Court can certainly

5   look at this case as an as-applied challenge to the

6   circumstance Mr. Volungus is in.  There's no dispute about the

7   facts or the nature of that class of people.  And so there

8   really is no reason not to treat this as a limited as-applied

9   challenge if the Court feels it has to do so to reach the

10  issue.

11          Other than that, I think I would leave it there.

12          THE COURT:  All right.

13          MR. FICK:  Thank you, your Honor.

14          THE COURT:  Thank you both.  I'll take it under

15  advisement.

16          MR. QUINLIVAN:  Thank you.

17          (The proceedings adjourned at 3:44 p.m.)

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

3    the United States District Court, do hereby certify that the

4    foregoing transcript constitutes, to the best of my skill and

5    ability, a true and accurate transcription of my stenotype

6    notes taken in the matter of Civil Action No. 07-12060-GAO,

7    United States of America v. John C. Volungus.

8                        /s/ Marcia G. Patrisso
9                        MARCIA G. PATRISSO, RMR, CRR
                         Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25