**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Petitioner,<br>v.<br>JOHN C. VOLUNGUS,<br>Respondent. | ) | Civil Action No. 07-12060-GAO |

# GOVERNMENT'S TRIAL BRIEF

## I. INTRODUCTION

This civil action was commenced under the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006) (the "Adam Walsh Act"), by the January 17, 2007 certification of the Bureau of Prisons ("BOP") that Respondent John C. Volungus ("Volungus"), who was then approaching the end of his federal prison sentence, is a "sexually dangerous person." Dkt. No. 1; see also, 18 U.S.C. § 4248(a).

This Court must now determine whether there is clear and convincing evidence that Volungus is a sexually dangerous person, as defined under the Adam Walsh Act. See 18 U.S.C. § 4248(a) and (d). The government expects to prove that Volungus is a sexually dangerous person who must be civilly committed because (1) he has attempted to engage in child molestation and/or sexually violent conduct, as evidenced by convictions for use of an interstate facility to entice a minor to engage in sex; (2) he suffers from a serious mental illness, abnormality, or disorder, namely, pedophilia; and (3) as a result of his pedophilia, Volungus would have serious difficulty in refraining from child molestation or sexually violent conduct if released. See 18 U.S.C. § 4247(a)(5)-(6).

## II. RELEVANT PROCEDURAL BACKGROUND

On January 31, 2007, the BOP certified that Volungus is a "sexually dangerous person." Dkt. No. 1; see also, 18 U.S.C. § 4248(a). The certification both requires the district court to conduct a hearing to determine if Volungus is a sexually dangerous person and stays Volungus's release from the BOP until such a determination is made. Id.

Volungus has retained two experts in this case, Dr. Leonard Bard and Dr. Robert Prentky. The government's expert is Dr. Amy Phenix. Each of the three experts has prepared a written report, which the parties contemplate admitting into evidence. Volungus's experts, Drs. Bard and Prentky, are expected to testify at trial that Volungus is not a sexually dangerous person. The government's expert, Dr. Phenix, will testify at trial that Volungus is a sexually dangerous person.

## III. LEGAL PRINCIPLES

As defined in the Adam Walsh Act, a "sexually dangerous person" is "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others . . . ." 18 U.S.C. § 4247(a)(5). The BOP regulations define "sexually violent conduct"as "any unlawful conduct of a sexual nature with another person ('the victim') that involves:

> (a) The use or threatened use of force against the victim;
>
> (b) Threatening or placing the victim in fear that the victim, or any other person, will be harmed;
>
> (c) Rendering the victim unconscious and thereby engaging in conduct of a sexual nature with the victim;

(d) Administering to the victim, by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance, and thereby substantially impairing the ability of the victim to appraise or control conduct; or

(e) Engaging in such conduct with a victim who is incapable of appraising the nature of the conduct, or physically or mentally incapable of declining participation in, or communicating unwillingness to engage in, that conduct."

28 C.F.R. § 549.92 (2008). The regulations define "child molestation,"for purposes of certification, as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. §549.93 (2008).

"Sexually dangerous to others," in turn, "means that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Commitment proceedings under the Adam Walsh Act are civil, as opposed to criminal, proceedings. See U.S. v. Shields, 522 F. Supp. 2d 317, 338 (D. Mass. 2007); Kansas v. Hendricks, 521 U.S. 346, 369 (1997). Given this statutory context, the government must show that:

1. Volungus has engaged or attempted to engage in sexually violent conduct or child molestation in the past;

2. Volungus currently suffers from a serious mental, illness, abnormality, or

disorder;[1] and

3. As a result of a serious mental, illness, abnormality, or disorder, Volungus would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

The government must demonstrate by "clear and convincing evidence" that Volungus is a sexually dangerous person. See 18 U.S.C. § 4248(d). The clear and convincing evidence standard is higher than the "preponderance of the evidence" standard typically used in civil cases, and requires the government to prove its contentions are "highly probable." Colorado v. New Mexico, 467 U.S. 310, 316 (1984); John W. Strong, ed., 2 McCormick on Evidence, Law of Evidence § 340, (West Group 1999).

