UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
    )
    Petitioner,    )
    )  Civil Action
v.    )  No. 07-12060-GAO
    )
JOHN C. VOLUNGUS,    )
    )
    Respondent.    )
    )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DAY ONE**
**BENCH TRIAL**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, January 31, 2011
9:57 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Mark J. Grady, Assistant U.S. Attorney
3            Jennifer Serafyn, Assistant U.S. Attorney
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        On Behalf of the Petitioner

6        FEDERAL DEFENDER'S OFFICE
         By: William W. Fick, Esq.
7            Ian Gold, Esq.
         51 Sleeper Street
8        Fifth Floor
         Boston, Massachusetts  02210
9        On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D -E X

2                    DIRECT  CROSS  REDIRECT  RECROSS
   WITNESSES FOR THE
3    PETITIONER:

4  MONICA FERRARO, PH.D.

5      By Mr. Grady            44
       By Mr. Fick                    78
6

7

8                      E X H I B I T S

9  PETITIONER'S        DESCRIPTION          FOR ID   IN EVD.

10 Exhibit A      Static-99                    52

11 Exhibit 61A    Document Bates-stamped 1534   75

12 JOINT

13 Nos. 1 through 62                                    10

14

15 OPENING ARGUMENT BY MR. GRADY.........................PAGE 11

16 OPENING ARGUMENT BY MR. GOLD.........................PAGE 26

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court

 2   before the Honorable George A. O'Toole, Jr., United States

 3   District Judge, United States District Court, District of

 4   Massachusetts, at the John J. Moakley United States Courthouse,

 5   One Courthouse Way, Boston, Massachusetts, on January 31,

 6   2011.)

 7              THE CLERK:  All rise.

 8              (The Court enters the courtroom at 9:57 a.m.)

 9              THE CLERK:  United States District Court for the

10   District of Massachusetts.

11              Please be seated.

12              For a bench trial in the case of United States of

13   America versus John Charles Volungus, 07-12060.

14              Will counsel identify yourselves for the record.

15              MR. GRADY:  Good afternoon, your Honor.  On behalf of

16   the United States, Mark Grady.  And with me is Jennifer

17   Serafyn.

18              MR. FICK:  Good morning, your Honor.  William Fick for

19   the Federal Defender for Mr. Volungus.  Also here is Ian Gold.

20              THE COURT:  Okay.

21              MR. FICK:  We have one sort of housekeeping issue,

22   your Honor.  I guess an evidentiary issue is that Mr. Volungus'

