UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
       Petitioner,          )
                                   )  Civil Action
v.                             )  No. 07-12060-GAO
                                 )
JOHN C. VOLUNGUS,           )
                                 )
       Respondent.          )
                                 )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DAY TWO**
**<u>BENCH TRIAL</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, February 3, 2011
9:10 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2       OFFICE OF THE UNITED STATES ATTORNEY
        By: Mark J. Grady, Assistant U.S. Attorney
3           Jennifer Serafyn, Assistant U.S. Attorney
        John Joseph Moakley Federal Courthouse
4       Suite 9200
        Boston, Massachusetts  02210
5       On Behalf of the Petitioner

6       FEDERAL DEFENDER'S OFFICE
        By: William W. Fick, Esq.
7           Ian Gold, Esq.
        51 Sleeper Street
8       Fifth Floor
        Boston, Massachusetts  02210
9       On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES FOR THE
  PETITIONER:

MONICA FERRARO, PH.D.

        By Mr. Fick (Cont'd)        4
        By Mr. Grady                        29

AMY PHENIX, PH.D.

        By Ms. Serafyn             35
        By Mr. Gold                        120


E X H I B I T S

| PETITIONER'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|
| No. 63 | Coding rules | | 65 |
| No. 64 | Static-99R score sheet | | 82 |
| No. 65 | Summary of three instruments | | 82 |

```
 1              (The following proceedings were held in open court

 2    before the Honorable George A. O'Toole, Jr., United States

 3    District Judge, United States District Court, District of

 4    Massachusetts, at the John J. Moakley United States Courthouse,

 5    One Courthouse Way, Boston, Massachusetts, on February 3,

 6    2011.)

 7              THE CLERK:  All rise.

 8              (The Court enters the courtroom at 9:10 a.m.)

 9              THE CLERK:  For a continuation of the bench trial.

10    Please be seated.

11              THE COURT:  Good morning.

12              MR. FICK:  Good morning, your Honor.

13              THE COURT:  Go ahead.

14              MR. FICK:  Thank you, your Honor.

15                    MONICA FERRARO, PH.D., resumed

16                    CROSS-EXAMINATION CONTINUED

17    BY MR. FICK:

18    Q.   Good morning, Dr. Ferraro.

19    A.   Good morning.

20    Q.   Since we broke on Monday afternoon, have you spoken with

21    anyone about the case?

22    A.   I don't think so.  I can't recall if I had spoken with

23    Mr. Grady additionally.

24    Q.   I'm sorry.  You don't recall if you spoke to Mr. Grady

25    after Monday?
```

1  A.   About the case, as opposed to just about time for coming

2  in.  I don't recall.

3  Q.   So when we left off, we were talking about some of the

4  initial conversations you had with Mr. Volungus back in late

5  2006.  Do you remember that?

6  A.   Yes.

7  Q.   So initially you saw him when he first got to Devens in

8  November, and he was very upset because he was being considered

9  for commitment, right?

10  A.   Yes.

11  Q.   And he told you at that point, even prior to your formal

12  interview, he acknowledged that he was sexually attracted to

13  minors?

14  A.   Yes.

15  Q.   And he said he realized he cannot act on that attraction?

16  A.   Correct.

17  Q.   Then a couple of weeks later, December 11th, you had the

18  formal evaluation interview?

19  A.   Yes.

20  Q.   And part of that interview was getting a personal history

21  from Mr. Volungus?

22  A.   Yes.

23  Q.   And part of the personal history is a sexual history from

24  Mr. Volungus?

25  A.   Correct.

1   Q.   So you asked him detailed questions about, you know, his

2   whole history of sexual experiences, from his first one on

3   through his life to date, right?

4   A.   Yes.

5   Q.   Right.  And in talking about the history, he related to

6   you that he thought he might have been hyperactive as a child

7   even though not formally diagnosed?

8   A.   Yes.

9   Q.   And he talked about feeling like an outsider at school?

10  A.   Correct.

11  Q.   About being picked on and his family moving around a lot?

12  A.   Correct.

13  Q.   And he told you he first learned about sex when he was

14  about eight years old at a summer camp, correct?

15  A.   Yes.

16  Q.   He and some of the other boys were involved in some kind

17  of masturbation-type behavior?

18  A.   Correct.

19  Q.   And then he recounted that a counselor actually became

20  involved in that, showing them certain things, right?

21  A.   Yes.

22  Q.   And he then talked about having various same-age

23  interactions, sexual interactions, as an adolescent?

24  A.   Yes.

25  Q.   And he related having some same-age relationships as a

1    young adult?

2    A.   Yes.

3    Q.   And he talked about interactions with adult prostitutes

4    when he was in the Army in Germany?

5    A.   Yes.

6    Q.   And in the discussion of sexual history, he again

7    acknowledged sexual attraction to minor females who are hitting

8    puberty, I think was the way it was phrased in your report,

9    right?

10   A.   Yes.

11   Q.   So girls who were starting to develop?

12   A.   Correct.

13   Q.   And you then went on to talk with him a little bit about

14   his underlying offense conduct, right?

15   A.   Yes.

16   Q.   He talked about how he began compulsively viewing child

17   pornography when he was in the military?

18   A.   Yes.

19   Q.   And he talked about -- and in that discussion, you asked

20   him, sort of, "What kinds of images would you masturbate to,"

21   right?

22   A.   Yes.

23   Q.   And he said, well, he estimated maybe girls who are 13 or

24   14 years old?

25   A.   Yes.

1  Q.   And then he went on to talk with you about the various

2  chat rooms which he got involved in on the Internet?

3  A.   Yes.

4  Q.   And one of the things he talked to you -- he described to

5  you with those was that in order to get anyone else to talk to

6  him, he had to start making up stories about who he was and

7  what he had done, right?

8  A.   Correct.

9  Q.   Because -- and he said that that was the only way he could

10  get people to interact with him?

11  A.   Yes.

12  Q.   And he then said something to you about -- to the effect

13  that the participants in this kind of -- in these chats were a

14  self-reinforcing community, is the phrase he used, right?

15  A.   Correct.

16  Q.   So he's relating to you some insight that these

17  are -- that an insular group like this tends to reinforce its

18  behavior?

19  A.   Correct.

20  Q.   And he went on to talk to you about some materials that

21  were confiscated from him in prison the first time he was

22  incarcerated in the late '90s-early 2000s?

23  A.   Yes.

24  Q.   And he talked about some of the reasons he gathered this

25  material and made drawings was that he was feeling lonely and

1    isolated, right?

2    A.    Yes.

3    Q.    And he explained that he wanted to develop an

4    understanding for why he was the way he was?

5    A.    Yes.

6    Q.    And so he looked to published work -- to various pieces of

7    published work to gain that insight?

8    A.    Correct.

9    Q.    And then he talked to you about his experience on

10   supervised release in 2004?

11   A.    Yes.

12   Q.    He talked about going into treatment, and at first he was

13   just showing up?

14   A.    Yes.

15   Q.    I'm sorry.  He went into supervised release in 2003.  That

16   was my error on the question.  Do you recall that?

17   A.    I'm sorry.  Could you repeat that?

18   Q.    He started his supervised release in the middle of '03?

19   A.    Yes.

20   Q.    So he starts treatment.  And he tells you about starting

21   treatment, right?

22   A.    Yes.

23   Q.    He talks about just showing up?

24   A.    Yes.

25   Q.    He mentioned to you in early 2004 his computer is seized

1  and some images of child pornography are found?

2  A.   Correct.

3  Q.   And then he explained that it really took him an

4  additional six months or so in treatment before he even came to

5  acknowledge to himself that it was real child pornography,

6  right?

7  A.   He said it took about six months for him to realize, yes.

8  Q.   Because initially, right, he had tried to explain to

9  himself and to others when he was on supervised release he was

10 just trying to download legal images of child erotica, or

11 something like that, right?

12 A.   He was downloading images.

13 Q.   Well, and his idea was -- or what he had explained -- both

14 what he said was at the time -- and told himself initially was

15 he was looking for legal images and he was getting the

16 pornography maybe unintentionally or by accident, right?

17 A.   I don't recall him saying that he was getting it

18 unintentionally by accident, but that it took him that amount

19 of time to realize it was child pornography.

20 Q.   In any event, he describes to you a process he goes

21 through, that after the computer is seized, over a period of

22 time he comes to realize, yes, this was real child pornography;

23 this stuff was illegal?

24 A.   Yes.

25 Q.   Now, at another point in the interview you again asked him

1    a specific question about -- to describe the age group to which

2    he was sexually attracted, right?

3    A.   Yes.

4    Q.   And again, he used the words "hitting puberty" and

5    "starting to develop," right?

6    A.   Correct.

7    Q.   And this is a question -- this is an issue, the age, that

8    came up at several different times in your interview with him,

9    right?

10   A.   Yes.

11   Q.   And that was by design from your part because the age of

12   interest is an important factor to consider in diagnosis?

13   A.   Correct.

14   Q.   So your write-up of that interview with Mr. Volungus

15   became a substantial part of the evaluation that you then

16   presented to the certification review panel?

17   A.   The report went to the certification review panel.

18   Q.   Right.  And the report contained a lengthy write-up of

19   your conversation with Mr. Volungus.

20   A.   Yes.

21   Q.   And we talked a little bit the other day also about how

22   your scoring of the Static-99 became a part of your evaluation

23   for the certification review panel, right?

24   A.   Correct.

25   Q.   And just to put back up on the screen, Government Exhibit

1  A that we talked about, you scored Mr. Volungus at the time an

2  eight, right?

3  A.   Yes.

4  Q.   And you talked about if you had to do it again, you would

5  not give him the score for prior non-sexual violence because

6  his military adjudication was not a conviction, right?

7  A.   Correct.

8  Q.   It wasn't even an adjudication; it was just a military

9  discipline?

10 A.   Correct.

11 Q.   Okay.  When did you come to realize that was a scoring

12 error?

13 A.   In preparing for the trial.

14 Q.   For this trial?

15 A.   Correct.

16 Q.   So in other words, back at the time you did this in late

17 '06, you didn't realize it was an error; shortly thereafter,

18 right?

19 A.   Correct.

20 Q.   And nothing came to your attention between then and the

21 trial now to suggest that that might have been a mistake?

22 A.   No, I hadn't looked at this since then.

23 Q.   Okay.  Now, one other question I just wanted to ask.  The

24 stranger-victim item down here, do you see that?

25 A.   Yes.

1   Q.   There's a set of -- as for all the items, there's a set of

2   rules in this book about how one codes the stranger-victim item

3   and whether there has been one or not, right?

4   A.   Correct.

5   Q.   And it's fair to say that the criteria for being a

6   stranger victim are very high, right?

7   A.   Correct.

8   Q.   In other words, a slight degree of knowing or prior

9   contact means that you don't score that item?

10  A.   Correct.

11  Q.   So can you just tell me what your reasoning was for

12  scoring that item, for giving him the point for that item?

13  A.   Sure.  According to the PSR, Mr. Volungus' first contact

14  with the individual that he believed to be the 14-year-old

15  occurred on August 20th of 1998.  During the course of that

16  contact he engaged in lewd conversation with her.  So it was at

17  the beginning -- within the 24-hour period.

18  Q.   All right.  And is that something you've talked about with

19  either the government or other evaluators recently?

20  A.   Yes.

21  Q.   When did you talk about that?

22  A.   In preparing for this trial.

23  Q.   Did you talk about it with Dr. Phenix or just with the

24  government lawyers?

25  A.   Well, with the government lawyers.  I didn't have

1    conversations with Dr. Phenix.

2    Q.   Okay.  So sitting here today, that's your explanation for

3    why you scored that item that way.  Is that the same thing that

4    was in your mind back then?

5    A.   Yes.

6    Q.   And you're sure about that?

7    A.   I'm pretty sure.  I can't imagine why I would have scored

8    it that way otherwise.  And looking it over, that's why -- I

9    would now score it that way, so I believe yes.

10   Q.   Okay.  Now, we've talked about the interview portion of

11   your evaluation; we've talked about the Static-99.  The other

12   major trunk of your evaluation was your diagnostic discussion,

13   right?

14   A.   Yes.

15   Q.   And you had -- you proposed several different diagnoses

16   for Mr. Volungus, correct?

17   A.   Correct.

18   Q.   One of the diagnoses you proposed was pedophilia, correct?

19   A.   Correct.

20   Q.   And pedophilia is specifically an attraction to

21   prepubescent children, correct?

22   A.   Correct.

23   Q.   And so while it might be an illegal act to act on an

24   attraction to an adolescent, attraction to adolescents is not

25   itself an indicia of a pedophilia diagnosis, correct?

1   A.   Not of pedophilia, no.

2   Q.   Now, Mr. Volungus' traveler offense is his first

3   conviction, the underlying conviction, for traveling to meet

4   minors.  That offense involved what Mr. Volungus thought were

5   14- and 19-year-olds, correct?

6   A.   Correct.

7   Q.   So that particular offense is not what one would call a

8   pedophilic offense, correct?

9   A.   Correct.

10  Q.   So your diagnosis of pedophilia is based, then, primarily

11  on the fact that he viewed pornography of prepubescence?

12  A.   That, and in discussing an incident that happened in the

13  library where there was a girl who was about 11 or 12 years

14  old, he indicated that he removed himself from that situation

15  as a way to manage his attraction.

16  Q.   Well, he removed himself from the situation because he

17  knows as a convicted sex offender any time he's near children

18  it's going to create a problem, right?  I mean, that's what

19  he's telling you.

20  A.   He was discussing it in the context of how he had learned

21  to manage his deviant sexual arousal.

22  Q.   So you interpreted that to mean he was attracted to the

23  11- or 12-year-old?

24  A.   Correct.

25  Q.   Now, you proposed other diagnoses in addition to

1  pedophilia in your evaluation as well, right?

2  A.   Yes.

3  Q.   You proposed a number of different variants of what's

4  called "paraphilia not otherwise specified," right?

5  A.   Right.

6  Q.   And there's a particular set of diagnostic criteria in the

7  manual, the DSM, for paraphilias, right?

8  A.   Yes.

9  Q.   And for these purposes, it defines paraphilias -- well,

10  there's sort of two criteria.  There's an A and B criteria that

11  are part of the diagnosis, right?

12  A.   Yes.

13  Q.   The first part of the diagnosis is recurrent intense

14  sexually arousing fantasies, sexual urges or behaviors

15  involving, among other things, inanimate objects, right?

16  A.   Yes.

17  Q.   And that's the portion of Criteria A that would have been

18  relevant to your diagnosis here?

19  A.   I'm sorry?

20  Q.   That's the portion of the first part of the diagnosis

21  that's relevant to your analysis here?

22  A.   Yes.

23  Q.   Okay.  The second part of that is that it causes

24  clinically significant distress or impairment in social,

25  occupational or other important areas of functioning, right?

1   A.   Correct.

2   Q.   And the urges, fantasies, et cetera, have to occur over a

3   period of six months, right?

4   A.   Yes.

5   Q.   Okay.  Now, one of the diagnoses you proposed was

6   coprophilia, right?

7   A.   Yes.

8   Q.   And that is an attraction to, or a stimulation by,

9   excrement, right?

10  A.   Yes.

11  Q.   And that was simply based on the fact that Mr. Volungus

12  told you at one time he had had magazines which contained

13  coprophilic-type images, right?

14  A.   Yes; that he had magazines.

15  Q.   But you certainly had no information to suggest that he

16  masturbated to pictures of feces or that this went on for more

17  than six months, right?

18  A.   Correct.

19  Q.   Okay.  And then you also diagnosed possibly urophilia,

20  right?

21  A.   Yes.   There were provisional diagnoses.

22  Q.   Provisional diagnoses because basically all he told you is

23  that he had once had magazines that had these things in them,

24  right?

25  A.   Correct.

1  Q.   You didn't have enough information to really make a final

2  diagnosis of those things?

3  A.   That's why they were provisional; yes.

4  Q.   But they're nevertheless included in the report that goes

5  to the certification review panel?

6  A.   Yes.

7  Q.   And finally you mentioned alcohol dependence, and that's

8  based on Mr. Volungus telling you that back when he was in

9  college and in the military, he thought he might have been

10  drinking a little bit too much back at the time, right?

11  A.   Back in college and the military, yes.

12  Q.   Certainly nothing in his self-reports indicate a current

13  problem with alcohol?

14  A.   He indicated he had stopped drinking in May of 2005.

15  Q.   And there was nothing in his supervised release history

16  that you're aware of to suggest he ever had any substance abuse

17  problems?

18  A.   No.

19  Q.   In any event, your report, with the various parts you've

20  talked about, your evaluation, went on to the certification

21  review panel, right?

22  A.   Yes.

23  Q.   And then a decision was made to certify Mr. Volungus, and

24  this case commenced in early 2007?

25  A.   Yes.

1  Q.   And when that happened, Mr. Volungus again was very upset,
2  correct?
3  A.   Correct.
4  Q.   I don't know if it was you, but there were various
5  professionals working with you at Devens who interacted with
6  him to talk about his feelings of being upset, right?
7  A.   Yes.
8  Q.   And one of the things you mentioned in your testimony the
9  other day was that four people in Mr. Volungus' status who were
10 no longer sentenced prisoners, their access to various programs
11 inside the Bureau of Prisons is very limited, right?
12 A.   I can speak to folks who are at Devens or who were at
13 Devens at that time.
14 Q.   Well, let's limit it to Devens.  At Devens the access of
15 non-sentenced-prisoner-status person to programs of various
16 kinds is limited, right?
17 A.   Yes.
18 Q.   So I think you mentioned he was not eligible to do sex
19 offender treatment at that point, correct?
20 A.   Correct.
21 Q.   And, in fact, there's a liability concern that mixing a
22 non-sentenced prisoner with a sentenced prisoner, if anything
23 happened, that could be -- the BOP could be liable, right?
24 A.   Yes.
25 Q.   And so that's part of why their access to programming is

1    limited, right?

2    A.    I assume so, yes.

3    Q.    People in Mr. Volungus' status at the time, they can't

4    have a regular prison job, right?

5    A.    I believe they could have a regular prison job; they

6    didn't have to have one.

7    Q.    And their access to other educational programs, et cetera,

8    is also extremely limited, if it exists at all?

9    A.    I don't believe that was the case.

10   Q.    So you believe that people in Mr. Volungus' status would

11   have been allowed to mix with sentenced prisoners for other

12   educational programs, just not for treatment?

13   A.    Not for the sex offender treatment program.

14   Q.    But your understanding is that they could mix with other

15   prisoners for other purposes?

16   A.    They're in the same institution.

17   Q.    Do you know one way or the other?

18   A.    It was my belief.  Am I positive?  No.

19   Q.    Okay.  Now, you talked a little bit in your direct

20   testimony about certain materials that were seized from

21   Mr. Volungus in August of 2007, correct?

22   A.    I'm sorry.  I didn't --

23   Q.    You talked in your testimony the other day about some

24   materials that were seized from Mr. Volungus in August of 2007.

25   A.    Yes.

1   Q.   And that's the materials in the binder in front of you

2   that the Court also has as Exhibit 61, this?

3   A.   Yes.

4   Q.   And other than the sort of hand-drawn picture that's, I

5   think, the first page of the exhibit, is it fair to say that

6   the material in and of itself is not necessarily what one would

7   call contraband?

