UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
                                 )
        Petitioner,         )
                                 )  Civil Action
v.                               )  No. 07-12060-GAO
                               )
JOHN C. VOLUNGUS,            )
                               )
        Respondent.        )
                               )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DAY THREE**
**<u>BENCH TRIAL</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday. February 4, 2011
9:10 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Mark J. Grady, Assistant U.S. Attorney
3            Jennifer Serafyn, Assistant U.S. Attorney
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        On Behalf of the Petitioner

6        FEDERAL DEFENDER'S OFFICE
         By: William W. Fick, Esq.
7            Ian Gold, Esq.
         51 Sleeper Street
8        Fifth Floor
         Boston, Massachusetts  02210
9        On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2                DIRECT   CROSS   REDIRECT   RECROSS
     WITNESSES FOR THE
3      PETITIONER:

4    AMY PHENIX, PH.D.

5        BY MR. GOLD (Cont'd)        4              96
         BY MS. SERAFYN                    87
6

7

8                      E X H I B I T S

9    RESPONDENT'S        DESCRIPTION              FOR ID   IN EVD.

10   No. 66        String of e-mails                        60

11   No. 67        Static-99R - non-routine and routine samples 70

12   No. 68        Current Chart - Summary                   70

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court

 2    before the Honorable George A. O'Toole, Jr., United States

 3    District Judge, United States District Court, District of

 4    Massachusetts, at the John J. Moakley United States Courthouse,

 5    One Courthouse Way, Boston, Massachusetts, on February 4,

 6    2011.)

 7              THE CLERK:  All rise.

 8              (The Court enters the courtroom at 9:10 a.m.)

 9              THE CLERK:  For a continuation of the bench trial.

10    Please be seated.

11              THE COURT:  Good morning.

12              MR. GOLD:  May I inquire?

13              THE COURT:  You may.

14                   CONTINUED CROSS-EXAMINATION

15    BY MR. GOLD:

16    Q.   Good morning, Dr. Phenix.

17    A.   Good morning.

18    Q.   When we left off yesterday we were talking about your

19    career with the California Department of Mental Health.  Do you

20    recall that?

21    A.   Yes.

22    Q.   And just to re-orient ourselves, it's your opinion that

23    Mr. Volungus is sexually dangerous to others as that term is

24    defined in the Adam Walsh Act?

25    A.   Yes.
```

1    Q.   And it's your opinion that he is likely to have a hands-on

2    sex offense if he were to be released?

3    A.   Yes.

4    Q.   And that is based, in part, on your finding that there is

5    official documentation that he had an attempted sex offense

6    with a 14-year-old girl, correct?

7    A.   Yes.

8    Q.   And the offense there was when he chatted with a

9    19-year-old and her 14-year-old sister, right?

10   A.   Yes.

11   Q.   At least it was a law enforcement officer, but that's what

12   he thought he was doing, right?

13   A.   Yes.

14   Q.   And he arranged to meet with them.  And when he went to

15   meet them on August 22, 1998, he was arrested, right?

16   A.   Yes.

17   Q.   And then Mr. Volungus said he had child pornography in his

18   home at the barracks where he lived, and that became the basis

19   of his federal sentence, right?

20   A.   Yes.

21   Q.   And in terms of as official documentation goes, there is

22   no other hands-on, or attempted hands-on, offense in the record

23   pertaining to Mr. Volungus, right?

24   A.   There's no convictions for that.

25   Q.   Right.  There's no official record of an offense, a

1   hands-on sexual offense, either attempted or completed by

2   Mr. Volungus, right?

3   A.   Right.

4   Q.   Now, it was your testimony yesterday, I believe, that you

5   relied on the chats that Mr. Volungus had with what he thought

6   was the 19-year-old sister of the 14-year-old girl where he

7   states that he had sexual contact with young people, right?

8   A.   Correct.

9   Q.   And that is among the information -- that information,

10  those are datums, pieces of information, upon which you base

11  your opinion in this case, right?

12  A.   Yes.

13  Q.   You very confidently said that you believe that what

14  Mr. Volungus said in those chats actually occurred, right?

15  A.   Right.  I believe it's consistent with his arousal

16  patterns.

17  Q.   But it is part of the basis of your opinion to believe

18  that when Mr. Volungus was claiming sexual contact with young

19  adults in the context of those chats, that that actually

20  occurred, right?

21  A.   Yes.

22  Q.   Now, it's true that Mr. Volungus, when he was chatting

23  with the 19-year-old and the 14-year-old girl, wanted to engage

24  them in -- or to have sex with the 14-year-old girl, correct?

25  A.   Yes.

1    Q.   And it's also true that he made several overtures toward

2    the 19-year-old as well, right?

3    A.   Yes.

4    Q.   And the purpose of the communications there was to --

5    probably the primary, if not the exclusive, purpose was to set

6    up a sexual tryst with these individuals, right?

7    A.   Right.  It was unclear whether he was only going to have

8    sexual activity with Sarah.  While he did have discussions of

9    sex with Deanna, it wasn't clear that she was the person that

10   he was interested in having sex with, to me.

11   Q.   It's certainly true that regardless of his relative

12   interest in both of them, or one or the other, he was

13   communicating with them in order to have sex with them, right?

14   A.   Well, I thought primarily with Sarah.  But he did suggest

15   having sex with Deanna, the 19-year-old, along with her

16   boyfriend and along with a 14-year-old friend of Sarah.  So he

17   mentioned a number of people; he seemed primarily interested in

18   having sex with Sarah.

19   Q.   Right.  So the purposes of his communications with Deanna

20   were to engage Sarah, perhaps Deanna, in sexual interaction,

21   right?

22   A.   Yes, I agree.

23   Q.   And that was the motive behind probably underlying -- if

24   not the exclusive, the primary motive behind his chatting

25   behavior?

```
 1   A.    Right.

 2   Q.    And it certainly is part of that motive to say things that

 3   will entice the other person to have sexual interaction, right?

 4   A.    Yes.

 5   Q.    Now, when we were talking about your career doing risk

 6   assessments and sex offender evaluations, we talked about how

 7   when you first -- got your first post in the field the

 8   California statute was just getting going, right?

 9   A.    Yes.

10   Q.    And you were provided research from Dr. Hanson.  And when

11   you became an employee, you retained Dr. Hanson as a

12   consultant, right?

13   A.    Yes.

14   Q.    And you attended the Association for the Treatment of

15   Sexual Abusers conference for the first time, right?

16   A.    Yes.

17   Q.    And since that time you've regularly attended that

18   conference, right?

19   A.    Yes.

20   Q.    And that's an annual conference where people in this field

21   congregate, get together; it's people wear badges; there are

22   breakout sessions and plenary sessions where people talk about

23   research going on in the field, right?

