```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS




                                         )
UNITED STATES OF AMERICA,                )
                                         )
         Petitioner,                     )
                                         )  Civil Action
v.                                       )  No. 07-12060-GAO
                                         )
JOHN C. VOLUNGUS,                        )
                                         )
         Respondent.                     )
                                         )


   -------------------------------------------------------------
                    TRANSCRIPT OF BENCH TRIAL
                           DAY FOUR

          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE
   -------------------------------------------------------------




             John J. Moakley United States Courthouse
                        Courtroom No. 9
                       One Courthouse Way
                    Boston, Massachusetts  02210
                     Monday, July 11, 2011
                          9:11 a.m.




                 Marcia G. Patrisso, RMR, CRR
                    Official Court Reporter
                 John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 3510
                   Boston, Massachusetts  02210
                        (617) 737-8728

             Mechanical Steno - Computer-Aided Transcript
```

1   APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Mark J. Grady, Assistant U.S. Attorney
3            Rachael S. Rollins, Assistant U.S. Attorney
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        On Behalf of the Petitioner

6        FEDERAL DEFENDER'S OFFICE
         By: William W. Fick, Esq.
7            Ian Gold, Esq.
         51 Sleeper Street
8        Fifth Floor
         Boston, Massachusetts  02210
9        On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

DIRECT   CROSS   REDIRECT   RECROSS

WITNESSES FOR THE
   RESPONDENT:

ROBERT ALAN PRENTKY, Ph.D.

        By Mr. Gold                5

1          (The following proceedings were held in open court

2    before the Honorable George A. O'Toole, Jr., United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Boston, Massachusetts, on July 11, 2011.)

6          THE CLERK:  All rise.

7          (The Court enters the courtroom at 9:11 a.m.)

8          THE CLERK:  United States District Court for the

9    District of Massachusetts.  Court is now in session.  Please be

00:00 10   seated.

11          For a continuation of the bench trial in the case of

12   the United States of America versus John Charles Volungus,

13   Docket 07-12060.

14          Will counsel identify yourselves for the record.

15          MR. GRADY:  Good morning, your Honor.  Mark Grady on

16   behalf of the United States.  With me is Assistant United

17   States Attorney Rachael Rollins.

18          MR. GOLD:  Good morning, your Honor.  Ian Gold on

19   behalf of John Volungus.  With me at counsel table is Bill

00:00 20   Fick.

21          THE COURT:  Okay.

22          MR. GOLD:  Your Honor, the government has not yet

23   rested.  I believe they have one more witness to present.  But

24   for purposes of convenience we determined -- or agreed to start

25   the defendant's case today by presenting the testimony of one

1    of our two experts, Dr. Robert Prentky.

2           THE COURT:  Okay.  All right.

3           MR. GOLD:  With the Court's permission, we'd call

4    Dr. Prentky to the stand.

5           THE CLERK:  Dr. Prentky, step up here, please.

6             ROBERT A. PRENTKY, Ph.D., duly sworn

7           THE CLERK:  Please be seated.  State your name, spell

8    your last name for the record, speak into the mic, and keep

9    your voice up so everyone can hear you.

00:01 10           THE WITNESS:  Robert Alan Prentky, P-R-E-N-T-K-Y.

11                    DIRECT EXAMINATION

12   BY MR. GOLD:

13   Q.   Good morning, Dr. Prentky.

14   A.   Good morning.

15   Q.   Dr. Prentky, you have two binders in front of you on the

16   witness stand.  Do you see those?

17   A.   Yes.

18   Q.   And the first is opened to Exhibit 55.  Do you recognize

19   Exhibit 55?

00:02 20   A.   Yes.

21   Q.   And what is that?

22   A.   The report that I submitted.

23   Q.   And could you please turn to Exhibit 56.  And do you

24   recognize Exhibit 56?

25   A.   My curriculum vitae.

1  Q.   And does that curriculum vitae, or CV, indicate that it

2  was prepared in September of 2010?

3  A.   Yes.

4  Q.   And is that, in your estimation, a current CV?

5  A.   It should be current for present purposes, Counsel.  It's

6  not entirely correct.

7  Q.   Is there anything of significance or which is germane to

8  your experience as a testifying witness here today that doesn't

9  appear on the CV that you think should be included in the

00:03 10  record?

11  A.   Just publications that are no longer in press, they may

12  have been published at this point, manuscripts submitted, that

13  sort of thing.

14  Q.   Dr. Prentky, what is your profession?

15  A.   Psychologist.

16  Q.   And do you have a current post or full-time employment

17  that you hold?

18  A.   Professor of psychology at Fairleigh Dickinson University

19  at the metropolitan campus in Teaneck, New Jersey, and director

00:04 20  of forensic training in that department.

21  Q.   And have you always been an academic?

22  A.   For the most part.  I have not always held a full-time

23  academic appointment, but essentially I've always been an

24  academic, yes.

25  Q.   Could you summarize for the Court your -- briefly, your

1    educational background, where you obtained your Ph.D.?

2    A.    I obtained my Ph.D. in 1975 from Northwestern University

3    in Chicago.   That was followed by three National Institute of

4    Mental Health postdoctoral fellowships:   the first at the

5    University of Massachusetts-Amherst; I was there for two years.

6    I went to England.   I was at the University of York in

7    Heslington, York, for a year.   I returned to the University of

8    Rochester Medical School.   I was in the department of

9    psychiatry there for two years.

00:05 10      The theme of all of that postdoctoral research was

11   high-risk schizophrenia.   I was doing research at that time

12   looking at the correlates of schizophrenia among those

13   youngsters who had parents that were schizophrenic.   I

14   completed my training in 1980 and went on my first real job

15   interview around 1980.   It was at the Massachusetts Treatment

16   Center, which is a prison for sex offenders.   And that was in

17   the Boston area.   That essentially brings me up to my first

18   job.

19   Q.    Well, could you describe for the Court what role the

00:06 20  Massachusetts Treatment Center plays, or has played, in the

21   area of sex-offender recidivism research, or sex-offender

22   research generally?

23   A.    I should first preempt my answer to that question by

24   indicating that my tour at the treatment center was quite

25   serendipitous, that I was in the Boston area for several

1    academic job interviews and was invited to interview for this

2    position.  I had spent, at that point, all of my career

3    studying and doing research.  And this seemed to me a rather

4    interesting opportunity for a variety of reasons.

5        It did turn out to be a lifelong decision, ultimately.  In

6    the early years -- and of course this is 1980 -- the National

7    Institute of Justice was keen on supporting research in the

8    area of taxonomic differentiation among offenders, different

9    subgroups of offenders.  And we were supported at that time to

00:08 10    develop classification systems for sex offenders.

11        We developed two separate models, one for rapists and one

12    for child molesters, and devoted roughly a decade to revising,

13    testing, validating and re-revising those schemes.

14        That takes us essentially up to the late 1980s and 1990.

15    1990 was, of course, the year that the first SVP law was passed

16    in this country, in the state of Washington.  And that second

17    wave of civil commitment legislation for sex offenders ushered

18    in a new interest in risk assessment.  So it was in the late

19    1980s or early 1990s that we shifted our focus from research on

00:09 20    classification to essentially programmatic research on risk

21    assessment.

22    Q.   Dr. Prentky, let me just ask you a few basic questions.

23    When you were working at the Massachusetts Treatment Center in

24    the 1980s, who did you work for?

25    A.   I worked for the Department of Mental Health.

Q.   The Massachusetts -- the Commonwealth of Massachusetts
Department of Mental Health?

A.   Yes.

Q.   And when you mentioned the National Institute of Justice,
was this research that you were conducting funded in part by
the federal government?

A.   All of our research at that time was funded by the federal
government.

Q.   And when you refer to "we," you're talking about yourself
and --

A.   I think -- I'm sorry?

Q.   -- colleagues?

A.   Principally myself and my colleague Professor Knight at
Brandeis University.  The team included as many as 15 people at
different times.

Q.   And so there was a switch -- or a change in the focus of
the research group that was contemporaneous with the beginning
of the new breed of SVP law?

A.   I suppose one could couch it that way.  Researchers are
always in search of support, are they not?  And when we see
that there is a unique and changing interest on the part of the
federal government, then we gravitate toward that new emerging
area that's of interest to the funding agencies.

Q.   Well -- and so the focus, then, went from typologies of
different types of sex offenders in your case?

A.    Correct.  The assumption -- the widely held assumption is

that not only do sex offenders constitute an extraordinarily

heterogenous group of human beings, even the two large

subgroups of rapists and child molesters are themselves highly

heterogenous, and that by developing a system for

differentiating among them, we might be able to inform

decision-making.

Q.    And was that research successful?

A.    It was the first attempt to develop classification models

using empirical methodology and employing a programmatic effort

over a period of many years to not only develop a test and to

revise an existing instrument in keeping with what is known in

the field over a fairly long time period, a span, as I said, of

roughly a decade.

Q.    And the Massachusetts Treatment Center, was that a prison

or was that a commitment facility?

A.    The Massachusetts Treatment Center is a medium-security

prison run by the Department of Corrections.  When I first

arrived there in 1980, the treatment program was under the

auspices of the Department of Mental Health.

Q.    And so were men there committed pursuant to a commitment

law?

A.    That's right.  It was the same -- in those years referred

to as SDP, or sexually-dangerous person statute, that existed

in many other states in the country.

1    Q.    But this is prior to this development in Washington State

2    in 1990 that you made reference to?

3    A.    It was what we occasionally refer to as sort of the first

4    wave of these civil commitment laws for sex offenders.

5    Q.    Could you continue to describe the research focus that

6    your group started to hone in on in the 1990s, the programmatic

7    approach to risk assessment?

8    A.    The -- I think the intervening step that I didn't mention

9    before was our interest in etiology.  We are by our nature, by

00:14 10  our training, psychologists.  Both Dr. Knight and I are both

11   clinical psychologists and also trained as psychopathologists,

12   so one of our interests was in etiology.  And we were looking

13   at outcomes using our classification models in terms of

14   etiology.  That was one of the things that we explored.

15   Q.    And just for the benefit of everyone in the room, could

16   you define "etiology"?

17   A.    "Etiology" essentially refers to the precursors, the

18   underlying factors that give rise to a certain outcome of

19   interest.  They could be biosocial; they could be, you know,

00:15 20  developmental, familial.

21   Q.    Continue.  So what form did this research take?

22   A.    Well, inevitably, when you start thinking about etiology,

23   you start thinking about what places people at risk.  We could

24   think about outcome in both -- short-term outcome, referred to

25   as distal -- we have both distal and proximal outcome.  So some

1      of our initial studies were simply looking at proximal outcome,

2      but obviously, that was not of interest to the court.  The

3      court is interested in a much longer outcome, a longer-term

4      outcome.

5           And as we expanded our scope of inquiry, we started asking

6      whether there were ways in which we might be able to predict

7      longer-term outcomes using these antecedent events, using

8      social, historical, familial or behavioral risk factors that

9      might give rise to these longer-term outcomes.

00:17 10   Q.   Now, again, the population that you're doing this research

11     on is the committed population of sex offenders that is in the

12     Massachusetts Treatment Center?

13     A.   That's right.  Arguably, it is a higher-risk population to

14     begin with because naturally, all of these individuals have

15     already been committed to the treatment center as sexually

16     dangerous.  So they do not reflect the level of risk, or the

17     level of dangerousness, that would be posed of prisoners in the

18     general prison population.

19     Q.   Now, did this research result in any peer-reviewed

00:17 20   publications?

21     A.   Yes.

22     Q.   And could you describe those publications for the Court?

23     Where did they appear, what was the...

24     A.   Oh, I don't know how to capture that quickly.  I mean,

25     we've been publishing our research now for about 30 years.

```
 1   Q.   Well, were there any articles of particular note that
 2   summarized or presented the results of your research into
 3   typologies or precursors or etiology or risk assessment?
 4   A.   There were many technical articles that described
 5   individual studies focusing on the rapist typology; that is,
 6   the rapist classification system, or the child molester
 7   classification system.  They all appeared in peer-reviewed
 8   journals.  Some of them were criminology journals.  Some of
 9   them were psychology journals.  And as is often the case, after
10   one has amassed a large-enough pool of evidence based on a
11   program of research, it's often summarized in the context of
12   book chapters.  So that occurred as well.
13        And there's one particular chapter that when anyone
14   requests an overview of our research on classification of child
15   molesters, I always refer them to "Knight and Prentky, 1990."
16   It was a chapter that appeared in a book by Professor Marshall
17   and his colleagues.
18   Q.   And during -- were you an employee of the Department of
19   Mental Health throughout the 1990s or were you in the employ of
20   other employers during that period?
21   A.   No.  No, until I left the treatment center, I was an
22   employee of the Department of Mental Health.
23   Q.   And you've discussed the publications pertaining to the
24   typologies, but were there publications -- can you describe
25   similarly publications related to recidivism, research in
```

1  particular?

2  A.   I mean, by the very nature of the work that we were doing

3  looking at outcomes, we were gathering reoffense data.  Looking

4  at recidivism in the abstract was never particularly of

5  interest.  In the mid-1990s I became interested in a particular

6  question as I perused the literature at that time and noticed

7  that there was a considerable degree of variability among

8  published studies with respect to recidivism base rates.

9      And somewhat tongue-in-cheek I posed a problem.  I set out

00:21 10  to see whether using the same database from the Massachusetts

11  Treatment Center I could create any base rate that I wanted --

12  or perhaps not any one, but I could create a range of base

13  rates simply by tweaking, or changing slightly, how I defined

14  "recidivism."

