UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                  )
        Petitioner,          )
                                  )  Civil Action
v.                             )  No. 07-12060-GAO
                                  )
JOHN C. VOLUNGUS,               )
                                  )
        Respondent.         )
                                  )

---

TRANSCRIPT OF BENCH TRIAL
DAY FIVE

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

---

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, July 12, 2011
9:07 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Mark J. Grady, Assistant U.S. Attorney
 3             Rachael S. Rollins, Assistant U.S. Attorney
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         On Behalf of the Petitioner

 6         FEDERAL DEFENDER'S OFFICE
           By: William W. Fick, Esq.
 7             Ian Gold, Esq.
           51 Sleeper Street
 8         Fifth Floor
           Boston, Massachusetts  02210
 9         On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES FOR THE
  RESPONDENT:

ROBERT ALAN PRENTKY, Ph.D. (Cont'd)

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| By Mr. Gold | 4 | | 43 | |
| By Ms. Rollins | | 13 | | 50 |

WITNESSES FOR THE
  PETITIONER:

EDWARD CARDINAL

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| By Mr. Grady | 54 | | 102 | |
| By Mr. Fick | | 79 | | 104 |

```
 1              (The following proceedings were held in open court

 2     before the Honorable George A. O'Toole, Jr., United States

 3     District Judge, United States District Court, District of

 4     Massachusetts, at the John J. Moakley United States Courthouse,

 5     One Courthouse Way, Boston, Massachusetts, on July 12, 2011.)

 6              THE CLERK:  All rise.

 7              (The Court enters the courtroom at 9:07 a.m.)

 8              THE CLERK:  For a continuation of the Volungus bench

 9     trial.  Please be seated.

10              THE COURT:  Good morning.

11              MR. GOLD:  Good morning, your Honor.  May I inquire?

12              THE COURT:  Please.

13                     CONTINUED DIRECT EXAMINATION

14     BY MR. GOLD:

15     Q.   Good morning, Dr. Prentky.

16     A.   Good morning.

17     Q.   Dr. Prentky, when we were discussing the risk assessment

18     instruments yesterday, you had mentioned that the state of the

19     science, in your view, tended to obfuscate rather than

20     elucidate some of the questions that you were called upon to

21     answer in cases like this.  Do you recall that?

22     A.   Yes.

23     Q.   Now, when you spoke about the family of Static instruments

24     and related instruments produced over the last decade, did you

25     make reference to or score a number of those while preparing
```

1   your opinion in this case?

2   A.   Yes.

3   Q.   Did you include the results of all of that work in your

4   report?

5   A.   No.

6   Q.   Why not?

7   A.   Frankly, at the end of the day I'm not sure how to make

8   sense of it all.  I -- as I think I indicated yesterday, I'm

9   not sure of the bridge, the connection, for me between any

00:03 10   score on the Static-99 and serious difficulty.  I used the

11   Static-99 in part because both of the other examiners used it,

12   and part because I wanted to look at what I regarded as the

13   worst-case scenario.

14       The original Static-99 uses norms that are understood

15   today to be elevated, or inflated.  That presumably would have

16   provided the worst case in terms of the base rates for

17   estimated reoffense.  However, having said that, I'm not sure

18   what the connection is, the relationship is, between any

19   estimated probability of a hands-on reoffense and serious

00:04 20   difficulty in the present context.

21       As I said yesterday, the actuarials serve a much more

22   obvious function for me at the state level with language that

23   includes "likely."  So I wanted to do, essentially, what has

24   been recommended by Dr. Hanson, which is to provide a bounded

25   estimate.  That is, indeed, what I think he recommends.  If you

```
  1   take a look at all the four different normative samples that

  2   are made available to us, and you look at those probabilistic

  3   estimates from all four samples, or two or three of the

  4   samples, and you come up with a range, that would be what he

  5   would refer to as a "bounded estimate."

  6       I did that and still have no idea essentially what it

  7   tells me in terms of what I believe the Court needs to hear

  8   from me regarding the issue of serious difficulty.  I can go

  9   through it if you wish, but as I said, I did not find it

 10   particularly informative.

 11   Q.  No, that's not necessary.  Thank you, Dr. Prentky.

 12       Now, to repeat or -- I'm sorry.  Not to repeat -- but to

 13   summarize your opinion with respect to serious difficulty

 14   refraining from sexually violent conduct or child molestation,

 15   is it your opinion that Mr. Volungus will not have serious

 16   difficulty refraining from sexually violent conduct or child

 17   molestation?

 18   A.  That is my opinion having defined, as I explained

 19   yesterday, my working understanding of the word "conduct."

 20   Child molestation clearly implies in my mind to reflect a

 21   hands-on sexual offense.  However, "conduct" is not defined and

 22   it could be open to conjecture.

 23       The question is whether sexually violent conduct includes

 24   child pornography.  And as I think I indicated clearly

 25   yesterday, if I'm asked whether he has serious difficulty, or I
```

1   can anticipate serious difficulty refraining from the use of

2   child pornography, I would say yes; however, that's not how I

3   defined it.  I define "conduct" in terms of behavior.  And we

4   have scant evidence to base a judgment of serious difficulty on

5   when it comes to behavior.

6   Q.   When you made your determination as to the appropriateness

7   of using the Static-99 instrument in this case in particular,

8   did you consult with any other experts?

9   A.   Yes.

00:08 10   Q.   And who did you consult with?

11   A.   I e-mailed Leslie Helmus.

12   Q.   And were the results of that communication supportive of

13   your opinion regarding the applicability of the Static-99?

14   A.   Yes.  Leslie clearly indicated that the coding rules are

15   quite clear, that when using the Static-99, all child

16   pornography offenses --

17          MS. ROLLINS:  Your Honor, objection.

18          If your answer is done.  Are you finished?

19          THE WITNESS:  No.

00:09 20          THE COURT:  Why do you want the answer finished if

21   you're objecting to it?

22          The objection is sustained.

23          MS. ROLLINS:  I was going to move to strike.

24          THE COURT:  The objection is sustained.

25          MR. GOLD:  No further questions.

```
 1              THE COURT:  Let me just ask a couple of -- serious
 2    difficulty seems to import the volitional impairment issue, I
 3    suppose; is that right?
 4              THE WITNESS:  Yes.
 5              THE COURT:  You said -- and I guess Dr. Phenix said as
 6    well -- that volitional impairment is not a term of art, it --
 7              THE WITNESS:  It's not a professional or scientific
 8    term.
 9              THE COURT:  Right.  It is a concept that you consider?
00:10 10   If you want to --
11              THE WITNESS:  It's a concept --
12              THE COURT:  -- distinguish between a term and a
13    concept, do you consider the impairment of volitional as a
14    psychological issue?
15              THE WITNESS:  Your Honor, I regard volitional
16    impairment neither as a psychological or psychiatric term.
17    There's no -- or very, very little psychological literature
18    that speaks to something called "volitional impairment."  It
19    is, however, clearly articulated in case law in many,
00:10 20   obviously, law review articles that I've read, and it seems to
21    me that its centrality has been consistently supported from
22    *Crane* and *Hendricks*, and most recently, in Judge Saris's
23    opinion in *Carta*.  She talks about vocational impairment.
24              So it seems to me it's something that I'm compelled to
25    pay attention to.  It's not defined or operationalized, so I
```

must, like other terms, such as "serious difficulty," come up

with some way of trying to understand what it means such that I

apply that understanding consistently across cases.  I try to

do that for myself.  I don't know how other examiners approach

VI.

       The way I have tried to understand it in the past is

evidence of repeated wrongdoing following sanction or

punishment.  So that if an individual has been repeatedly

engaged in behavior that is criminal in nature, and repeatedly

been sanctioned for that behavior, or punished for it, and

still gone ahead and repeated the behavior again, that to me is

evidence of what I would consider sort of volitionally impaired

behavior leading to serious difficulty.

       THE COURT:  And you have that opinion with respect to

child pornography?

       THE WITNESS:  Child pornography.  That's correct.

That's correct.

       THE COURT:  So if, as a clinical matter, you were

addressing someone who had that issue, how would you describe

it, not in the legal terms, but in psychological professional

terms?

       THE WITNESS:  Volitional impairment?

       THE COURT:  Well, the issue of having -- returning to

behaviors notwithstanding sanction and disapproval and

encouragement and anything else you want to put into the

```
    1   picture.  Persistence despite the disincentives, so...

    2           THE WITNESS:  It could manifest itself clinically in

    3   many ways depending upon the individual.  However, in

    4   Mr. Volungus's case, I would describe it in terms of

    5   compulsivity.  There's an element of compulsivity to his

    6   behavior that is driving him that goes well beyond any rational

    7   appreciation of the -- both the gravity of what he's doing as

    8   well as the -- any sense of sort of guardedness around

    9   protecting himself.

00:14 10           My comment yesterday, perhaps out of line when I said

   11   that his judgment sucks, when I saw 70-odd pages of further

   12   documentation of his interest in pedophilia in his cell at the

   13   same time he's on trial now, clearly elevates to a higher level

   14   of sort of inappropriateness behavior which could only be

   15   defined, to me, as sort of compulsive.

   16           THE COURT:  That's sort of what I was getting at

   17   eventually, was whether something like OCD or other compulsions

   18   are, themselves, consistent with something that might be termed

   19   "volitional impairment."

00:14 20           THE WITNESS:  On a case-by-case basis, your Honor.  I

   21   wouldn't say that is always the case.  In this particular

   22   instance that would be my guess.  I don't know for certain, but

   23   that would be my hunch.

   24           THE COURT:  Okay.  Thank you.

   25           MR. GOLD:  May I ask a follow-up?
```

1          THE COURT:  Mr. Gold, you can follow through.

2     BY MR. GOLD:

3     Q.   Dr. Prentky, what, then, is the link, or the lack of a

4     link, that supports your opinion that this volitional

5     impairment that we can discern in the records with regard to

6     child pornography does not extend to hands-on offending?

7     A.   If I'm understanding the question correctly, Counsel,

8     Mr. Volungus has a long history of retreating to a world of

9     fantasy, as I described yesterday.  Child pornography, and

00:15 10     becoming a member of this subculture of pedophilia, as he

11     describes it, is part of that world of fantasy.  He describes

12     his first exposure to D&D at the age of ten.  He doesn't

13     discover child pornography, of course, for many years after

14     that, at least according to what he says.  However, I see it as

15     a very similar pattern of living in a world of fantasy.  That

16     world of fantasy permits him to cope with these chronic

17     feelings of anxiety related to his anger.

18          So we can clearly establish, in my mind, a pattern -- a

19     lifelong pattern around this issue of coping with a high level

00:17 20     of anxiety that leads to, ultimately, somewhere down the road

21     living in this world of pedophilia.  That, to me, it's easy to

22     assert, is beyond his control.  It was beyond his control when

23     he was at FMC Devens over the past number of years compiling

24     this list of 70 pages of material that you shared with me the

25     other day.  So clearly there's an issue there having to do with

 1  volitional impairment, in my mind.

 2     If the question is volitional impairment with respect to

 3  conduct that is defined as I have defined it in terms of a

 4  hands-on offense, the evidence there is scant.  We have

 5  essentially one clear instance in which he sought to have sex

 6  with a 14-year-old girl.  It was an abortive offense.  And

 7  presumably he would have had she really been a 14-year-old

 8  girl.  But that's all.  That's all there is, to the best of my

 9  knowledge.  Everything else that we know about this man is

00:18 10  self-report.

11     And as I tried to explain yesterday, I don't know what to

12  make of his rather extraordinary declarations about his past

13  conduct.  I don't know whether this is simply fantasy on his

14  part, whether he's boasting, whether a certain element of it

15  reflects accurately behavior that we don't know about.  I

16  simply don't know how to make sense of all of his written

17  statements, all of his verbal statements, his drawings, other

18  than the fact that, as I said, he's immersed in this subculture

19  of pedophilia.

00:19 20     To get back to your original question, you asked me

21  whether he is volitionally impaired with respect to a hands-on

22  offense.  I can only conclude the answer is no based on past

23  behavior.

24          MR. GOLD:  Thank you.

25          THE COURT:  Okay.

1           Ms. Rollins?

2           MS. ROLLINS:  Unfortunately, it's going to take me a

3   minute to get my stuff together.

4           THE COURT:  Go ahead.

5           (Pause.)

6                    CROSS-EXAMINATION

7   BY MS. ROLLINS:

8   Q.   Good morning, Dr. Prentky.

9   A.   Good morning.

00:21 10   Q.   I'm going to start with what you and I agree on, okay?

11   You would agree with me that Mr. Volungus has engaged in or

12   attempted to engage in child molestation, correct?

13   A.   Yes.

14   Q.   You would agree with me that there's overwhelming evidence

15   of pedophilia in this case, correct?

16   A.   Yes.

17   Q.   You also stated yesterday that Mr. Volungus could easily

18   be diagnosed with pedophilia under the DSM-IV-TR, right?

19   A.   Yes.

00:21 20   Q.   You also acknowledged that fact in your expert report,

21   didn't you?

22   A.   Yes.

23   Q.   If the question were is Mr. Volungus going to have serious

24   difficulty refraining from accessing child pornography, your

25   answer would be unequivocally yes, correct?

1    A.    Correct.

2    Q.    You would agree with me that Mr. Volungus has received

3    inadequate sexual-offender treatment to date, correct?

4    A.    I'm not sure, Counsel, I'd use the word "inadequate."

5    Q.    What word would you use, Doctor?

6    A.    Certainly insufficient.

7    Q.    I'll take "insufficient."

8          The only place, Doctor, where you pause, though, is

9    regarding volitional impairment and serious difficulty with

00:22 10   respect to the three prongs.  Is that accurate?

11   A.    Yes.

12   Q.    Now, Doctor, you'd agree with me that child pornography is

13   illegal, and Dungeons and Dragons and World of Warcraft, at

14   least as of today, is not illegal, correct?

15   A.    Correct.

16   Q.    And you would agree with me that Mr. Volungus is

17   obsessive, compulsive, and frequently exhibits poor judgment,

18   correct?

19   A.    If we take those terms, Counsel, out of the context of a

00:23 20   formal diagnosis, I would absolutely agree with you.  I've used

21   those terms in my own testimony.  But as I said yesterday, I

22   did not set out to formally diagnose him with OCD.

23   Q.    Okay.  But you agree with me that you have used the words

24   "obsessive" when describing Mr. Volungus, correct?

25   A.    The word "obsessive" -- yes.  The word "obsessive" clearly

1    applies to Mr. Volungus.  Even more so, I think, than the word

2    "compulsive."

3    Q.   Okay.  So you would agree with "obsessive"; you say that

4    even more so compulsive.  Is that accurate?

5    A.   No, just the opposite.

6    Q.   Oh, you would --

7    A.   The obsessionality is entirely consistent with all of his

8    fantasies.  There's a very similar concordance between

9    obsessionality and his sexual fantasies.  Compulsions, of

00:24 10   course, refer to his behavior.

11   Q.   Okay.  And would you agree with me that Mr. Volungus

12   frequently exhibits poor judgment?

13   A.   Yes.

14   Q.   And, in fact, I think yesterday and this morning you said

15   it sucks, correct?

