UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Petitioner,                )
                                    )   Civil Action
v.                                  )   No. 07-12060-GAO
                                    )
JOHN C. VOLUNGUS,                   )
                                    )
         Respondent.                )
                                    )
```

---------------------------------------------------------------
TRANSCRIPT OF BENCH TRIAL
DAY SIX

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE
---------------------------------------------------------------

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, July 13, 2011
9:14 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Mark J. Grady, Assistant U.S. Attorney
 3             Rachael S. Rollins, Assistant U.S. Attorney
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        On Behalf of the Petitioner

 6        FEDERAL DEFENDER'S OFFICE
          By: William W. Fick, Esq.
 7             Ian Gold, Esq.
          51 Sleeper Street
 8        Fifth Floor
          Boston, Massachusetts  02210
 9        On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          <u>I N D E X</u>

2                    <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

3    WITNESSES FOR THE
       <u>RESPONDENT:</u>

4

     LEONARD DAVID BARD, Ph.D.

5

6         By Mr. Gold          4
          By Mr. Grady               60

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (The following proceedings were held in open court

 2    before the Honorable George A. O'Toole, Jr., United States

 3    District Judge, United States District Court, District of

 4    Massachusetts, at the John J. Moakley United States Courthouse,

 5    One Courthouse Way, Boston, Massachusetts, on July 13, 2011.)

 6                 THE CLERK:  All rise.

 7                 (The Court enters the courtroom at 9:14 a.m.)

 8                 THE CLERK:  For a continuation of the bench trial on

 9    Volungus.  Please be seated.

10                 THE COURT:  Good morning.

11                 MR. GOLD:  Good morning, your Honor.  For a

12    continuation of the respondent's case, the respondent would

13    seek to call our additional expert, Dr. Leonard Bard.

14                 THE COURT:  All right.

15                 THE CLERK:  Doctor, would you step up to the box,

16    please.

17                    LEONARD DAVID BARD, Ph.D., duly sworn

18                 THE CLERK:  Please be seated.  State your name, spell

19    your last name for the record, keep your voice up and speak

20    into the record so everyone can hear you.

21                 THE WITNESS:  My name is Leonard David Bard.

22                            DIRECT EXAMINATION

23    BY MR. GOLD:

24    Q.   Good morning, Dr. Bard.

25    A.   Good morning.
```

00:00 (line 10)
00:01 (line 20)

1    Q.   Dr. Bard, there are two binders on the witness stand

2    before you.  One of them should be open to Exhibit 54.

3    A.   Yes.

4    Q.   Do you recognize the document which has been entered into

5    evidence as Exhibit 54?

6    A.   I do.

7    Q.   What is that document?

8    A.   This is a copy of my CV, or my resumé, as of October of

9    last year.

00:01 10   Q.   And if I could turn your attention to the preceding

11   exhibit, Exhibit No. 53, would you identify that document?

12   A.   Yes.  This is a copy of the report that I wrote on this

13   case dated October 19, 2010.

14   Q.   Now, we will be revisiting this issue in some further

15   detail, but does this contain -- this report contain the

16   entirety of your conclusions and findings in the case?

17   A.   At that time, yes.

18   Q.   And since drafting this report have you received further

19   information about the case?

00:02 20   A.   I have.

21   Q.   And has that further information altered or informed your

22   conclusions in any way?

23   A.   It has informed it.  I would not say altered, but it

24   certainly has given me a little different perspective on

25   things.

1    Q.   Now, Dr. Bard, could you please describe your educational

2    background starting at the -- well, starting where you feel

3    appropriate, but in the higher education level?

4    A.   I received my BA in psychology from Brandeis University in

5    1979, and my Ph.D. in clinical psychology from the University

6    of Miami in 1984.

7    Q.   And did you do any postdoctoral research or work?

8    A.   I did research, actually, before my Ph.D. as part of my

9    honors thesis at Brandeis.  I was involved at the Massachusetts

00:03 10    Treatment Center for Sexually Dangerous Persons.

11    Q.   And we spoke a bit about the Massachusetts Treatment

12    Center for Sexually Dangerous Persons in testimony with

13    Dr. Prentky, but could you briefly describe what the

14    Massachusetts Treatment Center is?

15    A.   It is a medium-security system in Massachusetts who houses

16    individuals who have been adjudicated as dangerous under

17    Massachusetts General Law 123A.  At the time I was first

18    involved, the law was a little bit different at that time;

19    individuals were committed there primarily at the time of

00:04 20    sentencing, sometimes in lieu of any criminal time.  But

21    certainly when they were sentenced they were deemed to be

22    sexually dangerous and committed there on an indeterminate

23    basis for treatment.  I was involved there in the late 1970s

24    doing research with a psychologist at Brandeis named Ray

25    Knight, and that was my first exposure to any research or

1    practice in this field.

2    Q.   And after completing your Ph.D., did you return to the

3    Massachusetts Treatment Center?

4    A.   Actually, before I completed my Ph.D. I had completed the

5    academic requirements and my dissertation in 1982.  I went back

6    to Massachusetts.  I worked at the treatment center for about a

7    year in the research area, and then I did an internship at the

8    Boston VA Medical Center as my pre-doctoral internship.  I

9    actually received my Ph.D. in 1984 and was hired, again, at the

00:05 10   treatment center part time as a clinician and part time as a

11   researcher.

12   Q.   And what was the area or the subject of the research in

13   which you were involved during this period?

14   A.   Back then the treatment center's research department was

15   being federally funded in order to examine subtyping of sexual

16   offenders.  This is in the early '80s, and there was not much

17   research that had been done and was being done on sex

18   offenders.  The thinking overall was that sex offenders are

19   pretty much the same.

00:06 20        And our work, among others, showed that there are

21   significant differences among sex offenders that led to the

22   refinement of a subtyping system at the treatment center which

23   had been proposed even further, but looking at the differences

24   in motivation, behavior and other aspects of offending among

25   various subtypes of rapists and child molesters.

1    Q.   And were you involved in the same research that we heard

2    about from Dr. Prentky about typologies and so forth?

3    A.   Yes.  I was actually involved, in college, before

4    Dr. Prentky came aboard there.  When I got back to the

5    treatment center in 1983 he was there, and he was the director

6    of the research program there.

7    Q.   Did your research in particular result in any

8    peer-reviewed publications documenting your research?

9    A.   The research team published a number of articles, papers,

00:07 10   chapters.  I was the first author on a paper in 1987 called "A

11   Descriptive Study of Rapists and Child Molesters," and I

12   contributed to several others.  We also presented our findings

13   at various conferences from 1984 until about 1990.

14   Q.   And when you say "first author," could you briefly

15   describe in the area of scientific peer-reviewed articles what

16   being a first author connotes?

17   A.   Usually it means that that was the person who assumed more

18   responsibility for the article:  the researching of it,

19   preparing a first draft, making revisions.  Basically, managing

00:08 20   it, I would say.

21   Q.   And briefly, what was the content of the research article

22   in which you were the first author?

23   A.   It was a descriptive study of the population that we were

24   dealing with, the differences on various descriptive factors:

25   criminal histories, social history, sexual history,

1    development, and on some of the clinical scales that we had

2    created.  In some ways it was a precursor to some of the

3    research that followed.

4    Q.   You stated that you were a clinician at the Massachusetts

5    Treatment Center at this same time period.  What were your

6    responsibilities and duties as a clinician at the MTC?

7    A.   I was a member of the intake and observation team there.

8    Basically, we were responsible for doing comprehensive intake

9    evaluations on newly committed individuals.  So when an

00:09 10    individual was committed by the court as a sexually-dangerous

11    person, our team would begin working with him.  We would assign

12    a clinician to do an intake, a series of three, four, five

13    interviews to get as much historical information as we could.

14    I did some of those; I supervised others doing those.  We also

15    assigned a psychologist to do a psychological testing.  I was

16    actually the coordinator of that.  And we put the individual in

17    an introductory group therapy, and I was the coleader of that,

18    trying to acclimate them, trying to teach them a little bit

19    about what therapy is.

00:10 20        I also supervised two doctoral interns from BU that were

21    there at the time:  I ran case conferences on newly committed

22    individuals; and where we would use our consultants, two very

23    experienced mental health professionals, one psychiatrist and

24    one psychologist, who would also interview the individual and

25    formulate the case.  And we created what we hoped was a

1   baseline understanding of the individual at that time in order

2   to help, first, guide his treatment; and, two, to assess

3   changes over time.  Because oftentimes when individuals had

4   gone through treatment for five or ten years, there was no

5   baseline to compare where they had been as to where they were

6   at that time.

7       I also did individual treatment.  And as the coordinator

8   of psychological testing, I was occasionally asked by other

9   therapists to do psychological testing on their patients for

00:11 10   various reasons:  neuropsychological concerns, various issues

11   that would come up in treatment, cognitive problems, all those

12   things.

13   Q.   And who is your employer at this time?

14   A.   At that time I was being employed by the Department of

15   Mental Health in Massachusetts.

16   Q.   And the period of time that we're talking about is the

17   1980s into the early 1990s?

18   A.   No.  Actually, I was only at the treatment center as an

19   employee after my Ph.D. until '86.  I then left the employment

00:12 20   of the treatment center because I was offered a job at

21   Bridgewater State Hospital as a forensic psychologist.  And

22   although I took that job, I maintained my affiliation with the

23   research department probably until '88 or '90.

24   Q.   At this time at the Massachusetts Treatment Center there

25   was a -- you mentioned that the law in Massachusetts had

1   changed?

2   A.   Yes.

3   Q.   At this time is it fair to say that Massachusetts law had

4   permitted the commitment of sexually-dangerous persons,

5   individuals who were accused of sex crimes, in lieu of criminal

6   sentences?

7   A.   This was the old law, yes.

8   Q.   The old law?

9   A.   That was in effect until 1990.

00:13 10   Q.   And to your knowledge are those old laws sometimes called

11   the Sexual Psychopath Statutes?

12   A.   That was the original term.  This law in Massachusetts I

13   believe was established in 1959.  And that was among the only

14   states at that time to have those, quote, sexual psychopath

15   kind of laws.

16   Q.   And since it's relevant as background to your career, to

17   the extent that you know, what developments happened in

18   Massachusetts law with respect to the sexually-dangerous

19   persons statute?

00:14 20   A.   Well, in 1990 the old SDP law was allowed to sunset, to

21   expire.  There had been some concerns in the late '80s that

22   these laws were not effective; that they were costing a great

23   deal of money and not really helping.  And Massachusetts, among

24   others, decided to do away with new commitments.  The law held

25   for all of those individuals who were already there.  But from

1    1990 till 1999 there were no commitments to the treatment

2    center.

3         In the 1990s, beginning with the State of Washington, a

4    new sort of sexually-dangerous person, also known as

5    sexually-violent predator, kind of law came into effect

6    basically saying that individuals could be considered for

7    indeterminate commitments after they completed their criminal

8    sentences if they suffered from, in general, a mental

9    abnormality and it was likely that they were going to reoffend.

00:15 10     Since that time 20 states, and now the federal government,

11   have joined in and passed laws that are essentially very

12   similar in that way.  And the Supreme Court, as you know, has

13   ruled that these laws are constitutional.

14   Q.   And what happened in particular in Massachusetts with

15   respect to the sexually-dangerous persons statutes?

16   A.   In 1999 a new law was passed allowing commitments after

17   the completion of a criminal sentence if the individual

18   suffered from either a mental abnormality or a personality

19   disorder, as those terms were defined in the law, and if they

00:16 20   were likely to offend if not confined.

21   Q.   Returning back to the late 1980s and early 1990s, you

22   stated you worked for a time for the Bridgewater State Hospital

23   as a forensic psychologist but maintained a relationship with

24   the research department at the MTC?

25   A.   Yes.

1    Q.   What course did your professional career take after that

2    time?

3    A.   Well, I became more involved in the forensic part of my

4    profession.  I received advanced training.  I was doing

5    evaluations of competency at trial, I was doing evaluations of

6    mental state at the time of the offense, and I was also

7    appointed by the Department of Mental Health as a qualified

8    examiner under the SDP law, which allowed me to do

9    sexually-dangerous persons evaluations for the Commonwealth.

00:17 10   And I did that from 1986 or '87 up until 1999.

11   Q.   And did you receive any other designations as a forensic

12   psychologist at this time?

13   A.   Yes.  In 1989 I was among the first psychologists in

14   Massachusetts who were qualified -- at that time it was called

15   a "qualified forensic psychologist" and now it's called a

16   "designated forensic psychologist."  We went through training

17   where we had to pass a test in order to be so designated and

18   which allows us to do evaluations for the Commonwealth on

19   certain areas, like I said, competency to stand trial, criminal

00:18 20   responsibility, civil commitment, aid to a sentencing.  I think

21   it was something like that.

22   Q.   In addition to this general forensic designation, you

23   mentioned you had a designation as a qualified examiner in the

24   1990s?

25   A.   From 1986 or 1987 until 1999, yes.

1   Q.   And what is a qualified examiner under the Massachusetts

2   sexually-dangerous persons' regime?

3   A.   A qualified examiner is a licensed psychologist or

4   psychiatrist who has at least two years of training in the

5   diagnosis or treatment of sex offenders and is so designated by

6   the authority.  At that time it was the commissioner of the

7   Department of Mental Health; now it's the commissioner of the

8   Department of Correction.

9   Q.   And what were your duties, or what did you do as a

00:19 10   qualified examiner?

11   A.   I received referrals from the treatment center to conduct

12   evaluations on various individuals both on the way in and on

13   the way out.  At that time, as I indicated, you could be

14   committed as a sexually-dangerous person directly from court,

15   as it were in lieu of sentence or in addition to a sentence.

16   So when someone was found guilty or pled guilty to a sexual

17   offense, I was among the psychologists who would interview them

18   and conduct an evaluation and render an opinion whether I

19   thought they were sexually dangerous or not.

00:20 20        There was also a second way to be committed at the time,

21   which was any prisoner in a correctional facility who had acted

22   out sexually, if there was concerns about them as being

23   sexually dangerous.  So we would do evaluations of those

24   individuals as well.

25        And the third piece of this was individuals who are

1    already committed to the treatment center as sexually-dangerous

2    persons are entitled to a review every year.  And as part of

3    that, called a Section 9 evaluation, you would interview

4    individuals and review the files to see if they had made

5    sufficient progress or they were no longer likely to offend.

6    Q.   And Section 9 is the section of the statute in

7    Massachusetts under which people petition to get out of the

8    treatment center?

9    A.   Yes, that's correct.

00:21 10   Q.   Approximately how many men did you evaluate during this

11   period, if you can put a rough figure on it?

12   A.   My best estimate is in those 12 years I probably evaluated

13   anywhere between three and four hundred men.

14   Q.   And can you give us a rough sense of how often you opined

15   that men remained, or were sexually dangerous under the

16   statute?

17   A.   My best estimate, having never gone back and counted them,

18   and I think there were probably some differences between the

19   initial commitment evaluations and the Section 9 evaluations,

00:22 20   was I would find people sexually dangerous between a quarter

21   and a third of the time.

22   Q.   Now, during this period of your career, were you only

23   involved with evaluations as a qualified examiner or did you

24   have other activities that you did as a psychologist?

25   A.   Well, as I said, I worked at Bridgewater State Hospital as

1    a forensic psychologist for three years.  I then took a job in

2    the courts.  I was the court psychologist in New Bedford, and I

3    was on a forensic team that was doing evaluations in the

4    courthouses of New Bedford, Fall River, Taunton, Attleboro and

5    Wareham.  I was doing that on a part-time basis.  And I began a

6    private practice in Fall River in the late '80s, and I went

7    full-time private practice in 1993.

8         And my practice existed partly of doing the more

9    traditional things that psychologists do -- individual therapy,

00:23 10   family therapy, psychological testing -- but also forensic

11   evaluations.  I was still doing evaluations for the

12   Commonwealth at the treatment center.  I was being called by

13   attorneys to do evaluations for competency and other forensic

14   areas.

15   Q.   About how much of your practice was taken up in what you

16   called the traditional role of the psychologist, providing

17   treatment?

18   A.   I would say in the '90s probably I was spending at least

19   half of my time, if not more, doing treatment, doing psych

00:24 20   testing.  I was doing psychological testing for Mass. Rehab,

21   for various agencies.  So I would say it was probably more than

22   half at that time, but as I began to do forensic work, I was

23   finding I was getting more referrals from there up to a point

24   in 2006 where I had to end my private practice because I

25   couldn't do it all.

```
 1    Q.   And since 2006 have you been employed as a forensic
 2    psychologist full time?
 3    A.   Yes.  I have a private practice which consists solely of
 4    forensic evaluations and consultations.  I don't do any more
 5    treatment.
 6    Q.   And the treatment that you did had very little, if
 7    anything, to do with sexually-based disorders.  Is that fair to
 8    say?
 9    A.   Well, I always had some patients who were referred from
10    probation or privately referred because of sexual issues,
11    whether they were exhibitionists or hands-on sexual offenders
12    who were on probation, individuals who had gotten out of prison
13    who needed ongoing treatment.  I always tried to see some
14    patients for sexual-offending issues because there were so few
15    individuals in southeastern Massachusetts who had any
16    experience doing this.
17    Q.   Dr. Bard, did a change in your role as a forensic
18    psychologist happen around 1999?
19    A.   Yes.
20    Q.   And could you describe that?
21    A.   In 1999 I was informed by the commissioner of correction
22    in Massachusetts that since the jurisdiction of the treatment
23    center had gone over from DMH to corrections, that he would be
24    the one who was responsible for assigning or -- I'm
25    sorry -- appointing qualified examiners, and he had chosen not
```

1  to appoint me anymore.

2  Q.   And what path did your career as a forensic psychologist

3  take after that?

4  A.   I continued to do sexually-dangerous person evaluations at

5  various times, but I was doing them only for the attorneys who

6  would call me and not for the Commonwealth.

7  Q.   And so is it fair to say your work as an examiner in this

8  context has been for the defense since that time?

9  A.   Yes.

00:26 10  Q.   And with respect to a breakdown, if you will, of how often

11  you find individuals dangerous under the statute has your

12  calculus changed, or that ratio that you mentioned earlier?

