UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,       )
                                   )
        Petitioner,          )
                                   )  Civil Action
v.                             )  No. 07-12060-GAO
                                 )
JOHN C. VOLUNGUS,          )
                                 )
        Respondent.         )
                                 )

------------------------------------------------------------
TRANSCRIPT OF BENCH TRIAL
DAY SEVEN

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE
------------------------------------------------------------


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, July 14, 2011
9:09 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Mark J. Grady, Assistant U.S. Attorney
3              Rachael S. Rollins, Assistant U.S. Attorney
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         On Behalf of the Petitioner

6         FEDERAL DEFENDER'S OFFICE
          By: William W. Fick, Esq.
7              Ian Gold, Esq.
          51 Sleeper Street
8         Fifth Floor
          Boston, Massachusetts  02210
9         On Behalf of the Respondent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                  DIRECT   CROSS   REDIRECT   RECROSS

3    WITNESSES FOR THE
        RESPONDENT:

4    LEONARD DAVID BARD, Ph.D.

5
         By Mr. Gold                      4
6        By Mr. Grady                                   17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on July 14, 2011.)

6               THE CLERK:  All rise.

7               (The Court enters the courtroom at 9:09 a.m.)

8               THE CLERK:  For a continuation of the bench trial on

9     Volungus.

00:-04 10               Please be seated.

11               THE COURT:  Good morning.

12               MR. GOLD:  Good morning, your Honor.

13                         REDIRECT EXAMINATION

14     BY MR. GOLD:

15     Q.   Good morning, Dr. Bard.

16     A.   Good morning.

17     Q.   During cross-examination, Dr. Bard, you were asked several

18     questions about the contents of the 4,000 images,

19     approximately, that were recovered from Mr. Volungus's computer

00:-04 20     when he confessed to having child pornography on his computer

21     when he was stationed in Kentucky.  Do you remember that?

22     A.   I do.

23     Q.   And you were shown a statement in the presentence report

24     which indicated that the majority of the images were of

25     prepubescent children.  Do you recall that?

1   A.   I believe it was under the age of 12, yes.

2   Q.   And you conceded that you did not include that information

3   in your report.

4   A.   Correct.

5   Q.   And the point of the questioning was that you did not see

6   enough information in the records to make a diagnosis of

7   pedophilia.

8   A.   I would say that I did not see enough reliable

9   information.  There's a lot of information in there, but the

00:-03 10  question is how reliable is it and can it be used to indicate

11   that Mr. Volungus meets the diagnostic criteria for pedophilia.

12   Q.   And for the record, I have placed on the document viewer

13   the same paragraph with highlights of the passage from the

14   presentence report that you were shown, which is Paragraph 25.

15   And that's the paragraph we were just talking about?

16   A.   Yes.

17   Q.   And under that, starting in Paragraph 26, you see that

18   there's a defense counsel -- or defendant's version of the

19   offense?

00:-02 20  A.   Yes.

21   Q.   And that has a paragraph where it discusses in more

22   general terms the images that were recovered from the computer?

23   A.   Correct.

24   Q.   I'm placing a document on the document viewer.  It's

25   Exhibit No. 8, which is the transcript of the change of plea in

1    the case.  And Bates stamp number V 01329 has a statement by

2    the government regarding the images.  And it says, "Later, when

3    the computer was sent to the lab, they found over 4,000

4    pictures, most of which were child pornography.  All of this

5    was within his possession.  All of this was in John Charles

6    Volungus's room, which he had to himself."

7         Is that among the documents that you reviewed?

8    A.   Yes.

9    Q.   I'm placing the sentencing transcript which has been

00:00 10   entered into evidence as Exhibit No. 5, and if I could direct

11   your attention down to the bottom of that page.  It's

12   Bates-stamped No. V 01242.  In that passage, "Now, all the

13   4,000, though" -- the court inquires of the government -- "were

14   not necessarily pornographic, and certainly only a small

15   portion of them were underage; is that correct?"

