UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12060-GAO

UNITED STATES OF AMERICA,
Petitioner,

v.

JOHN CHARLES VOLUNGUS,
Respondent.

FINDINGS OF FACT, CONCLUSIONS OF LAW, and
ORDER FOR JUDGMENT
March 8, 2012

O'TOOLE, D.J.

The United States seeks to have John Volungus civilly committed as a "sexually dangerous person" under the Adam Walsh Child Protection and Safety Act, Pub. L. No. 109-248, 120 Stat. 587 (2006) (the "Act"), 18 U.S.C. §§ 4247, 4248. The Court conducted a seven-day evidentiary hearing on the matter. Three expert witnesses, an examining psychologist for the Bureau of Prisons, and the respondent's former supervising probation officer testified. Numerous exhibits were entered into evidence. Each party thereafter filed proposed findings and conclusions. Both sides waived final argument.

Having considered the evidence presented, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). In summary, the Court determines that the government has met its burden of proving that the respondent is a sexually dangerous person subject to commitment pursuant to sections 4247 and 4248.

Readers should be advised that some of the following findings contain sexually graphic expressions. Their inclusion is necessary to explain the Court's reasoning.

## I. Findings of Fact

Volungus was born in 1967. He grew up in a stable two-parent family with two younger brothers. Because his father was in the military, the family lived in various locations. He spent his late teen years in New Hampshire, where he graduated from high school. The family relocated to Rexford, New York, when he was 19 years old. He reported to examining psychologists that he had had poor peer relationships during his school years and had frequently engaged in fighting with other students at school, sometimes as a consequence of their teasing of him.

After high school, he attended Pennsylvania State University at Erie, graduating in 1989 with a bachelor's degree in history. His academic record was not distinguished, and he graduated with a relatively low GPA. While in college he immersed himself in fantasy role-playing games and activities such as Dungeons & Dragons and the Society for Creative Anachronism.

After college, he enrolled in the United States Army and was stationed in various locations in the United States, the Middle East, and Europe. While stationed in Europe, he began viewing what he called "teen sex magazines." He also told interviewers that he frequently visited prostitutes while in the Army. It became a "payday ritual" for him. As discussed below, he later bragged about what he described as his sexual experiences while in Europe in on-line chats with undercover law enforcement officers.

Volungus has reported varying numbers of sexual partners to different interviewing psychologists. To Dr. Robert Prentky, an expert for the defense, he said that he had between 50 and 70 sexual partners; to Dr. Monica Ferraro, a psychologist at the Bureau of Prisons, that he

had over 120 partners; and, to Dr. Amy Phenix, an expert for the government, that he had between 150 and 200. He has reported that most of his sexual encounters have been one-night relationships with prostitutes. He reportedly had a longer-term romantic relationship with two of his partners although in neither case did he live with her. He has never been engaged or married. To examining psychologists and criminal investigators, he denied having had sex with anyone younger than eighteen.

Volungus returned from Europe in 1997 and was stationed at Fort Campbell, Kentucky. In 1998, after seeing a television program about pornography, he started downloading child pornography from the internet. He told an interviewer that he collected pornographic images of children whose ages ranged from eighteen months to eighteen years in age. He reported that he began viewing child pornography obsessively, from 5 p.m. until 12 a.m. on weekdays, and from 5 p.m. until 6 a.m. on weekends. He programmed his computer to download and save pornography even when he was not actively using the computer. He collected thousands of images of child pornography.

Volungus also frequented internet chat rooms where people discussed sex with children. Volungus reported that the participants only accepted him when "he learned how to talk" and that he believed he would be more accepted there the "wilder and more outrageous" he was. In 1998, he began sexualized chats with people he understood to be minors. He masturbated as he and the minors "talked dirty" with one another. He placed advertisements on chat room bulletins with the intent of meeting and having sex with younger females.