## IV. ARGUMENT

### A. Volungus has engaged or attempted to engage in sexually violent conduct or child molestation in the past.

The evidence will show that Volungus meets the first element of the Adam Walsh Act, that is, that he has engaged or attempted to engage in sexually violent conduct or child molestation in the past. Volungus's criminal convictions involve receipt of or possession of child pornography, as well as attempting to engage in a sexual act with a person under 18 years of age, though his sexually deviant behavior covers a wider range of activities.

[1] The government must establish a current serious mental illness, abnormality, or disorder. As the Supreme Court has recognized in a civil commitment context, however, "[p]revious instances of violent behavior are an important indicator of future violent tendencies." Hendricks, 521 U.S. at 358 (quoting Heller v. Doe, 509 U.S. 312, 323 (1993)).

- From roughly May through August 22, 1998, Volungus would download and view child pornography from 5 p.m. to midnight on weekdays and from 5 p.m. to 6 a.m. on weekends.

- Volungus reported masturbating approximately two to three times per week while viewing pornographic images of minor females, who were 13 to 14 years of age, and adults engaging in sexual activity with animals.

- Volungus reported having internet conversations with other females under the age of 18 and placed advertisements in chatrooms to meet younger females for sexual acts. He reported talking "dirty" to minors and masturbating during chat sessions.

- Between August 8, 1998 and August 17, 1998,Volungus had unsolicited internet conversations with an undercover law enforcement officer to whom he claimed he was a "real-life pedophile" and asked to be introduced to a 14 year old sibling named "Sarah" in order to have sex with her and take photographs of the acts. Volungus additionally described other sexual relations he had engaged in with ten-year-old, 12-year-old, and 14-year-old females.

- On August 18, 1998 and August 20, 1998, Volungus knowingly persuaded and induced an undercover law enforcement officer, who was portraying herself as a 14-year old named "Sarah," to engage in a sexual act, through internet and telephone communications.

- On August 22, 1998, Volungus coordinated to meet "Sarah," and he planned to perform sexual acts with her and volunteered to bring her lingerie and alcohol. He met "Sarah" and her sister at the agreed upon location and time, where he was arrested. He was arrested on eight counts; Count 1: Use of Interstate Facility to Attempt to Persuade Person Under 18 Years of Age to Engage in a Sexual Act, Count 2: Possession of Child Pornography, Counts 3-7: Receipt of Child Pornography in Interstate Commerce by Computer, and Count 8: Criminal Forfeiture.

- Volungus was sentenced to 53 months in prison for Counts 1-7, to run consecutively. Additionally, he was required to forfeit his computer, equipment manuals, memory storage, and miscellaneous pornographic pictures previous downloaded onto his computer.

- Volungus was placed on supervised release for three years upon his release from prison. This order also included provisions prohibiting him from possessing a firearm and a computer during the period of supervised release.

- Volungus reported having approximately 8,000 images of child pornography on his computer, in addition to 4,000 to 5,000 images that he had deleted. These pictures included children ranging from 18 months to 18 years of age engaged in sexual contact with other children and adults.

- Volungus reported sexual attraction to pre-pubescent females to the degree that he would avoid watching television because of fear that commercials with children might come on.

- On February 12, 2002, prison staff discovered in Volungus's locker self-drawn depictions of adult males engaging in sexual acts with children, articles about incest, and a book that reference sex with children and child pornography.

- On April 12, 2004, during supervised release, images of young children engaging in sexual activity as well as other pornographic images were found on Volungus's computer.

- On June 29, 2005, Volungus pled guilty to violating the terms of his supervised release when found in possession of child pornographic images on his computer and for having had unauthorized contact with a person under the age of 18. Volungus was then returned to BOP for 23 months to be followed by an additional 13 months of supervised release.