23   parents are here, and we had also anticipated calling one or

24   both of them as witnesses.  Now, ordinarily, of course, there

25   might be a sequestration question but, of course, they're very
```

1    interested in watching the trial.  And since this is really not

2    a situation where the question is, you know, who went through

3    the red light, our hope was that the Court would permit them

4    both to watch, although I understand the government,

5    nevertheless, would like to have them sequestered.

6         MR. GRADY:  I think, your Honor, witnesses should be

7    sequestered.  The testimony in this case will bear, in no small

8    part -- or some of the testimony in this case will bear upon

9    the suitability of Mr. Volungus returning to living with them;

10   you'll hear testimony from the probation officer about the fact

11   that while he lived with them he was violated on supervised

12   release, and he proposes to go back there.

13        And if their testimony will cover, in any way, issues

14   that are going to be covered by other testimony, I think that

15   it would be unfair for the government for them to have a sense

16   of what that type of evidence would be so that they can frame

17   their responses to counsels' questions.

18        THE COURT:  Well, I'm looking at Rule 615 of the rules

19   of evidence which says that at the request of a party, the

20   Court shall order the witnesses excluded unless they fall into

21   one of the categories, and I think that they do not fall within

22   the exception.  So they should be excluded.

23        MR. FICK:  And the other thing, your Honor, we've

24   actually -- sort of as a contingency, then, what we would

25   propose to do is withdraw Mr. Volungus from the witness list

1   and only leave Mrs. Volungus on the witness list and then ask

2   her, then, to be excused now and...

3         THE COURT:  That's fine, so long as Mr. Volungus

4   clearly understands that he's not to communicate the substance

5   of the testimony to Mrs. Volungus.  That would violate the

6   sequestration order.

7         MR. FICK:  We've had a preliminary discussion about

8   that.  In fact, Mr. Volungus, apparently, has been involved in

9   various national security activities, and he's quite used to

10   compartmentalizing --

11         THE COURT:  I'm not suggesting that he would act

12   otherwise.  I just want to be sure that -- laypeople, who are

13   not familiar with the procedures, may not necessarily

14   understand the parameters.  And I would just like you to make

15   it clear.

16         MR. FICK:  And then the other question is may they at

17   least be here for openings, since I believe the rule refers to

18   the testimony of witnesses.

19         THE COURT:  I think the tradition is you're excluded

20   for the openings as well.

21         MR. FICK:  I would ask Mrs. Volungus, then, if she

22   would leave the courtroom.

23         (Mrs. Volungus exits the courtroom.)

24         MR. GRADY:  And, your Honor, just as a technical

25   matter, the parties have submitted 62 joint exhibits.

1    Actually, I believe it's actually 59, but there's a list of 1

2    to 62 with three numbers missing that were removed by

3    agreement.

4            I'd move to admit those into evidence by agreement.

5            MR. FICK:  Yes.  There's just one exhibit that I think

6    still needs to be swapped out -- there were some redactions

7    added which we haven't done yet.  But subject to that caveat,

8    there is an agreement about the exhibits as redacted with the

9    one additional swap-out.

10           MR. GRADY:  There is an agreement to do that, your

11   Honor.

12           THE COURT:  I haven't actually looked through them

13   very much yet.  I will as the case goes on, obviously.  I

14   just -- when you say -- this sounds picky -- when you say "62,"

15   I notice that some may have subparts.  You're including the

16   subparts with the main number?

17           MR. GRADY:  There are 1 to 62 agreed joint exhibits

18   with -- the specific numbers missing would be 28 and 43 on the

19   list.  There are an additional five items that have been marked

20   for identification at this point as 61A through -E or -F.  And

21   those are documents that are in evidence in Exhibit 61 but have

22   additional typing on them to make them easier to read for use

23   with witnesses.

24           THE COURT:  Let me just turn to 614.

25           MR. GRADY:  Sixty-one, your Honor, is actually about a

1    500-page package of materials that was seized from

2    Mr. Volungus' possession in August of 2007.  And the government

3    has taken five or six of those as exemplary of some of the

4    materials contained therein, and because they are handwritten

5    notes, has added typing under the handwritten notes to make

6    them easier to use for witnesses and for the Court to

7    understand.  And those are the additional -A to -E exhibits.

8    But the handwritten documents themselves are agreed in evidence

9    in Exhibit 61.

10           THE COURT:  Okay.  So what I have is -- the A, B, C,

11   D, E, I may have someplace else, but not in my book here

12   anyway.

13           MR. FICK:  The entire 61, your Honor, should be a

14   separate binder that is just Exhibit 61.

15           THE COURT:  I think we only got one binder.

16           MR. GRADY:  We'll have a second binder for the Court

17   that is Exhibit 61.  It's a very large exhibit, your Honor.

18   It's a lot of documents.

19           MR. FICK:  The Exhibit 61A to -E are just selected

20   pages of the larger exhibit --

21           MR. GRADY:  To which there have been additions made

22   for ease of use.

23           MR. FICK:  We don't dispute they may be usable as

24   chalks, but they ought not be the actual evidence, is our

25   position.  But it's really nothing we need to get into now.

1          THE COURT:  If this were a jury, you'd worry about

2     that.  I would have to look at them to make the ruling.  So I

3     don't preclude you from making the point if you think it's a

4     substantial one but it --

5          MR. FICK:  And that's been our approach --

6          THE COURT:  Let me just say, this is sort of a *Rengifo*

7     kind of thing.  Have you any issue with the attempted

8     translations?

9          MR. FICK:  Not specifically.  I mean, I'm not sure

10    I've studied them to the point of every single word, but, I

11    mean, in general I don't have any --

12         THE COURT:  Well, let me know if you do and we'll --

13         MR. GRADY:  This would be how a witness would read

14    them.

15         THE COURT:  I mean -- I guess, again, I'm the

16    fact-finder.  And so if there's a scrawl and a suggested

17    transliteration or whatever, I'll make my own decision about

18    it.

19         MR. GRADY:  There's a lot of question marks in the

20    typing because some of it was not clear, and it's made clear --

21         THE COURT:  Yeah.

22         MR. FICK:  But I think in context, it will all become

23    clear in the trial.

24         THE COURT:  Sure.  Sure.

25         MR. GRADY:  Just for record, then, 1 through 62 is in

1   by agreement, your Honor?

2           MR. FICK:  That's fine.

3           THE COURT:  Yes.

4           (Joint Exhibit Nos. 1 through 62 received into

5   evidence.)

6           THE COURT:  Let me ask you about the hookup with

7   Mr. Cardinal.

8           MR. GRADY:  Yes, your Honor.  Probation officer

9   Cardinal from the Northern District of New York.

10          THE COURT:  All right.  What arrangements do you have

11  with him?

12          MR. GRADY:  He is available to testify today.  If he

13  needs to do it a different day, he will accommodate it.  He's a

14  probation officer and he's used to accommodating the court's

15  schedule, or so he's relayed to me.

16          But I had anticipated starting at eleven-thirty or

17  twelve with him but I --

18          THE COURT:  Well, how long will his testimony be?

19          MR. GRADY:  It's hard to -- direct, maybe an hour at

20  tops.  And I'm trying to be conservative on the outside

21  lengthwise.

22          THE COURT:  The one thing I don't want to do is start

23  today and have to do it again some other day.  I mean, if we do

24  it, I would like to get it all in.

25          MR. FICK:  I mean, his cross, your Honor, is likely to

1   be also an hour, perhaps even a little more.  So, you know...

2           MR. GRADY:  Given where we are now, your Honor, I

3   think that even if the parties took 20 or 40 minutes for

4   direct -- Dr. Ferraro is here, outside from DYS who is

5   available today, but perhaps not later in the week.  She's a

6   former psychologist at BOP and is now working for the state.  I

7   think she would need to be first, at least in the government's

8   view, your Honor.

9           THE COURT:  Fine.  Fine.  If you want to get

10  her -- make sure that she's finished today, that's fine.  So if

11  we took her testimony and then had some time but not enough

12  time for a complete Cardinal testimony, is there somebody else

13  you could plug in or not?

14          MR. GRADY:  I think --

15          THE COURT:  I guess as I think about it, my initial

16  reaction was do it all at once but there's nothing -- I mean,

17  we can also make the connection again, I guess.  We could start

18  him today and then pick it up on Wednesday.  I guess there's no

19  problem with that.  That was just kind of a knee-jerk response.

20          MR. GRADY:  All right.  With the Court's permission,

21  then, I'd just give a brief opening statement on behalf of the

22  government.

23          THE COURT:  Go ahead, please.

24          MR. GRADY:  Your Honor, I will cut directly to the

25  chase.  There are three elements to the government's case, only

1    two of which will be contested.  Here the government must prove

2    that Mr. Volungus has engaged in, or attempted to engage in,

3    child molestation or sexually violent conduct.  There will be

4    no question that Mr. Volungus has attempted to engage in child

5    molestation.  He was convicted in 1998 of the use of the

6    Internet to attempt to entice a 14-year-old girl to have sex

7    with him.

8         You will learn from both his plea and from

9    contemporaneous police reports that it was Mr. Volungus' intent

10   to have sex with the 14-year-old girl whom he solicited over

11   the Internet.  And that particular element will not be largely

12   in dispute.

13        What will be in dispute, your Honor, are the second

14   and third elements of this case; namely, whether Mr. Volungus

15   suffers from a serious mental illness, abnormality or disorder,

16   and whether as a result of that he will have serious difficulty

17   refraining from further acts of child molestation.

18        Now, your Honor, the government in this case will

19   demonstrate to you through expert testimony and exhibits that

20   Mr. Volungus does suffer from a serious mental illness,

21   abnormality or disorder; namely, pedophilia.  And what I have

22   put up on the screen for the Court is Exhibit 59 in evidence,

23   the diagnostic criteria for pedophilia from the American

24   Psychiatric Association's Diagnostic and Statistical Manual of

25   Mental Disorders, Fourth Edition Text Revision.

1          In reading from that, the diagnostic criteria provides

2     that over a period of at least six months an individual

3     experiences recurrent, intense, sexually arousing fantasies,

4     sexual urges or behaviors involving sexual activity with a

5     prepubescent child or children.  And this will be important for

6     the case, your Honor.  The APA recognizes that prepubescent

7     children are, quote, "generally aged 13 or younger."

8          The second element, or the second diagnostic criteria,

9     requires that the individual have acted on the urges or that

10    the sexual urges or fantasies cause marked distress or

11    interpersonal difficulty.

12         I believe your Honor will see in the case that there

13    really is no dispute that Mr. Volungus meets the second

14    element.  He has gone to jail and he has attempted to act on

15    these sexual urges.  And all of the experts will tell you that

16    an individual who has gone to jail as a result of such urges

17    has suffered marked distress or interpersonal difficulty, as

18    it's defined here.

19         And the third criteria has to do with the age of the

20    victim.  And essentially, it's a limitation on the diagnosis

21    that the person must be at least age 16 years and at least five

22    years older than the child or children described in Criterion

23    A.  And again, your Honor, I would suggest the evidence in this

24    case will not be disputed that Mr. Volungus would meet Exhibit

25    C [sic], having committed his first sexual offense, or

1    attempted to do so, in 1998, well over the age of 16.

2         To the extent it is disputed, your Honor, the evidence

3    in this case will overwhelmingly demonstrate that Mr. Volungus

4    experiences recurrent and intense sexual-arousing fantasies to

5    prepubescent children.  And the evidence of this, your Honor,

6    will include the fact that in 1998 when he was arrested he was

7    found in possession of over 4,000 images of child pornography,

8    the majority of which depicted prepubescent children.  And you

9    don't need an expert, but you'll hear from one, that the

10   possession of well over 2,000 *[sic]* images of child pornography

11   depicting prepubescent children is evidence of sexual interest

12   in prepubescent children.  And I note, your Honor, that you

13   will actually have -- as a sealed exhibit as part of Exhibit 1

14   the government has submitted about a half dozen of the images,

15   exemplary, of the materials that were seized from Mr. Volungus.

16        You will hear evidence that in October of 2002, your

17   Honor, while incarcerated, prison officials found Mr. Volungus

18   in possession of hand-drawn images of an adult male engaged in

19   sexual acts with children.  A random search was conducted in

20   October of 2002.  These images were found.  And Mr. Volungus

21   acknowledges to officers, quote, "I have a problem and I think

22   about sex with children all the time," Exhibit 21 in evidence.

23        He was asked where did he get the drawings?  He drew

24   them, he told the officers.  He was asked if the pictures of

25   the male in the pictures was him, and he said yes.  During the

1    interview he acted upset and continued to say he was having a

2    problem and thought about sex with children all the time.  And

3    again, your Honor, you will not need an expert to tell you that

4    that is evidence of a sexual interest in children, but there

5    will be expert testimony that this is evidence to support a

6    diagnosis of pedophilia.

7         You will learn that Mr. Volungus was released from his

8    first conviction in May of 2003, and he began sex offender

9    treatment in June of that year.  And by December of that year

10   he had begun downloading child pornography again, while on

11   supervised release.  And again, these images you will see, by

12   virtue of a plea agreement, entered into with respect to the

13   probation violation or -- excuse me -- the supervised release

14   violation that the images found on his computer contained

15   images of prepubescent children.  And again, your Honor, you

16   don't need an expert, but you will hear expert testimony that

17   this is evidence of a sexual interest in prepubescent children.

18        And you will learn that while on supervised release

19   Mr. Volungus underwent a number of polygraph examinations in

20   connection with his supervised release, during one of which in

21   November of 2003 Mr. Volungus made the following statement:

22   Quote, "I am sexually attracted to females between the ages of

23   11 and 13 years of age."  Again, your Honor, I don't think you

24   need an expert to interpret that, but you will have expert

25   testimony that that is evidence of a sexual interest in

1   prepubescent children which the DSM describes as aged 13 or

2   younger.

3        Now, I've mentioned that Mr. Volungus was caught with

4   child pornography in March of 2004.  You'll learn that he's not

5   violated at that particular time, your Honor.  The computer was

6   seized and sent to the FBI for analysis, and Mr. Volungus

7   continues on supervised release.

8        And you'll hear from his probation officer that after

9   his computer is seized he begins to spend a great deal of time

10   in libraries.  And this is of some small concern to the officer

11   because there can be children at libraries.  But beyond that,

12   at the time the officer, the probation officer supervising

13   Mr. Volungus, does not think a great deal of it.  But you'll

14   learn that in July of 2005 -- and this will be a -- I'll relate

15   that to this case -- in San Antonio, Texas, officers arrest

16   another individual by the name of Guy Gallardo.

17        And Mr. Gallardo is found in the library attempting to

18   download child pornography to a 3.5-inch floppy disk in a

19   library computer.  And when he's arrested, found in his

20   possession are a number of letters from a J.C. Volungus, which

21   you will hear this Mr. Volungus admits to authoring.

22        And you will learn -- and I won't go through the

23   entirety of these letters, but I think that to some extent a

24   few of them are illustrative of a sexual interest in children.

25   And I'll read from a letter that was written -- it was found on

1    Mr. Gallardo written on March 1st of 2005.  And it reads,

2    "Watched some great vids last night, including one of guy's

3    daughter about seven.  Cute as hell and does one hell of a sexy

4    striptease and pussy show.  I got to figure out how to save a

5    webcam broadcast."

6            I'll read from another letter dated March 13, 2005.

7    "Met one fellow last week.  Watched his webcam.  He was

8    finger-fucking his daughter for the world to see.  She looked

9    about six years old.  She was loving it.  He had a microphone

10   on.  She was asking him to, quote, 'Do it faster, Daddy!' and

11   quote, 'Yeah, right there!'  Was fucking amazing.  If I hadn't

12   been in the middle of the library, I would have whipped it out