8   A.   I think it actually would be -- a lot of the articles in

9   there would -- were considered contraband.

10  Q.   I mean, Fort Devens has a library, right?

11  A.   Yes.

12  Q.   And inmates are allowed to receive magazines and

13  newspapers as long as they're sort of the mainstream type,

14  et cetera, right?

15  A.   Yes.

16  Q.   And so the concern was not the fact that there are

17  articles, but just the fact that he collected articles about

18  sex offenders, right?

19  A.   That there were so many, yes.

20  Q.   Right.  So it's not -- it's the fact that someone in

21  Mr. Volungus' position compiled these materials, not the

22  nature, so to speak, of the materials, per se, that made them

23  of concern?

24  A.   I believe that they would have been confiscated from

25  anybody.

1    Q.   You mean because they're collected like this or simply

2    because somebody has, say, a Wall Street Journal article about

3    child pornography?

4    A.   It was the number of it in one place, comments written on

5    it, on the articles.

6    Q.   Okay.  But in any event, I mean, it is fair to say that

7    each individual one of these articles might well be something

8    that one could find in the Devens library or in a newspaper

9    that an inmate got in the mail?

10   A.   I believe so.

11   Q.   Now, Mr. Volungus was never asked to explain himself about

12   these items, correct?

13   A.   He was put on callout to meet with me on one occasion

14   shortly after that -- but he was not on the housing unit; I

15   believe he had a visit that day -- so he didn't show for it.

16   But then after that, I was told not to put him on callout

17   again, so no.

18   Q.   Okay.  In other words, just the bottom line is he never

19   was interrogated by the BOP about this collection of stuff?

20   A.   I don't believe anyone ever spoke with him, no.

21   Q.   Okay.  And is it fair to say that in addition to the

22   articles and the things the government showed you in your

23   direct examination, I mean, there's a lot of stuff in here that

24   one would characterize as innocuous, right?

25   A.   I guess there was some, yes.  I don't recall all of it.

1    Q.   Well, I mean, there's like a letter from Mr. Volungus' dad

2    about some incident with an airplane, right, or an incident

3    with the Civil Air Patrol, right?

4    A.   Yes.

5    Q.   There's articles about -- there are lists of things, like

6    recipes and menus, correct?

7    A.   I don't have a specific recollection of that, but okay.

8    Q.   Okay.  Just to talk a little bit about some of these

9    things, I mean, one thing that is clear from reviewing these

10   materials, right, is that Mr. Volungus is someone who really

11   likes to make lists, correct?

12   A.   Correct.

13   Q.   And there's lists of many things that are not sex related

14   in here, correct?

15   A.   Again, I don't recall all the specific lists but, yes,

16   there were -- there was one to-do list that had stuff in it

17   that wasn't sex-offender specific.

18   Q.   I just want to do a little survey on some of the diversity

19   of material in here.  If you could just take the exhibit and

20   I'll ask you to look at different pages.

21        First off, I'll ask you, and I'll put it on the screen,

22   too, to just facilitate the issue.  Now, one of the things that

23   was of concern to you, right, were lists of books, many of

24   which had titles related to sex, I guess, for lack of a better

25   way to generalize, right?

1    A.    Yes.  Sex with children, sexual abuse of children, yes.

2    Q.    So I'm putting on the screen what's Bates-marked 1495,

3    which hopefully we can see at the bottom here.  It's part of

4    Exhibit 61, all right?  You can look on the screen or look in

5    the book.  I'm not trying to create an issue about whether it's

6    really there or not.

7         Now, this is just an excerpt from one of the lists.  And

8    one of the things one notices, right, is that the ISBN numbers

9    for all the various books are listed beneath the titles, right?

10   A.    Yes.

11   Q.    And one of the things the Devens library has is

12   bibliographic resources like books in print, right?

13   A.    Yes.

14   Q.    Where one could get the ISBN numbers for various books

15   that one might be interested in reading.  Yes?

16   A.    Yes, I believe so.

17   Q.    Now, the next page -- paging through a little further -- a

18   little further into these book lists -- I mean, it's fair to

19   say that not all of the titles reflect titles that might

20   advocate sexual abuse of children, right?

21   A.    Yes; correct.

22   Q.    I mean, just looking at page 1512, which I'll put up here,

23   among other things, there's a human rights watch report about

24   rape for profit in his list of books, right, or list of

25   publications?

1    A.    Yes.

2    Q.    And if we page ahead to page 1531, the last item there is

3    a reference to NAMBLA publishing, right?

4    A.    Yes.

5    Q.    And NAMBLA is the North American Man/Boy Love Association,

6    right?

7    A.    Yes.

8    Q.    So that's an -- an organization that sort of advocates, I

9    guess one would say, sexual relations between adults and

10   children, on one hand, but it's specifically man-boy oriented,

11   right?

12   A.    Yes.

13   Q.    And Mr. Volungus is not somebody who has ever had a

14   history, as far as anyone knows, about interactions with male

15   children, or interested in male children, correct?

16   A.    Correct.

17   Q.    Now, there's also articles in here about various things

18   such as role-playing video games, right?  There's a big article

19   about "Second Life" on page 1544, right?

20   A.    Yes.

21   Q.    There's an editorial on page 1638 called "Stop the

22   Trafficking," right?

23   A.    Yes.

24   Q.    It's an article about how bad the sexual abuse and the

25   exploitation of minors is.

1    A.    Yes.

2    Q.    And then on page 1684 there's an article with a

3    handwritten notation there, "Kill All Pedophiles," right?

4    A.    Yes.

5    Q.    And then on 1745 there's a multi-page list beginning with

6    what would appear to be life goals, right, beginning with "See

7    Halley's Comet, sail around the world," all that kind of stuff?

8    A.    Yes.

9    Q.    That's one of Mr. Volungus' other, sort of, non-sexual

10   lists, right?

11   A.    Well, also included in that list is "Get married to a

12   like-minded woman and houseful of children."

13   Q.    Okay.  And then in addition to the sexually explicit

14   drawing we saw at the beginning of the exhibit, I mean,

15   Mr. Volungus has, for example, sketched -- made sort of

16   architectural sketches, right?

17   A.    Yes.

18   Q.    And there are lists of various furniture companies,

19   architectural features and things like that among the lists,

20   correct?

21   A.    I don't specifically recall but...

22   Q.    And then he has a whole section, sort of, about food and

23   wine, one might describe, right?  Or a whole collection of

24   documents about food and wine?

25   A.    I don't recall all the documents.

1  Q.   Well, just as an example -- a couple of examples, I don't

2  want to belabor the point -- page 1790 has a bunch of

3  recipes -- or a recipe and then some other kinds of lists,

4  right?

5  A.   Yes.

6  Q.   And then page 1802, the beginning of a multi-paged series

7  of lists of other food stuffs, correct?

8  A.   Yes.

9  Q.   A list of books on page 1811 about medieval history?

10  A.   Yes.

11  Q.   Another lengthy list of food stuffs on page 1873?

12  A.   Yes.

13  Q.   All right.  And he also had some pages in there that

14  suggested, sort of, notes or thoughts about his legal strategy,

15  right?

16  A.   Again, I don't specifically recall.

17  Q.   Well, I mean, you know, not to put too fine a point on it,

18  I mean, back in 2007 when you found this stuff you went through

19  it pretty carefully and wrote a long, multi-page report about

20  what you had found, right, and why it concerned you?

21  A.   Yes.

22  Q.   And one of the first pages of the exhibit, page 1492, do

23  you see at the top it says "Ferraro," and maybe Lozano,

24  "qualifications."  Do you see that?

25  A.   Yes.

1   Q.   And then "Dr. R qualifications?"  Dr. Renault -- there was

2   a Dr. Renault who was sort of your boss at Devens, right?

3   A.   Yes.

4   Q.   And then Number 5, "Offense histories of those not

5   recommended"?

6   A.   Yes.

7   Q.   And that was a common theme.  From the time Mr. Volungus

8   came into prison, he was -- one of the reasons he was so upset

9   was that he felt like a lot of people who did many, many worse,

10  violent crimes were not being committed, and he was, right?

11  A.   Yes.

12  Q.   And, in fact, the collection of articles -- I mean,

13  there's a collection of articles in this stuff just about sex

14  offenders and sex offenses and the sentences they got, right?

15  A.   Yes.

16  Q.   And then down under Static-99 questions, Number 1,

17  "Article 15 qualifies as a violent conviction," and then in

18  paren under that, "Article 15 non-violent administrative

19  punishment."  Do you see that?

20  A.   Yes.

21  Q.   So that's the error in the Static-99 scoring that you told

22  us you realized only recently, right?

23  A.   Correct.

24  Q.   So Mr. Volungus was right about this back in 2007,

25  correct?

1   A.   Yes.

2   Q.   But you didn't look into it at the time?

3   A.   I didn't see that particular item in all these materials.

4        MR. FICK:  I have nothing further.

5        MR. GRADY:  I just have one or two questions, your

6   Honor.

7                    REDIRECT EXAMINATION

8   BY MR. GRADY:

9   Q.   Dr. Ferraro, can you tell me what a provisional diagnosis

10  is?

11  A.   It's a diagnosis that you make when you suspect that

12  somebody might meet criteria for the diagnosis but there's not

13  enough evidence at that time.

14  Q.   Can you tell me what were the diagnoses that you made

15  provisionally for Mr. Volungus?

16  A.   Yes.  There were three paraphilia not otherwise specified

17  diagnoses.  One was zoophilia, which is aroused by sexual

18  activity with animals; urophilia; and coprophilia.

19  Q.   And can you explain for us why you reached those diagnoses

20  and why you did so provisionally?

21  A.   Yes.  The zoophilia one, Mr. Volungus reported a history

22  of masturbating to images of adults engaged in sex with

23  animals, and reported being sexually aroused by those.  And

24  then the coprophilia and the urophilia provisional diagnoses

25  were because of the possession of the magazines.  He reported

1    he had magazines that depicted those -- they're provisional

2    because it didn't meet the full criteria; I didn't know about

3    the time frame.

4    Q.   Okay.  In the materials you reviewed in August of 2007 --

5    or strike that.  I'm just going to show you among the materials

6    you reviewed in 2007 was the following list.

7         MR. GRADY:  This is from 61A, your Honor.

8    Q.   There's a reference to Lisa on page 1615.  Can you read

9    that for me?

10   A.   "Lisa and her puppy.  Dachshund licks her good."

11   Q.   What, if any, relevance would that have to a provisional

12   diagnosis for bestiality?

13   A.   That he was compiling a list of pornography videos, one of

14   which did include sexual activity with an animal.

15   Q.   Referring to page 1616, same exhibit, can you read what's

16   highlighted there?

17   A.   "Hot vid.  Primal prod.  Value.  Really nice stuff.  All

18   HC with piss."

19   Q.   And what, if any, relevance might that have to your

20   diagnosis of urophilia and paraphilia?

21   A.   That he was beginning to compile materials that depicted

22   those types of activities.

23   Q.   I'll show you materials from page 1618.  Can you read

24   that?

25   A.   "HCLL??  Two boys about 15 fuck and suck seven-year-old.

1    Also piss - bathroom."

2    Q.   Would that be material to a diagnosis provisionally of

3    urophilia and paraphilia?

4    A.   Yes.

5    Q.   Mr. Fick mentioned an article concerning an online service

6    called "Second Life."  Do you recall that?

7    A.   Yes.

8    Q.   Do you recall reviewing an article in which Mr. Volungus

9    underlined particular passages in an article about "Second

10   Life"?  And I'm particularly referring to Bates page 1562?

11   A.   Yes.

12   Q.   Okay.  Can you tell me what are the types of things that

13   you noted him underlying when he was reviewing "Second Life" as

14   an online experience?

15   A.   That around parental applications, here it talks about on

16   hold because people looking -- it's around looking for the

17   perfect child.

18   Q.   With respect to 1582, which is on the screen, what, if

19   anything, did Mr. Volungus underline in this particular

20   passage?

21   A.   "At the so-called Tot Stop, which sounded alarmingly like

22   a drive-through joint, there was a polite notice that said

23   adoptions were suspended:  Parent applications are currently on

24   hold due to the overwhelming response of families looking for

25   the perfect child.

1        "Oh, yeah.  'Families.'  The last kiddie avatar I'd seen

2    in 'Second Life' had offered to masturbate for me if I gave her

3    a Linden C-note."

4    Q.   With respect to Mr. Volungus' collection of articles about

5    "Second Life," what, if anything, did you infer from the

6    passages he underlined concerning the purpose he was

7    researching "Second Life"?

8            MR. FICK:  Objection to all the inference questions.

9            THE COURT:  I'm sorry?

10           MR. FICK:  Objection to all the inference questions.

11           THE COURT:  Overruled.

12           THE WITNESS:  That he was potentially looking for a

13   way to access children.

14           MR. GRADY:  If I could just have one moment, your

15   Honor.

16           (Counsel confer off the record.)

17           MR. GRADY:  If it's possible, your Honor, there's a

18   particular reference in the records I would like to locate.  If

19   we could just maybe have a moment.

20           (Pause.)

21   BY MR. GRADY:

22   Q.   One of the things Mr. Fick asked you was about lists,

23   correct?

24   A.   Yes.

25   Q.   And one of the things that was specifically mentioned on

1    cross-examination was a discussion of Mr. Volungus marrying a,

2    quote, "like-minded woman," correct?

3    A.   Yes.

4    Q.   I'm just going to show you what's in Exhibit 1.  Do you

5    know what?  I don't think I found exactly what I was looking

6    for.  I apologize.  Can we take a five-minute break, your

7    Honor?  I would ask the Court's indulgence.

8            THE COURT:  Just go ahead and look.  We'll stay here.

9            (Pause.)

10   BY MR. GRADY:

11   Q.   Now, Dr. Ferraro, that particular quote, "find a

12   like-minded woman" struck me.  I'm just going to show you from

13   the various chats that were undertaken by Mr. Volungus in

14   connection with the underlying offense a discussion he had,

15   Bates page 1136.

16       Can you just read the section that says, "So does that

17   mean if you had children"?  What does that say?

18   A.   "So does that mean if you had children, you would want to

19   have sex with them?"

20       "Yes, but on their terms when they were ready to

21   experiment."

22   Q.   What, if anything, or how, if at all, does that inform

23   your understanding of what Mr. Volungus means when he says he

24   would like to meet a like-minded -- or marry a like-minded

25   girl?

1    A.    Somebody who has the same views or interests that he does.

2    Q.    With respect to children?

3    A.    With respect to sex with children, sexual attraction to

4    children.

5              MR. GRADY:  Nothing further.

6              MR. FICK:  No further questions.

7              THE COURT:  Nothing else?

8              All right, Dr. Ferraro.  Thank you.  You may step

9    down.

10             (The witness is excused.)

11             MS. SERAFYN:  Your Honor, the government calls Dr. Amy

12   Phenix.

13             Your Honor, while we're waiting for Dr. Phenix, I

14   don't believe that there's any objection to her qualifications

15   as an expert, so to kind of speed things along, I was just

16   going to hit the highlights of her background, unless the Court

17   wants me to formally proffer her as an expert, I'll certainly

18   do that.

19             THE COURT:  Mr. Gold?

20             MR. GOLD:  That's true.  There's no objection to

21   her --

22             THE COURT:  Right.  I assume that her CV, and so on,

23   are in the records someplace?

24             MS. SERAFYN:  Yes.  And I'll point those out, your

25   Honor.

```
 1            THE COURT:  That's fine.

 2            (Pause.)

 3                   AMY PHENIX, PH.D., duly sworn

 4            THE CLERK:  State your name, spell your last name for

 5   the record.

 6            THE WITNESS:  Amy Phenix, P-H-E-N-I-X.

 7                        DIRECT EXAMINATION

 8   BY MS. SERAFYN:

 9   Q.   Dr. Phenix, what is your occupation?

10   A.   I'm a clinical psychologist in private practice.

11   Q.   And what is the nature of your work as a clinical

12   psychologist?

13   A.   I work in forensic psychology.  I do evaluations of

14   individuals who have -- are pending a commitment as sexually

15   violent predators or sexually dangerous persons.

16   Q.   And there are two binders in front of you with trial

17   exhibits.  Could you please turn to Exhibit 52.  And is that a

18   copy of your CV?

19   A.   Yes, it is.

20   Q.   And is it a current copy?

21   A.   Yes, it is.

22   Q.   Dr. Phenix, have you published any books or articles

23   regarding sex offenders?

24   A.   I have written a book chapter that's been published.  That

25   was published in "Innovations in Clinical Practice:  A Source
```

1   Book," and that was a chapter on sex offender risk assessment.

2   I've had two articles in peer-reviewed journals, both of them

3   in the Journal of the American Academy of Psychiatry and the

4   Law, one of them the "Actuarial Risk Assessment Models:  A

5   Review of Critical Issues Related to Violence and Sex Offender

6   Recidivism Assessments"; and then a second publication more

7   recently in 2009, "A Practical Guide for the Evaluation of

8   Sexual Recidivism Risk in Mentally Retarded Sex Offenders."

9   Q.   Dr. Phenix, let me just stop you there.  What does it mean

10  to be peer-reviewed?

11  A.   A peer review is a process whereby an editorial board of a

12  journal ensure that the article meets the scientific standards

13  of the journal.  And often you're asked to make revisions to

14  improve the article so that it meets those standards.

15  Q.   So are the books and articles that you've published

16  accurately listed in your CV, which is Exhibit 52?

17  A.   Yes.

18  Q.   And have you given any presentations regarding sex

19  offender recidivism?

20  A.   Yes.  I've given many presentations and trainings,

21  primarily to individuals involved in mental health, law

22  enforcement, attorneys.  Trainings in how to use certain

23  actuarial instruments that measure sex offender recidivism as

24  well as how to conduct sex offender assessments.

25  Q.   And are the trainings that you've given accurately

1  reflected in your CV?

2  A.    Yes.

3  Q.    And, Dr. Phenix, have you given any recent trainings that,

4  perhaps, aren't listed in your CV yet?

5  A.    Yes.  Actually, last week I began one of five trainings

6  throughout the state of California.  I have been contracted to

7  train all of the probation officers and parole officers in

8  California in the use of the Static-99 Revised, which is an

9  actuarial instrument that is mandated by the State of

10  California to be administered to all inmates leaving the

11  Department of Corrections and that will be having to register

12  as sex offenders in the state of California.

13  Q.    And, Dr. Phenix, have you previously testified in court

14  about your professional opinions?

15  A.    Yes.

16  Q.    And in the last two years, or approximately two years, for

17  whom have you typically testified, prosecution or defense?

18  A.    Most of the time for the prosecution.  20 to 30 percent of

19  the time for the respondent, either conducting evaluations for

20  the respondent or providing court testimony.

21  Q.    And have you ever failed to qualify as an expert?

22  A.    No.

23  Q.    Now, in this case, Dr. Phenix, have you rendered an

24  opinion as to whether Mr. Volungus is a sexually dangerous

25  person under the Adam Walsh Act?

1    A.    Yes, I have.

2    Q.    What is your opinion?

3    A.    I believe that he is a sexually dangerous person under the

4    Adam Walsh Act.

5    Q.    And is that opinion given to a reasonable degree of

6    professional certainty?