24   A.    Yes.

25   Q.    And if there are new developments in the field of some
```

1    import, typically they're within this field of sex offender

2    research and assessment, they're rolled out, or presented, at

3    ATSA, right?

4    A.    Yes.

5    Q.    Now, at the time that you started these evaluations,

6    Dr. Hanson had a list of factors that had been shown to be

7    associated with recidivism; is that right?

8    A.    Yes.  Well, I had the list.  I had the article.

9    Q.    Well, there was an article first in unpublished form, and

10   then it was published in about 1998, right?

11   A.    Yes.

12   Q.    And the article was a metaanalysis of all the existing

13   studies that had been done, right?

14   A.    Yes; examining risk factors that predict sexual

15   re-offense.

16   Q.    And for the record, I've put Table 1 of the 1998

17   metaanalysis on the viewer.  Do you recognize that?  It's not

18   clear yet, but do you recognize that as being Table 1 of the

19   metaanalysis?

20   A.    Yes.

21   Q.    And this gives us a sense of what that research looks

22   like.  That shows a list of different types of factors, and

23   then there are numbers associated with them.

24   A.    Yes.

25   Q.    So, for example, with the factor of age, age was shown to

1  have a negative correlation with sexual re-offense, right?

2  A.   Yes.

3  Q.   A small, but negative, correlation.

4      Having been single was shown to have a very small, but

5  positive, correlation with future sexual re-offense, right?

6  A.   Yes.

7  Q.   And that's negative, or .11.  Being married, conversely,

8  shows a small negative correlation with future sexual

9  re-offense, right?

10 A.   Correct.

11 Q.   Now, these are the items that were -- or among the items,

12 not these two in particular, but items from this list were the

13 items that went into Dr. Hanson's first actuarial instrument,

14 right?

15 A.   Yes.

16 Q.   Now, Dr. Hanson developed one called the RRASOR that we

17 spoke about, right?

18 A.   Yes.

19 Q.   And then he later developed the Static-99, which is one of

20 the instruments still in use today, right?

21 A.   Yes.

22 Q.   And the Static-99 was based on the RRASOR and another

23 instrument by someone else, right?

24 A.   David Thornton.

25 Q.   David Thornton had developed an instrument called the

1    SACJ-min, I think; is that correct?

2    A.   Yes.

3    Q.   And that was combined with this RRASOR to come up with the

4    Static-99?

5    A.   Yes.

6    Q.   And they published an article about it, right?

7    A.   Yes.

8    Q.   Now, at the time you were still consulting with

9    Dr. Hanson, right?

10   A.   Yes.

11   Q.   And you were coding these instruments in the field, right?

12   A.   Yes.

13   Q.   And Dr. Hanson, Dr. Thornton and you drafted a coding

14   manual in the year 2000 for the Static-99, correct?

15   A.   Yes.

16   Q.   And you were the first author on that document which was

17   made available on the Canadian solicitor general's website,

18   right?

19   A.   Yes.

20             (Pause.)

21   Q.   And for the record, I have put up on the screen, just to

22   give a sense of what it looked like, but this is the document,

23   the first coding rules for the Static-99, and those were dated

24   April 20, 2000, right?

25   A.   Yes.

1    Q.    Now, the coding rules are, in this iteration, 15 pages

2    long, right?

3    A.    I don't recall, but it sounds familiar.

4    Q.    Well, it says down at the bottom here "page 1 of 15"?

5    A.    Yes.

6    Q.    And later, more extensive coding rules were issued, right?

7    A.    Yes.

8    Q.    And there you were still an author but you were not the

9    first author on that second iteration of the coding rules,

10   right?

11   A.    Yes.

12   Q.    And those are the coding rules that have been submitted as

13   an exhibit in this case, right?

14   A.    Yes.

15   Q.    Now, you mentioned you had some peer-reviewed article to

16   your credit, right?

17   A.    Yes.

18   Q.    And what "peer reviewed" means is -- generally, it means a

19   refereed journal where, in the scientific realm, individuals

20   submit an article and it's reviewed by anonymous reviewers,

21   right?

22   A.    Sometimes anonymous and sometimes not, but it's reviewed

23   by reviewers.

24   Q.    And the literature that you have done that's peer

25   reviewed, is that research that you do?

1   A.   No.

2   Q.   So you are, would you agree with the characterization, a

3   practitioner more than a researcher in this area?

4   A.   Yes.

5   Q.   You do risk assessments but you don't perform the research

6   on which they're based?

7   A.   Correct.

8   Q.   Now -- and the two articles that you have in refereed

9   journals are basically not opinion analyses rather than

10   original research?

11   A.   Correct.  They're about clinical practice.

12   Q.   About clinical practice.

13       And the coding rules here are not peer-reviewed documents

14   in that sense, are they?

15   A.   No.

16   Q.   No.  Now, the Static-99 came to be very quickly the major

17   actuarial instrument in the field of sex offender risk

18   assessment; is that fair to say?

19   A.   Yes.

20   Q.   And it's been around since 1999 or 2000 when the

21   peer-reviewed journal discussing it -- the peer-reviewed

22   journal article discussing it came out, right?

23   A.   Yes.

24   Q.   And since then it's been validated many times, right?

25   A.   Yes.

1   Q.   And when we say it's validated, we say that -- what is

2   understood -- what that is understood to mean is that the

3   instrument is pretty good at separating high- from low- to

4   middle-risk offenders, right?

5   A.   Well, it is, yes.

6   Q.   And, in fact, the statistic that is often reported with it

7   is called a -- it's interpreted as saying that the Static has a

8   moderate predictive accuracy, right?

9   A.   Yes.

10  Q.   That is, it's moderately good at performing the task of

11  separating out high, medium and low offenders from each other,

12  right?

13  A.   Yes.

14  Q.   And, in fact, all the actuarial instruments that you used

15  in this case, we can say about them about the same thing, that

16  the research shows that they're moderately accurate at

17  separating out high-, medium- and low-risk offenders, right?

18  A.   Yes.

19  Q.   Now, the Static-99 -- and so when we say that, we're not

20  saying that high-risk offenders recidivate at any particular

21  rate of recidivism, right?

22  A.   Well, they did in the original sample, of course.  If they

23  scored in the high range, they would have a cutoff score

24  associated with that, and that would have an associated

25  probability of sexual re-offense.

1   Q.   Well, the way the instrument was structured, or designed,

2   was once it was developed -- and there are ten items in the

3   Static-99 of the type that we just talked about, right?

4   A.   Yes.

5   Q.   And once it was developed, it was actually tested on a

6   population of individuals, right?

7   A.   Yes.

8   Q.   Or three or four populations which were grouped together,

9   right?

10   A.   It was tested on 531 inmates in the U.K.

11   Q.   Well, down here at the bottom it says 1,086 individuals?

12   A.   That would be the total development sample and the

13   validation sample.

14   Q.   And what I just referred to was page 72 of Exhibit 63 in

15   this case, which is the Static-99 coding rules, right?

16   A.   Yes.

17   Q.   Now, you said that those coding rules are still -- you

18   testified that those coding rules are still in use today,

19   right?

20   A.   The 2003 revision is still in use, yes.

21   Q.   And this number 6 on page 72 which says "Static-99

22   Recidivism Percentages by Risk Level" is contained in that

23   document, right?

24   A.   Yes; but those have been updated.

25   Q.   Those recidivism percentages that are in Exhibit 3 are no

1    longer the percentages that you would report with a Static-99

2    score, right?

3    A.   Correct.  New probabilities have been released.

4    Q.   New probabilities have been released.  And we'll get to

5    those.  But you report different percentages with the scores

6    than appear on this table, right?

7    A.   Right.  Those were the original probabilities of sexual

8    re-offense for each cutoff score.

9    Q.   Well, and you testified that you go to ATSA every year,

10   right?

11   A.   I try to, yes.

12   Q.   And, in fact, what you're referring to when you say new

13   probabilities have -- are available, is you're referring to

14   data that started coming out at ATSA in the fall of 2007,

15   right?

16   A.   2008, I believe.

17   Q.   Well, in 2008 the developers of the Static-99 released the

18   results of a new study they'd done which showed these different

19   percentages of re-offense associated with the scores, right?

20   A.   Yes.

21   Q.   But before that, in 2007 a student of Dr. Hanson named

22   Leslie Helmus who we've heard about yesterday had started to do

23   this research and report provisionally its results, right?

24   A.   Yes; but not for clinical use in 2007.

25   Q.   Well, referring to the table which is page 72 of Exhibit

1  63, the coding rules, I've isolated there the recidivism

2  percentages associated with a score of a five and a score of a

3  six, right?

4  A.   Yes.

5  Q.   And, now, first, the Number 6 says six-plus, right?

6  A.   Yes.

7  Q.   And that is because all individuals who scored above a six

8  were grouped together, right?

9  A.   Yes.

10 Q.   And that is because there were so few individuals, that to

11 get a meaningful statistic they grouped 6s, 7s, 8s, 9s and 10s

12 together, right?

13 A.   Yes.  And there was no significant difference in this

14 probability of re-offense.

15 Q.   Well, and there were only 129 individuals in that sample,

16 right --

17 A.   Yes.

18 Q.   -- of people with those scores?

19      Now, these are the recidivism percentages that were

20 reported with the Static-99 from the year 2000 up until the

21 fall of 2008, right?

22 A.   Yes.

23 Q.   And so if you were to testify in a case, you would say

24 that a score of six or above on the Static-99 equates to a 39

25 percent recidivism rate after five years, right?

1    A.    For the study sample, yes.

2    Q.    For the study sample.  But then you would make the move of

3    associating that with the individual who was being evaluated,

4    right?

5    A.    Not the exact value, but a similar value.

6    Q.    Well, and you'd be communicating to them, or to a court,

7    for example, a six on the Static, or high risk in this case,

8    the ballpark recidivism rate that you would associate would be

9    about 40 percent, right?

10   A.    In five years, correct.

11   Q.    Right.  And then 45 percent in ten years?

12   A.    Correct.

13   Q.    And over half after a period of 15 years, right?

14   A.    That's right.

15   Q.    Now, starting in the fall of 2008 the new results were

16   released, right?

17   A.    Yes, 17 new samples were analyzed and new norms were

18   released, or probabilities of sexual re-offense associated with

19   those 17 contemporary samples.

20   Q.    Now, you'd been reporting in -- doing reports in these

21   cases for a long time, right?

22   A.    Yes.

23   Q.    And you have, I think you've testified, in the past done

24   about 500 evaluations, or a number along those lines?

25   A.    Yes.  Many evaluations, 16 years.

1   Q.   And you have a kind of standard report that you do in

2   these cases, right?

3   A.   I have a standard format, yes.

4   Q.   And, in fact, that standard format you have used to

5   suggest the format that might be done in trainings that you do,

6   right?

7   A.   I provide it in trainings if it's useful to others.

8   Q.   You provide a template which has a lot of the information,

9   or language, in the form that -- or in the report that you

10  submitted to this Court; you provide a template which has a lot

11  of that same language, right?

12  A.   Right.  And a part of that template comes from the

13  Static-99 development team that developed a standardized way to

14  report the results of Static-99 and Static-2002 Revised.

15  Q.   Now, I put this number up on the screen, the

16  52-percent-after-15-years number, because these were the

17  numbers associated with a Static-99 for a long time, right?

18  A.   Yes.

19  Q.   And during that period individuals such as yourself would

20  testify in court cases that these numbers were a good ballpark

21  estimate of what a six or above on the Static-99 means, right?

22  A.   Yes.

23  Q.   And often -- and you, in your own reports, would refer to

24  literature showing that those recidivism percentages were what

25  were called stable no matter the underlying base rate of a

1    different population, right?

2    A.    That's true.  There was literature to demonstrate that.

3    Q.    And you would frequently cite that literature in your

4    reports as evidence that the recidivism percentages were good

5    information, not just for the development sample but for the

6    individual that you were evaluating, right?

7    A.    No, I didn't report it in my reports very often.  A few

8    times I have.  But generally I would just provide that

9    information in testimony.

10   Q.    Now, you have testified in a number of federal cases,

11   right?

12   A.    Yes.

13   Q.    And federal cases here in the District of Massachusetts,

14   right?

15   A.    Yes.

16   Q.    You have also done reports in cases where you have not

17   testified in the later case, right?

18   A.    Yes.

19   Q.    And so over the past several years, you have testified in

20   cases, or been deposed in cases, and talked about your

21   methodology and things like that, right?

22   A.    Yes.

23   Q.    And I have cross-examined you in two other cases, right?

24   A.    Yes.

25   Q.    Now, you just testified that you did not report that

1    information about stability of the recidivism percentages in

2    your reports typically, right?

3    A.    No, I think you're referring to the Doren study on

4    stability of the base rates in multiple samples.  And

5    generally, I did not.  I know I have at times, but usually not

6    put that article -- I generally don't cite a lot of literature;

7    I just provide testimony on those issues.

8          (Pause.)

9    Q.    Now, you've drafted reports for a case called *United*

10   *States versus Andrew Swarm*, right?

11   A.    Yes.

12   Q.    You've also drafted reports and testified in a case called

13   *United States versus Todd Carta*?

14   A.    Yes.

15   Q.    And, in fact, you testified in that case twice, right?

16   A.    Yes.

17   Q.    And you've testified in a case called *United States versus*

18   *Wayne Hunt*, right?

19   A.    Yes.

20   Q.    And for the record, I've placed on the document viewer the

21   copy of a report that you drafted from May 2008 in the case of

22   *Andrew Swarm*?

23   A.    Correct.

24   Q.    And do you recognize that as your report?

25   A.    Yes, I do.

1    Q.   And so paging through this report, in this report from May

2    2008 you stated that "Although the re-offense rates associated

3    with each level of risk on the Static-99 is currently being

4    reevaluated, it is noted that the Static-99 is continued to

5    effectively triage between low-, medium- and high-risk sexual

6    offenders; in other words, relative to the other men in a given

7    sample, those placed in the high-risk group continue to

8    re-offend at higher rates than those placed in the low- or

9    moderate-risk groups."

10        So there you make reference to what we talked about

11   earlier, which is that -- well, first, did I read that

12   correctly from your report of May of 2008?

13   A.   Yes.

14   Q.   And that refers to what I talked about earlier, which is

15   that Leslie Helmus had begun to perform the research which

16   showed that the recidivism rates may be lower than that

17   reflected in the table, right?

18   A.   Yes.  She had begun to do that.

19   Q.   And if we read a little further -- and so this report from

20   May of 2008 was one of those in which you refer to this Doren

21   study.  And Dennis Doren is a researcher in this area, right?

22   A.   He was.

23   Q.   And he was someone who worked at one of the facilities

24   where men are committed in Wisconsin, I believe, right?

25   A.   He did, yes.

1   Q.   And he published a book in 2002 which was influential in

2   this area called "Evaluating Sex Offenders," right?

3   A.   Yes.

4   Q.   And so he published a study in which he argued that the

5   recidivism rates were stable no matter what the underlying base

6   rate of the population, right?

7   A.   He did.

8   Q.   And here you make reference to that research, and you

9   contrast it with research that was coming out by Dr. Helmus

10  where -- not Dr. Helmus, but Leslie Helmus -- which showed that

11  in contemporaneous samples, the recidivism rates were lower,

12  right?

13  A.   Yes.

14  Q.   So come 2008, the developers of the Static-99 released

15  this new information officially, right?

16  A.   Yes.  They released a preliminary analysis of 23 data

17  sets, including only 17 data sets that showed lower overall

18  base rates of recidivism.

19  Q.   And that was the overall, or the take-home point, if you

20  will -- and you can disagree with this characterization, but

21  let me know if you do -- which is that the recidivism rates in

22  contemporary samples were lower than those that had been

23  reported for the past ten years, right?

24  A.   Yes.

25  Q.   And those that had been reported for the last ten years

1    came from older samples of individuals that the studies had

2    been done on, right?

3    A.   Yes.

4    Q.   Now, you mentioned that there were 23 data sets but

5    they -- and it was preliminary in the fall of 2008, but the

6    developers of the Static-99 did not suggest that you should not

7    report them; they said you should report this new information

8    with the scores, right?

9    A.   Yes.

10   Q.   But they didn't arrange the information the way that we

11   saw it in the table from Exhibit 63 where all the samples were

12   put into one group, right?

13   A.   Right.

14   Q.   In fact, they said that, well, we have a low-risk and a

15   high-risk group of samples, right?

16   A.   Yes.

17   Q.   And so evaluators for the first time were told to do

18   something that they hadn't done before in reporting the

19   Static-99 which was to, before reporting the score, make a

20   judgment as to whether someone fit in a high-risk or a low-risk

21   group, right?

22   A.   Yes.

23   Q.   And that determination had a dramatic effect on what the

24   score meant in a particular case, right?

25   A.   Yes.

1   Q.   Because if -- a six on the Static-99 compared to the

2   high-risk group had a much higher recidivism rate than a six on

3   the Static-99 for the low-risk group, right?

4   A.   Yes.

5   Q.   And so it was an important decision, right?

6   A.   Yes.

7   Q.   Now, we talked about peer review before, and how in 2000

8   the Static-99 was introduced in a peer-reviewed article, right?

9   A.   Yes.

10  Q.   And that was an article authored by Hanson and Thornton,

11  and they introduced how they developed the instrument and we

12  got the numbers that we've been talking about, right?

13  A.   Right.  They showed that the predictive accuracy was

14  better than the RRASOR assessment alone.

15  Q.   Right.  And one of the things that we talk about when we

16  talk about the validity, or the confidence we can place in the

17  Static-99, is that it has appeared in peer-reviewed literature

18  and, in fact, has been validated subsequently in other studies,

19  right?

20  A.   Yes.

21  Q.   Now, what we're beginning to talk about now is in 2008

22  evaluators were told to make this initial judgment before

23  reporting the score, right?

24  A.   Yes.  Or you could report a range of risk, the

25  probabilities for the low risk to the high risk.

1    Q.    Right.  And what evaluators were supposed to do is to make

2    a judgment about whether the high-risk or the low-risk

3    percentage was a better estimate of what the risk actually was,

4    right?

5    A.    If they were able to.  If not, you could simply report a

6    range and say that the probability of re-offense is somewhere

7    within that range.

8    Q.    Now, in fact, you had been drafting reports and testifying

9    in cases in federal court while this was going on, right?

10   A.    Yes.

11   Q.    And as these developments came out, you changed the method

12   in response to these developments by which you did these

13   evaluations, right?

14   A.    Yes; that's what we were advised to do.

15   Q.    You were advised to do by the developers of the Static-99,

16   right?

17   A.    Yes.

18   Q.    Now, the Static-99 has come a long way since that 15-page

19   coding report, right?

20   A.    It's changed quite a bit in certain regards.

21   Q.    I've put up on the viewer an image.  Do you recognize that

22   image?

23   A.    Yes.  That's the Static99.org website.

24   Q.    And it's called the "Static-99 Clearinghouse," right?

25   A.    That's what it says, yes.

1    Q.    So the developers of the Static-99 are responsible for

2    this website, right?

3    A.    Yes.

4    Q.    And it's available at Static99.org?

5    A.    Yes.

6    Q.    And this is a place where people who are scoring this

7    instrument, or wanting to learn more about it, would go for

8    further information, right?

9    A.    Yes.

10   Q.    And this started basically in the wake of these new

11   developments that we've been talking about, right?

12   A.    I don't think it was secondary to the new developments; it

13   was secondary to the State of New York wanting to have a

14   website where -- because they have adopted the Static-99 as

15   their statewide instrument for sex offender risk assessment,

16   and they wanted their probation and parole law enforcement and

17   clinician folks to have a place where they could get the most

18   recent research and to get responses to coding questions.

19   Q.    So what you're referring to is that New York has recently

20   implemented a sexually dangerous persons law within the last

21   two or three years, right?

22   A.    They have, yes.

23   Q.    About 2007?

24   A.    I believe so, yes.

25   Q.    And, in fact, these developments are happening -- even as

1   we speak, the State of New Hampshire has implemented a sexually

2   dangerous persons law, right?

3   A.    Correct.

4   Q.    And you are very involved with the litigation of these

5   cases in the state of New Hampshire, right?

6   A.    I don't think I'm very involved.  I was the witness in a

7   recent *Daubert* hearing, and also a *Daubert* hearing last year.

8   I think that -- and I provided training to the evaluators who

9   conduct these types of evaluations, but I think that's the

10  extent of my involvement.

11  Q.    But you've testified in *Daubert* hearings in the state of

12  New Hampshire about the validity of the methodology they're

13  using to assess sex offenders, right?

14  A.    Yes.

15  Q.    And you provided training about the methodology that the

16  evaluators in New Hampshire should use, right?

17  A.    I didn't tell them what they should use.  I simply

18  provided information on current sex assessment.

19  Q.    And you gave them, in the context of that training, a

20  model report, which looks very much like the reports that you

21  typically draft, right?

22  A.    Yes.  I shared with them how I write my evaluations.

23  Q.    And so although this is a New York -- or although this

24  website started at the behest of New York, it doesn't make

25  reference to that, at least explicitly, on this page of the