15      So my colleagues and I published a report in 1997,

16  referred to as methodological issues in recidivism rates for

17  sex offenders, and we simply demonstrated that by changing the

18  window of follow-up, that is to say, the length of time that

19  somebody is at large in the community; by changing something as

00:22 20  subtle as the collection of charges that you either include or

21  don't include in your survival analyses; by changing your

22  definition of what recidivism is defined as, in other words, is

23  recidivism simply another charge or arrest?  Is recidivism

24  return to prison?  Is recidivism simply defined as a

25  conviction, whether or not the person goes back to prison?  So

1   there are a variety of different ways you can actually define

2   what your target outcome is.

3        If you take all of these factors together you can come up

4   with tables that reflect a wide range of different base rates.

5   And what we published in 1997 was around exactly the same time

6   that we're starting to see the emergence of these new

7   risk-assessment scales.

8        Now, when you look in particular at the actuarial scales,

9   you see the same or similar types of life tables or experience

00:24 10  tables.  What we were publishing in 1997 at the same time was

11  effectively the same kind of thing.  It was an experience table

12  for our sample of child molesters and rapists at the treatment

13  center.

14  Q.   And where was this publication in 1997?  Where did it

15  appear?

16  A.   "Law and Human Behavior."

17  Q.   And is that a peer-reviewed journal?

18  A.   Oh, yes.

19  Q.   And I was going to ask you before why you posed the

00:24 20  particular question that you did, but you made reference to the

21  background of other research groups doing research on risk

22  assessment generally in the sex offender area.  Could you

23  describe the background against which -- in a little bit more

24  detail, the background against which your research was playing

25  out?

  1    A.    As I mentioned before, the need begins to emerge most

  2    obviously in the years after the civil commitment law was

  3    passed in Washington.  There is not a commonly used scale that

  4    appears until 1997, and in 1997, the two earliest scales are

  5    published:  One is the RRASOR, which ultimately gave rise

  6    to -- in connection with another instrument called the SACJ-Min

  7    to the Static-99 -- so the RRASOR is effectively a precursor of

  8    the Static-99 -- and the scale referred to as the SVR-20.  Both

  9    of those come out in 1997.

00:26 10         What we see after that is a series of moderately active

 11    developments in the research community that gave rise to a host

 12    of other risk assessment scales.  That research goes on for

 13    roughly another six, seven years.

 14    Q.    I want to return to this topic when we talk more about

 15    your opinion in this case.  But were you, yourself, involved in

 16    research which led to the development of risk assessment

 17    protocols like the RRASOR or Static-99?

 18    A.    Yes.

 19    Q.    And what were those?

00:26 20    A.    I left the Massachusetts Treatment Center in 1997 to

 21    accept an offer as clinical and research director of the Joseph

 22    J. Peters Institute in Philadelphia.  The Peters Institute is a

 23    private nonprofit agency that provides services both to victims

 24    of sexual violence as well as to perpetrators of sexual

 25    violence.

1      We had six different treatment programs there that I was

2   responsible for treating both child victims as well as

3   adolescents, adolescent offenders and adult offenders.  One of

4   the problems that we encountered in our adolescent treatment

5   program was the need to assess the relative risk posed by these

6   youngsters who are coming to us from the community for

7   treatment.  And when I called around to my colleagues who were

8   experts in the area of juvenile sex offenders, they indicated

9   to me, to my surprise, that there were no such scales for

00:28 10   assessing risk among juveniles.

11      We set out to develop one at that time at the Peters

12   Institute.  It ultimately became known as the J-SOAP, the

13   Juvenile-Sex Offender Assessment Protocol, and we have been

14   working on that instrument ever since.

15   Q.   And what is the status of that instrument in the field

16   right now, if that's a question that can be hopefully answered?

17   A.   It's hard to gauge status.  There are two instruments in

18   the field right now that dominate the assessment of juvenile

19   sex offenders.  One is the J-SOAP and the other is the ERASOR,

00:29 20   E-R-A-S-O-R *[sic],* developed by a colleague in Canada, a James

21   Worling.  J-SOAP, by all accounts from those who have

22   surveyed users, is widely used -- apparently, widely used

23   throughout the world.  My colleague, Dr. Righthand, and I are

24   very frequently receiving e-mails about translations into a

25   variety of foreign languages.  How it's used, of course, is

always troubling to Dr. Righthand and I, but we placed the

J-SOAP in the public domain.

Q.    Could you expand on that, Dr. Prentky?  When you say how

it's used can be troubling to your colleague, Dr. Righthand,

and yourself, what do you mean?

A.    We made the initial decision to not publish the J-SOAP for

profit but to simply place it, as I indicated, on the Internet,

in the public domain, so that any user can download it and use

it.  We have a detailed manual.  However, given time

obligations, neither Dr. Righthand nor I can go around the

country doing trainings.  We occasionally do trainings, but

rarely.

We both, however, are the frequent recipients of queries,

e-mails, asking about specific questions, and in the context of

these e-mails, often being informed as to how the scale is

used.  And what we find is often, without being hyperbolic,

shocking since it flagrantly is inconsistent with what we had

clearly indicated in the manual.

Occasionally we pass e-mails back and forth to one another

with the message to the effect, "Did you see this one?" or "How

shall I respond to this one?"  It's the price that we pay, I

suppose, for simply placing something in the public domain and

making it available to people all over the world.  They can do

with it and use it however they see fit.

Q.    And what are -- what is an example of an objectionable way

1   the scale could be used which is contrary to what you

2   anticipated?

3   A.   The J-SOAP is not actuarial in the same sense that the

4   Static-99 is actuarial.  There is no life table that we

5   provide.  We simply recommend that users report the relative

6   proportion of risk factors rated as present to the total number

7   of risk factors in a particular scale so that in -- as an

8   example, rating Scale 1 of the J-SOAP, if you observe that 40

9   percent of the items in Scale 1 are codable as present, then

00:33 10   you would simply report that.

11        It's not that dissimilar at all from how the SVR-20 works,

12   typically referred to as a professional judgment instrument,

13   occasionally referred to in the field as a conceptual

14   actuarial.  I believe that that term was used by Hanson and

15   Morton-Bourgon in their metaanalysis.  When they were referring

16   to the SVR-20, they called it a conceptual actuarial

17   instrument.  The J-SOAP would be very similar to that.

18   Q.   And just to remind the Court, Hanson is who?

19   A.   Dr. Karl Hanson?

00:34 20   Q.   Yes.

21   A.   The developer of the family of instruments often referred

22   to as simply the Static:  Static-99, the Static-2002, the

23   various -- SONAR, the STABLE, and so forth.

24   Q.   Have you completed your testimony about the use of the

25   J-SOAP?

A.   Well, I'm sorry.  What I was about to say is that although

this is what we clearly admonish users to say when they're

reporting the results of the J-SOAP, and to simply embrace as

one element of an ultimate and final decision regarding a

youngster's risk, whatever the proportions observed from the

scale, what we invariably see are users that will, in fact,

suggest, or indeed state very clearly, that an individual is 60

percent at risk to reoffend.  And there's no way that one can

possibly infer that from the scale.  That simply is

categorically misleading.

Q.   After the Peters Institute, could you summarize for the

Court your professional career?  How long were you at the

Peters Institute?

A.   I stayed there until 1997.

Q.   Did you begin there in 1997 or you stayed --

A.   No.  No.  No, I stayed there.  I left in 1997 and accepted

an offer -- I was there at the Peters Institute for four years.

Q.   And then from '97 to approximately --

A.   I accepted another offer to return back to Massachusetts,

this time as director of research, I believe, in the employment

of Justice Resource Institute.  JRI at that time held the

contract to provide services for the men at the Massachusetts

Treatment Center, no longer the responsibility of DMH, now the

responsibility of the vendor, JRI.  And some of my colleagues

who were now running that contract at the Massachusetts

1    Treatment Center enticed me to come back, and for a variety of

2    reasons I did.  I stayed at the Massachusetts Treatment Center

3    again -- it was my second period of time there -- until JRI

4    lost the contract in 2001.

5    Q.   And then subsequent to that, could you summarize for the

6    Court your professional career?

7    A.   I worked as a forensic psychologist more or less full

8    time, continuing to do research.  I still held my position as

9    director of research at JRI.  And eventually, four years ago,

00:38 10    accepted an invitation at Fairleigh Dickinson University to

11    move back down to New Jersey and take on a full-time role as

12    professor there.

13    Q.   Before I ask you to specifically describe to the Court

14    your career as a forensic psychologist, did you -- were you in

15    a -- working at any stage in a clinical capacity or a treatment

16    capacity?

17    A.   I have worked in a clinical capacity with sex offenders

18    most of my entire career.  When I was at the treatment center

19    initially I occasionally ran therapy groups.  At one time or

00:39 20    another I supervised therapists on a unit.  Obviously, as I

21    indicated, when I was at the Peters Institute, I was clinical

22    director responsible for all the service provisioned to about

23    300 clients every week.

24    Q.   And have you published on the particular subject of

25    sex-offender treatment?

A.   I would guess that I've probably written perhaps a half

dozen book chapters on sex-offender treatment.  I've never done

research, per se, on sex-offender treatment.

Q.   And would you -- are you an expert, in your own

estimation, on the subject of sex-offender treatment in

particular?

A.   I'm inclined to answer your question by saying as much as

most of us who have been in this field for about 30 years.

Q.   Now, your post right now is as director of the forensic

psychology program, is that correct, at Fairleigh Dickinson

University?

A.   A master's program in forensic psychology.  That's

correct.

Q.   And a substantial part of your career, is it fair to say,

has been as a -- working in a forensic capacity providing

testimony to the courts?

A.   I provided testimony in a forensic context for -- often

for about 30 years, but there was one time period after I

initially left the treatment -- not initially, the second time

that I left the treatment center, when I was doing forensic

work close to full time.  But the most concentrated time period

that I provided court testimony was actually during the first

period that I worked at the treatment center when I chaired

what was -- I believe it was then called the Restrictive

Integration Review Board, the RIRB.  It was a release board

```
 1  internal to the treatment center.
 2       And we were required to review every week X number of
 3  inmates at the treatment center that came up for review.  And
 4  once a month I went to court and represented the Attorney
 5  General's Office in court on -- anywhere from three to five
 6  offenders per month who were seeking release through a
 7  Section 9 petition.
 8  Q.   And the Section 9 petition was the means of getting out,
 9  or petitioning for release from the Massachusetts Treatment
10  Center?
11  A.   Correct.
12  Q.   And did you typically testify on behalf of the
13  Commonwealth of Massachusetts?
14  A.   As the chair of the RIRB I was always testifying on behalf
15  of the Commonwealth.
16  Q.   And in those cases did you testify in favor or against the
17  respondent or the petitioner in those cases?
18  A.   I supported whatever the conclusions were of the entire
19  board.  There were -- I didn't do this alone.  There were three
20  external members of the board, psychologists, psychiatrists,
21  and I believe two internal members, myself and someone else.
22  Q.   How many states have you provided testimony in areas
23  germane to sexual offending or sex-offender treatment?
24  A.   I honestly don't know.  I guess maybe ten.
25  Q.   And have you testified in -- as a special master or in
```

1    some capacity other than for or against the interests of a

2    particular respondent?

3    A.    I guess I've twice been retained -- once in the state of

4    Washington and once in the state of New Jersey -- to evaluate

5    sex-offender treatment programs for the court.  In the case of

6    Washington, I was retained by the attorney general, Sarah

7    Coats.  In the case of New Jersey, I was retained by the

8    counsel appointed by the court to represent the inmates in a

9    class suit.

00:44 10    Q.    And approximately when was that testimony provided in

11    those cases?

12    A.    The case of Washington, gosh, I honestly don't remember.

13    It may have been a decade ago, or more.  In the case of New

14    Jersey, I eventually withdrew my representation.  When I came

15    back to take the job at Fairleigh Dickinson, I felt it was no

16    longer appropriate for me to continue to be involved in that

17    matter and I withdrew my services.  But to the best of my

18    knowledge, it may still be an open case to this day.

19    Q.    Now, as -- you mentioned a period in your career after the

00:45 20    Peters Institute when you were working almost full time as a

21    forensic psychologist.  Was the bulk of that work involved in

22    evaluating respondents in cases similar to this?

23    A.    Yes.

24    Q.    And --

25    A.    At the state level, though.

1   Q.   And was the bulk of that work in the state of

2   Massachusetts?

3   A.   Yes.

4   Q.   And did you typically testify -- were you typically

5   retained by the defense at that period of your career?

6   A.   For some reason that I have mentioned virtually every time

7   I'm asked that question, which always baffles me, those of us

8   who do that work, this work, seem to be polarized either as

9   defense or prosecution experts.  I honestly don't know why.

00:46 10   But the answer to your question is, yes, I'm invariably

11   retained only by defense attorneys.  That certainly does not

12   mean that I always support their cases.

13   Q.   Well, could you expand on that a little bit?  Are you

14   retained on cases where you provide a consultation and then are

15   not asked to testify?

16   A.   Indeed.  Or in some instances I simply indicate to myself

17   that I don't think I could be of help.

18   Q.   And you indicate that to the counsel who's contacted you?

19   A.   Correct.  And the extent to which I find that I do that

00:46 20   really depends on the state.  It depends on the rigor with

21   which the state screens.  For instance, I think that in the

22   early years I must have been called by the State of Washington

23   perhaps a dozen times, but not once have I ever testified for a

24   respondent in an SVP case in the state of Washington.  And, of

25   course, eventually they stopped calling me.

```
 1   Q.   When you say "they" with respect to Washington in

 2   particular, you're talking about defense counsel in the state

 3   of Washington?

 4   A.   Yes.  The only case in the state of Washington that I

 5   testified in, with the exception of the matter that I referred

 6   to earlier in which I was retained by the attorney general,

 7   which is a separate issue -- the only case other than that that

 8   I testified in was an LRA matter.

 9   Q.   And what is LRA?

10   A.   Least restrictive alternative.  It was a --

11   Q.   In this context what was the issue?  What was the LRA

12   issue?

13   A.   It was a -- oh, gosh.  A man who was somewhere -- roughly

14   76 years old -- I don't remember exactly how old he was -- and

15   he was committed, and he was an inmate at the facility on

16   McNeil Island.  And he had petitioned under the LRA provision

17   of the Washington statute to be moved from McNeil Island to a

18   lower-custody facility on the mainland.  So the question is

19   whether that individual, you know, would be appropriate for a

20   lower-custody status.

21   Q.   Now, in recent -- in the recent past four years have you

22   been testifying in a forensic capacity -- obviously, you're

23   testifying in this case -- less frequently?

24   A.   Rather infrequently.

25   Q.   And have you had an occasion to testify in other SDP cases
```

 1  in this court or in this district?