16   A.   That's a term of art.

17   Q.   Okay.  You had the opportunity to interview Mr. Volungus,

18   sir?

19   A.   Yes.

00:24 20   Q.   And you wrote a report, right?

21   A.   Yes.

22   Q.   And in some cases all you had was Mr. Volungus's

23   self-report, right?

24   A.   Well, of course, in addition to discovery.

25   Q.   But there were some instances where there were no

1    documents supporting what it was that Mr. Volungus said,

2    correct?

3    A.   Naturally, I was not the first one to interview

4    Mr. Volungus, so many of the comments that he made to me

5    appeared elsewhere in discovery.

6    Q.   But you make frequent use of the words "by his

7    self-report" in your report, don't you, sir?

8    A.   In my attempt to be precise.

9    Q.   Okay.  Would you agree with me, Doctor, that if his

00:25 10   self-report was inaccurate, that would affect your overall

11   opinion?

12   A.   Counselor, the question you're asking me is so broad.  You

13   know, it encompasses all the work that I do.  I probably have

14   evaluated in my career some 2,000 sex offenders, and I always

15   go into that evaluation assuming that what they can and will

16   and are able to say to me is either partial -- it's partially

17   distorted, it could be partially biased, it could be

18   withholding.  In the context of a forensic evaluation, I don't

19   assume a veridical self-report especially around sensitive

00:26 20   issues, "sensitive issues" meaning things like offense history.

21       So in that regard, Mr. Volungus is no different from what

22   I have experienced over the past 30 years.

23   Q.   You'd agree with me, Doctor, though, that an individual

24   facing the possibility of civil commitment has an incentive not

25   to be candid about their sexual interests, correct?

1    A.    They all do.

2    Q.    So yes?

3    A.    Yes.

4    Q.    Now, Doctor, during your interview with Mr. Volungus you

5    talked about the April 2004 pornography incident.  Do you

6    remember that?

7    A.    Yes.

8    Q.    And I'm going to direct your attention to Exhibit 55 in

9    your report.  If it would help, I could put it up on the ELMO,

00:27 10    or if everyone has it, that's fine.  It's the third paragraph

11    down, Doctor.  Do you see that, an April 2004...

12    A.    Page number?

13    Q.    Number 5.  Page No. 5.

14    A.    Yes.

15    Q.    And about three lines down you write, Doctor, and please

16    tell me if I'm reading this correctly, "According to

17    Mr. Volungus, these were images of teenage models all clothed."

18    Did I read that correctly?

19    A.    I am sure you did.  I don't --

00:28 20    Q.    Let me try to put it up on the screen, if I could.

21    A.    Yes, I see it, Counsel.

22    Q.    You've got it?

23    A.    Yes.

24    Q.    And that was with regard to the 20 images of pornography

25    that were found at his home, correct?

1    A.   Correct.

2    Q.   And when you wrote "according to Mr. Volungus," he

3    reported that to you, correct?  That was a self-report?

4    A.   Yes.

5    Q.   And if you go down two more lines, it says, "I told myself

6    it wasn't illegal because they were in lingerie.  They weren't

7    nude.  They were just models.  They weren't doing anything

8    sexual."  Did I read that accurately, sir?

9    A.   Correct.

00:28  10   Q.   And, in fact, that was a statement Mr. Volungus said to

11   you, right?

12   A.   Correct.

13   Q.   But, Dr. Prentky, that wasn't true, was it?

14   A.   Counsel, I never saw those images, if that's what you're

15   asking me.

16   Q.   So you don't know whether it was true or not because you

17   never saw the images?

18   A.   It's my understanding that there were images reflecting

19   nudity, but I want to, again, make clear that I never saw

00:29  20   anything.

21   Q.   Right.  You never saw anything.  Let's look at the plea

22   agreement.  It's Exhibit 40.  If you could turn your attention

23   there, sir.

24        You're familiar, Dr. Prentky, are you not, that

25   Mr. Volungus entered into a plea agreement in the Northern

1    District of New York regarding that incident we just discussed?

2    A.    Yes.   Correct.

3    Q.    And I'm going to direct your attention, if I could, sir,

4    to page 4 of that report, and at the bottom right-hand corner

5    it should say V00741.  There's a Bates number there.  Are you

6    with me?

7    A.    Yes.

8    Q.    Okay.  And if I could direct your attention in Paragraph

9    5, sir, to the paragraph that starts, "On or about April 12,

00:30  10   2004."  Do you see that?

11   A.    Yes.

12   Q.    I'm going to read that, and please stop me if I'm reading

13   it incorrectly.  "On or about April 12, 2004, officers with the

14   U.S. Probation Department conducted a home visit at the

15   defendant's home."  Did I read that correctly?

16   A.    Yes.

17   Q.    And "defendant" is Mr. Volungus, right?

18   A.    Yes.

19   Q.    "While examining defendant's computer, these officers

00:30  20   observed sexually-explicit images of minors on said computer.

21   Some of these images depicted prepubescent minors engaged in

22   oral sex, intercourse and lascivious exhibition of the genital

23   or pubic area of such minors."  Did I read that correctly?

24   A.    Lascivious.

25   Q.    Lascivious.  So I didn't.  Thank you.

1    The next paragraph starts, "On April 15, 2004, the

2    defendant was interviewed by probation."  Did I read that

3    correctly?

4    A.    Yes.

5    Q.    "During this interview he admitted that he had been using

6    the Internet to view images of minors.  He also stated that he

7    had occasionally downloaded images that were questionable

8    whether minors were nude or explicitly posed.  He acknowledged

9    that some of these images were highly illegal."  Did I read

00:31 10   that correctly?

11   A.    Yes.

12   Q.    And if you turn the page, sir, right at the top there, the

13   first full paragraph, "A forensic examination of the

14   defendant's computer by the FBI resulted in the recovery of 20

15   to 25 images of minors engaged in sexually-explicit conduct.

16   Some of these images depicted prepubescent minors engaged in

17   oral sex, intercourse and" -- what's that word say,

18   Dr. Prentky?

19   A.    Lascivious.

00:31 20   Q.    -- "lascivious exhibition of the genital or pubic area of

21   such minors."  Did I read that correctly?

22   A.    Yes.

23   Q.    "And some of those images depicted prepubescent minors

24   that were actual identifiable minors, and there was a story

25   involving sex with a minor that was recovered."

1        Now, sir, if you would turn to the last page of that

2   document, V00746.  Mr. Volungus signed this document, correct?

3   A.   Yes.

4   Q.   And knowing that now, sir, and seeing that he was not

5   truthful to you when he made that statement, does that change

6   your opinion at all?

7   A.   With regard to what, Counsel?

8   Q.   With regard to whether or not he is a sexually dangerous

9   person.

00:32 10   A.   Counsel, I guess there are two points here:  One, I would

11   not hopefully be so naive as to believe that that was the only

12   thing that he said to me that was not truthful.  I'm assuming

13   that many of the things that he reported to me and to other

14   examiners had been less than accurate.

15        The second is that it goes to something that we know very

16   well about Mr. Volungus.  We know that under all circumstances,

17   no matter how extraordinary, including his prison environment

18   now in Devens, he is driven to access a fantasy world.  So the

19   fact that he returned back to these children -- this child

00:33 20   pornography -- is of certainly no surprise to me, and it would

21   certainly support my earlier conclusion that he has serious

22   difficulty avoiding child pornography.

23   Q.   With respect to you -- you asked Mr. Volungus whether or

24   not he was sexually attracted to the child pornography images,

25   and he told you he wasn't.  Is that accurate?

1    A.    Correct.

2    Q.    And if I could turn your attention to Exhibit 53.  Did you

3    have an opportunity to read Dr. Bard's expert report,

4    Dr. Prentky?

5    A.    Yes.

6    Q.    And if you could turn to page 5 of that report, about

7    halfway through the first full paragraph it says, "Mr. Volungus

8    became obsessed with finding pictures of young pubescent girls

9    and masturbating to them.  He describes his sexual interest as

00:35 10   being related to girls who had entered puberty and who were no

11   longer children."  Did I read that correctly?

12   A.    Yes.

13   Q.    So, in fact, he does masturbate, at least with respect to

14   what he told Dr. Bard, to images of child pornography.  Would

15   you agree with that?

16   A.    Yes.

17   Q.    Yes, you would?

18   A.    Yes.

19   Q.    And let's turn your attention, if I could, to Exhibit 41.

00:35 20   Are you familiar with the fact that Mr. Volungus has met with

21   the FBI on several occasions as a result of his behavior,

22   Doctor?

23   A.    Yes.

24   Q.    Yes?  And if I could turn your attention to the document

25   that in the lower right-hand corner says V01361.  Did you see

1   that?

2   A.   Yes.

3   Q.   And at the bottom of the second full paragraph it says,

4   "He frequently masturbates while looking at child pornography

5   on the computer, and that is the reason he has it.  He has been

6   chatting on the Internet for a few months and is constantly

7   seeking child pornography."  Did I read that accurately, sir?

8   A.   Yes.

9   Q.   And would you agree with me that he told the FBI that he

00:36 10   masturbates to child pornography?

11   A.   Yes.

12   Q.   And is this an example, Doctor, where he either lied to

13   you or minimized his prior offending conduct?

14   A.   The fact, Counsel, that he masturbates to child

15   pornography is not a surprising realization.  He has been

16   living in this world for a long time.  And as I said yesterday,

17   one of the major differences between living in a world of

18   pedophilia and living in a world of Dungeons and Dragons is

19   that the former is highly erotic.

00:37 20   Q.   And illegal.

21   A.   Of course it's illegal, and it's also erotic.

22        So in terms of developing and reinforcing a response, to

23   continue to return to pornography, it is not surprising at all.

24   Q.   So you agree with me, then, that this is an example where

25   he's minimized his prior offending conduct, or no?

1    A.   I'm sure he has minimized it to me as well as to many

2    other examiners.

3    Q.   Now, if we turn our attention, Doctor, in your report to

4    page 11.  And that's Exhibit, I believe, 55 that we're at, sir?

5    Under the heading "Behavioral Evidence."  Are you there,

6    Dr. Prentky?

7    A.   Yes.

8    Q.   Okay.  At the bottom of that paragraph, and please stop me

9    if I'm reading incorrectly, "He stated emphatically that he

00:38 10   never had sexual conduct with a child prostitute below the age

11   of 18 and that he has never had sexual conduct with any child."

12   And then in parens you say, quote, "I have never molested a

13   child.  I've never touched a child inappropriately.  His

14   behavioral track record dating back to about the age of eight

15   is to be sexual with same-age females."  Did I read that

16   accurately, sir?

17   A.   Almost.

18   Q.   What did I do wrong?

19   A.   The word is "contact," not "conduct."

00:39 20   Q.   Contact.  "Sexual contact with any child."  Is that

21   accurate now, sir?

22   A.   Yes.

23   Q.   All right.  I'm going to direct your attention to

24   Exhibit 1 in the binder in front of you.

25        Now, Dr. Prentky, you had an opportunity to read through

```
 1    Exhibit 1, have you not?

 2    A.    Yes.

 3    Q.    Yes, you have?

 4    A.    Yes.

 5    Q.    I'm going to direct your attention, if I could, to -- it

 6    says page 9, but in the lower right-hand corner it says

 7    V001129.  Do you have that, sir?

 8    A.    Yes.

 9    Q.    And am I accurate in describing this as the chats between

00:40 10   Mr. Volungus and an individual named Indy Girl?  Is that

11    accurate, sir?

12    A.    Deanna.

13    Q.    Deanna.  But it says on the page Indy Girl here, correct?

14    A.    Yes, correct.

15    Q.    And, in fact, that ended up being a military police

16    officer?

17    A.    Correct.

18    Q.    So if we go to the bottom pretty much of that page, it

19    says "Kossack."  You'd agree with me that that's Mr. Volungus,

00:40 20   right, sir?

21    A.    Correct.

22    Q.    Well, let's go up.  It says, "Kossack:  One was a

23    mother/daughter gang bang."  Do you see that?

24    A.    Yes.

25    Q.    Indy Girl says, "Oh, so not young or anything like that."
```

1    Kossack says, "Another was a mom and two daut, all lesbian."

2    Did I read that correctly?

3    A.    Yes.

4    Q.    Kossack then says, "Well, in Holland I saw some great

5    young stuff.  Even had a 13-year-old.  Cost me 200 guilder."

6    Did I read that accurately?

7    A.    Yes.

8    Q.    And would you agree with me that guilder is a monetary

9    form used somewhere near Holland?

00:41 10    A.    Yes.

11    Q.    Okay.  And am I overstepping my boundaries, sir, in

12    understanding Mr. Volungus as saying that he paid for sex with

13    a 13-year-old in this chat?

14    A.    Overstepping your bounds?  I think it's a correct

15    interpretation of what he said.

16    Q.    Thank you.  Now, you'd agree with me, Dr. Prentky, that

17    this is another example of Mr. Volungus minimizing his prior

18    offense conduct, correct?

19    A.    Correct.

00:42 20    Q.    Dr. Prentky, your methodology in this case is, "Will not

21    find serious difficulty in refraining without a history of

22    battery offenses after serious consequences," correct?

23    A.    I'm not sure, Counsel.  I wouldn't use the term

24    "methodology."  What I would say is that there is statutory

25    language that I'm not compelled to interpret but I am compelled

1    to try to understand if I am to provide some informed opinion

2    to the Court.  And since I have no guidance with respect to

3    these terms, I have to define them for myself.

4    Q.   There's no actuarial measurement of volitional impairment,

5    correct?

6    A.   No.

7    Q.   And would you agree with me that one place we could look

8    for evidence concerning whether Mr. Volungus experiences

9    difficulty controlling his sexual interests in children would

00:43 10    be Mr. Volungus himself, what he said on the issue?

11    A.   You've already said, Counsel, that it's very difficult to

12    invest a high degree of confidence in anything that he says.

13    Q.   You've said that, right?  I haven't.

14    A.   Well, we've gone through many instances in which you -- we

15    have both acknowledged that he has either underreported or

16    exaggerated or failed to tell the truth.  I think that's one of

17    the problems here, that it's very, very hard to know in all of

18    these reports, but all of his conduct, what is real, what's

19    imaginary, what's fantasy.

00:44 20    Q.   Or what -- and I think your testimony was fantasy,

21    boasting or accurately reflects what it is that he's doing.  Do

22    you remember saying that just a few moments ago?

23    A.   Yes.

24    Q.   So you would agree with me that one of the possibilities

25    could be that what he's saying accurately reflects what it is

1    he's doing, correct?

2    A.    Of course.

3    Q.    If we could turn to Exhibit 1, I would like to look at

4    some of the things that Mr. Volungus has actually said.  If you

5    would go to page 1122 in the lower right-hand corner, Doctor.

6    About a third of the way down it says, "Kossack:  Well, I'm a

7    real-life pedophile, and at least I can come out" -- "at least

8    here I can come out and admit it."  Did I read that accurately?

9    A.    Yes.

00:45 10    Q.    And Kossack is Mr. Volungus, right?

11    A.    That's correct.

12    Q.    And if we go to 1125, Indy Girl says about a third of the

13    way down, "So this will be your first experience with all of

14    this if Sarah says okay?

15         "Kossack:  No, I've enjoyed many young girls, even younger

16    than her.  As young as ten.