13  A.   I think it's been pretty much the same, if anything,

14  because the new law, which came into effect in '99 is, I think,

15  more stringent that you have to have a mental abnormality or a

16  personality disorder.  Before that, there was no such

17  requirement.  And there were actually individuals early in my

18  career that wanted to go to the treatment center because they

19  saw it as either a place where they could get help, because

00:27 20  they were going to serve time anyway, or they saw it as easier

21  time, that I probably found more people sexually dangerous

22  early on.

23       Once the new law, which was going to commit people after

24  their sentences, nobody wanted that anymore.  So those

25  individuals who I had found sexually dangerous because they

1    pretty much asked for help, those guys were gone, and I would

2    say that I probably found slightly less -- or slightly fewer

3    individuals sexually dangerous since then.

4    Q.   And in this context if you find that an individual who is

5    referred to you is sexually dangerous under a statute, what

6    happens next?

7    A.   Well, I do the same evaluation no matter who hires me.  I

8    submit a report to the attorney, and what the attorney does

9    with that report is up to them.  I do these evaluations in

00:28 10   various places now in Massachusetts, in New York, in New

11   Hampshire.  And these are federal cases.

12         In some jurisdictions I am required to turn over my report

13   to everybody no matter what my findings are, and in others,

14   when I am retained by an attorney, the practice is that if I

15   find someone sexually dangerous, I'm not called into court.

16   Q.   And are those the entirety of the jurisdictions in which

17   you do this work:  New York, New Hampshire, the federal

18   government, Massachusetts?

19   A.   I have done several evaluations also in Washington.

00:29 20   Q.   Before we move on to your opinion in this case, Dr. Bard,

21   is there anything about your qualifications or background that

22   I have not covered that you feel is germane?

23   A.   No.

24   Q.   Dr. Bard, how did you come to be involved in this case?

25   A.   Back in, I believe, 2008 you contacted me and asked me if

1    I would conduct an evaluation of Mr. Volungus.

2    Q.   And you did that.  Could you please describe for the Court

3    what your -- what you looked at in preparing an evaluation of

4    Mr. Volungus?

5    A.   Well, first, I evaluated -- I interviewed Mr. Volungus on

6    three occasions:  December 4th, 2008, July 13th, 2009, and July

7    1st, 2010, approximately a total of four to five hours.  I

8    reviewed the materials that you made available to me including

9    prior evaluations and court-related documents and information

00:31 10  from the Federal Bureau of Prisons.  I believe there are

11   approximately 1300 pages that I had originally looked at when I

12   completed my report, and since that time I've been given

13   another approximately seven to eight hundred pages.

14   Q.   And did you do any psychological testing or any other type

15   of protocol when developing your opinion in the case?

16   A.   I did.

17   Q.   And what was that?

18   A.   The second time that I met with Mr. Volungus I

19   administered two psychological tests.  The first is the Millon,

00:32 20  M-I-L-L-O-N, Clinical Multiaxial Inventory -- I think it was

21   the third version -- and the Rorschach, which is a

22   projective -- a projective psychological test.

23        And I -- the first test is the MCMI, as it's called, is an

24   objective personality-oriented inventory.  And I use that at

25   various times.  I worked with the author of it in Miami when I

1   was there, so I'm pretty familiar with it.

2       I rarely ever use the Rorschach in legal cases, but I

3   decided to use it because after my first meeting with

4   Mr. Volungus, I had a lot of unanswered questions and I wanted

5   to get information that I thought I could get from certain

6   psychological tests that I might have not been able to get from

7   him.  As part of the risk assessment in this case, I used an

8   actuarial tool called a Static-99, which is a well-known tool

9   in this field.

00:33 10  Q.   Now, Dr. Bard, I want to direct your attention to your

11  report which is entered into evidence as Exhibit 53, and

12  specifically, to page 12 where you list out the criteria for

13  sexual dangerousness under the federal law.

14  A.   Yes.

15  Q.   Now, this reference to what you list here is Chapter 313,

16  which is also referred to as 18 United States Code 4247 and

17  4248, and is this your understanding of the -- what the federal

18  statutory language is?

19  A.   Yes.

00:34 20  Q.   And did you arrive at an opinion after your review of the

21  materials you just described as to whether Mr. Volungus is a

22  sexually-dangerous person under the statute?

23  A.   Yes.

24  Q.   And what was that opinion?

25  A.   My opinion is that at the present time Mr. Volungus is not

1  a sexually-dangerous person.

2  Q.   And with respect to the elements under the statute, did

3  you arrive at an opinion as to whether Mr. Volungus suffers

4  from a serious mental abnormality, disorder or

5  illness -- illness, abnormality or disorder?

6  A.   Yes.

7  Q.   And what was that opinion?

8  A.   My opinion is that -- well, first -- I guess it's a

9  two-part answer.  First, he does not, but I don't usually

00:35 10  separate it out the way that you are because the law talks

11  about a serious mental illness, abnormality or disorder as a

12  result of which he would have serious difficulty in refraining

13  from sexually dangerous conduct like child molestation.  I

14  think you can look at them separately, but more importantly,

15  you have to look at them together.

16  Q.   So in keeping with your conception, then, do you have an

17  opinion as to whether Mr. Volungus has a mental illness,

18  abnormality or disorder as a result of which he will have

19  serious difficulty refraining from sexually violent conduct or

00:36 20  child molestation?

21  A.   I do.

22  Q.   And that opinion is?

23  A.   He does not.

24  Q.   Before we go in more detail into the elements of the

25  statute and the different aspects of your opinion, do you have

1  a clinical formulation of the case that you can provide to the

2  Court which will help us understand Mr. Volungus?

3  A.   I do.

4  Q.   And could you describe in terms that you deem appropriate

5  what that formulation is?

6  A.   In order to really do an appropriate and adequate clinical

7  formulation, I think we have to look back to see how

8  Mr. Volungus got where he is right now.  He had a relatively

9  unremarkable childhood in terms of his family, in terms of his

00:37 10  experiences with the exception of feeling that he was an

11  outsider, that he moved around a bit because of his father as

12  being in the service.  And he described himself as a bit of a

13  loner.  And I think he was a lot more of a loner than he thinks

14  he was.  And I think it was that isolation and the lack of

15  positive relationships early on that really sort of lay the

16  foundation to where he ended up.

17       Mr. Volungus, from my interviews with him and my reviews

18  of the material, never really had a solid pattern of

19  interpersonal relationships:  friendships, girlfriends,

00:38 20  intimate relationships.  And as a result of that, it's my

21  opinion that he became one of those people who sought

22  gratification internally.  I think he became very

23  fantasy-oriented.  He tried to picture himself in various ways

24  that were not necessarily the ways that he lived his life.

25       I think his self-image on the surface was someone who was

```
 1   fairly verbally facile.  He's an intelligent man.  But I think
 2   that was covering over a great deal of inadequacy, a great deal
 3   of anxiety about who he was and about his ability to have his
 4   needs met.
 5   Q.   And is inadequacy -- are you using that in a lay term, a
 6   lay sense, or is that a term of some significance in the field
 7   of psychology?
 8   A.   I think it can be looked at in both ways.  But I think its
 9   meaning is fairly obvious:  that internally he didn't see
10   himself as someone who was good enough, who could have friends,
11   who could have relationships, who others would like, who others
12   would pay attention to.  And I think that became a driving
13   factor in what he did later on.
14        I also think that his early sexual experiences, at least
15   from what he reported -- and I do have some concerns that he
16   was not accurate in that because the things that he talked
17   about are, in a word, unlikely.  He talked about learning about
18   sex in camp, which is not unlikely, and engaging in
19   masturbation, and mutual masturbation with other boys, which is
20   not unlikely, and having a counselor sort of show them how to
21   masturbate, which may be a little more unlikely, but also, in
22   performing oral sex on each other, which in my experience of
23   doing evaluations for 25 years is highly unlikely.
24        And while it's possible that, combined with his statements
25   that he engaged in sexual intercourse with a neighborhood girl
```

1    at the age of eight, also very unlikely.  At the age of eight

2    most boys don't even know what sex is.  And for him to be -- to

3    have been involved in intercourse, which most eight-year-olds,

4    again, could not physically do, hits me as someone who is

5    trying to exaggerate things somewhat, who is trying to portray

6    himself in a certain way, not a way that most people would.

7    But I think that's been a pattern which we would see more of.

8         To continue in this vein, Mr. Volungus has never had a

9    long-term relationship with a female.  He says he's not

00:42 10   attracted to males so his focus is, obviously, females.  But

11   the vast majority of his experience, according to him, has been

12   with prostitutes either in the United States or when he was

13   abroad in Germany.  He talked about a longer-term dating

14   relationship with a dancer.

15        But there's really no sense of intimacy.  There's no sense

16   of ever being in a relationship where somebody could get to

17   know who he was.  And I think he may have been doing that

18   because he's not very comfortable showing parts of himself, the

19   emotional side, to others.

00:42 20        And I think that continued in the nonsexual areas as well.

21   He does well in school.  He goes to college, has some problems

22   there, gets involved with some sort of -- I'm trying to think

23   of those like -- some groups of individuals who play various

24   fantasy-based games, Dungeons and Dragons, then gets involved

25   in something called the Society for Creative Anachronism,

1  again, acting out a fantasy of a time long ago, pretty much

2  anything he could do to avoid being in the moment and in the

3  present.

4      And that's Mr. Volungus for many, many years.  He goes to

5  Germany, engages in sexual activity with various prostitutes,

6  comes back.  And up until 1998 there's no evidence of any

7  significant interest in anyone other than adult females, maybe

8  teenagers as well.  But that's silly, not abnormal.

9      He becomes aware of child pornography in 1998, and for the

00:44 10  next five months pretty much develops a compulsive behavior

11  involving that, not just downloading things but trying to

12  collect things.  He talked about how it was so important to

13  find every image in a series.  I think that speaks also to his

14  compulsive nature, trying to, again, fill in what's empty

15  underneath with something out there.  He does tend to become

16  obsessive and compulsive at times not only around sexuality, as

17  we'll see later on, lists and the details of things which are

18  remarkable in a lot of ways.

19      Anyway, he becomes involved in pornography, finds child

00:45 20  pornography, goes online and attempts to meet an alleged

21  14-year-old girl for a sexual encounter possibly with her older

22  sister, possibly not.  It's not necessarily clear.  He's

23  actually talking online to a police officer, an FBI agent, I

24  think, and he gets arrested.

25      That's his only offense that involves attempted contact.

```
      1   Mr. Volungus told me he has never touched an underaged person
      2   in a sexual way, but that does not excuse the fact that he has
      3   clearly been involved in the use of pornographic materials,
      4   adult pornography, child pornography as that term is defined,
      5   anyone under 18, and even some images of younger children,
      6   although it's really not clear because we don't have that.
      7       Again, it's consistent with someone who is in his head all
      8   the time.  In some ways he doesn't really need to pursue
      9   anybody because in his head he is so involved in the fantasy of
00:46 10   being in control and adequate and powerful and all of those
     11   things that his outlet is masturbation with these fantasies of
     12   him as -- I'm not sure I want to use the word "powerful," but
     13   just as competent and a person that others will look up to.
     14       I think that's what drove him.  I think that's what drove
     15   him to write things that were not necessarily true both before
     16   his arrest and while he was in the community.  I think this is
     17   his way of trying to make himself feel better about himself,
     18   although in a bizarre and very dangerous way.  I think he
     19   played to his audience.  I think he was looking for attention
00:48 20   and approval from anyone who would give it to him.  And if it
     21   meant calling himself, quote, a real-life pedophile, which is
     22   what pedophiles don't usually talk about themselves as being,
     23   well, you know, in that context that would get him what he
     24   wanted.
     25       And I think that's my overly long summary of who he is and
```

1   how he came to do all these things.

2   Q.   I thank you, Dr. Bard.  Now, before we proceed

3   specifically to the elements of the statute, I just want to cut

4   to the chase a little bit and ask you if you're familiar with

5   references to hands-on offending in the chats with the law

6   enforcement officers in 1998.

7   A.   Yes.

8   Q.   And do you credit those statements as reflecting events

9   that actually occurred?

00:48 10   A.   Obviously, I cannot be 100 percent certain about that, but

11   I don't -- I think they are his fantasies, or his elaborations,

12   his exaggerations in trying to attract people to talk to him.

13   Mr. Volungus was telling me that he had been to other chat

14   rooms and no one would talk to him.  They ignored him.  For

15   someone like Mr. Volungus being ignored, it's as bad as it can

16   be, and I think he found a way to attract attention to himself.

17   "I'm a real-life pedophile."  Again, out of all the pedophiles

18   I've evaluated, I don't think I've ever heard anybody talk

19   about themselves that way.  But it got him attention.  Negative

00:49 20   attention:  arrest, conviction, all these things.  But at the

21   time -- and if you read the transcripts it's clear that

22   Mr. Volungus is enjoying the interaction.  He's really getting

23   something out of it that I don't think he was getting anywhere

24   else in his life.

25        I don't think people talked to him.  I don't think girls

did.  And here was this girl on this bizarre chat room talking

about hooking up her little sister with him.  It's craziness,

if you look at it from any point of view except for his, and

yet, here was this 19-year-old woman who was into this -- kept

talking to him.

Q.    And I want to ask you the same question again before we

proceed to the first -- or the second element under the

statute.  But with respect to the letters to Gary Gallardo, of

which we've heard a fair amount of testimony, do you credit the

00:50 statements in those letters as reflecting either a future

intent to engage in sex tourism or evidence of past offending,

or do you have reason to discredit some of the statements in

those letters?

A.    Again, I don't claim to know if it was 100 percent

accurate, zero percent accurate, but I certainly don't credit

his statements about intending to offend.  He was in the

community, he had opportunities.  Offenders always have

opportunities.  If he wanted to offend, he would have offended.

     As to his past behaviors, I think again, it's consistent

00:51 with the same elaboration and exaggeration for a specific

purpose.  He was talking with a convicted child molester and

he's advising him on computers and cameras and making himself

seem like "I know what I'm talking about.  You can listen to

me.  You can think of me in a positive way."  Again, he's

playing to this audience.  He picked a horrible audience to

1  play to.  But a lot of the things he reportedly wrote could not

2  have occurred when he said them.

3      I don't doubt that it's based on something that may have

4  happened in the past when he talked about viewing certain

5  videos or images.  He very well may have seen those.  It sounds

6  like he's familiar with them.  But it was, let's say, very

7  unlikely that he was doing that at that time because, frankly,

8  there wasn't any access.  And I think it's very unlikely that

9  he was sitting in a public library looking at child pornography

00:52 10  in a public setting.  I'm not saying it's impossible, but I

11  think it's very unlikely.

12  Q.   Now, Dr. Bard, how do you as a forensic psychologist

13  answering the question whether someone has a serious mental

14  illness, abnormality or disorder -- how do you go about

15  answering that question?

16  A.   Well, I think the way to do that is to conduct a

17  diagnostic evaluation.  The way that these terms are written in

18  the law have very little meaning for psychologists and

19  psychiatrists.  They're legally defined terms.  And I see the

00:53 20  job of a forensic psychologist as being able to apply clinical

21  material, clinical data to a legal question, whether that

22  question is competency to stand trial or criminal

23  responsibility at the time of the offense or a

24  sexually-dangerous person evaluation.  It begins with doing a

25  clinical formulation, as we've talked about, and developing the

```
 1   most appropriate diagnosis for the individual.  Only then do we
 2   see if that diagnosis corresponds to what the law is talking
 3   about here.
 4   Q.   And did you make such a diagnostic evaluation in this
 5   case?
 6   A.   Yes.
 7   Q.   And what were the results of that evaluation?
 8   A.   Well, as I wrote in my report, I did not diagnose
 9   Mr. Volungus with pedophilia and --
10   Q.   Could I just refer you to Exhibit 59 in the binder in
11   front of you?  Or actually, it should be up on the screen in
12   front of you.
13   A.   Oh, yes.
14   Q.   And page 572 of that exhibit has the diagnostic criteria
15   for pedophilia under the DSM-IV-TR.  Do you recognize those?
16   A.   Yes.
17   Q.   And did you consider these criteria in assessing
18   Mr. Volungus diagnostically?
19   A.   Yes.
20   Q.   And so can you describe what your findings were?
21   A.   Well, as you well know, this is a very complicated case in
22   terms of diagnosis, and the more I read over materials in this
23   case, the more I realize that it is a very complex issue
24   because unlike most cases where there's clear evidence of
25   someone's sexual interest and, particularly, their sexual
```

1    behavior, we don't have that here.

2         The diagnostic criteria talks about a period of at least

3    six months in which the individual had recurrent, intense

4    sexually-arousing fantasies, sexual urges or behaviors

5    involving sexual activity with a prepubescent child or children

6    (generally age 13 years or younger).  The key is not the age.

7    The author of the DSM-IV has indicated that over and over

8    again; it's the sexual development of the object or the child

9    that the individual is aroused to.

00:56 10      I don't think that Mr. Volungus is specifically aroused to

11   thoughts of sexual activity with prepubescent children.  I

12   think his focus has been on pubescent children,

13   sexually-developed adolescents and adults.  That's my

14   impression.  I'm aware that child pornography has been found.

15   I'm aware that he has made statements that suggest he is

16   interested in girls from 11 to 13.

17        But I look at the totality of the information, and the one

18   attempted offense was with a 14-year-old who was described as

19   being sexually mature with her measurements involved.  So he

00:57 20  goes and buys some lingerie for her and there's clearly no

21   evidence that she's prepubescent.  And if he's trying to meet

22   her and the older sister, well, that's obvious as well.  Well,

23   no one's going to mistake a 19-year-old for an 8-year-old.

24        So while I think there may be some evidence that argues

25   the other way, and I certainly respect the other two examiners

here in forming their opinion, I just don't agree with them

because I don't have enough information to conclusively say

that.

Q.   And for you, sexual interest in pubescents, that is,

not -- that is contrasted from prepubescents or postpubescent

adolescents, is not evidence of a mental disorder?