16        The government replies, "I don't think all 4,000 depicted

17   prepubescent children, but the entire 4,000 did depict what we

18   would regard as child pornography."

19        Is that among the documents that you reviewed?

00:00 20   A.   Yes.

21   Q.   As a forensic psychologist, what did you do synthesizing

22   this information when you were considering a diagnosis in the

23   case?

24   A.   As a forensic psychologist I tried to include the most

25   relevant and the most reliable information.  The three examples

1    that you showed me indicate three different opinions or

2    perspectives on what was actually found.  My bottom line is I

3    don't know what was found.  I certainly acknowledge that there

4    was child pornography there.  I think that's obvious.  But what

5    does child pornography mean?  I know that the federal

6    government defines child pornography involving anyone under 18

7    engaging in sexual acts.

8         As you know, I repeatedly asked you for any images that

9    were found, both in terms of the original case and the 2004

00:01 10   images, and I was not able to see them.  So I'm still left in

11   the position of not knowing.  And, again, while I certainly

12   acknowledge that my colleagues who diagnosed Mr. Volungus with

13   pedophilia have ample evidence for them, I do not have as much

14   evidence that I consider reliable, and as such, I'm still not

15   comfortable making a definitive diagnosis.

16   Q.   Now, yesterday you were shown by Mr. Grady information

17   that you had reviewed only after you drafted your report and

18   only after you were deposed in the case.  Specifically, I'm

19   referring to the list of child pornographic files -- what

00:02 20   appear to be names of child pornographic files that he,

21   Mr. Volungus, the respondent, listed out in his spare time at

22   Devens.

23   A.   Right.

24   Q.   You agreed with Mr. Grady that the majority of those were

25   ages -- or made reference to ages below the prepubescent line.

1  A.   Yes.

2  Q.   Is that information which might inform a diagnosis of

3  pedophilia?

4  A.   I think it can.  And as I indicated yesterday, I would

5  have definitely looked much more closely at that issue had I

6  had that information and had I been able to talk to

7  Mr. Volungus about that.  It certainly makes more of a case for

8  pedophilia.  And I don't argue that.  But I still am

9  uncomfortable with diagnostic labels that have such an enormous

00:03 10  consequence without having more certainty.

11  Q.   Now, I want to ask this question:  If, in your opinion,

12  this prepubescent line takes on this diagnostic importance, is

13  sexual interest in teens unproblematic in your view?

14  A.   No, I think it's certainly problematic.  I think if

15  someone is attracted to younger teenagers only and acts on

16  that, it's certainly problematic.  It's illegal.  I'm sorry --

17  it is illegal and it may cause harm to everybody involved.

18       But again, I think it depends more on the level of sexual

19  development, also emotional development.  But in terms of

00:04 20  whether or not that becomes deviant or not, there's no argument

21  that sexual arousal to prepubescent children is deviant.  I

22  don't think anyone in my field argues that.  But the question

23  is:  Is arousal to a 17-year-old sexually mature female, for

24  example -- is that deviant?  How about a 16-year-old?  How

25  about a 15-year-old?  How about a 14-year-old?  Where's that

line?  And it's not an age line; it's a sexual-development
line.

And I've said before if you have a 15-year-old who looks
like a younger child, maybe if she has developmental issues or
anything else, that would -- that might be considered
pedophilia.  Even though the age is older, the body type and
the maturity level maybe isn't.  And you can turn it around.

And I'm sure all of us are aware that -- and the research
is supportive of this, that girls in particular are maturing
00:05  earlier.  And there's research I was looking at that talks
about girls of eight or nine beginning puberty.

So there's no right answer.  There's no one right answer
about when something goes from deviant to non-deviant.  I think
it depends on a lot of different factors, most of which,
unfortunately, we don't have access to when we do these kinds
of evaluations.

Q.  Dr. Bard, assume with me, if you will, that the diagnostic
label "pedophilia" applies in the case.  Would that change your
overall opinion in this case as to whether he qualified for
00:06  commitment under the statute?