In August 1998, Volungus started internet chats with a person having the screen name "IndyGirl," who said she was a nineteen-year-old female named Deanna. "IndyGirl" actually was an undercover law enforcement officer. Volungus started his communication by explaining

he wished to meet her for some "real life fun." When he learned that "Deanna" had a fourteen-year-old sister "Sarah," Volungus said he would like to meet her as well. He discussed where they all could meet some time to have sex. He identified himself as a "real-life pedophile."

In his chats with "Deanna" and "Sarah," Volungus wrote about his sexual experiences. Among other things, he claimed to have "enjoyed many young girls . . . as young as ten," (Trial Ex. 1, Bates No. 1125), made a sex video with a fourteen-year-old, (id. at 1133), had anal sex with girls fourteen-years-old and younger who "loved it," (id. at 1178-79), and first had sex with an underage female when he was seventeen years old and was babysitting for a twelve-year-old girl, (id. at 1127-28).

After a series of chats over about a two-week period, law enforcement agents arranged a telephone call between Volungus and officers pretending to be "Deanna" and "Sarah." In the call, Volungus talked specifically with "Sarah," the fourteen-year-old, about engaging in sexual acts together. The three agreed to meet, and on August 22, 1998, Volungus drove to the agreed meeting place. He had lingerie and sex toys with him.

When he approached two military police officers posing as "Deanna" and "Sarah," he was arrested. After his arrest, Volungus was interviewed by law enforcement officials. Volungus told them that he had also chatted with another fourteen-year-old female using the screen name "facialgirl" on the internet and discussed meeting her. He also said that he had communicated with a man in Canada who had offered his eight- or nine-year-old daughter for sex. He denied ever having actually had sex with a minor. In March 1999, Volungus pled guilty in federal court to an eight-count federal indictment. The charges against him included the use of an interstate facility to attempt to persuade a person under eighteen years old to engage in a sexual act, possession of child pornography, receipt of child pornography, and criminal forfeiture. On June

4

14, 1999, Volungus was sentenced to fifty-three months of incarceration followed by three years of supervised release. (He was also discharged from the Army with an "Other Than Honorable Discharge.")

Volungus was incarcerated from July 1999 until May 2003 at the Federal Correctional Institution at Fort Dix, New Jersey. In October 2002, a search of his prison locker uncovered hand-drawn pornographic images he had done. Most of these drawings involved adults males having sex with children. When asked, Volungus admitted that he was the adult male in the drawings. Also found during the search was a list of books concerning sexual acts with children. During an interview soon after the search, Volungus stated that "he was having a problem and he thought about sex with children all the time." (Trial Ex. 21.)

In May 2003, Volungus was released from prison and began serving his term of supervised release. He was evaluated by psychologist Dr. Richard Hamill for the purpose of assessing his need for sex offender treatment. Dr. Hamill wrote in his report:

> John Volungus has characterized himself as a pedophile, which appears to be a diagnosis supported by his history and the results of his psychological testing. His primary sexual interest is in prepubescent girls, but he also has a strong sexual interest in girls around the age of onset of puberty (i.e., young adolescent girls). He also has some minor sexual interest in adult women. This writer noted that the results of his psychological testing also suggest that he may well pose a danger to girls who are younger than eight years old, as well as perhaps to pre-pubescent boys. Also, with respect to his sexuality, Mr. Volungus appears to have a range of sexual interests which is more broad than the range reported by most people. He also acknowledges having sexual fantasies of an intensity and frequency greater than most people.

(Trial Ex. 27, at 8-9.)

As a condition of his supervised release, Volungus was required to attend sex offender treatment classes. He later admitted that for the first several months he just "showed up" at the classes but later became more seriously involved in the treatment.

However, during his supervised release and while he was attending a sex offender treatment program, Volungus again started viewing child pornography. He obtained a computer in late 2003 and in November 2003 he acknowledged to his probation officer that he had been accessing adult pornography. As a result, a new condition to his supervised release was added prohibiting him from possessing any pornographic or sexually explicit material.