In addition to past attempts at sexually violent conduct or child molestation, Volungus also has engaged in the following non-sexual violence:

- In 1985 or 1986, Volungus was convicted of disturbing the peace for "playing with cap pistols" during his freshman year of college.

- In 1993, Volungus was convicted of assault and battery with a dangerous weapon while serving in the military. Volungus admitted to wielding "an object" at another officer, but claimed he was provoked and did not hit the officer. Volungus lost 45 days pay, received 45 days extra work, and was reduced in rank.

Past non-sexual offenses are a component of several actuarial instruments used in assessing sexual recidivism, including the Static-99. Studies have shown that "having a history of violence is a predictive factor for future violence." Andrew Harris, et al., Static-99 Coding Rules Revised - 2003, p. 27, available at www.cdcr.ca.gov. Further, "[t]he presence of non-sexual violence predicts the seriousness of damage where a re-offence to occur and is strongly

indicative of whether overt violence will occur." Id.

**B. Volungus currently suffers from a serious mental, illness, abnormality, or disorder.**

Volungus acknowledges a sexual attraction to females as young as 11 or 12, and meets the diagnostic criteria for pedophilia. Pedophilia "involves sexual activity with a prepubescent child (generally age 13 years or younger)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: Text Revision 535, 571 (4th ed. 2000) ("DSM-IV-TR"). The DSM-IV-TR lists the following diagnostic criteria for pedophilia:

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B. The person has acted on those sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.

DSM-IV-TR at 572. Volungus described himself as having pedophilia and has admitted to masturbating to child pornography. While in prison, Volungus created child pornography by drawing pictures of children having sex with men.

**C. As a result of his pedophilia, which is a serious mental, illness, abnormality, or disorder, Volungus would have serious difficulty in refraining from sexually violent conduct or child molestation if released.**

The final element required for civil commitment under the Adam Walsh Act is that, as a result of his serious mental illness, Volungus "would have serious difficulty in refraining from sexually violent conduct, if released from confinement." 18 U.S.C. § 4247(a)(6). Congress did not further define or explain the phrase "serious difficulty in refraining from," therefore, this Court is left with the plain meaning of the words used. In Hendricks, however, the Supreme

Court recognized that the Kansas civil commitment statute required only proof of the respondent's *risk to reoffend* if released. 521 U.S. at 357 (noting statute required proof of "likelihood" of committing sexually violent conduct)."[2] Thus, the statute does not require proof that the a particular respondent will reoffend, as Congress presumably recognized such a burden is impossibly high, but rather requires an assessment of the risk a respondent presents of reoffending.

The government expects the evidence will show, through expert testimony and accompanying documents, that, given his history and pedophilia diagnosis, Volungus will have serious difficulty in refraining from sexually violent conduct and/or child molestation if released. The government will present evidence that Volungus is at a high risk to reoffend on the basis of actuarial tools, namely the Static-99 and RRASOR. The government also will present evidence that Volungus re-offended almost immediately while on supervised release.

**1. Volungus's scores on Actuarial Risk Assessments place him in the Moderate-High risk category.**

It is generally accepted in the sex offender field that validated actuarial risk assessment instruments provide a more accurate and reliable assessment of a sex offender's likelihood of reoffending than even the best and most experienced clinical judgments. See United States v. Shields, 2008 WL 544940, *2 (D. Mass. Feb. 26, 2008) (finding that actuarial risk assessments are reliable under Daubert, in part because they "are generally accepted as a reliable methodology within the relevant scientific community and they have been subject to peer

---

[2] The government has not found a state civil commitment statute that uses precisely the same language as the Adam Walsh Act, but the wording of the Kansas civil commitment statute is similar and is the statute examined by the Supreme Court in Hendricks. The statute "establishes procedures for civil commitment of persons who, due to a 'mental abnormality' or a 'personality disorder,' are likely to engage in 'predatory acts of violence.'"). Kan. State. Ann. §59-29a01, et seq. (1994).

review"). Actuarial instruments, however, are but one piece of a larger risk assessment that also includes a practical consideration of dynamic risk factors, such as cooperation with supervision and sexual self-regulation, as well as protective factors, such as advanced age.