13   and jacked off right there."

14           You do not need an expert, but you will have expert

15   testimony, your Honor, that these letters are evidence of a

16   sexual interest in prepubescent children.  You'll also see

17   these letters, and I'll mention them down the road, because

18   they also bear upon serious difficulty in refrain.

19           Now, you're also going to learn, your Honor, that in

20   August of 2007 after Mr. Volungus had been certified as

21   potentially being sexually dangerous, and while he was awaiting

22   trial on this very hearing on the question of whether he was a

23   sexually dangerous person, that in August of 2007 he was found

24   in possession of a large package of materials, Joint Evidence

25   Exhibit 61, and among them you will see some images he drew,

1    which I suggest depict an adult male engaged in sex with very

2    young children.  And again, your Honor, you don't need an

3    expert, but you will have expert testimony that this is

4    evidence of sexual attraction to prepubescent children.

5          And among those materials as well you will learn there

6    was a seven-page list -- and it will help to probably zoom in

7    on these -- describing what appears to be various pieces of

8    child pornography that Mr. Volungus has viewed in the past.  As

9    an example, one of the handwritten notations, "My cowgirl

10   fantasy girl, about five or six."  And this list goes on for

11   not one page -- not two pages, not three pages, not even four,

12   your Honor -- it goes on for seven pages.  There are literally

13   hundreds of descriptions of incredibly graphic sex with

14   children.

15         And as I will suggest to the Court, as it reviews this

16   document which is in evidence, virtually all of the children

17   described are under the age of ten.  Again, your Honor, you

18   will not need an expert, but you will have expert testimony

19   that this is evidence of a sexual interest in prepubescent

20   children.

21         The credible testimony in this matter, your Honor, to

22   the extent it is even disputed, will overwhelmingly demonstrate

23   that Mr. Volungus suffers from pedophilia; that pedophilia is

24   for him an incredibly serious illness, abnormality or disorder.

25         Finally, your Honor, the government must establish

1    that Mr. Volungus would have serious difficulty because of his

2    pedophilia in refraining from further acts of child molestation

3    or sexually violent conduct.  And before I discuss the

4    evidence, I'd just like to make clear, your Honor, that the

5    statutory language is very important.

6           As the Supreme Court discussed in *Kansas versus*

7    *Hendricks* and *Kansas versus Crane*, which were two cases

8    construing a Kansas Sexually Violent Predator Act on which the

9    Adam Walsh is based, and which Congress stated in adopting the

10   Adam Walsh Act they wish to adopt the same substantive

11   standards, the third element does not require the government to

12   establish with any form of mathematical certainty that an

13   individual will commit a new offense.

14          The critical question with respect to this third

15   element, just as it was in the Kansas statute, is whether the

16   individual experiences a volitional impairment as a result of

17   his mental illness.  And viewed through this prism, again, the

18   evidence is overwhelming.  But before I go to the evidence that

19   directly supports that, your Honor, I will also point out to

20   this Court that there is evidence that Mr. Volungus intends to

21   go out and commit new offenses.

22          And in this regard you're going to hear -- I'm going

23   to come back to these letters -- another quote from the letter

24   written on March 13, 2005.  And this letter, page 794 of

25   Exhibit 26, reads -- and this is to the other sex offender,

1    Mr. Gallardo, who's at the time in Texas.  And this, by the

2    way, your Honor, is a letter written in March of 2005 after

3    Mr. Volungus had attended nearly two years of sex offender

4    treatment.  And I wish the Court to keep that in mind to the

5    extent it's suggested in any testimony in this case that

6    Mr. Volungus has benefited from that sex offender treatment.

7    This letter was written when he had undergone nearly two years

8    of treatment.

9          "What do you think about crossing the border to the

10   twins" -- and I'm not certain what that says, your Honor, as

11   it's reflected -- "and picking up some young girls?  How

12   available are they there?  I've heard they're pretty common.

13   You know what I like:  brunette, about ten.  Just budding is

14   perfect.  If you ever see the Alicia series or videos, she's

15   fucking perfect.  Well, almost.  I like longer hair."

16         And I'll recount for the Court, your Honor, this is

17   additional evidence that Mr. Volungus has a sexual interest in

18   prepubescent children, as he expresses his sexual interest in a

19   ten-year-old girl.  But what this is particularly relevant to,

20   in terms of serious difficulty refraining, is that it shows

21   Mr. Volungus has an intent to go out and commit contact

22   offense.  And as I previously said, your Honor, it's not

23   necessary for the government to prove that, but it's something

24   that informs the Court's decision.

25         In addition, your Honor, you're going to hear that

1    among the materials seized in August of 2007 is what I would

2    suggest to the Court is evidence that demonstrates almost a

3    near certainty that Mr. Volungus will attempt to possess child

4    pornography in the future.  Among these handwritten notes in

5    Exhibit 61, and this would be from page 1624 according to the

6    Bates stamps, he's writing notes to himself.  "As little

7    connection as possible.  Use proxies, anonymous, wireless,

8    minimal info on the CPU you're using, e-Gold or similar

9    service.  Open the account with anonymous info.  Western Union

10   money.  Cash only to account.  Use account throwaway, if

11   necessary."

12        Next line:  "Have throwaway e-mails and use public

13   CPUs to move info that way.  Move around.  Don't always use the

14   same hot spots.  Never keep illegal material on CPU.  Use

15   removable drives and media.  Try ultrasmall flash drives.

16        "Never have anything sent to a physical address, only

17   downloadable goodies.  Don't chat with kids, only consenting

18   adults.  If kids are offered up, later" -- and then the words,

19   it's unclear to me, your Honor.  Another statement -- I would

20   also note the last statement on that page, Mr. Volungus

21   handwrites, "Sex before eight, or else it's too late."  Not

22   specifically to future difficulty but, again, evidence of a

23   sexual interest in prepubescent children.

24        And I'll note, your Honor, another item seized in

25   December -- excuse me -- in August of 2007, contains

1    handwritten notes that includes a disguise list:  "Hair:  Dye,

2    wig."  And it finishes and concludes with the following

3    statement:  Quote, "Don't become predictable.  Use widely

4    scattered hotspots at various times and dates.  Don't get in

5    the habit of Thursdays at noon at the Fifth Street Library.

6    Eventually, even with wireless and proxies, they can find you."

7         Your Honor, I'd suggest that you will hear evidence

8    that shows that Mr. Volungus almost certainly intends to

9    attempt to possess child pornography in the future.  And this

10   is important, your Honor, you will hear, because this is

11   tantamount to Mr. Volungus stating an intent to commit another

12   contact offense.

13        You will hear evidence that Mr. Volungus' offense

14   cycle begins with child pornography.  In 1998 when he was first

15   convicted, Mr. Volungus began, you'll hear evidence,

16   downloading child porn in about December of 1997.  And he would

17   view child pornography obsessively, from 5 p.m. till midnight

18   on weekdays and from 12 hours -- almost 12 hours a day on

19   weekends.  He would view child pornography in lieu of sleeping.

20   But that wasn't enough.

21        And you'll learn that Mr. Volungus proceeded to chat

22   rooms, and he began chatting with minors on the Internet

23   because child pornography was not servicing -- was not

24   providing enough release for -- it wasn't enough.  And he would

25   masturbate while chatting with children on the Internet.  But

1    that wasn't enough.  And that led Mr. Volungus to attempt to

2    arrange to have sex with a 14-year-old girl which is how he was

3    caught.  The 14-year-old girl, of course, your Honor, was an

4    undercover officer.  You'll see that in the records.  But for

5    the intervention of law enforcement, Mr. Volungus would have

6    offended against a 14-year-old girl.  He admits as much.  His

7    clear intent to possess child pornography demonstrates he

8    clearly intends to start the same cycle again.

9            Now, I'd like to actually talk, your Honor, in

10   addition, about some of the evidence there is going to be about

11   volitional impairment.  The fact that Mr. Volungus is unable to

12   keep himself from drawing pictures of himself having sex with

13   children in prison by his very actions is evidence of an

14   inability to control his behavior.  And I say that, your Honor,

15   because a federal prison is no place to be a child sex

16   offender.  They're not the most popular people.  But even given

17   the danger that that presents, just vis-a-vis the other

18   offenders, let alone the virtual certainty that one will be

19   caught with child pornographic materials in prison where one

20   has no privacy, suggests that Mr. Volungus has no ability to

21   control his sexual interest and needs to find an outlet.  And

22   even in prison where he has no exposure to children he can't

23   control it.  And he tells the guards as much:  "I think of sex

24   with children all the time."

25           In 2004 when his probation officer shows up to install

1    monitoring software on his computer, an event which the

2    evidence will show, by the way, your Honor, that Mr. Volungus

3    was well aware of -- he had been told on at least three

4    occasions prior to the date the probation officer was coming

5    that very day -- the probation officer finds child pornography

6    on the computer.  Mr. Volungus says to his probation officer,

7    "I do everything I can to control myself but I want to give in

8    to my impulses."  Mr. Volungus himself acknowledges he's unable

9    to control his sexual interest in children.

10            And finally, your Honor, perhaps the most compelling

11   evidence in this case regarding Mr. Volungus' inability to

12   control his behavior comes, again, from Mr. Volungus himself.

13   And I'm going to show you a portion of a transcript from

14   Mr. Volungus' supervised release revocation hearing in June of

15   2005.  Mr. Volungus in this transcript is asked by the Court:

16   "Mr. Volungus, do you have anything you would like to say?"

17   And Mr. Volungus replies, "Sir, yes, sir.  While the treatment

18   program has helped some" -- and again, your Honor, this is when

19   Mr. Volungus had undergone -- or a better phrase would be

20   "attended" two years of sex offender treatment during which he

21   was downloading child pornography while in treatment -- "Sir,

22   yes, sir.  While the treatment program has helped some, it

23   hasn't helped enough.  I know that.  I've got a problem.  I

24   have a problem controlling it.  And it's one of the hardest

25   things I've had to do, is that I really don't have enough

1    control over it, recognizing that I don't have enough control

2    over it.  I've tried to control it.  It keeps rearing its head.

3    I know it causes a lot of problems, not only for myself, for my

4    family, but I don't want to keep doing this for the rest of my

5    life.  I would like to figure out how to make it stop.  I

6    really would.  I just don't know how to do it yet."

7             And since that time, your Honor, you're going to learn

8    Mr. Volungus hasn't changed.  He's undergone no sex offender

9    treatment.  He continues to hold attitudes that the rest of the

10   world is wrong.  There's nothing wrong with his interest in sex

11   with children.  He's being persecuted like homosexuals were

12   persecuted 50 years ago.  Those are his words.  And in the

13   materials you'll see from 2007 Mr. Volungus equates the

14   illegalization of child pornography to the illegalization of

15   marijuana.  He says it creates an underground market where

16   abuse is more frequent because it's illegal, failing to

17   recognize that the event itself is abuse.

18            Mr. Volungus is exactly the same person he was in

19   1998; he is exactly the same person he was in June 2005 when he

20   said he had no control.  And at the end of the case, your

21   Honor, the government will ask you to commit Mr. Volungus for

22   inpatient sex offender treatment where he won't have the

23   opportunity to download child porn, where he won't have the

24   opportunity to be around children.  And there may be an

25   opportunity for Mr. Volungus to be successfully treated.

1          So at the conclusion because, your Honor, he has

2    clearly attempted to engage in child molestation, he clearly

3    suffers from mental illness, and he clearly would have serious

4    difficulty refraining, the government will ask you to commit

5    Mr. Volungus.

6          Thank you.

7          THE COURT:  Mr. Fick, do you want to make an opening

8    at this time?  Or Mr. Gold?

9          MR. GOLD:  Thank you, Judge.

10         I don't want to get the Court's hopes up.  I don't

11   think I'm going to use the ELMO, but in the interest of

12   symmetry, I thought I'd stand at the same podium.

13         THE COURT:  Try to use the mic there so the reporter

14   can hear you accurately.

15         MR. GOLD:  I just wanted to start, your Honor, by

16   responding to a couple of the statements at the end of the

17   government's opening.  I don't think the evidence will show at

18   the end of this trial that Mr. Volungus is the same person as

19   he was in 1998 or the same person he was when he spoke to the

20   judge at his sentencing for his supervised release violation in

21   June of 2005.

22         He's a changed person.  He's unalterably changed by

23   the experiences that he's had, first, as serving a significant

24   prison sentence for his child pornography and traveling

25   conviction in 1998, and then for serving the 23-month sentence,

1    which has become a much longer term in federal custody.

2          In context, those feelings of inability to control, of

3    having benefitted from treatment, but not quite enough, are

4    evidence that helps our case, your Honor.  They show insight.

5    And in context, Mr. Volungus is clearly referring not to the

6    intention to lay his hands upon any child, but his fixation,

7    which he long acknowledged, with collecting and viewing child

8    pornography.  Child pornography is -- the viewing and

9    downloading of child pornography is not a sexually violent act

10   within the meaning of the Adam Walsh Act; it is not child

11   molestation within the meaning of the Adam Walsh Act.

12          The evidence will show that Mr. Volungus may, indeed,

13   have problems when he is out in the community needing to stay

14   away from pornography in general, and child pornography in

15   particular.  But the government argues that that is, in fact, a

16   necessary change -- or a necessary step or an inevitable step

17   toward re-offending, and that is not, in fact, the case.

18          Many of the judges to whom the -- or several of the

19   judges to whom these Adam Walsh Act cases -- there are ten in

20   the district, were assigned -- had a couple of them.  Your

21   Honor has had only this one.  And I thought I might take a

22   moment to -- as a lawyer with the Federal Defender's Office,

23   I've had the opportunity to litigate a few of them.  And the

24   experience, I think, is helpful in placing this case in context

25   and will provide some useful information.

1          We just tried a case in front of Judge Wolf.  It was

2     the second of the two that he did.  That was the case of *United*

3     *States versus Andrew Swarm.*  And it was, I think, an

4     instructive case in this context:  Judge Wolf found that the

5     respondent was not sexually dangerous, and right now we're in

6     the period where we're -- or the government is determining

7     whether or not to appeal.

8          And in that case, Judge Wolf laid out the Supreme

9     Court's formulation of what the clear and convincing standard

10    is.  And I just thought it would be useful to read that "the

11    clear and convincing standard requires the government to place

12    in the ultimate fact-finder an abiding conviction that the

13    truth of its factual contentions are highly probable, and the

14    burden is satisfied only when the material offered instantly

15    tilted the evidentiary scales in the government's favor when

16    weighed against the evidence the respondent offered in

17    opposition."  That's from *Colorado versus New Mexico*, the

18    Supreme Court.

19         The government will not be able to show by clear and

20    convincing evidence that Mr. Volungus either suffers from

21    pedophilia or will have serious difficulty refraining from

22    sexually violent conduct for child molestation.  The reason

23    that the standard is so high is, of course, because of the

24    liberty interests at stake.  Two individuals have been

25    committed under the Adam Walsh Act so far in the country.

1    There are about 11 or 15 of these cases that are in some

2    portion of trial; the rest of these individuals are at

3    the -- in the custody of the Bureau of Prisons down in Butner,

4    North Carolina, awaiting trial.  And, in fact, there are a

5    couple of staff members from the Federal Public Defender's

6    Office in North Carolina watching this trial.

7         The experience with the states, these statutes are

8    about 20 years old.  The first statute of its kind was in 1990

9    in Washington State.  And the experience of the states has been