7    A.    Yes.

8    Q.    And did you write a report in this case that contains your

9    conclusions?

10   A.    Yes.

11   Q.    And if you could just turn to Exhibit 51 in the binder.

12   Is that a copy of the report that you issued in this case?

13   A.    Yes.

14   Q.    Now, before writing your report, did you review any

15   documents?

16   A.    Yes, I did.

17   Q.    And can you categorize for us the documents that you

18   reviewed?

19   A.    I reviewed documents having to do with any convictions --

20   charges and convictions for sexual offenses for the federal

21   government that has -- that Mr. Volungus has.  I've also

22   reviewed all of the FBI reports having to do with the conduct

23   involved in those charges and convictions.  I also reviewed any

24   psychological evaluations and treatment reports that have been

25   completed for Mr. Volungus, as well as his psychiatric

1  treatment when he was committed to the Bureau of Prisons.  I

2  also reviewed the additional records from the Bureau of

3  Prisons, including Mr. Volungus' criminal history, work

4  reports, visiting reports from the Bureau of Prisons,

5  classification documents.

6  Q.   And are the documents that you reviewed listed in your

7  report, which is Exhibit 51?

8  A.   Yes, they are.

9  Q.   And, Dr. Phenix, are the documents that you reviewed the

10  type of documents that are typically relied on by an expert in

11  this type of case?

12  A.   Yes.

13  Q.   And other than reviewing documents, did you do anything

14  else to prepare your report?

15  A.   I had an interview with Mr. Volungus.

16  Q.   Approximately how long did you meet with Mr. Volungus?

17  A.   I believe I met with him approximately three hours.

18  Q.   Now, Dr. Phenix, have you ever testified in any other Adam

19  Walsh Act proceedings?

20  A.   Yes, I have testified in several.

21  Q.   So are you familiar with the statute that is the Adam

22  Walsh Act?

23  A.   Yes.

24  Q.   So I'd like to focus you on the first element of that

25  statute.  Now, in your opinion, has Mr. Volungus engaged in or

1    attempted to engage in sexually violent conduct or child

2    molestation?

3    A.    Yes, he has.

4    Q.    And can you please describe for us Mr. Volungus' past

5    instances of sexual violence or child molestation?

6    A.    Yes.  In March of 1999 he was convicted of eight counts,

7    the first of those use of interstate facility to attempt to

8    persuade a person under the age of 18 to engage in sexual

9    activity.  He was also convicted of possession of child

10   pornography, as well as receipt of child pornography by

11   interstate commerce, by computer.  And also -- that was five

12   charges and convictions.  Additionally, a charge and conviction

13   for criminal forfeiture.

14        These convictions involved not only receiving child

15   pornography, but also contacting two decoys -- law-enforcement

16   decoys who were posing as a 19-year-old female and a

17   14-year-old female, which Mr. Volungus contacted in an

18   Internet-relayed chat room called "PedoMoms."  He was seeking

19   sexual activity with minors.  He initially contacted the

20   19-year-old decoy, engaged in sexual chat with her and asked if

21   she had any sisters.  And she reported having an older sister

22   and a 14-year-old sister, at which point Mr. Volungus asked to

23   meet the 14-year-old sister to engage in sexual activity with

24   her, and to have her 19-year-old sister assist in him

25   contacting the 14-year-old.

1          So the 19-year-old decoy did, in fact, engage Mr. Volungus

2    in contact in the Internet-relayed chat room with the

3    14-year-old whose name was Sarah.  And Mr. Volungus had direct

4    contact with her in which -- at which time he engaged in lewd

5    talk with her and suggested that they engage in oral

6    copulation, sexual intercourse and anal intercourse when they

7    met.

8          He arranged to meet with both of the decoys, the

9    19-year-old and the 14-year-old.  He went to purchase lingerie

10   for Sarah, the 14-year-old, to wear during the sexual activity

11   for purpose of sexual arousal.  He also brought with him

12   alcohol.  And he arranged to meet the two decoys in a park.  He

13   went to meet them, and at that point he was arrested.

14         His intent and sexual motivation was to engage in sexual

15   activity with the 14-year-old in the sexual acts which he

16   described while talking to her which, in my opinion, would

17   comprise sexually violent conduct and child molest.

18   Q.   Now, you said that Mr. Volungus wanted to have sex with

19   the 14-year-old whom he knew as Sarah.  On what is that based?

20   A.   That's based on what he told Sarah when he had contact

21   with her on the Internet chat.  He was explicit in saying that

22   he wanted to lick her pussy and that would she like that?  He

23   said that he had engaged in anal intercourse with several other

24   minors and that they had enjoyed it and would she enjoy that?

25   So he made explicit references to the sexual behavior that he

1    wanted to engage in with her.  And also, asked if she wanted to

2    have lingerie, and then agreed to go purchase the lingerie for

3    her, and actually did that, and had it with him in his

4    possession when he was arrested.

5    Q.   Now, Dr. Phenix, I would like to show you what has been

6    marked as Exhibit No. 6.  And I'll just ask you, are these

7    convictions the convictions that you were referring to in terms

8    of Mr. Volungus engaging in past instances of sexual violence

9    or child molestation?

10   A.   That would be the first count, which would be use of

11   Internet facility to attempt to persuade a person under 18

12   years of age to engage in a sexual act.

13   Q.   And as far as you know, does Mr. Volungus have any other

14   convictions for instances of sexual violence or child

15   molestation?

16   A.   No, he does not.

17   Q.   Now, does have Mr. Volungus have any other instances of

18   sexual violence or child molestation for which he was not

19   charged or convicted?

20   A.   Yes, he does.

21   Q.   And can you describe those for us?

22   A.   Yes.  He has reported in Internet chat that he has had

23   victims aged 10, 12 and 14; he had said, quote/unquote, "I've

24   enjoyed many young girls, as young as ten years of age"; he

25   described engaging in sexual intercourse and oral copulation

1   with two ten-year-olds; he also reported that he engaged in

2   sexual intercourse with a 12-year-old when he was 17 years of

3   age; and he described engaging in sexual videos with a

4   14-year-old.

5   Q.   Dr. Phenix, I'm showing you what has been marked as

6   Exhibit 1, Bates-stamped 1125.  And is this a document that you

7   reviewed in connection with your evaluation of Mr. Volungus?

8   A.   Yes.  That would be the Internet chat.  And that related

9   to the 1998 conviction.

10  Q.   And, Dr. Phenix, have you read the transcript of this

11  entire chat?

12  A.   Yes, I have.

13  Q.   And what is your understanding of who Indy Girl is?

14  A.   Indy Girl is the 19-year-old female decoy.

15  Q.   And Indy Girl, on this document here says, "So this will

16  be your first experience with all this if Sarah says 'okay'?"

17  And, again, Sarah is who?

18  A.   The 14-year-old decoy.

19  Q.   Okay.  And then Kossack answers, "No."  And who is

20  Kossack?

21  A.   Kossack would be Mr. Volungus.

22  Q.   And then Kossack says, "I've enjoyed many young girls,

23  even younger than her, as young as ten."  And then Indy Girl

24  goes on to say, "Not trying to be too naive, but what can you

25  do with a ten-year-old girl?  Hope that isn't too stupid."  And

1    Kossack responds, "She wasn't a virgin, and I'm only average

2    size."

3         And then moving on to the next page, which is

4    Bates-stamped 1126, the chat continues with Kossack saying, "We

5    enjoyed each other orally then had regular sex.  Her sister

6    tried to convince her to try anal with me, but she said no."

7    And Kossack continues on, "Yup, 14-year-old.  Picked up at a

8    club when I was working in Germany.  If the young girls are

9    there after midnight, they are just looking for sex."

10        Dr. Phenix, do you credit the admission here about regular

11   sex with a ten-year-old?

12   A.   Yes, I do.

13   Q.   And why do you credit that admission?

14   A.   Well, it's consistent with his patterns of sexual arousal

15   and his expressed interest.  He has reported sexual arousal,

16   and since 1998 almost exclusively to children and to young

17   teenagers.  He's possessed an enormous amount of child

18   pornography between the age of 18 months and 18 years.  And so

19   his self-reported behavior is consistent with what he says he's

20   sexually aroused to.

21   Q.   And do you consider this admission regarding sex with a

22   ten-year-old as an instance of sexual violence or child

23   molestation?

24   A.   Yes, I do.

25   Q.   I would like to show you again part of Exhibit 1.  It's

1    been Bates-stamped 1129.  And this is more of the chat.  And

2    Kossack says at the bottom here, "Well, in Holland I saw some

3    great young stuff.  Even had a 13-year-old.  Cost me 200

4    guilder."  Did that admission play into your evaluation at all?

5    A.   Yes, it did.

6    Q.   And did you credit this admission about having some sort

7    of sexual interaction with a 13-year-old?

8    A.   Yes.

9    Q.   And, again, why do you credit this admission about sex

10   with a 13-year-old?

11   A.   Because he's admitted that he has sexual arousal to

12   13-year-olds because he was seeking young females that age on

13   the Internet, and went to meet a 14-year-old because he has

14   admitted to arousal to 13-year-olds, and also has shown sexual

15   arousal to females that age on physiological testing.  So it's

16   consistent with his self-report of who he's sexually interested

17   in.

18   Q.   I'd like to show you what's been Bates-stamped 1130, again

19   as part of Exhibit 1.  And here Kossack says -- or I'm sorry --

20   Indy Girl says, "I see.  So what's the youngest you did with a

21   BJ for you?"  Dr. Phenix, what is your understanding of what

22   "BJ" means in this instance?

23   A.   That would be a blow job, or a BA, a casual reference to

24   oral copulation.

25   Q.   And then Kossack says, "Ten."  And Indy Girl says, "Ten??"

1   And Kossack says, "Yes, the same one."

2        Dr. Phenix, did you credit this admission about sexual

3   interaction with a ten-year-old?

4   A.   Yes.

5   Q.   And then moving on to Bates-stamped 1133, again, part of

6   Exhibit 1, here Indy Girl says, "Have you ever taken pictures

7   before?  So do you know if it's safe?"  And Kossack responds,

8   "Did some video with a 14-year-old once.  Had to get rid of it.

9   Customs sucks."  What was your interpretation of this

10  admission?

11  A.   That he had taken video -- sexual video with a 14-year-old

12  and that he knew it was illegal.  So in order to travel through

13  customs, because he had been serving in the military in

14  Germany, and going back and forth to the United States, that he

15  needed to get rid of the video so he would not be arrested.

16  Q.   And again, did you credit this admission?

17  A.   Yes.

18  Q.   And then just moving on to Bates stamp 1178, again, part

19  of Exhibit 1, Kossack asks Indy Girl, "You ever had anal

20  sex" -- and Kossack goes on to say -- "on -- you mean me

21  getting fucked?  Nope."  And Indy Girl responds, "You mean you

22  did it to someone else?"  And Kossack says, "Yup, even girls

23  about your age, even younger."  And Indy Girl asks, "Did the

24  girls my age like it?"  And Kossack responds, "They loved it."

25  Do you see that?

1   A.   Yes.

2   Q.   And actually, here, Dr. Phenix, Indy Girl at this point

3   was actually Sarah; isn't that right?

4   A.   Correct.  Her sister, whose name was Indy Girl in the

5   chat, had turned over the chat to her sister at this point.

6   Q.   So this reference here to "anal sex with girls about your

7   age," the age would actually be what?

8   A.   Fourteen.

9   Q.   And do you credit that admission?

10  A.   Yes.

11  Q.   Now, Dr. Phenix, you talked a little bit about

12  Mr. Volungus' conviction for child pornography, receipt and

13  possession in 1998.  Do you believe that that conviction for

14  child pornography satisfies the first element of the Adam Walsh

15  Act?

16  A.   I don't think by itself it does, no.

17  Q.   Okay.  And why is that?

18  A.   Because I don't think that it involves -- there's no known

19  actual victim with the child pornography, so in terms of

20  comprising --

21       MR. GOLD:  Your Honor, I'd object to this.  It seems

22  to be asking a legal interpretation from the witness.

23       THE COURT:  Overruled.

24       THE WITNESS:  There's no identifiable victim in the

25  pornography that he had.  Consequently, I don't think it can,

1  in and of itself, comprise sexual violence or child

2  molestation.

3  BY MS. SERAFYN:

4  Q.   So in your opinion, does Mr. Volungus meet the first

5  element of the Adam Walsh Act?

6  A.   Yes, he does.

7  Q.   And is that opinion given to a reasonable degree of

8  professional certainty?

9  A.   Yes.

10  Q.   So moving on to the second element, Dr. Phenix,

11  does Mr. Volungus suffer from a serious mental illness,

12  abnormality or disorder?

13  A.   Yes, he does.

14  Q.   And did you make a diagnosis in this case?

15  A.   Yes, I did.

16  Q.   And what diagnoses did you make in this case?

17  A.   In this case I provided a diagnosis of pedophilia,

18  sexually attracted to females, nonexclusive type.

19  Q.   Dr. Phenix, are you familiar with the Diagnostic and

20  Statistical Manual of Mental Disorders, also known as the DSM?

21  A.   Yes, I am.

22  Q.   And is the DSM relied on in the field?

23  A.   Yes, it is.

24  Q.   And are you familiar with the diagnostic criteria for

25  pedophilia that's set out in the DSM?

1  A.   Yes, I am.

2  Q.   And I'd like to draw your attention to Exhibit 59.  The

3  third -- actually, I'm not sure if it's the third page.  I

4  think it's the last page of that exhibit.  What do you

5  recognize this to be?

6  A.   That is the diagnostic criteria for pedophilia contained

7  in the DSM-IV-TR.

8  Q.   Can you explain for us in your own words what the

9  diagnostic criteria are for pedophilia?

10  A.   Yes.  It's a description of what the person experiences

11  and the behaviors that they evidence when they have sexual

12  arousal to prepubescent children.  There's a period of time

13  given, because pedophilia is -- much like a sexual orientation,

14  it's not something that comes and goes; it's something that an

15  individual has present for them throughout their life.  So at

16  least over a period of six months the DSM advises that the

17  person experiences intense recurrent sexually arousing

18  fantasies, sexual urges or behaviors involving prepubescent

19  children.  This -- these behaviors, these fantasies, this

20  condition, is also a condition that causes the person marked

21  distress or interpersonal problems in their life.

22  Q.   So let's just focus on the first diagnostic criteria,

23  Criteria A.  Do you believe that Mr. Volungus meets that

24  criteria?

25  A.   Yes, I do.

1   Q.   And why?

2   A.   For many reasons.  First of all, we know that since at

3   least 1998 he has been consumed with looking at images of child

4   pornography, and also, seeking out child partners for sexual

5   activity.  He has made admissions, not only to myself that he

6   believes he has pedophilia, but also admissions to others.  For

7   example, when he was engaged in Internet chat in 1998 with Indy

8   Girl, one of the first things he said when he had contact with

9   her was that "I'm a real-life pedophile," and then he set about

10  seeking sexual activity with her younger sister.

11       So he has admitted that he has pedophilia.  He has

12  admitted at various times sexual arousal to prepubescent

13  children; for example, in November of 2003 during a polygraph

14  examination he admitted that he experienced sexual arousal to

15  girls 11 to 13.  That would be considered prepubescent and then

16  beginning to go through pubescence.

17  Q.   Dr. Phenix, actually, I just want to stop you right there

18  and refer you to Exhibit 34, specifically, Bates stamp 843.

19  And I just want to show you this highlighted portion here that

20  says, "I am sexually attracted to females between the ages of

21  11 and 13 years of age.  All the women I dated were petite and

22  had small breasts."

23       Did you take that into account in diagnosing Mr. Volungus

24  with pedophilia?

25  A.   Yes, I did.

1    Q.   And what, if anything, do we know about Mr. Volungus'

2    preferred sexual partner?

3    A.   Well, Mr. Volungus has reported that, you know, he prefers

4    immature-looking females; he has reported sexual arousal to

5    children and to young adolescents.

6    Q.   I want to show you what has been marked as Exhibit 26,

7    Bates stamp 794.  Is this a document that you reviewed in the

8    course of preparing your report?

9    A.   Yes.  That's a letter that he wrote to another individual

10   he was communicating with while on -- he was on conditional

11   release, and this is an individual involved in child

12   pornography.

13   Q.   And could you read this sort of middle paragraph here?

14   A.   "What do you think about crossing the border to the Twins

15   and picking up some young girls?  How available are they there?

16   I've heard it's pretty common."  Let's see.  "You know what I

17   like:  A brunette about ten.  Just budding is perfect.  If you

18   ever see Alicia" -- and he's referring to child pornography

19   that he had that he had viewed -- "Alicia series" -- it's a

20   series of molestation of a young girl -- "Alicia series or" --

21   I can't read that word -- "she's fucking perfect.  Well,

22   almost.  I like longer hair."

23   Q.   Now, Dr. Phenix, what significance, if any, does this

24   paragraph have for you in terms of making your diagnosis?

25   A.   Well, he identified kind of a -- what he's most sexually

1    aroused to:  an age and what that child looks like.  It's quite

2    common for individuals with pedophilia to have a certain

3    look -- a blonde, you know, or brunette.  And so he's

4    identified, you know, what he prefers, and he's identified that

5    that child is ten years of age.

6        He also reported when he was in the library looking at

7    pornography that he saw an image of a father digitally

8    penetrating his six-year-old daughter, and he said he felt so

9    aroused that he wanted to take his penis out and masturbate

10   while he was in the library.  So it's clear that he has sexual

11   arousal to prepubescent children as well as young adolescents.

12   Q.   And I would like to show you what has been marked as

13   Exhibit 27, and just ask you if this was a document that you

14   reviewed in connection with your evaluation in this case?

15   A.   Yes, it was.

16   Q.   And could you just describe for us the purpose of this

17   evaluation, or what your understanding of the purpose of this

18   evaluation is?

19   A.   It was to -- as reported there, to have a better

20   understanding of his sex offense and also to conduct a study of

21   his sexual arousal patterns by administering the Abel screen

22   for sexual interest.  Also, Dr. Hamill administered a

23   psychological testing battery or test in order to understand

24   more about his personality functioning, and also his

25   amenability to treatment, because he was about to enter an

1   outpatient treatment program and the program wanted more

2   information about him and how to best help him in the treatment

3   program.

4   Q.   And you testified about the Abel Assessment for Sexual

5   Interests.  Are you familiar with that instrument?

6   A.   Yes.

7   Q.   And what is it designed to do?

8   A.   It's designed to measure patterns of sexual arousal, so

9   would the individual be sexually attracted to males or females,

10  children or adults?

11  Q.   And just turning your attention to Bates stamp 812 of

12  Exhibit 27, at the bottom here -- this is from Dr. Hamill's

13  report -- it says, "On the viewing time portion of this test,

14  Mr. Volungus was found to have three primary sexual interests.

15  His most significant sexual interest was toward girls who are

16  in the age range of approximately eight to twelve years old."

17       Do you credit such a statement from another psychologist's

18  report?

19  A.   Yes.

20  Q.   And sort of looking at all of the descriptions that we've

21  looked at in the past few exhibits of Mr. Volungus' preferred

22  sexual attraction, how, if at all, does that affect your

23  diagnosis in this case?