```
 1  website, right?
 2  A.   Right.  They decided to discontinue support -- financial
 3  support -- for the website, so they no longer sponsor the
 4  website.
 5  Q.   But so the website remains a clearinghouse of information
 6  about the Static-99, right?
 7  A.   Right.  It's now on the ATSA.  It's sponsored by -- not
 8  sponsored by ATSA, but ATSA allows the website to be still
 9  available through ATSA so that people can access the
10  information.
11  Q.   Is it correct to say in the computer lingo that they host
12  it; ATSA hosts this website?
13  A.   I'm not exactly sure.
14  Q.   Let's not go there.
15       For the record, I've isolated the advisory board here, of
16  which you are a member, right?
17  A.   Correct.
18  Q.   And on the front page of this website is a photograph of
19  you and Dr. Hanson that we've mentioned, and Dr. David
20  Thornton, and a Dr. Andrew Harris, right?
21  A.   Yes.
22  Q.   And David Thornton and Karl Hanson developed the
23  Static-99, right?
24  A.   Yes.
25  Q.   You worked with them to draft those coding rules, right?
```

1    A.    Right.

2    Q.    And Dr. Harris was also involved in doing the 2003 coding

3    rules and is also a researcher in this area, right?

4    A.    Yes.

5    Q.    So the Static-99 has come a long way as an instrument in

6    practice, right?

7    A.    It certainly is widely used today, yes.

8    Q.    And you are doing trainings about how to score it and

9    other instruments also developed by Dr. Hanson, right?

10   A.    Yes, I really only have trained on Static-99 and

11   Static-99R.

12   Q.    And not the Static-2002?

13   A.    No, I haven't provided that training.

14   Q.    But you've drafted coding rules for the Static-2002?

15   A.    Oh, yes, I did.

16   Q.    And you are giving trainings to probation officers in

17   California, you testified yesterday?

18   A.    Yes.

19   Q.    And you're being remunerated, paid for that, obviously,

20   right?

21   A.    Yes.

22   Q.    And this is a big chunk of your living, right, doing

23   trainings?

24   A.    No, it is not.  I don't give that many trainings.  And in

25   terms of my income, my primary income comes from court

1    testimony and evaluations.

2    Q.   And do you recognize the image that I've put up on the

3    document viewer as an image from your website?

4    A.   Yes, I do.

5    Q.   So you are an incorporated business, right?

6    A.   Yes.

7    Q.   And the bulk of your income comes not from trainings but

8    from doing evaluations of this kind, right?

9    A.   Yes.

10   Q.   But trainings are helpful to you; you list them on your

11   resumé, right, when you perform them?

12   A.   I do list them on my resumé.

13   Q.   And you make contacts when you do trainings that might

14   lead to future work as an evaluator?

15   A.   Yes, I suppose I do.

16   Q.   Now, Dr. Phenix, what was your income doing these

17   evaluations last year?

18   A.   About $350,000.

19   Q.   And is that the most you've earned doing this work?

20   A.   No.  Probably about three years ago or four years ago I

21   made about $450,000 total.  That would include all of my work:

22   trainings and evaluations and court testimony.

23   Q.   And so that's a fairly good living; would you agree with

24   that?

25   A.   Oh, absolutely.

1    Q.    And a colleague that you wrote one of your articles with

2    is Shoba Sreenivasan; is that right?

3    A.    Yes.

4    Q.    And she is also an evaluator in this area, right?

5    A.    Yes, she is an evaluator in California.   She conducts

6    sexually violent predator evaluations in California, and for a

7    while in the state of Washington, I believe.

8    Q.    And she's an M.D.?

9    A.    No, she's a Ph.D.

10   Q.    She's a Ph.D.?   And a comment that she made was notorious

11   after she -- after it appeared in the Los Angeles Times when

12   she testified she was making boatloads of money doing this work

13   for the State of California?

14   A.    That's what she said.

15   Q.    That's what she said, right?   And you're familiar with

16   that incident when she reported that in testimony?

17   A.    I am familiar with it.

18   Q.    And she made over a million dollars that year?

19   A.    She did.

20   Q.    Now, you scored three actuarial instruments in this case,

21   right?

22   A.    Yes.

23   Q.    And you also scored an instrument called the PCLR, which

24   is the Psychopathy Checklist-Revised, right?

25   A.    Yes, I did.

1    Q.   And that was by someone named Robert Hare, right?

2    A.   Yes; it was developed by him.

3    Q.   And do you have any association with Robert Hare?

4    A.   No.

5    Q.   A professional association?

6    A.   No.

7    Q.   Any personal association with Robert Hare?

8    A.   Well, I know him and we're colleagues, and I've exchanged

9    e-mails about scoring issues and research issues.  But other

10   than that, no.

11   Q.   Now, you scored this Static-99 and the Static-2002, both

12   of which were developed by both Thornton and Hanson, right?

13   A.   Yes.

14   Q.   And you also scored the MnSOST-R, right?

15   A.   Yes.

16   Q.   And that was developed by someone named Douglas Epperson,

17   right?

18   A.   Yes.

19   Q.   Now, Douglas Epperson is your husband, right?

20   A.   Yes.

21   Q.   And you've testified in the past that there is new,

22   unpublished data about the MnSOST-R, which shows that the

23   recidivism rates are lower, right?

24   A.   Yes.

25   Q.   And Dr. Epperson, I believe, has a theory about why the

1   recidivism rates are lower than they were when he developed his

2   instrument, right?

3   A.   Yes.

4   Q.   And he says that's because more intensive community

5   supervision, more intensive treatment, and things like that,

6   that are available accounts for lower recidivism rates, right?

7   A.   Not treatment necessarily, but more intensive community

8   supervision, laws that allow the public to identify sex

9   offenders in the community.  A number of other factors, but not

10  treatment.

11  Q.   Well, but suffice it to say that Dr. Epperson, much like

12  the developers of the Static-99, undertook to determine -- or

13  to rerun their instrument to see if the recidivism rates held

14  up, right?

15  A.   Yes.

16  Q.   And both of them found that the recidivism rates were

17  lower than they had been previously, right?

18  A.   Yes.

19  Q.   Now, this information, is any of it published in a

20  peer-reviewed journal?

21  A.   No.  Dr. Epperson's data will be published in a book

22  chapter that will probably be released in the summer.  And the

23  new norms for Static-99R have been submitted to the Journal of

24  Sexual Abuse, and they're in the process of revising the

25  article to resubmit it.

1  Q.   I see.  So it has not yet been accepted for publication,

2  the new norms that we're talking about?

3  A.   Right.  It's not in press yet.  It should be a couple of

4  months.

5  Q.   So, but has it been accepted for publication but for some

6  revisions?

7  A.   To the extent that it's been accepted, I don't know.  They

8  have submitted it; it's been sent back with recommendations for

9  revisions.  And those revisions are currently being made before

10  it's resubmitted again.

11  Q.   So, but suffice it to say that the information that you're

12  reporting in your reports in these cases is based on this data

13  which has not yet appeared in a peer-reviewed journal, right?

14  A.   Right.  It takes about two years to appear in

15  peer-reviewed journals.  So this information was available at

16  the presentation at ATSA, and it's available on the website.

17  Q.   Well, that was over two years ago that it was first

18  presented, right?

19  A.   Well, there was a revision of that data.  So that data has

20  all been available through ATSA and through the website but not

21  yet in a peer-reviewed published journal.

22  Q.   And when we talk about peer-reviewed, we talk about two

23  different types of peer-reviewed:  one with anonymous reviewers

24  and one without, right?

25  A.   Yes.

1   Q.   And the anonymity feature of peer-reviewed is partly to

2   assure there is an objectivity which wouldn't otherwise be

3   obtained if everybody knows everybody else, right?

4   A.   Yes.

5   Q.   Now, you mentioned that Dr. Epperson's work is coming out

6   in a book chapter, right?

7   A.   Yes.

8   Q.   And is a book the same as a peer-reviewed journal?

9   A.   No.  One's a book and one's a journal.  So the reviewers

10  of the book would be the editors; the reviewers in the journal

11  would be the editorial board who has been chosen to conduct

12  those reviews.

13  Q.   But, so suffice it to say that with books you don't have

14  this anonymity feature that you do with other types of peer

15  review, because the book editors know the authors of the

16  articles, right?

17  A.   That's right.  You would know who the editors are.

18  Q.   And this research -- this new research that is yet to be

19  published by -- on the MnSOST-R by your husband, Dr. Epperson,

20  is coming out in a book, right?

21  A.   Well, a book.  And it will also be submitted to a journal,

22  but that article hasn't even been completed yet.

23  Q.   And the book that you're talking about is a book edited by

24  yourself?

25  A.   Myself and Dr. Harry Hoberman.

1  Q.   Now, when the data first came out in the fall of 2008 and

2  evaluators were told to report a range of risk, do you recall

3  changing the method by which you did evaluations?

4  A.   Yes.

5  Q.   In response to these developments you fine-tuned, or

6  revised, the method by which you did sex offender assessments,

7  right?

8  A.   I didn't change the method, I don't believe, in terms of

9  conducting the assessments; I changed the way that I reported

10  the probabilities of sexual re-offense.

11  Q.   Well, in this field evaluators talk about different

12  methods of assessing risk of future re-offense.  And one of

13  those is clinical judgment, right?

14  A.   Yes.

15  Q.   And clinical judgment is widely accepted to be not valid,

16  right?

17  A.   Yes.

18  Q.   And if someone said, "Based on my clinical judgment" -- in

19  court you testified yesterday, you know, that someone was

20  likely to re-offend simply based on my clinical formulation of

21  the case -- that would be unethical, right?

22  A.   Yes.

23  Q.   Based on current science, right?

24  A.   Right.

25  Q.   Because this is all about relying on the best science to

1    come up with a more accurate assessment of the risk an

2    individual poses, right?

3    A.    Yes.

4    Q.    And, again, the numbers that we're talking about for

5    Mr. Volungus, you agree that you're assessing the risk that he

6    commit a hands-on offense, right?

7    A.    I am.

8    Q.    And not the risk that he is unable to refrain from viewing

9    pornography again except to the extent that it is a gateway to

10   him for re-offense, right?

11   A.    Correct.

12   Q.    Now, you have testified that there are -- that there's an

13   in-between method called "empirically guided clinical

14   judgment," right?

15   A.    Yes.

16   Q.    Is that a method that you would endorse today?

17   A.    No.

18   Q.    And then there is an adjusted actuarial method --

19   A.    Yes.

20   Q.    -- correct?

21        Now, there are some researchers in this field who strongly

22   believe that actuarial instruments should not be adjusted at

23   all, right?

24   A.    Right.  The overall risk should not be adjusted; the risk

25   should be only what the actuarial instrument tells you.

1  Q.   And that is because of findings that the actuarial

2  instruments are contaminated by clinical overrides, right?

3  A.   That they can be, yes.

4  Q.   That they can be.  And so some researchers advocate a pure

5  actuarial approach, right?

6  A.   Right.

7  Q.   And so we have a continuum, then, from the clinical, at

8  one end, to the pure actuarial at the other, right?

9  A.   Yes.

10 Q.   And right now you do an adjusted actuarial method, right?

11 A.   Yes.

12 Q.   And, in fact, what you have testified is that you looked

13 at the actuarial assessments and then decided that the risk was

14 higher than suggested by the actuarial assessment based on the

15 presence of dynamic factors, right?

16 A.   Yes.

17 Q.   And the dynamic factors were also not just pulled out of

18 the air but they were made by you by reference to this

19 empirical literature, right?

20 A.   Correct.

21 Q.   Now, after this data came out in the fall of 2008, you

22 testified in the *Carta* case and the *Hunt* case; do you recall

23 that?

24 A.   Yes.

25 Q.   And, in fact, at that time you stated you were using what

1   was called a "pure actuarial approach"; do you recall that?

2   A.   Yes.

3   Q.   And that was an approach where you would not under any

4   circumstances adjust the risk level beyond what the actuarials

5   stated, right?

6   A.   Well, I wouldn't say that.  I wasn't adjusting the overall

7   risk level just based on the dynamic factors alone at that

8   point.

9   Q.   Well, you testified that you would use dynamic -- in these

10  cases you would use dynamic factors to help you determine where

11  in the range of risk recidivism that you were reporting an

12  individual fit, right?

13  A.   Yes.

14  Q.   But you would not use those risk -- and you would -- you

15  also wrote in a proposal for doing risk assessment in light of

16  the new information that you should use the dynamic factors to

17  explain the risk, right?

18  A.   Yes.

19  Q.   But not to adjust the risk beyond these actuarials, right?

20  A.   Right.  We didn't have the data at that time to be able to

21  do that.

22  Q.   Well, and that was the -- in fact, in the *Carta* case and

23  the *Hunt* case, you testified that you changed your methods

24  since the time that you had written your reports in those

25  cases, right?

1    A.    Right.  That's just when the new research was released.

2    Q.    Because the new research was released and you had begun to

3    use a pure actuarial approach?

4    A.    More of a pure actuarial approach.  For example, I always

5    look at individual factors in any case, and that may or may not

6    be consistent with the risk on the actuarials.

7    Q.    There's a feature of the new norms that were starting to

8    come out in the fall of 2008 that you had a lot more

9    individuals than you had previously in the development sample,

10   right?

11   A.    The validation sample, I believe, was the one that was

12   much larger.

13   Q.    Well, these new norms were based on many thousands of

14   individuals, right?

15   A.    Right.  It was validated on many thousand individuals.

16   Q.    And so one of the things that that allowed you to do was

17   report different recidivism rates for individuals with scores

18   higher than six, right?

19   A.    Yes.

20   Q.    So instead of having six-plus, six had its own set of

21   scores; seven had its own set of scores; eight had its own set

22   of scores; all the way up to ten, right?

23   A.    Yes.

24   Q.    Now, do you recall the case of *United States versus Wayne*

25   *Hunt*?

1   A.   No.

2   Q.   I have up on the screen a transcript that is from the

3   trial in the case of *United States versus Wayne Hunt*, Civil

4   Action 07-12063-JLT, Day 3 of a non-jury trial, from April 29th

5   of 2009.  Now, as you sit here, you don't recollect

6   participating in that case?

7   A.   No, I certainly recollect participating in the case.  I

8   don't remember the facts of the case is, I guess, what I was

9   referring to.

10  Q.   Now, does the information that Mr. *Hunt* was 63 years old

11  and scored an 11 on the Static-99 refresh your recollection to

12  any degree about this case?

13  A.   No.

14  Q.   But you acknowledge that you participated in the case?

15  A.   Yes, I did.

16  Q.   How often do you see an 11 on the Static-99?

17  A.   Very infrequently.

18          MR. GOLD:  I apologize, your Honor.  The pyrotechnics

19  are getting a little ahead of me here.

20          (Pause.)

21  Q.   So I've turned to page 28 of the transcript that I've

22  previously mentioned.  And in this case you testified that

23  currently the pure actuarial method is the preferred method,

24  and then you stated that doesn't mean that you don't consider

25  specific case factors, you always would, but the primary

1   overall risk levels comes from scoring the actuarial

2   instruments, right?

3   A.   Yes.

4   Q.   And do you recall testifying in that way in April of 2009?

5   A.   Yes.  And I believe I just repeated the same thing here

6   today.

7   Q.   Well, except that in this case you're using dynamic

8   factors to adjust the risk above what the actuarial suggests,

9   right?

10  A.   Using the dynamic risk factors to provide information

11  about what base rates to use.

12  Q.   Well, but you're also stating that the dynamic factors

13  make the risk higher than the actuarial results suggest to us,

14  right?

15  A.   I would say that that's true for the MnSOST-R that doesn't

16  have a multiple base rate; they just have one base rate.  In

17  terms of the Static-99R and the Static-2002R, the dynamic risk

18  factors contribute in a way that allows me to choose the

19  non-routine sample rather than the routine sample for the

20  probabilities -- absolute probabilities of sexual re-offense.

21  So in that way it increases the base rate over the routine

22  sample in considering the dynamic risk factors.

23  Q.   So you take those dynamic risk factors and you adjust

24  within the range that the actuarials give you?

25  A.   You pick a sample type that is most reflective of the

1  individual's risk, considering dynamic risk factors.  If