 2  A.   Yes.

 3  Q.   Did you testify in the case of *United States versus*

 4  *Wetmore*?

 5  A.   Yes, 2009.

 6  Q.   And in what capacity were you testifying in that case?

 7  A.   I was requested by Judge Saris, by the court.

 8  Q.   You were a court-appointed examiner in that case?

 9  A.   That's correct; yes.

00:49 10  Q.   And what was your opinion in that case with regard to

11  Mr. Wetmore?

12  A.   If you wish, I have the opinion in front of me.  If you

13  want me to go through it --

14  Q.   Well, just whether it was a positive or a negative

15  opinion -- or should I say SDP or not SDP?

16  A.   I would choose neither.  I would say that I testified that

17  Mr. Wetmore would have difficult refraining.  So however you

18  wish to couch that.

19  Q.   And in the case of *United States versus Carta*, which was

00:50 20  recently decided by Judge Saris, you testified in that case as

21  well?

22  A.   That's correct.

23  Q.   And that was a case where you came to the contrary

24  opinion?

25  A.   That's correct.

1    Q.    The case of -- are there other federal cases in which you

2    participated in this court?

3    A.    Perhaps the earlier case, 2008, that was Charles Peavy.

4    Q.    And what was your opinion in that case?

5    A.    I concluded once again, and this was before, once again,

6    Judge Saris, that I did not feel that Mr. Peavy was an

7    appropriate candidate for commitment.  But it was a complex

8    decision because I also concluded that Mr. Peavy could not be

9    returned to the community.  So although I felt that he really

00:51 10    didn't fit under the language of the statute, I also did not

11    feel that he could ever be returned to the community.

12    Q.    And are you familiar with the outcome, the ultimate

13    outcome, in that case?

14    A.    No, I'm not.

15    Q.    Now, do you recall participating in a case, the case of

16    *United States versus Swarm* or *United States versus Wilkinson*?

17    A.    Yes, I believe that they were somehow conjoined.  Yes.

18    Q.    And do you recall in what capacity you were asked to

19    participate in that case?

00:52 20    A.    In that instance I believe I was retained by you.

21    Q.    Did you evaluate, if you recall, the respondents in those

22    cases?

23    A.    No, I did not.

24    Q.    Now -- and do you have a -- well, I'll withdraw that.

25          Are there other federal cases in which you participated in

1    other courts that are germane to the subject of sexual

2    offending or sexual recidivism?

3    A.   The most recent would be Judge Weinstein in the C.R.

4    matter.

5    Q.   And what is the nature of that case and what was the

6    subject of your testimony?

7    A.   C.R. was a youngster I won't mention by name -- he was

8    never mentioned in court by name -- who was, once again, found

9    to be in possession of pornography.  It was a complex case.  It

00:53 10  was more complex than simply saying that he was found to be in

11   possession of pornography.  C.R. also had at least one instance

12   of sexual battery.

13        The question, once again, was what to do with this young

14   man.  Once again, we're talking about somebody that falls

15   outside the mainstream of most of the individuals that we

16   evaluate by virtue of age, by virtue of maturity.  I was

17   retained by counsel to evaluate C.R. in that case.

18   Q.   Now, your research activity has continued during this

19   period?

00:54 20  A.   Correct.

21   Q.   And what has been the focus of your research in the

22   recent -- more recent period?

23   A.   I have three major ongoing areas of research.  I can

24   dispatch two of them very quickly.  One, I continue to do

25   research with my colleagues on the J-SOAP; two, I continue to

1    do research in the area of childhood antecedents of short-term

2    outcomes among youngsters -- some very, very young kids -- who

3    are already engaging in sexually inappropriate conduct, some of

4    these children as young as three.  And again, we're trying to

5    understand what leads these youngsters to act out and, indeed,

6    what their short-term outcomes exactly are.

7         The third area that you're alluding to is my area -- is my

8    research in the area of child Internet pornography and child

9    victimization on the Internet.

00:56 10   Q.   And could you briefly describe for the Court, or

11   summarize, that research?

12   A.   We --

13   Q.   Well, first of all, is that research funded?

14   A.   It was funded by the Office of Juvenile Justice and

15   Delinquency Prevention, which is an agency, the Department of

16   Justice.  It was a five-year grant, or five years -- over a

17   period of five years we were funded to explore many, many

18   different facets of child victimization on the Internet.  We

19   gathered data from a large number of high school students,

00:57 20   several thousand high school students, we gathered data from a

21   fairly large sample of college students, and we gathered data

22   from a mixed sample of offenders.

23        We were looking at many different issues including

24   technology, ways that youngsters ever more easily and

25   frequently both communicate with and potentially are

communicated with by strangers through the Internet; the ways

that youngsters, as we're well aware, can run afoul of the law

through behavior such as sexting.  In the case of our high

school work we were looking at the predictors, once again, of

troubling behaviors; that is, behaviors that could get them in

trouble on the Internet.  Are there sort of either sequelae or

correlates of those kind of behaviors for those individuals who

were most at risk by virtue of their Internet behaviors.

I guess examples would be those kids who are doing the

most -- or who report the most bullying across the Internet,

bullying other peers, those youngsters who are reporting

sexting.  So those are some of the issues that we were working

with our high school students on.

With our college students, we were interested to look at

the base rates of exposure and age -- the first exposure to

pornography -- and look at those current reported base rates

and the age of the Internet with our offenders.

And finally, with our offenders, we had a large enough

sample that we could divide them ultimately into three groups:

Those individuals who were known to have committed an Internet

sex offense but not known to have ever committed a battery, a

sexual battery, offense.  So we call them the Internet-only

offenders.

Q.  I just want to pause here.  You had samples of high school

students, college students and offenders?

   1    A.    Yes.

   2    Q.    And where were the offenders drawn from?

   3    A.    Both the community and prisons.

   4    Q.    In certain communities or jurisdictions?

   5    A.    Perhaps a dozen different communities across the country.

   6    Q.    And how large was the sample?

   7    A.    The total sample was roughly 450.

   8    Q.    Of offenders?

   9    A.    Correct.

01:00 10    Q.    And if you could continue talking about how you broke the

  11    offenders into three discrete groups.

  12    A.    The second discrete group would be child molesters, those

  13    people, obviously, who have been convicted of -- served time

  14    for a child sexual battery offense but reported no use of the

  15    Internet and no offense related to the Internet.  And then the

  16    middle group, those individuals that -- child molesters that

  17    also had an Internet offense.

  18          Now, I hasten to add that all of the information that we

  19    used to create these groups was based on self-report.  And that

01:01 20    was done quite intentionally, that we were asking a lot of very

  21    sensitive information.  Many of the individuals, as I said,

  22    were still within the jurisdiction of the criminal justice

  23    system.  Many were still in prison, and those who weren't were

  24    either on probation or parole.

  25          We bent over backwards to try to ensure complete

1    confidentiality.  Vertical reporting was more important to us

2    than securing criminal offense data.  If we told them that we

3    were keeping a master list and that we would be seeking their

4    permission to access their criminal justice history, we would

5    further reasonably assume that that would undermine their

6    truthfulness in answering many of the questions that we were

7    asking, all of which is to say that we did everything that we

8    could to promote truthful responses on their part; however,

9    none of this can be documented with official records.

01:02 10    Q.    Could you describe -- are there findings that you can

11    describe for the Court that have emerged from this research?

12    A.    The most consistent finding that -- and the most dramatic

13    finding was the role of antisociality, a brand of social

14    behavior, in differentiating among those Internet offenders

15    that did and those that apparently did not have a contact

16    offense, that we developed after many series of data reduction

17    analyses two scales:  One reflected antisocial behavior and the

18    other reflected Internet preoccupation.

19         The antisocial behavior scale reflected a linear -- from a

01:04 20    predictive standpoint a linear increase in risk as a function

21    of the amount of antisocial behavior that the individual

22    reported to us.  It's not at all surprising in that Dr. Seto

23    finds exactly the same thing, and he's reported this in the

24    literature.  I always find it surprising, not that I -- not

25    that we see support for what's in the literature, but that we

1    see something which wasn't as dramatic as this.  It was a

2    diagonal line, a virtually linear increase at a diagonal in the

3    increased risk as a function of the increased amount of

4    antisocial behavior.

5    Q.    Could you describe a little bit more how antisocial

6    behavior was, if you will, operationalized, and how it

7    discriminated among the three groups of Internet-only, Internet

8    with hands-on, and the hands-on offenders?

9    A.    The way it was operationalized was driven by the data.  We

01:05 10    didn't have an a priori definition for antisocial behavior.  We

11    took most of the items in our questionnaire that reflected

12    non-sexual antisocial behavior and put them through a series of

13    principal quantitative analyses to try to reduce them to

14    eliminate those that didn't seem to cohere or be a part of a

15    coherent scale.  And eventually we came up with -- I believe it

16    was a 13-item scale of items that really clung together

17    that -- which is to say they were interrelated, and they

18    reflected a pattern of juvenile delinquency all the way through

19    adult antisocial behavior.

01:06 20    Q.    And the presence of antisocial behavior among these

21    offenders indicated what?

22    A.    The increased likelihood that that individual would have a

23    hands-on victim.

24    Q.    If you were to -- was this research -- has it been

25    published?

1   A.   Not yet.

2   Q.   Has it been distributed or have certain conclusions of it

3   been published in some prepublication format?

4   A.   There's a final technical report that, again, is on the

5   Internet and available to anyone who wishes it.  There were

6   three much smaller bulletins that we wrote up referred to as

7   LERBs, Law Enforcement Research Bulletins, and those have also

8   been circulated on the Internet.

9   Q.   And if you were to apply research like this to an SDP

01:07 10   case, what would be the -- what would be the application?

11   A.   I don't think that there is any one blanket application

12   for anything that I know.  Everything is a tapestry; everything

13   is attempting to sew together as many pieces of evidence as I

14   can find.  I keep in the back of my mind what the research

15   tells us, particularly the research from Dr. Seto.  I keep in

16   mind the fact that we ourselves supported his findings, that

17   the role of antisociality discriminates in an important way

18   between those who are intent to indulge their deviant fantasies

19   and deviant thoughts by looking at the computer, and those who

01:08 20   are inclined, have the wherewithal, have the motive to leave

21   their computer, sometimes referred to as travelers, and find

22   victims and assault those victims.

23       It's not surprising.  There's a certain logical rationale

24   for it.  To create a victim beyond simply looking at the

25   computer necessitates a certain callousness, a certain

1    indifference to the welfare of children.  You can easily reach

2    the conclusion that you're doing nothing to a child by looking

3    at the computer.  You can't do that if you abduct a child.

4         So to say that it requires a certain degree of sort of

5    willfulness, this antisociality, is certainly not the least bit

6    surprising, but it's encouraging when the data actually

7    supports our logical inferences.

8    Q.   Dr. Prentky, before we move on to your opinion in this

9    case, I just want to ask you:  Are you a member of any

01:10 10   professional associations?

11   A.   My memberships have shrunk over the years.  I continue to

12   be a member of the American Psychological Association.  My most

13   active involvement is with Division 41 of the American

14   Psychological Association, which is the forensic division

15   referred to as APLS, American Psychology Law Society.  I'm sure

16   I continue to be a member of various other organizations but

17   rarely ever go to their meetings.

18   Q.   Have you been a member of the Association for the

19   Treatment of Sexual Abusers?

01:10 20   A.   Yes.

21   Q.   Are you currently?

22   A.   I think so.  I'm not sure.

23   Q.   Do you attend -- have you ever been recognized by that

24   organization in any way?

25   A.   Yes.  A long time ago I received their -- I'm not sure

1    what it's called, lifetime achievement award or something like

2    that?  I'm not sure what it's called.

3    Q.   Now, I'm going to ask -- and -- is it obligatory to

4    perform evaluations in cases like this to be a member of ATSA?

5    A.   Obligatory?

6    Q.   Obligatory.

7    A.   No, it's certainly not obligatory.

8    Q.   And is it required to be abreast of the research or

9    current in this area to be a member of ATSA?

01:11 10   A.   I mean, I would imagine, Counsel, to the extent that those

11   people who are active members and go to the meetings are, in

12   varying degrees, abreast of the literature.  Is that what

13   you're asking?

14   Q.   I'm asking:  What is your relationship to ATSA today?

15   A.   I have not been to an ATSA meeting in, I would guess, ten

16   to 15 years.

17   Q.   And why is that, Dr. Prentky?

18   A.   I've become very disillusioned with the course that our

19   field has taken.  There's relatively a high degree of

01:12 20   insularity, or so it seems to me, in the field.  The field used

21   to be, going back to the early 1980s when we were active

22   members, vibrant, exciting.  Now the organization feels to me

23   rather stagnant.

24        It feels that there are a very, very, very few really

25   exciting novel advances in the field; that what we know today

1    about treatment we fundamentally knew many, many, many years

2    ago; that the field of risk assessment that at one time was

3    exciting, that there were a large number of the sharpest, most

4    intelligent investigators in the world -- most of them

5    Canadians, of course -- invested in this problem, and that

6    field has shrunken enormously.