17         "Oh, okay.  I think I misunderstood.  Can I ask a

18    question?

19         "Kossack:  Sure.

00:46 20         "Not trying to be too naive, but what can you do with a

21    10-year-old girl?  Hope that isn't too stupid.

22         "Kossack:  She wasn't a virgin and I'm only average-sized.

23         Kossack at the top of the next page.  "We enjoyed each

24    other orally and then had regular sex.  Her sister tried to

25    convince her to try anal with me.

1        "Indy Girl:  If this is too personal let me know.

2        "Kossack:  But she said no.

3        "Indy Girl:  Sister?

4        "Yeah.  14-year-old.  Picked up at club while I was

5    working in Germany.  If young girls are there after midnight

6    they're just looking for sex."

7        Did I read that accurately?

8    A.   Yes.

9    Q.   If we could turn to 1130, a quarter of the way down, "Indy

00:47 10   Girl:  I see.  So what's the youngest you did with a BJ for

11   you?

12       "Kossack:  Ten.

13       "Indy Girl:  Ten?

14       "Kossack:  Yes.  The same one."

15       Would you agree with me, Dr. Prentky, just for the record

16   that "BJ" stands for blow job?  Is that your understanding?

17   A.   That would be my understanding.

18   Q.   All right.  And, Dr. Volungus *[sic]*, if we could turn to

19   1133.  At the top, near the top, "Indy Girl:  Have you ever

00:47 20   taken pictures before?  So do you know if it's safe?

21       "Kossack:  Did some video with the 14-year-old once.  Had

22   to get rid of it.  Customs sucks."

23       Did I read that accurately?

24   A.   Yes.

25   Q.   Now, if we pause here for a minute, Dr. Prentky, some of

```
 1   the things I just read which are Mr. Volungus's statements
 2   indicate that there has been sexual conduct with a child.
 3   Would you agree with that?
 4   A.   This is what he's reporting.
 5   Q.   Correct.  He's saying that in his own words.  Would you
 6   agree with me?
 7   A.   Yes.
 8   Q.   And do you remember being deposed in this case, sir?
 9   A.   Yes.
10   Q.   And do you remember being asked with respect to volitional
11   impairment what you would need in order to find that
12   Mr. Volungus had serious difficulty refraining?
13   A.   Do I remember my exact response?  Can you refresh my
14   memory?
15   Q.   I actually expected you to remember exactly what you said.
16   Dr. Prentky, I'll put this down here, and I'm going to read
17   this to you.  This is page 86 of your deposition.  Please stop
18   me if I'm reading this incorrectly.
19       "To answer your question is no, but let me go one step
20   further and tell you what evidence I would require to change my
21   opinion."
22       Why don't I just walk up to you, Dr. Prentky, and read
23   this.
24           MS. ROLLINS:  Can I approach, your Honor?
25           THE COURT:  Yes.
```

00:48  10
00:49  20

```
 1   BY MS. ROLLINS:
 2   Q.   Dr. Prentky, I'm going to read this aloud.  Please stop me
 3   if I'm reading it incorrectly.  "I would require evidence, even
 4   just self-reported evidence, from Mr. Volungus that on many
 5   occasions he has sought to develop a sexualized relationship
 6   with a child that he contacted on the Internet.  If we take
 7   that one experience that we know about, the 14-year-old, and we
 8   multiply that multiple times, that to me defines 'serious
 9   difficulty.'"  Did I read that accurately?
10   A.   Yes.
11   Q.   And, sir, seeing that Mr. Volungus has said that he's, in
12   fact, had sexual contact with individuals before that were
13   children, does that change your opinion at all?
14   A.   Counselor, the issue -- and I would agree with that
15   earlier statement, the statement that you just read regarding
16   serious difficulty; the issue for me isn't serious difficulty,
17   the issue is serious difficulty with respect to what.  And
18   according to the statute, the serious difficulty must be with
19   regard to either child molestation or sexually-violent conduct.
20   Q.   And you'd agree with me that he admits, at least in his
21   own handwriting, that he sexually had contact with children
22   before even though he's reported to you he's never done that,
23   correct?
24   A.   Yes, by his report.  That's correct.
25   Q.   You'd agree with me, Dr. Prentky, that many sex crimes go
```

1   unreported and undetected?

2   A.   Yes.

3   Q.   I'm going to direct your attention, if I could, to Exhibit

4   12.  In the lower right-hand corner it says V00034?

5   A.   Yes.

6   Q.   This is with respect to Mr. Volungus was caught drawing

7   pictures of him having sex with children.  Do you remember

8   that, sir?  Why don't I read the third sentence for you.  "The

9   drawings mostly involved adults committing sexual acts with

00:52 10   children."  Did I read that accurately?

11   A.   Where are you, Counsel?  What paragraph?

12   Q.   I'll start right at the beginning.  "Mr. Volungus was

13   referred to psychology by Lieutenant Brown.  His locker had

14   been searched the night before and a considerable amount of

15   pornography drawn by inmate was found."  Are you with me?

16   A.   Yes.

17   Q.   "The drawings mostly involved adults committing sexual

18   acts with children.  Additionally, a list of books was found,

19   including a number of titles involving sexual acts with

00:53 20   children."  Did I read that accurately?

21   A.   Correct.

22   Q.   If you go down to the beginning of the next paragraph,

23   "Mr. Volungus stated that he had begun to draw these pictures

24   after having become more lonely and isolated of late.  He said

25   he had downloaded child pornography under similar

circumstances."  Did I read that correctly?

A.   Yes.

Q.   "Regarding the books, he stated that he was hoping to read them in an effort to understand his sexual attraction to children and thereby help himself."  Did I read that accurately?

A.   Yes.

Q.   Exhibit 15.  In the bottom right-hand corner, V00014.

A.   Yes.

Q.   About five lines up from the bottom.  "Mr. Volungus acknowledged that he is sexually attracted to minors.  He stated that he realized he cannot act on this attraction and has taken steps in the past to remove himself from high-risk situations."  Did I read that accurately?

A.   Yes.

Q.   And this is 2006?  At the top of the page.  Yes, Dr. Prentky?

A.   Yes.

Q.   And Exhibit 21.  This is from 2002.  At the beginning of the second paragraph, "During an interview with Inmate Volungus, he stated that he has a problem and he thinks about sex with children all the time."  Did I read that accurately?

A.   Yes.

Q.   Exhibit 23.  This document, again, is from the district court.  If you go to the second page this relates to, in the

1    third paragraph, the pornographic images on Mr. Volungus's

2    computer that we discussed earlier.  Is that accurate?

3    A.    Yes.

4    Q.    Exhibit 24.  Mr. Volungus wrote an affidavit --

5    A.    Yes.

6    Q.    -- regarding that incident?

7          And approximately six lines down, "All were supposed to be

8    fully clothed and non-explicit, but occasionally some would

9    post other pictures."  Did I read that accurately?

00:55 10   A.    It appears so.

11   Q.    "On occasion I did download a picture that would be

12   questionable.  The girl would be partially nude or explicitly

13   posed"?

14   A.    Hmm.

15   Q.    And Mr. Volungus wrote this, correct?

16   A.    Correct.

17   Q.    If you turn to the next page at the bottom, "I realize

18   that the pictures are highly illegal, but I did not download

19   them knowingly or deliberately.  I felt I could handle the

00:56 20   temptations but" -- and then I'm not sure what these words say,

21   but he says, "it's proven as potentially risky for causing

22   problems."  Did I read the part that I said out loud

23   accurately, Doctor?

24   A.    I think it says, "I am willing to return to the previous

25   conditions of custody, if necessary, for treatment to deal with

1   my problems."

2   Q.   "I felt I could handle the temptations"?

3   A.   "I felt I could handle the temptations but..."

4   Q.   "But I merely found a substitute that has proven as

5   potentially risky for causing problems"?

6   A.   I believe that that's correct.

7   Q.   Now, Doctor, you'd agree with me you're familiar with the

8   letters that Mr. Volungus wrote to Gary, correct?

9   A.   Yes.

00:57 10   Q.   Those are found at Exhibit 26.  And have you had an

11   opportunity to read those?

12   A.   Yes.

13   Q.   If I could draw your attention to page 00781.  About six

14   lines down, "Added a half dozen nude videos and I'm adding

15   more.  The whole vid of one girl I'm in lust with, Alicia.

16   Fucking awesome."  Did I read that accurately?

17   A.   Correct.

18   Q.   Then a few lines down he says, "Bet you she's got kids.

19   And if needs a fix, I've got your pussy."  Did I read that

00:59 20   accurately?

21   A.   I'm not sure where you are right now.

22   Q.   About a quarter of the way up.  "Bet you she's got kids."

23   Do you see that?

24   A.   Yes.

25   Q.   Did I read that sentence accurately?

1   A.   Yes.  Yes, correct.

2   Q.   If you could turn your attention to 00787.  It says, "Once

3   I'm free and you are too, we've got to make a trip across the

4   border and have some fun."  Do you see that?

5   A.   Yes.

6   Q.   And then at the bottom it says, "Pictures underaged

7   admirers have been a shitload of the FEBA series lately.  Girl

8   about seven.  Bondage, pissing, shitting, suck, fuck, lots of

9   anal.  Hot as hell."  Did I read that accurately?

01:00 10   A.   Correct.

11   Q.   If you could turn to 00792.  "Met a fellow last week,

12   watched his webcam."  Do you see where I am?

13   A.   Yes.

14   Q.   "He was finger-fucking his daughter for the world to see.

15   She looked about six years old.  She was loving it."  Am I

16   reading that accurately?

17   A.   Correct.

18   Q.   "She was asking him to 'Do it faster, Daddy,' and, 'Yeah,

19   right there.'  It was fucking amazing.  If I hadn't been in the

01:02 20   middle of the library I would have whipped it out and jacked

21   off right there."  Did I read that right?

22   A.   Correct.

23   Q.   And this is Mr. Volungus's handwriting, right?

24   A.   Correct.

25   Q.   Let's go to 00794.  "What do you think about crossing the

1    border to do things and picking up some young girls?  You know

2    what I like:  Brunette, about ten.  Just budding is perfect.

3    If you ever see the Alicia series, she's fucking perfect.

4    Well, almost.  A little longer hair," smiley face.  Did I read

5    that correctly?

6    A.   Yes.

7    Q.   If you could turn to Exhibit 34.  And, Dr. Prentky, you

8    had all of these exhibits when you wrote your report, right?

9    A.   Correct.

01:03 10  Q.   If you'd turn to the second page, 00843.  At the top it

11   says, "Prior to the PDD, Mr. Volungus made the following

12   statements."  Did I read that accurately?

13   A.   Yes.

14   Q.   And at the bottom of that grid it says, "I'm sexually

15   attracted to females between the age of 11 and 13 years of age.

16   All of the women I dated were petite and had small breasts."

17   Is that accurate?

18   A.   Yes.

19   Q.   Now, Dr. Prentky, you admit that at some point

01:04 20  Mr. Volungus cut the umbilical cord and traveled from his

21   computer with respect to Indy Girl, correct?

22   A.   Yes.

23   Q.   And we don't know what sparked that separation or that

24   traveling, do we?

25   A.   We can speculate but we certainly don't know for certain.

1   Q.   So as you sit here today you can't tell us what happened

2   that made him leave his computer and travel to go have sex with

3   this 14-year-old?

4   A.   As I said, we can speculate based on my comments yesterday

5   regarding some sort of clinical analysis of who Mr. Volungus

6   is, but it would only be suggestive on my part.  You know,

7   we're talking about a fairly lengthy period in which he

8   described being isolated during his convalescence.  He always

9   talked about isolation as being a precursor of this sort of

01:05 10  compulsive need to absorb himself in fantasy.

11       He obviously had access to the computer during this time

12   period.  He obviously was engaging in an encouraging dialogue

13   with someone that he thought was real.  And I'm sure we could

14   come up with some rational explanation, although whether or not

15   it's accurate, I don't know why on that particular occasion he

16   was sufficiently disinhibited to, as you put it, cut the

17   umbilical cord.

18   Q.   And you admit -- you called it an aborted attempt.  It was

19   only aborted because the person wasn't 14; it was a military

01:06 20  police officer, right?

21   A.   Abortive.

22   Q.   Abortive?

23   A.   It was abortive, yes, because obviously the victim was not

24   a real victim.

25   Q.   Are you familiar with what GhostSurf is, Dr. Prentky?

1    A.    Ghost- --

2    Q.    -- -Surf.

3    A.    No.

4    Q.    If you could turn to Exhibit 44.  Are you aware that

5    Mr. Volungus had a software program on his computer called

6    GhostSurf which would wipe files and folders clean with respect

7    to documents on his computer?

8    A.    I am aware that he would clean his computer.  I wasn't

9    aware of the software program that he used to do that.

01:08 10   Q.    And you're aware he would clean the computer and then

11   immediately start downloading more porn, correct?

12   A.    Yes.  It's been mentioned on various occasions in the

13   documents that I've read, and he said as much to me, that there

14   was that compulsive need to return back to the gathering of

15   these images even after he had cleansed his computer.

16   Q.    And received repercussions as a result of his behavior?

17   A.    Yes, of course.

18   Q.    Now, with respect to Mr. Volungus's release plan, do you

19   remember testifying yesterday, Doctor, that he would need to be

01:09 20   closely supervised, he would need medication, and compliance

21   with treatment would have to be assured?  Do you remember that

22   testimony?

23   A.    Yes.

24   Q.    And did that accurately reflect what it is you said

25   yesterday?

1    A.    Yes.

2    Q.    In fact, Mr. Volungus has been closely supervised in the

3    past, hasn't he, and violated?

4    A.    Correct.

5    Q.    And any medications he would have to take would have to be

6    voluntary, right?  Is that your understanding?

7    A.    Let me qualify my answer, Counsel.  He has been supervised

8    in the past.  I don't know how closely.

9    Q.    But by U.S. Probation he's been supervised, correct?

01:09 10    A.    Correct.

11    Q.    And he violated?

12    A.    Correct.

13    Q.    And what did you mean "compliance with treatment would

14    have to be assured" when you said that?

15    A.    The supervising officer would have to make sure on a

16    weekly basis that he was not only attending treatment but that

17    whoever was providing treatment reported that he was engaging

18    in the process and that he was making a good-faith effort to

19    participate.

01:10 20    Q.    Okay.  But you'd agree with me that the sexual-offender

21    treatment he's received to date -- what was the word you used,

22    Doctor?  Is -- I said inadequate.  What did you say?

23    Ineffective?

24    A.    Insufficient.

25    Q.    Insufficient.

1        The last exhibit I think I'm going to show you, Doctor,

2     is --

3     A.    Counsel, can I simply qualify or explain what I mean by

4     "insufficient"?

5     Q.    Sure.

6     A.    I believe that a critical component of care for

7     Mr. Volungus must be appropriate medication, and to the best of

8     my knowledge that has not happened thus far.  And that's what I

9     mean by "not sufficient."

01:11 10    Q.    Is it your understanding, Doctor, that if Mr. Volungus is

11    released, any medication he had to take would be voluntary,

12    correct?

13    A.    You mean other than to the extent that it's a requirement?

14    Q.    By whom?

15    A.    It's stipulated as a requirement of the year or so that he

16    still has of probation.