A.   It isn't.  It isn't because the research in this field is

clear that ordinary, average, quote, normal men are attracted

to adolescents, to individuals who have -- show the secondary

sexual characteristics.

    If someone is just beginning puberty, I'm more likely to

call them -- to consider them prepubescent.  But once the signs

are there, I don't see that as deviant in the same way that a

young child is.  It is illegal, obviously, it is harmful,

obviously, but it's very difficult to draw a line to say this

is normal and this is not normal.  Is it an age?  Is it the

physical characteristics?

    My experience is that pedophiles, real-life pedophiles,

genuine pedophiles, are pretty much interested in younger

children, and that shows through almost everything they do.

Here we have a lot of data, and the majority of it says that

Mr. Volungus is attracted to adolescents.  He likes younger

girls, perhaps because of their physical characteristics,

perhaps he's looking for them to look up to him, perhaps

because he's uncomfortable being with an adult because of his

1  own inadequacies.  But I just don't see him as being a

2  pedophile.  I see him, again, as someone who has probably

3  fantasized about everything.  And, again, he lives in his own

4  mind.

5      When he was out in the community, from the information

6  that he told me -- and I don't have any other information -- is

7  that he would masturbate every night and his only sexual

8  encounters were two episodes of oral sex with prostitutes in

9  two years.  One would expect that someone might have the

01:00 10  interest to try and meet somebody, and we have no information

11  about that.  Again, he gets his sexual gratification through

12  fantasy, through imagining himself with other people in which

13  he could play a role that I think only he knows.

14  Q.  Now, Dr. Bard, would you agree with a statement that a

15  pedophilia diagnosis in this case is defensible?

16  A.  I guess it depends how you're looking at it.  Again, I'm

17  not going up here and saying that it's absurd and you should

18  not even consider it.  I think if you're looking for evidence

19  for that diagnosis, you can probably find it.  But I think I go

01:01 20  back to what Dr. Prentky wrote, is that while you can probably

21  find ways to show pedophilia, it doesn't really capture him; it

22  doesn't really tell us who he is and why he does the things he

23  does.

24      Again, I look at his behavior in the community where, in

25  theory, if someone wants to offend, there are many

1    opportunities.  And there's no evidence of that at all.

2    There's no evidence that he is hanging around schools or parks

3    or anyplace else.  He's at the library because he has to be at

4    the library in order to use a computer.  And he works.  He

5    works huge hours.  He works overnight; he works the second

6    shift.  He's spending a lot of time doing that.

7         And he's spending time, according to him, with the Society

8    for Creative Anachronism, which is, again, a fantasy-based

9    "Let's relive what happened in the past."  It isn't healthy, in

01:03 10   my opinion, but it's certainly not deviant.  He's living an

11   antisocial, avoided lifestyle.

12   Q.   Now, arriving at this opinion, are you familiar with

13   statements in the records that Mr. Volungus has expressed a

14   sexual interest in what is referred to as "minors"?

15   A.   Yes.

16   Q.   And are you familiar with Mr. Volungus having expressed a

17   sexual interest in the term "children"?

18   A.   Yes.

19   Q.   And in the context of your evaluation, how did you

01:03 20   interpret references to minors and children?

21   A.   "Minors," as far as I can see, means under 18.

22   "Children," it's really not clear.  And I have certainly asked

23   you at various times if you could get me some of the images

24   that he was looking at because that would give me more

25   information about what interested him.  In his first

1  conviction -- so in his conviction in 2003 -- 2003 --

2  Q.   1998?

3  A.   I'm sorry -- 1998.

4       -- he was reported with thousands of images, adults,

5  adolescents, males, females, which he used to trade because he

6  would download everything that he could and then --

7           MR. GRADY:  Your Honor, I'm going to object to this on

8  the grounds that it's hearsay.  These are statements of the

9  defendant that are being offered for the truth and they were

01:04 10  not asserted and they were not offered for purposes of

11  treatment of this individual, and I'd object to them coming in.

12           THE COURT:  I didn't hear the last sentence or so.

13           MR. GRADY:  The doctor is offering statements made by

14  the defendant in the course of an interview that was conducted

15  for forensic purposes, not treatment purposes.  These are not

16  statements made in the course of treatment.  They're being

17  offered for the truth of the matter asserted.

18           The doctor is attempting to testify that this

19  individual traded prepubescent images rather than postpubescent

01:05 20  images.  The government objects to this as inadmissible

21  hearsay.

22           THE COURT:  Okay.  Overruled.

23           You may have it.

24           THE WITNESS:  I'm sorry.  I lost my thought.

25  BY MR. GOLD:

1  Q.   You were talking about your case formulation and your

2  sense of the activity Mr. Volungus was engaging in at the time

3  he was downloading pornography.

4  A.   Right.  I think he was downloading everything consistent

5  with the compulsion that he had at that time and he has now,

6  and was saving the ones that he liked and using the rest to

7  trade, which is a fairly consistent attitude I've seen in other

8  individuals who I've evaluated.  There was a point I was going

9  to -- but I lost that.  I'm sorry.

01:06 10  Q.   Well, let's see if I can ask a question which will help.

11  You stated that it would have been ideal to have access to the

12  images that Mr. Volungus was looking at to gain more insight

13  into what his sexual interests were?

14  A.   Yes.

15  Q.   But it appears to be the case that there were prepubescent

16  images among the images that were recovered from him in the

17  instances when images were recovered from him.

18  A.   Yes.  I guess my point is that I would like to see what he

19  was looking at overall.  Was that a very small minority of all

01:07 20  the images?  Was that a majority of the images?  I think that

21  can give us some more information.  But we don't have that now.

22  So -- and it's not like Mr. Volungus has only looked at that.

23  In 2003 when he -- or in 2004 -- late 2003-2004, his room is

24  purged and they find adult pornography, and that then becomes a

25  condition of his probation, that he can't use that anymore.  So

1   that's clearly an interest.  I'm not going to say it's his only

2   interest, but he's not the, quote, typical pedophile who only

3   looks at younger children because that's the only thing that

4   arouses him.

5       You can call him a nonexclusive pedophile, which is a term

6   that's used all over the place, but it doesn't say anything,

7   again, about what drives Mr. Volungus.  A diagnosis doesn't

8   capture the why.  The why someone does things.  Diagnoses are

9   atheoretical; they just describe behaviors.  And to say that he

01:08 10   did this because he's a pedophile doesn't say anything.

11   Because he didn't do it because he was a pedophile.  He may

12   have looked at young children, but it's such a more complex

13   kind of motivation, which is something you see in many

14   offenders that often goes overlooked.

15   Q.   Assuming for the moment that a DSM diagnosis were to

16   apply, in your opinion, to Mr. Volungus, would that carry any

17   necessary connotation with respect to his ability to control

18   his behavior in general or in a particular way?

19   A.   Well, I think that goes to the second part of the

01:09 20   definition here as a result of which he would have serious

21   difficulty in refraining from sexually-violent conduct or child

22   molestation.  I don't think anyone's talking about

23   sexually-violent conduct here.  There were no allegations of

24   sexual violence against anyone.  I assume what we're all

25   concerned about is child molestation.  So the question is:  If

he suffers from pedophilia, which is arousal to prepubescent

children, his only known offense is against a non-prepubescent

child, a pubescent person.

How does one get from saying because of his pedophilia

he's going to -- the logical conclusion, he's going to offend

against a prepubescent child?  I don't see that in the record.

Again, we have no evidence that he's ever touched a

prepubescent child except for the statements which he's made

online and in his letters which, again, seem to be his attempts

01:10 to embellish himself in the eyes of people who might in some

bizarre way look up to that.  But to say that he is likely to

do that means you're making a prediction for something that

he's never done, which is a little, I think, farfetched.

Q.   Do you include under either heading, sexually-violent

conduct or child molestation, the accessing of child

pornography?

A.   No, I don't.

Q.   If you were to make an opinion as to whether Mr. Volungus

would have serious difficulty refraining from accessing child

01:11 pornography in the future, would you have an opinion as to that

matter in particular?

A.   Yes.

Q.   And what would that opinion -- or does that alter the

opinion?

A.   I think that Mr. Volungus, based on his past and his

1   acknowledged difficulties controlling that aspect of his

2   behavior, would have -- I'm not sure I would call it serious

3   difficulty -- but would have difficulty refraining from looking

4   at what the government considers child pornography, which is

5   sexual images of anybody under the age of 18.  But that's a

6   very different kind of dynamic and behavior than those

7   individuals who I've seen who molest children.

8   Q.   Well, would you agree with me that the traveler case, as

9   we have been calling it, takes place in the context of

01:12 10   Mr. Volungus describing his introduction to child pornography

11   during the year of 1998?

12   A.   Yes.

13   Q.   And so why isn't that evidence of an offense cycle for

14   Mr. Volungus where he accesses child pornography and then moves

15   on to a hands-on offense?

16   A.   Because it's a single episode.  We have no evidence that

17   this is a cycle for him.  And if we assume that he did access

18   child pornography in 2003 and 2004, that did not lead to any

19   hands-on sexual offending, or even attempted hands-on sexual

01:12 20   offending.  I also think that Mr. Volungus now is in a very

21   different place than he was back then in terms of realizing

22   what was appropriate or not, and realizing up to a certain

23   point the fact that he has a problem in this area.

24   Q.   Now, in a typical evaluation such as this, have you had

25   the opportunity to testify in federal cases prior to this?

1    A.    Yes.

2    Q.    And in a typical evaluation such as this, how do you go

3    about answering the question of whether a respondent

4    has -- will have serious difficulty refraining from

5    sexually-violent conduct or child molestation?

6    A.    Well, it's a difficult question.  I've only testified

7    one -- in one case before this on the federal level.  On the

8    state level the usual way is to assess likelihood, whether or

9    not the individual is likely to offend in the future.  It

01:14 10   almost always involves hands-on offending.  And then you could

11   use an adjusted actuarial approach which I did here in trying

12   to assess the likelihood:  What are the chances that

13   Mr. Volungus would commit a sexual offense in the future?

14        But the question you asked me, serious difficulty in

15   refraining, really doesn't fit there all that well.  And you

16   could argue that the whole actuarial approach and likelihood is

17   irrelevant here.  You could say, "Let's look at Mr. Volungus's

18   behavior," because now we're talking behavior.  We're not

19   talking about in his head; we're talking about behavior.

01:14 20   Serious difficulty in refraining in some way so we could say he

21   could fantasize for the next 30 years and as long as he doesn't

22   touch anyone, everything's okay.  But now we're saying would he

23   have difficulty in basically controlling his impulses.

24        We look at his behavior.  Obviously, he's been in prison

25   for much of the past 12 or 13 years, and it's almost impossible

1    to engage in these kinds of behaviors while you're in prison.

2    But he was out for slightly over two years.  And that's data.

3    That's the most recent community living that we have.

4         And as far as I can see, although Mr. Volungus had his

5    problems out there, there were no -- there's no evidence of any

6    serious difficulty in refraining from child molestation.  He

7    may have sat home and masturbated every night to all sorts of

8    thoughts, but there isn't any evidence that he had difficulty

9    controlling his impulses to actually commit a serious hands-on

01:16 10   offense.

11   Q.   Dr. Bard, since you mentioned it I would like to almost,

12   in a sense, get it out of the way before we return to some of

13   the issues that you just discussed, but could you describe the

14   risk assessment that you did and then how it contributes to

15   your opinion in this case?

16   A.   When I do a risk assessment in cases like this, I use what

17   is called an adjusted actuarial approach.  I begin with the

18   results of an actuarial tool, here the Static-99 originally and

19   the Static-99R, because at the time I first did this the

01:17 20   Static-99R was not really being used all that much.  And that

21   is the beginning of my estimate.  I then factor in what are

22   called dynamic factors, things that may change over time,

23   because one of the problems with any actuarial tool is that

24   they are based on past behavior which will never change.

25        And when I used the Static-99 originally, I gave

```
 1    Mr. Volungus a score of four; when I used the Static-99R, I
 2    gave him a score of three because he loses one point for his
 3    age.  And I know there are some discrepancies about the scoring
 4    and, frankly, I don't think it means much because if we're
 5    concerned about the issue of being able to, you know, have
 6    serious difficulty refraining from conduct, the actuarials
 7    don't speak to that at all; they just give you a group estimate
 8    of how many individuals in a particular group were found to
 9    reoffend.
10    Q.   And did you evaluate dynamic risk factors in this contact?
11    A.   Yes, I did.
12    Q.   And what are those?
13    A.   Dynamic risk factors are risk factors that the research
14    has found to be related to recidivism that are changeable, that
15    are not fixed:  things like behavioral self-control, both
16    sexual and non-sexual; attitudes tolerant of sexual offending;
17    intimacy problems; participation in treatment, things like
18    that.
19    Q.   Now, what was the upshot of your evaluation of dynamic
20    factors in Mr. Volungus's case?
21    A.   Well, in terms of his general non-sexual impulse control,
22    there aren't really any issues.  Mr. Volungus is not an
23    individual who acts out violently, and there was no evidence of
24    any non-sexual problems.  He was employed.  He was meeting his
25    demands out there.
```

1    Sexually was not necessarily the same way.  He returned to

2    his use of pornography in the community; he was involved in

3    writing of those letters that you talked about, and even if I

4    feel that they are not necessarily accurate of what was going

5    on in his life, they are obviously concerning in terms of the

6    things that he was saying.  They certainly demonstrate ongoing

7    attitudes about that.

8    And, again, they have to be a concern.  Even if he was

9    doing it for, again, making himself feel better about himself

01:20 10   and attention-getting, it's still concerning that he was doing

11   this in a sexualized way, and that's a problem in my opinion.

12   Intimacy problems is something that I said already has been an

13   issue for him, and I think it is a clear motivator for him, and

14   he needs to work on that.

15   I think Mr. Volungus is someone who is intelligent enough

16   and insightful enough at times to benefit from therapy, but

17   he's never really had that.  And I'm not only talking about

18   sex-offender therapy; I'm talking about a relationship with a

19   therapist where he can actually talk about what's inside

01:21 20   without the shame or embarrassment that I know he fears.  And I

21   think with that he would be able to actually move forward a

22   great deal.

23   Q.   Dr. Bard, you alluded to -- and I want to speak

24   specifically about Mr. Volungus's creation of materials and

25   collection of materials while in prison.  In 2002 Mr. Volungus

```
        1    was found to have hand-drawn pictures, which were described as

        2    child pornography, by Bureau of Prisons staff, and in 2007 he

        3    had one image of a similar kind and then collected articles and

        4    so forth.

        5         Can I refer your attention to -- or direct your attention

        6    to the large binder which is not tabbed?  If you could turn

        7    past the first three pages, that is Exhibit 61.  Do you

        8    recognize those materials?

        9    A.   Yes, I do.

01:22  10    Q.   And were you provided the materials in Exhibit 61?

       11    A.   Yes.

       12    Q.   And about when were you provided those materials?  Or

       13    should I say, in relation to the drafting of your report, were

       14    you provided those materials afterwards?

       15    A.   Afterwards, yes.

       16    Q.   And what's your understanding of when and how those

       17    materials were recovered?

       18    A.   As far as I can recall, they were discovered in 2007 at

       19    Devens.

01:23  20    Q.   And have you had the opportunity to review them?

       21    A.   Yes.

       22    Q.   And can you give the Court a sense of what your

       23    interpretation of these documents is in the context of the

       24    case?

       25    A.   Well, there's a huge number of documents in here that I
```

1    don't think there's any one way to explain it all.  I think it

2    shows the sort of compulsive and obsessive nature of

3    Mr. Volungus, lists of everything from music to airplanes and

4    helicopters and cameras and computers and articles that he got

5    from the library at Devens:  lists of wine; lists of food;

6    lists of sites for pornography; architectural drawings that are

7    amazingly detailed; articles about sex offenders; articles

8    about the law which he finds to be objectionable, as many

9    individuals who I've evaluated.  I would have liked to have

01:24  10    talked to him about this.  I, unfortunately, did not have a

11    chance.  So anything that I say is just my impression.

12        I think Mr. Volungus uses this stuff to soothe himself, to

13    get him outside of his reality again, to make a list of things

14    he would like to do in his life, 100 things:  Wines of France,

15    the different regions; recipes.  I think it occupies his time

16    in that he doesn't have to think about where he is and why he's

17    there.

18        I think the sexual part of this -- and the sexual part of

19    this actually consists of this one page of which he is clearly

01:25  20    drawing things -- I don't know if it's clear or not -- to

21    either arouse himself or to fantasize or both.  Certainly it

22    involves younger children.  There's no way to know age,

23    obviously, but it's consistent with being more powerful and

24    more in control, which is what he seeks out.

25        There are questions about this case and about the

1  Static-99 and what Dr. Ferraro wrote, the computer things.  I

2  know there's been a bit of that.  Again, it's hard to know what

3  he was thinking at those times.  He obviously has an amazing

4  memory.  And I don't know.  There's a lot to do here, again,

5  with fantasy, video games, a virtual world, you know, to get

6  him out of where he is now.  But I guess my overall impression

7  is I'm not overly concerned about this.

8  Q.   Well, why is this cache of documents not evidence of

9  volitional impairment which might affect his ability to refrain

01:27  10  from hands-on offending?

11  A.   I just don't see how it is in any way.  The one -- the

12  only sexual things in here, those hand-drawn images, we can

13  consider them homemade child pornography if you want.  But,

14  again, that's already known, that Mr. Volungus has looked at

15  all sorts of images, sexual images, in order to arouse himself.

16      There isn't anything in here that says that he has

17  molested anybody.  I don't see how creating lists of anything

18  could be interpreted as evidence of serious difficulty in

19  refraining from child pornography when the list was done when

01:28  20  he was in prison.  I just don't see any link.

21  Q.   We've heard testimony about -- I'm just looking for the

22  page reference right now, but I do want to put it in front of

23  you, Dr. Bard, of the list that you mentioned of child

24  pornography that he remembers, which is about four or five

25  pages long with the names of child pornography files.