A.  It would not.

Q.  And taking a bird's-eye view, why is that?

A.  Even if I assume that he suffers from pedophilia, the
question is not just that.  The question is:  As a result of
his pedophilia would he have difficulty refraining from child

1   molestation?  And the facts in that question don't change

2   whether or not Mr. Volungus has pedophilia or not.  The one

3   time that he acted on, let's say, his deviant thoughts and

4   decided to try to engage in minor sexual contact, it was a

5   14-year-old who we could assume, based on the information we

6   have, was presented as a sexually-mature person.  We don't know

7   because there wasn't actually a 14-year-old and there was no

8   picture of her.  But the way she was described and the

9   willingness and the reports that she had already engaged in sex

00:07 10   seemed to imply that she was more sexually mature than you

11   would expect for someone who was interested only in younger

12   children.  And other than that --

13   Q.   Dr. Bard, if I could just stop you.  This is an excerpt

14   from Exhibit 1, Bates stamp number V 001157.  Do you see the

15   highlighted portion there?

16   A.   Yes.

17   Q.   And those are a description of the physical measurements

18   of the fictional Sarah?

19   A.   Yes.

00:07 20   Q.   Did that inform your opinion along the lines of what

21   you're talking about right now?

22   A.   It did.

23   Q.   And are those mature measurements?

24   A.   They would appear to be, yes.

25   Q.   Continue.

```
 1   A.   I was just going to say that -- I don't remember what I
 2   was going to say.
 3           THE COURT:  Maybe you should have a new question.
 4           THE WITNESS:  That's a very good point.
 5   BY MR. GOLD:
 6   Q.   You were testifying about the single evidence of a
 7   hands-on offense in the context of whether --
 8   A.   Yes.
 9   Q.   -- pedophilia -- if a pedophilia diagnosis applied to the
10   case, you would have the same or a different opinion.
11   A.   Right.  My only other point is that obviously the letters
12   that Mr. Volungus wrote imply that he is interested in younger
13   children and that he made statements that he was going to
14   travel in order to obtain that sort of central contact.  And
15   all I would say is that I think those letters are consistent
16   with the same pattern that we've seen earlier, that he's
17   someone who embellishes and exaggerates to make him feel better
18   about himself.  But if those are true, then I think that
19   Mr. Volungus clearly has many more problems than I am giving
20   him.  But I really don't buy that.
21   Q.   And you were asked on cross-examination about not just
22   what we covered at the beginning of this redirect examination
23   but other instances where you did not include information which
24   is arguably relevant to the case in your report.  Do you have
25   any comment about that in general?
```

00:08  10

00:09  20

1    A.    I write as succinctly as I can.  I certainly don't include

2    every important bit of information or else I would have to

3    write a report that was 100 or 150 or 200 pages long.  I don't

4    think that really helps.  I try to analyze the information and

5    to come up with an opinion and support that.  I don't see any

6    need to repeat what is elsewhere.

7         I probably could have been a little more inclusive.  That

8    happens often.  But it's not that I didn't consider it; it's

9    just that I try and just include certain things that have to do

00:10 10  with my opinion which you can't find anywhere else.

11   Q.    And one statement that you were shown was the statement

12   that Mr. Volungus made to the judge, to the court, when he was

13   being sentenced for his supervised release violation in which

14   he expressed essentially difficulty controlling his impulses.

15   Do you remember that?

16   A.    Yes.

17   Q.    Can you tell the Court -- or why that does not inform your

18   opinion as to whether or not he has serious difficulty

19   controlling his behavior in this context?

00:11 20  A.    Because I think it's clear that Mr. Volungus has

21   acknowledged, and anyone in this case -- and everyone in this

22   case has acknowledged, that Mr. Volungus has a problem with

23   Internet-based pornography.  It is a recent phenomenon.  There

24   have been articles written on it in the last several years.  It

25   is an addiction.  You get involved and you fall in that hole

and you can't pull yourself out.  And sometimes you don't want

to.  But even if you do want to, it's very difficult.  It's so

easy to access, it seems to be safe and you're not hurting

anybody, and it's done in the privacy of your home.  And

there's a lot of rationalizations going on around that.  But I

think we're going to be seeing more and more of that.