In connection with the terms of his supervised release, probation officers arranged to install monitoring software on his computer. In the process of installing the software on April 12, 2004, probation officers discovered that images of child pornography had been downloaded to Volungus's computer. In addition, a later forensic examination of the computer showed that a file-wiping program called GhostSurf had been run on April 9, 2004, three days before the probation officers made their software installation visit to Volungus's home. On April 15, 2004, Volungus acknowledged to his probation officer that "he had difficulty controlling his impulses" and that he visited some chat rooms called "Youth and Beauty." Volungus later acknowledged in a plea agreement in proceedings to revoke his supervised release that "[s]ome of the images depicted prepubescent minors engaged in oral sex, intercourse, and the lascivious exhibition of the genitals or pubic area of such minors." (Trial Ex. 40, at 5.) The probation officer increased supervision activities, including one-on-one psychological treatment in addition to the ongoing sex offender treatment program. For a time it seemed he was doing well. However, after a polygraph examination surfaced the issue, in May 2005 Volungus acknowledged having had unsupervised contact with his five-year-old niece in violation of a condition of his supervised

release. An investigation into the matter by New York's Office of Children and Family Services concluded that there had been no abuse or maltreatment of the child.

In June 2005, based on the forensic discovery of evidence of child pornography on his computer and on the contact with the niece, Volungus was arrested for violating the terms of his supervised release. He later stipulated to the three charged violations: engaging in criminal conduct (specifically, possession of child pornography), viewing and possessing child pornography, and having unauthorized contact with a minor. At his violation hearing, Volungus stated:

> While the treatment program has helped some, it hasn't helped enough. I know that. I've got a problem. I have a problem controlling it. And it's one of the hardest things I've had to do, is that I really don't have enough control over it, recognizing that I don't have enough control over it. I've tried to control it. It keeps rearing its head . . . . I would like to figure out how to make it stop. I really would. I just don't know how to do it yet.

(Trial Ex. 36, at 10-11.) Volungus's supervised release was revoked, and he was sentenced to twenty-three months of incarceration followed by thirteen months of supervised release.

In July 2005, after Volungus already had been sentenced for the supervised release violations, authorities discovered letters that had been written by him in March and April 2005 to a man in Texas named Gary Gallardo, who had been arrested there for possession of child pornography. Among other things, Volungus's letters to Gallardo contained the following graphic passages in Volungus's handwriting:

- Get a laptop 'puter, a wireless card and hook it up. (Less than $1k). Get YAHOO Messenger. Many good chat rooms where goodies are posted and traded. Watched some great vidz last night, including one of a guy's daughter – about 7, cute as hell and does one hell of a sexy striptease and pussy show. I <u>gotta</u> find out how to save a webcam broadcast! (Trial Ex. 26, Bates No. 786.)

7

- We (the pedos) are going to win. Europe will reject U.S. Puritanism and re-allow kp [kiddie porn] – They know how to make money – will get rid of A.O.C. [age of consent] laws and freedom will then spread to Latin America and Asia (because they'll want the Euro tourists). U.S. will be the last anti-kidsex holdout – just like they are the last holdout on marijuana. (<u>Id.</u> at 786-87.)

- Once I'm free, and you are too, we gotta make a trip across the border and have some fun. (<u>Id.</u> at 787.)

- BTW [by the way] . . . how are your overseas contacts? Anything good from them? Also once we hook-up online, I'll get you copies of my goodies. (<u>Id.</u>)

- Oh . . . Newsgroup for you to check out . . . You'll need a yenc decoder to see the goodies . . . . alt.binaries.pictures.underage.admirers. Have been a shitload of the FEBA series lately . . . . Girl about 7, Bondage, Pissin, Shittin, Suck, Fuck . . . Lots of Anal . . Hot as Hell. (<u>Id.</u> at 787.)