The Supreme Court of Illinois considered the use of actuarial risk assessment instruments in a case that questioned their admissibility under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). See In re: Commitment of Stephen E. Simons, 213 Ill.2d 523, 821 N.E. 2d 1184 (2004). The court concluded: "[W]hether or not actuarial risk assessment is subject to Frye, there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law. As of this writing, experts in at least 19 other states rely upon actuarial risk assessment in forming their opinions on sex offenders' risks of recidivism." Simons, 213 Ill.2d at 535, 821 N.E. at 1192 (citations omitted).[3]

In considering the risk assessment instruments and the established rates of recidivism, terminology, again, is important. The rates of recidivism associated with the different scores are what experience and research have established as the rates at which all male sex offenders with particular scores will recidivate over different periods of time. The rates should not be viewed as a prediction of whether any particular sex offender will reoffend, and that is certainly not what the Adam Wash Act requires this Court to determine. Risk assessment reoffense rates are most helpful when viewed in light of the dangerousness "element" of the statute, which requires this Court to determine, among other things, whether Volungus would have serious difficulty in

[3] As the Adam Walsh Act was enacted in 2006, and state civil commitment statutes for sex offenders have existed in many states for a long time, almost all reported decisions are from state courts. The Simons case from the Supreme Court of Illinois is particularly instructive, as the opinion includes a thorough review of case law from other jurisdictions with sex offender civil commitment statutes, as well as the literature in the sex offender field, in arriving at its holding that risk assessment instruments such as the Static-99 are admissible on the issue of sexual dangerousness.

refraining from sexually violent conduct or child molestation if released. If Volungus credibly falls within the moderate risk category of sex offenders by one or more validated risk assessment instruments, the government contends that such evidence is a strong indication that he meets the dangerousness "element" of the Adam Walsh Act.

The government's expert, Dr. Phenix, scored Volungus on three different actuarial instruments: the Static-99 Revised (Static-99R), the Static-2002 Revised (Static-2002R), and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R). Volungus received a score of 5 on the Static-99R, placing him in the Moderate-High Risk category for being charged or convicted of another sexual offense. See Phenix Report, p. 33. A score of 5 projects a 19.6% risk of recidivism in 5 years and 27.7% risk in 10 years. Volungus's scores on the Static-2002R and the MnSOST-R place him in the Low-Moderate and Low risk categories, respectively.

**2. Even considering dynamic and mitigating factors, Volungus's pedophilia still would cause him serious difficulty in refraining from sexually violent conduct or child molestation if released.**

In addition to scoring three actuarial instruments, Dr, Phenix also considered dynamic and protective risk factors. Dr. Phenix determined that Volungus has poorly controlled sexual self-regulation as measured by his high sexual preoccupation, lack of cooperation with supervision, and his significant impulsivity in seeking out risky behavior. He also did not progress well in sex offender treatment, being consistently rated as unacceptable. Volungus himself admitted that he "showed up" for sex offender treatment but did not meaningfully participate. He never completed treatment because his supervised release was violated for possession of child pornography and inappropriate contact with a minor, his 5 year-old niece, and Volungus returned to prison.

Volungus's scores on the actuarial instruments, coupled with his own admissions that he had masturbatory fantasies of girls under 9 years old and his most significant sexual interest was towards girls between the ages of 8 to 12 years old, show that he will have serious difficulty in refraining from sexually violent conduct or child molestation if released.

## V. CONCLUSION

For the foregoing reasons, and based on the evidence admitted at trial, the government respectfully requests that this Court find that Volungus is a sexually dangerous person and civilly commit him to the custody of the Bureau of Prisons.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: *_/s/ Jennifer A. Serafyn_*
Jennifer A. Serafyn
Assistant United States Attorney
United States Attorney' Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated: January 14, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants by First Class Mail.

*/s/ Jennifer A. Serafyn*
Jennifer A. Serafyn
Assistant United States Attorney

Dated: January 14, 2011