10   that once you get committed, it's very difficult to get out.

11   These are high-stakes proceedings, and commitment is very often

12   tantamount to a life sentence.

13        This case is extraordinary in one way, and that is,

14   for all that the government said about the statements that

15   Mr. Volungus has made, the writings that he's done, they can

16   only point to, in fact, one attempted hands-on offense.  And

17   that is somewhat unusual for a commitment case of this kind.

18   And we will -- submit the evidence will show that Mr. Volungus,

19   while he has this acknowledged fixation and fascination with

20   pornography, which extends to people in the age group which has

21   been described, nevertheless, is not someone who we can fairly

22   say would have serious difficulty refraining from laying his

23   hands on another person.

24        Now, these cases are driven by expert testimony to a

25   fair degree.  There are going to be three experts who testify

1    in this case.  And one of the things the experts do is they

2    help -- they each have their own formulation of the case.

3    They've met with -- each of them has met with Mr. Volungus and

4    interviewed him, reviewed the available records, and so forth.

5         Mr. Volungus is someone who has had a hard time his

6    entire life dealing with adverse emotions.  He experiences a

7    great deal of anxiety and depression and other negative

8    emotions, and has dealt with these by escaping into one form of

9    fantasy basically for his entire life.  The testimony will be

10   that he grew up in a relatively normal family environment.  He

11   is highly educated -- or he has a bachelor's degree.  And, in

12   fact, after high school he majored in history at the University

13   of Pennsylvania.

14        While there, he became very interested in Dungeons and

15   Dragons, an interest that he carried with him, and escaped into

16   that fantasy by spending inordinate amounts of time playing

17   Dungeons and Dragons as a young person.  Later on he became

18   involved with an even-more obscure group, the Society for

19   Creative Anachronism, where the individuals who participate

20   re-imagine themselves as medieval noblemen, or individuals, in

21   medieval society.

22        He spent so much time in ROTC and these other pursuits

23   that he basically barely got through school, but he did.  He

24   enlisted in the Army, where he succeeded.  He was a successful

25   member of the military for about eight years.  And the evidence

1  will show that while convalescing from a knee injury, he

2  discovered child pornography and became very involved with

3  pornography while he was in a period of isolation; also

4  Internet chats.

5       And there, the Court has the Internet chats.  They've

6  already been entered into evidence.  And what they reveal is

7  that Mr. Volungus was, indeed, arranging a tryst -- arranging a

8  tryst with a 14-year-old through the person of her 19-year-old

9  sister.  And it's very clear throughout that he contemplated

10 having sexual activity with both of them.  He certainly was

11 interested in the 14-year-old girl.

12      And what this demonstrates is something very

13 important.  Important for the case, important diagnostically in

14 the point of view of the experts, which is that the 14-year-old

15 girl -- at one point her measurements are described.  She was

16 described as a fully-developed girl.  Her measurements, I

17 think, were described.  Mr. Volungus bought lingerie for this

18 encounter, 36-26-36, which I actually looked that up in

19 researching this case, and I think I'll ask the experts about

20 it, but it's the measurements for the ideal woman, according to

21 the Commodores' 1977 hit "Brick House," but, so, someone who

22 was a mature female.

23      And as the expert -- or the government's expert in

24 this case will testify, Mr. Volungus' attempted tryst with this

25 woman was not evidence of the disorder that she diagnoses him

1    with, pedophilia; it may be problematic sexual behavior, but is

2    not the product of the central element of this case, which is

3    pedophilia.  He was seeking to have a sexual relation *[sic]*

4    with a physically mature person.

5         Before I talk about the experts individually, all of

6    them do the same thing:  They make a diagnosis; they state

7    whether there's -- in their view, in their expert opinion,

8    there will be serious difficulty controlling behavior.  And

9    there's a long history to how psychologists make that

10   determination, the rules that they say they go by when they do

11   it -- with the diagnostic decision in particular.

12        And there is some disagreement among the three experts

13   as to whether the diagnosis of pedophilia actually applies, but

14   all of them agree that it's a diagnosis with the qualifier

15   "nonexclusive."  There are people who are afflicted with

16   pedophilia for whom the qualifier for the diagnosis is

17   "exclusive"; that is, these certain individuals who have a

18   sexual attraction to immature people, boys or girls.  It's

19   generally men who have this disorder.  And they completely lose

20   interest when the person ages out of a particular age group.

21   They're fixated, is another word in the term -- in the field,

22   and they simply are unable to conceive of sexual interaction

23   with older adults.

24        Even under the government's view, Mr. Volungus does

25   not have a diagnosis of exclusive pedophilia.  And that is

1    because, the evidence will show, he's had interactions, sexual

2    interactions, with adults.  Even the offense which brings him

3    here was a contemplated sexual interaction with a sexually

4    developed 14-year-old and her 19-year-old sister.  That is

5    important on one basic level because it shows that if

6    Mr. Volungus is in society, he will always have an outlet, a

7    mature outlet, for his sexual interest, and will not be someone

8    who is doomed to only being interested in immature persons.

9            We have two experts in the case.  The government has

10   called -- or has retained Amy Phenix to testify.  I just wanted

11   to give the Court a brief preview of the qualifications and the

12   background of these experts.  And assuming the Court is

13   relatively unfamiliar with the background terrain, the careers

14   of the experts are interesting because they sort of dovetail

15   with the evolution of these statutes and these controversial

16   laws providing for the post-prison sentence containment of sex

17   offenders.

18           Leonard Bard is one of the experts, and he is -- who

19   will testify.  He started his career at a place called the

20   Massachusetts Treatment Center for the Sexually Dangerous in

21   Bridgewater, Massachusetts.  In 1983 he was providing treatment

22   there.  And then he spent a good portion of his career, from

23   1987 to '99, being what they called a "qualified examiner"

24   doing impartial evaluations of men who were committed to the

25   treatment center and either trying to obtain their release or

1    facing their initial commitment.  He was employed in that

2    capacity first by the Department of Mental Health and then by

3    the Department of Correction.

4         I bring that up at this stage, and it will come out in

5    testimony, but the Massachusetts Treatment Center for the

6    Sexually Dangerous is an important place because, as you'll

7    learn -- or the Court will learn later in the trial, a lot of

8    the opinions of these experts -- and when they make their

9    opinions, they rely on research, and they make inferences based

10   on the research and apply it to the case.  And they -- a lot of

11   the research on which they rely has to do with this place.

12        Massachusetts -- in fact, I stated earlier that

13   there -- these statutes started in 1990.  And that is true.

14   The current model of these statutes, which provide for the

15   post-prison sentence commitment, started in the -- in 1990 in

16   Washington State.  But, in fact, they were a new version of the

17   sexual psychopath statutes which had been around since the

18   1930s and 1940s.  And Massachusetts was one of the states that

19   had one of these statutes and they -- and the Massachusetts

20   Treatment Center is where men, who were committed pursuant to

21   that statute, were kept.

22        And so it became a research -- and one of the few

23   places where groups of men were released -- and we have

24   research on recidivism rates, and so forth.  And Dr. Bard

25   worked there and is now parlaying that experience and is an

1    expert in this area who testifies in cases like this.

2            We also have the benefit of Dr. Robert Prentky, who is

3    the director of the forensic psychology program at Fairleigh

4    Dickinson University in New Jersey.  And Dr. Prentky is one of

5    the -- really the leading researchers in this area.  And you'll

6    learn -- you'll have his CV.  The Court will have the

7    opportunity to look at the accomplishments of his career, but

8    it's important to recognize that many of his refereed articles

9    are leading articles in this field.  He performed research as a

10   Ph.D. psychologist -- all the experts in this case are

11   psychologists -- and on men at the Massachusetts Treatment

12   Center he developed a typology of child molesters and rapists,

13   which is still in use today; he developed one of these risk

14   assessment instruments which the Court will hear testimony

15   about, actuarial instruments.  He developed one of these

16   instruments for use with juvenile sex offenders which is widely

17   used today.

18           He was also employed at the Massachusetts Treatment

19   Center throughout the 1990s, and was a member of their

20   restrictive reintegration review board which determined when

21   inmates committed to this facility might be ready for release.

22   He's an -- often a requested expert witness who has testified

23   on both sides, for the government and the defense, in many

24   types of cases.

25           But the reason his testimony is also important, I

1  believe -- or it is -- the evidence will show he is also

2  someone who has thought long and deeply about forensic

3  psychology in this area.  He's written several articles with a

4  law professor and the dean of the William Mitchell College of

5  Law named Eric Janus.  And they have one particularly

6  influential article, which I'll just flag for the Court right

7  now, by Prentky, Janus and other authors called "Sexually

8  Violent Predators in the Courtroom, Science on Trial," in

9  Psychology, Public Policy and Law, 2006, Volume 12, Number 4,

10  from 357 to 393.  Also, an important use of the article with

11  Professor Janus about the forensic use of

12  actuarial -- assessment with sex offenders in the American

13  Criminal Law Review.  So he's actually published in law review

14  articles.

15       And one quote in particular from the "Sexually Violent

16  Predators in the Courtroom" article that I'd like to bring to

17  the Court's attention is this:  "The high political salience of

18  sexual predator policy combines with the real harm caused by

19  sexual violence to elevate concern for false negative judgments

20  over concern about false positives.  Added to this is the

21  opacity of psychiatric diagnosis and the statistical complexity

22  involved in evaluating and interpreting actuarial risk

23  assessment data.  Exacerbating these factors is the increasing

24  tendency, described below, for experts to stretch or distort

25  the science - to introduce bad science - in response to the

1    strong advocacy pressures inherent in SVP proceedings."

2         I think a theme that we have in this case is to urge

3    the Court -- or to continually be aware of the strong advocacy

4    pressures as they impinge on the opinions and the expert

5    reports, and even the underlying material that we -- that we're

6    going to be seeing in this case.

7         All that said, however, the expert opinions are very

8    simple.  Dr. Prentky's opinion essentially is it's impossible

9    for him to conclude that Mr. Volungus will not have -- will

10   have serious difficulty refraining from hands-on sex offenses

11   because he's actually never had a hands-on sexual offense.

12   Again, I started out saying that there was this other -- the

13   other experience of the other cases.  And it is instructive.

14   Only two individuals have been committed under the act.  *United*

15   *States versus Wayne Hunt* and *United States versus Jeffrey*

16   *Shields* are the two cases, the first in front of Judge Tauro

17   and the second in front of Judge Saris.

18        In the *Hunt* case there were dozens of victims; in the

19   *Shields* case, there were large numbers of victims.  And what

20   this brings to mind is the *Hendricks* case --

21        MR. GRADY:  Your Honor, just for the record, none of

22   this is going to be in evidence in this case.  And I understand

23   this is a bench trial, and I've tried to be exceedingly

24   gracious in not objecting.  But there's been a lot of mention

25   of materials that are not going to be in evidence in this case.

1    And I understand it's a bench trial --

2         THE COURT:  I guess this is a reference to legal

3    materials which are noticeable, I guess.  I don't know

4    whether --

5         Go ahead, Mr. Gold.

6         MR. GOLD:  And I was also going to just respond to

7    that, that the experts that we're using are populating a lot of

8    these cases, so I do think we may be asking Dr. Phenix, for

9    example, about her experience in other cases when we talk about

10   this.

11        But it brings us back to *Leroy Hendricks*.  1990 was

12   when these statutes started.  They caught on fire.  They were

13   passed in Minnesota, Kansas.  Kansas was the first entry to the

14   Supreme Court and was found constitutional in 1997.  And as the

15   government mentioned, in 1997, and again in 2002, the Supreme

16   Court sketched out the sort of common law sense of what these

17   predator -- sexually-violent-predator or

18   sexually-dangerous-person commitments are about.

19        And Judge Wolf in his recent decision, and we now

20   harken back to *Leroy Hendricks*, again, someone for whom

21   the -- was the center of the case -- in the case that found

22   that the statutes pass constitutional muster in which the

23   notion of what serious difficulty controlling behavior may, in

24   fact, mean.  And there you had someone who admitted -- in

25   contrast to this case, where we have someone who's expressing

1    insight and expressing difficulty controlling his behavior, we

2    argue, around drawing pictures or fantasizing or looking at

3    pictures -- contrast to that, *Leroy Hendricks* said he couldn't

4    control himself from laying hands on actual children and had

5    a -- what Justice Thomas said was a chilling history of

6    repeated re-offending; repeated release from incarceration and

7    then re-offending.  Probably the strongest evidence in any case

8    of volitional impairment is re-offending in the target way

9    after a serious sanction.

10          There is dispute about the diagnosis.  The one

11   hands-on offense -- Dr. Bard, who I mentioned first, said that

12   there is insufficient evidence; he couldn't make conclusions

13   based on the documents that the government has already flagged;

14   that Mr. Volungus suffers from pedophilia.  But, in fact,

15   Dr. Bard, for his part, finds there's insufficient evidence to

16   make the diagnosis.  A lot's centering on the fact that the one

17   hands-on offense, despite the collection of the child

18   pornography and certain statements that he's made, that he

19   appears to have a sexual interest in teenagers, he also has a

20   sexual interest in adults, and doesn't find the evidence

21   sufficient to make the diagnosis, and then makes the second

22   move about the risk piece.

23          Dr. Prentky is different.  He argues that the DSM

24   diagnosis may apply.  But his opinion, as we might expect, is a

25   little subtler than that, and I think these reports -- you'll

1    have an opportunity to review their reports in addition to

2    hearing their testimony -- presents a very compelling portrait

3    of Mr. Volungus as a person and how his resort to fantasy to

4    deal with negative emotions, his impersonal sex life sort of

5    contributes to his makeup.  But what Dr. Prentky will testify

6    is that the diagnosis, while it may technically apply, doesn't

7    actually give -- help us too much in understanding what makes

8    him tick.

9         All of the experts perform a risk assessment as part

10   of this assessment of volitional impairment.  And this, too, is

11   an important part of this case where I think we're going to

12   have to delve into it a little bit.  But in lockstep with the

13   evolution of these laws has been an evolution in the science,

14   if you will, of risk assessment.

15        It starts back in 1954.  There was a famous book by a

16   psychologist named Paul Miel stating that mechanical methods of

17   predicting human behavior were superior to clinical judgments,

18   and the paradigmatic idea is inmates in mental hospitals being

19   released, doctors just size someone up and use their clinical

20   judgment to determine whether they're safe to be released or

21   not, and then there had been the development based on empirical

22   research of tools, factor-based tools, that had been developed.

23   And the research shows, and has consistently showed, on average

24   that the use of these instruments does better than the use of

25   unaided clinical judgment.  And I think the three experts who

1    are going to testify are going to testify to exactly that.

2    They're all in agreement on it.

3           And so the question is:  Why do they come to different

4    results? I suppose.  And the Court will hear testimony that

5    they all rely, or make a part of the assessment, these

6    actuarial tools that have been developed over the last decade,

7    over the last 15 years at the outside.  What those actuarial

8    instruments, in fact, show is not the level of risk for