24  A.   Well, it certainly is consistent with my diagnosis.

25  There's overwhelming evidence that he is sexually aroused to

1    prepubescent children.  He had pictures -- when he was arrested

2    in 1998 and his apartment was searched, he had many pictures of

3    very, very young -- infants to children that looked to be two,

4    three, four years of age -- engaged in sexual acts with adult

5    men.  So he has a -- he was also found to have drawings that he

6    had made of himself engaging in sexual activity with children

7    both in 2002, while in a correctional setting, and again in

8    2007 while in federal custody.

9        So he has a very lengthy history of involvement in arousal

10   to prepubescent children, reinforcing that arousal through

11   masturbation, which he has reported to masturbate once to up to

12   six times a day to child pornography, and he's reported sexual

13   arousal to very young children.

14   Q.   I would like to show you what's been marked as Exhibit 41

15   and ask you if you looked at this document in connection with

16   your evaluation of Mr. Volungus.

17   A.   Yes, I did.

18   Q.   And can you describe for us what this document is?

19   A.   This is the FBI investigation that occurred in nineteen --

20   that resulted in his convictions in 1998 that identified that

21   he was using the Internet to seek child pornography and chat

22   rooms.  And this was the FBI investigating those allegations.

23   Q.   And in the middle of this document here it says, "He

24   frequently masturbates while looking at the child pornography

25   on the computer, and that is the reason he has it.  He has been

1   chatting on the Internet for a few months and is constantly

2   seeking child pornography."

3        What significance, if any, does this have for your

4   diagnosis in this case?

5   A.   Individuals seek the type of pornography that is

6   consistent with what they're aroused to.  And so when an

7   individual is seeking such large amounts of child pornography

8   with such a huge age range, from infancy, essentially, through

9   pubescence, and reporting that they are using those stimuli to

10  masturbate to, then you can feel assured that that reflects

11  their sexual arousal.

12  Q.   So moving on to the second diagnostic criteria for

13  pedophilia, it says here, "The person has acted on these sexual

14  urges or the sexual urges or fantasies cause marked distress or

15  interpersonal difficulty."

16       Do you believe that Mr. Volungus meets this criteria?

17  A.   Yes, I do.

18  Q.   Why is that?

19  A.   Well, first of all, we've already demonstrated that he has

20  self-reported acting on engaging in sexual activity with

21  victims as young as ten years of age, 12 years of age.  And

22  then also, he's sexually aroused not only to prepubescent

23  children, but it's not unusual for someone with pedophilia to

24  be also sexually aroused to young, immature adolescents.

25       So he has acted on those sexual urges and sexual fantasies

 1   which he's experienced.  And furthermore, it's caused him

 2   enormous difficulties in his life.  It's been associated with a

 3   significant loss of freedom, being in custody; it's been

 4   associated with having his probation violated and having to

 5   return to custody; it's been associated with causing a good

 6   deal of interpersonal problems with his parents and his

 7   families' relationship as a result of his repeated criminal

 8   behavior; it's caused him, in his own words, to feel isolated

 9   and different from other people as a result of his sexual

10   attraction to children.

11       It's also interfered, for example, in his ability to

12   maintain his work.  He reported that he would come home from

13   work when he was in the military and he would view child

14   pornography at five o'clock, as soon as he got home from work,

15   until midnight during the week, causing him to be fatigued,

16   causing him to have to take naps.  And then on the weekend,

17   viewing child pornography from five o'clock in the evening

18   until 6 a.m. in the morning, connecting with people, other

19   individuals interested in child images throughout the world,

20   because they're on a different time frame.

21       It essentially has taken over his life and not allowed him

22   to engage in normal activities that a young man his age would.

23   And now he has a significant criminal history.  So he has

24   clearly had to experience a marked distress and impairment in

25   his life.

1    Q.    What about the third criteria?  Does Mr. Volungus meet

2    that criteria?

3    A.    Oh, yes, he does.  When he was arrested -- he was 30 years

4    of age in 1998 -- so he was certainly well over 16 years of age

5    and well more than five years older than the 14-year-old that

6    he was attempting to engage in sexual activity with.

7    Q.    Now, Dr. Phenix, below the three diagnostic criteria for

8    pedophilia, it says, "Specify if" -- and it says -- "sexually

9    attracted to males, sexually attracted to females, sexually

10   attracted to both."  Did you specify one or more of those in

11   this case?

12   A.    I specified sexually attracted to females.  He has

13   reported sexual attraction only to females; not to males.  He

14   was attempting to engage in Internet chat with females only.  I

15   have no evidence that he was seeking out males.  And when you

16   look at the Abel Assessment for Sexual Interest, he

17   demonstrated his strongest arousal to females aged eight to 12,

18   with -- following that, the next strongest was young,

19   adolescent females.  And he did demonstrate some arousal to

20   males, but it wasn't clinically significant.

21        So by all indications, he is sexually aroused to immature

22   females.

23   Q.    And then, the next category there says, "Specify if

24   limited to incest."  Was that a factor here?

25   A.    No, it was not.

1    Q.   And then finally, it says, "Specify type:  Exclusive type,

2    attracted only to children, and nonexclusive type."  Can you

3    just explain what that means?

4    A.   It's not unusual for individuals with pedophilia to also

5    have other patterns of sexual arousal to, for example, males or

6    females postpubescent, and that's why you might see somebody

7    with pedophilia who molests children repeatedly to actually be

8    married or have an adult partner.

9        If the individual is only sexually aroused to children,

10   prepubescent children, then I would diagnose "exclusive type";

11   exclusively aroused to children.  In this case I diagnosed

12   "nonexclusive type."  I believe that for Mr. Volungus, that

13   clearly his strongest arousal is to prepubescent children and

14   young adolescents; however, he has reported many adult female

15   sexual partners, approximately 100 prostitutes that

16   he -- female prostitutes he engaged in sexual activity with

17   while in the military.  He also reported to me about 25 other

18   sexual partners; generally, one-night stands.  He hasn't really

19   maintained relationships with women, but he reports sexual

20   activity with adult females.

21       When you look at the results of the Abel assessment,

22   however, you see that that arousal to adult women is less

23   significant than his arousal to prepubescent females as well as

24   young adolescents.  So I diagnosed "nonexclusive type" because

25   he has reported adult female sexual partners.  I don't think

1    it's as strong as his sexual interest in children.

2    Q.    Dr. Phenix, can pedophilia amount to a mental illness

3    without being a serious mental illness?

4    A.    No; I would consider it a serious mental disorder.

5    Q.    And in this case, is it your opinion that Mr. Volungus'

6    pedophilia is a serious mental illness, abnormality or disorder

7    for him?

8    A.    Oh, yes.

9    Q.    So, Dr. Phenix, I would like to move on now to the third

10   element of the Adam Walsh Act.  Do you have an opinion based on

11   a reasonable degree of professional certainty as to whether, as

12   a result of Mr. Volungus' pedophilia, he would have serious

13   difficulty in refraining from sexually violent conduct or child

14   molestation if he were released from prison?

15   A.    Yes, I do.

16   Q.    And can you just tell us a little bit about how you

17   reached that opinion?

18   A.    I reached that opinion by conducting a risk assessment in

19   this case.  The first thing that I did was to score three known

20   actuarial instruments that measure sex offender risk.  Because

21   we don't have any actuarial instruments that include all of the

22   risk factors that predict future sexual re-offense, I went on

23   to look at additional factors that are associated statistically

24   with an increased risk in re-offending sexually.

25         I then put all of that together by looking at the risk on

1    the actuarial instruments and determining if it was higher than

2    that or lower than that reflected on the actuarial instruments

3    to come up with an assessment of overall risk for him.

4    Q.   Could you describe for us generally what actuarial

5    instruments are, or what they're designed to do in this

6    context?

7    A.   Yes.  An actuarial instrument is a list of risk factors

8    that research tells us, when present, those risk factors would

9    increase a person's probability of future sexual re-offense.

10   So it's a list of research-derived risk factors that are

11   weighted statistically for their contribution to risk.  You can

12   get an overall score on the actuarial instrument that equates

13   to a level of risk:  low, medium or high; and also equates to a

14   measure of absolute risk or -- for the study sample for that

15   particular score an overall, or general probability, of sexual

16   re-offense over a period of time, for example, five or ten

17   years in the future.

18   Q.   So you talked about sort of a level of risk.  Does an

19   actuarial instrument tell us anything specifically about

20   Mr. Volungus' level of risk?

21   A.   Yes, it does.  While this actuarial instrument is based on

22   group data -- or the sample on which it was developed and

23   validated, if Mr. Volungus is similar to the individuals in

24   that study on which they developed the instrument in that

25   sample, then those -- that risk level, that probability of

1    sexual re-offense, can be a good measure for Mr. Volungus.

2    Q.    Do psychologists in the field generally use actuarial

3    instruments in risk assessments?

4    A.    Yes.   It's significantly more accurate than using, for

5    example, just my own judgment about the individual.

6    Q.    And approximately how long have you been scoring actuarial

7    instruments?

8    A.    About 15 years.

9    Q.    Now, you mentioned that you scored three actuarial

10   instruments here.   Which ones did you score?

11   A.    I scored the Static-99 Revised; the Static-2002 Revised,

12   and the Minnesota Sex Offender Screening Tool Revised, which

13   I'll call the MnSOST-R.

14   Q.    And is that M-N-S-O-S-T-R?

15   A.    Yes.

16   Q.    And let's start first with the Static-99 Revised.   What

17   does the name "Static-99" refer to?

18   A.    "Static-99" refers to a list of risk factors that are

19   static in nature; in other words, we have two types of risk

20   factors that predict future sexual re-offense.   The first is

21   static:   And those are historical risk factors when present.

22   They can't ever go away.   And so that would be something like

23   having prior sex offenses.   Once you have prior sex offenses,

24   you will always have them in your history.   Things like having

25   an unrelated victim.   That can never go away, if you've had an

1    unrelated victim.

2        So Static-99 would be a list of ten static risk factors,

3    the instrument being developed in 1999.

4    Q.   And I should have asked you this before, but why did you

5    score three instruments here?

6    A.   I scored multiple actuarial instruments because primarily

7    I'm looking for converging evidence.  So, for example, if three

8    instruments tell me that a person is high risk or three

9    instruments tell me a person is low risk, then I have more

10   confidence in the overall risk level for that person.

11       If the instruments are giving me discrepant results -- as

12   a matter of fact, that happened in this case -- then I need to

13   look at more information about the case.  I need to analyze why

14   there's discrepancies and to make judgments about what I think

15   is the most accurate overall risk level.

16       And furthermore, there is no best actuarial instrument

17   today.  They all have what we call "moderate predictive

18   accuracy."  One is not superior in terms of how well they

19   predict than the others.  So if I could pick the best

20   instrument and use that one, I would have done that, but we

21   don't have the capacity to do that at this point in time.

22       And then finally, I use multiple actuarial instruments

23   because they have some different risk factors on them.  I get

24   more of a broad view by using more than one instrument in terms

25   of covering the known risk factors for future sexual

1    re-offense.

2    Q.    Is there a particular actuarial instrument that's used

3    more frequently than others in the field as far as you know?

4    A.    Yes.  The most well-established actuarial instrument is

5    the Static-99, now Static-99 Revised.  That has been tested, or

6    validated, on over 64 samples of sex offenders over, you know,

7    20,000 sex offenders it's been tested on at this point in time.

8    It's been the most widely used of the instruments.  It's used

9    internationally and in huge jurisdictions.  For example, all of

10   Canada, every inmate leaving prison will be assessed on

11   Static-99R; in California every inmate leaving the corrections

12   will be assessed on Static-99R; and now has been adopted by

13   many of the U.S. jurisdictions to assess sex offenders.

14   Q.    Are there known error rates associated with the Static-99?

15   A.    Yes, there are.

16   Q.    And can you describe sort of the questions on a Static-99;

17   just describe for us how the instrument is administered.

18   A.    Yes.  The question -- the risk factors on Static-99

19   involve two conceptual factors.  The first is factors having to

20   do with sexual deviance.  That would be something like prior

21   sexual offenses; have they had male victims.  There are other

22   factors -- or had they had noncontact sex offenses.

23       Another cluster of factors has to do with non-sexual

24   violence and general criminality, which we know also predict

25   future sexual re-offense; factors like having any convictions

1   for non-sexual violence at the time of the most recent sex

2   offense or prior to that; factors like total number of

3   sentencing dates, which is an English term for convictions of

4   any type.  So the instrument contains factors related to sexual

5   deviance and also related to general criminality and non-sexual

6   violence.

7   Q.   How does a clinician know how to score an instrument?

8   A.   Each instrument has coding rules, how to score it.  And

9   there's a manual that you can refer to in order to score the

10  instrument.

11  Q.   And what, if any, role did you play with respect to the

12  Static-99 coding rules?

13  A.   I'm one of the authors of the coding rules for Static-99,

14  and also, I'm one of the authors for coding the Static-2002

15  Revised.

16  Q.   And I'm just showing you a document here.  Are these

17  the -- well, actually, what is this that I've put on the screen

18  there?

19  A.   Those are the coding rules for Static-99, and they are

20  also applicable to coding the Static-99R, the new, revised

21  version.

22  Q.   And what's the difference -- you keep referring to the

23  Static-99 and the Static-99R.  What's the difference between

24  the two?

25  A.   The Static-99 is the original ten items that are related

1   to future sexual re-offense.  It was revised a little more than

2   a year ago to change one item, the age item, to reflect more

3   accurately the reduction in sexual recidivism with aging for

4   sex offenders.  So Item 1 is different between Static-99 and

5   Static-99R; otherwise, they're identical.

6   Q.   And are these coding rules that I've put on the screen

7   here that were revised in 2003 -- are those the rules that are

8   in effect today?

9   A.   Yes.

10       MS. SERAFYN:  Your Honor, I would actually like to

11  move the coding rules into evidence.  I don't believe that we

12  had talked about it previously, but I think it's recently

13  become an issue, and it would help to have it marked into

14  evidence.

15       MR. GOLD:  I don't object to that, your Honor.

16       THE COURT:  Okay.  So that would make it Exhibit 63?

17       (Petitioner's Exhibit No. 63 received into evidence.)

18  BY MS. SERAFYN:

19  Q.   Now, Dr. Phenix, what is the range of scores that one can

20  get on the Static-99R?

21  A.   Currently a minus three to a 12.

22  Q.   And is there an average score that one can get on this

23  instrument?

24  A.   Two.

25  Q.   And did you score Mr. Volungus on this instrument as part

1    of your risk assessment?

2    A.    Yes.

3    Q.    And did you report that score in your report, which is

4    Exhibit 51?

5    A.    Yes.

6    Q.    And what score did Mr. Volungus receive when you scored

7    this instrument?

8    A.    Originally, I scored him a five.

9    Q.    Now, I'm just showing you page 34 of your report.  What

10   risk category is a score of five associated with?

11   A.    Moderate high.

12   Q.    Now, Dr. Phenix, is that the score that you would give to

13   Mr. Volungus if you were scoring that instrument today?

14   A.    I would increase it by one point.  I would give him a six

15   today.

16   Q.    And why would you give him a six today?

17   A.    Because he had a stranger victim, and I did not score him

18   for that originally.

19   Q.    Okay.  So I want to get to that, but actually what I would

20   like to do is just sort of walk through quickly how this

21   instrument is scored.  So I'm putting a document up on the

22   screen here, and I'll just ask you if you've seen this document

23   before.

24   A.    Yes; I wrote that document.  I filled out the worksheet.

25   Q.    Okay.  And when did you fill out this worksheet?

1    A.    Yesterday.

2    Q.    And why did you fill out this worksheet yesterday?

3    A.    Well, I made a revision to the score, so I had a similar

4    worksheet previously when I scored him a five, but I corrected

5    that on this worksheet.

6    Q.    So could you just go through this for us and tell us what

7    each category is and why you scored Mr. Volungus the way you

8    did?

9    A.    Yes.  Item 1 is the new item that was not on Static-99.

10   On Static-99, originally there was an age range of over 25 or

11   under 25.  And under 25 would have been one risk point and over

12   25 would have been a no risk points, a zero.  However, research

13   has indicated that there is a greater reduction in sexual

14   recidivism rates as the individual gets older, and that that

15   age item was not fully accounting for age.  And so we can now

16   fully account for age within the instrument, which is quite an

17   improvement.

18        So you look at the associated risk point for Mr. Volungus'

19   age of now 43.  He's between 40 and 59.5, and that's associated

20   with minus one, which is a reduction in risk for his age.

21   Q.    And then what about Question No. 2?  It just says, "Ever

22   lived with."  What does that mean?

23   A.    Yes.  Statistically, offenders who have lived consistently

24   in a two-year relationship are at lower risk than those who

25   have not.  So Mr. Volungus has never had a live-in

1   relationship, so he would receive a risk point on that item.

2   Q.   And then what about Number 3, "Index non-sexual violence"?

3   A.   Right.   There are two items which measure non-sexual

4   violence:   The first is, has Mr. Volungus been convicted of

5   non-sexual violence, something like assault and battery at the

6   time of his most recent sex offense.   His most recent sex

7   offense, or index sex offense, we call it, would be when he

8   committed his probation violation for being in possession of

9   child pornography.   That would not be a true conviction;

10   therefore, he cannot have index non-sexual violence in his

11   record.   Furthermore, he does not have any convictions for

12   non-sexual violence in his criminal history.   So Number 4 would

13   also be zero, or no risk point.

14   Q.   And what about Number 5, "prior sex offenses"?

15   A.   Number 5 is the strongest predictor of future sexual

16   re-offense.   It can have up to three risk points.

17   Q.   Can I just stop you there?   When you say that it's the

18   strongest predictor of sexual re-offense, how do we know that?

19   A.   We know that because we look at the base rates, or the

20   re-offense rates, for sex offenders who have had only one sex

21   offense, and then we look at the re-offense rates for large

22   groups of sex offenders who have had two sex offenses or three

23   sex offenses in their history.   And you see consistently

24   significant increases in re-offense in the groups that had

25   prior sex offenses.   If you look at another item, for example,

1    prior non-sexual violence, any convictions, when that risk

2    factor is present, there is an increased risk in that group

3    that had prior non-sexual violence convictions, but not nearly

4    as high of a recidivism rate as those with at least six charges

5    or four convictions for prior sex offenses.

6    Q.    I'm sorry I interrupted you.  Why did Mr. Volungus get a

7    score of three in the prior sex offense category?

8    A.    Well, because, as I said, we're going to identify what is

9    his most recent sex offense according to the coding rules, and

10   that can be probation or parole violation if that behavior was

11   something he could have been arrested for and charged with in

12   the community.  We know that his probation violation was for

13   possession of child pornography, as well as being in the

14   presence of his five-year-old niece, and he could have been

15   charged and convicted, of course, of child pornography had he

16   not been on community supervision.

17        So we look back prior to that probation violation.  How

18   many charges for sex offenses and how many convictions for sex

19   offenses did he have?  He had eight charges and eight

20   convictions in 1998, so that would equate to three risk points

21   on Item 5, prior sex offenses.

22   Q.    And what about Item 6, prior sentencing dates?

23   A.    Right.  He has only two prior sentencing dates.  If there

24   are three or less convictions prior to the index sex offense,

25   he would have a zero or no risk point; if there were four or

1    more, he would have a risk point.  So he received a zero on

2    that item.