2  they're high, then their risk would be above the routine

3  sample, which is why I chose the non-routine sample.

4  Q.   Well, but you choose the non-routine -- the non-routine

5  sample -- we'll get ahead to this in a minute.  But I think the

6  non-routine sample associated with Mr. Volungus's score, in

7  your opinion, corresponds to a ten-year recidivism rating of 27

8  percent, right?

9  A.   I believe so, yes.

10 Q.   But you testified, if I'm not mistaken, that the risk

11 posed by Mr. Volungus is higher than that figure, correct?

12 A.   I may have said that.  What I think I was referring to was

13 the fact that it places him in a higher risk sample type, that

14 being the non-routine sample type.

15 Q.   I see.  So that 27.7 percent gives us a sense, then, of

16 the risk posed by Mr. Volungus with the presence of the dynamic

17 factors that you identified?

18 A.   Yes, I would say that that was accurate.

19 Q.   And that, for you, is a sufficiently weighty level of risk

20 to justify commitment in a particular case as opposed to a

21 different intervention?

22 A.   I don't equate a probability of re-offense equalling

23 commitment or not equalling commitment.  I consider the overall

24 risk of the individual, which I do believe in his case is high,

25 and I believe that the most appropriate decision on my part

1   would be that he be committed.

2   Q.   And -- but when you say "high," what you mean is 27.7

3   percent?

4   A.   27.7 percent was the probability of re-offense in ten

5   years for the study sample in the non-routine sample type with

6   a score of six.  So there's two things to consider:  One is

7   that Mr. Volungus is high risk on the Static-99R, and those

8   high-risk offenders in the non-routine sample had 27 percent

9   probability of re-offense.  That would not be Mr. Volungus'

10  probability of sexual re-offense.

11  Q.   Now, Mr. Volungus is high risk, but he's high risk as

12  of -- in your opinion as of Monday when you changed the scoring

13  on the Static-99, correct?

14  A.   He's high risk on the Static-99, right.  As of Monday he

15  was moderately high risk in my scoring prior to that.

16  Q.   Right.  And I believe you testified in a deposition in

17  this case that the dynamic factors put him in a high-risk

18  range; that moderate risk was not high enough?

19  A.   I don't believe he's moderate risk; I believe he's high

20  risk.

21  Q.   But let me just be clear about what I'm asking.  When you

22  were deposed in this case, you believed that Mr. Volungus had a

23  five on the Static-99, and that put him in the moderate

24  high-risk category?

25  A.   It does.

1    Q.    And you testified at a deposition that the presence of the

2    dynamic factors allowed you to say he was, in fact, high risk,

3    not moderate high; do you recall that?

4    A.    I don't recall that.

5    Q.    Because that's not consistent with your method of doing

6    these things currently, to say that?

7    A.    It's more consistent for me to say that the presence of

8    dynamic risk factors place him in a sample type that is higher

9    risk.  So in other words, he would be more consistent -- his

10   risk would be more consistent with non-routine, or the

11   high-risk sample type, versus the routine sample type, which

12   would have lower probabilities of sexual re-offense.

13   Q.    So the way you formulate opinions in these cases is

14   to -- and again, just to reiterate, as of 2008, and then again

15   in 2009, there was a further development, but scoring the

16   Static-99 changed dramatically because individuals had to put

17   someone in a high- or low-risk group before interpreting the

18   scores, right?

19   A.    The interpretation of the probabilities of re-offense

20   changed significantly, yes.

21   Q.    And the new step for an evaluator was to, at first, report

22   a range, right, and tell a court where in the range an

23   individual should be, right?

24   A.    If they were able, yes.

25   Q.    Yes.  And now there's a year later, and currently it's

1   done slightly differently, right?

2   A.   Yes.

3   Q.   There are now four separate groups of samples that an

4   evaluator can compare an individual to, right?

5   A.   Yes.

6   Q.   And, in fact, there is verbiage about that in your report,

7   which is the same language that we'd find on the Static-99

8   website, right?

9   A.   Yes.

10  Q.   About certain of these samples and how to make that

11  comparison, right?

12  A.   Right.   They're described.

13  Q.   And this is the same language that we would find in the

14  sample report that you gave to the people you were training in

15  New Hampshire, right?

16  A.   Yes.  And I also referred them to the website for the

17  templates developed by the authors.

18  Q.   So before Monday, Mr. Volungus was moderate risk on the

19  Static-99, right?

20  A.   Right; he was a five.

21  Q.   He was moderate low on the Static-2002, right?

22  A.   Correct.

23  Q.   And he was low on the MnSOST-R, right?

24  A.   Yes.  He remains low on the MnSOST-R.

25  Q.   Now, one of the features that we talked about already is

1    how the new research gives you results for scores higher than a

2    six, right?

3    A.    Yes.

4    Q.    So that the table that we looked at that's in Exhibit 63

5    has the figure six-plus, while this table, which for the record

6    comes from the -- do you recognize that document?

7    A.    Yes.

8    Q.    And that document comes from the Static-99 Revised

9    Evaluators' Workbook, right?

10   A.    Yes.

11   Q.    And that is for individuals who are doing this type of

12   work who might score the Static-99, they would go to your

13   website to get a copy of -- or the Static-99 website to get a

14   copy of this workbook, right?

15   A.    Yes.

16   Q.    They could go to your website as well, because I believe

17   you crosslinked to the Static99.org website, right?

18   A.    Yes.  I have this document independently on my website as

19   well.

20   Q.    Now, this table shows the non-routine sample.  And we'll

21   get to this, but this is the sample that you chose to compare

22   Mr. Volungus to, right?

23   A.    Yes.

24   Q.    Now, we've reported to the Court that in 2008 there was

25   this change with a low-risk and a high-risk sample.  In 2009

1  there were four different samples that were introduced, right?

2  A.   Yes.

3  Q.   And, again, the choice-of-sample issue requires

4  professional judgment on the part of the evaluator, right?

5  A.   Yes.

6  Q.   And the way the -- well, let me -- before I ask that -- so

7  Mr. Volungus scores, in your view today, a six on the

8  Static-99, right?

9  A.   Yes.

10  Q.   And that's based on the fact that you scored him as having

11  a stranger victim?

12  A.   Yes.

13  Q.   And that changed your scoring on the three different

14  actuarials, right, because they all have that as an item?

15  A.   Correct.

16  Q.   And that takes us back to the metaanalysis, probably,

17  where having had a stranger victim shows that you've got an

18  increased risk of re-offense, slightly increased risk of

19  re-offense, right?

20  A.   Yes.

21  Q.   Now, the recidivism rates here for a score of ten -- I

22  notice they don't go up to 11?

23  A.   Right.

24  Q.   And why is that?

25  A.   There weren't enough in the sample -- individuals in the

1   sample with a score of 11.

2   Q.   But there were enough to report scores for a ten, right?

3   A.   Yes.

4   Q.   And, in fact, if you were testifying in a case with a

5   score of an 11, as you did in the *Hunt* case, or a score of a

6   ten, you would testify, and you would report these numbers if

7   the non-routine sample was appropriate, right?

8   A.   Right.  If it was a score of 11 on a report with values

9   for a score of ten.

10  Q.   And a score of ten had a predicted recidivism rate of 51.6

11  percent over five years, right?

12  A.   Yes.

13  Q.   And a score of six has about half that, right?  Somewhat

14  less than half that?

15  A.   Yes.

16  Q.   So I understand why the six-plus was called high risk in

17  the previous iteration of the Static-99, but now you have the

18  opportunity to report scores of ten, nine, eight and seven.  So

19  what is the justification for calling a six a high risk?

20  A.   Because very few offenders get a score of six or above.

21  Q.   But a score of six is about half the recidivism rate for a

22  score of ten, which you can score on the instrument, right?

23  A.   That's correct.

24  Q.   Now, the MnSOST-R has a category called "refer," right?

25  A.   Yes.

1  Q.   So they have low, moderate, high and then refer, right?

2  A.   Yes.

3  Q.   And that was because when Dr. Epperson developed that

4  instrument, it was designed for the sexually violent predator

5  law in the state of Minnesota, right?

6  A.   Yes.

7  Q.   That's why it's called the Minnesota Sex Offender

8  Screening Tool?

9  A.   Right.

10  Q.   And individuals who had scored above a certain level were

11  determined to be appropriate to refer for commitment -- for

12  further consideration, right?

13  A.   Right.  For further consideration.

14  Q.   Right.

15  A.   They could be referred under that score under certain

16  conditions, but they were always referred over that score.

17  Q.   And we've already discussed that Mr. Volungus is low risk

18  on that instrument, right?

19  A.   He is.

20  Q.   And so it's -- so this is the score for a five and a six,

21  both of which you've reported in this case a

22  five-year recidivism rate of 19.6 and 24.7 after five years,

23  right?

24  A.   Yes.

25  Q.   And it's 27.7 or 33.4 percent after ten years, right?

1   A.    Yes.

2   Q.    Now, I've put on the screen a document from the Static-99

3   Evaluators' Workbook where the results for the routine -- the

4   so-called routine sample are reported, right?

5   A.    Yes.

6   Q.    Now, you testified that you have been deposed and

7   testified in cases in the state of New Hampshire, right?

8   A.    Yes.  I've been deposed for the *Daubert* hearing.

9   Q.    You've been deposed for the *Daubert* hearing, but you've

10  not yet testified in any court proceeding, or have you?

11  A.    I've testified in two *Daubert* hearings.

12  Q.    So you provided testimony where there was a judge present?

13  A.    Yes.

14  Q.    And on the Static-99 website, judicial decisions are made

15  reference to talking about the new norms, right?

16  A.    Yes.

17  Q.    And, in fact, there have not been many extended

18  discussions about the new norms in the existing case law,

19  right?

20  A.    Correct.

21  Q.    But there has been a decision, a *Daubert* decision, from

22  the State of New Hampshire, right?

23  A.    Yes.

24  Q.    And the upshot of that decision was to exclude reference

25  to any samples but this sample, the non-routine sample, right?

1    A.    To exclude any reference except for the routine sample.

2    Q.    I'm sorry.  The routine sample.  Right.  Right.

3    A.    Uh-huh.

4    Q.    And because that was considered by that court having heard

5    testimony to be representative of all sex offenders, right?

6    A.    I'm not sure that was the reasoning, but that was the

7    ruling.

8    Q.    But that was the ruling, right?

9    A.    Right.

10   Q.    Right?  And so I have here the Static-99 routine sample

11   recidivism rates.  Do you see that?

12   A.    Yes.

13   Q.    And that is from the same document, the Evaluators'

14   Workbook.  And if you had chosen that sample, the recidivism,

15   to compare Mr. Volungus to, which I understand you did not do,

16   that Mr. Volungus -- the scores reported would have been much

17   lower than even the low scores that you've -- percentage rates

18   that you've reported, right?

19   A.    They would have been lower, right.

20   Q.    11.4 percent or 14.7 percent, right, for a five and a six?

21   A.    That's right.

22   Q.    For the record, I've placed on the document viewer a

23   document that I created from the material that you've submitted

24   in this case.  And first I want to ask you, do you recognize

25   the first table?

1    A.   Yes.

2    Q.   And is that the table that you submitted to the government

3    to be submitted as an exhibit in this case?

4    A.   Yes.

5    Q.   And the title is "Mine," correct?

6    A.   Yes.

7    Q.   And the title is "Current Scores Stranger Item," correct?

8    A.   Correct.

9    Q.   The next table, do you recognize that table?

10   A.   Yes.

11   Q.   And those are the scores that are reported in the body of

12   your report in this case, right?

13   A.   Yes.

14   Q.   And the title is "Mine," and says, "Previous scores before

15   stranger item," right?

16   A.   Yes.

17   Q.   And then I have two sample -- or two tables that I

18   created.  The bottom is the way the current scores would be

19   interpreted if the routine reference sample is used for

20   comparison.  Do you see that?

21   A.   Yes.

22   Q.   And do you recognize those figures for the Static-99, that

23   is, as the figures that we were just looking at?

24   A.   Yes.

25   Q.   And, again, that table is how the previous scorers, that

1    is, without the stranger item, would have been interpreted if

2    the routine sample were to be used, right?

3    A.    Yes.

4    Q.    And so especially with respect to the Static-2002R, the

5    recidivism percentages are quite low for the score that

6    Mr. Volungus originally obtained, right?

7    A.    Yes, for the routine sample there.

8    Q.    And so the decision of whether to compare someone to this

9    routine or non-routine sample is very important, right?

10   A.    It's important.

11   Q.    And it has a dramatic effect on how we interpret the

12   scores, right?

13   A.    Well, it will change the probabilities of sexual

14   re-offense.

15   Q.    Now, the method that you use to determine that is to look

16   at dynamic factors, right?

17   A.    Dynamic factors.  Also, other behavioral indices such as

18   compliance with supervision, problems institutionally, that

19   type of thing.

20   Q.    And referring back to behavior, always the behavior we're

21   concerned about with Mr. Volungus is the ultimate risk that he

22   would harm a child, right?  Lay hands on a child, right?

23   A.    Correct.

24   Q.    And the behavioral evidence, leaving apart the references

25   in the chats for a moment, consists of the attempt, the

1  traveler case, right?

2  A.   Right.

3  Q.   Now, and on his current term of supervised release, he

4  accessed child pornography, right?

5  A.   Yes.

6  Q.   And he talked about having, you know, some volitional

7  control issues around accessing child pornography when he spoke

8  to the judge at his sentencing, right?

9  A.   Yes.  Serious problems with his volition.

10  Q.   And the context of that conversation, though, was the

11  sentencing for a child pornography violation, right?

12  A.   Yes.

13  Q.   And there was no hands-on offense that led to his

14  reincarceration, correct?

15  A.   Correct.

16  Q.   This decision about how to determine which sample to refer

17  to, that's, as we've discussed, not been peer-reviewed, right?

18  A.   No.

19  Q.   Now, researchers in your field are proposing ways to

20  assist in making that determination, right?

21  A.   Yes.

22  Q.   One of the features of the non-routine sample is that it

23  contains individuals from the Bridgewater Treatment Center for

24  the Sexually Dangerous, right?

25  A.   Yes.

1   Q.   And that's called the "Knight and Thornton Sample" because

2   those were two researchers who did a study about it?

3   A.   Yes.

4   Q.   And those are individuals who were released as long ago as

5   1959, right?

6   A.   Yes.

7   Q.   And so those samples were also samples of released

8   individuals who had already been committed pursuant to a

9   sexually dangerous persons law, right?

10   A.   Yes.

11   Q.   And that sample is among the -- it's probably the only

12   United States sample in the group of samples that you compared

13   to Mr. Volungus, right?

14   A.   (Nonverbal response.)

15   Q.   Let me take the question out of the middle of the

16   question.  That sample is among the samples in the group that

17   you compared Mr. Volungus to, correct?

18   A.   Yes.  There's other U.S. samples; I just need to refresh

19   my memory about them.

20   Q.   But that sample doesn't have the virtue of some of the

21   other samples in being contemporary, right?

22   A.   That's right.  80 percent of the samples were

23   contemporary.

24   Q.   But that sample, from as long ago as 1959, was among the

25   samples that you compared Mr. Volungus to, right?

1    A.    That's right.

2    Q.    Now, Dr. Thornton, your colleague, has proposed a method

3    of helping to determine which sample to compare someone to,

4    right?

5    A.    Yes.

6    Q.    Dr. Thornton has yet another instrument called the SRA; is

7    that correct?

8    A.    SRA, forensic version, yes.

9    Q.    SRAFV, forensic version?

10   A.    Yes.

11   Q.    Now, you recently testified in the case of *United States*

12   *versus Carta*, right?

13   A.    Yes.

14   Q.    And again, we see the development of the field in the

15   course of your testimony in a single case, right?

16   A.    Yes, there's always new research.

17   Q.    And so in the *Carta* case, in particular, you updated your

18   report and used this SRAFV to justify your decision to place --

19   or to compare Mr. *Carta* to a particular sample, right?

20   A.    Yes.

21   Q.    And that was in front of Judge Saris just in last

22   December, right?

23   A.    Yes.

24   Q.    And, in fact, that operation has not been peer-reviewed,

25   right?