7         I can recall many, many years ago, sometime in the

8    mid-1980s when we were still young and naive, and someone had

9    asked me at a meeting that I was speaking at about what I

01:14 10    envisioned many years down the road in terms of cracking the

11    secrets of pedophilia.  And I remember commenting at that time

12    that I had a lot of confidence that within a decade or so we

13    would have a much, much better understanding of the inner

14    workings of pedophiles, to use the word I used before, the

15    etiology, the dynamics, the motives of pedophiles.  Why?

16    Because they still represent a relatively small subgroup of all

17    offenders, and all we had to do is put a large enough number of

18    them under our microscope and examine them, and we would be

19    able to come up with answers that generalized to the population

01:16 20    of pedophiles.

21         By contrast, I think the coming up with models that

22    explain rape would be tantamount to impossible, because in the

23    early days when we looked at the research being done by

24    individuals such as Professor Malamuth and Professor Koss and

25    others, we were identifying as much as a quarter of the entire

1  college student population that were self-reporting sexually

2  coercive behavior.  Not in prisons; these are college students.

3  So by extension, if we could infer that a quarter of all men

4  are rape-prone, how in the world could we come up with a model

5  that explains behavior that is observable in a quarter of all

6  men?

7       And we fast-forward now 20 years later, and I was dead

8  wrong.  We have excellent models that explain rape behavior,

9  models that work for both college students and prisoners,

01:17 10 rapists.  And frankly, today, sadly, pedophilia is as much a

11 black box as it was 30 years ago.  So it's all rather

12 discouraging.

13      And to get back to your original question about ATSA, I no

14 longer find it to be the -- sort of the -- sort of exciting,

15 vibrant, stimulating place that it used to be.

16 Q.   Just to sum up, have you written about issues that arise

17 in the forensic evaluation of sex offenders; specifically,

18 about the interface between science and the courtroom?

19 A.   Yes.

01:18 20 Q.   And can you describe any publication of note that you've

21 made in that area?

22 A.   For a time period I was publishing papers with my

23 colleague, Professor Janus, Eric Janus, who's then dean and now

24 president, I believe, at William Mitchell Law School, and our

25 colleagues.  Several papers we published alone, and another

1   paper we published in PPPL, Psychology Public Policy and the

2   Law, with many of our colleagues.  And we tried to address what

3   we all regarded as matters of great concern at the interface of

4   science with the adjudication of SVP in the courtroom.

5   Q.   And can you -- are there conclusions that you can

6   summarize from that work or that paper for the Court?

7   A.   Let me say at the outset, after everything I've said thus

8   far this morning, that it's very clear that my passion is with

9   science; my passion is not with the adjudication of sex

01:20 10   offenders, or with forensic work in particular.  My passion is

11   trying to understand problems.

12        We were all excited 20 years ago with the prospect of

13   informing both treatment and management and discretionary

14   decision-making with good science.  I guess I was just very

15   naive.  I didn't take into account the sort of adversarial

16   nature of the proceedings.  I didn't take into account that

17   we're dealing with sex offenders, you know.  And it feels to

18   me, sadly, that science at this point obfuscates more than it

19   illuminates.  And it's a true irony for me because there's

01:21 20   nothing more important to me than the use of good science, the

21   application of good science.  In this particular case, it's in

22   the context of helping the Court adjudicate these cases.

23   Q.   Is there anything I've left out about your qualifications

24   or background as a forensic or clinical psychologist that you

25   feel is -- we should mention now before we move to your opinion

 1   on Mr. Volungus?

 2   A.   I don't know.  We've spent an awful lot of time talking

 3   about me.

 4   Q.   Well, in that case, have you performed an evaluation of

 5   Mr. Volungus?

 6   A.   Yes.

 7   Q.   And the report which has been entered into evidence as

 8   Exhibit 55, does that fairly summarize your conclusions in the

 9   case?

01:22 10   A.   I've noticed, Counsel, that my report is on letterhead and

11   it has a slightly different date.  That does not mean that I

12   changed anything other than perhaps the date when I printed it

13   out on letterhead.  But this report is dated November 15th; the

14   report that I have in front of me is dated two weeks later, the

15   1st of December.

16        MR. GOLD:  Your Honor, could we examine that at some

17   convenient point to determine whether there's some discrepancy

18   here?

19        THE COURT:  You mean to compare the two?

01:23 20        MR. GOLD:  Just to compare the two reports.  I think

21   they should be identical.  But maybe during the break.

22        THE COURT:  Okay.

23   BY MR. GOLD:

24   Q.   Dr. Prentky, did you arrive at an opinion to a

25   professional degree of certainty as to whether Mr. Volungus met

the criteria, as you understood them, under the federal SDP

statute?

A.    Yes.

Q.    And what was that opinion?

A.    I eventually reached the opinion, again, to a reasonable

degree of professional certainty, that Mr. Volungus does not

meet the standard under the statute for being considered an

SDP.

Q.    And before we get into the nuts and bolts, can you

01:24 summarize your -- the reasons for your opinion?

A.    I guess this does get into the nuts and bolts.  As is

simply stated, that when I started doing these evaluations I

set out for myself a means of standardizing the way that I

looked at the statutory language and applied the statutory

language since terms "serious difficulty" and "sexually violent

conduct" are not defined, are not operationalized, I wanted to

at least be sure that I was consistent in the way I was

applying those terms.  And I'm sure we'll get into this.  I

don't think there's any question, the evidence is overwhelming

01:25 that one can easily diagnose Mr. Volungus as a pedophile using

the criteria in the Diagnostic and Statistical Manual.

      The issue for me is the last part of the definition where

that very condition must make it difficult for him to refrain

from sexually violent conduct or child molestation.  That is

where I get hung up; that is where I eventually came down

1   on -- I drew a bright line in the sand and said, It is what it

2   is.  The case is overwhelming.  But I have never, ever seen an

3   instance in 30 years where somebody has been civilly committed

4   without any evidence that they have ever actually -- that is,

5   behavioral evidence -- that they've ever actually touched a

6   child.

7       And it seems to me that's what we're talking about here:

8   a perfusion of evidence around this man's pedophilia.  But if

9   we civilly commit him, it will be based on one single aborted

01:27 10   attempted assault.  Even had that assault been executed, even

11   had there been a real Sarah, a 14-year-old child, even if he

12   had had sex with that child and committed a crime -- obviously,

13   a crime -- we would have a single incident.  Even then there

14   would be one isolated incident.

15       A long time ago when I started these cases I defined

16   conduct in terms of behavior, and that, ultimately, is where I

17   came down on this case.

18   Q.   Now the nuts and bolts, Dr. Prentky.  What information did

19   you rely on to arrive at your opinion as to Mr. Volungus?

01:28 20   A.   The sort of broader framework of my methodology when I

21   approach these cases hasn't changed.  They're pretty much the

22   same.  I read in advance whatever discovery I can.  I always

23   take notes on the discovery, including notes from my interview,

24   and notes about specialized tests that I may need.  For

25   instance, if malingering is at issue, then obviously I'll make

1    a note to myself to bring SIRS around; if PTSD was at issue,

2    then I would make a note to myself to bring the trauma symptom

3    inventory along, and so forth.  So based on what I'm reading, I

4    will pay attention to whether or not I need to include a

5    particular type of test.

6        I would never, ever administer tests simply for the sake

7    of giving tests.  Tests are used to gather evidence for

8    answering questions.  So I always am fairly Spartan, fairly

9    conservative around that matter.  I formulate my questions

01:29 10  after consulting with the attorney.  As I indicated, I develop

11   a list of questions for a clinical interview.  I consider

12   whether or not there are any third parties that I might wish to

13   speak to, and if so, I will bring along some releases in case

14   the attorney's client wishes to allow me to speak to that

15   individual.

16       I gather whatever I need, including my notes, and then I

17   conduct an interview.  In this particular case I conducted two

18   interviews:  one on the 17th of May, and then a couple of

19   months later, on the 12th of July, a total of about six hours.

01:30 20  Q.   Now, the Court heard testimony in this case during the

21   government's direct case, but could you summarize, perhaps give

22   a formulation, of the case as it presented itself to you after

23   doing the interviews and reviewing the documents?

24   A.   I'm not sure what you mean by -- when you say

25   "formulation."  You mean to go through the timeline, a

chronology?

Q.   I do think that would be useful, Dr. Prentky, for the

benefit of the Court, if you could tell the story of

Mr. Volungus as you understand it, as it's germane.

A.   Again, Counsel, let me clarify.  Are you asking me to

provide some kind of a sort of clinical analysis of who this

man is or are you asking me to discuss his criminal behavior?

Q.   If you could discuss his personal background to the extent

that it's germane to your ultimate conclusions in the case?

A.   I can attempt to do that.  Again, it's not my goal -- when

I set out to do one of these evaluations, I'm not treating the

individual; I'm not coming up with a treatment plan.  You know,

I was trained as a psychopsychologist, as I said before, so

obviously it is inherently interesting to me -- what is the

expression?  From whence arriving this madness.  You know,

there's always a curiosity to me, but it's not the focal point

of what I am asked to do.

     We start out with -- and, again, much of this will

probably be repetitious, but Mr. Volungus reports that as young

as the age of five he recalls chewing and biting his

fingernails.  He was, again, many -- as, you know, has been

reported many times in the discovery documents, he was

constantly taunted, teased, picked on by his peers, you know,

referred to by the name "Fungus."  He said he got into fights

all the time as far back as he could remember.

1    There was an incident that I found notable in particular

2   that occurs, he said, in the third grade.  I guess he was,

3   what, about ten years old -- nine, ten years old at the time.

4   The incident was at school when he describes that he was

5   playing on the monkey bars and some kid that was much bigger

6   than he was is throwing rocks -- not at him, just throwing

7   rocks.  He leaves the monkey bars and attacks the kid.  He

8   said, "It took two teachers to pull me off of him.  I don't

9   know why I did it.  He hadn't done anything to me."  That was

01:34 10   his quote.  I'll comment later why I found that notable, or

11   noteworthy.

12    So except for what I've said, his childhood, again, by his

13   report is rather unremarkable.  He has no known juvenile

14   offense history, no delinquency, no report of any kind of

15   abuse.  I believe he -- Dr. Hamill refers to perhaps emotional

16   abuse, but no physical, certainly, or sexual abuse.

17    The only thing is a misdemeanor of disorderly conduct at

18   the age of 18 or 19 years old.  That's essentially it.  We have

19   no -- other than his constant fights that he talks about being

01:35 20   in -- constantly fighting, being -- presumably as fights

21   initiated by others, however, in this instance where he beats

22   up this kid, he clearly initiated it.

23    We now fast-forward to the second rather anomalous

24   incident that occurs at Fort Hood where he's arrested and

25   convicted of assault with a deadly weapon as a result of this

altercation in the barracks at Fort Hood.  Again, I found this
rather interesting.  It was the second seemingly anomalous
incident that he reported to me that I found some similarity in
which there's this sudden explosion of anger.  It wasn't
instrumental, it wasn't simply defensive, it was offensive, and
it was not characteristic of who the man appears to be.

So who is he?  He describes himself as a control fanatic.
That's self-described, a control fanatic.  What is he
controlling?  Controlling his emotions.  What emotions?
Mostly anger.  What is the formula here?  It appears to be a
high level of anxiety around his ability to control his anger.
He says, "I'm incredibly anxious that I might not control my
anger."

So from the age of five when he's biting his nails, he's
trying to do something to hold down, to keep a lid on the
anger.  And the more -- like mercury in a thermometer, the more
the anger begins to creep up and creep up and creep up, the
more anxious he gets.  There are a lot of different metaphors.
You could think of an erupting volcano.  The more the magma
begins to come up and up and up, the more anxious he gets.  And
the more anxious he gets, the more he needs to cope with that
anxiety.  When he was five, all he could do was bite his nails.

He is negative for an alcohol and drug abuse history,
interesting, because alcohol and drugs is the typical coping
response -- a much more typical coping response for children

1       that are dealing with this same problem that he appears to

2       have, or have had.

3           So he enters college.  And he immediately becomes immersed

4       in this world of fantasy, Dungeons and Dragons.  It turns out

5       that college was not the first time that he discovers Dungeons

6       and Dragons.  He's reported elsewhere that he was living in a

7       world of Dungeons and Dragons since he was ten years old.

8       Well, essentially, his principal coping response is to retreat

9       into a world of fantasy.

01:38 10        So he goes through a number of semesters in college in

11      which he's consumed by Dungeons and Dragons and the Society for

12      Creative Anachronism, and he almost flunks out.  He manages to

13      pull his GPA up very slightly, and he graduates in '89.  He

14      enlists in the Army.  And I think that that was a remarkably

15      fortuitous choice for him.  To some extent, he truly thrives in

16      the Army, with the obvious exception of this assault at Fort

17      Hood.  But even after that assault he reenlists and he's

18      deployed to Bosnia.  And after that he reenlists a second time.

19      So he spends almost nine years in the military leading up to

01:39 20      his arrest.

21          The very nature of the military is sort of hyper-control,

22      isn't it?  It's external control.  Control from the outside.  I

23      would guess it's that very hyper-control of the armed forces

24      that served him well along with all of the rather rigorous

25      training.  The combat in Desert Storm, going off to Bosnia, it

1    all provided an effective way of enabling him to cope.

2        The pattern that we also see, obviously, during the same

3    time period is frequenting prostitutes on the weekend.  And to

4    some extent, obviously, frequenting prostitutes is customary

5    for GIs; however, even by Army standards, what Mr. Volungus was

6    doing in the Army with prostitutes was excessive.  And I think,

7    again, there are ways of explaining that.