17    Q.    And do you -- how old is Mr. Volungus?

18    A.    About a year left?

19    Q.    But how old is he right now, do you know?

01:12 20    A.    Forty-four, I believe?  Forty-five, maybe?  Forty-four, I

21    believe.

22    Q.    And he's received insufficient treatment thus far.  Do you

23    believe as you sit here today that one year of treatment would

24    cure Mr. Volungus?

25    A.    He has one year of supervision.

1    Q.   But I asked a different question.

2    A.   Is one year adequate?  No.  I would expect that he would

3    be in treatment for a lot more than a year.

4    Q.   Okay.  If I could turn your attention to Exhibit 36.  Are

5    you familiar that there was a supervised release violation

6    hearing in the Eastern District of New York, Doctor?

7    A.   Yes.

8    Q.   And if I could turn your attention to V01452, that page

9    right there, sir.

01:13 10    A.   Yes.

11    Q.   At the bottom Mr. Spina says, "Your Honor, if I could just

12    briefly be heard on that.  In this case there was supervision,

13    obviously, but Mr. Volungus is adept enough in computer usage

14    that he was able to ghost serve [sic] software that he was able

15    to locate, and this software allowed him to delete any of his

16    Internet history, his cookies and various files on the

17    computer.  And I think because he possesses that degree of

18    sophistication, that he is probably capable of circumventing

19    some of the supervision requirements."  Did I read that

01:13 20    accurately?

21    A.   Yes.

22    Q.   "And therefore, under the circumstances, I think that at

23    least a temporary prohibition until a mental health provider

24    could conclude he could use the computer only for legal

25    purposes would be appropriate.  Thank you."  Did I read that

accurately?

A.    Yes.

Q.    And then lower on that page, Doctor, Mr. Volungus himself speaks to the court.  And the court asks, "Okay, Mr. Volungus. Is there anything you wish to say before I pass sentence on you?"  Mr. Volungus says, "Yes, sir.  Yes.  While the treatment program has helped some, it hasn't helped enough.  I know that. I have a problem.  I have a problem controlling it.  And it's one of the hardest things I've had to do, is that I really don't have enough control over it, recognizing that I don't have enough control over it.  I've tried to control it.  It keeps rearing its head.  I know it causes a lot of problems, not only for myself, for my family, but I don't want to keep doing this for the rest of my life.  I would like to figure out how to make it stop.  I really would.  I just don't know how to do it yet."  Did I read that correctly?

A.    Correct.

        MS. ROLLINS:  Your Honor, may I just have one moment?

        (Counsel confer off the record.)

        MS. ROLLINS:  Nothing further, your Honor.

        THE COURT:  Mr. Gold?

        MR. GOLD:  Just a few questions on redirect, your Honor.

        THE COURT:  Go ahead.

                    REDIRECT EXAMINATION

```
 1    BY MR. GOLD:

 2    Q.   Dr. Prentky, could I have you refer back to Exhibit 1,

 3    please, page 1129?  Do you recall that the government asked you

 4    about this page in particular?

 5    A.   Yes.

 6    Q.   And the government characterized this as self-report by

 7    Mr. Volungus about his past sexual activity?

 8    A.   Correct.

 9    Q.   Do you have any reason to doubt the reliability of the

01:17 10    self-report -- or the self-reported behavior in these chats?

11    A.   Counsel, I wouldn't use the word "reliability."  They

12    obviously come from him.  So to that extent, it's reliable.  He

13    articulated them, he -- I'm assuming that Indy Girl didn't make

14    this up.  So he actually said it.  I think the issue is how to

15    understand it, what sense to make of it.

16         It seems like the overwhelming evidence that we're dealing

17    with in this case comes from his writings, his drawings and his

18    declarations in the context of what he says both to Gary in

19    letter form, what he says to Indy Girl in e-mail.  We can

01:18 20    ascribe to being a veridical representation of what he's

21    actually done if we choose to, we can ascribe it to being

22    fanciful boasting, or his imagination or his vivid sexual

23    fantasy life if we wish to.  And at the end of the day there

24    really are no -- it seems to me that there are no hard answers

25    to those questions of what's real.
```

1       We know that he attempted to visit this 14-year-old.

2   That's real.  What he reports to Deanna, or Indy Girl, it's

3   entirely speculation as to how much of that actually happened,

4   whether he was, in fact, paying 200 guilder for a child in

5   Holland.  I have no idea to the extent to which, as I said,

6   this is fantasy or it's real.

7   Q.    You agreed with the government that a person in a forensic

8   context such as the one Mr. Volungus finds himself in has an

9   incentive to color statements about himself in a way that will

01:19 10   try to forestall commitment, right?

11  A.    Even here the evidence is not clean because, on the one

12  hand, it makes eminent sense that his disclosures in the course

13  of a forensic evaluation are going to be colored by the

14  circumstances of the evaluation.  We're also aware that at the

15  very time that this adjudicatory process is unfolding, he's

16  gathering information in his room at FMC Devens which would be

17  quite harmful to him, which also doesn't make sense.

18      So, again, we could ascribe that to simply poor judgment,

19  but he certainly isn't making wise decisions, either with

01:20 20   respect to his behavior at Devens, his behavior years ago, or

21  perhaps what he says in his self-report to Indy Girl.  It's not

22  clean.  His behavior is not clean.  It's very difficult to

23  simply come up with an ironclad formulaic conclusion about who

24  this man is.  To say that everything that goes to criminal

25  behavior obviously is true and all else is denial, that's

1    simplistic as well.

2    Q.   Are there incentives in the context of the chats or

3    incentives in the context of the letters to Gary Gallardo to

4    make misrepresentations in those contexts, in your view?

5    A.   There are no legal incentives, if that's what you're

6    asking me.

7    Q.   Are there incentives of some other kind?

8    A.   There are all manners of motive here.  I'm not sure if the

9    word is "incentive" or simply he's impressing Mr. Gallardo, who

01:21 10   is certainly many years, I believe, his senior, who he has

11   apparently taken under his wing.  I'm not sure what their

12   relationship is precisely.  A comrade in arms that he has

13   superior knowledge about with respect to accessing child

14   pornography on the Internet?

15       You know, we've talked before about his need for a

16   community, his need for the subculture of pedophilia.  Well,

17   here's an example of an individual that is somebody that he can

18   invest a great deal of confidence in, who looks up to him,

19   who's fulfilling some kind of needs that he has.  I've

01:23 20   no -- which is to say I don't know what the motives are, but we

21   can certainly, you know, speculate that it's fostered by the

22   nature of the relationship that he has with Mr. Gallardo.

23   Q.   Continuing with the notion of incentive, does Mr. Volungus

24   have an incentive to continue with treatment after the

25   expiration of his -- or will Mr. Volungus have an incentive to

1    continue with treatment after the expiration of his term of

2    supervised release?

3    A.   Obviously, the primary incentive is to not return to

4    prison.  And to the extent to which he values his liberty, that

5    can be a fairly powerful incentive.

6    Q.   Now, I believe the theme of the government's questioning

7    is that given the events that we've talked about in the

8    testimony pertaining to Mr. Volungus, the traveler offense, the

9    later accessing of child pornography, is that Mr. Volungus is

01:24 10   dangerous or volitionally impaired unless he receives a certain

11   course of treatment.  In your opinion, is it necessary for

12   Mr. Volungus to go through a certain course of treatment in

13   order to support an opinion that he's not SDP under the

14   statute?

15           MS. ROLLINS:  Objection to form, your Honor.

16           THE COURT:  Why don't you try it again.

17   BY MR. GOLD:

18   Q.   In your opinion, Dr. Prentky, is -- does Mr. Volungus have

19   to -- would Mr. Volungus have to undergo a certain course of

01:25 20   treatment in order to be not SDP under the statute?

21   A.   I certainly don't take treatment into consideration in

22   formulating my opinion.  I think that I was clear in my report

23   that I didn't arrive at my opinion as conditioned on treatment,

24   if that's what you're asking me.

25   Q.   I'm trying to -- well, Dr. Prentky, you testified that

1  treatment is indicated for Mr. Volungus.

2  A.   Yes.

3  Q.   That treatment includes pharmacological medication, in

4  your opinion?

5  A.   I believe the very best evidence for that is that last

6  paragraph that counsel had me read, the paragraph on page 11

7  which reports Mr. Volungus's statements regarding his

8  incapacity, his lack of control.  I believe that goes to the

9  heart of the problem here.  I believe that it speaks to the

01:27 10  more nuanced picture that I tried to paint of Mr. Volungus,

11  that he's more than simply an untreated pedophile, that he's a

12  man who has been driven to pedophilia in midlife after having

13  employed other means of coping; that at this point I have no

14  doubt that he has a highly erotic response to child

15  pornography; that if we're talking about control -- that's a

16  word that he uses, that would seem to me to be the most

17  appropriate word in this context, medication can afford that

18  sense of internal control.

19      My comment yesterday was that he -- had he been properly

01:28 20  diagnosed and medicated many years ago, it might have addressed

21  the struggle -- his lifelong struggle -- with control, with

22  hyperanxiety, with feelings of anger, and with the consequent

23  need to immerse himself in some kind of fantasy world, which

24  eventually did end in child pornography.

25  Q.   If Mr. Volungus were not to receive this treatment, would

1   he be sexually dangerous, in your opinion, or would your

2   opinion be unchanged?

3   A.   Two responses:  One, as I said before, I did not qualify

4   my opinion in my report based on treatment.  I wouldn't do

5   that.  Second, without treatment, I think there's a high

6   likelihood that he will return to child pornography.  I simply

7   don't have the behavioral evidence to conclude that without

8   treatment he will return to another attempted offense involving

9   the hands-on assault of a child.

01:30 10   Q.   And, Dr. Prentky, in your experience doing evaluations of

11   this kind, have you evaluated other cases with a similar amount

12   of behavioral evidence as is in this case?

13   A.   Similar amount of behavioral evidence?  You mean the lack

14   of evidence?  I'm not sure what you're asking me.

15   Q.   Correct.  I think you referred to the behavioral evidence

16   that you're looking for in an evaluation such as this in this

17   case to be scant?

18   A.   Yes, that was my word.

19   Q.   In comparison to other similar evaluations, have you

01:31 20   encountered scant evidence like this in your experience as a

21   forensic psychologist?

22        MS. ROLLINS:  Objection, your Honor.

23        THE COURT:  Overruled.

24        You may answer.

25        THE WITNESS:  I have to say absolutely not, Counselor.

1   As I mentioned a moment ago, I evaluate somewhere in the

2   neighborhood of a couple thousand offenders, and I'm usually

3   the -- evidence is rather compelling.  I have, perhaps more

4   often than not, had the experience once somebody has petitioned

5   for commitment that the evidence is so compelling that I -- my

6   testimony is not even used.  It's rare -- rather rare in my

7   experience -- that somebody would be petitioned for commitment

8   without a clear, bona fide, which is to say documented, history

9   of battery -- sexual battery offenses.

01:32  10        MR. GOLD:  Nothing further, your Honor.

11                        RECROSS-EXAMINATION

12   BY MS. ROLLINS:

13   Q.    So, Dr. Prentky, in order for you to find Mr. Volungus

14   sexually dangerous, he would have had to have had a battery

15   with Indy Girl, correct?

16   A.    Allow me to restate it.  In order for me to have concluded

17   that he has serious difficulty refraining from sexually violent

18   conduct, it would have to be an established pattern of sexually

19   violent conduct.

01:34  20   Q.    Okay.  So -- and I think you said earlier there would have

21   had to have been some sort of repercussion and then a

22   reoffense, correct?

23   A.    I said that in the context of defining "serious

24   difficulty."

25   Q.    Right.  Which is what I'm speaking about now.

1  A.   Yes.

2  Q.   So there would have had to have been a battery, he would

3  have had to have been found responsible --

4  A.   Yes.

5  Q.   -- and then there would have been, had to have been

6  another battery, correct, and then another battery, and then

7  you would have found him to have a volitional impairment?

8  A.   I can't, you know, give you a number.  This is

9  hypothetical.  I'm trying to give you an idea what it is I

01:34 10  would look for.

11  Q.   So you would look for at least two more incidences and

12  then he's going to be found --

13  A.   You know, the -- I mentioned before sanction or

14  punishment.  In a prior recent case that I did in federal

15  court, I found that the individual met the criterion based on

16  his seeming inability to refrain from assaulting adult women --

17  it happened to be nurses -- on the floor of the prison.  It was

18  FMC Devens.

19      So in those instances I was basing my opinion, again, on

01:35 20  behavior, but not behavior that he had been sanctioned for by

21  the criminal justice system.  But it was clear behavior and,

22  indeed, behavior in the context of a penal environment, a

23  highly restrictive environment.

24  Q.   But we have that here, don't we?  Mr. Volungus, while

25  awaiting this very proceeding, is courting sexualized material,

1    drawing pictures of himself having sex with children.  He can't

2    control that, can he?

3    A.    Counsel, it gets back to my understanding of sexually

4    violent conduct.  What he did -- and that's an excellent

5    point --

6    Q.    Thank you.

7    A.    -- in compiling 70-odd pages is provide additional

8    evidence of his compulsive need to live in this fantasy world.

9    That's what he does.  He's been doing it his whole life.

01:36 10   Q.    Except that he actually cut the umbilical cord at one

11   point and traveled?

12   A.    Yes.  Correct.  But that's what I'm saying.  That's the

13   only thing that he's ever done to attempt to actually commit a

14   battery offense.

15   Q.    But that's, Dr. Prentky, because you're not validating

16   other things he said where he's admitted in chats or letters to

17   Gary that he's, in fact, done this before, right?

18   A.    Counsel, I'm not either validating or invalidating.  I'm

19   saying that I don't know.  That he said so much -- he's

01:37 20   declared so much, I don't know what's true, I don't know what's

21   fantasy.  We could err on either side of this and say that

22   whatever he's reported of a criminal nature is probably true

23   and whatever he's reported that seems to minimize is clearly a

24   lie.  I have no idea how to ascribe truth or falsehood to these

25   statements which is why -- exactly why -- I rely on behavior.

 1          MS. ROLLINS:  I have nothing further, your Honor.

 2          THE COURT:  All right, Dr. Prentky.  Thank you very

 3     much.  You may step down.

 4          THE WITNESS:  You're welcome.

 5          (The witness is excused.)

 6          THE COURT:  I believe the next witness is the remote.

 7          MR. GRADY:  Yes, your Honor.  And he should be in the

 8     room waiting for us to start.

 9          THE COURT:  All right.  We'll take a short recess just

01:38 10     to get everything set up.

11          THE CLERK:  All rise for the Court.  The Court will

12     take a short recess.

13          (The Court exits the courtroom and there is a recess

14     in the proceedings at 10:44 a.m.)

15          THE CLERK:  All rise.

16          (The Court enters the courtroom at 11:07 a.m.)

17          THE CLERK:  For a continuation of the bench trial for

18     Volungus.

19          Please be seated.

02:02 20          MR. GRADY:  Your Honor, the government is prepared to

21     call its last witness, but there is one housekeeping matter the

22     parties would just like to briefly address.  In terms of

23     closing arguments, your Honor, the parties propose to do them

24     after proposed findings have been submitted, and that proposed

25     findings we do 30 days after whenever the court reporter

1   completes the transcript.