 1        Now, I see that Mr. Fick is helping me track down the

 2    specific page reference, but Mr. Volungus lists over five or

 3    six pages of child pornography video names by name.  What

 4    significance does that have for you about what's going on with

 5    Mr. Volungus?  and going back to the statutory question.

 6    A.   Again, I would have liked to have had the opportunity to

 7    ask him that, but my hypothesis is that he's trying to write

 8    things down because maybe he won't remember them.  It's clear

 9    that even then Mr. Volungus was thinking about child

01:29 10   pornography online.  And as I indicated, I think he would have

11    difficulty refraining from that.

12        But here again, looking at child pornography online is a

13    new thing.  It was not around 20 years ago.  I'm not sure it

14    was around ten years ago the same way.  And there's hardly any

15    research in the field about that.  There was an article --

16    actually, a series of articles that came out this past year

17    that actually suggest that we may be looking at a different

18    kind of sexual offender who is much more Internet-focused than

19    hands-on.  I don't think that's dispositive of anything yet,

01:30 20   but obviously, people in my field are beginning to see this as

21    a problem, obviously, because of the easy access.

22        And the question is:  Are the offenders who look at child

23    pornography similar to those who molest kids?  Are the

24    offenders who try to meet people online, underage or any other

25    age, are they similar to the individuals that we've seen who

1  befriend the family in order to molest a child?  I don't know

2  the answer to that.  But we know that Mr. Volungus's -- the

3  entirety of his offending behavior relates to a computer.

4  Without the computer, there's no offense.

5  Q.   And I'd just like to, for the sake of closing the door on

6  this, turn your attention to page 1613.

7  A.   Yes.

8  Q.   And do you recognize what appears on that page as a

9  document that you've reviewed?

01:32 10  A.   Yes.

11  Q.   And what does that appear to be?

12  A.   It looks to be a list of descriptions of -- I'm not sure

13  if they're websites or anything else because some of them just

14  have numbers associated with them, but it seems to be his

15  recall of specific things that he has either looked at or is

16  aware of.  It's hard to read his handwriting at times.  It

17  seems to involve, some of them -- some of them have ages next

18  to them, some indicate girls and/or boys, some indicate

19  specific acts.

01:33 20  Q.   And, again, I just return to the question:  Does this

21  list -- its presence here inform your opinion as to serious

22  difficulty with regard to a hands-on offense?

23  A.   No.  Because, again, it's consistent with what

24  Mr. Volungus has done in the past, which is to look at child

25  pornography.  And again, if this was a question of whether or

1   not it is likely that he will look at child pornography, I

2   would say yes, but it's not.  It's whether he is going to try

3   to -- or have difficulty controlling his sexual impulses to

4   molest a child.  And I just don't see that as being related,

5   first, in more theoretical terms; and secondly, specifically as

6   to what Mr. Volungus has or has not done in the past.

7   Q.   If I could turn your attention, Dr. Bard, to Exhibit 1 of

8   the first binder, which is the chats.

9   A.   Yes.

01:35 10   Q.   And if I could turn your attention specifically to page

11   1127.

12   A.   Yes.

13   Q.   And as a bit of background, this is one of the instances

14   we've discussed in which Mr. Volungus, under the identity which

15   he's called Kossack, is speaking with the law enforcement

16   officer whose identity is Indy Girl.  And he's making reference

17   to supposed past hands-on offending.  And he's making reference

18   to first having sexual relations with a ten-year-old girl.  Do

19   you recall reviewing that?

01:36 20   A.   Yes.

21   Q.   And then elsewhere on this page he said he's had many

22   more, in the highlighted phrase, hands-on offenses in his

23   career?

24   A.   Yes.

25   Q.   And then he recounts an anecdote when he is baby-sitting a

 1    12-year-old girl and has sexual relations with her at the age

 2    of 17?

 3    A.    Yes.

 4    Q.    And this continues on to page 1128?

 5    A.    Yes.

 6    Q.    And he describes how that interaction occurred, how they

 7    had intercourse and then almost got caught by her parents?

 8    A.    Right.

 9    Q.    Taking this example, if you will, did you take this

01:37 10    sequence in this chat as evidence of something that actually

11    occurred?

12    A.    No.

13    Q.    Why not?

14    A.    Well, again, I cannot say with 100 percent certainty that

15    this happened or did not happen.  But given his development,

16    what we know about him, this is very unlikely that a

17    12-year-old is going to sort of, quote, come on to him out of

18    the blue, that she's going to want to have sex with him while

19    they're watching a pornographic video.  It stretches it a

01:38 20    little bit.  But, again, it's consistent with him seeing

21    himself in a certain way.  This may have been a fantasy of his.

22    Who knows.

23    Q.    And would there be incentives, as you discern them, for

24    someone to invent or make up stories like this in this context?

25    A.    Well, I think the whole context is his way of, for lack of

1  a better word, showing off.  "Listen to all the stuff I've

2  done," you know, and lists things that, again, may have

3  occurred, may not have occurred, may have occurred in his head.

4  But he's trying -- he's trying to impress in some way and the

5  police officer is pulling for that.  "What's the kinkiest thing

6  that you've ever done," you know, asking him to sort of, you

7  know, hang himself as it were, but, you know, in the context of

8  she's really interested in him, and the kinkier the better, and

9  he clearly complies.

01:39 10  Q.   I want to ask a few specific questions about components of

11  your report and pieces of evidence that you reviewed.  Did the

12  personality testing that you did inform your opinion in this

13  case, and if so, in what way?

14  A.   I'm not sure it informed my opinion as to dangerousness

15  because personality tests don't have specific bearing on that

16  issue.  It did inform my opinion as to Mr. Volungus in general:

17  in terms of his personality, dynamics, how he lives his life

18  and his overall personality, of functioning.

19  Q.   Have you had an opportunity to review Dr. Prentky's report

01:40 20  and the report by Dr. Richard Hamill?

21  A.   Yes.

22  Q.   And are you familiar with the fact that both of those

23  psychologists performed what's known as the Abel Assessment of

24  Sexual Interest?

25  A.   Yes.

1  Q.   How did you interpret the divergent results of those tests

2  and how did those tests contribute to your opinion in this

3  case?

4  A.   I think any test of sexual interest like the Abel is

5  inherently problematic.  It's a test; it's not fact.  It is

6  interpreted by the author of the test who will not release the

7  information about how he does that.  It is not accepted in

8  Massachusetts, for example.

9           MR. GRADY:  Objection.  Move to strike.

01:41 10          THE COURT:  I'll strike that sentence.

11          MR. GOLD:  "It's not accepted in Massachusetts"?

12          THE WITNESS:  My experience is that it can provide

13  information but doesn't provide information about arousal.  And

14  when I read Dr. Hamill's report, I was not particularly swayed

15  by it.  And when I saw that Dr. Prentky had redone the test and

16  found diametrically opposite kinds of things, I was not

17  particularly swayed by that either.  If you accept it all,

18  maybe it means that back then he was interested in children and

19  now he's not; if you don't accept it all, then you can look at

01:42 20  it as information which has limited importance here.

21           Again, it says nothing about an individual's ability

22  to refrain from child molestation; it says nothing about

23  whether or not an individual is aroused -- sexually aroused to

24  certain things.

25  BY MR. GOLD:

1    Q.   We've made reference to the letters to Gary Gallardo.   And

2    I just want to draw your attention to what's been marked as

3    Exhibit 26, page 793, which is also on the screen.

4    A.   Yes.

5    Q.   You may be able to see it on the screen in front of you as

6    well.

7    A.   Yes.

8    Q.   The highlighted passage there says, "While in the library

9    yesterday a little cutie came over and was apparently watching

01:44 10    what I was doing.  She gave me this coy grin.  I guess she

11    liked what she saw.  I had been watching a KP fuck vid before

12    that.  I see her again, I'm going to see what happens.  She

13    seems like an approachable girl.  Or maybe I'll just watch her

14    and thank the lord she didn't say anything to anybody."

15         Did you review this letter in the context of your

16    evaluation?

17    A.   Yes.

18    Q.   How did you interpret this in the context of the

19    back-and-forth between Mr. Volungus and Mr. Gallardo?

01:44 20    A.   Well, I interpreted this partly because I was able to talk

21    with him about that.  And, again, I think this fits in

22    perfectly with the kind of personality dynamics that we are

23    talking about.  You know, here's something that will get this

24    guy to pay attention to me, to make him think that I'm like

25    him.  And, again, perhaps he did see a young girl there and

1  perhaps the rest of it is his fantasy or his thoughts.

2      But, again, if he wanted to offend -- unfortunately,

3  offenders are very good at that and they know how to target

4  children.  He's clearly in a library and there are kids around,

5  but there's no evidence that he was seen by anybody doing

6  anything untoward.  There's no evidence of anything.  Again, he

7  lives a fantasy life.  Does he go back to his room after seeing

8  this 12-year-old and masturbate?  Perhaps.  But, again,

9  Mr. Volungus has never done this.

01:46 10      This is -- this is -- in some ways we're talking about two

11  separate issues all along here.  We know that he looks at child

12  pornography.  He looks at all kinds of pornography.  We know he

13  is sexually compulsive.  He's compulsive in general and

14  sexually compulsive.  The question is:  Has that led to serious

15  difficulty refraining from child molestation?  He's attempted

16  to meet a child on one occasion, a 14-year-old, clearly an

17  illegal act.  Other than that, we don't know anything else.  We

18  can think things, but we don't know anything else.

19      And I say that after being in prison for all of these

01:46 20  years, and being in the community for a couple of years and not

21  offending with any contact offenses.  And realizing that he

22  could spend the rest of his life in prison, I think

23  Mr. Volungus is smart enough to realize that he needs to change

24  the way he lives his life, all the ways in which -- not only

25  sexually.  But he's lived a very dysfunctional life for a long

1    time.  And I think he's aware of that.

2        He's aware that he's had opportunities and he's blown it,

3    and he's aware that he's been his own worst enemy for years.

4    And I think he's at a point now where he really doesn't want to

5    be in prison anymore and he's willing to make those changes.  I

6    think it will be hard for him, but I think it's certainly

7    possible.  And I don't see him -- as much as I see the concern

8    about the child pornography, I just don't see him trying in any

9    way, shape or form to molest a child.

01:48 10      I think he'll go back to prostitutes; I think he'll try to

11   find younger-looking prostitutes, if that's what interests him,

12   18-, 19-year-olds who look younger.  And if that's what he

13   wants to do, it's legal.  It's not good, but it's legal.  But I

14   don't see him as the kind of person who's going to leave here

15   and try to molest somebody.  I just don't.

16            MR. GOLD:  Just one moment, your Honor.

17            (Counsel confer off the record.)

18            MR. GOLD:  Your Honor, could I request that we

19   might -- I just would like to confer with Mr. Fick.  I think

01:48 20   I'm almost done but may have one or two more questions.  Could

21   we take the morning --

22            THE COURT:  Sure.  We'll take the morning recess.

23            THE CLERK:  All rise.  The Court will take the morning

24   recess.

25            (The Court exits the courtroom and there is a recess

```
 1   at 11:03 a.m.)

 2              THE CLERK:  All rise.

 3              (The Court enters the courtroom at 11:24 a.m.)

 4              THE CLERK:  For a continuation of the bench trial.

 5   Please be seated.

 6   BY MR. GOLD:

 7   Q.   Dr. Bard, are you familiar with the records pertaining to

 8   Mr. Volungus's treatment while he was in the community?

 9   A.   Yes.

10   Q.   And did Mr. Volungus make statements to you in your

11   clinical evaluation or interview of him about the treatment?

12   A.   Yes.

13   Q.   And what was your sense of his progress in treatment when

14   he was in the community on supervised release?

15   A.   It appears that for the first six to eight, maybe ten

16   months, he was, as he said, just really showing up.  He didn't

17   really take it seriously, didn't really think that he had a

18   problem.  After they found the images on his computer and

19   confiscated it, which was in April of '04, he indicates that he

20   began to take treatment more seriously.  And that's borne out

21   by the reports of his therapist back then.  He continued to

22   participate in treatment for about a year longer, was doing

23   fairly well, but as you know, he was violated in June of '05.

24   Q.   Now, isn't it concerning, Dr. Bard, that it later emerged

25   that he was writing the letters to Mr. Gallardo at the same
```

1    time that he's turned over a new leaf in treatment?

2    A.    Yes.

3    Q.    And what do you make of that?

4    A.    I make of that much the same as I did of his other

5    writings in that while treatment may have been positive in

6    terms of dealing with some of his sexual issues, it wasn't

7    really even impacting on his underlying non-sexual needs and

8    that these letters, again, were his way of making himself look

9    more competent and getting attention and approval from others.

02:12 10   And, again, he has done this all of his life, both in sexual

11   ways and non-sexual ways.  It's certainly an obstacle to

12   treatment.  He was clearly not seeing this as being related to

13   his treatment.  Clearly, it is.

14        And I think that Mr. Volungus has the ability, as I've

15   said before, to benefit from treatment, not just for

16   sex-offending issues, because, again, his sex and issues deal

17   more with the child pornography, but just in developing a

18   better sense of self and developing a sense of adequacy as an

19   individual so that he can live a life that he can approach

02:12 20   others and he can feel confident in having interpersonal

21   relationships and he's not fearful of rejection and

22   humiliation, which I think has been the most important

23   underlying dynamic all of his life.

24   Q.    If you were to prescribe a treatment regimen for

25   Mr. Volungus, what would that consist of?

```
 1   A.   If I could devise a plan, I think first and foremost, it
 2   would involve individual treatment once a week, maybe more at
 3   first.  Mr. Volungus needs to develop a trusting relationship
 4   with somebody.  I don't think he's ever had that.  And in the
 5   context of that trusting relationship, he can talk about things
 6   that he's been ashamed to talk about or embarrassed to talk
 7   about, things that clearly led to some of his behaviors.
 8        I would not put him in group treatment right now.  I think
 9   the group dynamic would not be helpful to him.  I know that
10   most sex therapy in the community involves groups and/or
11   individuals, but I think that would enforce a lot of the
12   competitiveness and feelings of inadequacy.  I think that
13   perhaps at some point, yes, but I think he needs to develop a
14   better sense of self first to deal with the confrontation in a
15   group setting.
16        I would obviously not allow unsupervised access to
17   the -- on a computer; I would not allow unsupervised access to
18   any minors.  And I would refer him to an experienced
19   psychiatrist for a psychopharmacological evaluation, because
20   there's been success in treating the sort of compulsive sexual
21   behaviors that I see in Mr. Volungus by medication.  And
22   there's a man in the area, Dr. Marty Kafka, who's particularly
23   adept in that.
24            MR. GRADY:  I'm just going to object and move to
25   strike on the grounds this was not contained in the expert
```

02:14  (line 10)

02:14  (line 20)

1    report.  The government was provided no notice that this

2    witness would testify about a proposed treatment plan, and I'm

3    going to object on that basis.

4              THE COURT:  Overruled.  I'll let it stand.

5              MR. GOLD:  Thank you.  And I have no more questions,

6    your Honor.

7              THE COURT:  All right.

8              MR. GRADY:  If I may just have a moment to set up.

9              With the Court's permission, may I inquire?

02:15 10             THE COURT:  Please.

11                        CROSS-EXAMINATION

12   BY MR. GRADY:

13   Q.   Dr. Bard, how are you?

14   A.   Good, thank you.

15   Q.   You'd agree that Mr. Volungus has engaged in or attempted

16   to engage in sexually-violent conduct or child molestation?

17   A.   I would.

18   Q.   And in this case you've concluded that there is no mental

19   illness, abnormality or disorder for Mr. Volungus, correct?

02:16 20   A.   I have.

21   Q.   And sort of giving it the view from a thousand feet -- and

22   we'll come back in more detail -- you've essentially concluded

23   that he's attracted to pubescent and adolescent children?

24   A.   I think that's his primary -- actually, if we're talking

25   about minors, yes.

1    Q.   And in your view, Mr. Volungus's attraction as a 30- or

2    40-year-old man is not deviant when it's focused on pubescent

3    or adolescent children?

4    A.   Correct.

5    Q.   And you've previously identified in your report, I believe

6    it was Exhibit 54 -- is that right -- or was it Exhibit 53?

7    A.   I don't know.  Fifty-three.

8    Q.   Fifty-three?

9    A.   Yes, fifty-three.

02:17 10   Q.   I just want to go over the materials you actually reviewed

11   before you prepared that report.  That was Bates pages 1 to

12   1391 and Bates 1444 to 1459, correct?

13   A.   No, I think it only went up to 1391, as far as I recall.

14   Q.   Do you recall being deposed in this matter by myself?

15   A.   Yes.

16   Q.   Okay.  I'm just going to direct you to the Redweld binder

17   to your left.

18   A.   Yes.

19   Q.   Yes.  There's actually three separate copies of your prior

02:18 20   testimony, and other matters amongst them is your deposition in

21   this matter.  If you would take a look at it.

22   A.   I'm sorry?  This is.

23   Q.   The last one is your deposition?

24   A.   This isn't -- yes.  This isn't that.  Sorry.  Yes.

25   Q.   It is your deposition, correct?

1    A.    This one is.

2    Q.    Okay.  And I'd direct your attention to pages 21 and 22.

3    A.    Yes.

4    Q.    I'm just going to -- you could actually even follow along

5    with me on the screen, if you want, to the highlighted portion.

6    The question was:  "I want to start by just going over what

7    were the sources of information that you considered in

8    preparing that report," starting at line 12.  Have I read that

9    correctly?

02:19 10   A.    Yes.

11   Q.    And the answer was, "I interviewed Mr. Volungus on three

12   occasions, as is indicated in the report:  December 4, 2008;

13   July 13, 2009; July 1, 2010.  I reviewed the materials made

14   available to me by the Federal Defender's Office.  I listed the

15   most important ones in my report.  But I reviewed the entire

16   file over the weekend.  And I believe they are Bates-stamped

17   from 1 to 1391 or 1392, I don't recall the last digit, and

18   about 15 pages after that, of the sentencing agreement, the

19   sort of a plea agreement or whatever it's called."

02:19 20        Continuing on to the next page, "So 1 to 1391 or -2?" is

21   the question, "and Bates Nos. 1444 to 1459?