However, it's clear from what he said and from what the

court said then that it had nothing to do with child

molestation.  He was not violated for child molestation; he was

violated primarily because of the Internet pornography.  He

also was violated because he had unauthorized contact with a

five-year-old.  Here again, if Mr. Volungus could not control

himself, you might see more of an effort to be alone with that

five-year-old, if he was interested in her at all, which I

don't think he was.  It was really an innocent thing after a

death in the family.  And to --

MR. GRADY:  Objection.  Move to strike.

THE COURT:  Overruled.

THE WITNESS:  And to make that out into something much

more serious than it actually was really doesn't fit.  It was

pornographic images.  He acknowledged the problem.  He asked

for help.  He requested treatment for that.  It was denied.  I

don't even know why.  But it's clear that he's never expressed

difficulty controlling impulses that had to do with molesting a

child.

```
 1   BY MR. GOLD:

 2   Q.   The material that was seized from him in 2007, is that

 3   evidence of.

 4        Impulse-control problems, in your opinion, that goes to

 5   the central issue in the case?

 6   A.   No.  I think Mr. Volungus has shown impulse-control

 7   problems regarding sexuality, regarding pornography.  He's more

 8   compulsive, though, than impulsive, if anything.  I don't think

 9   Mr. Volungus acts on his thoughts without thinking; I think

10   it's the opposite.  He probably thinks too much about things.

11   He obsesses; he goes into things, turns it over and over again.

12   Q.   Is there anything about the governing offense; that is --

13   when I say "the governing offense," let me be more clear --

14   about the traveler offense which speaks to what you're talking

15   about right now?

16   A.   Yes.

17   Q.   And what is that?

18   A.   In contrast to other cases that I've been involved in

19   where the individual makes contact and arranges meetings

20   immediately or sends pornographic images immediately, the

21   planned meet happens, I believe, two weeks or so after the

22   initial contact.  So it's clear that Mr. Volungus is not acting

23   impulsively.  He's thinking about this.  Is this something he

24   really wants to do?  Is he -- are there risks?  Are there

25   benefits?  So he's not impulsive.  He's not the kind of person,
```

1    personality-wise, who's going to just decide to think about

2    something and then do it.  He's going to think about something

3    and toss it over and think about it and maybe he'll do it,

4    maybe he won't.

5        But the particular time sequence suggests that there was a

6    great deal of conversation before any thought of meeting.

7    There was a great deal of conversation before the meeting was

8    set.  There was a great deal of conversation when he actually

9    decided to do it.  So he certainly doesn't fit in my definition

00:15 10   of "impulsive."

11   Q.   Why doesn't the fact that this meet occurred in the

12   context of Mr. Volungus's discovery of child pornography lead

13   to the fair inference that we have a pattern of behavior in

14   which he accesses child pornography and then seeks to commit a

15   hands-on offense?

16   A.   Because you can't have a pattern based on a single

17   incident.  If there were other incidents where he looked at

18   child pornography afterwards and he did the same kind of thing,

19   then you begin to have a pattern.  But let's say, for example,

00:16 20   that in 2003-2004 he was accessing pornography, because he was.

21   He admitted to it.  There certainly was no evidence that he was

22   going on to chat rooms again and talking to people and trying

23   to arrange things, or he was making any other plans in the

24   community to offend.  We just don't have that.  That's not to

25   minimize the offense, the governing offense, but there's no

 1   pattern of that.  It seems to be around that time he was in

 2   conversation with other people.  I mean, he didn't act on any

 3   of those; he acted on one thing, and that's not a pattern.