- You want a good anti-virus, anti-popup, anti-spyware program. I also have GhostSurf – this program allows anonymous web surfing and has a capability to clean up all your files and scrubbing them – basically overwriting the file with 1s and 0s to cover up anything underneath. (<u>Id.</u> at 790.)

- If you go through the newsgroups, you will want a yenc program. Yenc32 is pretty good. It (yenc) has become the default encryption on usernet. (<u>Id.</u>)

- If you are on Yahoo Messenger, I am bi_ped67. (<u>Id.</u>)

- I have a pretty nice collection building, about 1 Gb worth. Will share with you when your 'puter is up and running. (<u>Id.</u> at 791.)

- So, when we are free, where do we take a vacation? Cambodia, Thailand, Philippines, Costa Rica, Brazil, Czech Republic, or wherever? If you still have contacts, we could make some extra cash with some homemade product. (<u>Id.</u>)

- BTW . . . if a disk just happens to arrive for you, what do you like . . ages, acts, race, the more details you give me, the better things could be. (<u>Id.</u>)

8

- Our "Stonewall" is coming. As the EU gains more power, economic and political, the closer they are to telling the USA to fuck off. The Netherlands already have a 12 y.o. age of consent and allow [?] of k.p. to be sold. Europe has always liked kiddie porn and kidsex. They will be the first to re-establish it, with Asia and Latin America following closely to cash in on tourism. The changes are coming in the foreseeable future. (Id. at 792.)

- Met one fella last week . . . watched his webcam . . . he was finger-fucking his daughter for the world to see. She looked about 6 years old. She was loving it. He had a microphone on. She was asking him to "Do it faster Daddy!" and "Yeah . . . right there!" Was fucking amazing. If I hadn't been in the middle of the library I would have whipped it out and jacked off right there. (Id.)

- While in the library yesterday a little cutie came over and was apparently watchin what I was doing . . . she gave me this coy grin . . . I guess she liked what she saw (I had been watching a k.p. [kiddie porn] fuck vid before that). I see her again, I'm going to see what happens, she seems like an approachable girl . . . or maybe I'll just watch her and thank the Lord she didn't say anything to anybody. (Id. at 793.)

- What do you think about crossing the border to "Twins" and picking up some young girls? How available are they there . . . I've heard they are pretty common. You know what I like . . . Brunette about 10 . . . Just budding is perfect. If you ever see the Alicia series or videos, she's fucking perfect . . . well almost . . . I like longer hair. (Id. at 794.)

- Well . . . Getting ready to send this out. Oh yeah – I asked the last time, what about your overseas connections? Are they still active? If so, sure could use a cc and a dropbox to order some goods. (Id.)

- Found a nice site, you have to search through it, but I have added over 100 great pix to my collection. Also just the other day tried kazaa . . . sucks, got another p2p program suggestion – Limewire – it's great!!! Added a half dozen new videos, and am adding more. Includes the whole vid of one girl I'm in lust with (Alicia). Fucking Awesome. I'm filing my motion for relief soon, and once I do, and once you are free to travel, we have to take a trip and fuck some girls . . . and video it! Get a phone so I can call you! (Id. at 781.)

- I took a trip to our local "red light" district, picked up a great girl . . . sucked the cum outta my nuts and ate it up. She seemed to be a

9

>bit "high," so I figure I'm gonna work on her some more. Betcha she's got kids, and if she needs a fix, I've got young pussy. (Id.)

Volungus wrote these letters in March and April 2005, during his supervised release when he was attending sex offender treatment classes.

In late 2006, as his term of incarceration was drawing to a close, the Bureau of Prisons had Volungus undergo a psychological evaluation with Dr. Ferraro to determine whether he should be civilly committed as a sexually dangerous person under the Act. Dr. Ferraro, using a standard actuarial tool for gauging recidivism risk for sex offenders, assessed Volungus as a high risk to reoffend. Soon thereafter, the government initiated the present proceeding.