9    Mr. Volungus that you would expect for someone who's facing

10   civil commitment.  At least that's what we'll argue.  The

11   actuarial instruments, the other relevant empirical data, what

12   is known about sex offender recidivism, generally, and what is

13   known is that the overall rates of offending are much lower

14   than we have been led to believe or might expect based on our

15   intuition, is that the risk presented before we begin with any

16   other type of analysis, the risk of the empirical data shows

17   for an offender like Volungus who has the relevant risk factors

18   that he does is not high.

19           In fact, the government's expert, she employs three of

20   these actuarial instruments, Dr. Phenix.  And she opines that

21   the instrument that she says that shows the highest risk of the

22   three that she uses, one shows moderate high, one shows

23   moderate low, and the other shows low.  And the one that she

24   finds -- or goes with in this case is the one that says

25   moderate high.

1     But even that instrument shows a recidivism rate for

2  what she says is the relevant sample of 27 percent over ten

3  years, which is lower than -- is arguably lower than commitment

4  thresholds.  All of the experts agree that you don't -- you

5  start an analysis there; you don't end it there.  And the

6  experts apply relevant dynamic factors, or in Dr. Prentky's

7  case, employ a different instrument to come up with a

8  formulation of risk of re-offense that makes sense.

9     Mr. Volungus was someone, when he was sentenced to the

10  term of supervised release in 2005, was sentenced to 23 months

11  because he said he wanted treatment and help.  And, in fact,

12  there was a judicial recommendation that he be referred to the

13  Butner Sex Offender Treatment Program, which is no longer

14  there, but was basically the treatment program for sex

15  offenders in the system.  In the case of *United States v. Swarm*

16  we had the benefit of hearing from the current director of the

17  treatment program for committed patients who had been the head

18  of that program for many years.

19     Mr. Volungus, when he got into the system, himself

20  requested that the judicial recommendation be honored; he

21  wanted to go to Butner, and he was declined.  And that's very

22  important.  We're not arguing in the case of Mr. Volungus that

23  he deserves a Congressional Medal of Honor and is someone who

24  doesn't present with any problems that could benefit from

25  treatment.  But the question here is one of threshold:  How

 1    dangerous is he?  Is he dangerous enough that we can say he'll

 2    have serious difficulty controlling his behavior?

 3          Apparently, there's a reference in the records to him

 4    having denial at some point in the past before he did

 5    treatment, and that was used as a rationale to reject his

 6    application for the treatment that he requested.  At the time

 7    that he was sentenced, it was contemplated that he would go to

 8    Butner and then continue out on supervised release where he

 9    would continue with treatment.  And he has remaining to him 13

10    months of federal supervised release, which is part of what

11    goes into the determination of whether someone is going to have

12    serious difficulty controlling their behavior as a

13    consideration of what the environment -- he's going to be again

14    released to the home of his parents, and he's going to be

15    released under this term of supervised release with a panoply

16    of very strict sex offender-specific conditions.

17          That, again, is the overview, your Honor, and I thank

18    you.

19          THE COURT:  Okay.  Thank you.

20          Mr. Grady?

21          MR. GRADY:  Your Honor, the government's first witness

22    is Monica Ferraro, who's out in the hall.  I'd be happy to go

23    get her.

24          THE COURT:  Okay.

25                MONICA FERRARO, Ph.D., duly sworn

1          THE CLERK:  Please be seated.  State your name and

2     spell your last name for the record.

3          THE WITNESS:  Monica Ferraro, F-E-R-R-A-R-O.

4          THE CLERK:  Thank you.

5                          DIRECT EXAMINATION

6     BY MR. GRADY:

7     Q.   Ms. Ferraro, can you tell us what you do for a living?

8     A.   I'm a psychologist.  I currently work for the

9     Massachusetts Department of Youth Services, and I'm the

10    clinical coordinator for the central region.

11    Q.   And generally speaking, what is it you do for them and

12    what does that job entail?

13    A.   I'm responsible for clinical oversight for programs in the

14    central region.

15    Q.   And prior to DYS, where did you work?

16    A.   FMC Devens.

17    Q.   And what did you do for FMC Devens?

18    A.   I was a psychologist there for most of the time I was

19    there, in the sex offender management program.

20    Q.   Okay.  I'd ask you to take a look at Exhibit 57 in the

21    binder in front of you.  There's one that's marked "Trial

22    Exhibits" and one marked "Exhibit 61."  You'll want to look in

23    the one that just says "Trial Exhibits."

24          Have you seen it?  What is that?

25    A.   My curriculum vitae.

1          MR. GRADY:  Your Honor, this is in evidence already,

2     so...

3          THE COURT:  Yes.

4     BY MR. GRADY:

5     Q.   In lieu of going through it --

6          MR. GRADY:  The CV is in evidence, your Honor.

7     Q.   -- can you just tell me, generally speaking -- do you need

8     some water?

9     A.   Thank you.

10    Q.   Generally speaking, what were your duties as a sex

11    offender management program psychologist?

12    A.   I was responsible for doing initial intakes when

13    individuals transferred to Devens, or were first designated

14    there for the sex offender management program.  I had a

15    caseload of individuals in the program who I met with if they

16    were found to engage in risk-relevant behavior.  I also

17    completed discharge reports.

18         THE CLERK:  I just want to move the mic up a little

19    bit.  If you'd speak a little bit louder so we can hear.

20    Thanks.

21         THE WITNESS:  I completed discharge reports for

22    individuals prior to their discharge from Devens.  I also

23    worked in the sex offender treatment program, which was part of

24    the overall sex offender services, doing some groups; I had a

25    caseload of individual clients, and completing intakes, initial

1    assessments and discharge reports on those individuals.

2    BY MR. GRADY:

3    Q.   And in your capacity as a psychologist for the Bureau of

4    Prisons, did you come to conduct an evaluation of Mr. Volungus?

5    A.   Yes, I did.

6    Q.   Okay.  I'm just going to ask you to take a look quickly at

7    Exhibit 58 in the binder in front of you and ask you if you

8    recognize what that document is.

9    A.   It's a Notice of Psychological Evaluation.

10   Q.   And can you just describe for the Court what generally

11   that is and what its purpose was?

12   A.   Individuals who were transferred to Devens for a

13   pre-certification evaluation were given a copy of this to sign.

14   Q.   And what does it basically say?

15   A.   It explains what the evaluation is for, and it's a review

16   of some of the limitations of confidentiality.

17   Q.   And did Mr. Volungus sign this waiver of confidentiality?

18   A.   Yes.

19   Q.   What was the purpose of the evaluation you were asked to

20   conduct of Mr. Volungus?

21   A.   The evaluation was requested to be sent to the

22   certification review panel.  And they would use that, in part,

23   to determine whether Mr. Volungus met criteria for

24   certification as a sexually dangerous person.

25   Q.   Okay.  When did you evaluate Mr. Volungus?

1    A.    December 11, 2006.

2    Q.    Okay.  And did you inform Mr. Volungus of the purpose of

3    the evaluation?

4    A.    Yes.

5    Q.    And what did you explain to him about the purpose of the

6    evaluation?  What, if anything, did he say to you?

7    A.    What did I explain to him?

8    Q.    About the purpose of the evaluation --

9    A.    That it was for the certification review panel, and that

10   they would be using it to consider whether or not he met the

11   criteria for certification.

12   Q.    Okay.  And was this the first time you had interacted with

13   Mr. Volungus?

14   A.    No.

15   Q.    When had you previously interacted with him?

16   A.    When he initially was transferred to FMC Devens.  I think

17   the date was -- it was the end of November.  Maybe the 29th?

18   Q.    And what was the nature of that interaction?

19   A.    Individuals who are initially transferred to Devens

20   are -- go through R&D.

21   Q.    What's R&D?

22   A.    Receiving and discharge.

23         And they fill out what was really twofold.  They fill out

24   an original questionnaire where they're asked about some

25   symptoms they might have experienced in the last couple of

1    weeks, and the individuals who check off a certain number or

2    certain type of symptoms are seen by psychology services, but

3    also to let him know why he has been transferred there, and to

4    go over the purpose -- the evaluation, limitations of

5    confidentiality.

6    Q.    I'm going to bring you now back to the evaluation you

7    conducted in December of 2006.  Can you tell me what procedure

8    you used in conducting the evaluation?  What types of things

9    did you do, what were you looking for?

10   A.    I conducted a clinical interview, scored a Static-99, and

11   reviewed the PSR as well as the Bureau of Prison records.

12   Q.    The PSR you mentioned.  That's an abbreviation for

13   presentence report?

14   A.    Correct.

15   Q.    And that's from his 1998 conviction?

16   A.    Correct.

17   Q.    And some BOP psychology and data notes, correct?

18   A.    Correct.

19   Q.    But not the entire universe of documents available to the

20   BOP?

21   A.    No.

22   Q.    So you had a limited number of documents at the time,

23   correct?

24   A.    Correct.

25   Q.    Okay.  You mentioned a Static-99.  Can you just explain

1   for the Court what is Static-99 generally and how does it work?

2   A.   It's an actuarial tool that assesses an

3   individual's -- categorizes their risk for future sexual

4   recidivism.

5   Q.   Okay.  And just for illustration purposes, I'm just going

6   to show an item.  This is not in evidence.  Do you recognize

7   this document?

8   A.   Yes.

9   Q.   What is it?

10  A.   It's the scoring sheet for the Static-99 that I completed.

11  Q.   And can you describe for me what does the Static-99

12  consist of mechanically?  There's a series of questions,

13  correct?

14  A.   Correct.

15  Q.   Okay.  And what are those questions?

16  A.   There are ten items related to the individual's age, some

17  historical factors such as whether or not they ever lived with

18  a lover, questions about their prior offense history including

19  non-sexual violence and then sexual convictions, information

20  about sentencing dates, and then characteristics related to the

21  victim or victims.

22  Q.   Okay.  And in your understanding, why is it that these

23  questions are in the test?

24  A.   Because they have been found to be related to risk for

25  sexual recidivism.

1    Q.   Okay.  And so one would just go through this series of

2    questions and score an individual, correct, depending on how

3    they answered your questions, or these questions?

4    A.   No, not depending on how they answered; it's based on

5    records, and then some of them are based on self-report.

6    Q.   Okay.  And, again, how did you score -- or what was

7    Mr. Volungus' ultimate score on the Static-99 when you did it?

8    A.   An eight.

9    Q.   And what is the significance of an eight?  Can you

10   describe for us, what's significant about the scores that an

11   individual gets in this actuarial model?

12   A.   A score of eight falls in the high risk category for

13   sexual recidivism.

14   Q.   Are there any items you would score differently today?

15   A.   Yes.

16   Q.   Okay.  How so?

17   A.   The item that's related to prior non-sexual violence, any

18   convictions, I would score it as a zero.

19   Q.   Okay.  That's Item No. 4 in this?

20   A.   Yes.

21   Q.   Okay.  Why is it that you would score it differently

22   today?

23   A.   The PSR indicated that he had a prior conviction for -- it

24   was an assault and battery or assault with a dangerous weapon

25   charge.  And he actually -- it was under Article 15, under

1    military, that he received consequences for that.

2    Q.   Do you now understand something about Article 15 military

3    sanctions that was different than what you understood at the

4    time you initially scored this?

5    A.   That it's a non-judicial process, so it actually wouldn't

6    count as a conviction.

7    Q.   So it's not a formal court-martial?

8    A.   Correct.

9    Q.   And therefore, he would have, if you scored this today, a

10   seven, correct?

11   A.   Yes.

12   Q.   What, if any, difference is there between a seven and an

13   eight?

14   A.   They both fall in the high risk category.

15   Q.   In terms of score, how does the score or -- at what point

16   or at what threshold does an individual become a high risk?

17   A.   Six.

18   Q.   And all individuals above six are high risk, correct?

19   A.   Correct.

20   Q.   There's no distinguishing between a six, a seven, an

21   eight, a nine, a ten, an 11?

22   A.   It's all high risk.

23   Q.   So while you would score him differently by a point, it

24   makes no difference as a practical matter; is that correct?

25   A.   Correct.

 1          MR. GRADY:  Just for the record, I marked this for

 2     identification as just Exhibit A, you Honor.

 3          MR. FICK:  I'm sorry?

 4          MR. GRADY:  This is marked for identification as

 5     Exhibit A.

 6          THE COURT:  It has already been or are you doing it

 7     now?

 8          MR. GRADY:  No, it isn't.  I would like to mark it for

 9     identification.

10          MR. FICK:  I have no objection to the marking for

11     identification.  And we're going to, I think, inquire as well.

12     What I want to make clear, which I think I understand, is that

13     the government is not actually proffering Ms. Ferraro as an

14     expert for this case or purporting that this scoring of the

15     Static ought to govern the Court's decision.

16          MR. GRADY:  No, your Honor.  The government is not,

17     and the government merely wanted to mark the piece of paper to

18     which it referred so the record is clear on the issue that that

19     was that piece of paper to which the government was referring.

20          MR. FICK:  That's fine.

21          THE COURT:  Okay.

22          THE CLERK:  Government's A is marked for

23     identification.

24          MR. GRADY:  Thank you.

25          (Petitioner's Exhibit A marked for identification.)

1    BY MR. GRADY:

2    Q.   Did you base your evaluation entirely upon the Static-99

3    score?

4    A.   No.

5    Q.   In conducting your evaluation -- what information

6    contributed beyond the actuaries?

7    A.   Well, the evaluation report and the interview consisted of

8    questions about general background, biographical information as

9    well as sex-offense history; it wasn't just limited to a

10   Static-99 score.

11   Q.   Okay.  Directing your attention to the background

12   information you learned from Mr. Volungus, what types of

13   information did you learn?

14   A.   He reported he was raised -- born and raised into an

15   intact family; described his childhood as good, his family

16   members as supportive.  With respect to educational background

17   history, he obtained a BA in history, I think it was in 1989.

18   With early -- with respect to early school history, reported a

19   history of some behavioral difficulties in grammar school,

20   involvement in fights with other youth, usually in response to

21   being picked on.  That continued up until about the sixth

22   grade.

23        His employment history, he reported a history of

24   consistent employment.  Relationship history, he reported a

25   history of six significant adult romantic relationships.

1    Q.    What, if anything, did he tell you about his relationships

2    or how they ended?

3    A.    That they typically ended in disaster.

4    Q.    Did he tell you anything about the type of individuals

5    with whom he had relationships or their physical appearance?

6    A.    That they tended to look younger.

7    Q.    What was the reason Mr. Volungus was in BOP custody?

8    A.    For violation of probation -- supervised release.

9    Q.    And do you understand, or do you know what the original

10   conviction was that led to his supervised release?

11   A.    The original conviction, prior --

12   Q.    Yes; what he was convicted for.

13   A.    I'm sorry.  For the supervised release?

14   Q.    A term of supervised release was imposed in connection

15   with his conviction, correct?

16   A.    Yes.

17   Q.    And he was violated on the supervised release, correct?

18   A.    Yes.

19   Q.    Do you know what the conviction was on which he was given

20   a term of supervised release?

21   A.    Use of an interstate facility to attempt to entice a minor

22   to engage in sexual contact, receipt of child pornography,

23   possession of child pornography.

24   Q.    And briefly, can you tell me what do you understand the

25   facts underlying that offense to be?

1   A.   That Mr. Volungus had been engaged in contact over the

2   Internet with someone that he believed to be a 19-year-old

3   female who reported she had a 14-year-old sister, and he made

4   arrangements to travel to meet them to engage in sexual

5   conduct, and was arrested when he arrived for the meeting.  And

6   then following that, when his home was searched, child

7   pornography was found.

8   Q.   Do you recall what his initial sentence was, the

9   incarcerated portion?

10  A.   Fifty-three months.

11  Q.   And what was the term of supervised release initially

12  imposed?

13  A.   Three years.

14  Q.   Do you recall, or do you know, when Mr. Volungus was

15  incarcerated in the BOP?  Between what and what dates?