3    Q.   And what about Number 7, any convictions for non-contact

4    sex offenses?

5    A.   Right.  We know that offenders are higher risk if they

6    have both contact and noncontact sex offenses, what we call

7    multiple paraphilias, multiple sexual abnormalities.  So this

8    item would be a one, or a risk point, if there are convictions

9    for things like exhibitionism, voyeurism or child pornography.

10   And of course he has convictions for child pornography, so he

11   receives a one.

12   Q.   And then Category No. 9, any stranger victims.

13   A.   Actually, there are two victim items:  The first is

14   unrelated victim and the second is stranger victim.  So the

15   lowest recidivism rating is for individuals who have incest or

16   family relationship victims, but risk increases if the victim

17   is unrelated to the person or extrafamilial, and it increases

18   if it is a stranger victim.

19        So unrelated victims, Mr. Volungus was attempting to meet

20   Sarah, who was unrelated to him.  We code these as if the -- as

21   if it was the true intended victim rather than the decoy.  So

22   even though we know it was an adult male officer, Sarah was, we

23   still code for the intended victim.

24        So she was unrelated.  I also coded her as a stranger.

25   It's kind of an unusual coding situation, but Mr. Volungus

1   had -- a stranger would be someone that he has not had contact

2   with, or contact was less than 24 hours.

3       So if you look at Internet chat, okay, originally I coded

4   him as not having a stranger because he chatted for some time

5   with intended victim 19-year-old female, and then ultimately

6   had chat with Sarah, after he had been chatting for days with

7   her alleged 19-year-old sister.

8       So originally, I coded this as not a stranger victim.  In

9   fact, it turns out that the first real contact he had with

10  Sarah, the 14-year-old -- alleged 14-year-old -- female, he did

11  engage in lewd conversation with her, which I've already

12  discussed, talking about anal sex, talking about oral

13  copulation.  So within 24 hours of his first contact with

14  Sarah, he did commit a sex offense.

15      So I scored her as a stranger, and I scored a zero for

16  male victim, because there was no record of him engaging in

17  sexual activity with a male victim.

18  Q.   Dr. Phenix, I just want to walk through a little bit the

19  stranger victim category because you did change that score.

20  And you referenced the chat.  So I just want to show you again

21  what's been marked as Exhibit 1, specifically, Bates-stamped

22  1176.  And I just want to show you this highlighted portion

23  here where Kossack asks, "Is Sarah there?"  And then says,

24  "Think I could chat with her?"

25      So is it your understanding that at some point

1   Mr. Volungus actually began chatting with who he thought was

2   14-year-old Sarah?

3   A.   Yes.

4   Q.   Okay.  And then you referenced lewd comments that he made

5   to Sarah.  Do you recall what those were?

6   A.   Yes.  Asking if she would like to have her pussy licked,

7   if she would enjoy that, and asking her if she would like to

8   engage in anal sex, I believe.

9   Q.   So we were just looking at Bates stamp 1176.  And now

10  turning to 1177, Kossack says, "So, Sarah, why did you decide

11  to meet with me?"  And then down a little further he says, "I

12  hope you like having your pussy licked."  And is it your

13  understanding that -- well, actually, strike that.  Indy Girl

14  responds, "I think I would."

15      What's your understanding of who is responding at that

16  time?

17  A.   At this point it's Sarah responding rather than her

18  alleged sister, Deanna.

19  Q.   And I would like to show you the coding rules which were

20  marked as Exhibit 63; specifically, page 55.  And can you just

21  read that highlighted portion for us?

22  A.   "If an offender transmits sexually explicit/objectionable

23  materials over the Internet within 24 hours of the first

24  contact, this can count as a stranger victim."

25  Q.   So, Dr. Phenix, is the question, "I hope" -- or the

1    statement, "I hope you like having your pussy licked," does

2    that qualify as explicit or objectionable material in your

3    opinion?

4    A.    Yes.

5    Q.    So I'm just going to put this coding sheet back up here.

6    And what is the score that you came up with now?

7    A.    Six.

8    Q.    Okay.  And what is the risk category associated with that

9    score?

10    A.    That's the high-risk category.

11    Q.    And, now, what was the score that you previously scored

12    Mr. Volungus again?

13    A.    A five.

14    Q.    And the risk category associated with that is

15    moderate-high?

16    A.    Right.

17    Q.    So does the fact that your score has changed by one, does

18    that affect your opinion in any way in this case?

19    A.    No.

20            THE COURT:  Ms. Serafyn, if you're going to a new

21    subject, I think we'll take the morning recess now.

22            MS. SERAFYN:  I am, your Honor.

23            THE COURT:  All right.  We'll take a break, then.

24            THE CLERK:  All rise.  Court is in recess.

25            (The Court exits the courtroom, and there is a recess

1  in the proceedings at 10:52 a.m.)

2          THE CLERK:  All rise.

3          (The Court enters the courtroom at 11:13 a.m.)

4          THE CLERK:  For a continuation of the bench trial.

5          Please be seated.

6  BY MS. SERAFYN:

7  Q.   Dr. Phenix, I just want to go back briefly to this

8  stranger-victim item.  Did you consult with anyone concerning

9  that item?

10 A.   I consulted with other individuals involved in the

11 Static-99 development team, Dr. Karl Hanson, Dr. Leslie

12 Helmus -- or Leslie Helmus.

13 Q.   And can you tell us sort of generally the substance of

14 that communication?

15 A.   I just talked about -- because it was a situation that

16 wasn't as clear to me -- whether the contact in terms of this

17 offense would begin for the first time that he had contact with

18 the 19-year-old sister, with Deanna, which is how I originally

19 interpreted it, and then not having contacted with Sarah until

20 well after 24 hours, or if the stranger victim would be coded

21 from the 24 hours from the first contact with the 14-year-old

22 Sarah.  And they both believed that it would be from the first

23 contact with the 14-year-old victim.

24 Q.   And who are Dr. Karl Hanson and Leslie Helmus?

25 A.   There's both on the Static-99 development team.  Dr. Karl

1  Hanson developed the Static-99 with Dr. David Thornton, and

2  he's also one of the authors of the coding, and Leslie Helmus

3  is -- has been involved in the -- the primary person involved

4  in the revision of the Static-99, so developing the Static-99R.

5  Q.   I would like to move on now to the Static-2002R.  What is

6  the difference, if any, between the Static-2002R and the

7  Static-99R?

8  A.   It's developed in a different way.  If you look at the

9  Static-99R, it's ten items that we know statistically predict

10 future sexual re-offense.  The Static-2002R can better help you

11 to understand where the risk is coming from.  So its items are

12 clustered according to meaningful groups such as persistence of

13 sexual offending.  So there will be a number of items that let

14 me know if I endorse these items for the individual, that their

15 risk more comes from sexual deviance, from the persistence of

16 acting out on their sexual deviance.  Another cluster called

17 sexually deviant interests, okay?  These are the stronger

18 predictors of future sexual re-offense.  So I can see where the

19 risk is coming from.

20     And then another cluster that has to do with general

21 criminality, several factors that predict future sexual

22 re-offense but all have to do with general criminality.  So I

23 can say for any individual that I evaluate, you know, I think

24 much of their risk is coming from the fact that they just have

25 a lengthy criminal history, but they don't seem to have a good

1  deal of sexual deviance, and vice-versa, I can say this is a

2  person, like Mr. Volungus, whose risk primarily comes from his

3  very strong deviant sexual arousal.

4  Q.   And has the Static-2002R been cross-validated?

5  A.   Yes, it has been cross-validated.

6  Q.   And has it gained general acceptance in the psychological

7  community?

8  A.   Yes.  I don't think it's as widely used, certainly, as the

9  Static-99R, but it's relatively widely used at this point.

10  Q.   And are there known error rates associated with the

11  Static-2002R?

12  A.   Yes.

13  Q.   Now, how is the Static-2002R scored?

14  A.   It's scored in the same way.  And some of the items are

15  identical; for example, the age item is almost identical to

16  that on the Static-99.  It has several of the same items and

17  several new items, but they're all scored in the same way.  So

18  it would be adding up risk points:  0, 1, 2, 3.

19  Q.   And so I'm putting up on the screen here page 38 from your

20  report.  And is this chart here your score sheet, essentially,

21  for the Static-2002R?

22  A.   Yes, it is.  My original score sheet.

23  Q.   Okay.  And you said your original score sheet.  Did your

24  score on the Static-2002R change at all?

25  A.   Yes.  Relationship to victim.  Again, if I add the

1    stranger victim, IV, relationship to victim would be a two

2    instead of a one with an overvalue score of five.

3    Q.   And is there a range of scores that one can get on the

4    Static-2002R?

5    A.   Yes.  You see them right there next to the total score, so

6    it would be minus two to a 13, a plus 13.

7    Q.   Is there an average score on this instrument?

8    A.   Four.

9    Q.   Now, you testified that you have now scored Mr. Volungus a

10   five on this instrument.  Is there a risk category associated

11   with a score of five?

12   A.   Yes, that would be moderate risk.

13   Q.   And moving on to the third instrument that you scored, the

14   MnSOST-R, can you just tell us how that instrument is similar

15   to or different from the two static instruments that you scored

16   here?

17   A.   Similar in that it has research-derived risk factors which

18   are scored by assigning risk points to them.  It has some

19   different items that are not contained on either of the other

20   two instruments, items like was force or the threat of force

21   used during an offense; items like were there multiple sexual

22   acts committed on any victim; were any sexual acts charged or

23   convicted, conducted in a public place.  It also has very

24   similar items; for example, the number of sex-related

25   convictions, with two or more being risk points, and less than

1  that being no risk points.

2  Q.   And has -- I'm sorry.

3  A.   I'm sorry.  It's added up in a similar way.  And the total

4  score equates to a risk level as well as general probabilities

5  of future sexual re-offense.

6  Q.   And has the MnSOST-R been cross-validated?

7  A.   Yes; several times.

8  Q.   And has it also gained general acceptance in the

9  psychological community?

10  A.   Yes.

11  Q.   And are there known error rates associated with this

12  instrument?

13  A.   Yes.

14  Q.   Now, is there a range of scores that a person can get on

15  the MnSOST-R?

16  A.   Yes, there's a much wider range of scores on the MnSOST-R,

17  from negative scores to up to about 30 points.

18  Q.   And is there an average score on this instrument?

19  A.   I don't know the average score on the instrument.

20  Q.   What score did Mr. Volungus get on this instrument?

21  A.   He received a plus three.

22  Q.   And what significance, if any, is there to a score of plus

23  three?

24  A.   That would be in Bin 1, which is associated with

25  low -- it's a low score.  It's in the low range of risk on the

1 MnSOST-R.

2 Q. And, Dr. Phenix, I'm putting up a chart here. Can you

3 tell us if you've seen this document before?

4 A. Yes, I made the document.

5 Q. Okay. And can you just sort of walk us through this

6 document and explain the information that it's telling us here?

7 A. Yes. This is -- the purpose of this is to get an overall

8 view of what the actuarials are telling us in this particular

9 case. So you can see the total score on the instrument.

10 Perhaps more informative is the next column of risk category.

11 And as you can see here, the instruments are giving us a very

12 wide range of risk, from low on MnSOST-R to moderate on the

13 Static-2002R and a high range on the Static-99R.

14     These ranges are associated with percentiles. So we can

15 tell about that score what the percentile, either range or

16 actual percentile, was interpreted as. For example, if on the

17 MnSOST-R he scored in the 26th percentile, that would indicate

18 that 26 percent of the individuals scored at or below his

19 score. And as you can see for Static-99R, most of the

20 individuals involved in developing percentiles, which would

21 represent a wide range of sex offenders -- most of the

22 individuals scored at or below his Static-99R score because it

23 was quite high. Quite the opposite with the MnSOST-R score.

24     We can also get some absolute probabilities of sexual

25 re-offense for the study samples for each of these instruments,

1    and we can get probabilities of sexual rearrest for all three

2    instruments for five years for the static instruments and for

3    six years for the MnSOST-R.  And both the static instruments

4    have absolute probabilities of sexual re-offense for the study

5    sample for a full ten years after release to the community.

6         So if you look at those probabilities of sexual re-offense

7    in five to six years after release to the community, on all

8    three instruments that ranges from about 15 percent to about 25

9    percent; probability of sexual rearrest in five years for the

10   study samples.  And, of course, that goes up gradually as

11   individuals are released to the community.  And you can see a

12   range on the two static instruments between about 25 and 33

13   percent probability of sexual rearrest in ten years for the

14   study sample.

15   Q.   Dr. Phenix, what significance is there, if any, to the

16   fact that the percentage risk is a risk of rearrest?

17   A.   It's a more accurate reflection of actually committing a

18   future sex offense.  We know that most sex offenses go

19   undetected.  We have huge survey studies which indicate when

20   thousands of people are called and asked if they have

21   ever -- if a sex offense has ever been perpetrated against

22   them, we find that most sex offenses are not reported.  So that

23   these numbers are significant underestimates of sexual

24   re-offense.

25        We also know that when you ask offenders who have been

1    convicted, for example, of a sex offense, and you give them

2    confidentiality if they report the true number of sex offenses,

3    that it's significantly higher than what they've been detected

4    for.  So we consider these probabilities significant

5    underestimates of future sexual recidivism.

6        So including the definition of recidivism as being

7    rearrest rather than reconviction, it will capture more of

8    those undetected offenses.  So it's a more accurate reflection

9    of absolute risk.

10   Q.   And just to be clear, Dr. Phenix, is this chart showing us

11   that Mr. Volungus specifically -- if we look at the Static-99R

12   line, is it telling us that Mr. Volungus specifically will have

13   a 24.7 percent risk of recidivism in five years?

14   A.   No.  These are the true probabilities of re-offense for

15   the study sample with a cutoff score of six.  But Mr. Volungus

16   will have -- it's -- I think it's a good ballpark figure, okay?

17   But since he wasn't in the study sample, it wouldn't be exactly

18   this probability, but it would be a good indication of a range

19   of probability for him.

20       MS. SERAFYN:  Your Honor, I would like to move this

21   document into evidence.

22       MR. GOLD:  No objection.

23       THE COURT:  Okay.

24       MS. SERAFYN:  As well, your Honor, I forgot to ask to

25   move Dr. Phenix's revised Static-99 score sheet into evidence.

```
 1              MR. GOLD:  No objection.

 2              THE COURT:  All right.  Why don't we make the 99, what

 3    is it, 64, and the one --

 4              MS. SERAFYN:  65.

 5              THE COURT:  I don't think it had a caption, but the

 6    summary of the three instruments as 65.

 7              (Petitioner's Exhibit Nos. 64 and 65 received into

 8    evidence.)

 9    BY MS. SERAFYN:

10    Q.   Dr. Phenix, I think you touched on this briefly, but just

11    to be clear, how do you count for the discrepancy among these

12    three instruments in terms of the high-, moderate- and low-risk

13    category?

14    A.   Well, as I said, each instrument has different items on

15    them, and they're scored in somewhat different ways.  I think

16    that one explanation for the discrepancy in this case is pretty

17    clear, and that is that the MnSOST-R is an instrument that is

18    more heavily weighted with items having to do with general

19    criminality and non-sexual violence.  Almost all, if not all,

20    of Mr. Volungus' risk comes from factors having to do with

21    sexual deviance.

22         The Static-99 is going to assess those factors better, in

23    a more thorough way than the MnSOST-R.  So it's not surprising

24    to me he received a much higher score on the Static-99 than the

25    MnSOST-R.  I don't think that the MnSOST-R is representing his
```

1    risk adequately, in my opinion.

2         Static-2002R has -- generally, we receive somewhat lower

3    scores on that instrument related to the fact that prior sex

4    offenses is only counted in terms of convictions.  You do not

5    count charges for prior sex offenses.  So we tend to see one

6    risk range lower on Static-2002R simply because of construction

7    of the items.

8         But I do think that those two instruments are a better

9    measure, that his risk is between moderate and high.  It is a

10   better assessment of his overall risk.  If I'm going to look at

11   all three instruments, I'm going to rely more on both of the

12   static instruments.

13   Q.   What, if anything, do you do after you score actuarial

14   instruments in your risk assessment?

15   A.   Then I look at -- well, two things.  I first look at any

16   dynamic or changeable risk factors that we know are related to

17   future sexual re-offense.  When present, they essentially add

18   new information to actuarials.  They add incremental validity,

19   we call it; in other words, our overall predictive accuracy is

20   improved when we consider the dynamic instruments collectively

21   with the actuarial instruments.  And, of course, for any case,

22   because this assessment is about an individual person, there

23   will be individual factors that I want to consider for any

24   particular case.

25   Q.   So is it fair to say, Dr. Phenix, that you don't rely

1  solely on scores from actuarial instruments in determining

2  whether someone is a sexually dangerous person?

3  A.    No, I never rely solely on them.  The overall risk may be,

4  in my opinion, similar to what the actuarial instruments are

5  measuring, but I would not consider them exclusively by

6  themselves.

7  Q.    And in your report you mentioned dynamic risk factors.

8  Can you explain to us what dynamic risk factors are in this

9  context?

10  A.    Those are changeable factors, unlike static risk factors.

11  So they are generally treatment targets.  Because if we can

12  reduce the dynamic risk factors, or changeable risk factors,

13  then we can reduce the person's overall risk.  We'll never be

14  able to take away the static risk factors.  So when they're 25

15  they'll have those static risk factors; when they're 65 they'll

16  have those static risk factors.  But we can, through treatment,

17  reduce the dynamic, or changeable, risk factors and reduce

18  overall risk.

19  Q.    And did you consider dynamic risk factors for Mr. Volungus

20  in this case?

21  A.    Yes, I did.

22  Q.    And I'm putting on the screen here page 43 of your report.

23  Is that a list of the dynamic risk factors that you considered

24  here?

25  A.    Yes, it is.

1    Q.   And I'd like to just go through each of those.  And if you

2    could tell us, you know, what information, if any, you

3    considered with respect to each one.  So let's just start with

4    significant social influences.

5    A.   Right.

6    Q.   Can you first tell us what that means?

7    A.   Right.  We know that both for general criminal offending

8    and sex offending, that the person's associations -- who they

9    associate with -- may increase or decrease their risk of future

10   sexual re-offense.  So if people with a criminal history

11   associate with prosocial individuals, people without criminal

12   histories, people without criminal past, people who don't use

13   substances, people who haven't also been involved in sex

14   offending, that their risk for future sexual re-offense goes

15   down.  Likewise, if they associate with individuals who are not

16   prosocial, that their risk will go up.

17   Q.   And what information specifically did you consider here in

18   determining whether Mr. Volungus had significant social

19   influences?

20   A.   Well, I examined who he associates with, first of all, in

21   the community and institutionally.  What I know about his

22   institutional associations -- because he told me in the

23   interview -- was that when he was placed in the Bureau of

24   Prisons he began immediately associating with individuals who

25   had committed child molest.

1    He said there were about 12 individuals who were involved

2  in creating child pornography, who made child pornography in

3  the prison, and that he was involved with them; that it

4  reinforced his belief that that was okay; it reinforced his

5  belief that that engaging in sex with children was acceptable

6  and permissible.  So that's how he behaved immediately after

7  being convicted of trying to contact a 14-year-old for sex and

8  having child pornography.