```
 1   A.    No.
 2   Q.    And, in fact, Dr. Thornton had recently introduced the
 3   notion in a PowerPoint just two or three weeks before, right?
 4   A.    Well, he had provided a training, yeah, two or three weeks
 5   prior to that.
 6   Q.    And that was the first proposal of using this instrument
 7   to do what you've done in this case with these dynamic factors,
 8   right?
 9   A.    Right.
10   Q.    So what you do in this case is you look at the dynamic
11   factors and then you make a judgment as to which sample to
12   compare Mr. Volungus to, right?
13   A.    I do.
14   Q.    What Dr. Thornton is proposing is that you score an
15   instrument, come up with a score, and then use that score to
16   determine which sample someone should fall into, right?
17   A.    Yes.  The dynamic factors are mechanically weighted, so
18   you have a score, rather than simple observation of the
19   presence or absence.
20   Q.    And the purpose of that is to improve the accuracy of
21   these judgments, right?
22   A.    Hopefully, yes.
23   Q.    And to exclude, as much as possible, the subjectivity
24   inherent in many of these decisions, right?
25   A.    Yes, I think so.
```

1    Q.   And you will agree with me that the assessment of dynamic

2    factors is a more subjective enterprise than the assessment of

3    whether or not a static factor is present, right?

4    A.   Yes.

5    Q.   On Monday you -- or yesterday we discussed how on Monday

6    you e-mailed with Dr. Hanson and Leslie Helmus about whether

7    the stranger-victim item should be scored on the instruments.

8    Do you recall that?

9    A.   Yes.

10   Q.   And I put up on the document viewer an image of that

11   document with the e-mail addresses blacked out.  Do you

12   otherwise recognize it as the e-mail chain that we were

13   discussing yesterday?

14   A.   I do.

15        MR. GOLD:  Your Honor, we'd seek to move this document

16   into evidence.

17        THE COURT:  Any objection?

18        MS. SERAFYN:  No objection.

19        THE COURT:  All right.  66; is that right?

20        MR. GOLD:  That's right.

21        (Respondent's Exhibit No. 66 received into evidence.)

22   BY MR. GOLD:

23   Q.   Now, we talked about the coding rules for the Static-99

24   and then the Static-2003.  Did you refer to the coding rules

25   prior to e-mailing with Dr. Helmus -- or Leslie Helmus and

1    Dr. Hanson?

2    A.   I don't recall whether I did or not.  I refer to them all

3    the time.

4    Q.   I've placed a document on the document viewer.  Can you

5    tell me if you recognize it?

6    A.   That's from the Static-99, 2003 revised coding rules for

7    Item 9, stranger victim.

8    Q.   And that states that you can use -- you don't have to use

9    a conviction, right, to score this item, right?

10   A.   Well, you can use all credible information.

11   Q.   Now, again, this item refers back to that original

12   research in the metaanalysis that we briefly reviewed, right?

13   And it's been incorporated into this instrument as an item,

14   right?

15   A.   Right.  Well, the definitions came from how they coded the

16   original Static-99.

17   Q.   So the criteria for being a stranger are very high.

18   That's what the coding rules say?

19   A.   Yes.

20        MS. SERAFYN:  Your Honor, I apologize.  This doesn't

21   appear to be the same page in my Exhibit 63.

22        MR. GOLD:  Oh, you know, she's identified this as

23   Exhibit 63, but it's not; it's the coding rules from the 2002.

24   BY MR. GOLD:

25   Q.   Are the coding rules from the 2002 the same with respect

1    to this?

2    A.   Oh, I have no recall.  So much has changed from one

3    version to the other.

4    Q.   So you're not sure?

5    A.   I'm not sure.

6    Q.   Okay.  Okay.  But I meant to go to the exhibit, so we'll

7    go there.

8         THE COURT:  I'm not sure where that leaves us.  Are

9    you going to Exhibit 63?

10        MR. GOLD:  I'm going to Exhibit 63.  I had intended to

11   show that.

12        THE COURT:  Okay.

13        (Pause.)

14   BY MR. GOLD:

15   Q.   And for the record, we're at page 54 of Exhibit 63, and

16   it's the same language.  "The criteria for being a stranger are

17   very high.  Even a slight degree of knowing is enough for a

18   victim not to be a stranger."  That's what it says there in the

19   rules, correct?

20   A.   Yes.

21   Q.   "If the victim knows the offender at all for more than 24

22   hours, the victim is not a stranger; for example, if the victim

23   was a convenience store clerk and they recognized the

24   perpetrator as someone who had been in on several occasions to

25   buy cigarettes, the victim would no longer be a stranger

1    victim."  I'm going to skip a sentence and continue reading.

2    "The evaluator must determine whether the victim,

3    quote/unquote, knew the offender 24 hours before the assault

4    took place.  The criteria for know/knew is quite low but does

5    involve some level of interaction.  They need not know each

6    other's names or addresses; however, simply knowing of someone

7    but never having interacted with them would not be enough,"

8    correct?

9    A.   Yes.

10   Q.   Now, it's clear in this case that Mr. Volungus spoke with

11   the intended victim, Sarah, on the phone, and also had a chat

12   with her prior to meeting her, correct?

13   A.   Yes.

14   Q.   And so to the extent that the crime is meeting her, she

15   wasn't a stranger for that crime, correct?

16   A.   Right.  It would be the lewd talk on the telephone with

17   her.  That would be the beginning of the crime.

18   Q.   Well, what is the crime there, the lewd talk?  To you

19   that's part of the crime that he was convicted of?

20   A.   That's the beginning of the criminal behavior with her.

21   Q.   Now, these coding rules have to do with the development

22   sample, right?

23   A.   For the most part.

24   Q.   Well, they were drafted in 2003, right?

25   A.   Right.

1    Q.   And so they don't have to do with the samples that you

2    were talking about now, more contemporary samples; these were

3    samples from the past, right?

4    A.   That's right.

5    Q.   And the Internet has been developing by leaps and bounds,

6    especially since the mid '90s, right?

7    A.   Yes.

8    Q.   And a lot of the crimes that we see in federal court

9    today, such as child pornography crimes, were really

10   facilitated by the increased availability of certain types of

11   pornography because of the Internet, right?

12   A.   Yes.

13   Q.   And chatting is something that probably was unknown in the

14   early 1990s, right?

15   A.   Yes.

16   Q.   And so many of these samples don't have, presumably, as

17   many child pornography offenders as we might see in

18   contemporaneous samples?

19   A.   There are no child pornography offenders in these samples.

20   The Internet was not -- there was no Internet when these

21   samples were released to the community.

22   Q.   So the rules for the Internet that are promulgated here

23   were kind of post hoc, correct?

24   A.   Correct.

25   Q.   And they were good guesses about how the items should be

1  scored in the future, right?

2  A.    Well, they were rules -- reasonable rules -- for how to

3  code Internet offenses that were not coded in the original

4  data.

5  Q.    Well, but you just made reference to an important

6  principle that the rules that often derive from how they were

7  scored in the development sample, right?

8  A.    Well, that's ideal.

9  Q.    And with the Internet, these rules were just developed for

10 this document, right?  It's a standardized practice going

11 forward, but they weren't what was used in the development

12 sample because there was no Internet, right?

13 A.    Right.

14 Q.    And so this rule says, "Internet, e-mail and telephone:

15 Sometimes offenders attempt to access or lure victims over the

16 Internet.  This is a special case and the threshold for not

17 being a stranger victim is quite low.  If the offender and the

18 victim have communicated over the Internet, e-mail or telephone

19 for more than 24 hours before the initial face-to-face meeting,

20 the victim, child or adult, is not a stranger victim."

21       That's what it says there, right?

22 A.    Yes.

23 Q.    And, again, did you author this section of these coding

24 rules, to your recollection?

25 A.    I don't remember.

1    Q.   But, again, because these rules were developed at the

2    time, they were developed with a sense of what the purpose of

3    the -- or what type of quality the stranger-victim item was

4    meant to capture, right?

5    A.   Yes.

6    Q.   And so the threshold was quite high, right?

7    A.   In the original coding, yes.

8    Q.   In the original coding.  And when you were trying to sort

9    out a way to code into the code "Internet offenses" in the

10   future, this is what you wrote, right?

11   A.   That's right.

12   Q.   And, again, it goes on to say, "To be clear, this means

13   that if an offender contacts for the first time a victim at

14   eight on a Wednesday night, their first face-to-face meeting

15   must start before eight on Thursday night"; otherwise, there's

16   this rule that the -- you don't code this item, right?

17   A.   Right.

18   Q.   Now, if the crime is conceived of as the meeting, then the

19   attempt to meet the girls -- then clearly this item doesn't

20   apply, correct?

21   A.   Right.

22   Q.   Because the first contact occurs several days before,

23   right?

24   A.   Right.

25   Q.   And, in fact, Mr. Volungus is communicating, chatting for

1  hours with the older sister weeks before that.

2  A.   Right.

3  Q.   Right.  And, in fact, even then the chats with the sister

4  make reference to communications back and forth with the

5  younger sister, right?

6  A.   Right.  But there was no communication.

7  Q.   There was no actual communication, but there was

8  communication through the older sister, right?

9  A.   Well, there was discussions of the 14-year-old with the

10  older sister but no contact with the 14-year-old.

11  Q.   And do you recall incidents in the chats where the older

12  sister says the younger sister says "hi," for example?

13  A.   I don't recall that.

14  Q.   Would that qualify as a contact, in your view, under this

15  item?

16  A.   I wouldn't say so, no.

17  Q.   Now, do you know if Dr. Hanson would think that --

18  A.   I don't know.

19  Q.   -- if you provided him those facts?

20       You don't know?

21  A.   I don't know.

22            THE COURT:  Mr. Gold, it's eleven o'clock.  I think

23  we'll take the morning recess.

24            THE CLERK:  All rise.  The Court will take the morning

25  recess.