8        We eventually arrive in the spring of 1998, Fort Campbell.

9    He's on leave for convalescence with his knee injury.  He's

01:41 10    increasingly isolated.  He has no means of coping.  So what's

11    his logical response?  Again, not terribly surprising.  He

12    begins to retreat back into the same fantasy world that he

13    relied on as a child and that he relied on in college, the

14    fantasy world through the computer and the television.

15        And of course, it was the television, the A&E show,

16    American Justice, that he finds pornography.  Again, that's

17    probably not terribly surprising.  1998, it's only, what, five

18    years or so after the very first browsers became commonly

19    available?  So we're talking about the earliest years of the

01:41 20    Internet.

21        So how would I see Mr. Volungus?  He has a lifelong

22    history of relying on maladaptive coping mechanisms, starting

23    to do things beginning, at least, at the age of five; he

24    retreats into a fantasy world, D&D, and eventually pornography.

25        The dynamic that I'm describing is not that dissimilar

from OCD.  I am not here to testify that he has

obsessive-compulsive disorder.  I would not do that.  I didn't

set out to diagnose him with OCD.  But certainly the pattern is

very similar to what we would expect in a case of OCD.

Indeed, obsessions are very similar to sexual fantasies,

both deviant sexual fantasies and normal sexual fantasies.  In

addition, there is a high degree of crossover of comorbidity

between OCD and sexual disorders, with both anxiety and

depression being quite common in both groups.

01:43 So being absorbed into a world of child pornography

functioned in a similar way to being absorbed in a world of

Dungeons and Dragons with two obvious exceptions:  Porn by its

very nature is highly erotic and, thus, has the potential to

reinforce in a powerful way that Dungeons and Dragons can't;

second, CP, child pornography, is blatantly illegal, and in

some respects, that made it all the more alluring to him.

Again, flaunting society's laws regarding child

pornography is, in my estimation in his case, an expression of

anger.  Writing letters declaring the virtues of child sex,

01:44 promoting NAMBLA is dumb unless you understand it as an

expression of anger.  Why do I say it's dumb?  Well, it's

obviously dumb.  But the reason I'm referring to it that way is

because the goal of any dyed-in-the-wool NAMBLA pedophile is to

hide successfully while enjoying the fruits of their criminal

activity, not to broadcast your opinions and be hoisted by your

1    own petard.  So in that respect, it's dumb.

2        I would guess that Mr. Volungus might not -- again, this

3    is sheer speculation on my part -- might not be sitting here

4    today had he been properly diagnosed and treated many, many

5    years ago.  There are effective treatments for OCD-like

6    conditions that might have been of assistance to him, but I

7    guess that's moot at this point.

8            THE COURT:  Mr. Gold, if you're at a convenient

9    stopping place, it's just about eleven o'clock.  Why don't we

01:46 10   take the morning recess at this stage.

11           MR. GOLD:  Okay.  Thank you.

12           THE CLERK:  All rise.  The Court will take the morning

13   recess.

14           (The Court exits the courtroom, and there is a recess

15   in the proceedings at 10:58 a.m.)

16           THE CLERK:  All rise.

17           (The Court enters the courtroom at 11:21 a.m.)

18           THE CLERK:  For a continuation in the bench trial of

19   the Volungus matter.

02:09 20   BY MR. GOLD:

21   Q.   Dr. Prentky, could I ask you to turn to page 7 of your

22   report.  And on page 7 you lay out the statutory criteria for a

23   sexually dangerous person in the federal law?

24   A.   Yes.

25   Q.   Have you made a determination as to whether Mr. Volungus

1    suffers from a serious mental abnormality, illness or disorder

2    as that -- as you understand the term?

3    A.    Yes.

4    Q.    And what is that opinion?

5    A.    I indicate in my report that Mr. Volungus can easily be

6    diagnosable using the criteria for the Diagnostic and

7    Statistics Manual with pedophilia.

8    Q.    And is that -- the Diagnostic and Statistics Manual, is

9    that the DSM-IV-TR that you referenced in your prior testimony?

02:11 10   A.    That's correct.

11   Q.    And is that the end of the story as to whether someone has

12   a serious mental abnormality, illness or disorder under the

13   statute, whether they're diagnosable as pedophilia under the

14   DSM-IV-TR?

15   A.    Well, to begin with, I think that the evidence are

16   overwhelming.  First and foremost, obviously, is the child

17   pornography, but there's much other evidence as well to bear on

18   a diagnosis of pedophilia insofar as the DSM is concerned, the

19   letters to Gary; the drawings; the -- Dr. Hamill's Abel

02:12 20   Assessment; the repeated references to sexual interest in

21   minors during therapy; his declaration to the UC, to Deanna,

22   that "I'm a real-life pedophile"; and, of course,

23   the -- obviously, the most recently confiscated pages of random

24   lists and articles, and so forth and so on.

25        So certainly anyone would be on firm ground leading to

1    that DSM diagnosis, but I believe what you're asking is

2    clearly, what works for the DSM does not necessarily work in

3    court.  The DSM makes that absolutely clear in its caveat at

4    the beginning, as does Dr. Jackson in her paper with her

5    colleagues.  So there isn't a direct transfer from a DSM

6    diagnosis to a conclusion that someone has a mental

7    abnormality.  "Mental abnormality" is obviously language

8    specific to the statute, not to the DSM.

9    Q.   And does the DSM -- does a DSM diagnosis have any

02:13 10   necessary connotation with respect to ability to control one's

11   behavior?

12   A.   No, absolutely not.  There's no implied VI, volitional

13   impairment, to a DSM diagnosis, and the DSM makes that clear.

14   So VI clearly is part of the statutory finding of mental

15   abnormality or mental disorder but not a DSM diagnosis.

16   Q.   Now, are you familiar with evidence in the record or on

17   your -- from your interview with Mr. Volungus that he is

18   sexually interested in adults?

19   A.   There seems to be considerable evidence by his self-report

02:14 20   of sexual engagements with adults.

21   Q.   And are you familiar with evidence that when pornography

22   has been seized from Mr. Volungus, adult pornography has been

23   seized as well?

24   A.   Yes.

25   Q.   How does that figure in to your diagnosis in this case?

```
 1    A.   The DSM does not inquire as to whether the individual also
 2    has interests in adults.  The DSM is a barn-door diagnosis.  It
 3    lets in virtually all child molesters -- the more generic
 4    term -- all child molesters that meet the six-month criterion.
 5    And once you're in the barn, it attempts to differentiate with
 6    respect to the type of victims that you have.  It
 7    differentiates incest from non-incest offenders.  But it is a
 8    fairly heterogeneous diagnosis.  Although it is called
 9    pedophilia, it is one of the paraphilias, in truth, the result
02:16  10    is the rather mixed bag of child molesters that have varying
11    degrees of attachment to children.
12    Q.   Now, in the course of reviewing the materials in this
13    case, have you reviewed the chats that Mr. Volungus engaged in
14    in the governing offense?
15    A.   Yes.
16    Q.   And those chats were with two law enforcement officers; is
17    that right?
18    A.   It turns out to be two MPs; that's correct.
19    Q.   And one was posing as a 19-year-old girl and another as a
02:17  20    14-year-old girl?
21    A.   Leanna and Sarah -- or Deanna -- sorry -- and Sarah.
22    Q.   Is the attempted offense, the traveler offense against
23    Sarah, when Mr. Volungus travels to meet Sarah, is that part of
24    the -- is that evidence supporting the pedophilia diagnosis?
25    A.   I'm not sure if this is a trick question.  Clearly it
```

1    would be a criminal act.  She's a minor.  Technically,

2    according to the DSM, were she 14 -- she's slightly older than

3    the DSM conventional cutoff of 13 or younger.  So I'm not sure

4    that we want to make that sort of discrimination and refer to

5    him more as a pedophile rather than a peedophile (ph).  But had

6    he had sex with the 14-year-old, it's not clear how that would

7    factor into a diagnosis of pedophilia.  If I were asked, given

8    all of the overwhelming evidence that I listed a moment ago,

9    and threw into the consideration an assault of a 14-year-old,

02:18 10   it would not dissuade me from diagnosing him as a pedophilia.

11   Q.   Now, just for clarity sake, how is pedophilia defined in

12   the DSM-IV-TR?

13   A.   Well, to begin with, all of the paraphilias are defined by

14   intense recurrent sexual urges, thoughts, fantasies around the

15   particular theme of that paraphilia.  In the case of

16   pedophilia, the theme, obviously, is sexual interest and

17   attraction to children identified in the DSM generally as 13 or

18   younger.

19   Q.   Is the word "prepubescent" used?

02:20 20   A.   Yes.

21   Q.   Are you aware of any evidence in the record that

22   Mr. Volungus has a hands-on offense against a prepubescent

23   child?

24   A.   No.

25   Q.   Now, are you aware of references in the chats that

1    Mr. Volungus had with the law enforcement officers where he

2    made reference to hands-on offending against a 12- and

3    13-year-old?

4    A.   Yes, correct.

5    Q.   Did you interpret that in your reading of the record as

6    evidence of a hands-on offense against a 13- and 14-year-old?

7    Well, first of all, did you ask Mr. Volungus anything about

8    hands-on offending against people of that age group?

9    A.   I did.  And he -- again, of course, remember, this is in

02:21 10   the context of a forensic evaluation.  He denied having such

11   victims.  But, again, I hasten to add that this is in the

12   context of an evaluation for this proceeding.

13   Q.   And the reason you mention that caveat is because?

14   A.   In this peculiar world of doing forensic evaluations we

15   always assume some degree of underreporting, some degree of

16   bias.  It's intentional and understandable given the

17   high-stakes decisions that are to be made.

18   Q.   In that case, discounting the denial during the interview,

19   why do you not interpret those references in the chats as

02:22 20   evidence of hands-on offending committed by Mr. Volungus?

21   A.   You mean because obviously those chats are clearly, at

22   least in his mind, made to a sympathetic party and are

23   presumably confidential?

24   Q.   Correct.

25   A.   In Mr. Volungus's case, what he has offered in the way of

1    verbal feedback is so extraordinary.  He has said so many

2    different things about so many different exploits that,

3    frankly, I have absolutely no idea where to draw the line

4    between fantasy and reality.  I have no idea what he makes up,

5    what is driven by internally motivated needs to present himself

6    in a certain way to this subculture of pedophilia.

7        He said to me, quite candidly, that he was inclined to be

8    extravagant.  He said, "The more extravagant things that I

9    said, the better it was.  The more I would be accepted.  The

02:23 10   more people would talk to me."

11   Q.   Did you find this -- did you interpret this statement as

12   plausible in the context of your evaluation?

13   A.   Indeed, as I said, I think it's all part and parcel of a

14   problem trying to sort out, in the case of Mr. Volungus's

15   self-report, what's real, what's not, what's fantasy, what's

16   truth, what's reality.  And that also applies to statements he

17   makes about his encounters with adults.  I don't know, in

18   truth, how many prostitutes he actually slept with and, of

19   course, we don't know, obviously, what they looked like,

02:24 20   assertions that some of them were very young.  How young is

21   "very young"?

22   Q.   Now, you made reference to a report by a Dr. Hamill?

23   A.   Yes.

24   Q.   Would you describe to the Court what that report is?

25   A.   I'm not sure I know what you mean, what the report is.

 1    You mean the --

 2    Q.    Well, you made reference to an assessment by a Dr. Hamill.

 3    A.    I would say it's a fairly thorough psychosexual evaluation

 4    that was done on Mr. Volungus.

 5    Q.    In what context?

 6    A.    In the aftermath of having been violated, having been

 7    polygraphed.  And I'm not sure I know what you're --

 8    Q.    Well, I'm asking you a -- just a question about the Abel

 9    Assessment which you made reference to.  It appears in the

02:25 10    context of a report by a psychologist named Dr. Hamill.

 11    A.    Yes, that's correct.  Are you asking about the Abel

 12    Assessment that Dr. Hamill did?

 13    Q.    That's what I'm getting at.

 14          So you cite the Dr. Hamill Abel Assessment as evidence

 15    that -- supporting a diagnosis of pedophilia in Mr. Volungus's

 16    case?

 17    A.    That's correct.

 18    Q.    And what is the Abel Assessment?

 19    A.    The Abel Assessment of sexual interest developed by

02:26 20    Dr. Gene Abel to provide a much less invasive means of

 21    evaluating sexual interest than had been, and continues to be,

 22    provided by the penile plethysmograph.  The traditional way of

 23    assessing sexual interest in children was to use the penile

 24    plethysmograph, which uses a strain gauge placed on the penis

 25    and exposes the individual to usually auditory vignettes about

1   sexual encounters with both children and adults, and monitoring

2   the arousal response to those vignettes.  It's obviously a

3   fairly complex, cumbersome and invasive procedure.

4       The Abel Assessment, by contrast, requires nothing more

5   than a laptop computer.  There's no nudity.  The images that

6   you look at on the computer are not nude.  You're simply asked

7   to view the images and to rate those images on how sexually

8   appealing or, I believe the term is, sexual disgusting you find

9   those images on a scale of 1 to 7.

02:27 10  Q.   And do you recall what the results were of the Abel

11  Assessment as administered by Dr. Hamill?

12  A.   The results reflected three areas of sexual interest, the

13  primary area being of children in the age range I believe of

14  eight to twelve; the second area of sexual interest, as I

15  recall, was of adolescence, adolescent females; and the third

16  area of interest was of adult women.

17  Q.   And for the record, we're referring to Exhibit 27.

18       Now, did you perform an Abel Assessment in the context of

19  this forensic evaluation?

02:28 20  A.   Yes.

21  Q.   Did you administer it using the same protocol that was

22  used when Dr. Hamill administered it?

23  A.   I would imagine.  I mean, I don't know what his protocol

24  was, but I believe we probably both used the same standard

25  protocol.

1    Q.   And what were the results of the test when you

2    administered it?