2        Does that work for the Court?

3        THE COURT:  That sounds fine.

4        MR. GRADY:  Your Honor, at this point, if I may?

5        THE COURT:  Yes.

6        MR. GRADY:  Okay.  The government would call Edward

7   Cardinal, who's testifying via videoconference from Albany, New

8   York, in the Northern District of New York.

9                    EDWARD CARDINAL, duly sworn

02:02 10       THE CLERK:  Please state your name, and spell your

11   last name for the record.

12        THE WITNESS:  My name is Edward Cardinal, last name

13   C-A-R-D-I-N-A-L.

14                    DIRECT EXAMINATION

15   BY MR. GRADY:

16   Q.   Mr. Cardinal, can you please tell us how you're currently

17   employed.

18   A.    Yes.  I'm currently employed as the United States

19   probation officer in the Northern District of New York.

02:03 20   Q.   And can you just give us a general description of your

21   duties as a probation officer?

22   A.    Sure.  My duties include the supervision of offenders and

23   defendants placed on pretrial supervision and post-release

24   supervision, probation or parole.

25   Q.   Are you familiar with John Volungus, and how so?

1   A.   I am familiar with John Volungus.  I was assigned to

2   supervise his case from May 2003 through his revocation in June

3   of 2005.

4   Q.   I'm going to direct you to Exhibit 6 in the binder that

5   I've provided you, and I'll just put it up to allow people to

6   follow along here.  What was the conviction for which

7   Mr. Volungus was placed on supervised release?

8   A.   The conviction included use of interstate facility to

9   attempt to persuade a person under the age 18 years of age to

02:04 10   engage in a sexual act, and possession of child pornography and

11   receipt of child pornography.

12   Q.   And can you briefly tell me, he was convicted in Kentucky

13   but you're in the Northern District of New York.  How do you

14   come to supervise an individual convicted in Kentucky?

15   A.   Sure.  While he was incarcerated, Mr. Volungus made a

16   request through the Bureau of Prisons to have his supervision

17   term completed in the Northern District of New York, which is

18   where his parents reside.

19   Q.   In that same Exhibit 6 I'm going to ask you to look at

02:04 20   Bates pages 1258 and 1259, and ask if you recognize what those

21   are.

22   A.   I do recognize those as the conditions of release.

23   Q.   And can you describe for me what happens when an offender

24   first reports to you upon their release from prison?

25   A.   When an offender is released, we sit down with the

offender and we have an initial interview.  We review the

conditions of supervision.  We try to identify barriers or

obstacles of supervision.  We try and accomplish any special

conditions such as facilitating a treatment and any other

special condition that we can do during that first meeting.

Q.   And what, if any, issues or concerns existed for you at

the time you first met with Mr. Volungus concerning your

supervision of him?

A.   There were some special conditions that we needed to

02:06 10   review and take care of.  One of the special conditions was

that Mr. Volungus needed to register as a sex offender, and we

facilitated that by providing him a sex-offender registration

form.  There were some other issues in relation to special

conditions including some computers that were present at his

release address.  There was the issue of facilitating

sex-offender-specific treatment for Mr. Volungus.  And during

that first interview, those are some of the issues that we

addressed.

Q.   Okay.  At that point were there any conditions that you

02:06 20   sought to add at that point, or were there conditions that were

typical of the Northern District of New York that were not

present?

A.   There were.  During that time we started to include

additional special conditions for those convicted of sex

offenses.  And with Mr. Volungus at the time there were two

1    conditions that I addressed:  One was that he be subject to

2    polygraph testing, and the other is that he not have any

3    contact with anyone less than 18 years old.

4    Q.   Were those conditions added to his supervised release?

5    A.   They were.

6    Q.   Now, just by way of background, one of the conditions that

7    he came to you with was that he was prohibited from having a

8    computer, correct?

9    A.   That is correct.

02:07 10   Q.   At some point was that no-computer condition removed and

11   why?

12   A.   It was.  There had been some case law dictating that the

13   restriction from anyone possessing or using their computer

14   totally was not supported.  And I had some telephone contact

15   actually with a PO in the sentencing district, and they also

16   were -- had advised that they were now operating under the new

17   case law indicating that that restriction wasn't permissible.

18   Q.   Okay.  So at some point Mr. Volungus was then permitted to

19   have a computer, correct?

02:08 20   A.   That is correct.

21   Q.   You mentioned that one of the issues was getting him a

22   mental-health evaluation.  I would ask you to take a look at

23   Exhibit 27 of the binder in front of you and ask you if you

24   recognize it.

25   A.   That's -- that is the written evaluation conducted by

1    Forensic Mental Health Associates regarding Mr. Volungus.

2    Q.   Okay.  And what -- why was this prepared?  What's its

3    purpose?

4    A.   There's several purposes.  One, the evaluation is

5    conducted to ascertain the -- any specific issues or needs that

6    a sex offender may have so that a treatment plan can be

7    devised.  Additionally, it serves as an assistance or a guide

8    in the supervision process so that our office is aware of any

9    potential areas of concern or issues.

02:09 10   Q.   Okay.  I'd ask you to take a look at Exhibit 33 in the

11   binder in front of you and ask if you recognize what that is.

12   A.   That's a letter that I had prepared and sent to U.S.

13   District Court Judge Kahn in the Northern District of New York.

14   Q.   Is that something that you prepared in the regular course

15   of your work as a probation officer?

16   A.   It is, yes.

17   Q.   Are you required to prepare such letters?

18   A.   We are.  When there's issues of noncompliance, we're

19   required to provide that information to the district court.

02:10 20   Q.   Are you required to report -- with respect to the matters

21   contained in that letter, to report truthfully?

22   A.   That's correct.

23   Q.   Okay.  I'm going to just now skip ahead a bit of time.

24   When did you first begin to supervise him?

25   A.   I first began to supervise Mr. Volungus in May of 2003.

1    Q.   Okay.  I want to skip forward to about November.  Do you

2    recall what, if anything, happened that required or caused you

3    to seek out a change of conditions of his release?

4    A.   In November of 2003 I was notified through the treatment

5    provider, Forensic Mental Health, that there were some issues

6    that arose out of Mr. Volungus's participation in a polygraph

7    examination.

8    Q.   Without talking about any specific results, what, if

9    anything, did you do in response to that communication?

02:11  10   A.   I met with -- well, I certainly reviewed the information

11   that was received during the course of the polygraph.

12   Q.   Let me back up --

13   A.   And then I met and spoke with Mr. Volungus regarding the

14   information.

15   Q.   I'd ask you to take a look at Exhibits 34 and 35 in the

16   binder in front of you.  Do you recognize those, and what do

17   you recognize them to be?

18   A.   Exhibit 34 is a redacted version of the polygraph

19   examination conducted on November 10, 2003, and Exhibit 35 is a

02:12  20   handwritten note from John Volungus in response to the outcome

21   of the test.

22   Q.   As of a result of reviewing those materials, what, if any,

23   issues/concerns did they raise for you and what, if anything,

24   did you do in response?

25   A.   There were a couple of concerns that were raised as a

1    result of the examination.  One, there was indication, again,

2    that Mr. Volungus had an attraction to children between the

3    ages of 11 and 13; additionally, Mr. Volungus had reported that

4    he had, in fact, possessed pornography at his home and was

5    viewing it.  And additionally, he elaborated that the type of

6    pornography he was viewing was such that it had titles

7    including "Barely Legal" or "Just 18," things of that nature.

8    So that's the definition.

9    Q.    This was adult pornography?

02:13 10   A.    It was determined to be -- it was reported as adult

11   pornography in terms of the adult pornography.

12   Q.    Okay.  What, if any, issues or concerns did this raise

13   with you concerning your supervision?

14   A.    Well, it definitely raised concerns.  The issue is that

15   obviously any type of pornography for someone convicted of

16   possessing child pornography presents, as a treatment issue in

17   addition to a supervision issue, in that it is considered a

18   gateway or it leads to the increasing chance of someone

19   engaging in or viewing child pornography.

02:14 20   Q.    Okay.  What did you do as a result of this?

21   A.    As a result of that I reviewed with Mr. Volungus the issue

22   of possessing and viewing pornography.  I asked him to consent

23   to a further modification of his conditions to prohibit his

24   viewing and possessing of pornography, and I let him know that

25   our recommendation to the court would be just that.

1  Q.   And was that no-pornography condition approved by the

2  court?

3  A.   It was, yes.

4  Q.   In December of 2003?

5  A.   I believe so, yes.

6  Q.   Now, at some point after you had removed the restriction

7  on his owning a computer, was there some substitute condition

8  or some modifications of that no-computer condition that was

9  proposed?

02:15 10  A.   I had -- throughout probably a few months into the

11  supervision of Mr. Volungus, I had indicated to him that our

12  office was in the process of acquiring the ability to monitor

13  computer use in that it was my intention to further modify his

14  conditions to include a condition so that his computer use

15  would be modified and -- I'm sorry -- it would be monitored.

16  Q.   And was computer monitoring ultimately added as a

17  supervised release condition by the court?

18  A.   It was, yes.

19  Q.   And in or around February 2004?

02:16 20  A.   It was in February 2004.

21  Q.   Okay.  When was the monitoring software installed in

22  Mr. Volungus's computer?

23  A.   The monitoring software was installed on April 12, 2004.

24  Q.   Was the fact that you were coming to install this going to

25  be a surprise to Mr. Volungus?

```
 1   A.   Not at all.  I had spoken, again, to Mr. Volungus on

 2   numerous occasions regarding the installation of the computer

 3   monitoring program.  I had actually -- had mentioned to him

 4   that he would need to fill out some paperwork so that we could

 5   commence the monitoring.  And I had dropped off the paperwork,

 6   I believe at the end of March 2004, and he had completed the

 7   paperwork.  And I know there were some phone conversations

 8   regarding trying to pinpoint the exact date of when I would

 9   arrive.
```

02:17 10   Q.   Can you tell us what happened when you arrived to install

```
11   the computer monitoring software on April 12, 2004?

12   A.    Sure.  I, along with Senior U.S. Probation Officer Mike

13   Patnaude, conducted a home contact for the purpose of

14   preparing -- putting the computer monitoring software on

15   Mr. Volungus's computer.  As part of that process a preview is

16   conducted to get an inventory or snapshot or a look at what is

17   currently contained on the computer.  During that process Mike

18   Patnaude and I observed what we considered child pornography on

19   the computer.
```

02:18 20   Q.   How would you describe the age and appearance of the

```
21   children in what you depicted as the child pornography?

22   A.    They were clearly young children.  I considered them

23   prepubescent children.

24   Q.    Okay.  On what do you conclude the children were

25   prepubescent?
```

1   A.   Well, based on my experience, children that don't have

2   secondary maturation, signs of starting puberty, they appeared

3   to be prepubescent.  And additionally, as outlined in the

4   supervised release plea agreement, it's noted in there as to

5   the type of -- I'm sorry -- the approximate ages of the

6   children.

7   Q.   And I would just ask you to take a quick look at Exhibit

8   40 and ask if you recognize what that is.

9   A.   I do recognize it.

02:19 10   Q.   And that's the plea agreement you just referred to?

11   A.   It is the plea agreement.

12   Q.   Okay.  I'm just going to show you -- ask you to take a

13   look at Bates page 741, or what's Paragraph 5 of that

14   agreement.

15   A.   Okay.

16   Q.   That document reads, "John Volungus admits the following

17   facts," and skipping down to the second full paragraph, "On or

18   about April 14th, officers" -- why don't you just read that

19   paragraph that begins with "on or about April 14" -- "April 12,

02:20 20   2004."

21   A.   "On or about April 12, 2004, officers with the U.S.

22   Probation Department conducted a home visit at defendant's

23   home.  While examining defendant's computer, these officers

24   observed sexually explicit images of minors on said computer.

25   Some of these images depicted prepubescent minors engaged in

1    oral sex, intercourse, and the lascivious exhibition of the

2    genital or pubic area of such minors.  Said computer was seized

3    and turned over to the Federal Bureau of Investigation."

4    Q.   And just skipping over to the next page, the first full

5    paragraph on that next page beginning with "a forensic

6    examination."  Can you read that?

7    A.   "A forensic examination of the defendant's computer by the

8    FBI resulted in the recovery of 20 to 25 images of minors

9    engaged in sexually explicit conduct.  Some of these images

02:21 10   depicted prepubescent minors engaged in oral sex, intercourse,

11   and the lascivious exhibition of the genital or pubic area of

12   such minors.  In addition, a number of the images depicted

13   prepubescent minors, and some were actually identifiable minors

14   [sic].  Moreover, at least one story involving sex with a minor

15   was recovered.  Furthermore, adult pornography was recovered

16   from said computer."

17   Q.   Okay.  Is the description of events in this plea agreement

18   consistent with your memory of events as they occurred?

19   A.   It does.

02:21 20   Q.   It is?

21   A.   It is.

22   Q.   Okay.  Now, I've skipped ahead a lot.  I want to just come

23   back to that.  This plea agreement was sometime in June 2005,

24   correct?

25   A.   That's correct.

1    Q.   I want to back up to April 12, 2004.  Was Mr. Volungus

2    arrested or violated at that point?

3    A.   He was not.

4    Q.   Why not?

5    A.   Our office had decided that we wanted to further

6    investigate what we discovered and we wanted the ability to

7    turn over the seized computer to the FBI for further analysis.

8    Q.   Would anything be done differently today?

9    A.   It would.  Since that time our office has evolved in

02:22 10   regards to our technology, our ability to review computers,

11   and -- it's just evolved.

12   Q.   Would he have been allowed to remain at large?

13   A.   Today should that have occurred, he would have been -- our

14   office would have recommended to the court that a warrant be

15   issued for his arrest.

16   Q.   But in this case you were waiting for the FBI analysis?

17   A.   That's correct.

18   Q.   What did you do with the computer on April 12th?

19   A.   We seized it; I returned it to the office; we secured it.

02:23 20   And then we, from there, made arrangements to turn it over to

21   the FBI.

22   Q.   Okay.  During the time you were reviewing the images on

23   the computer, where was Mr. Volungus?

24   A.   Primarily he was in his bedroom with us at the time.

25   Q.   What, if anything, was he doing?  What was he saying?

1    A.   Mr. Volungus was pretty emotional.  He was reporting that

2    he had no idea how the images were placed or were located or

3    why they were on his computer.

4    Q.   The next day did you receive a call from someone?

5    A.   I did.  I received a call from the father of John

6    Volungus.

7    Q.   And as a result of that call -- or just tell us, what was

8    the nature of that call?

9    A.   The nature of the call was Mr. Volungus indicated to me

02:24 10   that John's reporting to him that John had no idea how the

11   images were on his computer and that he would like to come down

12   to my office and discuss the matter.

13   Q.   As a result of that call was there a discussion at your

14   office?

15   A.   Well, there was.  John Volungus came down with his father,

16   and, actually, I wanted the opportunity for John to speak to me

17   alone.  So I actually spoke with John without his father

18   present.

19   Q.   When did that discussion take place?

02:24 20   A.   I think -- I believe it was April 15th.  If I needed to be

21   specific, I could allude to my chronological records.