22        "ANSWER:  That sounds right."

23        Have I read that correctly?

24   A.    Yes.

25   Q.    And that was your deposition testimony in this matter?

1    A.   It was.

2    Q.   And would you agree with me now the materials you reviewed

3    prior to preparing your report were pages 1 to 1391 and

4    Bates-stamped Nos. 1444 to 1459?

5    A.   I don't know that.  I was deposed on January 20th of this

6    year, I wrote my report on October 19th of 2010, and what you

7    just read me, I said that I had things over the weekend before.

8    I don't think I saw the plea agreement.  I may have, but I

9    really don't know.

02:20  10    Q.   Let's read this one more time.  "So 1391 or -2 and Bates

11    Nos. 1444 to about 1459."  That was the question, correct?

12    A.   If you read before that, sir --

13    Q.   Sure.  Go ahead.  Please read whatever you want.

14    A.   -- I think -- I believe that I said I reviewed the entire

15    file over the weekend, Bates-stamped 1 to 1391 or -92, and

16    about 15 pages after that.  I don't think it matters a lot, but

17    I just don't know if I saw the plea agreement before I did my

18    report or not unless it's in here.  And it is, actually.  So,

19    yes, I would say that I did see all of that.  Sorry.

02:21  20    Q.   So after reviewing your deposition testimony, and disputed

21    whether you saw this, you're now prepared to admit that you

22    actually saw that document?

23    A.   I find your language a little bit difficult.  I'm not

24    disputing; I'm trying to give the Court as much accurate

25    information as I can.  You can see it as disputing.  That's

1    fine.  If I am accurate, I will be accurate.  If I am not,

2    sure, I will say, as I did, I am not sure.  Now that I've

3    looked at this, it appears that I have seen the plea agreement

4    beforehand.

5    Q.   Okay.  So it's accurate to say that first we went through

6    this deposition testimony, correct?  We went through it?

7    That's accurate?

8    A.   Yes.

9    Q.   And you previously weren't sure, correct?  That's

02:21 10   accurate?

11   A.   Correct.

12   Q.   But now you're sure.  That's accurate?

13   A.   I am sure.

14   Q.   Okay.  And at some point in January of this year or some

15   point thereafter were you provided an opportunity to review the

16   materials in Exhibit 61?

17   A.   Is this Exhibit 61 over here?  Yes.

18   Q.   Okay.  With respect to the materials that you were

19   provided, the Bates numbers 1 to 1391, 1444 to 1459, and those

02:22 20   materials contained in Exhibit 61, are those the types of

21   materials typically relied upon in the field of sex offender

22   risk assessment?

23   A.   Yes.

24   Q.   Okay.  Prior convictions, police reports, court records,

25   probation records, treatment records, psych records, prison

```
 1    records, those are all materials typically relied on by sex

 2    evaluators in conducting risk assessments, correct?

 3    A.   Yes.

 4    Q.   I want to come back to your report which I guess is page

 5    53 -- excuse me -- Exhibit 53, correct?

 6    A.   Yes.

 7    Q.   On page 3 you gave a personal history of Mr. Volungus up

 8    through 1997, correct?  Take a look at your report, if you

 9    wish.
```
02:23 10    A.   Yes.
```
11    Q.   Okay.  And you've previously testified nothing about this

12    history or background was important to your diagnosis, correct?

13    A.   I don't recall that.

14    Q.   I direct your attention to your deposition in this matter,

15    page 30, lines 15 to 17.  I'm going to read that.

16         "QUESTION:  Was anything in his family history

17    specifically important to your diagnosis in this case?

18         "ANSWER:  Not particularly."

19         Have I read that correctly?
```
02:23 20    A.   You read part of it.
```
21    Q.   "Only about his family background or anything else."  Is

22    that the rest of the answer?

23    A.   Yes.  Yes.

24    Q.   That was your prior testimony?

25    A.   That's obviously what I said.
```

1    Q.    Okay.  And you previously indicated that nothing in this

2    section was important to your risk assessment, correct?

3    A.    That's totally wrong.

4    Q.    Well, again, page 30, lines 24 and 25.

5          "QUESTION:  What about -- well, what, if anything, in his

6    family background informed your sex offender risk assessment?"

7    I'll go to the next page.

8          "ANSWER:  There really isn't anything in a risk assessment

9    per se that refers to family background."

02:24 10         Have I read that correctly?

11   A.    Yes.

12   Q.    And you go on to talk about his education next in your

13   report, correct?

14   A.    Yes.

15   Q.    And that information had no bearing on your diagnosis or

16   your opinion concerning risk of dangerousness, correct?

17   A.    There was no relation between his education and his risk,

18   right.

19   Q.    I want to just talk a little bit about how you've reported

02:25 20  Mr. Volungus's criminal history in your report.  Do you follow

21   with me so far?  Do you understand that's what I'm asking about

22   your report?

23   A.    I think so.

24   Q.    Okay.  Mr. Volungus was convicted in 1998 of soliciting an

25   under-aged girl to engage in sex, correct?

```
 1    A.    Correct.

 2    Q.    And he was convicted of one count of possession of child

 3    pornography, five counts of receipt of child pornography, and

 4    one count of use of an interstate facility to attempt to

 5    persuade a person under the age of 18 to engage in sex,

 6    correct?

 7    A.    Correct.

 8    Q.    And the basic facts, Volungus chatted with a military

 9    police officer posing as a 19-year-old, correct?

10    A.    Correct.

11    Q.    And he arranged to meet with the -- what was portrayed to

12    be that officer's 14-year-old sister, correct?

13    A.    Correct.

14    Q.    And Mr. Volungus actually traveled to meet that

15    14-year-old, correct?

16    A.    Correct.

17    Q.    And he intended to have sex with the 14-year-old, correct?

18    A.    Correct.

19    Q.    And, in fact, Mr. Volungus brought condoms --

20    A.    Yes.

21    Q.    -- sex toys and alcohol with him, correct?

22    A.    I believe so.

23    Q.    And when he arrived for the meeting he was arrested?

24    A.    Correct.

25    Q.    When interviewed by the FBI, Mr. Volungus admitted
```

1  possessing child porn and, in fact, child porn was later found

2  on his computer, correct?

3  A.   Correct.

4  Q.   And when he spoke -- you spoke to him, he told you that he

5  had become obsessed with finding pictures of young, pubescent

6  girls and masturbating to them; he described his sexual

7  interest as being related to girls who entered puberty and were

8  no longer children, correct?

9  A.   Yes, that is what he said.

02:26 10  Q.   And he told you he obsessed over collecting the images?

11  A.   Yes.

12  Q.   And he collected them because they were the focus of his

13  sexual attraction?

14  A.   That is what he said.

15  Q.   Now, in fact, Mr. Volungus actually possessed

16  predominantly images of prepubescent children on his computer,

17  correct?

18  A.   I don't know that.

19  Q.   I'd ask you to take a look at Exhibit 9 in the materials

02:27 20  before you.  Take a look at Paragraph 25.  First of all, let's

21  identify what Exhibit 9 is.  That is the presentence report

22  from his child pornography conviction in 1998, correct?

23  A.   Correct.

24  Q.   If we could skip ahead to Paragraph 25, Bates No. 0081,

25  that was amongst the materials you reviewed prior to preparing

1  your report, correct?

2  A.    Correct.

3  Q.    Paragraph 25, if you'd follow along on the screen or in

4  the exhibit in front of you, "Volungus consented to a search of

5  his barracks room at Fort Campbell including his computer.

6  Agents found over 4,000 pictures stored in directors" -- I

7  suppose that should be directories -- "in Volungus's computer,

8  most of which depicted children under the age of 12 being

9  sexually abused, which establishes the factual basis for Counts

02:28 10  2 through 7."  Have I read that correctly?

11  A.    Yes.

12  Q.    And this was amongst the materials you were provided,

13  correct?

14  A.    Yes.

15  Q.    So there's nothing in your report about the majority of

16  the images that he was found with in 1998 being of children

17  ages 12 and under, correct?

18  A.    No.

19  Q.    Now, you next state in your report that at some point

02:28 20  Volungus discovers chat rooms.  And this is on page 5 of your

21  report, correct?

22  A.    Yes.

23  Q.    By "at some point" when you refer to that in your report,

24  you mean prior to his arrest, obviously?

25  A.    Obviously.

```
 1   Q.   Okay.  He used these chat rooms to download additional
 2   child pornography, correct?
 3   A.   Correct.
 4   Q.   And you relate in your report that he chatted with people,
 5   that he was being ignored, so he created stories to draw more
 6   attention, correct?
 7   A.   Correct.
 8   Q.   And he created stories about sexual exploits with
 9   children, correct?
10   A.   Correct.
11   Q.   He didn't go on the Internet and post a fake picture of
12   himself with, you know, Scott Brown's head?
13   A.   Not that I'm aware of.
14   Q.   He didn't say he was rich?
15   A.   No.
16   Q.   He didn't say he was well endowed?
17   A.   Not that I'm aware of.
18   Q.   He went on the Internet and he said he engaged in sex with
19   children, correct?
20   A.   In this context, yes.
21   Q.   And none of the other ways in which he could have
22   portrayed himself is more than he is.  He chose to hold himself
23   out as an individual that engaged in sex with children,
24   correct?
25   A.   He did.
```

1  Q.  And you reviewed those chats that he engaged in as part of

2  your evaluation, correct?

3  A.  I did.

4  Q.  And according to you, the undercover officer and her

5  sister were the only individuals that you're aware of

6  Mr. Volungus having chatted with, correct?

7  A.  I don't recall saying that.  From what Mr. Volungus told

8  me, he attempted to contact other people but he was being

9  ignored.  I'm sure that he did at least attempt to chat with

02:30 10  someone else at some point, but these are the only indications

11  we have of any sort of back-and-forth thing.

12  Q.  I'm just going to show you your deposition, page 82.  Take

13  a look at that either on the copy in front of you or on the

14  screen.

15      "QUESTION:  And he never acknowledged or sought out other

16  minors that you're aware of?

17      "ANSWER:  He says he has not.

18      "QUESTION:  Okay.  So aside from the 14-year-old who was

19  an undercover law enforcement" --

02:31 20  A.  19-year-old.

21  Q.  19-year-old?  Sorry.

22      "So aside from the 19-year-old who was an undercover law

23  enforcement, Mr. Volungus did not use the chat rooms to target

24  other minors for the purposes of meeting up for the purposes of

25  sex?

1          "ANSWER:  As far as I know, he did not."

2          Have I read that correctly?

3     A.    Yes.

4     Q.    And that was your deposition testimony in this matter?

5     A.    Yes.

6     Q.    And over the Internet, by the way, just while we're on the

7     subject, this was not the only way or means by which

8     Mr. Volungus communicated with what he thought was a

9     14-year-old girl, correct?  There was actually a phone call?

02:31 10    A.    Correct.

11    Q.    And during the course of that phone call, Mr. Volungus

12    asked the 14-year-old if she'd like to have her pussy licked

13    and would she like to go into the bushes and do so, correct?

14    A.    I don't recall if that was said on the phone or on the

15    computer but --

16    Q.    Sure.  If you could take a look at Exhibit 8 in front of

17    you.

18    A.    Yes.

19    Q.    And that is a transcript of Mr. Volungus's plea in the

02:32 20    1998 case, correct?

21    A.    Yes.

22    Q.    And I'm going to direct your attention to Bates page 1328,

23    which is page 7 of that transcript.  You'd agree at this point

24    the prosecutor is now reading the factual allegations that

25    support the guilty plea, correct?

1   A.   I believe so, yes.

2   Q.   Okay.  And the highlighted portion you can follow on the

3   screen.

4   A.   Oh.

5   Q.   "After several more conversations discussing where they

6   would meet at, which they decided to be in Elizabethtown,

7   Kentucky, they set up a live phone call in which two young

8   female MPs spoke to John Charles Volungus in which they set up

9   the meeting place in Elizabethtown, Kentucky, in which he

02:32 10   believed he was speaking with 14-year-old Sarah, and he asked

11   many questions, in fact, quote, 'Have you ever had your pussy

12   licked?' and, quote, 'Would you like to go into the bushes to

13   do so?'"  Have I read that correctly?

14   A.   Yes, you have.

15   Q.   Okay.  And those are the facts that Mr. Volungus admitted

16   to in the course of his 1998 plea, correct?

17   A.   Yes.

18   Q.   I want to come back to the fact that to your knowledge he

19   did not seek out sexual encounters with any other minors

02:33 20   through these chat rooms.  That's what your deposition

21   testimony previously reflected, correct?

22   A.   I said as far as I knew, right.

23   Q.   I would ask you to take a look at Exhibit 1, page 1441.

24   And again, this was among the materials that you were provided

25   in advance of preparing this report, correct?

1    A.   Yes.

2    Q.   You can follow along on the screen or you can go to the

3    exhibit, whichever you prefer.  I've highlighted a portion of

4    this report, and it reads, "Volungus has had other

5    conversations with females supposedly under the age of 18 on

6    the Internet.  One of these individuals" -- well, strike that.

7    Let me back up.

8         This you recognize to be a report of the Federal Bureau of

9    Investigation from 9/3/1998 when Mr. Volungus was arrested,

02:34 10   correct?

11   A.   Correct.

12   Q.   And this report reflects that during the course of a

13   subsequent interview after his arrest he made several

14   admissions, correct?

15   A.   Correct.

16   Q.   Okay.  And in the course of making these admissions I'm

17   going to read the following statement Mr. Volungus made to the

18   FBI, at least according to this report.  "Volungus has had

19   other conversations with females supposedly under the age of 18

02:34 20   on the Internet.  One of these individuals that he has had

21   conversations with claims to be a 14-year-old female from Las

22   Vegas and goes by the Internet chat name 'Facial Girl.'  Her

23   real name is supposedly Nicole, and he has talked to her about

24   meeting while on the Internet."  Have I read that correctly?

25   A.   Yes, you have.

1    Q.   And this report reflects that Mr. Volungus admitted

2    chatting with another under-aged female claiming to be 14 using

3    the screen name "Facial Girl," correct?

4    A.   Correct.

5    Q.   And they talked about meeting?

6    A.   That's what it says, yes.

7    Q.   Mr. Volungus wasn't just chatting with one person with the

8    possibility of meeting, correct?

9    A.   Correct.

02:35 10   Q.   Nowhere in your report, however, does it mention that

11   Mr. Volungus was chatting with more than one person, correct?

12   A.   It does not.

13   Q.   And, in fact, Mr. Volungus actually talked about Facial

14   Girl in some of these chats, didn't he?

15   A.   Yes, I believe I saw that.

16   Q.   And when he spoke about Facial Girl, he described how

17   excited he was to meet her and, in fact, he stated, "And she

18   has a 12-year-old sister! and she wants to meet me too,"

19   correct?

02:35 20   A.   I believe so, yes.

21   Q.   And there's no mention of either Facial Girl or the fact

22   that Mr. Volungus was looking forward to meeting her

23   12-year-old sister, correct --

24   A.   Correct.

25   Q.   -- in your report?

1   A.   Correct.

2   Q.   Now I want to come back to that page 1141 again.

3   Subsequent to the discussion concerning Facial Girl, there's

4   another admission from Mr. Volungus, correct?

5   A.   Correct.

6   Q.   Volungus has also spoken with an individual with the chat

7   name of BCDad, B-C-D-a-d.   "BCDad is supposedly from Canada and

8   offered Volungus his eight- or nine-year-old daughter for sex.

9   They never set up a meeting but they have talked about it."

02:36 10   Have I read that correctly?

11   A.   Yes.

12   Q.   And this is another instance in which Mr. Volungus has

13   apparently -- or at least according to this report he admitted

14   to the FBI that he used the Internet to chat for the purposes

15   of talking about potentially meeting with an individual to have

16   sex with this eight- or nine-year-old girl.   That's what this

17   report says.

18   A.   Yes.

19   Q.   And there's nothing about that in your report, correct?

02:36 20   A.   Correct.

21   Q.   It's pretty safe to say an eight- or nine-year-old is

22   prepubescent, correct?

23   A.   Absolutely.

24   Q.   While incarcerated in 2002 Mr. Volungus was found with

25   hand-drawn pornography of himself engaged in sexual acts with

1    children, correct?

2    A.    Correct.

3    Q.    And you mention this on page 6 of your report.  You

4    write -- follow along with me either on the screen or on the

5    copy you have -- "At that time he had been found with

6    hand-drawn pornography in his locker.  Mr. Volungus stated that

7    he had drawn the pictures as a result of his loneliness,

8    similar to the pattern of obtaining Internet pornography in the

9    past.  Follow-up sessions noted his anxiety and discomfort in

02:37 10    discussing personal material, although he did admit to sexual

11    interest in minors."  Have I read that correctly?

12    A.    You have.

13    Q.    You note he drew the pictures as a result of what he told

14    you was as a result of loneliness, correct?

15    A.    Correct.

16    Q.    But your report doesn't say that the pornography was of

17    adults engaging in sex with children, correct?

18    A.    It does not.

19    Q.    Okay.  I show you Exhibit 12 -- or ask you to take a look

02:38 20    at it.  This was Bates-stamped 34.  That was amongst the

21    materials you were provided in advance of preparing your

22    report, correct?

23    A.    Correct.

24    Q.    And that reflects, "Mr. Volungus was referred to

25    psychology by Lieutenant Brown.  His locker had been searched

1    the night before and a considerable amount of pornography,

2    drawn by the inmate, was found.  Drawings mostly involved

3    adults committing sexual acts with children," correct?

4    A.   Yes, that's what it says.

5    Q.   This was amongst the materials you were provided to review

6    in advance of preparing this report, correct?

7    A.   Yes.

8    Q.   But when you discussed this incident, there's nothing in

9    your report about the fact that he was drawing pictures of

02:38 10    adults engaging in sex with children, correct?