 4   Q.   On cross-examination you were shown excerpts from legal

 5   cases that are foundational in this area, *Kansas versus*

 6   *Hendricks* and *Kansas versus Crane*.  Do you recall that?

 7   A.   I do.

 8   Q.   And are you familiar at all based on your readings as a

 9   forensic psychologist in this area with those cases and with

00:17 10   the case of *Leroy Hendricks*?

11   A.   Yes.

12   Q.   And how does *Leroy Hendricks* compare to Mr. Volungus?

13   A.   I think we're comparing apples and oranges here.

14   Mr. Hendricks is somebody who committed a number of hands-on

15   sexual offenses against children -- I don't remember how

16   many -- and who was clear when he said he had difficulty

17   controlling his impulses to molest children.  Mr. Volungus has

18   one attempted hands-on offense, a number of offenses that have

19   to do with child pornography, and has expressed difficulty

00:18 20   controlling his impulses to look at child pornography.  I don't

21   think they can make any other comparisons there.

22        MR. GOLD:  Nothing further, your Honor.

23        THE COURT:  Mr. Grady?

24        MR. GRADY:  Very quickly, your Honor.

25        Permission just to exceed the scope of redirect on one

1  question, your Honor, with respect to probation.  I wasn't

2  aware he had seen those.

3          MR. GOLD:  I don't object.

4                      RECROSS-EXAMINATION

5  BY MR. GRADY:

6  Q.   Dr. Bard, I'm just going to -- do you remember we

7  discussed the issue of whether the probation chronologies

8  reflected library Internet usage?

9  A.   Yes.

00:19 10  Q.   I'm just going to show you one of those chronologies

11  Bates-stamped 2056, a date entry June 6, 2005.  I would

12  represent to you that the probation officer's name is Edward

13  Cardinal.  And I'm just going to read from it.  "EC informed

14  O" -- that being "offender" -- "he needed to refrain from any

15  computer use at any library due to computers having Internet

16  access and not having computer-monitoring software as stated in

17  O's condition."  Have I read that correctly?

18  A.   Yes.

19  Q.   And that was in the probation's chronology you reviewed,

00:19 20  correct?

21  A.   It was.

22  Q.   Just quickly on redirect.  You mentioned that you were

23  confused about the nature of the picture in the underlying

24  conviction; is that correct?

25  A.   I don't know if I used the word "confused."  I just don't

1    know what those images consisted of.

2    Q.    Okay.  Now, we've been through this before, but I'm just

3    going to put Exhibit 9, Paragraph 25, back up on the board.  In

4    Paragraph 25 it's identified that there were 4,000 pictures,

5    most of which depicted children under the age of 12 being

6    sexually abused, correct?

7    A.    Yes.

8    Q.    So you'd agree with me that most of the 4,000 pictures

9    depicted children under the age of 12, correct?

00:20 10   A.    No.  I would agree with you that that's what this says

11   because there are other statements related to the same search

12   that say something different.  My bottom line is I don't know

13   because I haven't been allowed to see them, and the records are

14   not consistent here.

15   Q.    Okay.  And Mr. Gold pointed out in Paragraph 28, "Volungus

16   does not dispute the government's calculations"; is that

17   correct?

18   A.    Yes, it is.

19   Q.    So Mr. Volungus doesn't dispute that there were 4,000

00:20 20   images, most of which depicted children under the age of 12,

21   correct?

22   A.    I don't know that.  I don't know what he means by "does

23   not dispute the government's calculations."  Is that number of

24   pictures?  I don't know.

25   Q.    Okay.  So from this you don't infer that Mr. Volungus

1    doesn't dispute the government's calculations?

2    A.   Whatever "calculations" means, he doesn't dispute them.

3    Q.   I'm just going to ask you to take a look at Exhibit 5.

4    And this is the transcript of the sentencing.  I'm just going

5    to show you page 4 of the transcript Bates-stamped 1242.

6         Now, you understand that our system is adversary?

7    A.   Yes.

8    Q.   Parties put on facts and the other side is given an

9    opportunity to contest them, and if there's a challenge to

00:21 10   facts, there's an objection, correct?