In August 2007, while Volungus remained in custody pending these commitment proceedings, a very sizable collection of documents belonging to him was found in a large envelope or accordion file among his belongings. The file contained, among other things, hundreds of articles about sex and sex with minors, hand-drawn pictures of an adult male having sex with a child, and several pages containing what appears to be a handwritten list of graphic videos or pictures of young children engaged in explicit sexual acts. Passages from that list include, among many others, the following entries: "boy about 5 fucks baby sis in backyard," "video of 4 girls getting fucked—youngest is about 6 or 7 oldest about 12," and "girl about 8 getting cherry busted hot." (Trial Ex. 61, Bates Nos. 1613, 1618.) The file also contained notes on physical disguises and notes on how to avoid detection when viewing child pornography. There were also hand-written notes making reference to "lovers' rights" and NAMBLA (the North American Man-Boy Love Association) (id. at 1613) and slogans such as, "Sex before eight or else it's too late!" (Id. at 1624.)

Several experts evaluated Volungus to determine whether he should be committed as a "sexually dangerous person." These experts used various actuarial instruments to help assess

10

Volungus's risk of sexual recidivism. Applying an instrument known as the Static-99, a widely used actuarial instrument in this field, Dr. Ferraro of the Bureau of Prisons concluded that Volungus had a "high" risk of recidivism, and Drs. Bard and Prentky, who testified as experts for the respondent, concluded that Volungus had a "moderate-high" risk of recidivism. Applying the Static-99R, a revised version of the Static-99, Dr. Bard concluded that Volungus had a "low-moderate" risk of recidivism, and Dr. Phenix, who testified as an expert for the government, concluded, first, that he had a "moderate-high" risk and, later, that he had a "high" risk. Using another actuarial instrument, the Static-2002R, Dr. Phenix concluded, first, that Volungus had a "low-moderate" risk of recidivism and, later, that he had a "moderate" risk. Applying still another test, the MnSOST-R, Dr. Phenix concluded that Volungus showed a "low" risk of recidivism.

In their assessments of Volungus, the experts considered not only actuarial tests but also additional "dynamic" risk factors. According to Dr. Phenix, these factors included, among other things, the fact that Volungus associated in prison with other inmates who had been convicted of child pornography offenses, that he did not get proper support from those around him when he was on supervised release (in particular that his family permitted him to have unsupervised contact with his minor niece in violation of the terms of his supervised release), that he had had difficulty forming and sustaining meaningful relationships with adult women, that he demonstrated poor sexual self-regulation, and that he had a poor record of cooperating with his supervision.

## II.    Conclusions of Law

The Act provides for the civil commitment of a "sexually dangerous person." 18 U.S.C. § 4248. A "sexually dangerous person," as defined by the statute, is someone who "has engaged or

attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). A person is "sexually dangerous to others" when that person "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. at § 4247(a)(6).

To establish that Volungus is a "sexually dangerous person" subject to civil commitment, the government must prove the following three propositions: first, that Volungus has engaged or attempted to engage in sexually violent conduct or child molestation; second, that he suffers from a serious mental illness, abnormality, or disorder; and, third, that as a result of his serious mental illness, abnormality, or disorder, he would have serious difficulty in refraining from sexually violent conduct or child molestation if released. See id.

The government must prove each of these elements with clear and convincing evidence. 18 U.S.C. § 4248(d). The clear-and-convincing-evidence standard is an "intermediate standard" somewhere "between a preponderance of the evidence and proof beyond a reasonable doubt." Addington v. Texas, 441 U.S. 418, 425 (1979). Under this standard, the government must prove that the truth of its factual assertions are "highly probable." Colorado v. New Mexico, 467 U.S. 310, 316-17 (1984).

The first element is not contested. Volungus's attempt to meet what he thought was a fourteen-year-old girl for the purposes of having sex with her was an attempt to engage in child molestation within the meaning of the statute.

The government has proven the second element, that Volungus suffers from a serious mental illness, abnormality, or disorder, by clear and convincing evidence. Pedophilia is a serious mental disorder. See Kansas v. Hendricks, 521 U.S. 346, 360 (1997); United States v.