16  A.   I believe it was -- not exact dates -- sometime in 1999 to

17  2003.

18  Q.   And subsequent to his surrender -- excuse me -- or the

19  violation of his supervised release?

20  A.   When was he incarcerated?  From June of 2005.

21  Q.   Until?

22  A.   Present.

23  Q.   Until his certification in this case?

24  A.   Correct.

25  Q.   Did you review materials and discuss with him his 1998

1   offense?

2   A.   Yes.

3   Q.   What did he tell you about that?

4   A.   He reported that after watching a special on television

5   that he learned how to access child pornography, or find it on

6   the Internet.  And for a period of probably about three to four

7   months before he was arrested he had been viewing child

8   pornography.  He would view it typically on weekdays from

9   5 p.m. to midnight; and then Friday, Saturdays and Sundays from

10  5 p.m. to 6 a.m., often sleeping at lunchtime because he was up

11  at night viewing pornography.  He reported that he also had set

12  up the computer to download child pornography when he wasn't

13  there.

14  Q.   Did he, in the context of this discussion, make any

15  statements about particular images that he said -- or he told

16  to you that he was masturbating to?

17  A.   He reported masturbating to images of girls between the

18  ages of about 13 or 14, and that he liked -- he preferred the

19  images that depicted children engaged in sexual contact with

20  other children because that reminded him of high school, his

21  high school days.

22  Q.   What, if anything, did he tell you about images he may or

23  may not have deleted prior to his arrest?

24  A.   He reported that he deleted images that had depicted

25  bondage or children crying because sex was supposed to be

1   something that was happy.

2   Q.   And what, if anything, did he say about the ages of the

3   children that were depicted in the child pornography he

4   possessed?

5   A.   That he ranged from 18 months to 18 years.

6   Q.   What, if anything, did he relate to you about the use of

7   Internet chat rooms at this time?

8   A.   That sometime in June or July of 1998 he discovered chat

9   rooms and that he, over the period of about two weeks prior to

10  his arrest, engaged in chat with about two minors.  He reported

11  that while engaged in the chat, he engaged in -- I forget the

12  exact words, but dirty -- sexualized talk, and masturbated

13  during those chats.

14  Q.   So the incident with the military police which led to his

15  conviction was not the only child with whom he spoke or

16  chatted?

17  A.   Correct.

18          MR. FICK:  Object -- well...

19  BY MR. GRADY:

20  Q.   Did you have an opportunity to review documents and

21  discuss with him his incarceration --

22  A.   Yes.

23  Q.   -- from 1999 until 2003?

24  A.   Yes.

25  Q.   In connection with your evaluation in December of 2006,

1    did you review various PDS notes?

2    A.    Yes.

3    Q.    What is a PDS note?

4    A.    PDS stands for the Psychology Data System.  It's a note

5    entered by psychology staff after they have contact with an

6    inmate.

7    Q.    I'm going to show you what's in evidence and marked as

8    Exhibit 10, and ask you if you recognize what this document is.

9    A.    Yes.

10    Q.    Okay.  What is it?

11    A.    It's a note for a brief counseling session.

12    Q.    Okay.  And what, if any, note of this did you make in your

13    evaluation, and why?

14    A.    That the author had indicated that he appeared to be

15    expressing denial and minimizing his role.

16    Q.    What is the significance of denial and minimizing his role

17    to you?

18    A.    It can be related to an individual's risk for re-offense.

19    Q.    How so?

20    A.    Individuals who don't take responsibility for --

21          MR. FICK:  Objection.  To the extent she's not being

22    proffered as an expert, I would object to this line of

23    testimony certainly with her.

24          THE COURT:  Yeah.  What is the --

25          MR. GRADY:  That's fine.  I can move away from this,

1    your Honor.

2         THE COURT:  All right.

3    BY MR. GRADY:

4    Q.   I'm just going to show you another exhibit in evidence as

5    Exhibit 12, and ask if you recognize what this document is.

6    A.   Yes; it's another PDS note.

7    Q.   And is this something you made note of in your report and

8    your evaluation?

9    A.   Yes.

10   Q.   Okay.  And can you tell me what specifically did you make

11   note of in your report or evaluation of Mr. Volungus?

12   A.   That in October of 2002 during a shakedown of his

13   belongings, Mr. Volungus was found to possess hand-done

14   drawings of children engaged in sexual activities with adults,

15   and that he had reported that he had -- was feeling more lonely

16   and isolated when he engaged in these drawings, which was

17   similar to how he had felt when he began downloading child

18   pornography.

19   Q.   What, if anything, did he say to you specifically in

20   relation to this incident about how he felt that he could

21   control his urges?

22   A.   He reported his belief that his sexually deviant interests

23   were compulsive; that the behavior was compulsive.

24   Q.   What did you take that to mean in the context of your

25   interview, that his behavior was compulsive?

1   A.   That he had difficulty not engaging in it.

2   Q.   What, if any, significance is it to you of Mr. Volungus

3   engaging in this in a prison setting?

4            MR. FICK:  Objection.

5            THE COURT:  Again, it sounds like expert testimony.

6            MR. GRADY:  I'll withdraw the question, your Honor.

7   BY MR. GRADY:

8   Q.   I'm going to show you what's in evidence and marked as

9   Exhibit 13.  Do you recognize this document?

10  A.   Yes; it's another PDS note.

11  Q.   Okay.  And is this something you made note of in your

12  evaluation?

13  A.   Yes, I did.

14  Q.   What did you note?  Excuse me.

15  A.   That he questioned the extent to which his sexually

16  deviant interests, or his offense conduct, was aberrant or

17  deviant.

18  Q.   And what did that reflect to you?

19  A.   That he was --

20           MR. FICK:  Objection.

21           MR. GRADY:  Withdrawn.

22  BY MR. GRADY:

23  Q.   I'm going to show you what's been previously marked as

24  Exhibit 14 and ask if you recognize what that document is?

25  A.   It's another PDS note.

1   Q.   Is that something you referred to in your evaluation?

2   A.   Yes.

3   Q.   Okay.  And what, if anything, did you -- or what did you

4   refer to in your evaluation from this note?

5   A.   That he had expressed an attraction to minors and that --

6   Q.   Sexual?

7   A.   A sexual attraction to minors, and that he noted that the

8   adults that he dated tend to be younger looking.

9   Q.   And what, if anything, did you note about his attitudes

10  about how his sexual interests were perceived by society in

11  general?

12  A.   That he believed that the sanctions that individuals

13  received aren't justified and that it was society that just

14  hadn't come to accept their preferences.

15  Q.   His sexual preferences?

16  A.   Yes.

17  Q.   In the course of your evaluation, did you have an

18  opportunity to review and discuss the circumstances of his

19  supervised release revocation?

20  A.   Yes.

21  Q.   Okay.  You understand he was released from prison sometime

22  in May of 2003; is that correct?

23  A.   Correct.

24  Q.   Okay.  At that point what is your understanding of any sex

25  offender treatment he underwent, if any?

1   A.    It's my understanding he participated in outpatient sex

2   offender-specific treatment from June of 2003 through June of

3   2005, when he was reincarcerated.

4   Q.    And did you have those treatment records when you

5   conducted your evaluation?

6   A.    No, I did not.

7   Q.    What did he tell you about the sex offender treatment

8   between 2003 and 2005?

9   A.    He reported that during the first six months he just

10  showed up, and that it wasn't until after that that he became

11  engaged in treatment.

12  Q.    And what, if anything, did he tell you about what he

13  learned in treatment?

14  A.    That he realized that the women that he had dated tended

15  to be younger looking; they tended to be petite; they tended to

16  be small breasted.  And that he realized that the pornography

17  he had been looking at was -- or erotica -- child erotica was

18  child pornography.

19  Q.    But prior to that he hadn't realized that child

20  pornography was child pornography?  How did you understand

21  that?

22  A.    That he came to realize that during treatment.

23  Q.    What, if anything, did he tell you about his possession of

24  child pornography after his release from prison in May of 2003?

25  A.    He reported that he obtained a computer in about December

1    of 2003, and began accessing child pornography almost

2    immediately after getting the computer with Internet access.

3    Q.   My recollection is that you said that Mr. Volungus began

4    treatment in June, and he told you he didn't really begin to

5    engage for six months, correct?

6    A.   Correct.

7    Q.   That would take us to December, correct?

8    A.   Correct.

9    Q.   And that's when he told you he really started paying

10   attention in treatment?

11   A.   Correct.

12   Q.   Repeat for me what he told you about when he started

13   downloading child pornography.

14   A.   As soon as he obtained a computer with Internet access,

15   which was in December.

16   Q.   At the same time he told you he was beginning to engage in

17   treatment?

18   A.   Yes.

19   Q.   He was downloading child pornography?

20   A.   Yes.

21        THE COURT:  Mr. Grady, I would like to take a short

22   break for the benefit of everybody.  This might be a good place

23   to do it.

24        MR. GRADY:  That's fine.

25        THE COURT:  Okay.

1           By the way, it looks like -- I don't know how long

2   Dr. Ferraro will be on, but it looks like we may not be making

3   a phone call today.

4           MR. GRADY:  I had one of the paralegals send an e-mail

5   note to the probation officer saying we had started an hour

6   late because --

7           THE COURT:  All right.  We'll take a short recess.

8           THE CLERK:  All rise.

9           (The Court exits the courtroom at 11:28 a.m.)

10          THE CLERK:  The Court will take a short recess.

11          (There is a recess in the proceedings at 11:28 a.m.)

12          THE CLERK:  All rise.

13          (The Court enters the courtroom at 11:47 a.m.)

14          THE CLERK:  For a continuation of the bench trial.

15   Please be seated.

16          MR. GRADY:  Your Honor, thank you.

17          I will note, due to the late start, I had promised

18   Ms. Ferraro that she would be out by 12:30, your Honor.  I

19   would hope your Honor will allow me to keep that promise.

20          THE COURT:  That's all right.  I'm sorry we can't

21   finish her today; that's the only problem.

22   BY MR. GRADY:

23   Q.   In addition to the possession of child pornography that

24   occurred while on supervised release, are you aware of any

25   other ground upon which his supervised release was revoked?

1    A.    Contact with a minor.

2    Q.    When you refer to the minor, just use initials, if

3    possible.  Can you tell me what, if anything, did he tell you

4    about the minor?

5    A.    That the minor was in his home with him.  He was in his

6    room, she came up to his room, jumped on his bed and gave him a

7    hug.

8    Q.    Any familial relationship?

9    A.    The child was his niece.

10   Q.    Okay.  Was there any mention of a child in protective

11   services investigation with respect to this incident?

12   A.    Yes.

13   Q.    And what, if any, mention was there?  And what was the

14   discussion?

15   A.    Mr. Volungus mentioned that there had been one, and that

16   the results came back that he didn't do it.

17   Q.    By "he didn't do it," there had been no sexual abuse?

18   A.    Correct.

19   Q.    I'm just going to ask you to take a look at Exhibits 48,

20   49 and 50 in the binder in front of you.

21   A.    I'm sorry.  Did you say 40?

22   Q.    Forty-eight, 49 and 50.

23          MR. GRADY:  And just to preface this for my brother,

24   your Honor, I had intended at this point to ask her about her

25   knowledge of the sex offender treatment program and to comment

1    upon the fact that Mr. Volungus was denied entry to the Sex

2    Offender Treatment Program in BOP.  I don't know whether they

3    believe this to be beyond the scope of what they thought she

4    would be called about.

5           MR. FICK:  I don't have a particular objection if she

6    has knowledge about what the criteria is or something.

7           MR. GRADY:  All right.  Thank you.

8    BY MR. GRADY:

9    Q.   Have you -- prior to this trial and prior to preparing

10   with me, had you ever seen these documents before, 48, 49 and

11   50?

12   A.   No.

13   Q.   Okay.  Can you just take a look -- let's start with

14   Exhibit 48.  Can you tell me what that is?

15   A.   It's a letter to the judge from the regional director of

16   the Bureau of Prisons.

17   Q.   And in sum and substance, what does it relay?

18   A.   That the Bureau of Prisons is aware of the recommendation

19   made by the judge regarding the Sex Offender Treatment Program,

20   but that Mr. Volungus had been denied by the program director

21   based on documentation indicating that he didn't take

22   responsibility for his sexually deviant behaviors.

23   Q.   In your capacity as a psychologist in the sex offender

24   treatment and Sex Offender Management Program at FMC Devens,

25   did you become familiar, as a professional matter, with the

1   eligibility requirements for the BOP for the Sex Offender

2   Treatment Program generally?

3   A.   Yes.

4   Q.   Okay.  And based upon your familiarity with the BOP Sex

5   Offender Treatment Program, can you explain for me how it is

6   that an individual whom a judge recommends for sex offender

7   treatment might not be accepted?

8   A.   There could be a variety of different reasons.

9   Q.   Can you give us some of those?

10  A.   Sure.  Sentence length could be one.  At that point in

11  time, I believe, it was someone who was within 36 -- had about

12  36, to a little bit more than that, time left on their sentence

13  in terms of eligibility criteria.  Some other examples might be

14  significant mental illness that would impact their ability to

15  participate in treatment.  And also, individuals who weren't

16  taking responsibility for their offense conduct.

17  Q.   What, if anything, do you know about the size of the BOP

18  Sex Offender Treatment Program as it existed at this time in

19  2005?

20  A.   There was only one, and I can't remember the exact number,

21  but was something just over 100 individuals.

22  Q.   And based on your experience, was this a difficult program

23  to get into?

24  A.   There were a lot of people waiting to get into it because

25  it was, again, a small program.

1    Q.   Okay.  Again, in the context of your knowledge of the

2    program generally and the information contained in this letter,

3    can you tell us why it is that Mr. Volungus may not have made

4    it into the Sex Offender Treatment Program?

5              MR. FICK:  Objection.

6              THE COURT:  Let her speak for herself.

7              MR. GRADY:  Okay.

8    BY MR. GRADY:

9    Q.   I would ask you just to take a look at Exhibits 49 and 50.

10   And again, had you seen either of those documents before we

11   prepared for this trial?

12   A.   No.

13   Q.   Are you familiar, however, with the type of documents that

14   these are?

15   A.   Yes.

16   Q.   Okay.  And are these documents typically used -- strike

17   that.

18        What is Exhibit 49?

19   A.   It's what's called a "copout," which is an inmate request

20   to staff.

21   Q.   And how is this used within the context of -- by an

22   individual who's incarcerated by BOP?

23   A.   It would be written to a staff member for a variety of

24   different reasons.

25   Q.   And what is Exhibit 50, if you know?

1   A.   It's the response to the copout.

2   Q.   Having reviewed Exhibits 49 and 50, and based on your

3   generalized familiarity with sex offenders, can you tell me

4   what, if anything, is your opinion as to whether this is an

5   earnest request for sex offender treatment?

6           MR. FICK:  Objection.

7           THE COURT:  Sustained.

8   BY MR. GRADY:

9   Q.   Since he was certified -- I'm going to step away from

10  those documents now, Dr. Ferraro.

11          Since Mr. Volungus was certified, could he have sought sex

12  offender treatment at Devens?

13  A.   No.

14  Q.   Why not?

15  A.   The Sex Offender Treatment Program at Devens is for

16  sentenced inmates.

17  Q.   Okay.  To your knowledge, however, has Mr. Volungus sought

18  treatment since he was certified?

19  A.   Not to my knowledge.

20  Q.   Is that something you would have been aware of?

21  A.   That I likely would have been aware of during the time I

22  was still working in the sex offender management program, yes.

23  Q.   Okay.  I would like to just now come back to the

24  evaluation in December of 2006.  What, if anything, did

25  Mr. Volungus tell you about his sexual activities on a

1  day-to-day basis at the time you evaluated him?

2  A.   He reported that he was masturbating on a daily basis,

3  usually while fantasizing about ex-girlfriends or old

4  girlfriends.

5  Q.   What, if anything, did he tell you about his sexual

6  interests at that time, or what his -- the basis of -- what the

7  focus of his attraction was?

8  A.   He reported a sexual attraction to minors.

9  Q.   Did he use -- do you recall specifically any particular

10  words he used?

11  A.   Girls who were just entering puberty.

12  Q.   What, if anything, did you discuss at that time about his

13  ability to manage his desires, either presently or in the past?

14  A.   He stated his belief that he had developed the ability or

15  learned to manage his deviant sexual interests.

16  Q.   Okay.  And can you describe for me what was that

17  conversation?  What kind of steps did he say he had taken to

18  manage his attraction?

19  A.   He gave the example of an incident prior to his