9    He was found to have child pornography in 2002 in the

10  Bureau of Prisons.  He was found in custody, again, in 2007 to

11  have an inordinate amount of child-related materials, including

12  drawings that he had made similar to those in 2002.  So he has

13  associated with individuals who reinforce that it's permissible

14  to have sex with children.

15    Furthermore, when he was in the community on conditional

16  release on probation, he was communicating by letters with

17  another known child molester who was trading pornography, child

18  pornography, with him.  So both institutionally and in the

19  community, and even on community supervision, he has associated

20  with others who are involved in child pornography and sex with

21  children.

22    And then, furthermore, examining his life at home with his

23  parents and his brothers, who now live out of the house, when

24  you look at his family environment, ideally, you want a family

25  that will call him to task if he is engaging in high-risk

1  behaviors, and also, a family that will protect him from his

2  problems, which would be from children.

3      And from what I can ascertain from his self-report in the

4  interview and also from the records, when he was living at home

5  on conditional release, there were numerous times that his

6  brother came over to the house with his five-year-old daughter

7  and his sister-in-law, spent the night in the home with the

8  five-year-old when Mr. Volungus was living in the home.  This

9  is clearly a high-risk situation for him.  In treatment, he

10 would never be permitted to be in the presence of a

11 five-year-old female given that that is his victim pool.

12     This child was in the room with him, his room, alone with

13 him.  His conditions, I believe, were that it had to be

14 supervised situations.  Even that is a high-risk situation for

15 him.  He had physical contact with the child by having

16 her -- have her shoulder -- her head on his shoulder, by having

17 the child in his lap, by hugging the child.

18     So these are very high-risk situations.  He said that his

19 family did not feel that that was any problem whatsoever, to

20 have this child in the home with him; and furthermore, that he

21 did not see that as a problem, and he did not see being alone

22 with children as being a problem for him.

23     So his home environment did pose some really risky

24 situations that would make it very difficult for someone like

25 Mr. Volungus who has such strong sexual arousal to prepubescent

1    children.  It's just almost like an accident waiting to happen.

2    So I think there were problems in the home environment; there

3    were problems with the people he associated, with like-minded

4    individuals who were permissive of sex with children.

5    Q.   And, Dr. Phenix, I'm showing you what has been marked as

6    Exhibit 47.  And have you seen this document before?

7    A.   Yes.

8    Q.   Okay.  And I just want to refer you to the highlighted

9    portion, the last paragraph at the end, when it says, "During

10   his search, Volungus found letters from Gary Gallardo to his

11   son.  He read the letters and then destroyed them.  He recalled

12   that they talked about child pornography and websites and

13   computers."

14       Can you just put this paragraph in context for us and

15   explain what happened here?

16   A.   Yes.  After Mr. Volungus was arrested, his father searched

17   his room and found letters.  As I said, he had been

18   communicating with a known individual who committed -- who was

19   involved in child pornography.  And they had been communicating

20   by letters, which there is documentation of those letters.  And

21   his father found those and destroyed those letters knowing that

22   they talked about child pornography and how to access child

23   pornography on the web.

24   Q.   And what, if any, significance does this have for you in

25   evaluating significant social influences for Mr. Volungus?

1    A.    Right.   These types of behaviors -- if the family is not

2    colluding with the offender, needs to bring these types of

3    behaviors, letters, information to the appropriate authorities,

4    which would have been his probation officer, rather than kind

5    of hiding it under the covers, you know, not bringing it to

6    anyone's attention so that it could be handled in an

7    appropriate way.

8    Q.    And is there anything else that you considered with

9    respect to significant social influences that we haven't

10   discussed before we move on?

11   A.    No.

12   Q.    All right.   And then moving on, then, to intimacy

13   deficits, what does that mean in this context?

14   A.    Intimacy deficits is the ability to establish appropriate

15   intimate relationships that are meaningful and that are

16   satisfying to the individual.   We know if a person doesn't have

17   the capacity to do that, or has not done that, then they're

18   higher risk for future sexual re-offense.   So you look at the

19   nature and length of the individual's intimate relationships

20   with others.

21        In this case, Mr. Volungus has identified having two

22   girlfriends, neither of them live-in relationships.   One did

23   not involve sexual activity over several months, and the other

24   involved engaging in sexual intercourse apparently twice over a

25   several-month period.   These were short-term relationships.

1   One of them didn't even involve intimate sexual behavior.  And

2   he reported engaging in sexual activity with 100 prostitutes,

3   having at least 25 one-night stands.

4       So when you look at the sexual activity he's engaging in,

5   it's sex with strangers, essentially, and it gives him the

6   tendency -- and he's acknowledged this -- to objectify women,

7   to see women not as having emotional capacity but seeing women

8   as a sexual object; and also, of course, someone who doesn't

9   satisfy any of his needs for close emotional contact, if, in

10  fact, he had all of those relationships that he reported with

11  adult women.

12      And if you look at really, since 1998, who has he been

13  seeking out in terms of partners; and that is, going on to

14  Internet chat lines -- and this relates to emotional

15  identification with children as well.  So he's looking for very

16  young partners for intimate sexual activity; the 14-year-old

17  that he went to meet and his repeated discussion of sexual

18  activity with a ten-year-old or a 12-year-old or 13-year-old.

19      So this is a wholly inappropriate sexual partner for him,

20  and that's what he has been seeking out since at least 1998.

21  And so I think he has significant intimacy deficits both by

22  reason of the fact that he has not had appropriate adult

23  intimate relationships.  I think much of the reason is because

24  he's not interested in that, or aroused by that, but that he

25  seeks out a totally inappropriate partner.  And in part, I

1  think, because as you see the second factor listed there, he

2  has a pretty strong emotional identification with children.

3      He endorsed an item in his testing with Dr. Hamill that

4  indicated that you can get more love from a child than an

5  adult.  I think that he chats on teenage Internet-relayed chat

6  rooms because he feels much more identification with youngsters

7  than he does adults.

8      So he's getting his emotional needs met by prepubescent

9  and becoming-pubescent children, and this is an identified

10  dynamic risk factor for future sexual re-offense.

11  Q.   And what about sexual self-regulation; what does that

12  mean?

13  A.   That addresses how sexual the person is in terms of their

14  sex drive and their libido.  We know statistically that

15  individuals who commit sex offenses oftentimes are hypersexual,

16  or have significantly increased sex drive and sexual libido; in

17  other words, they'll masturbate more often, they have many more

18  sexual fantasies than normal men would have.  So it's their

19  level of sexual preoccupation.

20      It's also defined by a history of deviant or abnormal

21  sexual fantasies and behavior which, of course, has been

22  present for Mr. Volungus.  In terms of sexual preoccupation,

23  Mr. Volungus has reported, and the records would clearly

24  indicate, that he has been consumed by viewing child

25  pornography for many years; that it doesn't matter the setting

1   or the situation.  He will create it if it's not available and

2   he will seek it out if it is available.  And that he spends an

3   inordinate amount of time, as I've discussed previously,

4   looking at the pornography, reinforcing deviant sexual arousal

5   by masturbating to it.  And if he's not viewing child

6   pornography in free hours, then he was seeking youngsters in

7   order to engage in sexual activity and also to engage in lewd

8   talk over the Internet.

9       So he has a very high level of sexual preoccupation, he

10  has very established deviant sexual interest, both dynamic risk

11  factors for future sexual re-offense.

12      I don't know the extent to which he uses sex as coping.

13  It's not uncommon for individuals who have committed sex

14  offenses, or have paraphilias or sexual abnormalities, to cope

15  with negative mood states by sex offending, by looking at

16  pornography, things that would make them feel better.  So I

17  don't know how related these -- this sexual preoccupation is to

18  coping with negative mood states.  I know he experiences them;

19  I don't know to what extent he uses these sexual activities to

20  cope with them.

21  Q.   Dr. Phenix, I'm showing you what has been marked as

22  Exhibit 36, which is the transcript of Mr. Volungus' supervised

23  release violation hearing in 2005.  And did you review this

24  document?

25  A.   Yes, I did.

1   Q.   I'd just like to draw your attention to Bates stamp 1453,

2   this last paragraph here.  Could you actually just read that

3   for us, where it says, "The Defendant," and it starts with,

4   "Sir, yes, sir"?

5   A.   "While the treatment program has helped some, it hasn't

6   helped enough.  I know that I've got a problem.  I have a

7   problem controlling it.  And it's one of the hardest things

8   I've had to do, is that I really don't have enough control over

9   it.  Recognizing that I don't have enough control over it.

10  I've tried to control it.  It keeps rearing its head."

11  Q.   And can you just continue, actually?  Sorry.

12  A.   "I know it causes a lot of problems, not only for myself,

13  but for my" -- I think it's family -- "family, but I don't want

14  to keep doing this for the rest of my life.  I would like to

15  figure out how to make it stop.  I really would.  I just don't

16  know how to do it yet."

17  Q.   Dr. Phenix, what significance, if any, does this admission

18  have about -- does Mr. Volungus' admission about inability to

19  control have on your assessment of the dynamic risk factors?

20  A.   In terms of -- in terms of sexual self-regulation, he's

21  essentially saying that "I have deviant sexual interests" --

22  those are well established.  The child pornography, the seeking

23  minors for sexual activity -- and that he has no coping

24  strategies.  He has no way to stop it.

25       In sex offender treatment, offenders learn -- you can't

1    cure pedophilia but you can manage it.  Sex offenders learn the

2    skills and techniques to redirect their sexual interest to

3    appropriate outlets and to avoid high-risk situations.  They

4    learn how to do that.  And Mr. Volungus has not completed sex

5    offender treatment to the extent that he has been able to

6    develop a relapse prevention plan, so emotionally he feels

7    completely out of control.  And that is what is driving these

8    repeated incidents, in and out of custody, to seek child

9    pornography and to seek children for sexual behavior.

10   Q.   I want to just focus specifically on Mr. Volungus' sexual

11   self-regulation while in prison.  And I'm showing you Exhibit

12   21.  And is this also a document that you reviewed in

13   connection with your evaluation?

14   A.   Yes.

15   Q.   So just focused on -- I guess it's the second paragraph

16   here.  It says, "During the interview, Volungus acted very

17   upset and continued to say he was having a problem and he

18   thought about sex with children all the time."

19        How, if at all, did that factor into your assessment of

20   Mr. Volungus' sexual self-regulation in prison?

21   A.   Well, it explains why he's having such a difficult time.

22   There are some individuals with pedophilia who have

23   intermittent deviant sexual fantasies of children; for example,

24   when they feel stressed or overwhelmed.  Other times they don't

25   struggle with that.  Or perhaps that deviant sexual arousal

1   comes up at a time when they've just gotten divorced or they've

2   lost their job.  But at other times they are able to manage

3   that or they don't even experience those sexual fantasies.

4       For some offenders with pedophilia, and this would be

5   typical for Mr. Volungus, they're essentially constant sexual

6   fantasies and urges to engage in sexual activity with children.

7   And so when he says, "I think about it all the time," what he's

8   describing is the sexual fantasies and urges that won't go

9   away; the ones that he can't control when he's in an

10  environment where he can act out on that.

11  Q.   And, Dr. Phenix, I'm showing you now what has been marked

12  as Exhibit 61.  It's the first page, Bates stamp 1421.  What's

13  your understanding of this document?

14  A.   These are drawings that he made depicting himself engaging

15  in sexual activity with what looks like a young child.  This

16  was from the vast amount of material that he had created or

17  collected in 2007 while he was in custody and had actually

18  already been certified for the purpose of this law.  So he also

19  admitted in 2002 -- not only in 2007 -- that he created

20  drawings that depicted him engaging in sex with minors.

21  Q.   And in 2002 was Mr. Volungus in prison or in the

22  community?

23  A.    Prison.

24  Q.   Dr. Phenix, is there anything else with respect to sexual

25  self-regulation that we haven't talked about that you wanted to

1  mention?

2  A.   I think just to wrap up, that in order for him to manage

3  it, he would need to have a relapse prevention plan and to have

4  completed adequate treatment so that he had controls over his

5  behavior, and that has not occurred yet.  So I would expect his

6  level of preoccupation to be the same, unchanged, certainly at

7  his young age of 42, and I would expect him to struggle with

8  the same control problems that he has discussed candidly in the

9  past.

10  Q.   And what about cooperation with supervision?

11  A.   Mr. Volungus has had really a dismal record of cooperation

12  with supervision.  That's both institutionally and in the

13  community.  He was first imprisoned in 1998.  He was released

14  in 2003.  He began collecting and viewing child pornography

15  again while he was under community supervision.  He was in the

16  presence of his five-year-old niece on repeated occasions, even

17  when she spent the night in the house.  He was communicating

18  with a known individual who engaged in exchanging child

19  pornography and, I don't know, perhaps child molesting.  I

20  don't know that piece of it.  But continued to reinforce those

21  deviant patterns.  He continued to masturbate to deviant

22  stimuli.

23       He then went into custody as a result of finally being

24  violated -- his probation being violated.  And once in custody

25  again, he continued to collect vast amounts of child-related

1   articles, materials for erotic stimulation involving children,

2   and making drawings such as we just saw.

3   Q.   Now, you testified earlier about Mr. Volungus'

4   unauthorized contact with his five-year-old niece.  Can you

5   describe for us your understanding of the nature of that

6   contact?

7   A.   What he described is that she came into the house one

8   time, ran up into his room and got on his bed and hugged him;

9   that he felt uncomfortable and decided to go downstairs in the

10  living room where they watched television and she laid her head

11  on his shoulder.  And then they read books together.  And that

12  the child had been in the house numerous times.  Prior to

13  leaving the house, that he would hug her before she left.

14  Q.   And did all of this contact occur during the two years

15  that Mr. Volungus was on supervised release?

16  A.   Yes.

17  Q.   And is it your understanding that this was a violation of

18  his supervised release condition?

19  A.   It was found to be a violation, yes.  That was one of the

20  reasons he was violated.

21  Q.   And I'm showing you what has been marked as Exhibit 26,

22  specifically, Bates-stamped 786.  And I'd just like to -- well,

23  first, have you seen this document before in connection with

24  your evaluation?

25  A.   Yes.

1    Q.    Okay.  And is it your understanding that this is a letter

2    that Mr. Volungus wrote to Gary Gallardo, the other sex

3    offender in Texas, I believe?

4    A.    Yes.

5    Q.    And just focusing on this highlighted portion here, it

6    says, "Downloaded some great video last night including one of

7    guy's daughter, about seven.  Cute as hell and does one hell of

8    a sexy strip tease and pussy show.  I gotta figure out how to

9    save a webcam broadcast."

10        What significance, if any, does this statement to Gary

11   Gallardo, while on supervised release, have in terms of the

12   dynamic risk factors?

13   A.    That Mr. Volungus essentially was unchanged.  So he was a

14   person who is sexually preoccupied, was going to seek out child

15   pornography, was going to seek out contact with minors for

16   sexual activity as of 1998, and that he continued in those

17   efforts throughout the time that he was both in custody and

18   during community supervision.

19        He was also in sex offender treatment during this time.

20   He was ordered, mandated to go into sex offender treatment.  So

21   he was going to sex offender treatment, but all the while was

22   engaging in the same high-risk behaviors that had originally

23   resulted in his conviction.

24   Q.    And, Dr. Phenix, what about this one from the same

25   exhibit, Bates stamp 792?  It says, "Met one fella last week.

1   Watched his webcam.  He was finger-fucking his daughter for the

2   world to see.  She looked about six years old.  She was loving

3   it.  He had a microphone on.  She was asking him to 'Do it

4   faster, Daddy.'  And, 'Yeah, right there.'  Was fucking

5   amazing.  If I hadn't been in the middle of the library, I

6   would have whipped it out and jacked off right there."

7       Is there any significance for you to the fact that

8   Mr. Volungus is apparently looking at child porn while in a

9   library?

10  A.    Yes.  I mean, the fact is that he will engage in very

11  risky behavior to meet his deviant sexual arousal needs.  So he

12  even said at one point he thought a girl in the library had

13  actually seen him viewing a video, a pornographic video, while

14  he was in the library.  It just indicates that he has such poor

15  volitional control over this behavior that he will engage in it

16  in very, very risky settings.

17  Q.    And I just want to show you Bates stamp 793.  And I

18  believe you just referred to this incident.  It says, "While in

19  the library yesterday, a little cutie came over and was

20  apparently watching what I was doing.  She gave me this coy

21  grin.  I guess she liked what she saw.  I had been watching a

22  KP fuck vid before that.  I see her again, I'm going to see

23  what happens.  She seems like an approachable girl."

24      Dr. Phenix, what is your understanding of what "KP" stands

25  for here?

1   A.   "Kiddie porn."

2   Q.   And, again, is there any significance to the fact that

3   Mr. Volungus is having this interaction in a library while on

4   supervised release?

5   A.   Right.  I mean, if he doesn't have access to a computer --

6   if you take away his computer -- that was part of his

7   conditions -- he will find somewhere to access child

8   pornography.  And in this case, in the library, in a public

9   setting.  So he will risk anything to be able to seek out his

10  compulsion, which is child pornography.  And in this case, we

11  see a strong indication of his offense cycle.  In other words,

12  what does looking at child pornography lead to for

13  Mr. Volungus?  It leads to hands-on sex offending.  He went to

14  meet a 14-year-old from the chat room, and here his thinking is

15  not just that this youngster in the library saw this

16  pornography --

17           MR. GOLD:  Objection to what he thought, your Honor.

18           THE COURT:  Overruled.

19           THE WITNESS:  -- but he planned on approaching her if

20  he saw her again.

21           So that's his offense cycle, and that leads to

22  hands-on sex offending.

23  BY MS. SERAFYN:

24  Q.   And, Dr. Phenix, does the research tell us anything about

25  individuals who have a lack of cooperation with supervision?

1    A.    Yes.   Actually, in the study, the primary study we have

2    that looked at and examined dynamic risk factors, originally

3    this was one of the strongest predictors, future sexual

4    re-offense.   What we do know is that it increases the

5    probability of sexual re-offense.

6    Q.    And is there anything else about cooperation with

7    supervision that you wanted to mention that we haven't talked

8    about?

9    A.    No.

10   Q.    Okay.   So then moving on to the last dynamic factor,

11   general self-regulation, can you explain what that is?

12   A.    Yes.   That's how he conducts himself when he's in the

13   community, and it results from his internal thinking process

14   and what his behaviors are like.   So it examines the level of

15   behavioral impulsivity.   Can he think through the consequences

16   of his behavior or does he just act without being able to do

17   that?   I think that that's an obvious answer here.

18        This is a person who, for example, goes to the library to

19   look at pornography.   He's not thinking through the

20   consequences of this behavior, "Gee, I'm on conditional

21   release.   I could be sent back to prison if I do this.   Anyone

22   in the community could see me doing this and report me."   So

23   he's not thinking in ways that he needs to in order to make

24   sensible decisions.   He shows very poor problem-solving skills.

25   He's so anxious to meet his needs in terms of his deviant

1  sexual arousal that he ignores sensibilities.