```
 1              (The Court exits the courtroom at 11:01 a.m.)

 2              (There is a recess in the proceedings at 11:01 a.m.)

 3         THE CLERK:  All rise.

 4              (The Court enters the courtroom at 11:25 a.m.)

 5         THE CLERK:  A continuation of the bench trial.  Please

 6    be seated.

 7         MR. GOLD:  Your Honor, before we recommence, I've

 8    shown the witness two charts regarding the revised Static-99.

 9    I would seek to introduce those as an exhibit.  And I've also

10    shown the witness -- and I believe she's adopted different

11    versions of the chart that she did with the various versions of

12    the scores, one of which appears in her report, one of which

13    has been submitted as an exhibit, and the other two tables

14    showing what the results would be with the so-called routine

15    sample.  I'd seek to introduce that as a separate exhibit.

16         THE COURT:  Are there any objections?

17         MS. SERAFYN:  Well, your Honor, no objection to the

18    first two, the individual pages.

19         THE COURT:  Let me see them, please.

20         MS. SERAFYN:  I guess my only objection to the

21    other --

22         THE COURT:  This is non-routine and routine?

23         MR. GOLD:  Correct.

24         THE COURT:  Are those intended to be separate?

25         MR. GOLD:  The non-routine and routine are intended to
```

1    be one exhibit.

2         THE COURT:  One exhibit?  Okay.  Okay.  You have no

3    trouble with that?

4         MS. SERAFYN:  No trouble with that.

5         THE COURT:  Okay.  What else?

6         Paul?  No, let me see the others.

7         MS. SERAFYN:  You know, it's just that the exhibit

8    that we introduced on direct was a table that Dr. Phenix had

9    created; this is something that counsel created.

10        THE COURT:  It's kind of a summary of other things.

11   It's derived from evidence, I guess.  It's more like a chalk

12   than an exhibit, I guess.

13        MR. GOLD:  Although --

14        THE COURT:  And, you know, in a non-jury trial that

15   distinction isn't all that meaningful.

16        MS. SERAFYN:  That's fine.

17        THE COURT:  So if you want to press the objection I

18   would exclude it, but admit it as a chalk.

19        MS. SERAFYN:  No need to press it.

20        THE COURT:  Okay.  All right.

21        I thought you said there were three things.

22        MR. GOLD:  No.  No.

23        THE COURT:  Two and one and one.  Okay.  Very good.

24   The next two numbers, 67 and 68.

25        THE CLERK:  67 and 68.

1          (Respondent's Exhibit Nos. 67 and 68 received into

2     evidence.)

3     BY MR. GOLD:

4     Q.   Dr. Phenix, I'm going to continue on with the reading of

5     the rules that we were discussing for coding of the stranger

6     victim.  Again, these rules continue that were developed and

7     may have been drafted by you.  "It is possible in certain

8     jurisdictions to perpetrate a sexual offense over the Internet,

9     by telephone or e-mail, and never be in physical proximity to

10    the victim.  If the offender transmits sexually explicit,

11    objectionable materials over the Internet within 24 hours of

12    first contact, this can count as a stranger victim.  Once

13    again, the 24-hour rule applies.  However, if the perpetrator

14    and the victim have been in communication for more than 24

15    hours prior to the sending of the indecent material or the

16    starting of indecent talk on the telephone, then the victim can

17    no longer be considered a stranger," right?

18    A.   Yes.

19    Q.   And that's the paragraph which you consulted, or base your

20    opinion that -- on the stranger-victim item should be coded in

21    this case, right?

22    A.   Yes.

23    Q.   Because, again, as you agreed, if the offense is the

24    meeting of the two girls -- or attempted meeting of the two

25    girls, then there's no question that the stranger victim would

1   not apply to that, right?

2   A.    Yes.

3   Q.    And so you conceptualize essentially a separate offense

4   occurring the first chat that he has with her, right?

5   A.    I conceptualize the beginning of the offense with the

6   chat.

7   Q.    But you did not conceptualize it that way until prior to

8   Monday of this week, right?

9   A.    I conceptualized it differently prior to this week.

10  Q.    And here -- again, these were ruled that weren't done with

11  reference to how it was originally coded, and that's where we

12  tend to get our validity from, right?  If it's done the same

13  way, then we know that it's valid, right?

14  A.    Yes.

15  Q.    And so these rules don't have that virtue because they are

16  simply rules developed for future use, right?

17  A.    That's right.

18  Q.    And it says here, "It is possible in certain jurisdictions

19  to perpetrate a sexual offense over the Internet."  Looked at

20  by itself, is the -- is the first offense a -- or the indecent

21  talk with the younger victim, Sarah, an offense in the state of

22  Kentucky standing alone?

23  A.    I don't know.

24  Q.    Now, do the same rules apply with the MnSOST-R for the

25  stranger victim?

1    A.    Yes.

2    Q.    And are you able to use credible information or only

3    charges and convictions with the MnSOST-R?

4    A.    Credible information.

5    Q.    Now, you consulted with Dr. Hanson about this.  Did you

6    also consult with Dr. Epperson?

7    A.    No.

8    Q.    For the record, I have a page from the MnSOST-R scoring

9    manual labeled Item 9.  Do you recognize that?

10   A.    Yes.

11   Q.    Now, there it says "charged or convicted," correct?

12   A.    Right.

13   Q.    And so Mr. Volungus was not charged or convicted of

14   lewdness, correct?

15   A.    No; he was charged or convicted of going to meet the

16   victim for sex.

17   Q.    But if that is the crime, then the victim was not a

18   stranger for the purposes of that crime, right?

19   A.    I don't agree with that.  My perception is that the crime

20   began when he solicited her for sex.

21   Q.    Well, and, again, he had had the communications with the

22   older sister for some weeks prior to this incident, right?

23   A.    Correct.

24   Q.    And what we do is, we make reference to what that item was

25   supposed to capture, right, when we think about coming up with

1   rules for how to score an item, right?

2   A.   Yes.

3   Q.   And so stranger victim is supposed to -- or thought to

4   indicate some special type of deviance for individuals who

5   target strangers, right?

6   A.   Yes.

7   Q.   And so individuals who jump out of the bushes and grab

8   someone that they've never met before to rape them would have

9   been scored having a stranger victim under the old rules,

10  right?

11  A.   Yes.

12  Q.   And there were no Internet offenders that were scored

13  under these old rules, right?

14  A.   Yes.

15  Q.   And so this type of interaction -- this type of

16  interaction of chatting and then meeting -- was unknown in the

17  development sample, right?

18  A.   Yes.

19  Q.   Now, for the record, I've placed on the document viewer

20  your scoring sheet for the Static-99R, and that's been entered

21  as Exhibit 64.  Do you recognize that?

22  A.   Yes.

23  Q.   Now, as we discussed, the six-plus is still labeled as

24  high here, right?

25  A.   Yes.

1  Q.   Despite the fact that there are different recidivism rates

2  associated with ten, nine, and so forth, right?

3  A.   Yes.

4  Q.   And the items have remained the same except that in 2009

5  the age element was added, right?

6  A.   Yes.

7  Q.   And before the age element was added, it was often argued

8  that the Static-99 results overestimated the recidivism

9  potential of older offenders, right?

10  A.   They did.

11  Q.   And, in fact, there was a lot of resistance to that in

12  cases of this kind until this development, right?

13  A.   Yes.

14  Q.   And, in fact, you yourself have testified in cases that

15  you would not adjust actuarial results for age until after the

16  age of 70, right?

17  A.   Yes.

18  Q.   But that now that this research has come out, adjustments

19  are made starting at the age of 40, right?

20  A.   Adjustments are made at the age of 40?  I previously

21  considered age outside of the actuarial instrument in making

22  adjustments for age.

23  Q.   But you would not make that adjustment until the age of

24  70, at least for a time, right?

25  A.   When we had data -- at one point that's true.  Shortly

1    thereafter we began -- I began adjusting for age over 60.

2    Q.    Now, again, you stated you don't recall the case of *United*

3    *States versus Wayne Hunt*, right?

4    A.    I don't recall the details of the case.

5    Q.    But that was the case of a 63-year-old individual who had

6    an 11 on the Static-99?

7    A.    It was.

8    Q.    Now, the way you scored this, Mr. Volungus gets one point

9    off because he's between 40 and 59.9 years of age, right?

10   A.    Yes.

11   Q.    He's never lived with a lover for at least two years, so

12   he gets one point for that.  Is it true that that item is

13   supposed to capture intimacy deficits?

14   A.    No, not necessarily.  Intimacy deficits would more be

15   defined as the quality of the relationship.  This is a

16   statistical item.  Statistically, if you have not lived in a

17   continuous two-year relationship, your risk to re-offend is

18   higher than if you had.  But it doesn't examine the quality of

19   the relationship.

20   Q.    And again, that takes us back to that metaanalysis that we

21   talked about where it was simply a statistical relationship

22   perceived in the studies by Dr. Hanson, that when that was a

23   coded factor, people without the relationship tended to

24   recidivate at a higher -- slightly higher rate than those who

25   had had one of these relationships, right?

1    A.    Actually, those -- without the factor, recidivated at a
2    lower rate than those with the factor.
3    Q.    Okay.  Or without a relationship, recidivated at a higher
4    rate.  But we're talking about the same thing?
5    A.    I see what you're saying.  Yes, that's correct.
6    Q.    Now, index non-sexual violence, he doesn't have that.  I
7    just want to -- three of his points come from prior offenses,
8    right?
9    A.    Yes.
10   Q.    And so the index offense for your purposes is the child
11   pornography possession which formed the basis of his supervised
12   release violation, correct?
13   A.    Yes.
14   Q.    And that occurred in April of 2004, although he was not
15   ultimately sentenced for it until June of 2005, right?
16   A.    Yes.
17   Q.    And that's the index offense?
18   A.    Yes.
19   Q.    All other offenses become past offenses, right?
20   A.    Yes.
21   Q.    And so prior to this, Mr. Volungus only has one sequence
22   of offense conduct.  Would you agree with that statement?
23   A.    Yes.
24   Q.    And that sequence is, partly based on his own accounts,
25   discovering child pornography after viewing an episode which

1   talked about child pornography on the Internet, becoming very

2   involved with it, and also, engaging in chats which led to his

3   commission of the crime, right?

4   A.   Right.

5   Q.   And that offense was charged in a particular way, right?

6   A.   Yes.

7   Q.   It was charged as numerous accounts having to do with the

8   child pornography, and also one account for traveling to meet

9   those two individuals, right?

10  A.   Right.

11  Q.   And so although there is one sequence there, Mr. Volungus

12  gets three points by virtue of the way that case was charged,

13  right?

14  A.   Yes.

15  Q.   And so he is classed, then, with people who might have

16  offenses which were punctuated with incarcerations and then

17  subsequent offenses, so long as those people only had one

18  conviction or one charge at a time, right?

19  A.   Right.

20  Q.   And the noncontact sex offense item, that also refers back

21  to the child pornography possession, right?

22  A.   Yes.

23  Q.   But you just told me that there were no child pornography

24  offenders in the development sample from which that was

25  derived, right?

1    A.   That's right.

2    Q.   And, in fact, noncontact offenses in the development

3    sample meant exhibitionists, the voyeurs, things of that

4    nature, right?

5    A.   Right.

6    Q.   And those individuals had somewhat higher risk than

7    individuals who didn't have that in their history, right?

8    A.   They did.

9    Q.   And so, again, we have one of these rules to adapt to the

10   Internet age where child pornography offenders were -- it was

11   decided would be scored on that item, right?

12   A.   Actually, there were in the original sample, the

13   development sample and the original validation sample, there

14   may well have been child pornography offenders there, not on

15   the Internet necessarily.

16   Q.   And do you know if they were coded on this item?

17   A.   I don't know if they were coded on this item.  I would

18   expect that they would be.  But -- and I don't know how many of

19   them there were.

20   Q.   Now, you recall that he was scored by a therapist named

21   Richard Hamill, and we referred to his report, when he was

22   first released, right?

23   A.   Yes.

24   Q.   And Mr. Hamill -- or Dr. Hamill did a battery of tests?

25   A.   Yes.

1    Q.    He scored the Static-99?

2    A.    Yes.

3    Q.    And he found -- this was when Mr. Volungus had no prior

4    offenses, right?

5    A.    Right.

6    Q.    Right.  And at that time Dr. Hamill scored him something

7    like a three, right?

8    A.    I'm not sure that I saw an actual score.  I think what I

9    saw was a range.  I would have to refresh my memory.

10   Q.    Well, but what Dr. Hamill said was that he found

11   Mr. Volungus to be a moderate risk of non-violent sexual

12   re-offense, right?

13   A.    Yes.

14   Q.    And, in fact, the re-offense that Mr. Volungus had was

15   non-violent, right?

16   A.    Yes.

17   Q.    Now, you've reviewed other documents, other reports in

18   this case, which were developed by the other experts?

19   A.    Yes.

20   Q.    And I asked you before, you participated in a number of

21   the other cases that have been in federal court.  Have you ever

22   been a court-appointed examiner, to your knowledge?

23   A.    In a federal case?

24   Q.    In a federal case here in Massachusetts.

25   A.    No.

1    Q.   You reviewed reports by the experts retained by the

2    defense in this case, Dr. Bard and Dr. Prentky?

3    A.   Yes.

4    Q.   Now, the report that we were just talking about when

5    Mr. Volungus was in the community by Dr. Hamill, where

6    Dr. Hamill said that Mr. Volungus was amenable to treatment but

7    posed a moderate to high risk of non-violent re-offense, he

8    also scored the Abel that we talked about yesterday, right?

9    A.   Yes.

10   Q.   And the Abel is something on which you relied as part of

11   your diagnostic conclusions in this case, right?

12   A.   Yes.

13   Q.   And the Abel that he scored showed a primary sexual

14   interest in 11- to 12-year-olds, right?

15   A.   Eight to twelve, I believe.

16   Q.   Eight to twelve.  And then a secondary sexual interest in

17   teenagers, right?

18   A.   Young adolescents.

19   Q.   And then a tertiary interest in adults, right?

20   A.   Right.

21   Q.   And, there's now another Abel assessment in the case by

22   Dr. Prentky, right?

23   A.   Yes.

24   Q.   And have you reviewed that?

25   A.   I'd have to refresh my memory.

1   Q.   And the Abel is an assessment of sexual interest which

2   looks at visual viewing time of the subject of the test, right?

3   A.   Yes.

4   Q.   So there are two real measures that people in your field

5   have developed to determine sexual arousal.  One is the PPG,

6   right?

7   A.   Yes.

8   Q.   And that is a device where a ring is placed around the

9   man's penis, and images or stories are played for him, and his

10  arousal is measured in that way, right?

11  A.   Yes.

12  Q.   The Abel assessment attempts to do the same thing but in a

13  less invasive way, right?

14  A.   Yes.

15  Q.   You look at the images, and a computer is actually

16  watching your pupils.  Or not exactly that way, but you click

17  past the images, and the amount of time that you view the

18  images is recorded, right?

19  A.   Yes.

20  Q.   And you also do a questionnaire at the same time, right?

21  A.   Yes.

22  Q.   Now, the Abel has been correlated with the PPG, which is

23  the better measure, right?

24  A.   Yes.

25  Q.   And so Dr. Prentky scored an Abel that shows normal sexual

1    interest in adults, right?

2    A.    Adolescents -- normal interest in adolescents and adult

3    females.

4    Q.    Well, on the Abel, interest in adolescents is considered

5    within the normal range, right?

6    A.    Yes.

7    Q.    Now, some of the reports in the records we've talked

8    about, Mr. Volungus is talking about sexual interest in minors

9    without specifying their age, right?

10    A.    Yes.

11    Q.    And he's also talked about realizing at some point during

12    treatment that the adults with whom he had had relations were