3    A.    The results were quite different.  The results reflected a

4    rather classic normal profile of sexualized interest in

5    adolescent and adult women.  The results evidenced no

6    particular interest in children at all.

7    Q.   How does this information, this data point, figure into

8    your diagnosis in the case?

9    A.   I don't use my Abel in any weighty manner to reach a

02:30 10   diagnosis one way or the other.  I'm mindful, once again, of

11   the fact that I administered the Abel in the context of a

12   forensic evaluation.  I'm always mindful of that.  I am aware

13   that, as we've just been talking about, that he'd taken the

14   same test previously.

15        To the extent that he understands the way the Abel works,

16   he might have -- that might have informed the way he took it

17   when he was with me.  So although I have to report the fact

18   that I gave him the Abel, and I have to report responsibly what

19   the Abel said, I did not provide much weight to it.

02:31 20   Q.   So are you suggesting that it's a possibility that he

21   gamed for the test or was somehow biased in the way that he

22   took the test?

23   A.    Sure.  Of course.  I mean, he's smart enough to understand

24   how the test works, and I appreciate that and I -- as I said, I

25   also am aware that this is part and parcel of what we deal with

1    in conducting these kind of evaluations.

2    Q.   Are there alternate explanations as to the conflicting

3    results of the two Abel administrations?

4    A.   Alternate explanations?  Dr. Abel would probably say that

5    the results of the second administration are reliable.  I have

6    certainly heard Dr. Abel lecture in the past about attempts to,

7    as you put it, game the test, fool the test, and he said that

8    it doesn't work, that the test seems to be relatively immune to

9    faking.  I don't know if that's the case.  I'm not sure if

02:32 10   there's conflicting evidence with respect to the ability to

11   understand and manipulate the outcome of the test.

12       Obviously, one alternative explanation beyond what I just

13   said would be a new-found realization that he really no longer

14   has any particular sexualized interest in children; however,

15   frankly, I wouldn't put a lot of stock in that explanation.

16   Q.   Now, in your report you discuss the DSM-IV-TR diagnosis of

17   pedophilia but then state that that might not be describing

18   Mr. Volungus's true sexual interest.  Do you recall that?

19   A.   Yes.

02:33 20   Q.   And you also write in your report that Mr. Volungus may

21   not be a pedophilia in the historical sense of the term.

22   A.   Yes.

23   Q.   Could you simply explain to the Court those statements?

24   A.   First of all, I said before that when I was talking about

25   my research on classification during the decade of the 1980s,

1    that research was driven by a prevailing understanding that

2    both child molesters and rapists are highly heterogenous with

3    respect to their motives, their background, their criminal

4    history.

5         The way that the word "pedophile" has been used

6    historically, going back to the earliest tones in the 1950s

7    that talk about pedophilia, it is an exclusive sexual and

8    social preference for children.  There are two critical words

9    there:  one, obviously, being "exclusive."  The pedophile, as

02:35 10   distinguished from many other types of child molesters,

11   including incest offenders, only has a sexualized interest in

12   children.  The second is "social."  That pedophiles tend to

13   socialize with children.  Their social skills are markedly

14   limited; their interpersonal relationships with adults are

15   markedly imperfect, anxiety-provoking; and they usually prefer

16   to hang out with children.

17        That is historically the way we have always understood

18   this very small -- relatively small subgroup of child molesters

19   that have been called "pedophiles."  That -- those distinctions

02:36 20   are not made in the DSM.  As a consequence, as I said before,

21   anyone that meets the six-month criterion can qualify as a

22   pedophile, including incest offenders.

23   Q.   Is it significant to you that Mr. Volungus appears to have

24   a broader sexual interest than a classical description of the

25   pedophile?

1    A.    Oh, I think there are two things that obviously need to be

2    equally taken into consideration:  One, he, by his report,

3    seems to have had same-sex sexual encounters -- I'm sorry --

4    same-age sexual encounters with girls going all the way back to

5    childhood by his report.  He reports these sexual involvements

6    with women going all the way up to and through his

7    time -- close to the time when he's arrested at Fort Campbell

8    where he has this, I believe, 18-month relationship with this

9    stripper, Dixie Lee Ray, or whatever her name was.

02:37 10    There are many instances in which he reports sexual

11    involvements with women roughly his own age; however, at the

12    same time, I think it's very important to also state that his

13    relationships with women are rather dysfunctional.  I mean,

14    it's clear that he never has ever sustained a relationship with

15    a woman long enough to have a stable, ongoing, cohabiting

16    encounter with that individual.

17    So obviously, there are problems here.  The latter issue

18    speaks to social skills deficits, self-esteem; the former issue

19    speaks more to sexual interest.

02:38 20    Q.    Dr. Prentky, I want to move now to the difficulty

21    refraining prong of the statute.  Did you arrive at an opinion

22    to a reasonable degree of professional certainty that

23    Mr. Volungus would have serious difficulty in refraining from

24    sexually violent conduct of child molestation?

25    A.    Yes.

1    Q.    And what was that opinion?

2    A.    That he would not.

3    Q.    And how did you go about answering that question?

4    A.    The way that I operationalize these constructs for my own

5    purposes, I do so, as I said before, such that I'll be

6    consistent across the cases that I evaluate.  I see serious

7    difficulty as repeated instances of engaging in offense-like

8    behavior after being repeatedly sanctioned or punished.  That's

9    the way I define "serious difficulty" in my mind.  And insofar

02:40 10   as "sexually violent conduct," I define that in behavioral

11   terms.  Clearly, child molestation is behavior.  I also define

12   "sexually violent conduct" as a behavioral outcome.  I've even

13   sought to see how the word, simple as the word is, is defined,

14   and that's the way it's defined in the dictionary.  "The manner

15   in which a person behaves" is the definition on dictionary.com;

16   "the way a person acts" is the definition on free line *[sic]*

17   dictionary.  So it's a simple word, but I wanted to make sure

18   that the way I was defining it was not an outlier.

19         So for me the issue is not serious difficulty refraining

02:41 20   from child pornography.  If it's couched that way, I'll be the

21   first one to agree that he is likely to have serious difficulty

22   refraining from child pornography.  If the question is whether

23   he'll have serious difficulty refraining from engaging in

24   behavior that he has never engaged in, I would be hard put to

25   reach that conclusion.  He sought to engage in that kind of

behavior once.  It was an abortive attempt of an assault on a

14-year-old.  But I don't know how I would conclude that based

on that alone he has serious difficulty refraining from any

future instances of a battery offense involving a child when

that's all that I'd have to work with.

Q.    Did you make use of any instrumentation or protocols in

approaching the question of "serious difficulty"?

A.    I completed both the Static-99 and the SVR-20.

Q.    And what is the Static-99?

02:43  A.    The Static-99 is a scale that includes ten empirically

determined factors of variables that are associated with risk

of reoffending both with child molesters and rapists.  The

Static-99 is considered an actuarial scale in that it has a

life table, or experience table, associated with the scores.

That means that one could derive some probabilistic estimate of

how other individuals with the same score fared such that if

your individual has a score of, hypothetically, six, you can

look at the table and see, of all of those individuals with a

score of six, how many of them were known to have reoffended

02:44  sexually within a certain time frame, be it five years, ten

years or 15 years.  You don't, of course, know where your

individual falls in that group, but you know, relatively

speaking, how many people in that group failed, or were known

to have failed.

Q.    And why, exactly, did you choose the Static-99 as an

1    appropriate instrument to include in your evaluation?

2    A.    The Static-99 clearly is the most commonly used

3    risk-assessment measure in all of these adjudications of sexual

4    dangerousness, be it at a federal or state level.  The

5    Static-99 is an instrument that was common to both of the other

6    experts that evaluated Mr. Volungus and that will testify in

7    this matter.  So it certainly made sense to me to at least look

8    at it.

9    Q.    And how much more than look at it did you do?  Or better

02:45 10   phrased, how much reliance do you put on the Static-99 as an

11   informative piece of information in this case?

12   A.    Well, partly your question goes to a matter that has to do

13   really with the statutory requirement of serious difficulty at

14   the federal court as opposed to more likely than not or likely

15   at the state court.

16   Q.    Could you describe that difference, please?  What is your

17   experience of the state court requirements, generally?

18   A.    The word "likely" -- whether it's likely or very likely or

19   more likely than not -- is probabilistic in nature and is

02:46 20   interpreted in that way.  The actuarial tools feed into that

21   probabilistic nature of the word "likely" in a fairly

22   comfortable way.  The problem that we face here at the federal

23   level with serious difficulty is there's an imperfect match, a

24   very imperfect match, between what an actuarial tool tells us

25   and what we are required to conclude regarding serious

1    difficulty.  "Serious difficulty" clearly has a VI underpinning

2    to it.

3    Q.    VI?

4    A.    Vocational impairment or vocational incapacity, the notion

5    that the individual was somehow sufficiently impaired of

6    internal self-control that they have serious difficulty

7    managing their urges to not refrain.

8    Q.    The Court asked previously in this trial, and I'm going to

9    ask you, is "volitional impairment" a term with a specialized

02:48 10   meaning within the field of psychology?

11   A.    Not only does it have no specialized meaning, frankly,

12   many of my colleagues regard it as rather archaic.  I have

13   heard more than once -- it probably suggests to me -- that

14   volitional impairment is like assessing the likelihood of an

15   angel dancing on the head of a pin.  That's how easily the

16   terms are -- or the term is used.  There is no way of -- in any

17   consistent, clear, concrete way, of evaluating VI, volitional

18   impairment.

19   Q.    And to continue, you were talking about the relationship

02:49 20   of your scoring of the Static-99 in this case to your

21   understanding of the statutory question.

22   A.    Well, to begin with I used as the index offense for

23   scoring the Static-99 the attempted assault on the 14-year-old

24   girl.  That was my starting point.  The offense qualifies under

25   Category A of the Static-99 as Internet luring using the

1    Static-2002.  Unfortunately, the offense doesn't qualify under

2    the Static-99.  Nonetheless, I went ahead and used the offense

3    in order to score the Static-99 since it had already been used

4    by others in this matter, and I wanted to see from a broader

5    framework what the results would be using not only the

6    Static-99 as the worst-case scenario -- and I'll tell you what

7    I mean by that in a moment -- but the companion instruments as

8    well, meaning the Static-99R and the Static-2002.

9         I wanted to get some ballpark understanding of the -- what

02:51  10   these instruments are saying about Mr. Volungus.  His is an

11   atypical case.  His is a difficult case to score.  And, in

12   truth, the Static-99 should probably have never been used on

13   him.

14   Q.   And why is that?

15   A.   Well, as I said, because the Static-99 coding rules are

16   very clear, that all child pornography offenses, including

17   child-luring, are Category B.  That is different, as I said a

18   moment ago, from the Static-2002.  The next progeny, the next

19   scale, 2002, has different coding rules and treats child

02:52  20   pornography differently.

21   Q.   But in your opinion, the Static-99 coding rules exclude

22   Mr. Volungus's case from Static-99 scoring?

23   A.   I don't know, Counsel, if it's so much my opinion; it's

24   simply the -- clearly the reading of the manual.  I think the

25   manual is rather clear with respect to that -- this issue.

1    Q.    For the benefit of the Court, you've mentioned Static-99/

2    Static-2002.  Earlier in your testimony, you placed your

3    research in the context of the development of the precursor to

4    the Static-99, which was another actuarial instrument developed

5    in 1997, called a RRASOR?

6    A.    Correct.

7    Q.    Could you briefly describe what this set of instruments

8    is?  Are there more than the Static-99 and the Static-2002?

9    A.    You mean within the same kind of family?

02:53 10    Q.    Family, yes.

11    A.    Yes.  The RRASOR, R-R-A-S-O-R, is the Rapid Risk

12    Assessment for Sexual Offense Recidivism, and it consists of

13    four variables.  It was first published, as I said, by Hanson

14    in 1997.  The only other risk assessment scale that comes on

15    line that early was the SVR-20.  Within the Static family of

16    instruments, we have to wait two years for the Static-99,

17    obviously, published in 1999 by Hanson and Thornton.

18          The Static-99 is a combination of the items from the

19    RRASOR and items that appeared on another scale called the

02:54 20    SACJ-Min developed in Great Britain and imported by

21    Dr. Thornton.  The bringing together of these two scales, the

22    SACJ-Min and the RRASOR, resulted in the Static-99.  Roughly a

23    year later the -- not roughly, exactly a year later the SONAR

24    was published.

25    Q.    And what was the SONAR?

1   A.   The SONAR, Sex Offender Need Assessment Rating?  Sex

2   Offender Need Assessment Rating.  That's right.  And it was

3   published by Hanson and Harris in the year 2000.  That was the

4   first attempt to provide a measure of both acute and stable

5   dynamic risk.

6   Q.   And dynamic risk is?

7   A.   Static, by its nature, is historical and fixed.  Static --

8   it can't change -- with the single exception of the age

9   variable.  Whatever score you get on the Static-99 today,

02:55 10   you'll get the same score 30 years from now.  There's

11   recognition, obviously, of the importance -- indeed, the

12   critical importance -- of understanding the risk relevance of

13   things that change over time.

14        Stable dynamic risk factors are those which may be

15   characteristic of an individual over a long time period and,

16   hence, are temporarily stable, but can change.  That's why

17   they're considered dynamic.  An obvious example is anger

18   management.  Anger is something that somebody can carry with

19   you much of your lifetime.  It fluctuates.  Sometimes you're

02:56 20   angry, sometimes not at all.  It most importantly is something

21   that is lendable to interventions and treatment; hence, it's

22   dynamic.  It has a flux to it.

23        Acute dynamic risk factors are things that can change the

24   risk temperature quickly, an obvious one being alcohol.  One

25   minute you're sober and your risk level is low and the next

minute you're intoxicated and your risk level is high.  It's an

acute change in risk temperature as a result of alcohol

intoxication.