22   Q.   And to refresh your memory, if you could take a look at

23   page 2070 on the Bates-stamped material that you have out

24   there.  And take a look at the notes for April 13th, 2004.

25   A.   Okay.  So the --

```
 1   Q.   Excuse me.

 2   A.   Okay.  So the --

 3   Q.   Let me stop you for a second.

 4   A.   -- offices -- yeah, I spoke --

 5   Q.   Let me stop you for a second.  Did that refresh your

 6   memory as to the date that the conversation with Mr. Volungus

 7   occurred?

 8   A.   It did, yes.

 9   Q.   Okay.  Can you now tell us the date on which you spoke

02:25  10   with Mr. Volungus?

11   A.   It was April 15, 2004.

12   Q.   Okay.  When you spoke to Mr. Volungus on April 15th, what

13   did he say?

14   A.   Mr. Volungus again indicated to me that he had no idea how

15   the child pornography was put -- placed on his computer, and he

16   had -- he had indicated to me he had a problem and that he had,

17   in fact...

18   Q.   Are you having trouble recalling exactly what was said?

19   A.   I was.  And if I could just take a moment to review it, it

02:26  20   would be helpful.

21   Q.   Sure.  If you'd look at the chronology date April 15,

22   2004, 2071 of the Bates-stamped material that you have.  And

23   when you're done, just look up.

24        Have you had an opportunity to review contemporaneous

25   notes that you made concerning Mr. Volungus's statements?
```

```
 1   A.   I did.

 2   Q.   Okay.  And did that refresh your present recollection

 3   regarding what was said by Mr. Volungus?

 4   A.   It has.

 5   Q.   Okay.  Can you tell me what Mr. Volungus said?

 6   A.   Mr. Volungus indicated to me that he had a problem -- that

 7   he had a problem controlling himself.  He indicated to me that

 8   he had looked at some -- been in some chat rooms called "Youth

 9   and Beauty," and that's pretty much the gist of it.

10   Q.   What, if anything, did he tell you about wanting to

11   control -- or his ability to control his impulses?

12   A.   That he had difficulty controlling his impulses.

13   Q.   What, if anything, did you do after this conversation?

14   A.   Subsequent to that conversation I increased the

15   supervision activities for Mr. Volungus --

16   Q.   Let me take a step back.

17   A.   -- and that included more frequent office contact.  I was

18   in contact with Forensic Mental Health Associates, the

19   treatment agency in which Mr. Volungus attended.  I facilitated

20   some individual treatment sessions.  And just overall, an

21   increase in supervision.

22   Q.   Okay.  I'd ask you to just take a quick look at Exhibit 24

23   in the binder in front of you.  Do you recognize that?

24   A.   I do.

25   Q.   What is it?
```

1    A.    That's a written statement by Mr. Volungus dated April

2    15th, 2004.

3    Q.    At whose direction was that prepared?

4    A.    I had asked Mr. Volungus to prepare a written statement in

5    regards to the information that he provided me on that date.

6    Q.    At this point you've taken away Mr. Volungus's computer,

7    correct?

8    A.    We had.  He agreed not to use or possess a computer.

9    Q.    But there were other computers in the home he was residing

02:31 10   in, correct?

11   A.    That's correct.

12   Q.    At some point in June did you have a conversation with

13   Mr. Volungus's mother concerning her computer?

14   A.    I did, in fact.  I had made an unannounced home contact to

15   the home of the Volunguses.  I was informed that John Volungus

16   was not home at the time.  I took the opportunity to speak with

17   Mrs. Volungus.  During that conversation she indicated to me

18   that she -- during her computer use, that there were

19   pornography images popping up as she was using it.

02:31 20   Q.    Okay.  And what, if anything, did these circumstances

21   suggest to you?

22   A.    They suggest to me that --

23         MR. FICK:  Objection.

24   A.    -- someone was actively using the computer --

25         THE COURT:  Excuse me, Mr. Cardinal.  Mr. Cardinal,

1   wait a minute.  There's an objection, I think.  Let me hear it.

2       MR. FICK:  Objection.  He's asking the officer to

3   speculate about why Mrs. Volungus may have seen pornography pop

4   up on her computer.

5       MR. GRADY:  I'm asking what his understanding or what

6   his --

7       THE COURT:  No, the question is permitted.  Go ahead.

8   You may re-ask it so it's clear.

9   BY MR. GRADY:

02:32 10   Q.   What did these circumstance suggest to you?

11   A.   They suggested to me that someone was viewing pornography

12   on the computer.

13   Q.   Okay.  And what, if anything, did you say to Mrs. Volungus

14   concerning what this suggested to you?

15   A.   I suggested to Mrs. Volungus that someone may be viewing

16   pornography on her computer.

17   Q.   And what did she say?

18   A.   I believe -- she stated that John didn't have access to

19   the computer and that it was password-protected.

02:33 20   Q.   Despite the fact that the computer was password-protected,

21   did you still have concerns and what were they?

22   A.   My concerns were that John may have been using the

23   computer without his mother's or father's knowledge.

24   Q.   Bringing yourself now forward to May of 2005, without

25   speaking to particular results of any examination that was

1   done, did the results of a polygraph examination conducted at

2   that time cause you to have concerns about whether there had

3   been unauthorized contact with a minor under the age of 18?

4   A.   Yes.   I received information from the Forensic Mental

5   Health as well as the -- as a result of the polygraph there was

6   information regarding Mr. Volungus's reporting his having

7   contact with a niece that was approximately five or six years

8   old.

9   Q.   And just for the record, if we could refrain from using

02:34 10   the name of that individual, if we know of the niece, or use

11   initials, okay?

12   A.   Okay.

13   Q.   Can you just take a look at what's been marked in front of

14   you as Exhibits 29, 30 and 31, and I'll ask if you recognize

15   what those are.

16   A.   I'm sorry.   Can you just state what the exhibits are

17   again?

18   Q.   29, 30 and 31.

19   A.   Okay.

02:35 20   Q.   What are those just in order, 29, 30 and 31?

21   A.   Exhibit 29 is a redacted version of a -- the outcome of a

22   polygraph examination conducted on May 27, 2005; Exhibit 30 is

23   a written statement by John Volungus witnessed by a

24   polygrapher; and Exhibit 31 is a typed statement by John

25   Volungus dated May 27, 2005.

1    Q.   Okay.  Did you review those back in May of 2005?

2    A.   I did.

3    Q.   Okay.  Without explaining any reliance you may have placed

4    upon the results of any particular polygraph examination,

5    question or response, what, if any, issues/concerns did these

6    events, or the events relayed in these documents and Volungus's

7    statement, raise for you?

8    A.   Well, first and foremost, I was alarmed by Mr. Volungus's

9    report of his contact with his niece.

02:36 10   Q.   Okay.  And ultimately, was this found to be a basis upon

11   which Mr. Volungus was found to have violated the conditions of

12   his release?

13   A.   That is correct.

14   Q.   In or around this same time, May or June of 2005, did you

15   receive information from the FBI concerning their analysis of

16   Volungus's computer?

17   A.   I did, yes.

18   Q.   And if I could just ask you to take a quick look at

19   Exhibit 44 in front of you in the binder.  Can you tell us what

02:36 20   that is?

21   A.   Exhibit 44 is a report from the Federal Bureau of

22   Investigation dated June 28, 2005.

23   Q.   And what is the subject of that report?

24   A.   The subject of the report is a review -- is a report

25   regarding the review of the seized computer from Mr. Volungus,

1    and it indicated that there were images depicting children

2    engaged in child pornography.

3    Q.    That report is dated late June.  Did you actually receive

4    notification of the results sometime sooner?

5    A.    I did, yes.

6    Q.    Okay.  As a result of these events, the completion of the

7    computer forensic evaluation and the incident with Volungus's

8    niece, what did you do?

9    A.    In response, I notified Judge Kahn, U.S. District Judge,

02:37 10   and made a recommendation that a warrant for Mr. Volungus's

11   arrest be issued.

12   Q.    Okay.  And I'd ask you to take a look at Exhibit 38 in the

13   binder in front of you, and ask you whether you recognize what

14   that is.

15   A.    Exhibit 38 is the actual warrant for Mr. Volungus's arrest

16   and an amended Petition for Warrant for Offender Under

17   Supervision.

18   Q.    Was Mr. Volungus subsequently arrested after the issuance

19   of that warrant?

02:38 20   A.    He was, yes.

21   Q.    Okay.  And on June 29, 2005, what happened?  What, if any,

22   admissions did he make concerning the allegations of the

23   warrant?

24   A.    Mr. Volungus appeared in front of -- U.S. District Court,

25   and he pled guilty to three violations.

1   Q.   And just for the record again, I'd ask you to take a look

2   at Exhibit 40 and tell me what that is.

3   A.   Exhibit 40 is a plea agreement -- a supervised release

4   plea agreement.

5   Q.   What, if any, sentence did Mr. Volungus receive for

6   violating his supervised release?

7   A.   Mr. Volungus was sentenced to 23 months' imprisonment and

8   13 months' supervised release.

9   Q.   After the surrender of Mr. Volungus in July of 2005, did

02:39 10   you receive additional information or materials concerning

11   Mr. Volungus?

12   A.   I did.   In July 2005 I received a call from a United

13   States probation officer in the Western District of Texas.

14   Q.   And what was the nature of that call?   What was the nature

15   of that communication?

16   A.   The probation officer in Texas indicated to me that he

17   supervised a gentleman by the name of Gary Gallardo.   He

18   indicated that Mr. Gallardo was arrested and charged with

19   possession of child pornography.   He also indicated that during

02:40 20   the search of Mr. Gallardo's belongings at home, it was

21   discovered that there were letters written by John Volungus

22   sent to Mr. Gallardo, and he was in possession of them.

23   Q.   Did you obtain a copy of those letters?

24   A.   Yes.

25   Q.   I'd ask you to take a look at Exhibit 26 in the binder in

1   front of you and ask you if you recognize what that is.

2   A.   Exhibit 26 is a copy of the letters that were provided to

3   me by the U.S. probation officer in Texas.

4   Q.   I won't go through all of this, just some portions of it.

5   I would ask you to take a look at page 786 in those materials.

6   If you could read the third full paragraph beginning "Got a

7   laptop computer."  Do you see that?

8   A.    It says, "Got a laptop computer, a wireless card and a" --

9   something -- "setup, less than 1K.  Get Yahoo Messenger.  Many

02:41 10   good chat rooms where goodies are posted and traded."

11   Q.   Continuing?

12   A.   Something.

13   Q.   "Watched"?

14   A.   "Watched some great video last night including one of a

15   guy's daughter, about seven.  Cute as hell, and does a hell of

16   a sexy striptease and pussy show.  I got to figure out how to

17   save a webcam broadcast."

18   Q.   What, if any, issues or concerns does this particular

19   letter raise for you concerning your past supervision, any

02:42 20   supervision you may be called to undertake in the future?

21   A.   Well, it suggested to me that all the efforts that our

22   office and myself provided Mr. Volungus to try to get him to

23   contain his behavior and work on his issues really were

24   fruitless in that he was committed to, you know, give in to his

25   impulses and...

1    Q.    Okay.  I'm just going to ask you to take a look at page

2    792, those same exhibits.  I would ask you to read the second

3    full paragraph beginning, "Met one fella."

4    A.    792?  And you said the second --

5    Q.    Second full paragraph which appears to begin, "Met one

6    fella."

7    A.    "Met one fella last week.  Watched his webcam.  He was

8    finger-fucking his daughter for the world to see.  She looked

9    about six years old.  She was loving it.  He had a microphone

02:43 10  on.  She was asking him, 'Do it faster, Daddy.'  And, 'Yeah,

11   right there.'  Was fucking amazing.  If I hadn't been in the

12   middle of the library I would have whipped it out and jacked

13   off right there."

14   Q.    What, if any, issues does this -- or concerns does this

15   raise for you concerning your past supervision and supervision

16   you may be called upon to undertake in the future?

17   A.    Again, our office had gone to great lengths to facilitate

18   effecting change in assisting Mr. Volungus in containing

19   himself, and it appears that he was just committed to giving in

02:44 20  to his impulses and, you know, obviously doing it at a library.

21   And it would suggest to me, obviously, he wasn't heeding the

22   recommendations of the treatment agency and everyone else.

23   Q.    Okay.  Coming back to the point at which Mr. Volungus's

24   computer was seized in April of 2004, was there any particular

25   location outside the home at which you recall Mr. Volungus

1    spending a great deal of time?

2    A.    There was.  I had spoken to Mr. Volungus on numerous

3    occasions regarding his being at various libraries located in

4    and around the area in which he lived.

5    Q.    Coming back to the content of this letter, what, if

6    anything, does this suggest to you concerning why Mr. Volungus

7    began spending so much time in libraries after his computer was

8    seized?

9              MR. FICK:  Objection.

02:45 10              THE COURT:  Overruled.

11              THE WITNESS:  It's clear to me that Mr. Volungus had

12    viewed the library as a source of accessing information that he

13    desired, and it was a way that he was protected from being

14    discovered.

15    BY MR. GRADY:

16    Q.    I'm just going to ask you to take a look at one last thing

17    in these letters again.  Back to 792 of Exhibit 26, the first

18    full paragraph beginning, "Our stonewall is coming."  Can you

19    read that for us?

02:46 20    A.    "Our stonewall is coming.  As the EU gaining more power

21    economic and political, the closer they are to telling the USA

22    to fuck off.  The Netherlands already have a 12-year-old age of

23    consent and" -- something -- "KP to be sold.  Europe has always

24    liked kiddie porn and kid sex.  They will be the first to

25    reestablish it, with Asia and Latin America following closely

1    to cash in on tourism."

2    Q.    Okay.

3    A.    "Changes are coming in the foreseeable future."

4    Q.    Just for the record, when that letter refers to "KP," what

5    is it you understand "KP" to be initials for?

6    A.    Kiddie porn.

7    Q.    Okay.  Now, if I could ask you just to go back to page 789

8    and take a look at the date this letter was written?

9    A.    I'm sorry.  The date?

02:47 10   Q.    What date was this letter written?

11   A.    Dated March 13, 2005.

12   Q.    Now, one of the conditions of Mr. Volungus's supervision

13   was that he undergo sex-offender treatment, correct?

14   A.    That is correct.

15   Q.    And at this point in March of 2005, approximately how long

16   had he been attending sex-offender treatment?

17   A.    He had been attending treatment for almost two years.

18   Q.    In your view as a probation officer and given your

19   experience in overseeing or supervising sex offenders, is this

02:47 20   letter reflective of an individual who's engaging in

21   sex-offender treatment?

22   A.    It isn't.  As a matter of fact, he was -- had the

23   opportunity to engage in individual treatment from -- for the

24   previous nine months, and I believe the individual treatment

25   stopped in March of 2005.

1    Q.    Okay.  One last question:  Based upon what you now know,

2    are his current conditions of release sufficient?

3    A.    I'm not sure there are any conditions that are sufficient

4    if someone is not willing to try to contain their impulses or

5    work on whatever issues that drive him.  If Mr. Volungus wanted

6    to effect change, he would have to do it internally.

7    Q.    Okay.

8          MR. GRADY:  May I have a moment, your Honor?

9          (Counsel confer off the record.)