11   A.   Correct.

12   Q.   I show you another exhibit, Exhibit 21, Bates-stamped 341.

13   This was also amongst the materials you were provided, correct?

14   A.   Correct.

15   Q.   And this report states that "On October 28, 2002, during a

16   random search of Unit 5703, Room 306, Officer T. Killen found

17   drawings depicting adult males performing sexual acts with

18   children inside the secure locker assigned to Inmate Volungus,

19   No. 06705-0334.  Also, staff found several articles about

02:39 20   incest and a book that references sex with children and child

21   pornography.

22       "During an interview with Inmate Volungus, he stated he

23   has a problem and he thinks about sex with children all the

24   time.  Volungus was asked where he got the drawings, and he

25   stated he drew them.  He was asked if the pictures of the male

1   was him, and he stated yes.  During the interview, Volungus

2   acted very upset and continued to say he was having a problem

3   and he thought about sex with children all the time."

4        Have I read that correctly?

5   A.   Yes, you have.

6   Q.   Mr. Volungus stated in an interview regarding this

7   incident that he had a problem and thought about sex with

8   children all the time, correct?

9   A.   That's what it says, yes.

02:40 10  Q.   And we're not going to find that in your report, are we?

11  A.   No.

12  Q.   And, in fact, Mr. Volungus stated more than once he had a

13  problem and he thought about sex with children all the time,

14  correct?

15  A.   Yes.

16  Q.   And we find no mention of this in your report?

17  A.   No.

18  Q.   And in this report Mr. Volungus acknowledges that the

19  adult drawn having sex with children was, in fact, himself, but

02:40 20  we don't find that fact in your report either.

21  A.   No, we don't.

22  Q.   Now, you didn't ask him about the children that he drew,

23  did you?

24  A.   I don't recall asking him about that, no.

25  Q.   You only asked why he drew the materials, correct, and he

1    told you he was lonely?

2    A.    Yes.

3    Q.    You didn't ask Mr. Volungus whether the children depicted

4    were prepubescent or postpubescent, correct?

5    A.    I do not recall asking him that, no.

6    Q.    And that's certainly a question you could have asked him.

7    A.    I could have asked him a lot of things, right.

8    Q.    Now, there has been some discussion that in June 2003 when

9    he was released from prison Mr. Volungus underwent a

02:41 10    sex-offender evaluation, correct?

11    A.    Correct.

12    Q.    More of -- a psychological evaluation -- excuse me.  There

13    was no sex-offender commitment statute at that point, correct,

14    through the federal system?

15    A.    True.  But he was being evaluated because of his sexual

16    behavior, so...

17    Q.    He was being evaluated for the purposes of assessing what

18    treatment would be appropriate over the course of his

19    supervised release, correct?

02:41 20    A.    Correct.

21    Q.    And that was Dr. Hamill's purpose in conducting the

22    evaluation in June 2003, correct?

23    A.    Yes.

24    Q.    And that's Exhibit 27 in the binder in front of you, by

25    the way?

1    A.    Yes.

2    Q.    Now, Dr. Hamill was performing this evaluation for the

3    purpose of setting up a treatment program, correct?

4    A.    Correct.

5    Q.    You didn't evaluate Mr. Volungus for the purpose of

6    setting up the treatment program, correct?

7    A.    No, I did not.

8    Q.    You're a forensic examiner; you were asked to give an

9    opinion about a pending legal matter, correct?

02:42 10    A.    Correct.

11    Q.    And you were paid to do so?

12    A.    Yes.

13    Q.    And Dr. Hamill diagnosed Mr. Volungus as a pedophile back

14    in June 2003, correct?

15    A.    Yes.

16    Q.    That was before the Adam Walsh Act ever existed, correct?

17    A.    Correct.

18    Q.    Now, in April 2004 Mr. Volungus is found in possession of

19    child pornography; is that right?

02:42 20    A.    Correct.

21    Q.    Your report doesn't say when he began downloading child

22    pornography upon his release from prison, correct?

23    A.    No, it doesn't.

24    Q.    In fact, you didn't even ask him when he began downloading

25    child pornography after his release from prison, correct?

```
 1   A.   Correct.
 2   Q.   You didn't ask him, even though you yourself recognized
 3   that it could be diagnostically significant both to a potential
 4   diagnosis and both with respect to risk evaluation when, in
 5   fact, he began downloading child porn?
 6   A.   I respectfully disagree with you there.
 7   Q.   Okay.  I'm going to show you deposition page 116.  Start
 8   with line 7.  "Did you ask him when, after his release, he
 9   first began looking at child pornography on the Internet again?
02:43 10       "ANSWER:  I don't think so.
11       "QUESTION:  Would that be significant, either
12   diagnostically or with respect to initial impairment?
13       "ANSWER:  It might be."
14       Have I read that correctly?
15   A.   Yes.
16   Q.   But you didn't ask him about when he began downloading
17   child pornography after he got out of prison, correct?
18   A.   You asked me two different questions here.  The answer I
19   gave here a moment ago is not the same as what you showed me.
02:44 20   That's been a pattern all along.  I just want to make the Court
21   aware of that.  And if you had read a little bit more, you
22   would get what I was actually saying --
23   Q.   Okay.
24   A.   -- but --
25   Q.   Attorney Gold will have an opportunity to come back and
```

```
 1  talk about issues he thinks I haven't adequately covered, but
 2  my question to you is just:  Have I read lines 7 to 12
 3  correctly?
 4  A.   That's not what you just asked me, but the answer to that
 5  question is yes.
 6  Q.   Okay.  That's the question I just asked.
 7       Now, among the materials you were provided was a report by
 8  Dr. Monica Ferraro, correct?
 9  A.   Correct.
10  Q.   I'd ask you to look at --
11       MR. GRADY:  Actually, with the Court's permission, I
12  would like to show the doctor an item that was not in evidence
13  but was shown to the doctor as part of his review.
14       MR. GOLD:  No objection.
15       THE COURT:  Okay.
16       MR. GRADY:  If I could have a moment, your Honor.  I
17  don't believe I highlighted this in advance.
18       (Pause.)
19  BY MR. GRADY:
20  Q.   I refer to you Bates stamp 0005.  And that was amongst the
21  materials that you were provided in advance of preparing your
22  report, correct?
23  A.   Correct.
24  Q.   Now reading the highlighted section.  "He reported that in
25  December of 2003 he obtained a computer with Internet access.
```

1    According to Mr. Volungus, he immediately began accessing child

2    erotica and child pornography."

3        That was among the materials you were provided in advance

4    of preparing your report, correct?

5    A.   Correct.

6    Q.   We don't find any reference to this at all in your report,

7    correct?

8    A.   No.

9    Q.   Now, when Mr. Volungus was found with the images, he

02:46 10   prepared an affidavit, correct?

11   A.   An affidavit?  I don't know if it was an affidavit.

12   Q.   I'd ask you to take a look at Exhibit 24.

13   A.   Sure.  Yes.

14   Q.   Take a look at the second page.  Well, strike that.  I'll

15   ask the question.

16       Mr. Volungus denied in this affidavit knowingly

17   downloading images, correct?

18   A.   If I could have a moment?

19   Q.   I'll put it up and save you the time.

02:46 20   A.   Okay.  Yes, that's what it says.

21   Q.   However, despite what he claims in this affidavit,

22   Mr. Volungus knowingly downloaded that child pornography,

23   correct?

24   A.   I believe he did, yes.

25   Q.   And nowhere in your report does it note that he initially

```
 1    lied about knowingly downloading this, correct?
 2    A.   Correct.
 3    Q.   In your report you relate -- with respect to this
 4    pornography, in your report you indicated there wasn't much
 5    information, correct?
 6    A.   Correct.
 7    Q.   And that Mr. Volungus told you he was never even sure
 8    which pictures there were?
 9    A.   Correct.
02:47 10   Q.   But, in fact, Mr. Volungus knew then and knows now that
11    the images, or at least some of the images that he possessed
12    then, depicted prepubescent children engaged in sexual acts,
13    correct?
14    A.   Correct.
15    Q.   He just didn't tell you.
16    A.   Correct.
17    Q.   And it's clear these were, in fact, images -- or at least
18    some of them were prepubescent children engaged in sexual acts,
19    correct?
02:47 20   A.   It appears that way from the plea agreement, yes.
21    Q.   Okay.  And when you refer to the plea agreement, you're
22    referring to Exhibit 40, I believe?  41.  40 or 41.  I
23    apologize.  Exhibit 40, correct?
24    A.   Yes.
25    Q.   And this plea agreement provides that Mr. Volungus
```

1  knowingly and intentionally downloaded images of prepubescent

2  minors engaged in oral sex, intercourse and the lascivious

3  exhibition of the genital or pubic areas of such minors,

4  correct?

5  A.   Correct.

6  Q.   And that's not in the report?

7  A.   No.

8  Q.   And this plea agreement was among the materials you were

9  provided in advance?

02:48 10  A.   Yes, it was.

11  Q.   Now, Mr. Volungus noted to you, and you noted in your

12  report, that these materials were found in the temporary

13  Internet folder in files he had discarded, correct?

14  A.   Correct.

15  Q.   And you noted that for your report?

16  A.   That's what he had told me, yes.

17  Q.   Let me show you Exhibit 44, Bates-stamped 1372.  Do you

18  recognize this document?

19  A.   Yes, I do.

02:49 20  Q.   Okay.  This was among the materials you were provided in

21  advance of preparing your report, correct?

22  A.   Correct.

23  Q.   And it reflects that in June of 2005 the FBI completed a

24  forensic evaluation of Mr. Volungus's computer, correct?

25  A.   Yes.

1    Q.    And amongst the findings was, first, that he possessed

2    child pornography, correct?

3    A.    Yes.

4    Q.    But also found -- and I'll read from the report.  "Also

5    found during the review was a software program GhostSurf which,

6    when utilized, wiped certain files and folders.  The forensic

7    examination found that this program was last used on 4/9/2004."

8    Have I read that correctly?

9    A.    Yes, you have.

02:50 10   Q.    And we don't find any mention of this in your report, do

11   we?

12   A.    No.

13   Q.    Did you ever look up what GhostSurf was, or its purpose?

14   A.    It seems obvious.

15   Q.    I'm just going to show you --

16       MR. GRADY:  Again, with the Court's permission, can I

17   show the witness something not in evidence?

18       THE COURT:  All right.

19   BY MR. GRADY:

02:50 20   Q.    I show you a bit of a screen shot from a website from a

21   company called Tenebril.  It's a program called GhostSurf.  Is

22   that what it appears to be?

23   A.    It does.

24   Q.    Okay.  And from this screen shot, GhostSurf holds itself

25   out to be a program that can hide your identity while you're

```
 1  surfing the Internet, correct?
 2  A.   Yes.
 3  Q.   Masks your IP address.
 4  A.   Yes.
 5  Q.   They say to prevent identity theft, but that would equally
 6  prevent law enforcement from learning your IP address, correct?
 7  A.   I would assume so.
 8  Q.   For an individual using the Internet to secure and view
 9  child pornography this would be a pretty useful program,
10  correct?
11  A.   Probably would.
12  Q.   It shows that Mr. Volungus actually -- well -- by the way,
13  the program was used on April 9th, three days before the child
14  pornography was found on his computer, correct?
15  A.   Yes.
16  Q.   Okay.  It was used to erase materials?
17  A.   I would assume it was.
18  Q.   According to the report.
19  A.   Yes.
20  Q.   Care to hazard a guess what he was erasing?
21       MR. GOLD:  Objection.
22       THE WITNESS:  It would only be a guess.
23  BY MR. GRADY:
24  Q.   Well, we know from Dr. Ferraro's report he began
25  downloading child porn in December of 2003, correct?
```

1    A.    My assumption is that he viewed child pornography.

2    Q.    But you noted in your report that there were only 20

3    images, correct?

4    A.    That is what -- that was the information I had at the

5    time.

6    Q.    You wrote down that he told you it was only 20 images and

7    they were in the discarded and deleted folders, correct?

8    A.    That is what he told me, yes.

9    Q.    And in conjunction with that statement that he told you,

02:52 10    there's no mention in your report of the GhostSurf program and

11    there's no mention of its use three days before the pornography

12    was found, correct?

13    A.    Correct.

14    Q.    Now, you would agree Mr. Volungus is fairly intelligent,

15    correct?

16    A.    I would.

17    Q.    And this GhostSurf program represents an example where Mr.

18    Volungus has adapted his behavior to evade law enforcement,

19    correct?

02:52 20    A.    That's fair to say.

21    Q.    So when he was released the second time around he didn't

22    make all the same mistakes he made the first time, correct?

23    A.    When was he released the --

24    Q.    When he was released --

25    A.    -- second time?

1   Q.   -- in May 2003.  Excuse me.  I apologize if I misspoke.

2        When he was released in May of 2003 he began to take steps

3   to hide his activities from law enforcement, correct?

4   A.   At some point he does, yes.

5   Q.   I'd ask you to take a look at Exhibit 26 in the binder in

6   front of you.  These are letters we've discussed to

7   Mr. Gallardo.  He acknowledged to you that he authored these

8   letters, correct?

9   A.   Yes.

02:53 10   Q.   Take a look at 786.  There Mr. Volungus relays, "Watched

11   some great vids last night including one of the guy's daughter

12   about seven, cute as hell, and does one hell of a sexy

13   striptease and pussy show.  I got to find out how to save a

14   webcam broadcast."

15        That's a letter Mr. Volungus wrote to Gary Gallardo on

16   March 1, 2005, correct?

17   A.   Correct.

18   Q.   Your testimony is that he has no mental illness,

19   abnormality or disorder, correct?

02:54 20   A.   That is my testimony as far as it concerns the legal

21   issues here, yes.

22   Q.   I show you Exhibits 786 on to 787.  Hopefully I can just

23   do it on one.  Mr. Volungus writes again another letter to

24   Mr. Gallardo.  "We, the pedos, are going to win.  Europe will

25   reject U.S. puritanism and reallow KP."  And there KP refers to

1    kiddie porn?

2    A.    I would think so.

3    Q.    "They know how to make money.  We'll get rid of AOC" --

4    AOC standing for age of consent?

5    A.    I didn't know that.  Okay.

6    Q.    Would you agree that's what it means?

7    A.    It sounds right.

8    Q.    -- "AOC laws and freedom will then spread to Latin America

9    and Asia because they'll want the Euro tourists.  U.S. will be

02:55 10   the last anti-kid sex holdout just like they are the last

11   holdout on marijuana," something else Mr. Volungus wrote to

12   Gary Gallardo, correct?

13   A.    Correct.

14   Q.    And he wrote that in a letter on March 1, 2005, correct?

15   If you would go back to 784, it has the page.

16   A.    Yes, I believe so.

17   Q.    And again, your testimony is Mr. Volungus has no mental

18   illness, abnormality or disorder?

19   A.    If you keep going on that, that will result in serious

02:55 20   difficulty refraining from sexually-violent conduct or child

21   molestation, yes.

22   Q.    But you testified he had no serious mental illness,

23   abnormality or disorder; you wouldn't diagnose him with

24   pedophilia, correct?

25   A.    I would not diagnose him with pedophilia.  But the issue

1    is not just that; it's the issue of how does that relate to the

2    rest of the legal issue here.

3    Q.   But you testified he does not have a diagnosis listed in

4    the DSM-IV.

5    A.   I testified that I don't have sufficient reliable

6    information to conclude with any certainty that he suffers from

7    pedophilia.  I also testified that I understand why others

8    have.  And I'm certainly not making any statements that such a

9    diagnosis given by others is horrible, wrong or inappropriate,

02:56 10   I just require a higher level in terms of what Mr. Volungus

11   actually fantasizes about and what he's actually done.

12   Q.   Okay.  But, again, the result of all of that talking you

13   just said was you don't make a diagnosis of pedophilia,

14   correct?

15   A.   I don't have enough valid and reliable information to make

16   such a diagnosis.  And as I said, if someone were to give him a

17   provisional diagnosis of pedophilia, I would not argue with

18   that.

19   Q.   But to reduce that down to, then, one sentence, you don't

02:56 20   diagnose him with pedophilia, correct?

21   A.   I'm not sure it's a one-sentence kind of answer.  As I

22   said from the beginning here, this is a complex case where we

23   don't have a lot of reliable information.  So if you want to

24   characterize it as no, he doesn't, that's fine.  But I'm

25   talking a more nuanced approach because I realize there are

1     indications of other things here as well.

2     Q.   Did he meet the diagnostic criteria for pedophilia as is

3     outlined in the DSM text revision IV?

4          MR. GOLD:  I think the doctor has answered that, your

5     Honor.

6          THE COURT:  Go ahead.  You may answer it.

7          THE WITNESS:  In my opinion there was not sufficiently

8     reliable information to diagnose him as such, although it is

9     clear that there were some indications of that.

02:57 10   BY MR. GRADY:

11    Q.   Okay.  You don't diagnose him with it?

12    A.   I am not diagnosing him with it at the present time.

13    Q.   All right.  Directing your attention to page 792 of the

14    exhibit in front of you, Mr. Volungus again writes to

15    Mr. Gallardo in a letter dated March 13, 2005, "Our stonewall

16    is coming.  As the EU gains more power, economic and political,

17    the closer they are to telling the USA to fuck off.  The

18    Netherlands already have a 12 YO" -- year old?  12-year-old --

19    A.   Yes, year old.

02:58 20   Q.   -- "age of consent and allow" -- something I can't make

21    out -- "of KP to be sold.  Europe has always liked kiddie porn

22    and kid sex.  They will be the first to reestablish it, with

23    Asia and Latin America following closely to cash in on

24    tourism."

25         That's something else Mr. Volungus wrote to Gary Gallardo,

          1  correct?

          2  A.   Yes.

          3  Q.   And you don't diagnose Mr. Volungus with any mental

          4  illness, abnormality or disorder, correct?

          5  A.   I think we've already discussed that.

          6  Q.   There's another letter at page -- excuse me -- another

          7  portion of a letter at 792.  Mr. Volungus writes in

          8  another -- in the letter dated March 13, 2005, to Gary

          9  Gallardo, "Met one fella last week.  Watched his webcam.  He

02:58 10  was finger-fucking his daughter for the world to see.  She

         11  looked about six years old.  She was loving it.  He had a

         12  microphone on.  She was asking him to 'Do it faster, Daddy,'

         13  and, 'Yeah, right there.'  Was fucking amazing.  If I hadn't

         14  been in the middle of the library I would have whipped it out

         15  and jacked off right there."