11   A.   Correct.

12   Q.   I'm just going to read from the judge's finding, line 2 to

13   3.

14        "THE COURT:  Then if there are no objections, the Court

15   will find that the presentence report is accurate."

16        Is that what the court said?

17   A.   It does.

18   Q.   Now, you mentioned that you don't include all important

19   information in your report.

00:22 20   A.   Yes.

21   Q.   I'd ask you to look at your deposition, page 29.  I'm just

22   going to read from lines 1 to 12.

23        "QUESTION:  And in preparing your report, is it your

24   practice to include information which you discern to be

25   important from your review of the records in your report?

1          "ANSWER:  Yes."

2          Have I read that correctly?

3    A.    Yes.

4    Q.    "QUESTION:  Now, obviously, if you miss something, you can

5    make mistakes and it won't be in your report, correct?

6          "ANSWER:  Exactly."

7          Have I read that correctly?

8    A.    Yes.

9    Q.    "QUESTION:  But if something that you later learned to be

00:22 10   important is not in your report, that suggests that you missed

11   it in your initial report; is that correct?

12         "ANSWER:  It's possible."

13         Have I read those correctly?

14   A.    Yes.

15   Q.    Now, you mentioned that in 2004 Mr. Volungus is found with

16   child pornography.  We have no evidence of him chatting with

17   other individuals, correct?

18   A.    Correct.

19   Q.    But we are aware that three days before the pornography

00:23 20   was found, Mr. Volungus used a commercially available

21   disk-wiping software program to erase his computer and to erase

22   the data thereon, correct?

23   A.    Correct.

24   Q.    We have no idea whether he erased chats during that time

25   or efforts to meet with other children, correct?

```
 1   A.   I don't know if you can do that, but, yes.

 2             MR. GRADY:  Just a moment, your Honor.

 3             (Counsel confer off the record.)

 4             MR. GRADY:  Dr. Bard, I have nothing further.  Thank

 5   you.

 6             THE COURT:  Dr. Bard, I think that completes your

 7   testimony.

 8             THE WITNESS:  Thank you very much, your Honor.

 9             (The witness is excused.)

10             MR. FICK:  At this point, your Honor, the respondent

11   would rest.  And so pursuant to the discussion yesterday, the

12   proposal, I guess, was to get the transcripts for proposed

13   findings, and then if the Court wishes we could have an

14   argument based on this.

15             THE COURT:  Yeah.  I think it was 30 days from -- are

16   the transcripts from the January-February period done?

17             MR. GOLD:  We already have those.

18             THE COURT:  You have those?  Okay.  So it's just the

19   last couple of days?  Okay.

20             MR. FICK:  The only request in addition would be to

21   inform the marshals Mr. Volungus is not here tomorrow to

22   facilitate his return to Devens rather than Wyatt during the

23   week, which is somewhat uncomfortable.

24             THE COURT:  All right.  Fine.  So simultaneous

25   submission of proposed requests within 30 days of the
```

1    transcript and then we'll set a time for argument.

2                MR. GRADY:  Thank you.

3                MR. FICK:  Thank you, your Honor.

4                THE COURT:  Thank you.

5                THE CLERK:  All rise.

6                (The Court exits the courtroom at 9:39 a.m.)

7                THE CLERK:  Court is in recess.

8                (The proceedings adjourned at 9:39 a.m.)

9

10

11                       C E R T I F I C A T E

12

13            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

14    the United States District Court, do hereby certify that the

15    foregoing transcript constitutes, to the best of my skill and

16    ability, a true and accurate transcription of my stenotype

17    notes taken in the matter of Civil Action No. 07-12060-GAO,

18    United States of America v. John C. Volungus.

19
      /s/ Marcia G. Patrisso
20    MARCIA G. PATRISSO, RMR, CRR
      Official Court Reporter
21

22    Dated:  August 5, 2011

23

24

25