Shields, 649 F.3d 78, 89 n.14 (1st Cir. 2011). The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), relied on by all the psychologists involved in this case, sets forth the following criteria for a diagnosis of pedophilia:

> A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger).
>
> B. The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.
>
> C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.

(Trial Ex. 59, at 572.)

Volungus meets these criteria. He has collected thousands of pornographic images of prepubescent children. He has even drawn his own pictures of an adult male having sex with a child and has said that he is the adult in the picture. He has acknowledged masturbating to such images. He has said that he thinks about sex with children all the time. He has referred to himself repeatedly, and sometimes with evident pride,[1] as a pedophile. He repeatedly has acknowledged over the course of years a sexual attraction to children under the age of thirteen. There can be little question that this attraction to prepubescent children has caused him "marked distress" and "interpersonal difficulty," including other than honorable discharge from the Army, feelings of failure and lack of control, and terms of incarceration.

Dr. Phenix, for the government, and Dr. Prentky, for the respondent, were in agreement that the diagnosis of pedophilia could easily be applied to Volungus. Dr. Prentky said that there was "overwhelming" evidence of Volungus's pedophilia. (July 11 Tr. 42:81-21 (dkt. no. 66).)

---

[1] He wrote to Gallardo, "We (the pedos) are going to win," (Trial Ex. 26, Bates No. 786), and "Our 'Stonewall' is coming," (id. at 792.)

Even Dr. Bard, who demurred at making the diagnosis himself, ultimately agreed that if another psychologist had made a "provisional" diagnosis of pedophilia, he "would not argue with that." (July 13 Tr. 92:15-18 (dkt. no. 70).)

The present case really turns on the third element, namely, whether the government has proven by clear and convincing evidence that Volungus, because of his pedophilia, would have "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

Civil commitment can be justified because of the limiting effect of a serious mental illness on a person's ability to control his actions. See Hendricks, 521 U.S. at 358.

> A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary confinement. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality." These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.

Id. (internal citations and quotations omitted)

"Volitional impairment" is a legal concept or construct, not a scientific or medical one. The experts in this case were emphatic that it is not a concept recognized or employed in the field of psychology. The utility of the term, the Supreme Court explained in Hendricks, is in distinguishing between persons who may be dangerous because they choose willfully to be so and persons who are dangerous because, by reason of mental illness, they act not willfully but out of an inability adequately to control their actions. See id. at 360. The former class may be deterred by the prospect of criminal punishment, whereas the latter class may not be. Id. at 362.

Because assessing "volitional impairment" is not something that psychologists do, the expert witnesses' opinions about risk of recidivism based on actuarial instruments did not

14

directly address the pertinent statutory standard. The psychological experts all discussed various risk factors that have been identified as indicators of an increased likelihood that a person would commit future sexual offenses, and they cited the various scores for Volungus from actuarial assessment instruments. There was agreement among the experts that the actuarial tools generally had "moderate predictive accuracy," (February 4 Tr. 14:6-9 (dkt. no. 62)), some more than others, but even so it appears that different psychologists place reliance on different tools, as the witnesses did in this case. The very number of available actuarial tools suggests that there is something less than full consensus about their utility; it seems researchers are continually trying to refine them. There is also the problem of comparing the results from one scale with those from another. The actuarial assessments provided some useful information, but they are far from determinative by themselves of the issue at hand. As Dr. Prentky put it, "[T]here's an imperfect match, a very imperfect match, between what an actuarial tool tells us and what we are required to conclude regarding serious difficulty" in a federal civil commitment case. (July 11 Tr. 66:23-67:1.)