20  incarceration where he had been at a library, and a girl who

21  was about 11 or 12 years old came into the area where he was in

22  the library.  He said he looked up, looked at her, and then

23  went to a different section of the library.  He also discussed

24  that he was making an effort not to watch television because he

25  was concerned that commercials might come on with children in

1    them.

2    Q.    Those are things he viewed as potential triggers for

3    offending?

4    A.    Yes.  Or high-risk situations, yes.

5    Q.    He mentioned walking away from a girl, 11 to 12, as an

6    example of controlling his sexual desires, correct?

7    A.    Correct.

8    Q.    Did he express to you a sexual interest in 11- and

9    12-year-old girls?

10   A.    During the course of that discussion he did.

11   Q.    What, if any, belief did he express to you concerning

12   whether he believed -- whether he could control these

13   images -- these interests in the future?

14   A.    He stated that he had -- when he realized that alcohol was

15   a problem for him, he had stopped drinking alcohol, and he

16   believed that he could do the same thing regarding his urges.

17   Q.    Do you think that's realistic?

18           MR. FICK:  Objection.

19           THE COURT:  Sustained.

20   BY MR. GRADY:

21   Q.    Doctor, I'm going to direct your attention to August of

22   2007.  Did you at that time have occasion to review a package

23   of materials related to Mr. Volungus?

24   A.    Yes.

25   Q.    Okay.  I'm just going to have you take a look at the

1    binder marked Exhibit 61 in evidence.  I'm just going to ask if

2    you recognize those materials.

3    A.   These look like copies of the materials that were found in

4    the binder.

5    Q.   Do you recognize them to be copies of those materials?

6    A.   Yes, sir.

7    Q.   Can you describe for me the circumstances that led to your

8    reviewing those materials in August of 2007?

9    A.   I received a call from education staff who reported that

10   during the course of shaking down inmates in education, there

11   was a large legal-sized manila envelope -- folder full of these

12   materials was found on Mr. Volungus.

13   Q.   And why were you called upon to be the one evaluating

14   these materials?

15   A.   Because it was part of my job.

16   Q.   And why was it that these particular materials led whoever

17   it was who found them to believe it was part of your job as a

18   sex offender treatment --

19             MR. FICK:  Objection.

20             THE COURT:  Sustained.

21   BY MR. GRADY:

22   Q.   I'm going to show you what's in evidence as Exhibit 18 and

23   ask if you recognize this.

24   A.   Yes.

25   Q.   What is it?

1    A.    It's the note that I wrote summarizing or describing a lot

2    of the materials found.

3    Q.    Okay.  Let me just ask you to take a look at Exhibit 61.

4    I don't even think you need to, but I'll let you note that page

5    1866 of those materials -- strike that.

6          Were there materials within the larger package that

7    suggested to you ownership of these materials?

8    A.    Yes.

9    Q.    Okay.  I'm going to show you page 1866 of Exhibit 16 --

10   61, and ask if you recognize that as having been among the

11   materials being reviewed?

12   A.    Yes.

13   Q.    And what is it?

14   A.    A copy of an envelope that was in the packet that's

15   addressed to Mr. Volungus at the prison.

16   Q.    Okay.  I just show you another section of materials from

17   that.  I show you another page from Exhibit 61, Exhibit 1833

18   [sic].  Do you recognize that as having been among the

19   materials you reviewed?

20   A.    I believe so, yes.

21   Q.    And what is that?

22   A.    It's a letter to Mr. Volungus.

23   Q.    From whom?

24   A.    From his father.

25   Q.    What, if anything, does that suggest to you about the

1    ownership of materials?

2    A.    That they were his materials.

3    Q.    I'm going to show you what's Bates-stamped page number

4    1491 from Exhibit 61 in evidence.  I'm going to ask you if you

5    recognize this particular image.

6    A.    Yes.

7    Q.    Where do you recognize it from?

8    A.    It was also a copy of what was found in the manila folder.

9    Q.    And what would you say are the age of the children

10   depicted in this drawing?

11          MR. FICK:  Objection.

12          THE COURT:  Sustained.

13   BY MR. GRADY:

14   Q.    I'm going to show you what's in evidence at Bates pages

15   1613-1619 of Exhibit 61.  And I will represent to you that I

16   have added some typing.  Do you recognize, however, the

17   handwritten portion of this document as having been among the

18   materials you reviewed in August of 2007?

19   A.    Yes.

20   Q.    And I'm going to ask you to --

21          MR. GRADY:  May I approach the witness, your Honor?

22   Q.    I'm sorry to do this to you.  I'm going to ask you if you

23   can take an opportunity to read through and see if the typing

24   accurately reflects how you would read that document.

25          THE COURT:  Is this 61A?

1          MR. GRADY:  61A, your Honor.

2          MR. FICK:  I don't know, your Honor.  I don't know if

3    I want to object, but I'm not sure it really adds anything

4    to the -- the Court can decide whether or not it wants to

5    believe --

6          THE COURT:  That's probably right.

7          MR. GRADY:  Then I'd just ask that 61A be marked for

8    identification, your Honor.

9          MR. FICK:  For identification, no objection.

10         MR. GRADY:  If the witness is not allowed to -- I

11   would propose to introduce the exhibit.

12         THE COURT:  If she had prepared it I'd allow it, but,

13   you know, otherwise, no.

14         MR. GRADY:  Very well, your Honor.

15         (Petitioner's Exhibit No. 61A marked for

16   identification.)

17   BY MR. GRADY:

18   Q.   I'm going to show you what's been introduced in evidence

19   in Exhibit 61 at Bates stamp 1534.  I'm going to ask if you

20   recognize the handwritten portion of this document as having

21   been part of the materials you reviewed.

22   A.   Yes.

23   Q.   And can you tell me where it is highlighted here, what

24   that document says?

25   A.   "The new sexual revolution will recognize the sexual

1    rights of our children, that they have the same right to sexual
2    pleasure as do adults."
3    Q.   And that was among the materials found on Mr. Volungus in
4    August of 2007?
5    A.   Correct.
6    Q.   I'm going to show you another document that's been marked
7    for identification as 61C, and it is at Bates 1621 of Exhibit
8    61, and ask if you recognize the handwritten portion of that
9    document as having been among the materials you reviewed in
10   2007.
11   A.   Yes.
12   Q.   Okay.  And can you read for me the highlighted portion of
13   that document?
14   A.   "Making CP illegal, you create a profitable enterprise for
15   criminals; you keep the activity underground where abuse has a
16   higher incidence.  Legalized, you can enforce minimum health
17   and safety standards."
18   Q.   And that was among the materials seized from Mr. Volungus
19   in August of 2007?
20   A.   Yes.
21   Q.   And I'm going to show you what's been marked for
22   identification as 61D.  Do you recognize the handwritten
23   portion of this document as having been among the materials you
24   reviewed in August of 2007?
25   A.   Yes.

1    Q.   And can you read for us the highlighted portion of this

2    document?

3    A.   "Disguise list.  Hair:  Dye, wig; colored contact lenses;

4    makeup to tan or make pale; fake facial hair:  Moustache,

5    beard, et cetera; fake tattoos; fake teeth.  Don't become

6    predictable.  Use widely scattered hotspots at various times

7    and dates.  Don't get in the habit of Thursdays at noon at the

8    Fifth Street Library.  Eventually, even with wireless and

9    proxies, they can find you."

10   Q.   Is this something you specifically made note of in your

11   review of the materials?

12   A.   Yes.

13   Q.   Why?

14   A.   Because it suggested that he was planning how to

15   re-offend.

16   Q.   I show you another document that's been marked for

17   identification as 61E.  I'm going to ask if you recognize the

18   handwritten portion of that document.

19   A.   Yes.

20   Q.   And was that among the materials seized from Mr. Volungus

21   that you reviewed in August of 2007?

22   A.   Yes.

23   Q.   And what, if anything, did you note of significance in

24   your review?

25   A.   That it seemed to also be ways to continue to engage in

1    the behavior without being detected.

2    Q.   The downloading of child pornography?

3    A.   Yes.

4    Q.   I'm just going to ask you to read the last sentence on

5    that page.

6    A.   "Sex before eight or else it's too late."

7    Q.   And did you make note of that in your review in August of

8    2007 and why?

9         MR. FICK:   Objection to the "why" at this point.

10        THE COURT:   Well, why don't you separate the question,

11   anyway.

12        MR. GRADY:   Sure.

13   BY MR. GRADY:

14   Q.   Did you make note of that particular statement in your

15   review of these documents in August of 2007?

16   A.   Yes.

17   Q.   And why?

18        MR. FICK:   Objection.

19        THE COURT:   Overruled.

20        You may answer that.

21        THE WITNESS:   Because it suggested that sex before the

22   age of eight; otherwise, the child's too old.

23        MR. GRADY:   Thank you.   Nothing further.

24                         CROSS-EXAMINATION

25   BY MR. FICK:

1   Q.   Good afternoon, Dr. Ferraro.

2   A.   Good afternoon.

3   Q.   So you were at Devens from about June of 2004 to June of

4   2009, correct?

5   A.   Correct.

6   Q.   And until about October of 2008, you were involved in what

7   you described as the Sex Offender Management Program and

8   treatment program there, correct?

9   A.   Correct.

10  Q.   Why did you stop that affiliation in 2008 when you left

11  Devens?

12  A.   There was an opening for a mental-health unit psychologist

13  and it was -- it seemed to be the opportunity for me to do more

14  program development types of work.

15  Q.   And then prior to Devens, your experience with sex

16  offenders specifically involved juveniles, correct?

17  A.   Correct.

18  Q.   That was work you incorporated, correct?

19  A.   Correct.

20  Q.   And it's fair to say the issues one confronts with

21  juvenile sex offenders tends to be very different from the

22  issues one encounters with older offenders, right?

23  A.   Correct.

24  Q.   Diagnostically tends to be different?

25  A.   Yes.

1   Q.   And the behavioral things one worries about going forward

2   tends to be different?

3   A.   Correct.

4   Q.   And in terms of specific education or training with regard

5   to adult sex offenders specifically, you only began that sort

6   of in parallel with the work you did at Devens, correct?

7   A.   Correct.

8   Q.   So at Devens you had on-the-job training dealing with sex

9   offenders, and simultaneously, you went to some conferences and

10  that sort of thing, correct?

11  A.   Correct.

12  Q.   You hadn't previously had any specific education or

13  specialization in this area, right?

14  A.   Well, specific education around conferences, some of the

15  conferences prior to, yes.

16  Q.   But no particular education about -- or certification

17  regarding the treatment of sex offenders and the evaluation of

18  sex offenders prior to Devens?

19  A.   For adults, no.

20  Q.   Now, I think your CV, which is Exhibit 57 -- do you have

21  that in front of you?  On page 3 one of the bullet points says,

22  "Provided expert testimony for assessments completed under the

23  Adam Walsh Act Child Safety Act."  Do you see that?

24  A.   Yes.

25  Q.   When did you provide actual expert testimony?

1  A.    The probable cause hearings.

2  Q.    Well, you testified at the probable cause hearings in the

3  *Peavy* case, correct?

4  A.    That was one of them, yes.

5  Q.    And in that case the government didn't actually proffer

6  you as an expert to offer an opinion, right?

7  A.    They referred to it as expert testimony, so...

8  Q.    Who referred to it as expert testimony?

9  A.    In the prepping for it, it was referred to that way.

10  Q.    Okay.  But have you ever been qualified by a court, where

11  the government says to the judge, "We proffer this person as an

12  expert to offer an opinion in this case"?  Has that ever

13  happened with you in one of these commitment cases?

14  A.    Not in one of these commitment cases, no.

15  Q.    And other than in commitment cases, have you ever been

16  proffered and approved by a court as an expert formally in that

17  way?

18  A.    Yes.

19  Q.    And when was that?

20  A.    It must have been probably 2005 or 2006.

21  Q.    One occasion, right?

22  A.    Yes.

23  Q.    And that was a sentencing situation where you did an

24  evaluation for sentencing, not a sex offender dangerousness

25  prediction issue, right?

1    A.    Right.

2    Q.    Correct?

3    A.    Correct.

4    Q.    And again, just to clarify, what I think was made clear

5    during the direct testimony, you're not here today to offer an

6    opinion right now about Mr. Volungus, correct?

7    A.    Correct.

8    Q.    Now, the Adam Walsh Act was passed in 2006, correct?

9    A.    Yes.

10   Q.    And once that happened, the Bureau of Prisons came up with

11   a process by which it was going to review inmates to see

12   whether they should be committed, right?

13   A.    Yes.

14   Q.    And that's the certification review panel you described,

15   correct?

16   A.    Yes.

17   Q.    So part of the process was somebody was going to do an

18   evaluation of somebody who may be a candidate, and then that

19   evaluation would go to the certification review panel for a

20   final decision, right?

21   A.    Yes.  They also reviewed -- the certification review panel

22   reviewed records prior to that and determined who they wanted

23   the pre-cert eval done on.

24   Q.    Okay.  So the certification review panel then does, like,

25   a cut of what people were going to look at as a first step,

1  right?

2  A.   Yes.

3  Q.   And then an evaluator does an evaluation, right?

4  A.   Yes.

5  Q.   Then the evaluation goes to the certification review panel

6  and the decision about whether to actually file a case like

7  this is made there?

8  A.   Yes.

9  Q.   Okay.  And the evaluation you talked about from

10  Mr. Volungus that you did was the sort of middle piece of that

11  scheme that we just described, right?

12  A.   Yes.

13  Q.   All right.  Now, the panel, the certification review

14  panel, had guidelines that were issued to guide both its

15  decisions and the kinds of things that needed to be covered in

16  the evaluations, right?

17  A.   Yes.

18  Q.   And you were familiar with those guidelines at the time,

19  right?

20  A.   Yes.

21  Q.   Because that was -- I mean, your job was to apply them in

22  the context of doing an evaluation?

23  A.   I'm sorry.  Could you repeat that?

24  Q.   Your job was to apply those guidelines in the context of

25  doing your evaluation?

1   A.   Are you asking about the guidelines for the evaluation

2   itself or the guidelines that the certification review panel

3   used to determine whether or not they were certifying someone?

4   Q.   Are they different?

5   A.   Yes.

6   Q.   All right.  So --

7   A.   Well, part of it was they had stuff they wanted included

8   in the report.

9   Q.   Right.  And so the certification review panel has

10  guidelines about how it's going to make its decision, and it

11  has guidelines about what it wants in the report.  And you used

12  those latter guidelines to guide your interview in the process

13  of making the report; fair to say?

14  A.   Yes.

15  Q.   And so then you would perform the evaluation and then pass

16  on the evaluation back to the panel for their final decision?

17  A.   Yes.

18  Q.   And you did that for Mr. Volungus and a number of other

19  people at around the same time?

20  A.   Yes.

21  Q.   Now, the certification review process essentially had

22  three main elements that there had to be a decision about,

23  right?  There was the first element, being the behavioral one,

24  has the person in the past engaged in sexually violent conduct

25  or child molestation, right?

1-85

1    A.    Yes.

2    Q.    Element No. 1.  The second element was:  Does the person

3    have a serious illness, abnormality or disorder that might be

4    relevant, right?

5    A.    Yes.

6    Q.    And then the third piece was the risk element, as a result

7    of the diagnosis, is there a -- does the inmate -- or will the

8    inmate have serious difficulty refraining from sexually violent

9    conduct or child molestation in the future?

10   A.    Correct.

11   Q.    Those three pieces.  And then the certification review

12   panel guidelines had criteria for how one should apply -- or

13   apply each of those three elements, right, or evaluate each of

14   those three elements?

15   A.    I'm not familiar with the guidelines of the certification

16   review panel used to determine certifying how they would apply

17   it.

18   Q.    Well, they at least -- you were familiar, I think you

19   testified, with the information that they wanted to get?

20   A.    Yes, for the report.  Yes.

21   Q.    And for the risk element, one of the things that was

22   supposed to be included in the evaluation is what was called a

23   "Clinically Adjusted Actuarial Assessment."  That was the

24   approach that was given to the evaluator to use in deciding the

25   risk element, right?

1  A.   Correct.

2  Q.   And you talked a little bit on direct testimony about

3  these actuarials, right?

4  A.   Yes.

5  Q.   And so an actuarial, or in particular, the Static-99 that

6  was used here is, as we saw, like a one-page kind of list of

7  factors, right?

8  A.   Yes.

9  Q.   And then based on information that you get from the

10  records and from the interview of the person, you assign a

11  numeric value to each of those things, right?

12  A.   Yes.

13  Q.   And then you add up the total score, right?

14  A.   Correct.

15  Q.   And then you -- there's statistical data in the background