2      Furthermore, he's a person who at times has expressed

3  negative emotionality and hostility.  He quite views himself as

4  the victim rather than the perpetrator of these problems.  He

5  sees that the community -- the judicial system is a witch hunt

6  for individuals who perpetrate offenses against children,

7  compares it to the Nazis seeking him out to punish him.  And

8  he -- at times when he's talked to various custody staff and to

9  mental health workers in the Bureau of Prisons, he's been

10  furious about the fact that he had additional conditions placed

11  on him when he was on conditional release, ignoring the fact

12  that he had not been complying with his conditions and that

13  they were necessary to keep him safe in the community and

14  protect him from re-offending.

15      So he has this underlying anger and hostility that he

16  projects on to everyone else rather than understanding that he

17  is just serving the consequences of his own decisions and his

18  own behavior.  And he has yet to demonstrate that he fully

19  understands his problems and to fully engage in meaningful

20  treatment to address them, so that he can reduce his

21  impulsivity, improve his problem-solving and reduce his overall

22  risk.

23  Q.   Other than the dynamic factors listed here, did you

24  consider any other dynamic factors in this situation?

25  A.   I considered treatment completion as being a protective

1    factor.  And the fact, as I've mentioned, that he has not had

2    sufficient treatment progress to allow him to manage his

3    deviant sexual arousal, at least at this point, I think it's

4    just largely completely unchanged.  Even though he did

5    participate in some community treatment, all the while, he was

6    reinforcing his deviant sexual arousal.

7    Q.   Has Mr. Volungus ever participated in sex offender

8    treatment?

9    A.   Yes, he did.  He participated in sex offender treatment

10   when he was -- he was arrested in 1998, then he was released to

11   the community and participated fairly briefly in some sex

12   offender treatment.  He was then participating in treatment

13   once released from the Bureau of Prisons in 2003 while he was

14   on conditional release, until that was violated.  It showed

15   that he didn't make significant progress in terms of developing

16   a relapse prevention plan that would stop him from

17   re-offending.  And since he was essentially re-offending while

18   in treatment, we wouldn't consider that to be successful.

19       He had applied, I believe in 2006, to participate in sex

20   offender treatment at Devens, and he was turned down for

21   treatment because he would not admit culpability for his sex

22   offending.  And so he was unable to participate in sex offender

23   treatment in his second term in the Bureau of Prisons.

24   Q.   How would you characterize Mr. Volungus' participation in

25   sex offender treatment while he was on supervised release?

1  A.   I think he was -- I think he was essentially

2  participating -- well, I mean, he said the reason that he

3  participated -- to me -- the reason he participated is because

4  he was mandated to do so.  So he was there because he had to go

5  there, but it was obvious that he was not conducting himself in

6  a manner consistent with taking his treatment seriously.  I

7  would not say at this point that he has had any significant

8  treatment progress.

9  Q.   Are you familiar with the term "cognitive distortions"?

10  A.   Yes.

11  Q.   And what does it mean in this context?

12  A.   It's what we also call "thinking errors."  Cognitive

13  distortions are beliefs that in this case sex offenders have in

14  order to permit them to offend, or to continue in the same

15  behaviors.  It's kind of like making up excuses.

16  Q.   And are cognitive distortions something that you consider

17  when doing a risk assessment?

18  A.   Yes, because -- well, essentially, if a person has

19  participated meaningfully in sex offender treatment, they will

20  have no cognitive distortions.  They will have challenged them;

21  they'll understand that they're not true and that they should

22  not guide their behavior.  But it's very common for untreated

23  sex offenders to have cognitive distortions that allow

24  them -- that permit them, essentially, to go on to re-offend.

25  Q.   And did you consider cognitive distortions in this case in

1    evaluating Mr. Volungus as to whether he was a sexually

2    dangerous person?

3    A.   Yes.

4    Q.   And I would like to show you what has been marked as

5    Exhibit 13.  Did you review this document in connection with

6    your evaluation?

7    A.   Yes.

8    Q.   And just drawing your attention to the highlighted portion

9    at the top that says, "He stated that he is questioning the

10   extent to which the behavior of his instant offense was

11   aberrant, and he noted that he believed that his behavior may

12   be considered appropriate under other circumstances."

13        What is your understanding of what the instant offense

14   refers to in this document?

15   A.   That would be him viewing child pornography and also

16   attempting to have sex with a 14-year-old.

17   Q.   And what, if anything, is significant about the statements

18   in this document as it relates to your risk assessment?

19   A.   Well, it indicates, and as you stated many other times,

20   that he believes that that behavior is acceptable.  At times

21   he's thought that that behavior should be legal, that

22   14-year-olds should be able to consent to sexual activity; it

23   actually can be beneficial to them, to teach them about sex;

24   and that girls that age should be able to exercise their sexual

25   rights without these laws that prohibit it.

1    Q.   And I'm showing you what has been marked as Exhibit 14.

2    And it says, "He expressed his dissatisfaction over being in

3    the position of receiving help, as this makes him feel out of

4    control, powerless and not responsible for his actions.  He

5    expressed his attraction to minors."  And then skipping down

6    toward the end, "However, he stated that the sanctions received

7    by individuals such as himself are not justified, and that

8    society simply has not come to accept his preferences."

9         What's the significance, if any, if there is any, to

10   Mr. Volungus' belief that society hasn't accepted his

11   preferences?

12   A.   He's trying to normalize his deviant sexual behavior so

13   that it doesn't look deviant.  He compared this to, for

14   example, in the early '70s when homosexuality was in the

15   DSM-IV-TR as a mental disorder, and he says that ultimately

16   society realized that that is not deviant sexual behavior and

17   that they will realize that sex with children, prepubescent

18   children, is not deviant.  So he twists this in his mind to

19   make his behavior acceptable.

20   Q.   So I'm showing you now what's been marked as Exhibit 22.

21   And I think this is what you were just referring to.

22   Specifically, this paragraph here that starts with,

23   "Mr. Volungus also expressed an attitude of denial regarding

24   his involvement with and his use of child pornography.

25   Mr. Volungus' response that he had a diagnosable disease was,

1    'So was homosexuality years ago.'"

2        In your opinion, Dr. Phenix, is this a cognitive

3    distortion for Mr. Volungus?

4    A.   Yes.

5    Q.   And now moving on to Exhibit 27, we looked at this exhibit

6    earlier.  This was a report by Dr. Hamill when Mr. Volungus

7    began his supervised release.  And I would like to draw your

8    attention to Bates stamp 812.  And this paragraph here talks

9    about the Bumby Cognitive Distortions Scales for Rapists and

10   Child Molesters, and it's Bumby, B-U-M-B-Y.

11       Are you familiar with that scale or that instrument?

12   A.   Yes.

13   Q.   And what exactly is it?

14   A.   It's an instrument that lists -- in treatment we hear many

15   cognitive distortions from sex offenders that are basically

16   attitudes that further their offending.  So it's essentially a

17   list of those kind of things that we frequently hear if you're

18   a treatment provider, and you ask -- you administer it to an

19   individual who has committed a sex offense to see if they

20   endorse those attitudes or cognitive distortions or if they

21   don't.  And it helps you in treatment to identify what

22   cognitive distortions you need to work on with that individual.

23   Q.   So according to this report, Mr. Volungus agreed with

24   these statements.  "Sexual activity with children can help the

25   child learn about sex.  Sometimes touching a child sexually is

1   a way to show love and affection, and children can give adults

2   more acceptance and love than other adults."

3       What's the significance, if there is any, to Mr. Volungus

4   agreeing with these statements?

5   A.   Well, if he believes them, which I think he does, because

6   he endorsed them, then it will give him permission to engage in

7   sex with children because he thinks he's doing something

8   helpful; he thinks he's teaching them about sex.  He will

9   engage in sex with children because he thinks it's a way of

10   showing them love and affection.  So these are

11   permission-givers for him to go on to offend.

12       Now, if he was in treatment in a meaningful way, he would

13   make a list of all of his cognitive distortions, an exhaustive

14   list, and the group would challenge him about the truth of

15   those cognitive distortions until he internalized, or

16   understood, that these things are clearly not true.  But he has

17   yet to engage in that type of treatment.

18   Q.   Just a couple other documents here, Dr. Phenix.  The

19   highlighted portions here, this is Mr. Volungus apparently in a

20   meeting with Dr. Ferraro.  And the highlighted portion here

21   says, "He said he felt as though the government were on a witch

22   hunt against pedophiles."

23       In your opinion, is that a cognitive distortion for

24   Mr. Volungus?

25   A.   Yes, of course.

1   Q.   I'm sorry.  That was Exhibit 15.

2        And then Exhibit 16, Dr. Phenix -- this is in 2007 --

3   "Mr. Volungus spent a large portion of his time explaining how

4   he had carefully planned to stay away from children upon his

5   release from prison.  He continued to deny he had ever sexually

6   offended against anyone and portrayed his attraction to

7   children as something over which he had no control.  He

8   described feeling morally persecuted, as though he was wearing

9   a scarlet letter or a Jewish star on his shirt."

10       Does this statement or belief have any significance for

11  you?

12  A.   Yes.  This is kind of a classic example of the dynamic

13  risk factor of feeling victimized.  So if he doesn't feel like

14  the perpetrator, if he feels like he is the victim, then he is

15  not likely to change his behavior or recognize that his

16  behavior is a problem.  And in order to change, the first thing

17  he has to do is recognize that is problematic so that he can

18  accept treatment.  He was closed off to treatment when he was

19  in the community because he thought he was being victimized.

20  Q.   Dr. Phenix, when we began your testimony earlier this

21  morning, I asked you about documents that you reviewed before

22  writing your report.  Do you recall that?

23  A.   Yes.

24  Q.   And I believe you testified that you listed some of those

25  documents that you had reviewed in your report?

1   A.   Yes.

2   Q.   Now, did you review any documents after you wrote your

3   report in this case?

4   A.   Yes.  I reviewed a number of documents that he had created

5   or had been secured while in custody in 2007.

6   Q.   And those documents should be in the binder up there as

7   Exhibit 61.  And I just ask you, you know, generally can you

8   sort of categorize these documents for us, or explain whether

9   anything in there was significant to you in terms of your

10  evaluation of Mr. Volungus?

11  A.   Yes.  There were a number of things that were quite

12  significant.  He had various themes about information that he

13  collected and he also created information.  In terms of what he

14  created, we saw drawings that he created that were erotic

15  images of children, of himself having sex with a child for the

16  purpose of sexual arousal.

17       He also had collected a number of articles referring to

18  sex slaves and child prostitution.  It described where this

19  happened, in various countries like Costa Rica, and described

20  the sexual behavior that happened to the sex slaves or the

21  prostitutes.  This information would be sexually arousing to

22  someone with pedophilia, reading it, rereading it.  He

23  collected --

24  Q.   Dr. Phenix, I'm sorry.  I'm just going to stop you there

25  because I want to put the document that I think you're

1    referring to up on the screen here.  This is Bates stamp 1502

2    in Exhibit 61.

3         And, Dr. Phenix, I think some might argue that this

4    article appears to be innocuous.  What is your opinion about

5    the significance of this article?

6    A.   The article's relatively explicit about what the men do in

7    order to seek out minors for sexual activity.  Mr. Volungus is

8    aroused to thoughts and fantasies of seeking out, you know, for

9    example, child prostitutes.  He had a number of articles that

10   referred to that, and the kinds of sexual behaviors that happen

11   to those prostitutes.  So just thinking about that and

12   fantasizing about that will be arousing to Mr. Volungus.

13   Q.   And I'd like to show you another document from this packet

14   and ask if this document, which is Bates-stamped 1531, is

15   significant to you at all.

16   A.   Yes.  That page indicates just a few, but he had some -- a

17   very detailed, long list of pamphlets and information that he

18   was going to write away about.  This one's particularly

19   poignant in that the bottom publication, the NAMBLA

20   publication, which is North American Man-Boy Love Association,

21   is a well-known association that promotes sexual activity

22   between adults -- adult males and minor boys.

23        While I'm not sure that Mr. Volungus is sexually aroused

24   to sexual activity with minor boys, this organization is also

25   well known for promoting the appropriateness of sexual activity

1    with children; that it's healthy for children.  It reflects the

2    cognitive distortions that he has; that indicates that it can

3    be beneficial for children to have sex with adults.

4         NAMBLA also in their publications discusses how you can

5    get away with that.  How you can go without being detected and

6    various things you can do to avoid detection in terms of

7    seeking out children for sexual activity.  There are actually

8    two references in his documents to NAMBLA.

9    Q.   I'm just going to show you the other -- this is Bates

10   stamp 1613, which was previously marked as Exhibit 61A.  And

11   what, if anything, is significant about the reference to NAMBLA

12   here?

13   A.   I think it's significant that he considers, obviously,

14   that an authority, that if he is referencing NAMBLA, he's

15   sending away for materials from NAMBLA, then he is sending away

16   for materials that endorse and promote sexual activity with

17   children.  He also wrote it on a list that appears to be a

18   catalog of child pornography which he has.  So I think you can

19   just see how incredibly sexually preoccupied he is here with

20   children in seeking children for sexual activity.

21   Q.   And what about this one?  This is Bates stamp 1586.  It

22   looks fairly innocuous, some sort of article titled "My Second

23   Vice."

24   A.   This article is one of many that has some explicit

25   descriptions of sexual behavior with children in it.  So he's

1   collecting erotic material that describes explicit sexual

2   behavior with children.  He would use that for the purpose of

3   masturbation and reinforcing his deviant sexual arousal.

4   Q.   And as part of this article -- it's Bates-stamped 1589 --

5   I just want to focus your attention on the highlighted

6   portions.  I highlighted these portions but they also appear to

7   be underlined.  Do you have any understanding of who underlined

8   this portion?

9   A.   Yes.  Mr. Volungus underlined portions that involved

10  explicit sexual behavior with children.  And he underlined

11  other content areas and other articles that were of interest to

12  him.

13  Q.   And what, if anything, is significant to you about this

14  underlined highlighted portion here?

15  A.   Well, while this describes kind of a computer-animated

16  virtual sexual activity, it describes explicit sexual activity

17  with a child.  "A girl goes into a kiddy-themed sex room"; "she

18  was young, she had eyes as big as saucers"; "it was something

19  out of a Keane painting"; the place had a gum-ball machine,

20  candy lane."  So this was obviously a young virtual child.

21  "She was fucking a huge sky-blue Teddy bear, which itself had a

22  large pink dildo."  So, again, this is explicit, the sexual

23  activity about children, that he collects for the purpose of

24  sexual arousal.

25  Q.   And I'm showing you what has been Bates-stamped 1669.  And

1    is there any significance for you to this article which was in

2    Mr. Volungus' possession in 2007 in the Bureau of Prisons?

3    A.    Mr. Volungus is trying to justify having sex with minors.

4    And so here's an article which discusses age of consent --

5    essentially, legal age of consent, and opinions that, for

6    example, teenagers of similar age should not be considered --

7    sexual activity with teenagers of similar age should not be

8    considered illegal.  So he's reinforcing his cognitive

9    distortions by searching for evidence that young teenagers

10   should really be allowed to consent to sex, essentially, with

11   anyone.

12   Q.   And just a couple more.  Bates stamp 2031:  What, if

13   anything, is significant about this document?

14   A.   Mr. Volungus needs to -- wants to masturbate to images of

15   children, so if he doesn't have pornography, he is going to

16   collect pictures of children that he might find arousing for

17   the purpose of masturbation.  So here we have multiple pictures

18   of children that he might find arousing in terms of developing

19   sexual fantasies about them.

20   Q.   And the last one I'll show you here is Bates stamp 1622,

21   which was previously marked as Exhibit 61D.  And there are

22   references here to a disguise list.  Is there anything

23   significant about that?

24   A.   Yes.  He plans, in my opinion, that -- he plans to engage

25   in sexual activity with children.  To do that, he has to find

1  ways to avoid detection.  I mentioned that NAMBLA in their

2  newsletters will publish various ways to protect yourself from

3  being detected.  And so he is, in my opinion, engaging in the

4  planning of how he can change his appearance and not be

5  detected engaging in sex with children.

6  Q.  So, Dr. Phenix, just to sort of close the loop on all of

7  the dynamic risk factors that we've talked about, what does

8  your consideration of these dynamic risk factors tell us about

9  Mr. Volungus?

10 A.  It tells us that his overall risk is higher than that

11 measured on the actuarial instruments.  He has present all of

12 the dynamic risk factors.  They are strongly present for him,

13 unchanged by meaningful sex offender treatment.  And that I

14 think, in summary, that his overall risk is high as a result of

15 the dynamic risk factors combined with his actuarial scores.

16 Q.  And are you familiar with the term "protective factors"?

17 A.  Yes.

18 Q.  And what are they?

19 A.  Those are factors that would, when present, reduce an

20 individual's risk of sexual re-offense rather than increase it.

21 Q.  And did you consider protective factors in this case for

22 Mr. Volungus?

23 A.  Yes.

24 Q.  And what are the protective factors that you typically

25 consider in a case like this?

1    A.   I would consider in this case advanced stage, and that

2    would be into the '70s, because mostly age now is already

3    considered in the static instruments, and he's in his early

4    40s.  I would consider health considerations.  So if he had

5    some type of impairment of mobility or degenerative health

6    conditions, I would consider that he's a healthy individual.  I

7    would consider being sex-offense free in the community.

8         Individuals who are sex-offense and serious-offense free

9    for five to ten years in the community have about half the risk

10   of recidivism as measured by the actuarial instruments.  While

11   he was in the community, he was offending again by collecting

12   child pornography.  So he does not have that risk factor.

13        And also, reductions in risk with treatment.  And I don't

14   believe that applies, as I said before, to Mr. Volungus.

15   Q.   So Mr. Volungus doesn't have any of the protective

16   factors?

17   A.   No.

18   Q.   And so did the consideration of these protective factors

19   affect your opinion at all?

20   A.   No.

21   Q.   Now, Dr. Phenix, does denial play any role in your risk

22   assessment?

23   A.   Well, denial does not increase the risk of future sexual

24   re-offense.  That has been studied.  So not in that regard.

25   But I think denial is important because it stops an offender

1  from participating in treatment.  So if you're denying that you

2  committed a sex offense, or that you committed a serious sex

3  offense, then you can't meaningfully participate and gain from

4  sex offender treatment.  And I think that's exactly what

5  happened with him in his treatment in the community, is that,

6  you know, he denied he had a serious problem, so why do I have

7  to engage in this, and decided not to do so meaningfully.

8  Q.   And do you have any information about whether Mr. Volungus

9  has a release plan if he were to be released from prison today?

10  A.   Yes.  He told me about a release plan.  He said that he

11  was going to release -- he would be living at his parents' home

12  again; he said that he would like to go back to work where he

13  worked before, at Panera.  He's worked at a number of different

14  restaurants.  And he said ultimately his longer-term goal was

15  to get some land, purchase some land, and to have a house on

16  the land and to farm.

17  Q.   Now, you mentioned Mr. Volungus mentioned to you that he

18  planned to return to living with his parents.  In your opinion,

19  is that appropriate?

20  A.   No.

21  Q.   And why's that?

22  A.   It's not appropriate because he was exposed to so many

23  high-risk situations when he lived at home.  He needs to, I

24  think, live in a setting where everyone is aware of his

25  problems and can appropriately manage his environment so that

1    he is not exposed to high-risk situations.  Also, with -- if he

2    does live with anyone, individuals who would report immediately

3    to the authorities when he was on community supervision of

4    finding any illegal material, for example, or risk-related

5    material.