13    petite and younger looking, right?

14    A.    Yes.

15    Q.    And he looked at that as evidence of how his sexual makeup

16    really was, right?

17    A.    Yes.

18    Q.    But, of course, if Mr. Volungus were to relate to

19    youthful-looking adults, there would be no problem, correct?

20    A.    Right.

21    Q.    Now, you testified -- is it true in this case we have a

22    limited set of records about the treatment in which

23    Mr. Volungus was engaged when he was in the community?

24    A.    Yes.

25    Q.    But we do know that he consistently attended for two

1   years, right?

2   A.    Correct.

3   Q.    We do know that at the time that he was in treatment, he

4   was also engaging in non-therapeutic behaviors, right?

5   A.    Right.

6   Q.    So that while he was in treatment, for example, he

7   accessed child pornography --

8   A.    Yes.

9   Q.    -- right?

10        Now, according to Mr. Volungus' account, sometime after

11   that he began to engage in treatment in earnest, right?

12   A.    Yes.

13   Q.    And it was part of the shock of not being able to refrain

14   from going out and accessing child pornography that led him to

15   take stock and engage more seriously, right?

16   A.    That's what he said.

17   Q.    And, in fact, we have further information that

18   Mr. Volungus was writing these letters that we've discussed

19   about while he was also in treatment, right?

20   A.    Yes.

21   Q.    Right.  But now treatment is not a linear process, right?

22   A.    Right.

23   Q.    You take two steps forward and oftentimes you take three

24   steps back, right?

25   A.    Yes.

1    Q.   But the notion is that taking those two steps forward has

2    been some gain for you, and that future progress will be moved

3    by that path that you've started to blaze, right?

4    A.   Yes, that's what you hope.

5    Q.   Now, you characterized the existing records as showing

6    that Mr. Volungus' participation in treatment was dismal.  Do

7    you recall that?

8    A.   I believe his treatment gains were dismal, although I

9    think I was referring, actually, to his cooperation with

10   supervision when I talked about that rather than treatment.  I

11   would have to go back and look.

12   Q.   For the record, I have an image of Exhibit 62 on the

13   document viewer.  Do you recognize that first page as being

14   among the documents that you reviewed?

15   A.   Yes.

16   Q.   And these are quarterly treatment progress reports, right?

17   A.   Yes.

18   Q.   And this one that we're looking at here is from April of

19   2005, right?

20   A.   Yes.

21   Q.   And there are the following items on this progress report:

22   "Talks openly and honestly about his life and offense; listens

23   and contributes to others in group; identified factors leading

24   up to offense (risk factors); and demonstrates understanding of

25   relapse prevention model," right?

1    A.    Yes.

2    Q.    And so what this indicates is that according to this

3    therapist, Mr. Volungus, for the quarter ending April of 2005,

4    was doing okay in all those areas, right?

5    A.    In those areas.  I'm sure the therapist was unaware that

6    he was seeking child pornography and being in the presence of a

7    five-year-old female repeatedly.

8    Q.    Well, he was.  But according to what this therapist could

9    evaluate in treatment, Mr. Volungus was doing okay in these

10   four areas, right?

11   A.    That's right.

12   Q.    And very often -- oh, just for the record, this is a year

13   after the child pornography was seized, correct?

14   A.    Yes.

15   Q.    And, again, demonstrating this in group is a positive

16   thing, right?

17   A.    Yes.

18   Q.    And here is the same for the last quarter of 2004.  So

19   going back in time -- and again, on the same four items, he did

20   less well, as you noted in your report, in the "demonstrates

21   understanding of relapse prevention," right?

22   A.    Right.

23   Q.    But according to this therapist, he was doing okay in

24   identifying the factors that led to his offense and listening

25   and contributing to group, right?

1    A.    Right.

2    Q.    And this was for the three months ending in January of

3    2005, correct?

4    A.    Right.

5    Q.    For the third quarter of that year essentially the same,

6    right?

7    A.    Yes.

8    Q.    Now, in your report you noted that Mr. Volungus, I believe

9    the language you used, was consistently rated unacceptable in

10   his understanding of the relapse prevention model.  But, in

11   fact, of the records that we have, this is the only time that

12   Mr. Volungus was rated unacceptable in that area?

13   A.    Actually, that was language from the treatment provider

14   after he completed treatment.  So this is the only time he

15   received a 1, to the best of my recollection.  But at the end

16   of his treatment, his treatment provider thought that he did

17   not have sufficient knowledge of the relapse prevention model.

18   Q.    Well, these records speak for themselves, correct?

19   A.    They do.  We've just seen two examples where he had

20   difficulty understanding that.

21   Q.    Right.

22   A.    Right?

23   Q.    Right.  But grappling with the other areas throughout this

24   course of time, right?

25   A.    I'm sorry.  Could you --

1  Q.   Grappling with these other areas, identifying risk

2  factors, talking openly and honestly about his life and offense

3  throughout this course of time, correct?

4  A.   Yes.

5          MR. GOLD:  If I might have a moment, your Honor?

6          (Counsel confer off the record.)

7          MR. GOLD:  I have nothing further at this time, your

8  Honor.

9          THE COURT:  All right.  Ms. Serafyn?

10         MS. SERAFYN:  Thank you, your Honor.

11                      REDIRECT EXAMINATION

12  BY MS. SERAFYN:

13  Q.   Dr. Phenix, when you scored Mr. Volungus a five on the

14  Static-99R, what was your opinion as to whether or not he was a

15  sexually dangerous person?

16  A.   I believed he was a sexually dangerous person.

17  Q.   And when you added a point for the stranger-victim

18  category and you gave Mr. Volungus a score of six, what is your

19  opinion as to whether he's a sexually dangerous person?

20  A.   It remains the same; that he is a sexually dangerous

21  person.

22  Q.   Now, Attorney Gold asked you questions on

23  cross-examination about this report, which is Exhibit 27, that

24  Dr. Richard Hamill authored.  Have you read that report?

25  A.   Yes.

1    Q.   And do you see the date of evaluation up there at the top?

2    It's sort of highlighted there in yellow.

3    A.   Yes.

4    Q.   And can you read those dates?

5    A.   June two thousand -- June 9th, June 17th and June 24th,

6    2003.

7    Q.   And when was this, in terms of the timeline, of when

8    Mr. Volungus was released from prison?

9    A.   It was right after he was released from prison.

10   Q.   So is it fair to say that this was the beginning of his

11   supervised release?

12   A.   Yes.

13   Q.   So I'd like to turn your attention to page 8 of

14   Dr. Hamill's report.  Dr. Phenix, could you just read the

15   highlighted portion for us?

16   A.   "On this instrument" -- referring to the Static-99 -- "he

17   appears to be in the low- to moderate-risk range primarily due

18   to this being his first conviction for any crime and to his not

19   having used any degree of force or violence.  This writer

20   suggests that his estimated level of risk of recidivism be

21   elevated to at least the moderate-risk level, or perhaps even

22   moderate- to high-risk level due to his acknowledgment that he

23   is a pedophile who has strong and frequently recurring sexual

24   fantasies of a broad range apparently to both prepubescent and

25   peri/postpubescent girls."

1    Q.    What does "peri/postpubescent" mean?

2    A.    Becoming pubescent and after pubescence.

3    Q.    And, Dr. Phenix, how does Dr. Hamill's elevation of the

4    risk level here from the actuarials compare to what you've done

5    here?

6    A.    Well, Dr. Hamill looked at the actuarial instrument and

7    tried to assess if that included all of the risk factors

8    present in the case, and he believed that there were additional

9    risk factors that contributed to his overall risk, making that

10   higher.  And that's -- I do a similar type of evaluation.

11   Q.    And, Dr. Phenix, what, if anything, do we know about

12   Mr. Volungus and his conduct after this evaluation was

13   conducted in June 2003?

14   A.    His conduct was unchanged compared to before his

15   incarceration.  He continued to seek out child pornography; he

16   continued to write and communicate well into two

17   thousand -- well, in March of 2005, with a known individual

18   who -- with whom he exchanged child pornography and discussed

19   molesting children, and he placed himself in the presence of a

20   five-year-old female alone.

21   Q.    So, Dr. Phenix, is it fair to say with the benefit of

22   hindsight in looking at Dr. Hamill's report, that the elevation

23   of risk beyond the actuarials was justified?

24          MR. GOLD:  I'm going to object to the leading, your

25   Honor.

1          THE COURT:  Overruled.

2          You may answer.

3          THE WITNESS:  The elevation was justified.

4    BY MS. SERAFYN:

5    Q.    Now, Dr. Phenix, you're not an attorney, correct?

6    A.    Right.

7    Q.    As part of your role as an evaluator and a psychologist in

8    these sex offender cases, do you view it as your role to

9    interpret the statute that you're asked to answer, or the

10   question that you're asked to answer?

11   A.    To the extent that it applies in a clinical case.

12   Q.    So in this case you're familiar with the three elements

13   under the Adam Walsh Act, correct?

14   A.    Yes.

15   Q.    And would you agree that the first element of the act is

16   that the person has engaged, or attempted to engage, in

17   sexually violent conduct or child molestation?

18   A.    Yes.

19   Q.    And when you, as a clinician, interpret that element of

20   the statute, do you interpret that to require more than one

21   instance of sexual violence or child molestation?

22   A.    No, one instance.

23   Q.    And, in fact, the statute is phrased in a way that says

24   "has engaged or attempted to engage"; is that right?

25   A.    Yes.

1    Q.    So in your interpretation of the statute, is a hands-on

2    sex offense required in order to meet the first element?

3    A.    No.

4    Q.    So, Dr. Phenix, if for some reason we were to discredit

5    Mr. Volungus' admissions in the chat with Deanna and Sarah

6    about prior sexual acts with a 10-year-old, a 13-year-old and a

7    14-year-old that you testified about earlier, if we were to

8    discredit those, does your opinion in this case change at all?

9    A.    No.

10   Q.    Now, I'd like to turn your attention, Dr. Phenix, to the

11   third element of the statute.  Now, is it -- let me back up.

12         Is it fair to say that you testify in different states, in

13   different jurisdictions, about their sex offender laws?

14   A.    Yes.

15   Q.    And on cross-examination you were asked about testimony

16   that you've given in New Hampshire, right?

17   A.    Yes.

18   Q.    And what other states have you testified in?

19   A.    California, Washington, Arizona, Florida, Minnesota,

20   Wisconsin, Iowa.

21   Q.    And is it fair to say that you're familiar with those

22   states and their sex offender statutes?

23   A.    Yes.

24   Q.    And some of the states have statutes that are known as

25   sexually violent predator, or SVP, laws; is that right?

1  A.   Yes.

2  Q.   And others frame it as "sexually dangerous person," or

3  SDP?

4  A.   Yes.

5  Q.   And are those statutes the same or different in terms of

6  the elements that are required to prove that someone is a

7  sexually violent predator or sexually dangerous person?

8  A.   The elements are similar; the standards of proof are

9  different.

10  Q.   Okay.  So are you familiar with some states having a

11  requirement that the government must prove that it's more

12  likely than not that the offender will essentially re-offend?

13  A.   Yes.

14  Q.   And is your interpretation of the Adam Walsh Act -- does a

15  third element require proof of re-offense?

16  A.   No.

17  Q.   And is it your understanding that the third element

18  requires proof that a person will have serious difficulty in

19  refraining from sexually violent conduct or child molestation?

20  A.   That's correct.

21  Q.   So what is your interpretation of "serious difficulty in

22  refraining"?

23  A.   It's an examination of the individual's behavioral

24  controls.  Certainly looking -- conducting a risk assessment, I

25  think, is important.  That gives you information about a

1    person's overall risk.  But each offender's volitional

2    capacities are different, or their ability to control their

3    behavior.  Some individuals may have pedophilia and have

4    established, and through treatment, good abilities to control

5    acting out on those fantasies and urges, while other offenders

6    who have problem-solving or impulsivity, strong deviance and

7    have not learned ways to manage that, will have serious

8    difficulty with their volition with the same diagnosis.

9         And so I make an examination of the level of sexual

10   deviance and the ability of that person to control acting out

11   on it.

12   Q.   So in your opinion, does serious difficulty in refraining

13   require some precise measure of recidivism risk?

14   A.   No, there is no precise measure of recidivism risk; it's a

15   behavioral examination of that individual to make a

16   determination if they have the skills and ability and will to

17   stop from re-offending in the future.

18   Q.   And just a few moments ago when you were talking about the

19   third element, you talked about behavioral controls and

20   volitional impairment.  Is there an actuarial instrument that

21   measures volitional impairment?

22   A.   No.

23   Q.   So what do you do to measure volitional impairment?

24   A.   Well, I examine the pattern and duration of the person's

25   offending.  And, of course, the more severe the pattern and

1    duration of the offending, the more frequent of the offending,

2    would indicate more problems with volitional control.  I'm not

3    talking about offending in terms of going on to commit a

4    hands-on sex offense, per se; I'm talking about the individual

5    being involved in their re-offense cycle, engaging in high-risk

6    behaviors that ultimately will lead to a hands-on offense.

7         So I look at the pattern and duration of those high-risk

8    behaviors, and I examine if there has been any intervention

9    that would allow the person to control, or better manage, their

10   offense cycle so that they would not; that would not result in

11   a hands-on offense.  And I also examine, for example, the

12   person's -- in doing so, I examine the person's admissions as

13   well.  You know, what are they saying in terms of how well are

14   they able to control themselves.  So I look at the pattern and

15   duration of the behavior, and also admissions of the individual

16   as to their ability to control themselves.

17   Q.   And what is your opinion about Mr. Volungus' volitional

18   impairment?

19   A.   I think that he is unable to control seeking out child

20   pornography; I think he's unable ultimately to control seeking

21   out minors and prepubescent children for sexual activity.  He

22   has admitted that he has very little control over his behavior,

23   and he's admitted that he has no skills to change that at this

24   time.

25   Q.   Just to be clear, do you believe that Mr. -- well, strike

1    that.

2         Just to be clear, is it your opinion that Mr. Volungus

3    will have serious difficulty in refraining from viewing child

4    pornography?

5    A.   Absolutely.  Yes, I believe that.

6    Q.   And do you have an opinion about whether Mr. Volungus will

7    have serious difficulty in refraining from sexual violence or

8    child molestation?

9    A.   Yes, I absolutely believe he will.

10   Q.   And is that different from being able to refrain from

11   viewing child pornography?

12   A.   Yes, it's different.  For example, there may be an

13   individual who can view child pornography, and we know that

14   there are individuals who do not act out by seeking out

15   hands-on sexual offending with children.  There are other

16   groups we've studied that child pornography reinforces the

17   deviance and leads to -- ultimately to hands-on sex offenses.

18   What distinguishes those two groups is having attempted to

19   engage in sexual activity with a child.  And that has happened

20   for Mr. Volungus.

21        So essentially what's going on is that he is able to

22   reinforce his deviance and be satisfied by looking at child

23   pornography for a period of time.  But ultimately, that will be

24   insufficient and he will, in my opinion, then seek out children

25   for sexual activity.