So there's, you know, understandable consideration of the

need for input from these dynamic risk factors.  And the SONAR

was the first one and it combined a number of these both acute

and dynamic factors.

Q.   For what purpose was the SONAR developed?

A.   Dynamic risk should either aggravate or mitigate static

02:58 risk.  Static risk is -- or can be understood as a baseline of

risk.  It's fixed.  It's historical.  It won't change.  It's

sort of a baseline.  That baseline fluctuates, however, and the

things that bring about that fluctuation can either increase it

off of baseline, aggravate risk, or can mitigate risk, lower

the baseline.  We can only recognize that, we can only monitor

it, we can only intervene if we understand what those dynamic

risk factors are.

Q.   Was it developed for the evaluation of sexually dangerous

person trials?

02:59 A.   I honestly can't tell you what was in the mind of

Drs. Hanson and Harris when they originally published it ten

years ago.  It is, in my experience, rarely ever introduced

into a hearing such as this unless the individual is developing

a fairly detailed aftercare plan, release plan, and there's an

attempt to evaluate the -- how risk-mitigating or perhaps

1    risk-aggravating components of that aftercare plan are.

2        So if we're concerned about whether the individual is

3    going back to the community to live in a house with 11 other

4    sex offenders, that might be noteworthy and we might consider

5    that under the item bad peer influence.  If the individual says

6    that "I'm going into treatment with the world authority on sex

7    offenders," presumably, that might be -- mitigate -- be used to

8    mitigate their potential risk when returning to the community.

9    But that's the only circumstance that I can think of when the

03:00 10   SONAR might have been used.

11   Q.   And you brought up the SONAR because you're talking about

12   this family of instruments.  Does that complete the family of

13   instruments?

14   A.   No, not at all.  The STABLE-2000 appears roughly at the

15   same time.  The STABLE-2000, again, Hanson and Harris, is an

16   instrument by its name that focuses exclusively on stable

17   dynamic risk factors.  The Static-2002 appears in 2003.

18   That's, again, Hanson and Thornton.  2002-2003, around the time

19   that we see the Static-2002, that's an entirely separate static

03:01 20   instrument from the Static-99.  It's a different set of

21   factors.  The STABLE-2007 appears in 2007, Hanson, Harris,

22   Scott and Helmus.  The Static-99R reflects the new norms that

23   were developed for the Static-99.

24   Q.   Could you briefly describe what the new norms are?

25   A.   It appears that the first recognition -- and I'm not

1    certain about this, but my impression is that the first

2    recognition of the need to provide new norms for the Static-99

3    comes about as a result of a master's thesis by Leslie Helmus

4    in 2009 when she discovers that the base rates are lower than

5    what had previously been understood.  If we go back now to the

6    Static-99 we're talking about, oh, almost ten years have

7    passed -- more than ten years.  2000 -- it's about one decade,

8    from 1999 to 2009.  So a solid decade has passed.

9    Q.   And the base rates are the rates at which the instrument

03:03 10   for the rules tell you people with certain scores would

11   reoffend?

12   A.   The base rate is very simple.  The base rate is simply the

13   calculated rate of your sample that reoffends.  So in this

14   particular case it would be the calculated proportion of those

15   individuals, say, with a score of four reoffend.  If you find

16   that according to the Static-99, the original norms, say,

17   hypothetically 25 percent of those people with a score of four

18   reoffend in ten years, and then ten years later you find out

19   another group of people with a score of four on the Static-99,

03:04 20   at ten years are -- only 20 percent of them reoffend, then the

21   base rates appear to have dropped somewhat.

22   Q.   And this was what Leslie Helmus found?

23   A.   I believe it was -- it comes out as a result of her

24   thesis.  I'm not certain.  But it's the same time frame when

25   these new norms are introduced.

1    Q.    Does that complete the story of the family of instruments?

2    A.    No.   We have the Static-2002R.   The Static-2002R comes out

3    in 2009, the same year.   And once again, that introduces yet a

4    different set of norms for us to follow.

5         And finally, and most recently, there are a couple of

6    instruments that are offspring of the Static-99 that have made

7    an appearance, which I find rather interesting.   One of them is

8    the Automated Sexual Recidivism Scale of Skelton and Vess.

9    That was 2008.   And that basically is a scale that simply uses

03:05 10   seven of the original ten variables on the Static-99.   What

11   makes it unique is that it's automated.

12        And finally, the most recent thing that we see in 2010 is

13   Dr. Wollert's MATS-1, which is a Multisample Age-Stratified

14   Table of Sexual Recidivism Rates.   And that was, I said, in an

15   article that Dr. Wollert published with his colleagues, Cramer,

16   Waggoner, Skelton and Vess.   And essentially what Dr. Wollert

17   did is to recognize the import of the age literature, suggest

18   that the age variable alone doesn't account for the reduction

19   in risk as a function of age.   And he provides age-stratified

03:06 20   samples.

21        So once you get a score on your -- in his case -- the

22   MATS-1 has, I believe, six -- yeah, six of the original ten

23   Static-99 variables, you can look at the age of your

24   individual, and there's a qualitative reduction in risk as a

25   function of the age group that they might fall in.

Q.   Well, Dr. Prentky, given all that you've discussed, why

did you choose in your report to not report the results of all

these instruments, for example?

A.   It's overwhelming.  It's confusing.  It's not clear to

what degree it goes to the ultimate question of serious

difficulty.  I felt since it is at issue and may come up in

this proceeding it was incumbent upon me to look at all facets

of the question of actuarial risk as it applies to

Mr. Volungus; however, as I said before, I am somewhat dubious

03:07  as to the bridge between all of this discussion about actuarial

risk and the ultimate finding of whether he has serious

difficulty.

Q.   Now, do you -- well, describe, then, your choice of the

SVR-20 as another instrument that you used in your report.  Why

did you choose that?

A.   The SVR-20, as I mentioned several times already, is one

of the oldest scales designed for assessing risk with adult sex

offenders.  It comes out at the same time as the RRASOR, 1997,

several years before the Static-99.  It's generally considered

03:08  a structured professional judgment tool.  It's not actuarial in

nature.  However -- and I think I also commented about this

earlier -- researchers occasionally treat it as a conceptual

actuarial measure.  That's not why I used it.  I don't treat it

that way.

     It's the most widely-used structured clinical judgment

1    scale for sex offenders.  It has a legacy of empirical

2    validation which extends back all the way to its inception over

3    the past ten years.  A recent article, empirical article, on

4    the SVR-20 is as recent as 2008, a paper by Dr. Barbaree, his

5    colleagues, Langton, Blanchard and Boer.  So it has a clear

6    empirical track record, as the Static-99 does, but it allows

7    for more professional judgment to enter into the mix and it

8    doesn't tie me to a probabilistic estimate from a life table

9    that I'm not sure what to do with in this particular case.

03:10 10   Q.   And could you briefly describe the nuts and bolts of that

11   instrument?  We've heard testimony about the individual items

12   on the Static-99.  Are the items on the SVR-20 the same,

13   similar?

14   A.   No.  No, not at all.  I provide a breakdown of my coding

15   of the SVR-20 items in my report and all of the items are

16   listed.

17   Q.   And that's on page 16 --

18   A.   That's correct.

19   Q.   -- of your report?

03:11 20   A.   The items are scored using a three-point system, 0, 1, 2,

21   effectively; no/yes/question mark:  either the clear presence,

22   the clear absence, or unclear would be a question mark.  Those

23   numbers -- those ratings are often translated to the

24   number -- numeric values that I include here which resulted in

25   actual score.

1      There are three scales, the much longer being the

2  psychosocial adjustment scale which is listed there, including

3  items such as sexual deviation, a victim of child abuse,

4  psychopathy, major mental illness and substance abuse, and so

5  forth; a second factor called sexual offenses.  And those are,

6  again, I believe seven items that cover the sexual offense

7  history.  And then a very small two-item -- two items that

8  reflect future plans.

9  Q.   And what did the SVR-20 tell you in this case?

03:12 10  A.   Well, the psychosocial adjustment -- if you look at those

11  group of items the scores are quite low, and it's evident when

12  you look at those items, since he has very little criminal

13  history that would contribute to a higher score, the sexual

14  deviation is obvious.  I gave him a score of two on that.  And

15  relationship problems are obvious with Mr. Volungus.  I gave

16  him a score of two on that.  And supervision failure is obvious

17  with Mr. Volungus, and I gave him a two on that.  That's six.

18      Essentially, most of the other items, though, are absent,

19  things like whether he was a victim of child abuse.  He says

03:13 20  no.  Psychopathy, major mental illness, substance abuse

21  problems, suicidality.  All of those clearly are absent.  So

22  the final score in that cluster of items is nine of 22.  But

23  there are essentially, as I said, three risk factors on that

24  entire -- in that entire group that applied to Mr. Volungus:

25  sexual deviation, the relationship problems and supervision

1    failure.

2        When you look at sexual offenses, perhaps it's also quite

3    remarkable that it's very difficult -- again, difficult to

4    score given his rather odd kind of history, "odd" meaning that

5    it is dominated by child pornography, and his numerous, rather,

6    you know, extravagant declarations about pedophilia, but it

7    doesn't really fit into the mold of what we expect when we are

8    evaluating a sex offense history where you have a pattern of

9    prior sex offenses and you have an index offense, that is, a

03:15 10   hands-on sex offense.

11       So a lot of these items are simply zeros:  physical harm

12   to victims, uses weapons or threats, escalation in frequency or

13   severity, extreme minimization or denial.  I did code him a two

14   for high density of sexual offenses.  I think that's certainly

15   fair and reasonable.  Multiple types of sex offenses and

16   attitudes that support or condone:  That's reasonable.  But all

17   of the other items are, in his case, missing.

18       And then finally, the future plans.  It's very, very

19   difficult -- that is pretty much hard for me to code those

03:15 20   reliably.  I have, really, very little information about what

21   his future plans would be.

22       So overall, the SVR-20 total is, as I come up with it, 15

23   out of 40.  I characterized that in my report, I think, as low

24   to moderate.  But again, that's entirely the -- within the

25   jurisdiction of a clinician to decide what the number actually

1   means.  The authors don't give you guidelines.  They don't say

2   a score within a certain bracket or range is called the

3   following, a certain label.

4   Q.   Now, Dr. Prentky, you've mentioned your commitment to

5   science.  How is this science informing your answer to the

6   statutory question?

7   A.   How does the SVR-20 --

8   Q.   This combination of presenting data from the two

9   instruments.

03:17 10   A.   I guess the SVR-20 does one thing:  It simply highlights

11   for me that when you drill down to the details of his sex

12   offense history, it is indeed anomalous; it is indeed an

13   outlier.  He is, indeed, different, from the vast majority of

14   individuals that we're asked to evaluate.  And it's that very

15   difference that makes it difficult, I think, for all of us to

16   render sort of a thoughtful, intelligent, informed empirically

17   based conclusion that I end up with a conclusion that I reached

18   based on the very fact that that sex offense history is defined

19   overwhelmingly by child pornography and by his numerous

03:18 20   collateral evidence reflecting his sort of identification with

21   pedophilia and his identification with children.  But what you

22   don't see here is a track record of coordinated predatory

23   acting-out that results in criminal battery offenses against

24   children.

25   Q.   Now, Dr. Prentky, did you -- you stated earlier in your

 1    testimony that you would concur -- or you might concur with an

 2    opinion that Mr. Volungus might have serious difficulty

 3    refraining from accessing child pornography again?

 4    A.    Yes.

 5    Q.    Why, in your opinion, does that -- well, is accessing

 6    child pornography -- if there were a serious risk of that, does

 7    that inevitably mean that Mr. Volungus will commit a hands-on

 8    offense?

 9    A.    Inevitably?  No, of course not.

03:19 10    Q.    Is it a -- part of an offense cycle for Mr. Volungus that

11    will lead to hands-on sexual offending?

12    A.    An offense cycle?  We have no evidence for that.  If we

13    had evidence for that, this case would be a lot easier.

14    There's no cycle here.  There's a pornography cycle, if that's

15    what you're asking me, but there's no battery cycle.  That we

16    have one isolated instance in which he tried to -- he left his

17    computer, he traveled to meet a 14-year-old.  And there's no

18    question I think that if the 14-year-old had been real and

19    willing, he would have had sex with her.

03:20 20    Q.    In your opinion, from your analysis of the offense with

21    the 14-year-old, what was the relationship of Mr. Volungus's

22    accessing child pornography to that offense?

23    A.    I'm not sure what the relationship was, Counselor.  It is

24    not obvious to me.  I'm somewhat surprised -- I guess this is

25    rather extraneous, but I'm somewhat surprised that the UC chose

1   to make Sarah 14.  I think it would have told us more had Sarah

2   been a lot younger.  Because much of what Mr. Volungus has

3   looked at, much of what he's talked about, much of the evidence

4   goes to preadolescent children, much younger children.  I'm not

5   sure what to do with noting that had there been an offense, it

6   would have been with a 14-year-old who, most likely, was

7   pubescent.

8        But as I said, in therapy when we talk about relapse

9   prevention and we develop a sexual assault cycle, sexual

03:22 10   assault cycles are based on many incidents, numerous incidents.

11   It's difficult to develop a cycle out of a single incident.

12   And in therapy we don't usually talk about profiling or

13   patterns; we talk about cycles and interrupting cycles.  I can

14   certainly understand developing a child pornography access

15   cycle for him.  Clearly there's a lot of room in treatment to

16   be intervening with respect to his use of child pornography.

17        There's rich information that could inform a treatment

18   plan and inform a cycle around child pornography; there is next

19   to nothing that would inform a cycle around the sexual assault

03:23 20   of a child with the possible exception -- I'm struggling to

21   think of what that offense -- if we call it that, the offense

22   involving Deanna, the conversation that he has with Deanna?