02:49 10        MR. GRADY:  Your Honor, the government has no further

11   questions for this witness.

12                        CROSS-EXAMINATION

13   BY MR. FICK:

14   Q.    Good morning, Mr. Cardinal.

15   A.    Good morning.

16   Q.    My name is Bill Fick.  I'm one of the lawyers representing

17   Mr. Volungus.  I tend to talk too fast, and that may be

18   magnified by the video link here.  So if you have trouble

19   understanding me, let me know and I'll try to slow down and ask

02:49 20   the question again.  I'm sure the court reporter will be

21   grateful as well.

22   A.    I will.

23   Q.    Thank you.  So it's fair to say, isn't it, that a lot of

24   your work involves taking steps to bring offenders into

25   compliance and help them stay compliant with their release

1   conditions?

2   A.   I'm not sure how to answer that.  No.

3   Q.   Well, as a probation officer you're charged with enforcing

4   the conditions that are imposed on people, right?

5   A.   Correct.

6   Q.   And you certainly want to help them succeed, right?

7   A.   Correct.

8   Q.   And so there's a kind of give-and-take that you have with

9   individuals over time in your efforts to ensure that they are

02:50 10   compliant and stay compliant, right?

11   A.   I'm not sure if I understand what you mean by

12   give-and-take.

13   Q.   Well, a supervision of offenders can often be kind of a

14   bumpy road, right?

15   A.   It can be.

16   Q.   People coming out of federal prison for various kinds of

17   crimes had various kinds of issues in their lives that led them

18   to where they are, right?

19   A.   Yes, true.

02:50 20   Q.   A drug addict coming out of prison is going to have a

21   struggle, potentially, with drug addiction going forward,

22   right?

23   A.   Correct.

24   Q.   So part of a probation officer's role is to work with the

25   offender to keep them on the straight and narrow and impose

1    sanctions if they violate, right?

2    A.    That is correct.

3    Q.    And with all the various issues different offenders have,

4    a myriad of different -- a myriad of different things happen

5    over time in your interaction with offenders, right?

6    A.    Correct.

7    Q.    And it's not uncommon for offenders to be compliant in

8    some respects and not in others, right?

9    A.    Correct.

02:51 10    Q.    And there were, for example, aspects of his compliance in

11    which -- there were aspects of the release conditions in which

12    Mr. Volungus was consistently compliant, correct?

13    A.    Correct.

14    Q.    In other words, he took the necessary steps to register as

15    a sex offender.  He even did that, I think you said, in his

16    first meeting with you, correct?

17    A.    Correct.

18    Q.    He filled out that paperwork so it could be sent in,

19    right?

02:52 20    A.    Correct.

21    Q.    And he filed his monthly reports to the probation office,

22    correct?

23    A.    Correct.

24    Q.    He didn't have any issues with substance abuse that you're

25    aware of?

```
 1   A.   Correct.

 2   Q.   He maintained stable employment?

 3   A.   For the most part.

 4   Q.   He sought advanced permission if he wanted to make

 5   overnight travel, right?

 6   A.   That is correct.

 7   Q.   He didn't incur any new criminal charges at least up until

 8   this revocation issue that happened -- the events of 2004?

 9   A.   Correct.

10   Q.   Other than that which was resolved by way of a violation,

11   there's no other -- no new criminal conduct of which you're

12   aware or which was reported?

13   A.   Correct.

14   Q.   He did report any incidental contact he had with law

15   enforcement.  Like there was an example, wasn't there, in 2004

16   when he called the police because someone had slashed the tires

17   on his car?

18   A.   Correct.

19   Q.   So he promptly reported to you that "I had interaction

20   with police officers for that reason," correct?

21   A.   Correct.

22   Q.   And he told you about his membership in a historical

23   reenactment club, correct?

24   A.   Correct.

25   Q.   And any time the club was going to do something, for
```

example, on a property that might be near a school, he told you

in advance and confirmed with you that there were not going to

be any kids present, right?

A.   That is correct.

Q.   And at one point when you learned he had accumulated

certain sort of ancient weapon-type props to use at these

events, like a sword or something like that, you instructed him

to get rid of those things, and he complied with that, right?

A.   That's correct.

02:53 Q.   And he participated in the sex-offender treatment that was

prescribed by your office, right?

A.   He attended.

Q.   Right.  And his attendance, at least from '03 to '05, was

excellent.  He made the bulk of his meetings as required,

right?

A.   That's correct.

Q.   And Forensic Mental Health Associates, that's a vendor

that your office works with and has worked with for some time,

correct?

02:53 A.   That is correct.

Q.   And they're a provider that works under the guidelines of

the Association for the Treatment of Sexual Abusers?

          MR. GRADY:  Objection.

          THE WITNESS:  They are, correct.

BY MR. FICK:

1   Q.   And you're familiar with the organization, generally,

2   right?

3   A.   Correct.

4   Q.   And, in fact, a fair amount of attention in recent years

5   has been paid by probation and pretrial services nationally to

6   address issues of how best to supervise sex offenders, right?

7   A.   That is correct.

8   Q.   So new information, guidelines, protocols are being sort

9   of distributed among probation officers nationally to deal with

02:54 10   these issues, right?

11   A.   That is correct.

12   Q.   And Forensic Mental Health, in particular, used a

13   cognitive behavioral therapy approach, right?

14   A.   That is correct.

15   Q.   And as an initial matter, Mr. Volungus was mostly doing

16   weekly group sessions, correct?

17   A.   That is correct.

18   Q.   And then around the time the incident with the computer

19   happened in 2004, you facilitated one-on-one treatment as well

02:55 20   there for a while, right?

21   A.   Correct.

22   Q.   And then it got backed off to the weekly group sessions

23   again?

24   A.   Correct.

25   Q.   Okay.  And is it fair to say that after the incident with

1    the computer in 2004 -- well, actually, before I ask that, part

2    of your monitoring someone on supervision, in particular a sex

3    offender, you receive regular reports back from the treatment

4    provider, correct?

5    A.   That is correct.

6    Q.   They evaluate for you how the person is doing, what the

7    issues are that you may need to be attentive to, right?

8    A.   That is correct.

9    Q.   And so that the reports that they give and the information

02:55 10   that they provide to you are things that you rely upon in

11   trying to figure out how best to supervise the offender, right?

12   A.   That is correct.

13   Q.   And is it fair to say that Mr. Volungus's evaluations at

14   the beginning, say in 2003 through the beginning of 2004,

15   tended to suggest he had a ways to go in terms of his -- the

16   substance of his participation, right?

17   A.   Correct.

18   Q.   And that after the seizure of the computer in 2004, the

19   evaluations you were getting from Forensic Mental Health

02:56 20   actually got better in terms of the substance of Mr. Volungus

21   acknowledging his issues and trying to deal with them, right?

22   A.   Correct.

23   Q.   And, in fact, I think Exhibit 62 in the binder in front of

24   you contain certain progress reports in reverse chronological

25   order that you received from Forensic Mental Health, correct?

A.   I don't -- my exhibits only go to 60.

Q.   Oh, well, I think these were added later, but I can forego

questions on this, I guess.  I just want to make sure -- we can

make sure the record is complete.

        MR. GRADY:  That is my mistake, your Honor, that it's

not there.  I meant to send the entire binder but...

        MR. FICK:  That's fine.  I understand there's a late

addition --

        THE COURT:  What is 62?  I had something added at the

hearings, but I don't see what 62 is.

        MR. FICK:  62 is a compilation of progress notes from

Forensic Mental Health that were supplied to probation.

        MR. GRADY:  Your Honor, I'm happy to approach --

        MR. FICK:  Your Honor, we can handle this, sort of,

housekeeping later.  I'm happy not to actually inquire about

the documents.  We can rely on them later, and they sort of

speak for themselves and we can go on.

BY MR. FICK:

Q.   I apologize for the interruption there, Mr. Cardinal.  So

I want to sort of step back now from sort of the general

questions and talk in a little more detail about the chronology

you went through with the government.

A.   Sure.

Q.   And one of the things you do in the course of your work to

sort of keep track of your interactions with offenders is you

1  keep a kind of chronological -- running notes about your

2  interactions, correct?

3  A.   Correct.

4  Q.   And that's something that's facilitated by a piece of

5  software that your office uses, and then those records are kept

6  on the computer so you can refer back to them?

7  A.   Correct.

8  Q.   And, in fact, when you were refreshing your memory during

9  your testimony here on direct, one of the things you were

02:58 10  referred to at various points was this chronological file for

11  Mr. Volungus, right?

12  A.   That's correct.

13  Q.   Now, you talked about his supervision commencing in May of

14  2003 when you had the first interview with him, right?

15  A.   Correct.

16  Q.   And that's the meeting where you went over his conditions

17  and he filled out the New York registry form right there,

18  right?

19  A.   Correct.

02:58 20  Q.   And at that point there still was a condition that he was

21  to have no computer access at all, right?

22  A.   That is correct.

23  Q.   And so at the first meeting Mr. Volungus told you that his

24  father had four computers in the house and arrangements were

25  being made to lock them in a separate room to which he would

1   not have access, right?

2   A.   That is correct.

3   Q.   Then that condition later gets removed later in the summer

4   of '03 because of the change in the law you mentioned, right?

5   A.   Correct.

6   Q.   But at roughly the same time, or a little bit earlier, he

7   agreed to some additional conditions, the polygraph and the no

8   unauthorized contact with somebody under the age of 18, right?

9   A.   That's correct.

02:59 10   Q.   And he voluntarily agreed to the addition of those

11   conditions, right?

12   A.   Correct.

13   Q.   And then in September of 2003 do you recall making an

14   unannounced visit to Mr. Volungus's house when he wasn't there?

15   I'm happy to have you refer to your notes if you'd like.   I

16   think it's on the page marked 2075.   Down toward the bottom of

17   the page.

18   A.   Yes.

19   Q.   And at that point -- this is in September of 2003 --

03:00 20   Mr. Volungus wasn't home.   You met other members of the family

21   including his visiting sister-in-law and niece, correct, the

22   five-year-old niece?

23   A.   Correct.

24   Q.   So this is the niece that we talked about later in 2005 in

25   connection with the polygraph, right, the same niece?

1    A.    I don't know definitively, but I assume, yes.

2    Q.    In any event -- so back in September of '03 Mr. Volungus

3    isn't home, the niece and the sister-in-law are visiting, and

4    you establish with everyone in the family that they know

5    Mr. Volungus is not supposed to have unsupervised contact with

6    the niece, correct?

7    A.    Correct.

8    Q.    And, in fact, they tell you that efforts are made to make

9    sure that that doesn't happen when they're in the house, right?

03:00 10   A.    Yes.

11   Q.    Okay.  And then you talked about this in October with

12   Mr. Volungus in a meeting, right, where he acknowledged that

13   his brother and family sometimes visit and that he knows that

14   he can't be alone with the niece, right?  That's on 2076, if

15   you want to take a look.

16   A.    That's correct.

17   Q.    Then in October -- well, during your direct testimony you

18   talked a little bit about the polygraph in November and the

19   adult pornography that caused the no-pornography condition to

03:01 20   be added.  Do you remember that?

21   A.    I do.

22   Q.    Okay.  Even before the polygraph, right, in October of

23   2003, earlier than that, you had a meeting with Mr. Volungus

24   and the sort of head of the treatment organization, Dr. Hamill,

25   right?

1    A.    That's correct.

2    Q.    And at that time Dr. Hamill was very up-front and said he

3    had concerns about Mr. Volungus reoffending with a computer,

4    right?

5    A.    That is correct.

6    Q.    And then you had a meeting with Mr. Volungus on November

7    6th, before the polygraph, correct?

8    A.    That's correct.

9    Q.    And in that meeting before the polygraph Mr. Volungus

03:02 10   admitted to you that he had been using adult pornography that

11   he was getting over the Internet, right?  If you want to look

12   at the notes, I can refer you to page 2077.

13   A.    That's correct.

14   Q.    Then the polygraph that we talked about happens a little

15   bit later, in November, right, the 10th or 12th or so, correct?

16   A.    That's correct.

17   Q.    After that you made unannounced visit to Mr. Volungus's

18   house, right?

19   A.    Correct.

03:03 20   Q.    He admitted the pornography use.  He also, among other

21   things, still had a box with what you observed to be adult

22   pornography that he was going to discard, and he took steps to

23   discard that, correct?

24   A.    Correct.

25   Q.    And so you observed personally at that point adult

1    pornography and did not observe any child pornography, correct?

2    A.   Correct.

3    Q.   And then later in November, the formal no-pornography-

4    of-any-kind modification to the conditions was signed, right?

5    A.   That is correct.

6    Q.   Moving then ahead to January of 2004, you had a meeting

7    with Mr. Volungus where, again, he reported to you that his

8    brother's family and the niece were in his house, but he,

9    again, you know, explained to you he avoided any unsupervised

03:04 10   contact, right?

11   A.   Correct.

12   Q.   And then in February the computer monitoring condition was

13   added, right?

14   A.   That's correct.

15   Q.   And then in April we have the incident that you discussed

16   where you came to install the monitoring software, and certain

17   images of child pornography were visible, right?

18   A.   That is correct.

19   Q.   Now, in addition to the child pornography images, there

03:04 20   were other kinds of images including images that you would

21   describe as not being child pornography, right?

22   A.   That's correct.

23   Q.   So there's a mix of stuff.  Some of it included child

24   pornography?

25   A.   Correct.

1    Q.    And then you talked a little bit in your direct

2    examination about a meeting that you had with Mr. Volungus at

3    your office on the 16th, I think it is, or the 15th of April.

4    Do you remember that testimony?

5    A.    I do remember that testimony.

6    Q.    And you were trying to recall what was said, and you sort

7    of paraphrased what was in your notes.  And I mean, beyond

8    that, you actually met with Mr. Volungus over an hour and a

9    half on that day, correct?

03:05 10   A.    I believe it was.

11    Q.    So it was a lengthy meeting.  And so today your best

12    memory is really just what's in your notes?

13    A.    That's correct.

14    Q.    And among other things, Mr. Volungus acknowledged to you

15    in that meeting that he really has a problem, right?

16    A.    That's correct.

17    Q.    Said it was something that he's struggling with and really

18    wants to be able to overcome?

19    A.    Correct.

03:05 20   Q.    Now, shortly after, I think even the next day, you

21    received a report from Forensic Mental Health that Mr. Volungus

22    was having suicidal ideation, correct?

23    A.    That is correct.

24    Q.    And that's part of what prompted you to facilitate the

25    additional one-on-one treatment sessions then, right?

1    A.    That was one of the reasons, correct.

2    Q.    And then in about three months later -- maybe less, two to

3    three months later -- in September Forensic Mental Health

4    reported that he had -- well, I guess the entire contract with

5    Forensic Mental Health for Mr. Volungus ended -- the first

6    contract -- or the contract he was operating under ended in

7    September with a report of successful progress, and then the

8    contract was reupped again to begin again, correct?

9    A.    Yeah.  I mean, are we talking about the administration of

03:06 10   the payment in which allows us to pay for the treatment?  Is

11   that what you're referring to?