         16       That's something else he wrote to Mr. Gallardo, correct?

         17  A.   He did.

         18  Q.   You asked him about these letters and he told you he made

         19  them up?

02:59 20  A.   Pretty much, yes.

         21  Q.   Okay.  And you credit the denial, among other reasons,

         22  because you observed the government took away his computer and

         23  he couldn't access the Internet, correct?

         24  A.   I think that was part of it, yes.

         25  Q.   And you mentioned on direct exam that you thought it was

1    very unlikely that he would use a library to access child

2    pornography, correct?

3    A.    I did.

4    Q.    Now, you don't know whether there were other computers in

5    his house after probation took his computer away, correct?

6    A.    There were some notes in the probation record that there

7    were other computers in the house that were owned --

8    Q.    Oh, have you seen the probation records?

9    A.    The reports of the probation officer who was supervising

03:00 10   him in '05.

11   Q.    And you were provided those?

12   A.    Yes.

13   Q.    The probation chronologies?

14   A.    Yes.

15   Q.    All right.  So that you know in June of 2003, about two

16   months after Mr. Volungus's computer was taken away from him,

17   that the probation officer had a discussion with Mr. Volungus's

18   mother, correct?

19   A.    I don't recall all that.  I reviewed it, but I don't

03:00 20   recall it that well.  I'm sorry.

21   Q.    Do you recall that pornographic popup ads started

22   appearing on his mother's computer?

23   A.    Yes, I do recall that.

24   Q.    And the probation officer suggested someone might be

25   accessing pornography, and Mrs. Volungus didn't believe it

1    could be John because the computer was password-protected,

2    right?

3    A.    Yes.

4    Q.    But you still conclude he didn't have any access to the

5    Internet?

6    A.    From the materials that I saw, those computers were locked

7    up and password-protected.  And according to everything I saw,

8    he was -- including in the probation records, he was accessing

9    the computers in libraries.

03:01 10   Q.    Okay.  And so you'd agree he was accessing library

11   computers, correct?

12   A.    Yes.

13   Q.    And, in fact, two of these letters referred to using

14   library computers to download child pornography, correct?

15   A.    Correct.

16   Q.    And you discount that as unlikely?

17   A.    Right.  I'm not saying that it's not possible.  I'm saying

18   that in my experience in going into libraries and seeing

19   computers, is that they are fairly public; they don't have

03:01 20   private rooms as far as I know.  I have not been to libraries

21   that he was at.  And there's a note in one of the probation

22   records that says that one of those libraries doesn't even have

23   Internet access.  So I'm saying that it's unlikely.  I'm not

24   saying it's not possible.

25   Q.    So your experience in saying it's unlikely is purely

```
 1   anecdotal.  It's based on your own experience?
 2   A.   No, I'm saying it's part of it.  But the other part has to
 3   do with the report in the probation notes that a certain
 4   library didn't even have access.
 5   Q.   Actually, I think you're wrong.  I think the probation
 6   report said the library had unmonitored Internet access and
 7   that was the concern that probation had.
 8   A.   No, I think there was -- one thing that I'm thinking about
 9   was that they said the only thing that they had a computer for
10   was an online card catalog.
11   Q.   I'll come back to that.  I'm just going to show you what's
12   Exhibit 46 in the materials in front of you.  And that was
13   Bates page 1344.  And that was among the materials that you had
14   prior to preparing your report, correct?
15   A.   Yes.
16   Q.   And this report reflects that Mr. Gallardo -- the
17   individual with whom Mr. Volungus was writing, correct?
18   A.   Correct.
19   Q.   It relates to Mr. Gallardo.  And it says that Mr. Gallardo
20   was arrested in a library using a library computer to download
21   child pornographic images and saved them to a disk, correct?
22   A.   A library at a college.
23   Q.   But a library.
24   A.   A library at a college.
25   Q.   Okay.  That's a library.
```

03:02  (line 10)
03:03  (line 20)

1  A.    It's also at a college, sir.

2  Q.    But it's a library, correct?

3  A.    And it's not a public library like the ones that he was

4  going to.

5  Q.    How is a library at a college not among the group of all

6  buildings that are described as "libraries"?

7  A.    It is among all the buildings that are described there.

8  There's libraries, but my experience is that they're not the

9  same.

03:03  10  Q.    I'm just going to come back to these letters very briefly

11  and ask you to look at page 794.  There was some discussion on

12  direct of this.  Mr. Volungus writes in another letter to

13  Mr. Gallardo, "What do you think about crossing the border to

14  the twins and picking up some young girls?  How available are

15  they there?  I've heard they're pretty common.  You know what I

16  like.  Brunette about ten.  Just budding is perfect."

17        Have I read that correctly?

18  A.    Yes.

19  Q.    And this was something else Mr. Volungus wrote to

03:04  20  Mr. Gallardo, correct?

21  A.    Correct.

22  Q.    And there's nothing in your report, by the way, about the

23  fact that Mr. Volungus described a ten-year-old girl as

24  perfect?

25  A.    Correct.

1    Q.   While on supervised release Mr. Volungus admitted having

2    unauthorized contact with his five-year-old niece, correct?

3    A.   Correct.

4    Q.   And it was, in fact, because he was alone in a room with

5    his five-year-old niece?

6    A.   Correct.

7    Q.   And since you prepared your report, you've had an

8    opportunity to look at the materials that were seized from

9    Mr. Volungus in August of 2007, correct?

03:04 10    A.   Yes.

11    Q.   The front page of that is Exhibit 61.  The pictures,

12    correct --

13    A.   Yes.

14    Q.   -- appears to be pictures of an adult male having sex with

15    younger, if not minor -- would you describe it as minor

16    children?  Would you agree with that?

17    A.   Oh, absolutely.

18    Q.   The second indication Mr. Volungus is drawing pictures of

19    adults engaging in sex with children in prison, correct?

03:05 20    A.   Correct.

21    Q.   Now, also in Exhibit 61 between Bates 1613 and 1619 is a

22    list of I think what you described as items he looked

23    at -- items of child pornography he looked at or was aware of,

24    correct?

25    A.   Correct.

```
 1   Q.   Now, you've previously described that Mr. Volungus's focus
 2   of his sexual interest was pubescent children and teens,
 3   correct?
 4   A.   Yes.
 5   Q.   Essentially, you know, over 12?
 6   A.   Essentially.
 7   Q.   Did you have an opportunity to take a look through these
 8   and sort of parse out how many of these descriptions of prior
 9   child pornography that he decided to write down while in prison
10   reference children under the age of 12 and how many reference
11   children over the age of 12?
12   A.   No, I didn't add them up.
13   Q.   Would you agree with me that Mr. Volungus's lists here
14   overwhelmingly involve descriptions of sex with children aged
15   12 and under?
16   A.   On this list, yes.
17   Q.   Overwhelmingly, by virtue of almost 110 to seven -- or six
18   or seven, correct?
19   A.   As I said, I will take you at your word for it because I
20   haven't added it up.
21   Q.   Okay.  The overwhelming majority of these descriptions
22   involve descriptions of sexual acts with children under the age
23   of 12 engaging in sex, correct?
24   A.   It appears that way, yes.
25   Q.   Far in excess of the number on those lists that involve
```

1    the descriptions of children over 12, correct?

2            MR. GOLD:  Your Honor, I would just object.  I mean,

3    it appears Mr. Grady is testifying to this, Dr. Bard is taking

4    his word for it --

5            MR. GRADY:  Fine.  I'll tell you what.  We could go

6    through it.

7    BY MR. GRADY:

8    Q.   Now, for the record, Dr. Bard, I've actually tried to make

9    this a little bit easier.  Why don't we zoom in on these.

03:07 10   We'll start at the first one and go through the whole thing, if

11   Mr. Gold wishes.

12           MR. GOLD:  I don't wish that.  That wasn't the point

13   of my objection, your Honor.  If we could -- Dr. Bard does take

14   his word for it.

15   BY MR. GRADY:

16   Q.   That overwhelmingly describes sex with children under 12,

17   correct?

18   A.   Yes.

19   Q.   Okay.  And some of these materials clearly evidence an

03:07 20   intent on Mr. Volungus's behalf to go out and access child porn

21   upon his release, correct?

22   A.   I don't know that, no.

23   Q.   Let me show you Bates page 1622.  Now, that reads

24   "Disguise list:  Hair dye, wig; colored contact lenses; makeup

25   to tan or make pale."  Correct so far?

```
 1   A.    That's what it looks like, yes.

 2   Q.    "Fake facial hair:  Moustache, beard, et cetera; fake

 3   tattoos; fake teeth," correct?

 4   A.    Yes.

 5   Q.    And down at the bottom it actually reads, "Don't become

 6   predictable.  Use widely scattered hotspots at various times

 7   and dates.  Don't get in the habit of Thursdays at noon at the

 8   Fifth Street Library."  By the way, he's referencing a library

 9   there, correct?

10   A.    That's what it sounds like.

11   Q.    It says "library"?

12   A.    Yes.

13   Q.    "Eventually, even with wireless and proxies, they could

14   find you," right?  That's the statement there?

15   A.    Correct.

16   Q.    Do you agree with me that suggests that Mr. Volungus is

17   contemplating ways in which to use -- to download child porn

18   upon his release?

19   A.    No.  I don't know what it means.

20   Q.    I show you another Bates stamp, 1624.  Start at the top.

21   It begins with, "As little connection to you as possible,"

22   correct?

23   A.    Yes.

24   Q.    "Use proxies, an anonymous" -- and then something I can't

25   make out, correct?
```

 1    A.    Correct.

 2    Q.    "Wireless.  Minimal info on the CPU you're using."  That's

 3    what it says next?

 4    A.    Yes.

 5    Q.    "E-Gold or similar service.  Open an account with

 6    anonymous info, Western Union money, cash only to account.  Use

 7    account throwaway if necessary."  That's what it reads,

 8    correct?

 9    A.    Yes.

03:09 10   Q.    "Have throwaway e-mails and use public CPU to move info

11    that way," correct?

12    A.    Correct.

13    Q.    "Move around.  Don't use the same hotspots"?

14    A.    Correct.

15    Q.    "Never keep illegal material on CPU," correct?

16    A.    Correct.

17    Q.    They're referring to child pornography?

18    A.    I would imagine so.

19    Q.    "Use removable drives and medium.  Try ultrasmall flash

03:10 20   drives."  Have I read that correctly?

21    A.    Yes.

22    Q.    "Never have anything sent to a physical address.  Use only

23    down-" -- excuse me.  "Use only" -- strike that -- "only

24    downloadable goodies," correct?

25    A.    That's what it looks like.

1    Q.    "Goodies" again being child pornography?

2    A.    I don't know if that says "goodies," but that's what it

3    looks like.

4    Q.    "Don't chat with kids, only consenting adults.  If kids

5    are offered up, later," and then I can't make out that last

6    word; is that correct?

7    A.    I don't know about "later," but yes.

8    Q.    "Be.net is still useful.  They can't trace downloads."

9    A.    Yes.  I know.

03:11 10   Q.    "Avoid uploading.  That's how they got you.  Distro."

11   Have I read that?

12   A.    That's what it looks like, yes.

13   Q.    "Distro" being short for distribution of child porn?

14   A.    I have no idea what that means.

15   Q.    Short for "distribution"?

16   A.    I don't know.

17   Q.    And then that final statement.  And again, you testified

18   his sexual interest is not in prepubescent children.  What does

19   that last sentence say?

03:11 20   A.    "Sex before eight or else it's too late."

21   Q.    And eight, concededly probably for you, is a prepubescent

22   child, correct?

23   A.    Yes.

24   Q.    Now, in the course of your practice you're familiar with

25   treatments -- developing what's called a release plan, correct?

```
 1   A.   Yes.
 2   Q.   Does Mr. Volungus have a formal release plan?
 3   A.   No, he does not.
 4   Q.   And if released, Mr. Volungus is going to live with his
 5   parents, correct?
 6   A.   Correct.
 7   Q.   And that's where he downloaded child porn previously,
 8   correct?
 9   A.   Correct.
10   Q.   Had unsupervised contact with a five-year-old girl,
11   correct?
12   A.   Yes.
13   Q.   I'm just going to ask you to take a look at one more item,
14   Exhibit 47.  Do you recognize that?  It's Bates 1377.  That was
15   among the materials you were provided, correct?
16   A.   Yes.
17   Q.   And this reflects that subsequent to Mr. Volungus's arrest
18   his father found a number of letters from Mr. Gallardo to the
19   defendant, correct?
20   A.   Correct.
21   Q.   And he didn't turn them over to law enforcement; he threw
22   them away, correct?
23   A.   Yes.
24   Q.   I just want to talk a little bit about his diagnosis.
25   This book I'm holding now, do you recognize it?
```

```
 1    A.    I do.

 2    Q.    It's the DSM-IV Text Revision, correct?

 3    A.    It is.

 4    Q.    This provides the diagnostic criteria for what the AP

 5    recognizes as mental disorders, correct?

 6    A.    Correct.

 7    Q.    It's the version in use today?

 8    A.    It is.

 9    Q.    And it's used by every medical professional in America to

03:13 10    determine when an individual suffers from a mental disorder,

11    correct?

12    A.    Presumably.

13    Q.    The overwhelming majority?

14    A.    Oh, yes.

15    Q.    And Exhibit 59, as Mr. Gold showed you, are the diagnostic

16    criteria of pedophilia from this very book, the DSM-IV-TR?

17    A.    Correct.

18    Q.    Pedophilia is a serious mental disorder, is it not?

19    A.    It is.

03:14 20          MR. GRADY:  If you'd give me a moment.

21          (Pause.)

22    Q.    And I've shown you, and am now putting up on the

23    monitor -- this is from Exhibit 59, correct?

24    A.    Correct.

25    Q.    And these are the diagnostic criteria for pedophilia?
```

1    A.    They are.

2    Q.    And the DSM provides that the diagnosis can be made if the

3    focus of the sexually arousing fantasies is prepubescent

4    children.  And the DSM then states generally aged 13 or

5    younger, correct?

6    A.    Correct.

7    Q.    Now, in your experience you don't generally know whether a

8    particular victim is pubescent or postpubescent, correct?  You

9    don't have a physical exam.

03:15 10    A.    We don't have a physical exam, but we oftentimes know

11    their age and we oftentimes have information about them.

12    Q.    Okay.  We know their age frequently?

13    A.    Right.

14    Q.    We don't usually have a physical exam in relation to

15    sexual abuse if they're under the age of 13, right?

16    A.    No, we certainly do not have a physical exam, but in my

17    experience offenders usually talk about what the victims look

18    like.

19    Q.    So we have the age.  That's an independent fact, correct?

03:15 20    A.    Yes.

21    Q.    And we have information from offenders, correct?

22    A.    Yes.

23    Q.    Okay.  But we don't have, for instance, independent

24    evidence concerning the sexual development of the victims.  We

25    don't have physical exams usually?

1    A.    Almost never.

2    Q.    Okay.  And so because we don't usually know whether a

3    particular victim is pre- or postpubescent, one of the things

4    the DSM suggests can be used is age, correct?

5    A.    Yes.

6    Q.    Now, with respect to your own diagnostic criteria,

7    however, if all that's known is the age of the victim, you

8    believe it's difficult to make a pedophilia diagnosis unless

9    the victims of sexual assault are under the age of ten,

03:16 10   correct?

11   A.    Yes, if you're on age.  Right.

12   Q.    Now, you've previously testified that the definition of

13   "prepubescent" is generally 12 and under, correct?

14   A.    I don't recall that.  I may have, but...

15   Q.    I direct your attention to testimony -- this would be

16   amongst the materials just to your left, in the *United States*

17   *versus Todd Carta*, the first such trial dated February 10th,

18   2009.  I would ask you to take a look at that, please.

19         (Pause.)

03:17 20   Q.    Judge Tauro, Day 2, if that helps.

21   A.    Right.  I have that.

22   Q.    I would direct your attention to page 167 and 168.  Again,

23   at the bottom of 167.

24         "QUESTION:  And so we're clear, in the images that were

25   downloaded" -- and moving on to page 168 -- "on the child porn,

1    when I say prepubescent children, those children were younger

2    than 12, weren't they?

3         "ANSWER:  Yes.

4         "QUESTION:  That's the definition of prepubescent

5    children?

6         "ANSWER:  Pretty much."

7         That was your testimony, correct?

8    A.   Yes.

9    Q.   Now, you note in your report at page 13 the mere

03:18 10   possession of child pornography is not evidence of pedophilia,

11   correct?

12   A.   Correct.

13   Q.   Your words.  "In my understanding, any sexualized images

14   of minors can be considered to be child pornography under

15   federal law, and an admission of such does not equate to a

16   diagnosis of pedophilia"; is that correct?

17   A.   Correct.

18   Q.   Now, Volungus possessed over 4,000 images of child

19   pornography, the majority of which depicted the sexual abuse of

03:18 20   children under the age of 12, correct?

21   A.   Correct.

22   Q.   And we don't see that in your report.

23   A.   No, we don't.

24   Q.   You don't say that the majority of the images were sexual

25   abuse of the children under the age of 12?

1  A.   The only source for that is the report that you gave me,

2  and I would ask -- I don't have an answer to it -- how do they

3  know the ages?  I mean, I don't know the ages.

4  Q.   So you're not now trusting the court records you're

5  provided?

6  A.   I'm just saying, how do they know what the ages were?

7  Q.   Okay.  But you're not willing to credit the court records

8  from his prior conviction on this issue?

9  A.   I am certainly crediting it, but I can certainly ask

03:19 10  questions as to how they assumed that they were under the age

11  of 12.

12  Q.   Now, the possession of child pornography is certainly some

13  potential evidence of pedophilia, correct?

14  A.   It depends.

15  Q.   I direct your attention to your deposition in this matter,

16  page 171.

17      "QUESTION:  Would the fact that an individual possessed

18  child pornography depicting prepubescent children engaged in

19  sexual acts potentially be some evidence to support a

03:19 20  pedophilia diagnosis?