While the actuarial instruments focus on assessing the statistical probability of a future offense based on the presence or absence of selected risk factors, the relevant statutory standard asks a different question, one that is centered on the respondent and his illness. That question is whether the respondent's existing mental illness, here pedophilia, so impairs his volitional control that, if released, he would have serious difficulty refraining from sexually violent conduct or child molestation. That is a question not so much about the likelihood of future events as it is about the present impact of the respondent's mental illness on his volitional control. To put it in terms consistent with the Hendricks Court's explanation, it is the question whether the threat of criminal sanction that is trusted to deter a person who has unimpaired volition is

insufficient or ineffective as to the respondent because he in fact has diminished volitional control brought about by his mental illness. See 521 U.S. at 362-63.[2]

Because volitional impairment—or "lack of control"—is a legal and not a scientific expression, it is not to be given "a particularly narrow or technical meaning," nor need it be demonstrated with "mathematical precision." Kansas v. Crane, 534 U.S. 407, 413 (2002). "It is enough to say that there must be proof of serious difficulty in controlling behavior." Id.

The evidentiary record unambiguously establishes that Volungus is obsessed, strongly, with child pornography and with the idea of performing sexual acts with minors. His obsession has so limited his volitional control that he has indulged the obsession even in situations where he had a significant risk of detection and sanction. Perhaps the most egregious example of this risk-taking is Trial Exhibit 61, the cache of materials he collected and maintained while at FMC Devens that includes his own drawings, lists of child pornography, newspaper and magazine clippings about various sex-related topics, including sex with minors, and a good bit of material about computer equipment and the internet. A substantial number of the clippings bear dates in 2007, which means that even as this present commitment proceeding was pending, Volungus was obsessively compiling materials that, if discovered, could have some potentially serious adverse effect on his argument against commitment. And he was doing this in an environment where discovery was highly likely, if not virtually inevitable. Another example was his rather prompt resumption of viewing child pornography on the internet within months of starting his term of supervised release, when he either knew or should have known that such behavior, if discovered by his supervisor, could result in reincarceration. Another example was his viewing

---

[2] The Court was addressing the Kansas statute, not the federal one at issue here. But its explanation of the requirement of some degree of volitional impairment to justify civil commitment is equally apt in both contexts.

of child pornography on a computer in a relatively public space at a library.[3] In each of these examples, he was acting as a man driven by his obsessional impulses, rather than by a controlled volition.

It was objected on his behalf at trial that even if his pedophilia made it difficult for him to refrain from viewing and collecting child pornography, it was not shown that he would also have difficulty in refraining from a "hands-on" offense, which is what the statute requires. Other than the offense that led to his conviction in 1999, there was no objective evidence that Volungus had engaged or attempted to engage in "hands-on" sexual contact with minors. In his chats with "IndyGirl," he described in florid detail a number of such encounters, but there is reason to suspect those descriptions were the product of fantasy, at least to some degree. In other contexts, we might accept such statements as admissions against interest, which are plausibly thought reliable because people do not generally admit they have done bad things unless it is true. In this context, however, as the respondent's experts pointed out, the declarant had a motive to make up a history of exploits, ironically to enhance his image of "credibility" with his target audience. On the other hand, those stories may only be embellished and not wholly false. We simply cannot

---

[3] At trial, it was suggested that it should not be concluded that Volungus used a library computer to access child pornography because his account in a letter to Gallardo of an incident at a library was more likely braggadocio than historical fact. While the salacious parts of the story may have been embellished (or imagined), the fact that Volungus was using a library computer was itself unnecessary to any effort to impress, except insofar as using a computer in any public or quasi-public space might add some spice to his account. Using any other public space where a real or imaginary encounter with a young girl could have occurred, such as a wireless hotspot at a coffee shop or in a building lobby, would be equivalent. There is no reason to think there was particular dissembling about the fact that he was at a library. Moreover, there was evidence that Volungus did use places other than his home to access the internet for pornography. In the same letter to Gallardo he wrote, "Let's see . . . Advantages of a laptop – can make it disappear quickly – hard drive is very compact – can take the 'puter with you – wireless access . . . I'm using someone else's server and get hi-speed access to the net without paying for it. And as far as I can tell, it's very hard to trace. One problem though, I have found, the wireless access I use . . . 1 place has a 'net nanny,' another has a firewall that I can't send through, and the last seems o.k." (Trial Ex. 26, Bates Nos. 792-793.) His statement that he was using a library computer is very likely true.

know on the evidence available.[4] On this record, the Court cannot conclude that the government has proved other instances of "hands-on" contact.