16  that correlates a particular score with a particular risk of

17  re-offense, right?

18  A.   Correct.

19  Q.   And those are the -- that's an actuarial.  The Static-99

20  is sort of an actuarial instrument?

21  A.   Yes.

22  Q.   And you would agree, right, that there's been a lot of

23  research about how one can most accurately predict the risk of

24  re-offense, right?

25  A.   Yes.

1    Q.   And there's a body of research that says using actuarials

2    all by themselves is the most accurate way, right?

3    A.   There are some.

4    Q.   And then there's another body of research that says -- or

5    people who say, well, no, actually, a purely clinical approach

6    is more accurate, right?

7    A.   That the purely clinical approach is more accurate?

8    Q.   Right.

9    A.   No.

10   Q.   Well, you'd agree that that's not supported by the

11   research even if there are some clinicians who might believe

12   that.

13   A.   Oh, people who might say that.

14   Q.   Okay.  And then there's people who -- there's people who

15   say, well, actually, the most accurate thing to do is take your

16   actuarial and combine it with the clinical approach, right?

17   A.   Yes.

18   Q.   And that's the clinically adjusted actuarial?

19   A.   Yes.

20   Q.   And that's the approach that you were mandated to use in

21   this certification review process?

22   A.   Yes.

23   Q.   Now, the certification review criteria said that the risk

24   element would be satisfied if the person scored over six unless

25   some kind of downward adjusting factor applied, right?

1    A.    I'm sorry.  Can you repeat that?

2    Q.    The certification review criteria that the BOP was using

3    provided that a score of over six on the Static-99 would

4    fulfill the risk element unless there were some reason

5    to -- some other reason to sort of downgrade the risk

6    assessment, right?

7    A.    I wasn't aware of what their criteria was for

8    certification.  I don't know.

9    Q.    So in other words, you do not recall ever having seen the

10   actual certification review panel guidelines that they were

11   using?

12   A.    For certification, no.

13   Q.    Okay.  I'm just going to ask -- show you a document and

14   ask if you actually might have seen it.  I would ask you to

15   page through that if you've -- if you've had a chance, and just

16   tell me if you've seen that document before, you recall having

17   reviewed it.

18   A.    No.

19   Q.    Okay.  So you were not aware what effect a particular

20   score on the Static-99 might have in the further review process

21   by the certification review panel?

22   A.    Not what a particular score would, no.

23   Q.    Okay.  Now, in scoring the Static-99 there's that one-page

24   sheet with the numbers on it that we looked at.

25                MR. FICK:  In fact, if I could ask the government if I

1    could see -- if Exhibit 1A is available for --

2            MR. GRADY:  It's with the clerk.

3            MR. FICK:  Thank you.

4    BY MR. FICK:

5    Q.   I'm putting back on the screen what was previously marked

6    as Government's Exhibit A for identification.  Now, this is a

7    Static-99 scoring sheet that you looked at before during your

8    direct testimony, right?

9    A.   Yes.

10   Q.   Okay.  And so for each of these items a numeric score is

11   assigned, right?

12   A.   Yes.

13   Q.   But then in addition to the single page there's like a

14   thick book of rules about how one scores or does not score each

15   of those individual items, correct?

16   A.   Yes; the coding manual.

17   Q.   Right.  And the rules are -- is it fair to say -- I mean,

18   it's not -- the rules are not obvious; it's somewhat

19   complicated that's reflected in this book, right?

20   A.   Yes.

21   Q.   And, in fact, you talked about -- one issue that you

22   talked about is that knowing what you know now, you actually

23   would not have scored him on the prior non-sexual violence,

24   right?

25   A.   Correct.

1    Q.   Because the Article 15 thing in the military doesn't

2    necessarily count as a conviction, right?

3    A.   Correct.

4    Q.   So under the scoring book criteria, that ought not be

5    assigned a point, right?

6    A.   Correct.

7    Q.   And so that's just -- however you want to call it, it's an

8    error, it's something that you applied then that knowing what

9    you know now, you would not have applied?

10   A.   Yes.

11   Q.   And, of course, you're not familiar with the Static-99

12   score that any of the currently retained experts in this case

13   have thought about Mr. Volungus already?

14   A.   Yes.

15   Q.   You are familiar with those?

16   A.   Yes.

17   Q.   But in any event, I think your testimony on direct was,

18   other than taking off that one point for Item 4, you would not

19   have changed anything in your scoring of the Static-99?

20   A.   Correct.

21   Q.   Now, in addition to the Static-99, we talked about some of

22   the other things that you incorporated in your evaluation

23   process.  One was the review of records, right?

24   A.   Yes.

25   Q.   And the other was the interview with Mr. Volungus?

1    A.    Yes.

2    Q.    Okay.  Now, a couple of things that I think you testified

3    you didn't have access to at the time were -- first of all, you

4    didn't have access to any of his treatment records from his

5    period of supervised release?

6    A.    Correct.

7    Q.    Right?  And you didn't have -- at least if I'm -- did you

8    have the transcript of his actual supervised release sentencing

9    hearing?

10   A.    No.

11   Q.    Essentially, you were working with the PSR in court

12   documents from the underlying case coupled with his Bureau of

13   Prisons records that -- the Bureau of Prisons records, right?

14   A.    Yes.

15   Q.    You didn't talk to his probation officer?

16   A.    No.

17   Q.    Right?  Correct?

18   A.    Correct.

19   Q.    You didn't talk to his treatment provider?

20   A.    Correct.

21   Q.    Is it fair to say that in other contexts when you're doing

22   a risk assessment, it would not be unusual to talk to

23   collateral sources of information who might be able to add

24   something to the picture, right?

25   A.    For other types, yes.

1    Q.    In fact, nothing really prevented you from calling the

2    probation officer in this case or anything, right?

3    A.    That was not part of the process for the evaluation.

4    Q.    But I mean, you could have done it if it had been part of

5    the process?

6    A.    If it had been part of the process, yes.

7    Q.    Who decided what was part of the process?

8    A.    That's how I was told to do my evaluation, through my

9    supervisor, through the certification review panel, I guess.

10   Q.    So the selection of sources of information and documents

11   was something that was sort of determined in a structured way

12   by the BOP for the evaluations that you and your counterparts

13   were doing?

14   A.    Yes.

15   Q.    Now, there was testimony about, I believe, Exhibit 58.  If

16   you can turn to your -- turn to your binder.  This was the

17   document entitled "Notice of Psychological Evaluation."  Do you

18   see that?

19   A.    Yes.

20   Q.    And in your testimony, I think this time you didn't use

21   the word, sort of, "informed consent," or that phrase, right?

22   A.    I don't recall.

23   Q.    Well, do you recall in prior testimony describing this

24   document as some kind of a waiver of informed consent, or a

25   waiver or an informed consent document?

1    A.    I don't recall.

2    Q.    Is it fair to say, though, that this document itself is

3    essentially declarative in nature; it tells the individual he

4    is being evaluated, right?

5    A.    Yes.

6    Q.    It doesn't tell him that he has a right not to talk to

7    you, right?

8    A.    This document doesn't, no.

9    Q.    It doesn't have anything at the bottom where he affirms a

10   consent to participate in this process, right?

11   A.    No.

12   Q.    In fact, the process is going to happen whether or not he

13   talks to you, right?

14   A.    A report will be written.

15   Q.    Right.  But -- and, in fact, the document, anyway, doesn't

16   tell him that the interview is optional?

17   A.    This document doesn't, no.

18   Q.    Well, there's no other document that he's given that tells

19   him it's optional either, is there?

20   A.    What's that?

21   Q.    There's no other document that he's given that tells him

22   that the interview is optional, is it?

23   A.    No.  I meant it's not included in the document.

24   Q.    It's not included in any other document he gets, right?

25   A.    Correct.

1    Q.   And it doesn't -- I mean, he's not given any warning or

2    advice that he can remain silent about past criminal activity,

3    right?

4    A.   In meeting with him and going over this form, I did state

5    participation was voluntary.

6    Q.   Well --

7    A.   But in here, no, it's not stated.

8    Q.   So your testimony is that even though it's not in the

9    paper, you told him he didn't have to talk to you?

10   A.   It's standard procedure for these evaluations to go over

11   the voluntary nature of participating in the evaluation.

12   Q.   Well, I mean, in your report about the evaluation, you

13   also sort of wrote a paragraph about what was told to

14   Mr. Volungus at the beginning, right?

15   A.   Yes.

16   Q.   And in that paragraph -- I'll just put it up on the

17   screen.  I'm not going to enter it as an exhibit.  But you

18   recognize this to be your report about Mr. Volungus, correct?

19   A.   Yes.

20   Q.   All right.  And the middle paragraph there talks about

21   notice of action and informed consent, right?

22   A.   Yes.

23   Q.   But, again, nothing in that paragraph indicates that you

24   actually told him he didn't have to do this.

25   A.   No, it doesn't.

1   Q.   Correct?

2   A.   Correct.

3   Q.   Now, is it fair to say -- well, stepping back a minute,

4   this interview that resulted in the report was done on December

5   11, 2006, I think you testified, right?

6   A.   Yes.

7   Q.   But I think you also said that you had met with

8   Mr. Volungus briefly when you first came into the facility late

9   in November, right?

10   A.   Yes.

11   Q.   Okay.  And he had been brought to Devens specifically so

12   that this evaluation for Adam Walsh could be done, right?

13   A.   Correct.

14   Q.   Otherwise, he would have been en route to, say, a halfway

15   house for a February of 2007 release date, correct?

16   A.   Yes.

17   Q.   So he shows up at Devens, and you meet him on one of the

18   first days he's there, right?

19   A.   Yes.

20   Q.   And it's fair to say he's not happy about being there,

21   right?

22   A.   Right.  Correct.

23   Q.   He is upset at the notion that he might be held beyond his

24   prison sentence because of the Adam Walsh Act, correct?

25   A.   Correct.

1  Q.   And so, you know, when you met him -- you met him on
2  November 29th, right?
3  A.   Yes.
4  Q.   And after that meeting, or after those meetings, you wrote
5  a couple of notes in the BOP system about the interaction with
6  him, right?
7  A.   Yes.
8  Q.   And among other things, he indicated to you in the past
9  couple of weeks he had anxiety, depression, sleeping problems,
10 racing thoughts, loss of appetite, feeling hopeless, problems
11 concentrating, right?
12 A.   Correct.
13 Q.   He shared that?
14 A.   Those were items that were checked off on that form that I
15 mentioned earlier, yes.
16 Q.   Okay.  So he fills out an intake form and he indicates
17 these things are issues for him, and then you meet with him and
18 you talk about it, right?
19 A.   Yes.
20 Q.   And then you indicate that those are issues for him in the
21 report that you write?
22 A.   Yes.
23 Q.   He also told you that he likes life too much and you
24 described him as being future-oriented, right?
25 A.   Correct.

1  Q.   And he acknowledged to you that he's sexually attracted to

2  minors and understands that he can't act on that attraction,

3  right?

4  A.   Correct.

5  Q.   And that's one of the times he talked to you about the

6  steps he's taken in the past to make sure that he's not

7  attempted to actually touch somebody, right?

8  A.   Correct.

9  Q.   And, you know, he also expressed a view that you can't

10 assume anyone who's got an attraction like this is necessarily

11 going to be violent or commit a murder or some horrible

12 hands-on offense, right?

13 A.   He stated his belief that people assumed that, yes.

14 Q.   Right.  People assumed -- he was upset with the idea that

15 people assume anyone who has an attraction might -- or would

16 necessarily commit a natural hands-on offense?

17 A.   Yes.

18 Q.   So that discussion with him happens on the 29th of

19 November, and then on December 11th is when you actually have

20 the interview.

21 A.   Yes.

22 Q.   And you talked a little bit -- or you talked a little bit

23 with Mr. Grady about some of the things Mr. Volungus said.  And

24 I want to go into a few of those things in a little bit more

25 detail.

1          THE COURT:  Well, we're almost at 12:30.  If you're

2     going to start a new topic --

3          MR. FICK:  It is a logical cutoff place, I guess, your

4     Honor.  Thank you.

5          THE COURT:  All right.

6          MR. GRADY:  Thank you.

7          THE COURT:  Thank you, Doctor.  I guess we'll have you

8     back on Wednesday morning.

9          (The witness is excused.)

10          THE COURT:  And I assume that that's as far as we'll

11     go today, then; is that it?

12          MR. GRADY:  Yes, your Honor.

13          MR. FICK:  I guess the one thing I wanted to address,

14     your Honor, is with the weather forecast, I just wanted to get

15     a sense of how the Court intended to proceed.  We also have

16     experts with travel issues and things, just to figure out --

17          THE COURT:  We'll assess it as it gets closer.  We'll

18     plan to be here at 9 a.m. on Wednesday.  If, by Tuesday

19     afternoon, it looks like that's imprudent, then we'll --

20          MR. FICK:  I guess we'll provide cell phones, maybe,

21     to Mr. Lyness so we can be --

22          THE COURT:  I am a little concerned with the length of

23     time it took to get Mr. Volungus here this morning and how that

24     can affect the time.  But I don't know, you know, the weather

25     reports change every 12 hours, and so exactly what it's going

1    to look like, I don't think we know yet.  Last night it sounded

2    to me like Thursday was going to be a worse day than Wednesday,

3    so I don't know.

4         MR. FICK:  Just in terms of Mr. Volungus' transport,

5    from past experience, what the marshals have usually done is

6    have housed people temporarily at Wyatt during these

7    proceedings.  Now, whether they're doing that again this time I

8    don't know.

9         THE COURT:  I don't know why it's any better than

10   Devens in terms of getting here on time.

11        MR. FICK:  Except that they have a more regular

12   transport schedule, I guess.  I don't have any certainty about

13   what they're doing, so...

14        THE COURT:  Well, maybe the government can look into

15   those arrangements to see if there's something that has a

16   slightly better chance of being on time.

17        MR. GRADY:  I'm happy to inquire, but will do so in

18   conjunction with Mr. Lyness who may have more force with the

19   marshals than my voice, your Honor.

20        THE COURT:  Really?  You work for the same agency,

21   anyway...

22        MR. GRADY:  The care and control of prisoners is, I

23   think, something they look at as their exclusive province,

24   appropriately.

25        THE COURT:  The one thing that could be said for

1   Wyatt, I guess, is that there is a regular van, probably, going

2   back and forth.

3          MR. FICK:  The other scheduling issue, your Honor, I

4   understand from Mr. Lyness that the jury trial the Court had on

5   for next week is still on.

6          THE COURT:  It definitely is.

7          MR. FICK:  Okay.  We have a few -- we have potential

8   issues with our experts in that they anticipated, before we

9   learned that, of testifying next week.  The following week may

10  create some difficulties.  I guess the issue is whether in

11  extreme circumstance an afternoon might be a possibility next

12  week.

13         THE COURT:  I don't know.  Probably not because I

14  think we're pretty booked in the afternoons.  But let me just

15  say that the trial that I expect to go so far -- I mean, you

16  never know, sometimes things happen at the last minute.  But so

17  far the body language from the participants is that it's going

18  to go forward -- it will probably take two weeks.  So it's not

19  the week afterwards; it's the second week after.

20         MR. FICK:  Okay.

21         THE COURT:  In other words, we're beginning on the

22  7th.  We'll probably be going through -- I don't know if all

23  the way through the week of the 14th, but we're certainly going

24  to be consuming a good part of the 14th, from what I know.

25         MR. FICK:  That's helpful.

1          THE COURT:  The following week is school vacation

2     week, which is a Monday holiday, and then four days.  As far as

3     I know, we're open in the mornings that week.

4          THE CLERK:  Yup.

5          MR. FICK:  Thank you.

6          THE COURT:  All right.  We'll recess now and resume

7     tomorrow -- not tomorrow.  Wednesday.

8          MR. GRADY:  Thank you, your Honor.

9          THE CLERK:  All rise.

10          (The Court exits the courtroom at 12:31 p.m.)

11          THE CLERK:  Court is in recess.

12          (The proceedings adjourned at 12:31 p.m.)

13

14                    C E R T I F I C A T E

15

16          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

17     the United States District Court, do hereby certify that the

18     foregoing transcript constitutes, to the best of my skill and

19     ability, a true and accurate transcription of my stenotype

20     notes taken in the matter of Civil Action No. 07-12060-GAO,

21     United States of America v. John C. Volungus.

22

23     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
24     Official Court Reporter

25     Date: 3/7/11