6    Q.   And are you aware that Mr. Volungus has a period of

7    supervised release remaining in New York?

8    A.   Yes; 13 months.

9    Q.   And in your opinion, is 13 months of supervised release

10   sufficient for Mr. Volungus?

11   A.   It is grossly insufficient for Mr. Volungus.  He is at an

12   age where he will remain high risk for a period of years.  He

13   has shown a complete inability to manage his deviant sexual

14   arousal in the community and institutionally.  We should

15   consider him untreated.  So even if he begins meaningful

16   treatment, when he's released to the community it will take

17   considerably longer than 13 months to reduce his risk so that

18   he will be safe in the community.

19   Q.   And do you have an opinion as to how much supervised

20   release would be effective for Mr. Volungus?

21   A.   A lengthy period of supervised release.  It's my opinion

22   that he should have, at very minimum, five years and up to ten

23   years of community supervision in order to protect the

24   community and to help him to be successful once he's released.

25   Q.   Dr. Phenix, has anything changed for Mr. Volungus since he

1  first entered federal prison in 1998?

2  A.   No.

3        MS. SERAFYN:  Your Honor, if I could just have a

4  moment?

5        (Counsel confer off the record.)

6  Q.   Dr. Phenix, just to sort of summarize, we discussed the

7  three elements of the Adam Walsh Act.  And do you have an

8  opinion to a reasonable degree of professional certainty as to

9  whether Mr. Volungus meets the criteria of the Adam Walsh Act

10 and is a sexually dangerous person?

11 A.   Yes, I believe he does meet the criteria of the Adam Walsh

12 Act and he is a sexually dangerous person.

13       MS. SERAFYN:  Thank you.  I have nothing further, your

14 Honor.

15       THE COURT:  All right.  Mr. Gold?

16       MR. GOLD:  Your Honor, I would ask the Court's

17 indulgence for a few minutes to set up a...

18       THE COURT:  How many is a few?

19       MR. GOLD:  Probably four or five.  I have a

20 paralegal --

21       THE COURT:  Why don't we take a short break?

22       THE CLERK:  All rise.  The Court will take a short

23 recess.

24       (The Court exits the courtroom, and there is a recess

25 in the proceedings at 12:29 p.m.)

```
 1              THE CLERK:  All rise.

 2              (The Court enters the courtroom at 12:39 p.m.)

 3              THE CLERK:  For a continuation of the bench trial.

 4   Please be seated.

 5                         CROSS-EXAMINATION

 6   BY MR. GOLD:

 7   Q.   Good morning, Dr. Phenix.

 8   A.   Good morning -- or afternoon.

 9   Q.   Good afternoon.  Yup.

10        Now, Dr. Phenix, you testified that prior to your

11   testimony today you rescored all the actuarial instruments that

12   you scored in this case?

13   A.   Yes.

14   Q.   Now, these actuarial instruments are designed to be

15   relatively simple to score, right?

16   A.   Generally, yes.  Sometimes it's complicated.

17   Q.   And, in fact, the instruments are designed to be scored by

18   probation officers, and you're conducting a training, you

19   testified, in California currently, right?

20   A.   Yes.

21   Q.   And so you don't have to be a psychologist, for example,

22   to score one of these instruments?

23   A.   No, you just have to go through the training.

24   Q.   And, in fact, they're not particularly psychological;

25   they're kind of -- oftentimes require you to assess criminal
```

1  history records and things of that nature which aren't

2  necessarily psychological documents, right?

3  A.    Right.

4  Q.    Now, your testimony today is as a forensic psychologist

5  who's testifying about the risk of re-offense posed by

6  Mr. Volungus.  Is that a fair statement?

7  A.    Yes.

8  Q.    And part of the basis of your opinion is that it -- or

9  part of the foundation of your opinion is empirical research,

10  right?

11  A.    Yes.

12  Q.    And you testified, I believe, that the judgment -- or

13  clinical judgment of a clinician, even one such as yourself,

14  without reference to this empirical literature would not be

15  appropriate; is that right?

16  A.    Yes.

17  Q.    That a psychologist, or forensic psychologist, working in

18  your field is ethically bound to make reference to the existing

19  empirical research?

20  A.    Yes.

21  Q.    Now, you testified that you scored three actuarials and

22  then looked at some dynamic factors.  Did I understand that

23  right?

24  A.    Yes.

25  Q.    And the dynamic factors that you were testifying about

1  just recently, where do those dynamic factors come from?

2  A.   They come from two publications.  The first one was a

3  metaanalysis that was conducted by Hanson and Morton, and it

4  identified the original dynamic risk factors for sex

5  re-offense.  Those were studied again in a recent article by

6  Mann, Hanson and Thornton, which essentially told us which of

7  those dynamic risk factors were the best predictors.

8  Q.   But suffice it to say that those dynamic risk factors are

9  also factors that you derived from the empirical literature in

10  your field?

11  A.   Right.

12  Q.   And those are factors which have been shown in this

13  research that you just referenced to be associated with the

14  risk of re-offense?

15  A.   Right.

16  Q.   For the record, I'm putting up the scoring sheet that you

17  recently did.  And what that reflects is you added points for

18  stranger victim, and that resulted an addition of a point in

19  all three actuarials?

20  A.   That's right.

21  Q.   And the reason you started that inquiry was because you

22  had noticed that there was a different actuarial scoring in the

23  records.  Is that fair to say?

24  A.   There were a couple of different actuarial scorings, I

25  believe, yes.

1    Q.   And one of the scorings showed that the stranger victim

2    was scored in one of the other actuarials?

3    A.   Yes.

4    Q.   Now, Dr. Phenix, there are rules that have been published

5    or disseminated for how to score these instruments, right?

6    A.   Yes.

7    Q.   And when you decided to analyze whether this item did or

8    did not apply, did you go to the rules?

9    A.   Yes.

10   Q.   And after you went to the rules, you referenced that you'd

11   consulted with some colleagues, right?

12   A.   Yes.

13   Q.   And you sent them an e-mail describing what the problem

14   was and asking for their input, right?

15   A.   That's right.

16   Q.   And you said those two colleagues were a researcher named

17   Karl Hanson --

18   A.   Yes.

19   Q.   -- correct?  And also a researcher named Leslie Helmus,

20   right?

21   A.   Yes.

22   Q.   Now, Karl Hanson, it's fair to say, is one of the

23   preeminent researchers in the area of sex offender recidivism?

24   A.   Yes.

25   Q.   And Leslie Helmus is a former student of his, correct?

1    A.    She remains a student, but she also works for the

2    solicitor general of Canada for Dr. Hanson.

3    Q.    And we'll get to this more in a few minutes, but you are,

4    with them, associated with the development of -- the ongoing

5    development of the Static-99, right?

6    A.    Yes.

7    Q.    There's an advisory board, or something of that nature, of

8    which you are a part?

9    A.    Yes.

10   Q.    And we asked for, and you provided to the government which

11   provided to us, a copy of the e-mail that you sent?

12   A.    Yes.

13   Q.    And for the record, I have up on the screen an e-mail

14   chain.  Do you recognize this -- and I'm going to scroll down

15   to the bottom so that you can see it -- as the e-mail that you

16   sent to Leslie and Karl?

17   A.    That's correct.

18   Q.    And this e-mail was sent on Monday, January 31st.  That's

19   what it reflects here?

20   A.    Right.

21   Q.    And it says, "I would appreciate your quick comments."

22   "Leslie and Karl, I would appreciate your quick comments.

23   Trial tomorrow."  Did I read that correctly?

24   A.    Yes.

25   Q.    Yes.  And then the e-mail goes on to say, "Perp goes on

1    Internet chat 8/1 and meets LEO posing as Deanna, 19 years."

2    Did I read that correctly?

3    A.    You did.

4    Q.    And "perp" refers to the defendant, or the respondent in

5    this case, Mr. Volungus?

6    A.    Right.   The perpetrator.

7    Q.    And that's short for "perpetrator"?

8    A.    Correct.

9    Q.    And LEO is also a law enforcement abbreviation?

10   A.    Yes.

11   Q.    It's "law enforcement officer"?

12   A.    Yes.

13   Q.    "Says he is a pedophile.  Says he wants to know if she has

14   sisters, and Deanna identifies she has sister Sarah, 14 years.

15   A week later he communicated directly with LEO posing as Sarah,

16   and says he wants to have sex with her.  They arrange to meet.

17        "Is the first contact in this crime with Deanna, where he

18   is trying to gain access to a younger victim (no stranger

19   because he is on the chat line for a week accessing Sarah) or

20   is Sarah a stranger because the first time he talked to her he

21   was lewd?

22        "I appreciate your input.  I did not count stranger but

23   the other evaluator for the state did.

24        "Much thanks, Amy."

25        Have I read that correctly?

1   A.   That's right.

2   Q.   And Leslie -- Dr. -- is she a doctor?

3   A.   No.

4   Q.   So Ms. Helmus responds, "Interesting.  I would count

5   stranger victim.  Using the intended victim rule; i.e., he

6   thought Deanna and Sarah were two separate people, Sarah is the

7   victim, whereas Deanna is more of an accomplice/facilitator."

8   And Dr. Hanson replied a little later saying, "Me, too, if I

9   figured out who's who correctly," right?

10  A.   That's right.

11  Q.   And based on this collegial input, you decided to score

12  the item?

13  A.   Yes.  We frequently communicate about various clinical

14  case scenarios and how we would score them, and so we try to

15  come to a collective consensus on that.

16  Q.   Now, I want to take a step back from this issue and just

17  talk a little bit about your experience in this field.  You

18  said that the -- you'd been using actuarials for about 15

19  years; is that correct?

20  A.   Yes; since I used the RRASOR in 1998.

21  Q.   So you got your Ph.D. in the field of clinical psychology

22  about when?  About 1990?

23  A.   Yes.

24  Q.   And at that time you weren't studying sex offending or

25  anything of that nature, were you?

1    A.    No.

2    Q.    And you did -- your thesis was based on health psychology;

3    is that right?

4    A.    That's right, correct.

5    Q.    And was not something having to do with the field that

6    you're now currently involved in, right?

7    A.    Correct.

8    Q.    And that looked at -- what did your thesis look at?

9    A.    It looked at weight loss giving different treatments

10   including exercise, behavioral psychological treatments, and

11   nutrition.

12   Q.    And so it was after you finished your coursework, I

13   believe, that you got an internship -- or you started to do

14   your practice in correctional psychology; is that right?

15   A.    Yes.

16   Q.    You got a job at a prison, essentially?

17   A.    Yes.

18   Q.    And your job -- and was that the California Men's Colony;

19   was that where you first started working?

20   A.    Yes.

21   Q.    And who did you work for?  Was that the department of

22   correction?

23   A.    Yes.

24   Q.    Now, your job at the department of correction was as a

25   psychologist, as an intern?

1   A.   Initially, yes.

2   Q.   Initially?  And then you continued to work there after you

3   got -- after you started working in the field?

4   A.   Right.  I was a staff psychologist.

5   Q.   And as a staff psychologist you interviewed and assessed

6   people who presented with psychological problems in the prison

7   system?

8   A.   Yes.

9   Q.   And then after the California Men's Colony, you went to

10  work for the parole entity, I believe?

11  A.   Yes.

12  Q.   And you did that for about eight or nine months; is that

13  right?

14  A.   Right.

15  Q.   And it was at the parole entity that you had some

16  experience running groups which were providing treatment to

17  lifers, people who had life -- or is that not correct?

18  A.   Actually, I provided groups for lifers in the Department

19  of Corrections, and in the parole department it was treatment

20  for sex offenders.

21  Q.   That was where you had treatment for sex offenders?

22  A.   Yes.

23  Q.   And that was for about an eight- or nine-month period?

24  A.   Right.

25  Q.   Now, I believe we discussed at a deposition that you then

1  moved to the Department of Mental Health after that period with

2  the department of parole?

3  A.   I went back to the Department of Corrections for a couple

4  of years, and then I went on to the Department of Mental

5  Health.

6  Q.   And so the Department of Correction was again as a staff

7  psychologist?

8  A.   It was.

9  Q.   And then you went to the Department of Mental Health in

10  California, and that was in part because the Department of

11  Correction, you would have had to move, and you wanted to stay

12  in the location you were living; is that right?

13  A.   Right.  Yes.

14  Q.   Now, you're familiar with the fact that Washington State

15  passed the first of the new breed of what was then the new type

16  of sex offender commitment law in 1990?

17  A.   Yes.

18  Q.   California didn't have a law such as that until about

19  1996; is that right?

20  A.   Yes.

21  Q.   And, in fact, you were contacted by a staff person with

22  the Department of Mental Health in California, Craig Nelson,

23  prior to the implementation of California's law?

24  A.   Yes.

25  Q.   And Craig Nelson is someone who -- is someone who was

1    working in the field of sex offender research at that time,

2    right?

3    A.    Yes.

4    Q.    And he was involved in a longitudinal study of sex

5    offender treatment, right?

6    A.    Yes.

7    Q.    Dr. Nelson retained you -- or asked you to become head of

8    a training program for the new California statute that was just

9    then about to be implemented, right?

10   A.    Yes.

11   Q.    Now, at that time you had the experience treating sex

12   offenders for eight or nine months, right?

13   A.    Right.  Well, I had also treated sex offenders in the

14   Department of Corrections.

15   Q.    And those sex offenders that you had treated, that

16   wasn't -- your portfolio was people presenting with

17   psychological problems, many of whom were -- happened to be sex

18   offenders, right?

19   A.    Right.  But the primary issues was their crime:  the sex

20   offending.

21   Q.    And Dr. Nelson gave you some material for you to study

22   when you agreed to take the job, right?

23   A.    Yes, he helped quite a bit.

24   Q.    Now, at that time Dr. Hanson that we've talked about had

25   published -- or had distributed a metaanalysis of all the

1    existing sex offender recidivism studies at that time, right?

2    A.   Yes.

3    Q.   And that was by Dr. Hanson and a co-author.  And it was --

4    Dr. Hanson at the time worked for the Canadian government?

5    A.   Yes.  He still does.

6    Q.   And what that metaanalysis was, was a quantitative review

7    of the literature, essentially, right?

8    A.   The literature having to do with risk factors for future

9    sexual re-offense, yes.

10   Q.   And it showed -- in fact, what you got when you looked at

11   that piece of literature was a long list of risk factors, some

12   of which were associated with the risk of recidivism and some

13   of which were found not to be associated with recidivism risk,

14   right?

15   A.   Yes.

16   Q.   And, in fact, when you just testified that denial -- for

17   example, when a clinician sees denial in a sex offender, that

18   didn't increase the risk, you were, in a sense, referring back

19   to this body of literature, right?

20   A.   Yes.

21   Q.   Because among those factors was denial of sex crime which

22   had long been thought to be associated with recidivism risk,

23   and Dr. Hanson found that it wasn't, right?

24   A.   Yes.

25   Q.   And this was a controversial finding.  And, in fact, he

1    tried to look at the question again, and found in another study

2    that it was still not associated with re-offense, right?

3    A.    Yes.

4    Q.    So when you were designing -- or undertaking to come up

5    with a training program for psychologists who would implement

6    the new California law, you used this metaanalysis, in part, to

7    do that, right?

8    A.    Yes; I'd say in large part.

9    Q.    And when this opportunity came up for you to have this

10   job, it was after that that you attended for the first time a

11   meeting of the association for the treatment of sexual abusers,

12   right?

13   A.    Yes.

14   Q.    So you had never attended one of these conferences, these

15   yearly conferences, before then, right?

16   A.    Right.

17   Q.    And also at that time you decided to hire Karl Hanson as a

18   consultant, right?

19   A.    Yes.

20   Q.    And so he would consult with you as you developed this

21   training program for the evaluators, right?

22   A.    Yes.

23   Q.    And at that time evaluators weren't instructed to use pure

24   clinical judgment, right?

25   A.    Right.

1    Q.    They were told to use what I think was called an

2    empirically informed clinical judgment?

3    A.    Right.

4    Q.    Where they would look at the factors which had been shown

5    by this metaanalysis, essentially, to be associated with

6    re-offense, and only consider those, right?

7    A.    Well, not totally.  I mean, there's always individual

8    factors in any case that are important to consider, but

9    not -- I advise them not to use factors wholly unrelated to

10   future sexual re-offense.

11   Q.    And is that what you called the method of risk assessment

12   at the time, empirically guided --

13   A.    Yes.

14   Q.    -- judgment or empirically guided risk assessment?

15   A.    Empirically guided risk assessment, yes.

16   Q.    Now, Dr. Hanson subsequently took some of the factors from

17   this metaanalysis and put them together for the first time in

18   an actuarial instrument in about 1997, right?

19   A.    Yes.

20   Q.    And that was called the Rapid -- the RRASOR, R-R-A-S-O-R?

21   A.    Right.  Rapid Risk Assessment for Sex Offender Recidivism.

22   Q.    Rapid Risk Assessment for Sex Offender Recidivism.  And

23   that's no longer used, right?

24   A.    Well, it should no longer be used.  I think it is, but

25   it's obsolete at this point.

1    Q.   But when Dr. Hanson designed that, he essentially took

2    some of these factors from this long list of factors and

3    combined -- I think he started with seven of them and ended up

4    with four to make that instrument; is that right?

5    A.   Yes.

6    Q.   And then after that happened, did you advise evaluators in

7    California to use the RRASOR in their assessments?

8    A.   Yes.

9    Q.   Now, at this time you were an employee of the Department

10   of Mental Health, correct?

11   A.   Yes.

12   Q.   And you would continue on as an employee with the

13   Department of Mental Health for about two or three more years?

14   A.   Yes.

15        THE COURT:  Mr. Gold, we've reached one o'clock.

16   Unless you have a couple, just to tie things up.

17        MR. GOLD:  Oh, your Honor, I'm having so much fun that

18   I didn't realize.  No, I can stop here and --

19        THE COURT:  Fine.  We'll recess, resume tomorrow at

20   nine.

21        MR. GRADY:  Your Honor, for one brief scheduling

22   issue, I understand from co-counsel that we really do not

23   expect to finish -- or we will just be struggling to finish

24   Dr. Phenix tomorrow.

25        I did have Probation Officer Cardinal possibly

1  available from twelve to one, but obviously, if he could be

2  free to go back and do his probation officer duties, he was

3  planning to be in the field tomorrow --

4          THE COURT:  Yes.  So if I am interpreting the question

5  correctly, you want to be sure I'm okay with finishing at 12:30

6  tomorrow if it goes well for Dr. Phenix?

7          MR. GRADY:  Yes.

8          THE COURT:  And you don't have to put the probation

9  officer on?  That's fine with me.

10          MR. GRADY:  Thank you, your Honor.

11          THE COURT:  All right.  We'll be in recess.

12          THE CLERK:  All rise.

13          (The Court exits the courtroom at 1:02 p.m.)

14          THE CLERK:  The Court will be in recess.

15          (The proceedings adjourned at 1:02 p.m.)

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Civil Action No. 07-12060-GAO,

8    United States of America v. John C. Volungus.

9
     /s/ Marcia G. Patrisso
10   MARCIA G. PATRISSO, RMR, CRR
     Official Court Reporter
11

12   Date: 3/7/11

13

14

15

16

17

18

19

20

21

22

23

24

25