```
1    Q.   And, Dr. Phenix, do the actuarial instruments alone answer

2    the question of whether Mr. Volungus will have serious

3    difficulty in refraining?

4    A.   No, that's a separate question.

5              MS. SERAFYN:  If I could just have a moment, your

6    Honor.

7              (Counsel confer off the record.)

8              MS. SERAFYN:  Nothing further, your Honor.

9              THE COURT:  Mr. Gold?

10             MR. GOLD:  Thank you.

11                           RECROSS-EXAMINATION

12   BY MR. GOLD:

13   Q.   So you testified that under this statute the serious

14   difficulty refraining from sexually violent conduct or child

15   molestation is -- a risk assessment is relevant to that?  You

16   do a risk assessment to make that determination?

17   A.   I think one component of looking at whether a person is

18   more likely to go on to commit a sex offense or not, and

19   demonstrate impairment in their volition, would be the overall

20   risk level that they pose on an actuarial instrument.  So I

21   think it has some relevance, but I think it needs further

22   examination behaviorally to understand that better.

23   Q.   Well, and so then when you assess volitional impairment,

24   it seemed to me that you look, as a clinician, at the pattern

25   of behavior that you see in the records, right?
```

1    A.    Yes.

2    Q.    And also by interviewing Mr. Volungus, as you did in this

3    case, right?

4    A.    Yes.

5    Q.    Did you ask Mr. Volungus, by the way, about the incidents

6    that he talked about in the chats?

7    A.    I don't recall exactly what I asked about -- asked him

8    about them.

9    Q.    So is it really true that the fact that you believe he's

10   had hands-on offenses, which are only reflected in those chats,

11   is not important to your opinion?

12   A.    I don't think I ever said it wasn't important.   I

13   considered that in my opinion.

14   Q.    And, but, excluding that now for the sake of argument,

15   what we have here is an incident in which Mr. Volungus says he

16   discovered child pornography in about 1998, right?

17   A.    Yes.

18   Q.    And -- or Internet child pornography, right?

19   A.    Right.

20   Q.    And there's no dispute in this case that he also was found

21   with a cache of adult pornography when his room was searched,

22   right?

23   A.    Yes.

24   Q.    And the incident was contemporaneous with him engaging in

25   a chat, right?

```
 1   A.    Yes.
 2   Q.    And that chat resulted in an attempted offense against a
 3   14-year-old girl, correct?
 4   A.    Yes.
 5   Q.    And that -- and I asked you about this at a
 6   deposition -- was not the result of pedophilia, right?
 7   A.    Right.
 8   Q.    Because pedophilia requires that the sexual interest be in
 9   prepubescent kids who are defined in the DSM as generally aged
10   13 years or under, right?
11   A.    Yes.
12   Q.    And you would agree with me this is not a pedophilic
13   offense, correct?
14   A.    Yes.
15   Q.    And so the mental disorder that you have diagnosed in this
16   case was not the product of the single hands-on offense of
17   which we have official documentation, correct?
18   A.    No, it was not.  I mean, it indicates sexual arousal to a
19   younger adolescent, which would be a different diagnosis if I
20   had provided that.  But my diagnosis was clearly diagnosing
21   sexual arousal to prepubescent children.
22   Q.    Now, and that is the mental disorder which underlies your
23   opinion, correct?
24   A.    Yes.
25   Q.    And, now, you said -- you testified to two things just
```

1  now.  You said you look at the pattern in duration of

2  offending, do you recall that, when you assess volitional

3  impairment?

4  A.   Yes.

5  Q.   And you then said you actually assess the pattern and

6  duration of high-risk behaviors, right?

7  A.   All of it, yes.

8  Q.   But you agree with me that if Mr. Volungus were a child

9  porn offender, he would not qualify for commitment under the

10  statute?

11  A.   I would not have found him to meet the criteria of the

12  statute.

13  Q.   And when you talk about a pattern of behavior in which

14  Mr. Volungus uses child pornography and then proceeds to seek

15  out an individual to offend with, you're basing that,

16  essentially, on one incident, right?

17  A.   Yes, I am.

18  Q.   And that the other behavior that you have is drawing

19  pictures in prison, correct?

20  A.   Right.

21  Q.   Or includes -- and also includes seeking out child

22  pornography, again, while on pretrial release, right?

23  A.   Right.

24  Q.   And also writing these letters that we've discussed to

25  a -- someone who's interested in child pornography, right?

3-100

Case 1:07-cv-12060-GAO   Document 62   Filed 03/07/11   Page 100 of 109

1    A.    Yes.

2    Q.    And that's it, right?

3    A.    That's a lot.

4    Q.    But there is no other -- this link that you make between

5    the high-risk behavior, as you call them, and offending

6    behavior, or hands-on offense behavior, you have simply the one

7    incident from 1998, correct?

8    A.    Yes.  And no information that he has changed in any way

9    since that time.

10   Q.    Now, the purpose of all this instrumentation that we've

11   been talking about, the actuarials and so forth, that was to

12   help rescue us from the inaccuracies of clinical judgment,

13   right?

14   A.    Yes.

15   Q.    And the purpose, then, was to assess the likelihood, or

16   not, of re-offense, right?

17   A.    Yes.

18   Q.    And when clinicians make these judgments -- and this is

19   not just in the sex offender realm but with mentally disordered

20   people, they decide whether someone's too dangerous to be

21   released, for example, in the standard civil commitment

22   situation, right?  Clinicians do, right?

23   A.    Could you rephrase that question?  I'm sorry.

24   Q.    Sure.  Yes.  It's not just in the sex offender realm that

25   we find risk assessments of this type, right?

1  A.   That's right.

2  Q.   And when we talk about the inaccuracy of clinical

3  judgment, for example, we're not simply talking about studies

4  of sex offender evaluations, right?

5  A.   Right.

6  Q.   We're talking about studies of clinicians making

7  evaluations in all different types of contexts, right?

8  A.   Right.

9  Q.   And instrumentation helps, right?

10 A.   It improves predictive accuracy, yes.

11 Q.   And so the predictive accuracy there is yes or no whether

12 someone offends or not, however that's defined in a particular

13 study, right?

14 A.   No.  It's a probability of re-offense, not whether they

15 will or won't.

16 Q.   Well, when we look at the effectiveness of these

17 instruments, we look at the ability that they have to help us

18 determine -- or separate offenders from -- re-offenders from

19 non-re-offenders, correct?

20 A.   Yes.

21 Q.   And you testified that that doesn't help us determine why

22 people re-offend, right?

23 A.   That's right.

24 Q.   And, in fact, many of the offenders may be offending

25 because -- not because of a volitional impairment, right?

1  A.   If an offender is offending, they would have a volitional

2  impairment, I believe.

3  Q.   Okay.  And so all offending is the result of a volitional

4  impairment?

5  A.   I believe a volitional impairment is present when a person

6  does engage in a sex offense.

7  Q.   And that's regardless of the situation.  For example, if

8  someone with antisocial personality disorder re-offends because

9  they want -- they think they want to, would that also be the

10  product of a volitional impairment?

11  A.   I believe that their volition is impaired if they go on to

12  choose to commit a sex offense.

13  Q.   So that, then, is how the risk assessment that we've been

14  talking about is relevant to assessing the volitional

15  impairment piece, right?

16  A.   I'm not sure I understand what you mean.

17  Q.   Well, you said that risk assessment, as we've been talking

18  about it and as you write about it in your report, does not

19  directly pertain to the issue that -- the question that you've

20  been asked, whether Mr. Volungus will have serious difficulty

21  refraining from sexually violent conduct or child molestation.

22  A.   It does pertain.  It gives us some information about that,

23  but not adequate information in terms of judging his level of

24  volitional impairment.

25  Q.   So I just want to be clear on what role the risk

1   assessment which makes up the -- could you do away with the

2   risk assessment and still have your opinion here?

3   A.   I would not do away with the risk assessment.  I would

4   still consider the results of the actuarial instrument.  The

5   dynamic risk factors play a strong role in this case because

6   they are the factors that primarily contribute to his

7   volitional problems, his sexual preoccupation and lack of

8   cooperation with supervision.  These are established factors

9   which really contribute strongly to his inability to control

10  his behaviors.  So while the actuarials are important, I think,

11  I think that the dynamic risk factors are equally important in

12  this case to inform us about his volitional controls.

13  Q.   Well, the instruments are good because they're based on

14  data, right?

15  A.   The instruments are based on data and the dynamic risk

16  factors are based on data.

17  Q.   Well, when you say the dynamic risk factors are based on

18  data, we were just talking about how there was a time when you

19  stated that you did a pure actuarial approach and you don't do

20  that anymore, right?

21  A.   Right.  We didn't have the data on the dynamic risk

22  factors that we have today.

23  Q.   Right.  And at the time you had the data on three research

24  studies collected by Dr. Hanson which said that adding dynamic

25  risk factors to static actuarial assessments decreased

1  predictive accuracy, correct?

2  A.    No, those weren't the dynamic risk factors we use today;

3  those were overrides.  So when, for example, a probation

4  officer would override a risk level based on factors largely

5  unrelated to future sexual re-offense, the predictive accuracy

6  would go down.  Some of those factors may have been the current

7  dynamic risk factors today, but they were three different

8  studies, so they were all considering three different things.

9  Q.    Well, I asked you whether those three studies were strong

10  enough evidence for you to change the method that you'd been

11  doing from -- for your entire career, basically, and you said

12  at that time that they were.  Do you recall that?

13  A.    Right.  Because, you know, the jury was out.  We didn't

14  really know how much contribution the dynamic risk factors we

15  use today were assisting in prediction and improving predictive

16  accuracy.  And so because we didn't know that, the conservative

17  approach was to not use them until that was more established.

18  Q.    Well, you were using them to tell where people fit in the

19  range, right?

20  A.    Right.

21  Q.    And so in this case are you saying that the -- are you

22  upwardly adjusting the risk assessment based on the dynamic

23  factors?

24  A.    I am saying that the dynamic factors are important in

25  assessing his volition.  The actuarials are what they are, and

1   we've seen the risk ranges on those.  The issue is how is he

2   going to behave in the future?  And there are -- and it's my

3   opinion that he's going to have serious difficulty with his

4   volition.  It's going to -- there's a good probability it will

5   cause him to seek out children for sexual activity.  The reason

6   I think that is because I think he has poor behavioral

7   controls, he disregards cooperation with supervision, he is

8   highly sexually preoccupied with no way to manage it, and

9   because he said --

10  Q.   I hate to cut you off, Dr. Phenix, but I don't know

11  that -- the question that I asked was do you upwardly adjust

12  the static risk assessment with the dynamic factors in this

13  case?

14  A.   No.  They are what they are.

15  Q.   And, again, what the actuarials tell us is who offended

16  and who did not, right?

17  A.   That's right.

18  Q.   And presumably, the people in those populations also had

19  dynamic risk factors, right?

20  A.   I'm sure they did.

21  Q.   And when you talk about the incremental validity of adding

22  dynamic risk factors to a -- the results of a Static-99, what

23  you're talking about are studies performed by researchers which

24  showed that the opposite of what the research had previously

25  shown, which is that using some dynamic factors with the

1   actuarials did not decrease, or actually added some validity to

2   the predictions, right?

3   A.   Yes; it added validity to the prediction.  That's true.

4   Q.   And you infer from this research that what you're doing in

5   this case, which is to, in a sense, privilege the dynamic

6   factors over the risk assessments in the actuarials, is good

7   information for the Court, right?

8   A.   I believe that, yes.

9          MR. GOLD:  Nothing further, your Honor.

10         THE COURT:  I have a question.  There were a few

11  questions back and forth a while ago about volitional

12  impairment.  Does that term have a specialized meaning within

13  the field of clinical psychology?

14         THE WITNESS:  No.

15         THE COURT:  Okay.  Thank you.

16         And I guess with that, your testimony is completed.

17  Thank you very much, Doctor.  You may step down.

18         THE WITNESS:  Thank you.

19         (The witness is excused.)

20         THE COURT:  I'm not sure what we do now about

21  scheduling.  What does the government have as further evidence?

22         MR. GRADY:  We have -- Probation Officer Cardinal is

23  the only witness remaining in the government's case at this

24  point.

25         THE COURT:  Okay.  How long would his testimony be?

1          MR. GRADY:  Under two hours.  But if the plan is

2     currently to come back the week of the 21st, I am informed he

3     is on a cruise from the 18th until the 28th.

4          THE COURT:  Does he have a telephone?  Anyway...

5          MR. GRADY:  They may.

6          THE COURT:  Never mind.

7          What's the burden of his testimony?  Is he the one

8     that violated --

9          MR. GRADY:  He was supervising Mr. Volungus.

10          THE COURT:  Okay.  And that would complete the

11     government's case --

12          MR. GRADY:  Yes.

13          THE COURT:  -- in chief, anyway?

14          And then for the -- you have two experts.

15          MR. FICK:  Two experts.  Dr. Prentky is available on

16     Thursdays and Fridays.  He would be available on those days,

17     the week of the 22nd.  Dr. Bard is on vacation from the 19th

18     until the 5th of March.

19          THE COURT:  All right.  I think what we have to do is

20     stay tuned.  Even as we speak this morning, we are experiencing

21     tremors in our scheduling of other cases.  So I don't know what

22     it means yet.  I haven't been able to assess it, but --

23          MR. GRADY:  Would it be useful --

24          THE COURT:  -- we're having problems.

25          MR. GRADY:  -- for us to confer with the clerk next

1    week about what's going on and what dates are available?

2         THE COURT:  We might even know something later this

3    afternoon.  I don't know.  But I have had indications -- I have

4    to put a lot of pieces on the table and look at them before I

5    figure out what's going on.  So hold the thought of that week,

6    at least for as much as we can do.  But at least for -- well, I

7    guess -- I've forgotten which is which, but the one who's

8    available Thursdays and Fridays, is that Bard?

9         MR. FICK:  That would be Prentky.

10         THE COURT:  That's Prentky?  Okay.

11         MR. FICK:  He would be available -- just in terms of

12    how movable the pieces are, is the Court suggesting that even

13    next week might open up?

14         THE COURT:  I don't know.  No, probably not.

15         MR. FICK:  But the week of the 14th?

16         THE COURT:  Certainly not next Thursday and Friday, it

17    will not.  The case that is scheduled to start Monday might

18    have to slip a day or two, and then I don't know what that does

19    rolling-wise.  So we're going to have to do some assessing.

20         But I think even if it's -- you know, they don't have

21    to be consecutive days and time periods, so we'll figure out a

22    pattern where we'll get it all done.

23         MR. GRADY:  Why don't we propose dates to the clerk

24    and then they'll be on the record.

25         THE COURT:  Well, let us assess what our schedule

1    looks like, and then we'll get back to you about what's

2    available.  So don't change anything.

3           All right?  Okay.  Thank you.  We'll recess for now

4    until the next time.

5           THE CLERK:  All rise.  Court is in recess.

6           (The Court exits the courtroom at 12:34 p.m.)

7           (The proceedings adjourned at 12:34 p.m.)

8

9

10                    C E R T I F I C A T E

11

12           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

13    the United States District Court, do hereby certify that the

14    foregoing transcript constitutes, to the best of my skill and

15    ability, a true and accurate transcription of my stenotype

16    notes taken in the matter of Civil Action No. 07-12060-GAO,

17    United States of America v. John C. Volungus.

18

19    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
20    Official Court Reporter

21
      Date: 3/7/11
22

23

24

25