23   That's what precipitated his ultimate -- he thought he was

24   meeting two young teenagers, a 19-year-old and a 14-year-old.

25        The percipient was this conversation that he's having with

1   this what he thought was a 19-year-old woman.  It wasn't porn,

2   per se; it was this chatting in this PedoMom chat room with

3   this woman.  At least he thought that's what he was talking to.

4       I'm just trying to think of how you would sort of contour

5   that into a cycle if you're in therapy -- if I were doing

6   therapy with him, I'm not sure what I would do with that.

7   Q.   Well, we've heard testimony that child pornography might

8   disinhibit Mr. Volungus from committing a hands-on offense.  Is

9   that a statement with which you might agree?

03:24 10   A.   It certainly does in some instances.  I don't think

11  there's any evidence in his case that it does because he's been

12  dealing with child pornography now for a long time and he

13  certainly has had ample opportunity in the past to go beyond

14  his child pornography and assault a child.

15  Q.   Now, moving on to some of the other pieces of that.

16  Dr. Prentky, have you had the opportunity to review the letters

17  that Mr. Volungus wrote to a man named Gary Lombardo?

18  A.   Yes.

19  Q.   And are you familiar with the references to sex tourism in

03:25 20  those letters?

21  A.   Yes.

22  Q.   So how did you interpret that course of correspondence in

23  the context of this case?

24  A.   As I must have indicated by now, interpreting what

25  Mr. Volungus means, what motivates him to say what he does is

1    very unclear to me.  I think that will only come about as a

2    result of therapy.  I don't think we can assume what it means.

3    As I mentioned a number of times, I keep using the word

4    "extravagant."  Another word that comes to mind is

5    "overdetermined."

6        His declarations seem to be overdetermined.  He seems to

7    be an extraordinarily eager campaigner for the rights of

8    pedophiles, sort of as if he were a politician on the stump

9    saying that a new age will dawn and one day we will all see the

03:27 10    virtues of child sex.  That's the feeling that I get from him.

11    I mean, he's almost, like, campaigning, as sort of a politician

12    for NAMBLA.

13        What does that mean?  I have absolutely no idea why he's

14    promoting it other than one statement that he made to me that

15    does make sense.  He said to me, "It is like saying F you to

16    society."  What does that mean to me?  Anger.  Flaunting

17    society.  Saying "I don't care what society says.  I'm going to

18    do what I" -- "I'm going to say what I want.  I'm going to do

19    what I want," flaunting this in society's face.  It's -- to me,

03:28 20    it's an expression of anger.  I don't know how else to

21    understand it.

22        Sexual tourism:  I understand what it means.  Is it

23    boasting?  Is he talking about something that -- is it a

24    fantasy?  "I'm going to go off to Thailand"; "I'm going to go

25    off to the Philippines"; "I'm going to procure children."  I

1    have no idea what he has in mind.

2    Q.   Now, does the anger that you're noting in Mr. Volungus,

3    doesn't that -- what's to say that the anger won't motivate him

4    to commit a hands-on offense against a child?

5    A.   I think the answer to that question is that I put

6    enormous, enormous stock not in what people say but in what

7    they do.  When I'm trying to predict behavior, I invariably

8    rely on past behavior as a guide to future behavior.  And what

9    we don't see in him is the kind of track record of antisocial

03:29 10   behavior and the kind of track record of aggression that you'd

11   expect of this angry person.  What you see, rather, is somebody

12   who has been eaten up by his anger, who has tried every step of

13   the way to do something to curtail anger, to stuff it, to push

14   it down, to keep a lid on it.

15        There are the only two instances that I recounted earlier

16   in which he lost control of his anger that I know of.  I would

17   think that if he had impaired control of anger, we would have

18   seen repeated instances over the course of his lifetime, not

19   just two.

03:30 20        The other comment that I would make is that, as I said

21   earlier, we have reasonably effective pharmacological means of

22   treating the kind of problems that Mr. Volungus has, and that

23   had he been so diagnosed and treated, he probably would have

24   been helped a long time ago.  And I would certainly encourage

25   whatever happens to him henceforth, that he be provided those

1    opportunities to be properly medicated --

2    Q.   Just a few follow-up questions, Dr. Prentky.  With respect

3    to what you just said, treated for what type of condition and

4    in what way, or with what type of psychopharmacological

5    treatment?

6    A.   If I am correct in my earlier assessment that what he has

7    been struggling with much of his life is a cycle of anxiety and

8    anger, or anger and anxiety, anxiety coming about as a result

9    of the fear of expressing anger, the kind of reasonable ways

03:32 10   that we have of treating this kind of OCD-like condition --

11   and, once again, I'm not saying I'm diagnosing him with OCD --

12   but there would be three types of medications that might be

13   appropriate.  Sometimes there would be administered a cocktail,

14   one -- the SSRIs, one of the selective serotonin reuptake

15   inhibitors like a Paxil and Prozac; and in combination, one of

16   the antiaggregants like cyproterone acetate, CPA, or NPA,

17   hydroxyprogesterone acetate.  And, as I said, sometimes they're

18   given together as a cocktail; the third category, somewhat less

19   frequently used, and that's luteinizing hormone, or a releasing

03:33 20   hormone agonist.  But there are drugs, as I said, on the market

21   that are appropriate for these problems.

22   Q.   Now, you mentioned earlier in your testimony research that

23   you and your colleagues are currently doing on Internet sex

24   offenders and the role that antisociality plays in

25   discriminating between hands-on Internet offenders and Internet

1    offenders who have not committed hands-on offenses?

2    A.   Yes.

3    Q.   Does that research by yourself and by a researcher named

4    Seto have a bearing here?

5    A.   I guess the bearing is twofold:  One, it tells us that

6    possessors of child pornography are not all created equal, they

7    don't all look alike, they're not homogeneous with respect to

8    their offense history or, presumably, their precursors; that

9    what I suppose we really need to know is much more about how

03:34 10   those individuals that possess and rely on and use and traffic

11   in pornography, child pornography, I differentiate among them,

12   that work has not been done.  Certainly not been done

13   empirically.  But that's clearly one issue, that we're dealing

14   with a mixed, diverse population of people and not all the

15   same.  They don't all act the same.  They don't all look the

16   same.  Their outcomes are not the same.

17        And the second related issue is that one way in which they

18   obviously differ is with respect to their level of

19   antisociality, and that if we are concerned about those

03:35 20   possessors of child pornography becoming known child molesters,

21   assuming they have not already identified themselves as such,

22   examining closely their long track record going back

23   to -- certainly to adolescence, and perhaps even earlier,

24   childhood, would tell us a whole lot about who we should really

25   be focusing on and worried about with respect to committing a

1    hands-on sexual offense.

2    Q.   Now, Dr. Prentky, after you interviewed Mr. Volungus and

3    after you prepared your report in this case, a cache of

4    materials that Mr. Volungus had collected had been -- came to

5    light, actually, had been seized from him in 2007 that came to

6    light prior to trial, have you had an opportunity to review

7    those materials?

8    A.   Yes.

9    Q.   What's your -- I know you haven't spoken with Mr. Volungus

03:37 10   about it.  What's your interpretation of those materials?

11   A.   His judgment sucks.  That's my professional opinion.  A

12   serious answer to your question, that he continues to live in a

13   world of fantasy.  And that's exactly what you're seeing.  That

14   when he was outside, when he had access to the television, when

15   he had access to the Internet, he had ready access to material

16   that sustained his fantasy world.  And now that he's in prison,

17   he's been in prison for almost five years now or so, or

18   something like that?  He obviously has no access to the

19   Internet, no access to the computer.  So he has no recourse, he

03:38 20   has no choice but to create the same kind of material for his

21   fantasy world that he used to rely on before.

22       I think that, again, although I haven't seen him for a

23   year, when last I was with him I inquired about whether he had

24   observation of behavior reports, disciplinary reports, that

25   kind of thing.  And he seems to be free of those kind of

1  reports.  And it may be that this is the way he keeps himself

2  controlled, this is the way he keeps himself -- his comportment

3  appropriate.  That's, I think, the way I would understand it.

4      And when -- my comment, my rather cavalier comment before,

5  is that it is rather dumb.  I mean, obviously he's facing a

6  commitment hearing, and to intentionally gather further --

7  material that is even further incriminating obviously makes no

8  intuitive sense.  It's not logical.  It's not something that an

9  intelligent, thoughtful person would do.  And he is

03:39 10  intelligent.

11      So you have to try to understand it differently in terms

12  of something that he has no -- that he must do, that there's a

13  certain compulsivity here, that he's compulsively driven to

14  organize and marshal and bring these materials together to

15  foster this kind of fantasy life for himself.

16  Q.   Do you recall Mr. Volungus describing to you how he became

17  more committed to treatment than he had begun when he was in

18  treatment in the community?

19  A.   Yes.

03:40 20  Q.   And are you aware that Mr. Volungus faces the remainder of

21  his term of supervised release in the event that he's released?

22  A.   As I recall once upon a time it was, what, three years?

23  I'm not sure what it is.

24  Q.   Once upon a time, but the remainder would be somewhat less

25  than that?

1  A.   Right.  Correct.

2  Q.   Now, can an offender such as Mr. Volungus receive

3  treatment in the community?

4  A.   Of course it's possible.  I mean, obviously we would want

5  to -- not "we."  You would want to explore what the best

6  options for an individual such as him were and who best could

7  provide treatment.  There are people in this particular area

8  who are national experts -- "this area" meaning the Boston

9  area -- but I don't know where he would be returning to.  I

03:41 10  don't have any idea what resources would be available.

11  Q.   Well, but in your opinion would inpatient treatment be the

12  only opportunity for successful treatment for somebody meeting

13  Mr. Volungus's description?

14  A.   There's a triad here that I think if applied would be

15  effective for someone like him.  Obviously, he would have to be

16  closely supervised.  As you're indicating, he would be.  He

17  would have to be medicated.  And compliance with treatment

18  would have to be assured.  Those are the three points that come

19  to mind for me.

03:42 20  Q.   Now, are you familiar with Dr. Phenix's report?

21  A.   Yes, I am.

22  Q.   And the dynamic factors that Dr. Phenix identifies in her

23  report, are you familiar with those and the sources of those?

24  A.   The --

25  Q.   Would you like to review the --

1    A.    The dynamic factors that I think she took from the table,

2    2007; is that correct?

3    Q.    If I could refer you to Exhibit 51, page 43.

4    A.    Yes.

5    Q.    And just if you'd look at that, she lays out what appears

6    to be a reference to the STABLE-2007?

7    A.    Yes.

8    Q.    Do you have an opinion as to the validity of using the

9    dynamic factors to assess risk in a situation like this one?

03:44 10    A.    I don't know, Counsel, how dynamic risk factors can be

11    reliably coded for somebody like Mr. Volungus who has been in

12    prison for these many years.  I think it would be possible to

13    design an institutional- or prison-based version of a dynamic

14    risk scale that could be coded that would look at things like

15    observation of behavior reports and disciplinary reports and

16    work comportment and -- there are a variety of things that

17    happen in a prison environment that could be monitored and

18    looked at.  But that's not what the STABLE-2007 was designed

19    for.

03:45 20         If you'll look at -- if you go online and look at the

21    "Dynamic Supervision Project" published in 2007 by Hanson and

22    Harris, and I guess a couple of other people, Scott, Helmus,

23    they say very clearly -- the very first sentence of the methods

24    section says "all offenders or adults starting a period of

25    community supervision, probation or parole, for a recent sexual

1    offense."

2         Generally, the way we understand dynamic risk assessment

3    is that which either -- as I said before, either mitigates or

4    aggravates existing risk within the community once you've been

5    released.  It's very difficult -- very, very difficult, to in

6    any intelligent way assess dynamic risk in a prison

7    environment.  As I said, I think it's not -- it's not

8    impossible, but the items would clearly have to be tailored to

9    the needs of a penal environment, and I'm not sure how one

03:47 10   could possibly look at things like intimacy deficits and all of

11   the items here, and code them in any intelligent way, you know.

12   Q.   Can't they be coded based on information from when the

13   person was last in the community?

14   A.   But that -- that belies the very purpose of dynamic risk

15   assessment.  To go back and assess dynamic variables

16   historically is to convert them into historic or static risk

17   factor.  That's not really what we're talking about.  If the

18   purpose -- if the goal is to take his risk temperature today,

19   all we'd know is how his risk temperature was affected by these

03:48 20   factors in the past, so we get a temperature based on history.

21        What we need to know is what is his risk temperature today

22   and -- or perhaps not today as he sits here in the courtroom.

23   I'd say the last six months, or perhaps the last year.  I mean,

24   generally factors that are dynamic in nature are reassessed

25   generally within a window of about six months.  So I mean, we

1    could go back to the log at FMC Devens and take a look at

2    everything we possibly could and try to glean whatever evidence

3    we could over the last six months and draw some inferences that

4    are related to dynamic risk factors, but that's about the

5    extent to which we could possibly reach any intelligent

6    conclusions about dynamic risk factors with someone who's been

7    in prison for years.

8             THE COURT:  Mr. Gold, I think we'll have to pause

9    here.  It's one o'clock.  We'll recess for the day and resume

03:49 10   tomorrow.

11             MR. GOLD:  Thank you, your Honor.

12             THE CLERK:  All rise.  Court is in recess.

13             (The Court exits the courtroom and the proceedings

14    adjourned at 1:01 p.m.)

15

16             C E R T I F I C A T E

17             I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

18    the United States District Court, do hereby certify that the

19    foregoing transcript constitutes, to the best of my skill and

20    ability, a true and accurate transcription of my stenotype

21    notes taken in the matter of Civil Action No. 07-12060-GAO,

22    United States of America v. John C. Volungus.

23    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
24    Official Court Reporter

25    Dated:  August 3, 2011