12   Q.    Well, I can just refer you to your notes on page 2064 from

13   September 3rd of 2004.  I'm sorry, September 30th of 2004, not

14   the 3rd.

15   A.    2064.

16   Q.    Your notation on that day was, "End of contract.  Reason:

17   Successful progress," right?

18   A.    I'm sorry.  Can you just give me that date again?

19   Q.    September 30th.

03:07 20   A.    September 30th?  Okay.  So that's -- that's an

21   administrative entry in the chronological record; that's not my

22   entry into the chronological record.

23   Q.    All right.  In any event, after that entry is made, then

24   the contract is reupped for him to continue, right?

25   A.    Absolutely.

1   Q.   And at that point it's continuing with both the individual

2   and the group therapy, right?

3   A.   Yes.

4   Q.   Then he -- you had a discussion with Mr. Volungus then in

5   January of 2005; you sort of had a check-in with him to talk

6   about his treatment, right?

7   A.   Can you --

8   Q.   Yes.  I can refer you to page 2062, I believe, a meeting

9   on January 6th of '05.

03:08 10   A.   Yes.

11   Q.   He acknowledged to you again his attraction to minors and

12   his need to control it, right?

13   A.   That's correct.

14   Q.   And he said he felt like he was making progress in

15   treatment, right?

16   A.   That's correct.

17   Q.   Okay.  And then in the end of January you received a

18   report from Forensic Mental Health reporting that Mr. Volungus

19   was exploring the role of his attraction to minors and a way to

03:09 20   manage it, right?

21   A.   I can't speak to that report, but okay.

22   Q.   Well, just referring you to your entry in the notes for

23   January 26th, up ahead on the same page, there's a reflection

24   there of the report from Forensic Mental Health, and that's one

25   of the things that you said you relied upon in supervising --

1    A.    That is a summation of the report entered by me, correct.

2    Q.    Okay.  And the gist of it was that he is exploring the

3    role of his attraction to minors and trying to figure out how

4    to manage it?

5    A.    Correct.

6    Q.    Then you had another check-in with him personally about

7    treatment in April of 2005, right, page 2060?  And again --

8    A.    Correct.

9    Q.    I'm sorry.  I didn't mean to step on your answer.

03:10 10   A.    No, I just said "correct."

11   Q.    And again, there he's open with you about acknowledging

12   his attraction to minors and the need to keep it in check?

13   A.    Correct.

14   Q.    Then later in April, FMHA reports to you -- Forensic

15   Mental Health reports to you that he's done with the one-on-one

16   treatment and he's "gained an insight.  Doing well.  Knows his

17   limits.  Biggest problem is computer use."  That's the

18   assessment of Forensic Mental Health as of April 2005, right?

19   A.    Correct.

03:11 20   Q.    And then May is when the polygraph examination concerning

21   the visit of the niece to the home occurs that causes concern

22   that we talked about, right?

23   A.    Correct.

24   Q.    And when that happened, you sort of referred the issue to

25   the Child Protective Services in New York for them to do their

1    own investigation, correct?

2    A.   The child protective agency conducted an investigation.

3    Q.   Right.  And that investigation, after interviewing

4    numerous people, concluded that nothing inappropriate had

5    happened, correct?

6    A.   The case was unfounded.

7    Q.   And then mid-June is when Mr. Volungus is arrested and the

8    revocation proceeding takes place that we talked about.  June

9    of '05?

03:12 10   A.   That's correct.

11   Q.   And at some point after the seizure of the computer -- and

12   I'm not personally recalling when in the chronology of the

13   revocation it happened -- but at some point after you,

14   probation, seize Mr. Volungus's computer, separately the FBI

15   executed a search warrant at the Volungus home, correct?

16   A.   That's correct.

17   Q.   And no further contraband was found -- no

18   child-pornography-type contraband or any contraband was found

19   -- otherwise in the Volungus home, correct?

03:12 20   A.   As far as I'm aware.

21   Q.   Now, you talked a little bit about potential conditions

22   when Mr. Volungus -- if Mr. Volungus were to be released.  Do

23   you recall that?

24   A.   I do.

25   Q.   And so it's your understanding, is it not, that he has 13

```
 1   months of supervised release remaining should he be released,
 2   correct?
 3   A.   That's still unclear to me.
 4   Q.   Unclear to you on what basis?  I mean, he was -- the
 5   revocation sentence imposed 13 months of additional supervised
 6   release, did it not?
 7   A.   Right.  And as you're probably aware, there's been several
 8   cases that have dictated when that supervised release
 9   commences, and I'm still unclear as to when it does commence.
03:13 10   Q.   So you're concerned that it may be deemed to run while
11   he's been in prison pending commitment?
12   A.   That is correct.
13   Q.   There's no published decision finding that it does run
14   that you're aware of, is there?
15   A.   Again, I'd have to defer to the U.S. Attorney's Office as
16   I do, but my understanding is that it still remains unclear.
17   Q.   In any event, on the day of Mr. Volungus's revocation, you
18   made a note in your chronological file about his supervision
19   history and the kinds of things that you'd want yourself or
03:14 20   whoever a new officer might be to be aware of if he were
21   supervised again, right?
22   A.   That is correct.
23   Q.   And you noted in the -- you noted to yourself that
24   Mr. Volungus had acknowledged in court that he had a problem at
25   the time of revocation, right?
```

```
 1    A.    That is correct.

 2    Q.    And you noted that he should be kept under close

 3    supervision if and when released, right?

 4    A.    Correct.

 5    Q.    You recommended that he continue sex-offender treatment at

 6    FMHA or some analogous organization?

 7    A.    That is correct.

 8    Q.    Are there other conditions, given probation's current

 9    policy and practice, that you would recommend to the Court to

10    be added?

11    A.    Are there other conditions other than what were imposed at

12    the time of his revocation?

13    Q.    Correct.

14    A.    Is that your question?

15    Q.    In other words, if he were to come under the supervision

16    of your office again, would you be inclined to ask the Court to

17    add additional conditions?

18    A.    I think the conditions imposed at the time of his

19    supervised release violation are the conditions that I would

20    recommend should Mr. Volungus be placed on a term of

21    supervision.

22    Q.    Well, I mean, there are new techniques that various

23    probation offices around the country have started to use to

24    provide additional monitoring of sex offenders, correct?

25    A.    There are.
```

1   Q.   For example, there are things like active and passive GPS

2   monitoring?

3   A.   That is correct.

4   Q.   There is a voice stress analysis program to be sort of

5   quicker and easier to use than a polygraph, right?

6   A.   That is correct.

7   Q.   Are those the types of things that your office could

8   certainly ask the Court to add if it deemed it necessary?

9   A.   We certainly could, yes.

03:15 10   Q.   And you could -- you added this a little bit in your

11   testimony.  You mentioned today the 2004 events with

12   Mr. Volungus would be handled differently.  Do you recall that?

13   A.   That's correct.

14   Q.   Is it fair to say sex offenders in more recent years are

15   sort of kept on a shorter leash?

16   A.   Shorter leash?  I'm not sure but -- yeah, I'm not sure

17   that would be an accurate statement.

18   Q.   Well, monitoring is -- there are efforts to make the

19   monitoring more intensive, correct?

03:16 20   A.   Yeah.  I didn't concede that supervision in 2004 wasn't at

21   a high level.  I'm not conceding that.

22   Q.   Well, I wasn't meaning to suggest that.  I'm just

23   suggesting that as probation nationally comes up with new

24   protocols and policies and new technologies are available,

25   additional measures are being taken to monitor sex offenders

1    more closely?

2    A.    That's an accurate statement.

3    Q.    And it's fair to say that probation, as necessary, works

4    with local law enforcement and the FBI to aggressively

5    investigate potential violations, particularly by sex

6    offenders, right?

7    A.    That's correct.

8    Q.    And in a way, I think as you were indicating, that's not

9    necessarily something new, right?  Because as early as 2004 you

03:17 10   had a conversation with the New York State Police just to

11   say -- you know, giving them sort of a heads-up to say, "If

12   there's any issues with Mr. Volungus, let me know," right?

13   A.    That's correct.

14   Q.    And that's a common practice.  I mean, part of executing

15   effective monitoring includes your accessing other sources of

16   information that may let you know if there's a problem, right?

17   A.    That's correct.

18            MR. FICK:  If I may just have one moment, your Honor?

19            (Counsel confer off the record.)

03:18 20   Q.    So again just addressing the question of what happened in

21   2004 and what would happen today if a similar activity were

22   detected, you'd mentioned that probation today probably would

23   seek a warrant, right?

24   A.    Correct.

25   Q.    Probation would also likely refer the information to law

1  enforcement, the FBI or the U.S. Attorney's Office, for a

2  possible separate prosecution and not simply as a revocation

3  petition, correct?

4  A.   Obviously, in the course of preparing a supervised release

5  violation, that is done in conjunction with the U.S. Attorney's

6  Office.  The U.S. Attorney may or may not decide to have the

7  case referred for a new criminal prosecution.

8  Q.   But it's fair to say in more recent years there's less

9  tolerance, certainly, for that kind of conduct and prosecution

03:19 10  is more likely?

11  A.   If you want to put a percentage on it I suppose it's more

12  likely, but I guess I wouldn't concede that it's automatic.

13  Q.   Right.  And then one other question about the issue of

14  libraries that you talked about in your direct testimony a

15  little bit.  You had read a section of the letters to Gary

16  Gallardo where Mr. Volungus talks about accessing child

17  pornography in a library.  Do you recall that?

18  A.   I do, yes.

19  Q.   And of course sitting here today, of course you have no

03:19 20  way to know whether that actually happened or whether it was

21  something he was just making up to impress Mr. Gallardo, right?

22  A.   I'm not sure how to answer that.

23  Q.   Well, do you have any -- I'm sorry.

24  A.   Are you asking me whether I believe the letters or I don't

25  believe the letters?

1    Q.    Not so much belief, but you have no sort of objective

2    evidence to corroborate or disprove one way or the other

3    whether that actually happened, right?

4    A.    I don't have any corroborating evidence other than the

5    fact that it's his handwriting and it's signed by him.

6    Q.    Well, he wrote the letter, right?  No question about that.

7    But whether or not the event actually happened is -- there's no

8    evidence one way or the other about that other than in the

9    letter, right?

03:20 10    A.    Correct.

11    Q.    And also fair to say that public libraries in your

12    experience tend to put blocking and monitoring software on

13    computers precisely to prevent people from accessing

14    pornography, correct?

15    A.    That's correct.

16    Q.    And so -- that's all.  I have no further questions.

17              THE COURT:  Mr. Grady, anything else?

18              MR. GRADY:  Just a moment, your Honor.

19              (Pause.)

03:21 20              MR. GRADY:  I have two questions, and I will be very

21    quick, your Honor.

22                        REDIRECT EXAMINATION

23    BY MR. GRADY:

24    Q.    Officer Cardinal, prior to even being informed of the

25    Gallardo letters, your probation chronology notes include

```
 1  concerns about how much time Mr. Volungus was spending in the
 2  library, correct?  And I refer you specifically to June 2nd --
 3  A.   That's correct.
 4  Q.   Okay.  And in addition, with respect to the possibility of
 5  corroborative evidence of whether an individual can use a
 6  library to access child pornography, I'd ask you to take a look
 7  at Exhibit 46 in the materials in front of you.
 8  A.   Okay.
 9  Q.   Reading the second full paragraph, "Morales
10  advised" -- can you read that for us?
11  A.   I'm sorry.  Which section?
12  Q.   The paragraph beginning "Morales advised" --
13  A.   "Morales advised that Gallardo, who was currently on
14  probation for mailing explicit sexual matters concerning minors
15  engaging in sexually explicit conduct, was arrested by the San
16  Antonio Police Department on June 29, 2005.  Gallardo allegedly
17  used an Internet computer in the library at St. Mary's
18  University, San Antonio, Texas, to view and then store images
19  of child pornography to a 3.5-inch floppy disk.  At the time of
20  the arrest, the disk was still inside the library computer used
21  by Gallardo."
22  Q.   So you are aware of evidence that Mr. Volungus could have
23  used a library computer to access the Internet and download
24  child pornography, correct, because that's exactly what
25  Mr. Gallardo was doing?
```

1          MR. FICK:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  That's correct.

4          MR. GRADY:  Nothing further.

5          MR. FICK:  Very briefly.

6                    RECROSS-EXAMINATION

7    BY MR. FICK:

8    Q.   With regard to libraries specifically in the area of

9    Mr. Volungus's residence and your supervision, did you ever do

03:23 10   any investigation to determine whether the libraries had

11   blocking software installed?

12   A.   I did not.

13   Q.   Did you or anyone else to your knowledge ever investigate

14   whether any pornographic images had been downloaded by

15   Mr. Volungus or anyone else during the relevant time frame on

16   computers in libraries in the vicinity geographically?

17   A.   I can only testify to what I did, and I did not do that

18   type of investigation.

19          MR. FICK:  Nothing further.

03:23 20        THE COURT:  All right.  Thank you, Mr. Cardinal.

21          MR. GRADY:  No questions.

22          THE COURT:  Your testimony is completed.  We

23   appreciate it, and we'll terminate the link.

24          THE WITNESS:  Thank you.

25          MR. GRADY:  Thank you, Probation Officer Cardinal.

```
 1              (The witness is excused.)

 2              MR. GRADY:  For the record, your Honor, the government

 3    would rest its affirmative evidence and case at this point.

 4              THE COURT:  Okay.

 5              MR. GOLD:  Your Honor, we have an additional expert

 6    witness.

 7              THE COURT:  Right.

 8              MR. GOLD:  But he's available starting tomorrow.

 9              THE COURT:  We've used most of the morning, so that's

03:24 10    fine.  What's your estimate with respect to Dr. Bard?

11              MR. GOLD:  I would estimate no longer, certainly, than

12    the time we took with Dr. Prentky, so perhaps into Thursday.

13              THE COURT:  Okay.

14              MR. GRADY:  Even with that, your Honor, cross would

15    finish on Thursday.

16              THE COURT:  And then?  Is Mrs. Volungus going to

17    testify?

18              MR. FICK:  We're possibly inclined to call

19    Mrs. Volungus after Dr. Bard, but it's possible we might decide

03:24 20    not to, so we won't --

21              THE COURT:  And if you did?

22              MR. FICK:  It would be short.  I expect a half-hour.

23              THE COURT:  So we'll probably finish on Thursday --

24              MR. GOLD:  Yes.

25              THE COURT:  -- if not before?  Good.
```

1          Thank you very much.

2          COUNSEL IN UNISON:  Thank you.

3          THE COURT:  We'll be in recess for today.

4          THE CLERK:  All rise.  The Court will be in recess.

5          (The Court exits the courtroom and the proceedings

6     adjourned at 12:30 p.m.)

7

8

9                    C E R T I F I C A T E

10

11          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

12     the United States District Court, do hereby certify that the

13     foregoing transcript constitutes, to the best of my skill and

14     ability, a true and accurate transcription of my stenotype

15     notes taken in the matter of Civil Action No. 07-12060-GAO,

16     United States of America v. John C. Volungus.

17
       /s/ Marcia G. Patrisso
18     MARCIA G. PATRISSO, RMR, CRR
       Official Court Reporter
19

20     Dated:  August 4, 2011

21

22

23

24

25