21      "ANSWER:  It could be."

22  A.   Yes.  That's not what you asked me, but yes.

23  Q.   Well, I can re-ask it.  But you would agree with that

24  testimony?

25  A.   Yes, I would.

1    Q.    And the possession of over 2,000 images of prepubescent

2    children being sexually abused can have diagnostic significance

3    of evidence of pedophilia, correct?

4    A.    It can.

5    Q.    Now, you'd agree, coming to these sort of chats that

6    Mr. Volungus engaged in with the undercover officer, one

7    potential inference from the fact that Mr. Volungus described

8    himself as a pedophile is that he is, in fact, a pedophile,

9    correct?

03:20 10   A.    It's possible.

11   Q.    You'd also agree that it could be diagnostically

12   significant with respect to a diagnosis of pedophilia that the

13   types of chat rooms Mr. Volungus focused on involved

14   pedophilia?

15   A.    It could be.

16   Q.    And this particular chat room was entitled PedoMoms,

17   P-E-D-O-M-O-M-S?

18   A.    Correct.

19   Q.    He wasn't going into that chat room to chat with peer-aged

03:21 20   women?

21   A.    Probably not.

22   Q.    We don't find any mention of that in your report, do we?

23   A.    No.

24   Q.    Now, I'm going to come back briefly to these letters.  I

25   won't read through them in detail, but you'd agree that if what

1    Mr. Volungus wrote about a six- and a seven-year-old girl was
2    true, he meets the criteria for pedophilia, correct?
3    A.    Yes.
4    Q.    And now in 2002, in October, he's caught with those
5    hand-drawn images of himself having sex with children, correct?
6    A.    Correct.
7    Q.    And he told you that he drew them because he was lonely?
8    A.    Yes.
9    Q.    But he didn't tell you he drew them because he thought
03:22 10   about sex with children all the time, correct?
11   A.    I don't believe he said that, no.
12   Q.    Okay.  But that is what he told prison officials, correct?
13   A.    Correct.
14   Q.    He told them multiple times?
15   A.    Yes.
16   Q.    But that's not in your report?
17   A.    No, it's not in my report.
18   Q.    And we know the second time -- excuse me.  You know that
19   when he gets out of jail, he's caught with child pornography
03:23 20   the second time, correct?
21   A.    Correct.
22   Q.    And we know that at least some of the images depicted
23   prepubescent children engaged in sexual acts, correct?
24   A.    Correct.
25   Q.    But we don't see any mention of that in your report?

1    A.    No.

2    Q.    And you acknowledge you're aware that in a November 2003

3    polygraph examination, not having to do with any results, prior

4    to that Mr. Volungus stated, "I'm sexually attracted to females

5    between the ages of 11 and 13 years of age"?

6    A.    That's what it said, yes.

7    Q.    That's what Mr. Volungus said, according to that report.

8    A.    Yes.  Yes, that's what it...

9    Q.    Now, with respect to -- moving on to the notion of

03:23 10   recidivism, you looked at the risk of recidivism here, correct?

11   A.    I did.

12   Q.    Now, you'd acknowledge that a failure to complete

13   sex-offender treatment increases the risk of recidivism,

14   correct?

15   A.    Correct.

16   Q.    And you looked at some -- in addition to the

17   actuarials I'm not going to go through, you looked at some

18   dynamic factors, correct?

19   A.    Correct.

03:24 20   Q.    And you looked at those because they're found to be

21   related to future reoffending?

22   A.    Correct.

23   Q.    The factors you looked at were general self-regulation,

24   sexual self-regulation, attitudes supporting sexual assault,

25   and intimacy deficits, correct?

```
 1   A.   Correct.
 2   Q.   And you acknowledge that Mr. Volungus has intimacy
 3   deficits, correct?
 4   A.   Yes.
 5   Q.   So that dynamic factor sort of counts in favor of risk,
 6   correct?
 7   A.   Correct.
 8   Q.   And with respect to sexual self-regulation, you found that
 9   he exhibited sexual self-regulation in your report, correct?
10   A.   That he exhibited self- -- that he exhibited -- exhibited
11   sexual self-regulation and that he has not acted out.
12   Q.   Specifically referring to page 16 of your report, quote,
13   "Sexual self-regulation is apparent through the lack of any
14   serious sexual misconduct while incarcerated or during his most
15   recent period of community living," correct?
16   A.   Correct.
17   Q.   In October of 2002 he's drawing pictures of himself having
18   sex with children in prison, correct?
19   A.   Correct.
20   Q.   Saying "I have a problem.  I think about sex with children
21   all the time," correct?
22   A.   Correct.
23   Q.   But your report says it's apparent he had sexual
24   self-regulation?
25   A.   We were looking at behaviors in terms of sexual
```

1    assaultiveness and acting out.  We're not just talking about

2    fantasies here.  We know he has fantasies.  We know he used

3    child porn.  The question is how does this factor relate to the

4    risk of committing a hands-on sexual offense.

5    Q.   Okay.  Your report says, "Sexual self-regulation is

6    apparent through the lack of any serious sexual misconduct

7    while incarcerated or during his most recent period of

8    community living," correct?

9    A.   Right.  And the keyword there is "serious."

03:26 10   Q.   But you'd agree, for example, that an individual acting

11   out sexually in prison is evidence of his inability to control

12   behavior, correct?

13   A.   It depends.

14   Q.   I'd direct your attention to your testimony in *United*

15   *States versus Carta* from March of this year.  Page 113.

16   A.   Yes.

17   Q.   "QUESTION:  Why is that of clinical significance if there

18   aren't outlets for sexually acting out as there are in the

19   community?

03:26 20       "ANSWER:  Well, I think it goes to someone's degree of

21   control over their sexual impulses."

22       Have I read that correctly?

23   A.   Yes.

24   Q.   Now, in August of 2007 Mr. Volungus is found with pictures

25   again of adults having sex with children, correct?

```
 1   A.   Correct.

 2   Q.   Your report still -- that wasn't part of the materials you

 3   reviewed in advance of your report, correct?

 4   A.   Correct.

 5   Q.   In fact, he's got a list of hundreds of descriptions of

 6   the sexual abuse of children from prior -- I guess child

 7   pornography, correct?

 8   A.   Are we talking about the cites --

 9   Q.   The lists.

10   A.   Yeah, right.

11   Q.   And that was while he was in prison, correct?

12   A.   Yes.

13   Q.   In fact, that was while he was in prison awaiting this

14   hearing on whether he would be found sexually dangerous?

15   A.   Correct.

16   Q.   Now, in your report you also relate that Mr. -- strike

17   that.

18        On page 16 of your report you relate that after monitoring

19   software was installed on his computer, Mr. Volungus was able

20   to discontinue his use of child pornography, correct?

21   A.   Yes.

22   Q.   But you're aware that in the Gallardo letters he wrote

23   about using a library to download child pornography.

24   A.   I'm aware of that.

25   Q.   And you're aware that the FBI caught the individual with
```

1   whom he was corresponding using a library computer to download

2   child pornography, correct?

3   A.    I'm aware of that.

4         MR. GRADY:   Sorry if I'm taking a moment, your Honor.

5   I'm trying to avoid repeating questions so I can wrap up before

6   one.

7   Q.    Now, you also report on page 16 that Mr. Volungus does not

8   exhibit attitudes supportive of offending, correct?

9   A.    Correct.

03:29 10   Q.    But we know that from March of 2005 he was writing about

11   how Europe was going to legalize kid sex, correct?

12   A.    Yup.

13   Q.    "Pedos are going to win"?

14   A.    Yes.

15   Q.    And then in August of 2007 he's writing "sex before eight

16   or else it's too late"?

17   A.    Yes.

18   Q.    But your report still says he doesn't exhibit any

19   attitudes supportive of sexual offending?

03:30 20   A.    I don't see any of those as an attitude that supports

21   that.  Again, I think it is partly his intent to impress the

22   other person and partly he's talking about legal ages.  He's

23   not talking about, you know, doing anything illegal.  He's

24   hoping that they will lower the age of consent.  In fact, the

25   age of consent in Europe is lower.

1    Q.   With respect to the statement "sex before eight or else

2    it's too late" in a document he kept to himself, who's he

3    trying to impress?

4    A.   I think that was in his letter.

5    Q.   No.

6    A.   No?

7    Q.   It was in the materials seized in August of 2007.  He's

8    not trying to impress anybody with that.

9    A.   I apologize, then.  I was assuming it was there.  Then I

03:30 10   really don't know.

11    Q.   You don't know?

12    A.   I don't.  I would certainly want to ask him about that,

13    but I didn't have a chance.

14    Q.   I'm going to try to spend 15 minutes and try to get you

15    out of here.

16         Volitional impairment I want to talk a little bit about.

17    You note he resided in the community without committing any

18    serious sexual offense.  That's what you write in your report,

19    correct?

03:31 20   A.   Correct.

21    Q.   You're not telling us that possession of child pornography

22    is not a serious offense?

23    A.   It is a very serious offense, but it's not what this law

24    is talking about, and that's what I was addressing.

25    Q.   Okay.  In at least one of his letters he talks about

         1    traveling and an intent in the future to go out and commit a
         2    sex offense, correct?
         3    A.   Yes, he did.
         4    Q.   He talks about going to the twins to meet a ten-year-old
         5    girl?
         6    A.   Correct.
         7    Q.   And given that this is some sort of future statement,
         8    assuming it to be true, does this indicate anything about his
         9    intent to engage in such behavior in the future, assuming it to
03:32   10    be true?
        11    A.   I don't assume it to be true.  This is not someone who has
        12    ever done that.  He was in -- he was out for two years and
        13    something months and the only place that he went was a -- I
        14    think he had a family thing in Lawrence.
        15    Q.   I direct your attention -- sorry.  You can finish.  I
        16    apologize.  Are you set?
        17    A.   Yes.
        18    Q.   Okay.  I apologize for interrupting you.  I never wish to
        19    do that.
03:32   20         I direct your attention to page 138 in your deposition --
        21    A.   Yes.
        22    Q.   -- and ask you the following question:  "And given that
        23    this is some sort of future statement, does that indicate
        24    anything about his intent to engage in such behavior in the
        25    future, assuming it is true?

1          "ANSWER:  Assuming that it is true that he intends to do

2     this in the future, yes."

3     A.   Yes.

4     Q.   Now, you'd agree the statute doesn't ask for likelihood

5     assessment of the risk of reoffense?

6     A.   Correct.

7     Q.   It asks whether an individual would have serious

8     difficulty refraining?

9     A.   Correct.

03:33 10   Q.   Now, you're aware the Supreme Court has addressed the

11    issue of whether these laws are constitutional, correct?

12    A.   I am aware of that.

13    Q.   You're familiar with the case *Kansas versus Hendricks*, 521

14    U.S. 346, 1997?

15    A.   I am.

16    Q.   And in that case the U.S. Supreme Court actually discussed

17    the issue of volitional impairment, did they not?  I'll show

18    you.  Directing your attention to page 360.  "To the extent

19    that the civil commitment statutes we have considered set forth

03:33 20   criteria relating to an individual's inability to control his

21    dangerousness, the Kansas Act sets forth comparable criteria,

22    and Hendricks' condition doubtless satisfies those criteria.

23    The mental health professionals who evaluated Hendricks

24    diagnosed him as suffering from pedophilia, a condition the

25    psychiatric profession itself classifies as a serious mental

1    disorder."

2         Have I read that correctly so far?

3    A.   Yes.

4    Q.   And then just skipping some cites, "Hendricks even

5    conceded that when he becomes stressed out, he cannot control

6    the urge to molest children.  This admitted lack of volitional

7    control" -- have I read that correctly?

8    A.   Yes.

9    Q.   -- "coupled with prediction of future dangerousness,

03:34 10   adequately distinguishes Hendricks from other dangerous persons

11   who are perhaps more properly dealt with exclusively through

12   criminal proceedings.  Hendricks' diagnosis as a pedophile,

13   which qualifies as a mental abnormality under the act, plainly

14   suffices for due process purposes."

15        Have I read that correctly?

16   A.   Yes.

17   Q.   And within the context of this discussion, the United

18   States Supreme Court refers to admissions by the individual

19   being committed about an inability to control as being evidence

03:34 20   of volitional impairment, correct?

21   A.   Specifically to molest children, yes.

22   Q.   But it's a statement of the individual about to be

23   committed, correct, and it's considered evidence of volitional

24   impairment, "admitted" -- let me read exactly what they said.

25   "Hendricks even conceded that when he becomes stressed out he

1   cannot control the urge to molest children.  This admitted lack

2   of volitional control."  That's the words the Supreme Court

3   uses, correct?

4   A.   It is.

5   Q.   So one place the U.S. Supreme Court has told us we can

6   look for evidence of an absence of volitional control would be

7   the statements of the defendant himself.

8   A.   I'm not an attorney; I'm a psychologist.  This is a legal

9   matter.  That's not how I interpret this.

03:35 10   Q.   When the Supreme Court says "this admitted lack of

11   volitional control," they're not referring to Hendricks'

12   statements about an inability to control his behavior?

13   A.   They're referring to his -- he cannot control the urge to

14   molest children.  That's what it has to do with.  If Mr. --

15   Q.   That's the statement --

16   A.   If Mr. Volungus had said that he cannot control his urges

17   to molest children, I would not be here right now.

18   Q.   So we could look to his statements.  If Mr. Volungus made

19   those types of statements that's something we should look at on

03:35 20   the issue of volitional control, right?

21   A.   If he said he cannot control his urge to molest children,

22   yes.

23   Q.   But that's the only statement, or can we look at all of

24   his statements that bear upon his ability to control?

25   A.   You just showed me this.  The Supreme Court has

```
 1  specifically indicated that someone saying they cannot control
 2  the urge to molest children is a lack of volitional control.
 3  Q.    Are you familiar with the case of Kansas versus Crane?
 4  A.    Yes.
 5  Q.    U.S. Supreme Court, 534 U.S. 407, 2002.  Let me show you
 6  on page 414 of that opinion, "We agree that Hendricks limited
 7  its discussion to volitional disabilities, and that fact is not
 8  surprising.  The case involved an individual suffering from
 9  pedophilia, a mental abnormality that critically involves what
10  a layperson might describe as a lack of control."
11       Have I read that correctly?
12  A.    Yes.
13  Q.    I'm going to skip ahead a cite.  "Hendricks himself stated
14  that he could not 'control the urge to molest children.'  In
15  addition, our cases suggest that civil commitment of dangerous
16  sexual offenders will normally involve individuals who find it
17  particularly difficult to control their behavior in the general
18  sense described above," correct?
19  A.    Yes.
20  Q.    I read that correctly?
21       Now, again, at least in that instance, the Supreme Court
22  again refers to an instance where an individual has made an
23  admission concerning a lack of control as evidence of
24  volitional impairment, correct?
25  A.    Yes.  Same case.  I mean...
```

```
 1            MR. GRADY:  One more moment, your Honor.  I have one
 2   more question, I think.
 3   Q.   I'd ask you to take a look at Exhibit 36 in the binder.
 4   What do you recognize that to be, if anything?
 5   A.   This is a transcript of a supervised release violation
 6   hearing in 2005.
 7   Q.   Okay.  Mr. Volungus's supervised release hearing.  And
 8   this is actually Bates 1444 to 1459, correct?
 9   A.   Yes.
10   Q.   And we had that long back-and-forth about the fact that
11   you had this before you prepared your report, correct?  Do you
12   remember that pleasant --
13   A.   Yes.
14   Q.   All right.
15   A.   Actually, I think I mixed it up.  But -- sorry.  Go ahead.
16   Q.   Sure.
17            MR. GRADY:  I just need a moment.  I have to find it,
18   your Honor.
19   Q.   Directing your attention to transcript page 10, Bates page
20   1453, there Mr. Volungus is asked by the court if he has
21   anything to say, correct?  Line 16-17.
22   A.   Yes.
23   Q.   And Mr. Volungus states, "Sir, yes, sir.  While the
24   treatment program has helped some, it hasn't helped enough.  I
25   know that.  I've got a problem.  I have a problem controlling
```

```
 1   it.  And it's one of the hardest things that I've had to do, is
 2   that I really don't have enough control over it, recognizing
 3   that I don't have enough control over it.  I've tried to
 4   control it.  It keeps rearing its head.  I know it causes a lot
 5   of problems, not only for myself, for my family, but I don't
 6   want to keep doing this for the rest of my life.  I would like
 7   to figure out how to make it stop.  I really would.  I just
 8   don't know how to do it yet," correct?
 9   A.   Correct.
03:40 10   Q.   I've read that correctly?
11   A.   Correct.
12   Q.   And nowhere in your report on the section of volitional
13   impairment do you ever mention this statement, correct?
14   A.   Because it has nothing to do with child molestation; it's
15   clearly talking about the use of child pornography.  The judge
16   in the next sentence talks about that.
17   Q.   It's not in your report.
18   A.   It's not a relevant issue.
19   Q.   It's not in your report?
03:41 20   A.   No, it's not.
21   Q.   Okay.  Thank you.
22        MR. GRADY:  May I have a moment, your Honor?
23        I have nothing further, your Honor.
24        MR. GOLD:  I have some redirect.
25        THE COURT:  How much?
```

1          MR. GOLD:  I'd say half an hour to 45 minutes.

2          THE COURT:  Okay.  We'll do it in the morning.  We'll

3    recess now and reconvene tomorrow.

4          THE CLERK:  All rise.  The Court is in recess.

5          (The Court exits the courtroom and the proceedings

6    adjourned at 12:56 p.m.)

7

8

9                    C E R T I F I C A T E

10

11          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

12    the United States District Court, do hereby certify that the

13    foregoing transcript constitutes, to the best of my skill and

14    ability, a true and accurate transcription of my stenotype

15    notes taken in the matter of Civil Action No. 07-12060-GAO,

16    United States of America v. John C. Volungus.

17
      /s/ Marcia G. Patrisso
18    MARCIA G. PATRISSO, RMR, CRR
      Official Court Reporter
19

20    Dated:  August 5, 2011

21

22

23

24

25