Nonetheless, while this case stands apart from others where respondents have had an undeniable history of offending, proof of other "hands-on" sexual contact with minors is not a *sine qua non* of the government's case for commitment, though it obviously has significant evidentiary value where it is available. Rather, the focus remains on the impact of mental illness on volition. On the trial record, this Court concludes that the government has proven by clear and convincing evidence that Volungus suffers from a mental illness, abnormality, or disorder—pedophilia—that presently impairs his volitional ability to refrain from deviant behavior and that, absent abatement by effective treatment, would in the future, because of its insistent force, give him serious difficulty in refraining from actual child molestation.

Volungus has not been just a passive consumer of child pornography. Even in the viewing and downloading of internet pornography, he has been obsessively active. The cache of materials seized in 2007 contain many pages of information regarding computers, software, cameras, storage devices, screen shields, and the like. It includes a hand-drawn diagram of an intricate interconnection of IP addresses (with one node identified as "c.p. video") by which users converge in a chat room; the schematic looks like a military commander's plan for battle. (Trial Ex. 61, Bates No. 1541.) He mentored Gallardo on what computer equipment Gallardo should acquire to access the web, undoubtedly to view child pornography.

More importantly, Volungus has participated in chat rooms, like the one where he met "IndyGirl," to meet other participants who were, or who he wanted to believe were, minor

---

[4] Similarly, we cannot know whether his subsequent denials to therapists that he had ever had sex with anyone under age 18 are true. Just as he had a motive to claim such behavior in a chat room, he had a motive to deny it during his prosecution, evaluation, and imprisonment.

females (such as "facialgirl"). While these do not qualify literally as "hands-on" encounters, they were nonetheless affirmative encounters, a step beyond passive consumption.

According to Volungus, his introduction to internet child pornography occurred in the Spring of 1998. His arrest occurred on August 22, 1998. It did not take long from his first exploration of child pornography on the internet for him to be moved to make an attempt at a "hands-on" offense. In subsequent years, despite imprisonment, participation in sex offender treatment programs, recommitment for supervised release violations, and the pendency of these proceedings, his obsession with child pornography appears undiminished. When he has been in custody and "real" pornography has not been available to him, he has created it. He has also collected materials that reminded him of it. He planned how to access and share it when he was released from custody. When he has not been in custody, he has surreptitiously used a computer to access internet pornography, attempting to hide the fact by employing file-wiping software. As he looked forward to completing his original term of supervised release, (see Trial Ex. 26, Bates No. 789), he corresponded with a like-minded person to plan to travel to places where they could engage in sex with children. This was not just posturing; Volungus urged Gallardo to get a cell phone so they could speak directly about their planning. He did these things while compulsorily attending obviously ineffectual sex offender treatment sessions.

This long and persistent trajectory of obsession with child pornography—and with sex with children—counsels strongly against a conclusion that Volungus, if released, would be able to control his pedophilia and limit his activity to private masturbation sessions at his home computer. The evidence of volitional impairment by reason of his mental illness is clear and convincing.

**III.     Conclusion and Order**

Accordingly, this Court finds, by clear and convincing evidence, that the respondent John Charles Volungus is a sexually dangerous person within the meaning of 18 U.S.C. § 4247(a)(5), (6). The respondent is therefore committed to the custody of the Attorney General pursuant to and subject to the provisions of 18 U.S.C. § 4248(d).

It is SO ORDERED.


                                                               /s/ George A. O'Toole, Jr.
                                                               United States District Judge